**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

DIANE D. JONES, individually and on behalf of herself and all others similarly situated,

*Plaintiff*,

v.

REALPAGE, INC. d/b/a LEASINGDESK SCREENING,

*Defendant*.

§ § § § § § § § § § § § §

Civ. No. 3:19-cv-02087-B

**APPENDIX TO PLAINTIFF'S MOTION TO CERTIFY CLASS**

| Exhibit | Description | Beginning Page Number |
|---|---|---|
| 1 | Defendant's First Supplemental Objections and Responses to Plaintiffs' First Set of Interrogatories in Connection with Defendant's Motion to Dismiss for Lack of Personal Jurisdiction or to Transfer Venue, dated August 1, 2019 | 001 |
| 2 | Excerpts of the RealPage LeasingDesk Screening Policies & Procedures document, bearing the Bates numbers REALPAGE/JONES 000238-242 | 019 |
| 3 | Transcript of the deposition of Pavithra Ramesh, taken in this litigation on August 9, 2019 (redacted portions are filed under seal) | 025 |
| 4 | A Service Agreement between Defendant RealPage, Inc. and their vendor, Backgroundchecks.com, dated October 13, 2006 and bearing the Bates numbers REALPAGE/JONES 000188-199 | 180 |
| 5 | A series of email communications among counsel in this action, dated August 13 and August 14, 2019 | 193 |
| 6 | Defendant's First Supplemental Objections and Responses to Plaintiff Jones' First Set of Interrogatories, dated August 5, 2019 | 197 |
| 7 | Copy of the report that Defendant sold about Plaintiff Diane D. Jones, dated August 28, 2017 and bearing the Bates numbers REALPAGE/JONES 000001-03 | 209 |

| Exhibit | Description | Beginning Page Number |
|---|---|---|
| 8 | Record regarding Toni Taylor, retrieved from the web site of the Georgia Department of Corrections, accessed on August 16, 2019 | 213 |
| 9 | Certified records from the Superior Court for the County of Fulton (Georgia) regarding Toni Taylor's criminal indictment number Z 33536, obtained by Plaintiffs and redacted to remove personal information, and bearing the Bates Numbers FULTON_COUNTY_0001-0060 | 216 |
| 10 | Document titled "Criminal Search Logic," bearing the Bates numbers REALPAGE/JONES 000185-187 (filed under seal) | 277 |
| 11 | Excerpt of the RealPage LeasingDesk Screening Policies & Procedures, bearing the Bates numbers REALPAGE/JONES 000538-541, 610-623, which was marked as Exhibit 2 at the deposition of Rebecca Boyst | 281 |
| 12 | Transcript of the deposition of Rebecca Boyst, taken in this litigation on August 9, 2019 (redacted portions are filed under seal) | 300 |
| 13 | Letter from Interstate Realty Management to Diane D. Jones, bearing the Bates number DIANE_D_JONES_REALPAGE_00003 | 361 |
| 14 | Records from Defendant regarding the dispute by Diane D. Jones of items on her consumer report, bearing the Bates numbers REALPAGE/JONES 000166-181 | 363 |
| 15 | Defendant's First Supplemental Objections and Responses to Plaintiff Jones' Second Set of Interrogatories (redacted portions are filed under seal) | 380 |
| 16 | Defendant's Third Supplemental Objections and Responses to Plaintiff Jones' Second Set of Interrogatories (filed under seal) | 390 |
| 17 | Transcript of the deposition of Manjitsingh Sohal, taken in this litigation on April 17, 2020 (redacted portions are filed under seal) | 396 |
| 18 | Document titled "LDS Investigative Methods," bearing the Bates numbers REALPAGE/JONES 000790-794 (filed under seal) | 447 |
| 19 | Transcript of the deposition of Laura Lee Castiglione, taken in this litigation on December 13, 2019 (redacted portions are filed under seal) | 453 |
| 20 | Transcript of the deposition of Plaintiff Diane D. Jones, taken in this litigation on December 13, 2019 | 571 |
| 21 | Biographical summary of the law firm Francis Mailman Soumilas, P.C. | 812 |

# Exhibit 1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| **DIANE D. JONES and JAMES ARNOLD,** Plaintiffs, | Case No. 1:19-cv-501-JG |
| v. | District Court Judge James S. Gwin |
| **REALPAGE, INC. d/b/a LEASINGDESK SCREENING,** Defendant. | Magistrate Judge William H. Baughman |

**DEFENDANT'S FIRST SUPPLEMENTAL OBJECTIONS AND RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES IN CONNECTION WITH DEFENDANT'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION OR TO TRANSFER VENUE**

Pursuant to Fed. R. Civ. P. 26 and 33, Defendant RealPage, Inc. d/b/a LeasingDesk Screening, ("RealPage" or "Defendant") objects and responds to Plaintiffs' First Set of Interrogatories in Connection with Defendant's Motion to Dismiss for Lack of Personal Jurisdiction or To Transfer Venue as follows:

**PRELIMINARY STATEMENT**

Defendant has not yet completed its investigation of the facts relating to this action, has not yet completed its discovery, and has not yet completed its preparation for trial. Consequently, the following responses are provided without prejudice to Defendant's right to introduce, at the time of trial or other proceedings, subsequently discovered information relating to the proof of presently known material facts and to introduce all information, whenever discovered, relating to

the proof of subsequently discovered material facts. However, Defendant does not assume any duty of ongoing amendment to these responses.

**OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS**

1. RealPage objects to the definition of "Defendant/You/Your" insofar as it includes any "agency, subsidiary(ies), parent corporation(s) and/or any of its branches, departments, employees, agents, contractual affiliates, or others connected by legal relationship, in the broadest sense." This definition is vague, ambiguous, and woefully overly broad and unduly burdensome, given that it would encompass third parties or entities, whose information and/or documents are not within RealPage's possession, custody, or control, or whose information has no relevance or bearing on the claims or defenses at issue in this matter.

2. RealPage objects to these Requests to the extent they request documents or information that is irrelevant to the analysis of whether the Court has general personal jurisdiction over RealPage in this case, including because many of these Requests are not related to the relevant legal standard set forth by the Supreme Court in *Daimler AG v. Bauman*, 571 U.S. 117 (2014) and followed by Courts within the Sixth Circuit. *See, e.g., Ahkeo Labs LLC v. Plurimi Inv. Managers, LLP,* 293 F. Supp. 3d 741, 749 (N.D. Ohio 2018); *Maclin v. Reliable Reports of Tex., Inc.*, 314 F. Supp. 3d 845, 849 (N.D. Ohio 2018).

**RESPONSES TO INTERROGATORIES**

1. Please state the total number of employees hired by RealPage (and/or any of its subsidiaries) who either resided and/or worked in Ohio during the Relevant Time Period.

**ANSWER**: RealPage objects to this Interrogatory because it requests information that is irrelevant to the analysis of whether the Court has general personal jurisdiction over RealPage in this case, including because this Interrogatory is not related to the relevant legal standard set forth

by the Supreme Court in *Daimler AG v. Bauman*, 571 U.S. 117 (2014) and followed by Courts within the Sixth Circuit. *See, e.g.*, *Ahkeo Labs LLC v. Plurimi Inv. Managers, LLP,* 293 F. Supp. 3d 741, 749 (N.D. Ohio 2018); *Maclin v. Reliable Reports of Tex., Inc.*, 314 F. Supp. 3d 845, 849 (N.D. Ohio 2018). RealPage objects to Plaintiffs' definition of "Relevant Time Period" as "five years prior to the filing of the action and continuing through the resolution of this action," as being overly broad, including because personal jurisdiction is determined with respect to the named representative(s) and the rental screenings at issue in this action occurred in 2016 and 2017. RealPage also objects to this Interrogatory to the extent that it seeks information that constitutes confidential business, financial, commercial, and proprietary information.

Subject to and without waiving any of its objections, RealPage states that there are currently 283 employees employed by RealPage who work on the LeasingDesk team and only one of these employees, who works remotely, resides in Ohio.

2. Please state the names, addresses, and last known contact information of all employees hired by RealPage (and/or any of its subsidiaries) who either resided and/or worked in Ohio during the Relevant Time Period, including the LeasingDesk employee located in Ohio mentioned in Defendant's Motion to Dismiss and Declaration of James Hilliard filed on June 10, 2019.

**ANSWER**: RealPage objects to this Interrogatory because it requests information that is irrelevant to the analysis of whether the Court has general personal jurisdiction over RealPage in this case, including because this Interrogatory is not related to the relevant legal standard set forth by the Supreme Court in *Daimler AG v. Bauman*, 571 U.S. 117 (2014) and followed by Courts within the Sixth Circuit. *See, e.g.*, *Ahkeo Labs LLC v. Plurimi Inv. Managers, LLP,* 293 F. Supp.

3d 741, 749 (N.D. Ohio 2018); *Maclin v. Reliable Reports of Tex., Inc.*, 314 F. Supp. 3d 845, 849 (N.D. Ohio 2018). Moreover, RealPage objects to this Interrogatory to the extent it seeks disclosure of private information of its employees, which is irrelevant to the claims and defenses asserted in this litigation and which is not necessary for the purposes of deciding the existence of personal jurisdiction.

Subject to and without waiving any of its objections, RealPage identifies Christina Day, a current employee who works on the LeasingDesk team, who may only be contacted through RealPage's counsel of record.

3. Please state the total amount of RealPage's (and/or any of its subsidiaries') customers located in Ohio during the Relevant Time Period, and list separately the number of customers located in Ohio who used the LeasingDesk software during the Relevant Time Period.

**ANSWER**: RealPage objects to this Interrogatory because it requests information that is irrelevant to the analysis of whether the Court has general personal jurisdiction over RealPage in this case, including because this Interrogatory is not related to the relevant legal standard set forth by the Supreme Court in *Daimler AG v. Bauman*, 571 U.S. 117 (2014) and followed by Courts within the Sixth Circuit. *See*, *e.g.*, *Ahkeo Labs LLC v. Plurimi Inv. Managers, LLP,* 293 F. Supp. 3d 741, 749 (N.D. Ohio 2018); *Maclin v. Reliable Reports of Tex., Inc.*, 314 F. Supp. 3d 845, 849 (N.D. Ohio 2018). RealPage objects to Plaintiffs' definition of "Relevant Time Period" as "five years prior to the filing of the action and continuing through the resolution of this action," as being overly broad, including because personal jurisdiction is determined with respect to the named representative(s) and the rental screenings at issue in this action occurred in 2016 and 2017.

RealPage also objects to this Interrogatory to the extent that it seeks information that constitutes confidential business, financial, commercial, and proprietary information.

Subject to and without waiving any of its objections, RealPage states that the number of Ohio-based customers from 2016 through present is 2,804, which was approximately 3% of the total 93,466 customers who engaged RealPage during the same time period. RealPage further states that the number of screening reports requested by Ohio-based customers through the LeasingDesk platform from 2016 through present is 299,808, which was approximately 2.5% of LeasingDesk's total screening volume during that time.

4. Please state the amount of RealPage's (and/or any of its subsidiaries') annual sales transacted with, and revenues earned from, customers located in Ohio during the Relevant Time Period.

**ANSWER**: RealPage objects to this Interrogatory because it requests information that is irrelevant to the analysis of whether the Court has general personal jurisdiction over RealPage in this case, including because this Interrogatory is not related to the relevant legal standard set forth by the Supreme Court in *Daimler AG v. Bauman*, 571 U.S. 117 (2014) and followed by Courts within the Sixth Circuit. *See, e.g.*, *Ahkeo Labs LLC v. Plurimi Inv. Managers, LLP,* 293 F. Supp. 3d 741, 749 (N.D. Ohio 2018); *Maclin v. Reliable Reports of Tex., Inc.*, 314 F. Supp. 3d 845, 849 (N.D. Ohio 2018). RealPage objects to Plaintiffs' definition of "Relevant Time Period" as "five years prior to the filing of the action and continuing through the resolution of this action," as being overly broad, including because personal jurisdiction is determined with respect to the named representative(s) and the rental screenings at issue in this action occurred in 2016 and 2017.

RealPage also objects to this Interrogatory to the extent that it seeks information that constitutes confidential business, financial, commercial, and proprietary information.

5. Please describe the web traffic to RealPage's (and/or any of its subsidiaries') websites during the Relevant Time Period that originated from Ohio, including the identity of people and/or entities that accessed the websites.

**ANSWER**: RealPage objects to this Interrogatory as vague and ambiguous, specifically with respect to the undefined terms "web traffic," "websites," and "originated." RealPage objects to this Interrogatory because it requests information that is irrelevant to the analysis of whether the Court has general personal jurisdiction over RealPage in this case, including because this Interrogatory is not related to the relevant legal standard set forth by the Supreme Court in *Daimler AG v. Bauman*, 571 U.S. 117 (2014) and followed by Courts within the Sixth Circuit. *See*, *e.g.*, *Ahkeo Labs LLC v. Plurimi Inv. Managers, LLP,* 293 F. Supp. 3d 741, 749 (N.D. Ohio 2018); *Maclin v. Reliable Reports of Tex., Inc.*, 314 F. Supp. 3d 845, 849 (N.D. Ohio 2018). RealPage objects to Plaintiffs' definition of "Relevant Time Period" as "five years prior to the filing of the action and continuing through the resolution of this action," as being overly broad, including because personal jurisdiction is determined with respect to the named representative(s) and the rental screenings at issue in this action occurred in 2016 and 2017. RealPage also objects to this Interrogatory to the extent that it seeks information that constitutes confidential business, financial, commercial, and proprietary information. RealPage objects to this Interrogatory as seeking irrelevant information, as the quantum of individuals located in Ohio who have chosen to visit RealPage's website(s) has no bearing on the issue of whether RealPage is subject to jurisdiction in Ohio.

6. Please list all Ohio state or federal government agencies that monitored the activities of RealPage (and/or any of its subsidiaries) during the Relevant Time Period, including, but not limited to, all Ohio agencies that issued a license to RealPage (and/or any of its subsidiaries), and identify the number of complaints filed by customers of RealPage with each agency.

**ANSWER**: RealPage objects to this Interrogatory as vague and ambiguous, specifically with respect to the undefined terms "monitored," "activities," "agencies," "license," "complaints," and "customers." RealPage objects to this Interrogatory because it requests information that is irrelevant to the analysis of whether the Court has general personal jurisdiction over RealPage in this case, including because this Interrogatory is not related to the relevant legal standard set forth by the Supreme Court in *Daimler AG v. Bauman*, 571 U.S. 117 (2014) and followed by Courts within the Sixth Circuit. *See*, *e.g.*, *Ahkeo Labs LLC v. Plurimi Inv. Managers, LLP,* 293 F. Supp. 3d 741, 749 (N.D. Ohio 2018); *Maclin v. Reliable Reports of Tex., Inc.*, 314 F. Supp. 3d 845, 849 (N.D. Ohio 2018). RealPage objects to Plaintiffs' definition of "Relevant Time Period" as "five years prior to the filing of the action and continuing through the resolution of this action," as being overly broad, including because personal jurisdiction is determined with respect to the named representative(s) and the rental screenings at issue in this action occurred in 2016 and 2017. Moreover, RealPage objects to this Interrogatory to the extent it seeks disclosure of private information of its customers, which is irrelevant to the claims and defenses asserted in this litigation and which is not necessary for the purposes of deciding the existence of personal jurisdiction. RealPage also objects to this Interrogatory to the extent that it seeks information that constitutes confidential business, financial, commercial, and proprietary information. RealPage

objects to this Interrogatory as seeking irrelevant information, as the filing of any "complaints" by Ohio-based customers has no bearing on the issue of whether RealPage is subject to jurisdiction in Ohio.

Subject to and without waiving any of its objections, from 2016 through present, RealPage has not been the subject of any state or government agency inquiry in Ohio. RealPage further responds that it is licensed to do business in Ohio by the Ohio Secretary of State.

7. Please state the total amount of background reports compiled by RealPage (and/or any of its subsidiaries) on Ohio residents during the Relevant Time Period.

**ANSWER**: RealPage objects to this Interrogatory because it requests information that is irrelevant to the analysis of whether the Court has general personal jurisdiction over RealPage in this case, including because this Interrogatory is not related to the relevant legal standard set forth by the Supreme Court in *Daimler AG v. Bauman*, 571 U.S. 117 (2014) and followed by Courts within the Sixth Circuit. *See, e.g.*, *Ahkeo Labs LLC v. Plurimi Inv. Managers, LLP,* 293 F. Supp. 3d 741, 749 (N.D. Ohio 2018); *Maclin v. Reliable Reports of Tex., Inc.*, 314 F. Supp. 3d 845, 849 (N.D. Ohio 2018). RealPage objects to Plaintiffs' definition of "Relevant Time Period" as "five years prior to the filing of the action and continuing through the resolution of this action," as being overly broad, including because personal jurisdiction is determined with respect to the named representative(s) and the rental screenings at issue in this action occurred in 2016 and 2017. RealPage also objects to this Interrogatory to the extent that it seeks information that constitutes confidential business, financial, commercial, and proprietary information.

Subject to and without waiving any of its objections, the number of screening reports requested for individuals with Ohio addresses through the LeasingDesk platform from 2016

through present is 316,852, which was approximately 2.6% of the total 11,945,877 number of reports prepared during the same time.

8. Please state the number of background reports compiled by RealPage (and/or any of its subsidiaries) containing a record maintained by an Ohio court during the Relevant Time Period.

**ANSWER**: RealPage objects to this Interrogatory because it requests information that is irrelevant to the analysis of whether the Court has general personal jurisdiction over RealPage in this case, including because this Interrogatory is not related to the relevant legal standard set forth by the Supreme Court in *Daimler AG v. Bauman*, 571 U.S. 117 (2014) and followed by Courts within the Sixth Circuit. *See, e.g.*, *Ahkeo Labs LLC v. Plurimi Inv. Managers, LLP*, 293 F. Supp. 3d 741, 749 (N.D. Ohio 2018); *Maclin v. Reliable Reports of Tex., Inc.*, 314 F. Supp. 3d 845, 849 (N.D. Ohio 2018). RealPage objects to this Interrogatory as irrelevant because the appearance of an Ohio record on a background report has no bearing on RealPage's relationship to Ohio, given that an Ohio record could be included in a report where neither the applicant nor the property has any nexus with Ohio. RealPage objects to Plaintiffs' definition of "Relevant Time Period" as "five years prior to the filing of the action and continuing through the resolution of this action," as being overly broad, including because personal jurisdiction is determined with respect to the named representative(s) and the rental screenings at issue in this action occurred in 2016 and 2017. RealPage also objects to this Interrogatory to the extent that it seeks information that constitutes confidential business, financial, commercial, and proprietary information. RealPage objects to this Interrogatory as seeking irrelevant information, as the identification of any criminal public record

originating in Ohio by the LeasingDesk software has no bearing on the issue of whether RealPage is subject to jurisdiction in Ohio.

9. Please state the number of Ohio residents to whom RealPage sent a copy of a background report or a full file disclosure during the Relevant Time Period.

**ANSWER**: RealPage objects to this Interrogatory because it requests information that is irrelevant to the analysis of whether the Court has general personal jurisdiction over RealPage in this case, including because this Interrogatory is not related to the relevant legal standard set forth by the Supreme Court in *Daimler AG v. Bauman*, 571 U.S. 117 (2014) and followed by Courts within the Sixth Circuit. *See, e.g.*, *Ahkeo Labs LLC v. Plurimi Inv. Managers, LLP,* 293 F. Supp. 3d 741, 749 (N.D. Ohio 2018); *Maclin v. Reliable Reports of Tex., Inc.*, 314 F. Supp. 3d 845, 849 (N.D. Ohio 2018). RealPage objects to Plaintiffs' definition of "Relevant Time Period" as "five years prior to the filing of the action and continuing through the resolution of this action," as being overly broad, including because personal jurisdiction is determined with respect to the named representative(s) and the rental screenings at issue in this action occurred in 2016 and 2017. RealPage also objects to this Interrogatory to the extent that it seeks information that constitutes confidential business, financial, commercial, and proprietary information. RealPage objects to this Interrogatory as seeking irrelevant information, as RealPage's response to communications initiated by consumers in Ohio has no bearing on the issue of whether RealPage is subject to jurisdiction in Ohio.

**SUPPLEMENTAL ANSWER**: Subject to and without waiving any of its objections, the number of individuals with Ohio addresses to whom RealPage sent a report copy or a full file

disclosure, from 2016 through present, was 329, which was approximately .01% of the total volume of report copies or full file disclosures sent during that time.

10. Please identify each court runner or other vendor with an address in Ohio that RealPage has retained during the Relevant Time Period to retrieve, obtain, or review records of Ohio courts.

**ANSWER**: RealPage objects to this Interrogatory as vague and ambiguous, specifically with respect to the undefined term "court runner." RealPage objects to this Interrogatory because it requests information that is irrelevant to the analysis of whether the Court has general personal jurisdiction over RealPage in this case, including because this Interrogatory is not related to the relevant legal standard set forth by the Supreme Court in *Daimler AG v. Bauman*, 571 U.S. 117 (2014) and followed by Courts within the Sixth Circuit. *See, e.g.*, *Ahkeo Labs LLC v. Plurimi Inv. Managers, LLP,* 293 F. Supp. 3d 741, 749 (N.D. Ohio 2018); *Maclin v. Reliable Reports of Tex., Inc.*, 314 F. Supp. 3d 845, 849 (N.D. Ohio 2018). RealPage objects to Plaintiffs' definition of "Relevant Time Period" as "five years prior to the filing of the action and continuing through the resolution of this action," as being overly broad, including because personal jurisdiction is determined with respect to the named representative(s) and the rental screenings at issue in this action occurred in 2016 and 2017. RealPage also objects to this Interrogatory to the extent that it seeks information that constitutes confidential business, financial, commercial, and proprietary information.

Subject to and without waiving its objections, RealPage responds as follows: RealPage's criminal records vendor is not located in Ohio.

11. Please state the percentage of market share that RealPage (and/or any of its subsidiaries) controlled in connection with the Ohio tenant screening business during the Relevant Time Period.

**ANSWER**: RealPage objects to this Interrogatory as vague and ambiguous, specifically with respect to the undefined term "Ohio tenant screening business." RealPage objects to this Interrogatory because it requests information that is irrelevant to the analysis of whether the Court has general personal jurisdiction over RealPage in this case, including because this Interrogatory is not related to the relevant legal standard set forth by the Supreme Court in *Daimler AG v. Bauman*, 571 U.S. 117 (2014) and followed by Courts within the Sixth Circuit. *See, e.g.*, *Ahkeo Labs LLC v. Plurimi Inv. Managers, LLP,* 293 F. Supp. 3d 741, 749 (N.D. Ohio 2018); *Maclin v. Reliable Reports of Tex., Inc.*, 314 F. Supp. 3d 845, 849 (N.D. Ohio 2018). RealPage objects to Plaintiffs' definition of "Relevant Time Period" as "five years prior to the filing of the action and continuing through the resolution of this action," as being overly broad, including because personal jurisdiction is determined with respect to the named representative(s) and the rental screenings at issue in this action occurred in 2016 and 2017. RealPage also objects to this Interrogatory to the extent that it seeks information that constitutes confidential business, financial, commercial, and proprietary information.

Subject to and without waiving its objections, RealPage responds that it is unable to produce documents in response to this request, including because the precise volume of tenant screenings by other entities/individuals in Ohio is not public and not known to RealPage.

12. Please identify the usage, value and square footage of real property owned, leased or used by RealPage (and/or any of its subsidiaries) in Ohio.

**ANSWER**: RealPage objects to this Interrogatory as vague and ambiguous, specifically with respect to the undefined term "usage." RealPage objects to this Interrogatory because it requests information that is irrelevant to the analysis of whether the Court has general personal jurisdiction over RealPage in this case, including because this Interrogatory is not related to the relevant legal standard set forth by the Supreme Court in *Daimler AG v. Bauman*, 571 U.S. 117 (2014) and followed by Courts within the Sixth Circuit. *See, e.g.*, *Ahkeo Labs LLC v. Plurimi Inv. Managers, LLP,* 293 F. Supp. 3d 741, 749 (N.D. Ohio 2018); *Maclin v. Reliable Reports of Tex., Inc.*, 314 F. Supp. 3d 845, 849 (N.D. Ohio 2018). RealPage also objects to this Interrogatory to the extent that it seeks information that constitutes confidential business, financial, commercial, and proprietary information.

Subject to and without waiving its objections, RealPage responds as follows: none.

13. Please state the number of cases filed by RealPage (and/or any of its subsidiaries) in either an Ohio state court or federal court in the last ten years.

**ANSWER**: RealPage objects to this Interrogatory because it requests information that is irrelevant to the analysis of whether the Court has general personal jurisdiction over RealPage in this case, including because this Interrogatory is not related to the relevant legal standard set forth by the Supreme Court in *Daimler AG v. Bauman*, 571 U.S. 117 (2014) and followed by Courts within the Sixth Circuit. *See, e.g.*, *Ahkeo Labs LLC v. Plurimi Inv. Managers, LLP,* 293 F. Supp. 3d 741, 749 (N.D. Ohio 2018); *Maclin v. Reliable Reports of Tex., Inc.*, 314 F. Supp. 3d 845, 849 (N.D. Ohio 2018). RealPage objects to this Interrogatory as overbroad, including as to time, because personal jurisdiction is determined with respect to the named representative(s) and the rental screenings at issue in this action occurred in 2016 and 2017.

Subject to and without waiving its objections, RealPage responds as follows: none.

14. Please state the number of contracts entered by RealPage (and/or any of its subsidiaries) to supply goods and services to customers located in Ohio during the Relevant Time Period.

**ANSWER**: RealPage objects to this Interrogatory because it requests information that is irrelevant to the analysis of whether the Court has general personal jurisdiction over RealPage in this case, including because this Interrogatory is not related to the relevant legal standard set forth by the Supreme Court in *Daimler AG v. Bauman*, 571 U.S. 117 (2014) and followed by Courts within the Sixth Circuit. *See*, *e.g.*, *Ahkeo Labs LLC v. Plurimi Inv. Managers, LLP,* 293 F. Supp. 3d 741, 749 (N.D. Ohio 2018); *Maclin v. Reliable Reports of Tex., Inc.*, 314 F. Supp. 3d 845, 849 (N.D. Ohio 2018). RealPage objects to Plaintiffs' definition of "Relevant Time Period" as "five years prior to the filing of the action and continuing through the resolution of this action," as being overly broad, including because personal jurisdiction is determined with respect to the named representative(s) and the rental screenings at issue in this action occurred in 2016 and 2017. RealPage also objects to this Interrogatory to the extent that it seeks information that constitutes confidential business, financial, commercial, and proprietary information.

Subject to and without waiving any of its objections, RealPage states that the number of Ohio-based customers from 2016 through present is 2,804, which was approximately 3% of the total 93,466 customers during the same time.

15. Please identify the name and addresses of any conferences held in Ohio that were sponsored by RealPage and/or were attended by RealPage employees during the Relevant Time Period.

**ANSWER**: RealPage objects to this Interrogatory because it requests information that is irrelevant to the analysis of whether the Court has general personal jurisdiction over RealPage in this case, including because this Interrogatory is not related to the relevant legal standard set forth by the Supreme Court in *Daimler AG v. Bauman*, 571 U.S. 117 (2014) and followed by Courts within the Sixth Circuit. *See, e.g.*, *Ahkeo Labs LLC v. Plurimi Inv. Managers, LLP,* 293 F. Supp. 3d 741, 749 (N.D. Ohio 2018); *Maclin v. Reliable Reports of Tex., Inc.*, 314 F. Supp. 3d 845, 849 (N.D. Ohio 2018). RealPage objects to Plaintiffs' definition of "Relevant Time Period" as "five years prior to the filing of the action and continuing through the resolution of this action," as being overly broad, including because personal jurisdiction is determined with respect to the named representative(s) and the rental screenings at issue in this action occurred in 2016 and 2017.

Dated: August 1, 2019

By: */s/ Timothy St. George*

Ronald I. Raether, Jr. (OH State Bar. 67731)
**Troutman Sanders LLP**
5 Park Plaza, Suite 1400
Irvine, CA 92614
Tel: (949) 622-2700
Fax: (949) 622-2739

Timothy St. George (pro hac vice)
**Troutman Sanders LLP**
1001 Haxall Point
Richmond, Virginia 23219
Telephone: (804) 697-1200
Facsimile: (804) 698-1339

Attorneys for Defendant
RealPage, Inc.

**VERIFICATION**

I, James Hilliard, state that I have read the foregoing RealPage, Inc.'s First Supplemental Responses to Plaintiffs' First Set of Interrogatories in Connection with Defendant's Motion to Dismiss for Lack of Personal Jurisdiction or To Transfer Venue ("Responses"), and that while I do not have personal knowledge of all of the facts recited in these Responses, the information contained has been collected and made available to me by others, and these Responses are true to the best of my knowledge, information, and belief based upon the information made available to me; and that these Responses are verified on behalf of RealPage, Inc. in this litigation.

Executed on August 1, 2019

______________________________

**CERTIFICATE OF SERVICE**

I hereby certify that I have served a copy of the foregoing document by electronic mail and U.S. first class mail on this the 1st day of August 2019:

John Soumilas, Esq.
James A. Francis, Esq.
Lauren KW Brennan, Esq.
Francis & Mailman
Land Title Building, 19th Floor
100 South Broad Street
Philadelphia, PA 19110
Email: jfrancis@consumerlawfirm.com
jsoumilas@consumerlawfirm.com
lbrennan@consumerlawfirm.com

Daniel Cohen, Esq.
Edward Y. Kroub, Esq.
Cohen & Mizrahi LLP
300 Cadman Plaza West, 12th Floor
Brooklyn, NY 11201
Email: dan@cml.legal
edward@cml.legal

Stephen M. Bosak, Esq.
Matthew A. Dooley, Esq.
O'Toole McLaughlin Dooley & Pecora
5455 Detroit Road
Sheffield Village, OH 44054
Email: sbosak@omdplaw.com
mdooley@omdplaw.com

*/s/ Jessica R. Lohr*
Jessica R. Lohr

*Attorney for Defendant, RealPage, Inc. d/b/a Leasing Desk*

# Exhibit 2

# RealPage LeasingDesk Screening Policies & Procedures

This document contains the current policies and procedures relating to the LeasingDesk Screening Product and interactions with consumers.

## Table of Contents

General Introduction ........ 1

The Role of the Product Support Team ........ 1

The Role of the Screening Operations Team ........ 2

The Role of the Manager of the Screening Operations Team ........ 2

The Role of the Consumer Dispute Team ........ 2

The Role of the Legal Team ........ 2

Review and Update of Manual ........ 3

Initial Documentation of a Consumer Inquiry ........ 5

- Creating and Locating Salesforce contacts ........ 5
- Assigning an Action Plan ........ 8
- If a Third Party is Calling on Behalf of a Consumer ........ 10
- Creating the Consumer Electronic Folder ........ 11
- Classification of Consumer Inquiry – Consumer Dispute E-Mail Inbox ........ 12
- Closing the Case in Salesforce ........ 15
- Adding Count to the Daily Production Log ........ 16
- Moving E-mail Items for Completed Requests ........ 16

Consumer Query Regarding Appearance of RealPage on Consumer Report ........ 17

- A “Who is RealPage” General Query Defined ........ 17
- Responding To A “Who is RealPage” Query ........ 17
- If A Third Party is Calling on Behalf of a Consumer ........ 18
- Creating and Sending the Who Is RealPage General Query Response Letter ........ 18
- Closing the “Who is RealPage” General Query in Salesforce ........ 20

Request for Disclosure of Consumer File ........ 21

- Initial Contact from Consumer ........ 21
- If A Third Party is Calling on Behalf of a Consumer ........ 21
- Sending Instructions for Obtaining the File to the Consumer ........ 21
- Consumer Identity Verification Process ........ 23
- Creating a Copy of the Consumer File ........ 24
- Delivering a Copy of the Consumer File to the Consumer ........ 39

Close the Case in Salesforce ........ 41
Consumer Disputes ........ 42
General Process for all Consumer Disputes ........ 42
Request for Consumer Dispute Form by US Mail or Fax ........ 43
If A Third Party is Calling on Behalf of a Consumer ........ 44
Receipt of Consumer Dispute Form ........ 44
Timing of Response for All Consumer Disputes ........ 47
Consumer Disputes regarding TeleCheck Information ........ 47
Consumer Dispute regarding Credit Report ........ 51
Retrieving Disputed Items from the Consumer's Report Copy ........ 52
If Dispute involves information from CSC/Equifax ........ 56
If Dispute involves information from Experian ........ 61
Close the Case in Salesforce ........ 68
If Dispute involves information from TransUnion ........ 68
Consumer Dispute regarding Criminal Report ........ 69
Retrieving Disputed Items from the Consumer Report ........ 69
Enter the Criminal Dispute in Test Director ........ 74
Investigation of the Dispute by Consumer Dispute Team ........ 77
Communicating the Reinvestigation Results to the Consumer ........ 81
Suppression of Records and/or Changes to Information in RealPage Database ........ 82
Closing the Case in Salesforce ........ 82
Consumer Dispute involving Eviction Filings & Judgments Report ........ 83
Retrieving Items in Dispute from the Consumer's Report ........ 83
Enter the Eviction Filings & Judgments Dispute in Test Director ........ 88
Investigation of the Dispute by Consumer Dispute Team ........ 89
Communicating the Reinvestigation Results to the Consumer ........ 93
Suppression of Records and/or Changes to Information in RealPage Database ........ 93
Closing the Case in Salesforce ........ 94
Consumer Dispute involving Rental History ........ 95
Request by Consumer to Provide Copy of Updated File ........ 100
Adding a Consumer Statement to a Consumer File ........ 109
Request for Statement of Disagreement Form by US Mail or Fax ........ 109

Receipt of Statement of Disagreement Form ..... 111

Enter the Statement of Disagreement Request in Test Director ..... 112

Adding the Statement to the Consumer's File - Consumer Dispute Team ..... 113

Closing the Case in Salesforce ..... 113

Adding a Fraud Alert to a Consumer File ..... 117

Consumer Services Line ..... 118

Consumer Support Website ..... 120

Authorization for Disclosure Form ..... 131

Consumer Request for Disclosure of Consumer File Instructions ..... 133

Request for Disclosure of Consumer File Form ..... 134

Incomplete Information Notice Letter ..... 136

Report Copy Transmittal Letter ..... 137

Report Copy Response Matrix ..... 148

CONSUMER DISPUTE FORM ..... 150

Incomplete Information Letter – Dispute ..... 151

Template for TD Consumer Dispute Escalation ..... 152

Telecheck Notice Letter ..... 153

TeleCheck Non-Response Letter ..... 154

Equifax/CSC Non-Response Letter ..... 155

Experian Non-Response Letter ..... 156

TransUnion Non-Response Letter ..... 157

Reinvestigation Results Letter ..... 158

Rental History Dispute Notice Letter to Property/PMC ..... 168

Updated File & Inquiry Report Transmittal Letter ..... 169

Statement of Disagreement Transmittal Letter and Form ..... 182

Statement of Disagreement Form ..... 183

Statement of Disagreement Closing Letter ..... 184

Revision Guide ..... 185

## General Introduction

As part of its service to RealPage customers (primarily multi-family apartment communities), RealPage provides tenant applicant screening services. Applicant Screening refers to a collection of products and services sold by RealPage intended for use by RealPage customers for the purpose of making leasing decisions in the course of the RealPage customer's business operations. This designation spans all RealPage platforms and service offerings; including "Legacy" screening, OneSite Screening and Domin-8 screening. Legacy screening is a service conducted by RealPage for small property management companies that do not use a computer based management system. The management company sends in the screening request by fax and reports are then run on the consumer at the RealPage offices and returned to the Customer by fax. Domin-8 screening is a screening service offered by RealPage's Domin-8 business unit and generated through the Domin-8 product lines.

This manual is designed to provide guidance to the Product Support team, Screening Operations Team and the Consumer Dispute Team in dealing with consumer inquiries.

It is the goal of LeasingDesk Screening to provide a service to RealPage customers that allows them to make leasing decisions that are in the best interests of its apartment community. It is also the goal of LeasingDesk Screening to provide consumer reports that are accurate and complete.

All members of the Product Support Team, Screening Operations Team and Consumer Dispute Team should be aware that every consumer is different and may require different handling and treatment, depending on the situation. While these policies are designed to guide the Product Support Team, Screening Operations Team and Consumer Dispute Team in the handling of consumers, it should not replace good judgment and discretion. If you have a consumer with a unique situation, one that is not covered by the procedures in this manual or one you have not encountered before, please escalate the consumer to the Manager of the Screening Operations Team or to the legal department, if necessary. Any contact from an attorney, or any other governmental agency or representative on behalf of a consumer should be immediately reported to the RealPage legal department by submitting an urgent Legal Support Request using the Sharepoint site.

RealPage and LeasingDesk are committed to following all state and federal laws that are applicable to LeasingDesk. The policies and procedures set forth in this manual are intended to assist LeasingDesk with its compliance efforts.

## The Role of the Product Support Team

The role of the Product Support call center is to handle all initial consumer inquiries coming to RealPage through the Consumer Services Line or through RealPage general product support. Product Support will attempt to answer consumers' questions regarding why RealPage has appeared on their consumer credit report and can provide forms to the consumer for requesting a copy of their RealPage consumer file or submitting a dispute. Product Support will also escalate to the Screening Operations Team any

# Exhibit 3

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO

DIANE D. JONES and JAMES ARNOLD, individually and on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

Case No. 1:19-cv-501-JG

REALPAGE, INC., d/b/a LeasingDesk SCREENING,

Defendant.

VIDEOTAPED AND ORAL DEPOSITION OF PAVITHRA RAMESH, produced as a witness at the instance of the Plaintiffs, and duly sworn, was taken in the above-styled and -numbered cause on August 9, 2019, from 11:05 a.m. to 3:49 p.m., before Christine Simons, CSR in and for the State of Texas, reported by machine shorthand, at RealPage, Inc., 2201 Lakeside Boulevard, Richardson, Texas, 75082, pursuant to the Federal Rules of Civil Procedure.

SUMMIT COURT REPORTING, INC.
Certified Court Reporters and Videographers
1500 Walnut Street, Suite 1610
Philadelphia, Pennsylvania 19102
424 Fleming Pike, Hammonton, New Jersey 08037
(215) 985-2400 * (609) 567-3315 * (800) 447-8648
www.summitreporting.com

A P P E A R A N C E S

FOR THE PLAINTIFFS:

By: John Soumilas, Esq. (via videoconference)
FRANCIS & MAILMAN, P.C.
1600 Market Street
Suite 2510
Philadelphia, Pennsylvania 19103
Phone: (215) 735-8600
E-mail: jsoumilas@consumerlawfirm.com

By: Lauren KW Brennan, Esq. (via videoconference)
FRANCIS & MAILMAN, P.C.
1600 Market Street
Suite 2510
Philadelphia, Pennsylvania 19103
Phone: (215) 735-8600
E-mail: lbrennan@consumerlawfirm.com

By: Edward Kroub, Esq. (via telephone)
COHEN & MIZRAHI LLP
300 Cadman Plaza West
12th Floor
Brooklyn, New York 11201
Phone: (929) 575-4175
E-mail: edward@cml.legal

FOR THE DEFENDANT:

By: Ronald I. Raether, Jr., Esq.
TROUTMAN SANDERS, LLP
5 Park Plaza
Suite 1400
Irvine, California 92614
Phone: (949) 622-2722
E-mail: ron.raether@troutman.com

By: Jessica R. Lohr, Esq.
TROUTMAN SANDERS, LLP
11682 El Camino Real
Suite 400
San Diego, California 92130
Phone: (858) 509-6044
E-mail: jessica.lohr@troutman.com

By: Martin Thornthwaite, Esq.
VP, ASSOCIATE GENERAL COUNSEL, REALPAGE, INC.
2201 Lakeside Boulevard
Richardson, Texas 75082
Phone: (877) 325-7243 E-mail:
martin.thornthwaite@realpage.com

ALSO PRESENT:

Chase Huddleston, Videographer

INDEX

| WITNESS | PAGE |
|---|---|
| PAVITHRA RAMESH | |
| EXAMINATION | |
| By Mr. Soumilas | 6 |

EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 - | Plaintiff Diane D. Jones' Revised Notice of Deposition | 7 |
| 2 - | Plaintiff's Revised Notice of Deposition Pursuant to Fed. R. CIV. P.30(b)(1) | 9 |
| 3 - | Screening Detail Report | 21 |
| 4 - | Criminal Search Logic | 41 |
| 5 - | Examples Sheet | 84 |
| 6 - | Defendant's Objections and Responses to Plaintiff Jones' First Set of Interrogatories | 98 |

THE VIDEOGRAPHER: We are now on the record for the video deposition of Pavithra Ramesh. The time is 11:05 on August 9th, 2019, in the matter of Diane D. Jones, et al versus RealPage, Inc., et al, Civil Action No. 1:19-cv-501-JG, being held in the United States District Court for the Northern District of Ohio.

The court reporter is Christine Simons, and the videographer is Chase Huddleston.

Today's deposition is being held at RealPage, Inc., in Richardson, Texas.

Will counsel please state their appearance for the record.

MR. SOUMILAS: For the plaintiff, Diane D. Jones, this is John Soumilas. My colleague Lauren Brennan is also participating in this deposition today. We are both located in Philadelphia and are participating remotely via video connection.

MR. KROUB: This is Edward Kroub, also representing the plaintiff, from Cohen and Mizrahi. I am also participating via telephone.

MR. RAETHER: Ronald Raether and Jessica Lohr of Troutman Sanders on behalf of defendant, RealPage, Inc.

MR. THORNTHWAITE: Martin Thornthwaite for RealPage, Inc.

MR. SOUMILAS: And before we swear the witness, just one correction for the record. This is a Rule 30(b)(6) deposition of RealPage, Inc., not of the witness, Ms. Ramesh, individually.

Swear in the witness.

PAVITHRA RAMESH,

after having been first duly sworn, was examined and testified on her oath as follows:

EXAMINATION

BY MR. SOUMILAS:

Q. Would you please state your full name for the record, please.

A. Could you repeat the question, please? Sorry.

MR. RAETHER: John, we're having connection problems, so I don't know if you heard the witness.

MR. SOUMILAS: I did not hear the witness. We'll do take two, as they say in Hollywood, and try again.

Q. Good morning. Would you please state your complete name for the record.

A. Good morning. My name is Pavithra Ramesh.

Q. Ms. Ramesh, my name is John Soumilas. I'm an attorney for Diane D. Jones who has brought a lawsuit in the United States District Court for the Northern District of Ohio in Cleveland against RealPage, Inc.

I'm here today to take a deposition of a corporate representative of the defendant, RealPage, Inc., pursuant to Ms. Jones' revised notice of deposition --

MR. SOUMILAS: -- which I'll ask the court reporter now to mark as Ramesh 1 for purposes of today's proceedings.

THE REPORTER: Can we go off the record? Can we go off the record?

MR. RAETHER: Yes.

THE VIDEOGRAPHER: We are now off the record. The time is 11:09 a.m.

(Discussion held off the record.)

(Exhibit No. 1 marked.)

THE VIDEOGRAPHER: We are now back on the record. The time is 11:10 a.m.

Q. (BY MR. SOUMILAS) And Ms. Ramesh, do you now have in front of you the document that we've marked as Ramesh 1 for purposes of these proceedings?

A. I do.

Q. And do you understand that this is a notice of deposition in which we asked RealPage to designate one or more people to testify on the 18 subject matters listed in this notice?

A. I do.

Q. And do you understand that the company has designated you to testify about several of those categories listed in the notice?

A. I do.

MR. SOUMILAS: And just to make this efficient, Counsel, could we stipulate that the defendant has designated Ms. Ramesh for topics 1, 2, 3, 4, 5, 6, 7, 8, 10, 12, 13, 14, and 16A and B?

MR. RAETHER: Yes.

THE WITNESS: I think I have a different set of documents.

Q. Now, Ms. Ramesh, you --

MR. RAETHER: Hold on, John -- John, hold on. You marked the interrogatory responses. We have the wrong document marked.

MR. SOUMILAS: Let's go back to the plaintiff Diane D. Jones' revised notice of deposition, that's what we're referring to.

THE REPORTER: Sorry about that.

THE WITNESS: Thank you. Now I do.

Q. All right. So just to clarify the record, now that we have the correct notice of deposition in front of you, Ms. Ramesh, are you aware that you are testifying on behalf of RealPage, Inc., in this case on those topics within this notice that we just stipulated

with your lawyer the company has designated you to speak on?

A. Yes.

Q. All right.

MR. SOUMILAS: I would also like to mark a second deposition notice for purposes of today's proceedings. This is a 30(b)(1) deposition notice, and let's call that Ramesh 2, please.

Q. Let me know when you have that in front of you.

(Exhibit No. 2 marked.)

THE REPORTER: I have it marked.

Q. All right. So Ramesh 2 should be a three-page document called Plaintiff's Revised Notice of Deposition Pursuant to Fed. R. Civ. P. 30(b)(1). Do you have that in front of you, ma'am?

A. I do.

Q. And have you seen this before?

A. Yes, yesterday.

Q. This document asks for RealPage to designate someone to speak on RealPage's search and/or query capabilities regarding consumer report data, and also the person who queried any databases to answer the plaintiff's discovery in this case, the subject of a court order. Do you see that?

A. Yes, I do.

Q. And are you also prepared today to testify in that capacity?

A. Yes, I am.

Q. All right. So Ms. Ramesh, all of your testimony today, that is, as someone speaking on behalf of RealPage on those designated subject areas where you've been permitted to testify on behalf of the company, you've done that before in your life, correct?

A. Yes, I have.

Q. And how many times?

A. Once.

Q. Was that in the Jackson versus RealPage case, which was a case in Tennessee?

A. Yes.

Q. In preparing for today, have you had the opportunity to review your testimony from the Jackson versus RealPage case?

A. No, I haven't.

Q. Have you ever reviewed your testimony -- the testimony that you gave in the Jackson versus RealPage case?

A. Yes, I did.

Q. Did you have the chance to make any corrections to that testimony?

A. There was one minor correction, but nothing

major.

Q. Other than that minor typographical-type correction, was that testimony that you gave in the Jackson versus RealPage accurate?

A. Yes, it was.

Q. Okay. Now in preparing to give testimony today in this case, could you tell us what you did to prepare?

A. I reviewed the screening reports of Ms. Jones and Mr. Arnold, and then walked through what I was expected to answer in the deposition today.

Q. Other than the lawyers who are in the room with you today, did you meet with anyone in order to prepare to give testimony today?

A. No.

Q. And other than the documents that you've identified already, did you review any other documents to prepare you to testify today?

A. No, I did not.

Q. I take it you presently work for RealPage, correct?

A. I do, yeah.

Q. What's your title, ma'am?

A. I am a senior product manager for screening.

Q. I'm sorry, did you say project manager?

A. Product manager.

Q. How long have you had the product manager position?

A. From March of 2018.

Q. And how long have you worked for RealPage overall?

A. For three years, started in July 2016.

Q. What was your -- positions did you hold with RealPage before product manager?

A. I was a data scientist for RealPage.

Q. Any other position?

A. No.

Q. Would you please explain your basic duties and responsibilities as a data scientist?

A. As a data scientist, I worked on any algorithm that the screening product used, it included criminal matching logic, and then the financial scoring algorithm. I also did an ad hoc analysis for clients when they came with questions, specific to their business and their requirements.

Q. And since you've been a project manager, what type of duties and responsibilities have you had for RealPage?

MR. RAETHER: Objection to form.

A. Product manager, and since I've been a product manager --

Q. I'm sorry -- I'm sorry, I made a mistake there inadvertently. Is it product manager?

A. Yes.

Q. Okay. I'm sorry.

A. No problem.

Q. Please finish your answer.

A. As the product manager, I oversee the team that works with consuming the data -- criminal data from our vendors, criminal and landlord/tenant data from our vendors.

I also work to keep the data science roadmap going, understand where we can make improvements. I work with clients to get their feedback on the product, work with marketing operations to ensure that we have internal tools.

Q. Ms. Ramesh, presently do you have people who report to you?

A. I do.

Q. How many?

A. Two of them, direct reports.

Q. What do the direct reports do?

A. Could you repeat that question? Sorry.

Q. Yes, what do your direct reports do for you?

A. Oh, both of them are involved in consuming the data that we get from our vendors in terms of criminal

and landlord/tenant data information, so they are involved in taking it, standardizing it in a way that we can consume the data for -- to provide screening reports, monitor it for completeness -- and what I mean completeness, to ensure that the data is most up-to-date -- push it to production, and if there's any changes that's required to be made in the data as a part of the dispute process, they also handle that part.

Q. Who are those two people who work for you, what are their names?

A. Megan Hartman and Robert Gonzalez.

Q. Do you report to anyone yourself?

A. Do -- can you say that, again? Sorry, the connection is pretty bad.

Q. Okay. I'm sensing some of that on my end as well.

I'm trying to figure out whether you have a direct supervisor.

A. I do. He's the director of product, and he oversees all product management for screening.

Q. And who is that?

A. Manjit Sohal.

Q. Could you try that one more time because I didn't hear it?

A. Manjit Sohal, that's his name.

Q. Could you help us with the spelling?

A. Sure. M-A-N-J-I-T, Manjit, Sohal, S-O-H-A-L.

Q. Prior to working for RealPage, could you summarize for us your work experience?

A. For sure. Prior to working for RealPage, I was initially a research associate at UT Dallas for two semesters, and then I was a consultant with Hewlett Packard Enterprise for about a year, and then I joined RealPage as a data scientist.

Q. Again, in summary form, could you tell us what your educational background is, ma'am?

A. Absolutely. I have a bachelor's from India in biotechnology and a master's in operations research with a minor in statistics from the Ohio State University.

Q. I want to next turn our attention to some of the topics for which you are designated to testify today on behalf of RealPage, and let's start with No. 1 in the Revised Notice of Deposition under Rule 30(b)(6). It asks for someone to testify about RealPage's process for gathering public record information. Do you see that?

A. Yes, I do.

Q. And how are you familiar with that process?

A. So my -- the team, Megan and Rob, are the ones responsible for gathering this information from our vendors, and because I oversee them, I have a close

understanding of what their process is and what RealPage's process is.

Q. All right. So you've mentioned the word "vendors" multiple times, who do you mean when you use that term?

A. For criminal bulk data, we use Genuine Data Services, and we also have out-of-network searches with backgroundchecks.com, and for landlord/tenant data, we have LexisNexis.

Q. So these are private companies that sell information about public records to RealPage?

A. I don't know if they're private, but yes, they are companies that sell public records, criminal and landlord/tenant, to RealPage.

Q. And am I correct that the basic part of the business is that RealPage investigates and does background reports on tenant applicants and tries to determine whether any of those applicants have a criminal background or some eviction-type record with -- with a prior landlord?

MR. RAETHER: Objection, vague and ambiguous.

A. We provide a comprehensive screening report based on the property's criteria, so criminal and landlord/tenant could be included if the property wants

it. We also do rental history and credit checks, so it depends on what the property has said and asked for.

Q. Okay. That's helpful.

With respect to Genuine Data Services, you said that RealPage acquires bulk criminal data is I believe what you called it; is that correct?

A. That is correct, yes.

Q. Could you pinpoint what bulk criminal data is?

A. For sure. So Genuine Data Services gathers public records information across different jurisdictions and provides it to us in a regular cadence, it provides updates to us in a regular cadence as a file, which we then maintain in our severs, SQL severs, which is what we call bulk data. It makes searching easier and instantaneous.

Q. And am I correct that Genuine Data Services focuses on criminal records?

A. Yes.

Q. What does backgroundchecks.com focus on?

A. They also focus on criminal records, but they focus on county-level criminal records, things that we cannot get in the bulk data, either because it's not readily available or there's reasons why the jurisdiction cannot provide it to the bulk. So in those cases, they send a court runner to gather the

information and send it back to us.

Q. And I take it -- you said LexisNexis focuses on landlord/tenant activities such as your rent and whether you've been evicted and things like that?

A. LexisNexis gives us landlord/tenant court records, so if an eviction was filed, dismissed, discharged, we would have information from LexisNexis.

Q. All right. Are you familiar in this case with where the records for the plaintiff, Diane Jones, came from?

A. You mean, which vendor it came from?

Q. Yes, which vendor provided the records that made their way onto a background report for the plaintiff, Diane Jones.

A. Yes, I am familiar with it.

Q. And have you reviewed the particular transaction involving Ms. Jones?

A. Yes.

Q. Have you seen the report prepared about her and delivered to a potential landlord about her?

A. Yes, I did review the report.

Q. Now, for how long has RealPage used vendors to gather criminal public record information?

A. I don't know the exact number of years or the exact answer.

Q. As long as you've been with the company, vendors were the source?

A. Yes, that's correct.

Q. And do you know of a time prior to when you joined where RealPage went to government agencies directly for criminal records information as opposed to using a vendor?

A. Not that I know of.

Q. Do you have any responsibility for deciding whether a vendor should be used to gather criminal records data as opposed to getting data directly from the government offices or courthouses?

A. No, I do not.

Q. Do you know the reason behind RealPage's decision to use a vendor to gather this information about criminal records as opposed to getting it directly itself?

A. The reason that I do know is the data landscape keeps changing, and it's hard to keep up with the different jurisdictions and their way of reporting, and so we use a vendor who can get us that information, keep up with the compliance changes and the changing landscape, and give us the data on a regular cadence.

Q. Have you ever seen any type of an analysis at RealPage as to what it would cost it to keep up with

getting the data itself directly from the government and courthouses?

A. No, I have not.

Q. By that I mean the criminal records data.

A. No. I have not.

Q. (Inaudible.)

THE REPORTER: Could you start over?

MR. SOUMILAS: Yes.

Q. Are you aware whether there is a contract between Genuine Data Services and RealPage which governs the pricing for criminal records information that RealPage buys from Genuine Data Services?

A. There is a contract.

Q. Is it a separate contract with Genuine Data Services and a separate one from backgroundchecks.com, or is it one and the same contract?

A. I don't know the answer to that.

Q. Do you know how much on the average RealPage pays Genuine Data Services per bulk record that it acquires from that vendor?

A. No, I do not.

Q. When you reference a bulk record, do you know whether Genuine Data Services is delivering the complete court record for that particular crime to RealPage as part of the --

THE REPORTER: I didn't hear the end of the question. Could you restate that?

MR. SOUMILAS: Yes.

Q. As part of the contractual relationship between Genuine Data Services and RealPage, do you know whether Genuine Data Services is required to go out and acquire the complete court record for any crime to deliver it as part of these bulk deliveries of data to RealPage?

A. Yes, they are.

Q. So let's just make sure I understand your testimony in that regard, and to help with that, I want to show you a document, which we'll mark as Ramesh 3 for purposes of today's proceedings. It has Bates numbers RealPage Jones 1 through 3.

(Exhibit No. 3 marked.)

THE REPORTER: I have it marked.

Q. Okay. Ms. Ramesh, have you seen this document before?

A. I have.

Q. What is it?

A. Say that again? Sorry.

Q. What is it?

A. Yesterday.

Q. I'm sorry. So what is this document, could you identify it for the record, please?

A. This is a screening report for Diane D. Jones that was run on the 15th of August, 2017.

Q. And if you look at the last page of this report, it appears that this was a report delivered from RealPage to a landlord called Marietta Road 7302 59?

A. Yes. I see that.

Q. And also on that third page of the report, there is some criminal history that is listed there for the plaintiff, Ms. Jones, correct?

A. Correct.

Q. All right. Looking about midway down on the page under source and vendor information, are you in that column?

A. Yes, sir.

Q. (Inaudible) is the vendor for this particular record, correct?

THE REPORTER: Could you restate that -- or say it again? It cut out.

MR. SOUMILAS: Yes, I'm sorry, there's a lot of background noise. I don't know how to control that.

Q. But the question is whether Genuine Data Services is the vendor for this criminal record that appears on Ms. Jones' August 2017 report?

A. Yes, that is correct.

Q. And that is because RealPage, you know, daily uses Genuine Data Services to acquire bulk criminal data you said?

A. That is correct, yes.

Q. (Inaudible.)

A. Sorry, could you repeat that?

Q. I'm sorry?

A. Could you repeat -- could you repeat that, please?

Q. (Inaudible) as the vendor source for this information?

THE REPORTER: The first part cut out again.

Q. I'm sorry, I'll try again. Is there anything unusual about the fact that we see Genuine Data Services as the vendor source for this information?

A. No, nothing unusual.

Q. And then it tells us that Genuine Data Services is pulling records from something called GADOCSPL. Do you see that on the left side of that same line?

A. Yes, I do.

Q. Do you know what that is?

A. It is -- it's a jurisdictional code that Genuine Data Services uses to tell us where the -- which jurisdiction they're pulling that information from.

Q. Okay. Do you know specifically what jurisdiction this is for this particular record?

A. There's the source right next to the code, which is Georgia Correction supplemental, so this is a Georgia Department of Corrections supplemental source.

Q. Okay. So going back to my question of a few minutes ago, regularly does Genuine Data Services go to the court and obtain the complete record -- court record for the crime, or does it go to the Department of Corrections and obtain some information from the supplemental database there?

A. I don't know their exact means of collecting records.

Q. Okay. Do you know specifically whether Genuine Data Services will go to the court where the conviction occurred and obtain any court records from the court, as opposed to the Department of Corrections?

A. Again, I don't know what their method of collection is.

Q. Do you know whether the Department of Corrections' records from Georgia are available for free online?

A. I don't know.

Q. Looking at the data above the source and vendor information, would this be the actual bulk data that

Genuine Data Service would have delivered to RealPage concerning this criminal offense?

A. Yes.

Q. And is what's displayed in the report all of the data that Genuine Data Services delivers to RealPage about a crime, or does RealPage hold any of the data back before reporting it?

A. There -- there could be instances where there's -- I'm not sure about Georgia Corrections supplemental, but there could be instances where we get tattoo information or scar information and so we don't display any of that. But in the offense table, everything that we get, if we get it, will be displayed in those columns.

Q. Okay. Is the way Genuine Data Services collected information about the criminal records that we see on the Jones report, which we have here marked as Ramesh 3, the typical way in which criminal records information is collected?

MR. RAETHER: Objection, form.

A. Could you repeat that question for me or restate it?

Q. Is there -- is the information that we see in Ramesh 3 about the criminal records information the typical way in which RealPage obtains criminal record

information from Genuine Data Services?

MR. RAETHER: Objection to form.

A. No, the way we see it is not the way RealPage obtains it.

Q. I'm sorry, you said the way you see it is not the way RealPage updates it?

A. The way we see it in the report is not the way we get that information from GDC, or Genuine Data Services.

Q. Is it in a different format?

A. Yes. It's all in bulk data, it's in multiple tables stored in our SQL servers.

Q. Do you have any reason to believe that in the case of Diane Jones that the data was delivered in any different way other than the usual bulk data way?

A. No, no reason to believe that.

Q. Was it conformed to fit the report in any different way other than the usual way in which that bulk data is conformed to be displayed on a background report?

A. No, no difference.

Q. Okay. So the way this particular record from Genuine Data Services made its way to be displayed on Ms. Jones' report is the usual process of how criminal records are obtained by RealPage and then displayed on a

particular consumer's report. Would you agree with that?

A. It follows -- yes, it does follow the process.

Q. The usual process, correct?

A. I don't know what you mean by "usual process," but it follows the process where we update the data into our -- into our servers and then there's the whole pulling the data specific for this consumer, so there's -- it depends on -- it depends on the input and -- at that point of time.

Q. Okay. Let me clarify that because it's important. What I mean by the "usual process" is that what you would expect the process to be was followed in the case of Ms. Jones; would you agree with that?

A. Yes, that I agree.

Q. And we don't see anything in the Jones report to suggest that some part of the usual process broke down and half of the data is missing or it's not conformed in a normal way, it appears how it would normally appear if the process is followed?

A. Yes, that is correct.

Q. (Inaudible.)

THE REPORTER: Could you start over?

Q. And the normal process was followed in the case of Ms. Jones, correct?

MR. RAETHER: Objection, form.

A. Yes, the same system was used to pull this report.

Q. What is the name of that system?

A. It's our LeasingDesk screening.

Q. I'm sorry, could you say that one more time? I couldn't hear it.

A. Sure, it's our screening application system.

Q. Does the screening application system have a name internally?

A. LeasingDesk.

Q. Okay. So then we can agree that Ms. Jones' report that we see here as Ramesh 3 was generated through the screening desk -- I'm sorry, the LeasingDesk screening application system as any report would be prepared, correct?

A. That is correct, yes.

Q. The criminal data came from Genuine Data Services like it would usually come for any particular criminal record, correct?

A. That is correct.

Q. And you're not aware what specifically Genuine Data Services did to acquire this data, correct?

A. That is correct.

Q. And you're not aware whether they went online

somewhere or they paid for it or they got it for free or they sent a runner to a courthouse or how exactly they got it, correct?

A. Yeah, I don't have that information.

Q. And you don't know whether they got all of the data publicly available for this crime either, do you?

A. Could you repeat that again? Sorry.

Q. Are you aware if Genuine Data Services got all of the publicly available information for this criminal offense and delivered it to RealPage?

A. That -- do I know that? Is that the question?

Q. Yes.

A. No.

Q. Yes. Okay. Well, let me back up. Other than the information from the Georgia Department of Corrections Genuine Data Services delivered to you about this criminal offense, was there any other government source for criminal information here?

MR. RAETHER: Objection to form.

A. No.

Q. Let me see if I can clarify that. If we look at Ms. Jones' report at page 3, right above Genuine Data Services, do you see that it has some information about the offense at issue?

A. Yes.

Q. It says that -- a narcotics-related offense, correct?

A. Yes.

Q. And it says that it's from the Fulton County court; do you see that?

A. I do see that, yes.

Q. Did RealPage receive any information from the Fulton County court about the narcotics offense that made its way onto the Jones report?

A. No, we did not.

THE REPORTER: The first couple words of that question didn't come through.

MR. SOUMILAS: So that sounds important. I'll repeat it.

Q. I want to know whether RealPage received any information from the Fulton County court concerning the narcotics offense that we see displayed on the third page of Ms. Jones' report?

A. Not directly from Fulton County, no.

Q. Okay. And through Genuine Data Services, did RealPage receive any information from Fulton County concerning the narcotics crime that's on page 3 of the Jones report?

A. Not that I know of.

Q. Have you ever seen information from Fulton

County concerning this particular crime?

A. Not -- not particular to this crime, no.

Q. Do you know whether the Fulton County records for this particular crime include a Social Security number for the offender?

A. I do not know that.

Q. Do you know whether the records from Fulton County include a complete date of birth for the offender?

A. I don't know that either.

Q. Do you know whether the records from Fulton County include information about the name of the offender or her address?

A. I don't know that.

Q. And had RealPage, either through Genuine Data Services or any other source, obtained Social Security information for this offense, would it be listed on page 3 under the SSN section of the report on the top?

A. I don't know that.

Q. Okay. What is that section, the SSN section, which is blank in this report?

A. It is the SSN information, but I -- in my time here, I've never seen an SSN report -- I mean, I've never seen SSNs being reported.

Q. Okay. And does Genuine Data Services typically

not provide any Social Security number information about crimes that it sells to RealPage in bulk form?

A. Yes, that is correct. We do not get Social Security numbers from Genuine Data Services.

Q. And in your time in working for the company and doing analytics, you've never seen a report that actually includes a Social Security number on a crime, correct?

A. Correct, not that I can recall.

Q. Now, next to that Social Security number column is a date of birth column. Do you see that?

A. I do.

Q. (Inaudible) in the report --

THE REPORTER: Could you start over?

Q. -- it says, 1/1 followed by a bunch of Xs through 12/31 followed by a bunch of Xs. What does that mean?

THE REPORTER: The first couple words of your question cut out.

MR. SOUMILAS: Oh, okay. I'll try it again.

REDAC  

REDACTED

Q. All right. So -- and again, you don't know whether the Fulton County court, which prosecuted this particular crime, has the complete month, day, and year date of birth available on its records, correct?

A. Yes, I don't know that.

Q. If you had gotten the complete date of birth

for the criminal offender, would that be listed here in the date field of the report?

A. Yes, if we had an exact date of birth, then the birth date for the offender and the alias would have just that exact date of birth.

Q. All right. So then the way this report is formatted tells us that in receiving bulk data about this crime from Genuine Data Services, RealPage, number one, received no Social Security number, correct?

A. Correct.

Q. And that is entirely typical, you would expect that for information coming from Genuine Data Services, correct?

A. Correct.

MR. RAETHER: Objection to form.

[redacted]

A. Correct.

Q. And, again, this -- you would consider that to be typical for this type of data coming from Genuine Data Services to you?

MR. RAETHER: Objection, vague and ambiguous.

A. It depends on the jurisdiction. Again, like I said, some jurisdictions only provide year of birth, some only give us the age, some give exact date of birth, so it depends on the jurisdiction, and they're changing constantly.

Q. Do you know why with respect to Georgia records, for example, why Genuine Data Services may have chosen to use records from the Department of Corrections, which only provide a year of birth, as opposed to court records from Fulton County, which provide the complete date of birth?

MR. RAETHER: Objection to form.

A. So Genuine Data Services provided this, but they also provide other jurisdictions, so I'm not clear on your question.

Q. My question is focused on this particular jurisdiction and this particular record.

A. Okay.

Q. Do you know why they would have used the Department of Corrections, which does not have a full date of birth, when another government source has the full date of birth for the exact same crime?

MR. RAETHER: Objection to form.

A. No.

Q. And you told me you have not seen any records

from the Georgia Department of Corrections, correct?

A. I have not seen any records from the -- can you repeat that, please? Sorry.

Q. Yeah. Let me clarify this because it's important. You told me that there's a bulk feed that comes from Genuine Data Services to RealPage, correct?

A. Yes, that is correct.

Q. (Inaudible.)

THE REPORTER: Could you start over?

Q. (Inaudible) to Genuine Data Services --

The source of that information for this crime is the Department of Corrections, according to Genuine Data Services, and not the Fulton County court, correct?

A. Correct.

Q. But you have not seen either Department of Corrections records or Fulton County records for this crime; is that also correct?

A. That is correct. I've only seen what's in this report.

Q. You've only seen the bulk data that was delivered to you by Genuine Data Services?

A. That is correct.

Q. Okay. And at least as far as you're familiar -- I'll withdraw that question.

Now, I take it, this bulk data that RealPage acquires is called bulk data because it includes a lot of criminal records at the same time?

A. That is correct.

Q. Could you give us a sense of the volume, how much bulk data comes in on a daily basis?

A. It's not on a daily basis, it's on a regular cadence, and every time we get a bulk data update from GenuineDataServices.com -- I'm sorry, Genuine Data Services, the update could be for different jurisdictions.

So, for example, we don't get all of it at the same time every day or every three days. As Genuine Data Services gets updates from those jurisdictions, they provide the updates back to us.

Q. When you say "on a regular cadence," how frequently is that?

A. It could be anywhere from three to five days, every three to five days.

Q. Okay. And once the data is received, where is it stored?

A. Once the data is received, it is first stored in a staff environment or a staging environment -- it's stored in a staging environment, and it's normalized or standardized to ensure that we can report on it, and

then it's pushed to a production environment.

Q. Okay. Backtracking for a moment to the date of birth field that might come with this bulk data, do you keep track internally as to how frequently Genuine Data Services delivers a complete date of birth as opposed to just a year for the criminal offense?

A. Yes, we do.

Q. And have you personally reviewed this data?

A. Not anytime soon -- or not anytime earlier.

Q. (Inaudible) what percentage of records --

THE REPORTER: Could you start that over?

Q. -- Genuine Data Services delivers you get a complete date of birth?

THE REPORTER: The first part of the question cut out.

Q. The question is whether you know, sitting here today, in what percentage of cases where Genuine Data Services delivers criminal data to RealPage it also delivers a complete date of birth for a criminal offense?

A. No, I do not know that.

Q. Are you aware that the Department of Corrections in most states typically does not include a full date of birth?

A. No, I do not know that.

REDAC

A. We could get that just for the date of birth -- date of -- date range.

Q. How would you go about determining that?

A. We would have to look at all the reports and all the jurisdictions that were reported in each report, and then backtrack it to see if the jurisdictions report an exact date of birth or not.

Q. This would be some type of a computer search that would result in that finding?

A. Yes, it would have to be.

Q. Okay. All right. Let's move along to another category in the 30(b)(6) notice, that's Ramesh 1, and if you look at No. 4, it talks about testimony concerning

RealPage's policies and procedures for placing criminal record information on the reports it prepares itself about consumers. Do you see that?

A. Yes, I do.

Q. Now moving on from the phase of simply gathering criminal data to actually matching particular records of crimes to particular tenant applicants that were the subject of one of these screening reports, okay?

A. Okay.

Q. And do you know how that process occurs at RealPage?

A. Yes, I do.

Q. And how did you become familiar with that?

A. One of my very first projects as a data scientist was to evaluate our matching logic, and so I became very familiar with the process. I was also involved in an enhancement, so again, I'm very familiar with the matching logic.

[redacted]

MR. SOUMILAS: Would you please mark that

as Ramesh 4.

(Exhibit No. 4 marked.)

THE REPORTER: I have it marked.

REDACT

THE WITNESS: It's September 2017 --

MR. RAETHER: I don't know if we have any -- I don't know, we can check. I don't know what you want me to explain, but --

MR. SOUMILAS: Well, I want you to explain whether you produced it and I don't see it, or whether you haven't produced it. It seems kind of relevant to this questioning.

MR. RAETHER: I'll check.

MR. SOUMILAS: All right. Well, why don't we take a short break and go off the record right now

and try to get to the bottom of this enhanced logic issue.

THE VIDEOGRAPHER: We are now off the record. The time is 12:11 p.m.

(Recess taken from 12:11 to 12:22)

THE VIDEOGRAPHER: We are now back on the record. The time is 12:22 p.m.

REDACT

Page 43
PAVITHRA RAMESH

REDACT [redacted]

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com
068



Page 44
PAVITHRA RAMESH

REDAC

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

069



Page 45
PAVITHRA RAMESH

REDACTED

[redacted]

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

070



Page 46
PAVITHRA RAMESH

REDAC [redacted]

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

071



**PAVITHRA RAMESH**



1    REDACTED

Page 48
PAVITHRA RAMESH

REDACT [redacted]

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com
073



Page 49
PAVITHRA RAMESH

REDAC

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com
074



REDACTED

Q. Why did it come to be that it would go into place at that time?

A. So we -- the project was going on for a while, and we were able to wrap up and finally get to a model, which was -- which made sense and, you know, work with our software engineers. It's a process to get it -- put it in place, and September 2017 was the -- was the month and the year.

Q. How long was it in development, the project?

A. It -- as far as I know, it started before I joined RealPage.

Q. Do you know why it started?

A. We are always looking for ways to improve our

matching logic, make fine tunes to it, ensure that we are using the best resources that's available to us in terms of data, in terms of technology, and with -- again, like I mentioned, the changing data landscape, it's so dynamic, the project started as a way to see if -- you know, what's the next thing that we can do.

Q. Was there any particular reason why it started?

A. Not that I know of. Like I said, it started before I did.

Q. And who ordered it?

A. I don't know that either.

Q. Who were you reporting to when you were working on it?

A. Rich Hughes.

Q. And what is Mr. Hughes?

A. He's the SVP of data science.

REDAC

REDACTED

Q. Who did the programming itself for this enhancement?

A. Wesley Elsberry and me, together.

Q. Who was in charge of this project?

A. I'm not sure I understand the question.

Q. Was there a person responsible to see the final implementation of this enhancement?

A. There were multiple people working on it, but predominantly the project leads was Wesley and me.

Q. Has the enhancement actually worked?

A. We think so, yes.

Q. And how do you gauge that, do you have any statistics to measure it?

A. We do use the disputes data, we track how many disputes we've received, and also off the disputes that are received, how many of them are removed from the consumer's report and how many are not.

Q. And how has that data shifted, if at all, after the implementation of the enhancement?

A. I don't have exact numbers right now, but we

did see a decrease in these non-match disputes, and off the disputes, we also have found that we are not removing records as much as we used to.

Q. How big of a decrease in non-match disputes, was it ten percent, 50 percent?

A. Again, I don't have exact numbers, but I would say close to 40 to 50 percent.

Q. Do you know how or what percentage of reports the enhancement applies to?

A. I don't understand.

[redacted]

A. I don't know that information.

Q. What's the total number of reports that RealPage sells in any given year?

A. I don't have that number either.

Q. When you talked about bulk data being purchased from Genuine Data Services earlier and you said that it's done on a regular cadence, how many records are delivered per such regular cadence?

A. I don't have a number, and I don't think I can get to a number either because --

Q. Why is that -- why is that?

A. Because with every cadence, it's different jurisdictions, it's -- so with -- depending on the

combination of the jurisdictions that they provide updates to, the numbers could vary.

Q. Do you keep track of how much bulk data Genuine Data Services sells to you?

A. We keep track of the jurisdictions, the number of jurisdictions they provide us, yes.

Q. Okay.

MR. SOUMILAS: Why don't we take a break here. I know you all need to take a lunch break, so we'll go off the record, and then we'll resume -- or we'll talk about what the appropriate time is.

THE VIDEOGRAPHER: We are now off the record. The time is 12:52 p.m.

(Recess taken from 12:52 to 1:36)

THE VIDEOGRAPHER: We are now back on the record. The time is 1:36 p.m.

REDAC  

REDACTED

Q. So you've mentioned this a couple times, you said the right threshold between not underreporting criminal records but not overreporting non-matching criminal records, correct?

A. Yes.

Q. And you said that the enhancement reduced the number of non-match records being reported by as much as 40 to 50 percent?

A. Yes, that is correct.

Q. Did it increase -- or did it result, I should say, in the underreporting of certain crimes?

A. We have not had any evidence of that. So unless someone tells us we've not reported this offense of mine, we have no way of knowing, and we don't have any such evidence.

Q. So then how would you measure whether you're underreporting criminal offenses, if you don't have any measure or any objective evidence?

A. So when we set the threshold, it was based on historical evidence, right, because in the past, we did report -- we did report and we did get disputes and we knew what the result was, or we did not get disputes. We were able to set a threshold.

Going forward, the only way of knowing whether we missed -- or underreporting a record is if a client finds it and tells us, or if an applicant owns up to not having a record.

Q. Okay. But how about looking backwards, how would you know from historical data whether you're under view -- or underreporting certain records?

A. There is no way of knowing.

Q. Okay. So when you just testified about finding the right threshold or the right balance between not underreporting criminal records but not overreporting non-matches, what data are you looking at to come up with that balance?

A. Yeah. So we do have dispute data where not -- where a significant portion of them, we -- the results of the investigation is that we're going to leave the record back on the file.

REDACTED

them or most of them to not be reported to begin with, then that's underreporting. Because after

investigations, we could not say that it's a non-match, it still remains on file.

So the underreporting and overreporting that I am talking about is based on historical data of everything that we have reported and disputes that came out of it and the results of the disputes.

Q. All right. So your entire universe of data is the dispute data. You are not measuring accuracy with any other barometer; is that right?

A. Presence or absence of disputes and what happened with the dispute data, yes, correct.

Q. And you're assuming that if the record is removed, then it's a non-match and it shouldn't have been there in the first place, correct?

A. We are assuming -- the record, yes.

Q. Do you know what percentage of records historically have been removed following a non-match dispute?

A. I don't know the exact numbers.

Q. And for purposes of this balance, you're also assuming that if a record is disputed and it stays on, that it should have been there in the first place?

A. That is correct, yes.

Q. Okay. That doesn't seem to have anything to do with underreporting of data because it wouldn't have

been underreporting, it was reported. So that's what I'm trying to figure out is what data are you looking to figure out whether crimes are underreported?

MR. RAETHER: Objection to form, asked and answered.

REDAC

Q. Do you have any data to gauge accuracy for the population which has not disputed, the population of tenant applicants?

A. No.

Q. Okay. So you just don't know one way or the other whether those reports tend to include accurate criminal records associated to that applicant, or not so?

A. We don't have any data because we've not heard from the consumer, so...

Q. But independently on your own, you haven't done some type of a -- you know, a survey or a sampling of records to determine whether they are actually criminal records for crimes committed by the people who are applying for apartments?

A. There is no way to do that kind of analysis because we have the data that we used to -- that the system uses to match on and report on. We don't have any more data. Having a human review it is only going to cause some bias, right, without additional data or without the consumer or the client dispute, where we can assess it on a case-by-case basis, it's not possible to do a widespread analysis.

Q. You would agree with me that if you had more complete data concerning the perpetrators of the crime, including their complete date of birth or Social Security number, that that type of an analysis would be possible?

MR. RAETHER: Objection, vague and ambiguous.

A. I'm not sure if I can answer that with certainty.

[redacted]

REDAC

Q. Do you know how the enhancement has affected -- strike that.

Among the population of tenant applicants who have disputed a criminal record as a non-match, but the record has nevertheless stayed on, on their file, do you know what percentage of those people actually committed the crimes which are associated with their report?

Page 61
PAVITHRA RAMESH

MR. RAETHER: Objection to form.

A. No.

REDACT

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

086

REDACTED

MR. RAETHER: Objection, form.

A. No, the purpose is we are constantly improving our matching logic. We are constantly evaluating the changing landscape of the data that we do get, that we can get from consumers, that we do get from the jurisdictions, and everything that we can do to make sure that we are staying current, the matching logic works, and we are updating it.

Q. To what end?

A. To provide maximum possible accurate data.

Q. Right, that's what I was saying, that you're

using this logic to try to get a correct match between a criminal record and a tenant applicant who's applying for an apartment, correct?

A. Yes.

Q. And you felt that the logic needed some type of an enhancement, that's why you rolled this enhancement out in September 2017; otherwise, you wouldn't have done it. Is that correct?

A. I was part of the project. Again, I don't know what the basis of starting this project was. It's not so much --

Q. Okay.

A. -- it's about ensuring that we're keeping up with the technology and we're keeping up with the changing landscape and making sure that our system continues to stay dynamic.

Q. Well, that's what I'm trying to figure out. I'm trying to figure whether the enhancement is an enhancement that's designed to assure accuracy in the matching, or whether it's an enhancement to keep up with new technology or new software or to become, you know, compatible with how the data is coming in, the formatting and so forth. Could you answer that?

A. So the enhancement is to ensure that we are consistently continuing to report records with maximum

possible accuracy. To say improving in accuracy, to your point, if we don't have disputes from consumers, we don't know whether -- you know, whether the record belongs to them or not. We take that it does because they've not disputed it.

But also to your point, not everyone who disputes it -- not everyone who disputes it do not have the record matched to them. There's a significant portion where even after the dispute, after the investigations, we do rule it and say it should still stay on your report.

So your definition of accuracy, I'm -- I think that's where I'm trying to clear that this is to keep up with technology and also to ensure that we are -- to keep up with the changing landscape of data, and obviously to ensure that we are reporting with maximum possible accuracy.

Q. Do you think that the enhancement has improved the accuracy of the matching of criminal records to tenant applicants?

A. Based on the disputes and the results of the disputes data, yes.

Q. All right. Because that is your only measure that you have to judge whether there's any differences, how the dispute data is looking, before and after,

correct?

A. Yes. The number of disputes and also what the result of the disputes were.

Q. Right. So that is the population we're looking at, we don't know what's going on with the population that's not disputing just simply because we don't have any data on it; do you agree with that?

A. Correct. Yes.

Q. But on the population for which we do have data, I think you're telling me that this enhancement is reducing the number of disputes of non-matches very significantly, by as much as 40 to 50 percent, correct?

A. Correct. Yes.

Q. And that is by scoring this matching logic to a point where, you know, you said, you're -- to achieve the correct balance, but it is basically ferreting out those records which would have been considered a match in the past but now are scoring too low?

MR. RAETHER: Objection, form.

A. Yes, that is correct.

Q. Okay. Therefore, would you agree with me that it's the matching logic that's causing the non-matches?

A. But this enhancement is part of the matching logic, so there's -- I'm not able to separate those two out.

Q. Well, why not? Let's take it a step at a time. You first consider a set of rules in relating a criminal record to a tenant applicant, correct?

A. Yes --

Q. All right.

A. -- several rules.

Q. I'm sorry?

A. Several rules. Sorry, go ahead.

Q. What did you say, several what?

A. Several rules that go into the matching logic, I wasn't -- go ahead, sorry.

REDAC



PAVITHRA RAMESH



1   REDACTED

REDACTED

Q. All right. Now along with that, I'd like you to take a look at Ramesh 3, which is the screening report that was prepared in this case in August 2017 for the plaintiff, Diane Jones. Do you have that as well?

A. Yes, I do.

Q. All right. So I want to see if I can walk you through the process of matching. Let's start, I guess, where the beginning would be, where you're getting an inquiry from a client that there's a tenant applicant and they're looking to screen them; would that be correct?

A. Yes, that is correct.

Q. Are your tenant applicants allowed to access some computer system to make that request for a -- for a screening report?

A. Yes.

Q. Okay. And in this case, it looks that it's -- Marietta Road is the landlord that's making the request, correct?

A. That is correct, yes. That's the property.

Q. Now as part of the usual process of how a request like this will be made, I take it the landlord will need to identify the tenant, correct?

A. You would expect so, yes.

Q. In fact, there are certain fields that landlords need to fill in, in order to make a request for a background report on a tenant -- potential tenant?

A. Correct.

Q. All right. So in this case, when we look at Ramesh 3, and we see certain information at the top, such as Diane D. Jones with a University Heights, Ohio, address; do you see that?

A. Yes, I do.

Q. Would that be supplied by the landlord to RealPage in connection with a request for a report?

A. It is supplied by the applicant to the landlord and to RealPage.

Q. Okay. That's a good point. So the tenant applicant would obviously have access to their information, they'll give it to the landlord, and when the landlord wants a RealPage screening report, they'll put it in the system?

A. Correct.

Q. Okay. And then we see a date of birth for the

applicant. That's usually required to get one of these reports?

A. Yes.

Q. And is it date, month, and year that's required?

A. That is correct.

Q. And then we have a Social Security number for the applicant. Here, again, it's partially masked, I guess for security purposes, but it looks like it was provided for Ms. Jones, correct?

A. Yes.

Q. And, again, this is a required field where the tenant would provide the information to the landlord, the landlord would need to plug it into the system to make the request for a screening report?

A. Social Security numbers are not required. They're encouraged to enter it, but they're not required.

Q. Okay. So there's a field for it, but if the landlord doesn't fill it in, it's not going to stop them from getting a report?

A. Right.

Q. What's the minimum information that's required -- what are the required fields that the landlord must fill out in order for the process to go

forward?

A. The name, date of birth, and at least one current address.

Q. Okay. And the Social Security number, if they have it, there's a field for it, right?

A. Yes.

Q. Okay. Do you encourage landlords to provide Social Security numbers?

A. Yes. We don't discourage them from not providing it.

Q. If RealPage wanted to add an additional field to landlords to provide information about the applicant, could it do that?

A. Depends on what information.

Q. Well, I mean -- so that's a good point. I'm just asking from a technical point of view, if you wanted to add an additional field to say, would you please give us your driver's license number, would you be able to add that to the computer system?

A. Yeah, we can add additional fields.

Q. Okay. Are the basic fields available now, name, address, date of birth, and if available, Social Security number?

A. We have some other fields, like gender.

Q. Gender, okay. I see that. Anything else?

A. We have a field for driver's license or a state ID, and month and rent -- monthly rent and income, but none of them are required.

Q. Okay. In the case of Jones, do we know whether there was a field for a driver's license?

A. I do not know that.

Q. Where would it be? I don't even see a field on this report.

A. It would be in the application, not in the screening report.

Q. Oh, got it. Okay.

At any rate, would you agree with me that it is RealPage that sets the fields that landlords are required or encouraged to fill in, as the case may be, in order for them to make a request for a screening report?

A. So RealPage does provide the software, but landlords can -- like Social Security, landlords can elect to not require Social Security numbers, or require it.

For RealPage, name, address, and date of birth is required. Everything else is based on the landlord to provide or not.

Q. Okay. Let me just clarify this point because it might end up being an important one, I'm not sure,

but I think we've all done things online these days where you go and fill out some information on a website and some of the fields are required and some of the fields are optional. You've seen that, right?

A. Yes.

Q. And then if you don't fill out data on the required fields, the computer doesn't let you get on to the next page, but if you leave an optional field blank, you can move on to the next page. Do you know what I'm talking about?

A. Yes.

Q. My question is, does RealPage get to control which fields are the required ones and which ones are the optional ones?

A. It's not a yes or no answer. Like, example, Social Security, a property can say that I do not want Social Security from my applicants, which means we cannot make it a required field. The only fields that RealPage requires to run any kind of screen is name, address, and date of birth.

Q. Okay.

A. So it is customizable to a certain degree.

Q. Okay. So you take into consideration the wishes of your customers as to what type of data might be readily available to them or provided easily by

tenant applicants, things like that?

A. Yes.

Q. And then you set the parameters of what it is that you're going to require and what you're going to make optional in the input field?

A. Correct, yes.

Q. Got it. But if you wanted to make Social Security number required, nothing technologically prevents you from doing that?

A. It doesn't technologically prevent us from doing it, but again, there are properties, or clients, who do not want to use Social Security numbers, and it would mean that we cannot use it.

Q. Got it. Okay. So it's a business decision?

A. Right.

Q. Same for driver's license number, that -- it's a business decision not to require it, but if it's available, you'll take it?

A. Right, exactly.

REDACT

**PAVITHRA RAMESH**



1  REDACTED

Page 76
PAVITHRA RAMESH

REDACTED

[redacted]

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

101



Page 77
PAVITHRA RAMESH

REDACT [redacted]

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com
102



Page 78
PAVITHRA RAMESH

REDACTED [redacted]

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

103



**PAVITHRA RAMESH**



1   REDACTED

Page 80
PAVITHRA RAMESH

REDACTED

[redacted]

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

105



Page 81
PAVITHRA RAMESH

REDAC [redacted]

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

106



Page 82
PAVITHRA RAMESH

REDACTED [redacted]

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

107



Page 83
PAVITHRA RAMESH

REDACTED

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

108



Page 84
PAVITHRA RAMESH

REDACTED

[redacted]

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

109



Page 85
PAVITHRA RAMESH

REDACT [redacted]

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

110



Page 86
PAVITHRA RAMESH

REDACTED

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

111



Page 87
PAVITHRA RAMESH

REDAC [redacted]

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

112



**PAVITHRA RAMESH**



1   REDACTED

Page 89
PAVITHRA RAMESH

REDACTED

[redacted]

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

114



Page 90
PAVITHRA RAMESH

REDACT [redacted]

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

115



Page 91
PAVITHRA RAMESH

REDACTED

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com
116



Page 92
PAVITHRA RAMESH

REDACT [redacted]

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

117



**PAVITHRA RAMESH**



1    REDACTED

**PAVITHRA RAMESH**



1   REDACTED

Page 95
PAVITHRA RAMESH

REDAC [redacted]

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

120



**PAVITHRA RAMESH**



1  REDACTED

REDACTED

Q. Have you looked into whether requiring an exact character-for-character name match and an exact date of birth match -- month, date, and year -- might affect the sales of your reports?

A. We've haven't looked at it from an analytical perspective.

Q. Have you looked at it from some other perspective?

A. We have -- we know from our disputes that there are some disputes that we -- after the investigation, we say -- we leave the record on the report. So those were not exact character-for-character matches on first names and exact date of birth matches.

So we know from empirical evidence -- not empir- -- from hearsay evidence that it is going to cause us to lose, you know, underreport, going back to the underreporting and overreporting balance, but we don't have exact numbers to justify or give you an

analytical view as to what that would mean.

Q. Have you had a chance to see the defendant's First Supplemental Objections and Responses to Plaintiff Diane Jones's Interrogatories in this case?

A. I'm not sure.

Q. Let me show them to you and then see if you can answer the question.

MR. SOUMILAS: And then we'll mark this as Ramesh 6. It's about an 11-page document, it reads, Defendant's Objections and Responses to Plaintiff Diane Jones' -- Plaintiff Jones' First Set of Interrogatories, and the heading says, First Supplemental Objections and Responses.

(Exhibit No. 6 marked.)

THE REPORTER: I have it marked.

MR. SOUMILAS: Okay. Thank you.

Q. Before we turn to that document, Ms. Ramesh, let me just stay a moment longer about the comment you just made about this balance between underreporting crimes and overreporting non-matches.

Are you aware of any instances where RealPage's customers have come back and said you failed to report this crime about someone and ended up giving them an apartment and then something bad happened?

A. Yes.

Q. Okay. How many of those instances?

A. I don't have the number.

Q. How did you become aware of them?

A. Again, hearsay, they typically reach out to our -- their account managers, their customer success representatives, and then it gets quickly escalated through the ranks of RealPage.

Q. You're saying that this is how it would happen typically?

A. Yes.

Q. I'm asking about any one example that you are familiar with, how did it come to your attention?

A. Same way. Clients would reach out to account managers, or their customer success representatives, who would bring the question to us, and we would then research it to see did we not report it because of a state compliance issue, or did we, you know, not report it? And then based on that, I know that we have not reported something that we should have.

Q. When is the last time you dealt with a situation like that?

A. I -- I don't have the date off the top of my head.

Q. What could you tell us about it, who was the client involved, what happened?

A. I don't -- I don't have too many details of it without -- without going through it -- I mean, I can't recollect much.

Q. When you say "go through it, is there some record of instances like this where a client is telling RealPage that they underreported a crime?

A. There's -- there's an e-mail chain somewhere.

Q. Okay. Are all these instances maintained in a database or in a place where we could find them?

A. No, they're not.

Q. How many of these instances occur over the course of a year total?

A. I don't know that.

Q. When is the last time you were personally involved in one of those situations, a month ago, three months ago, a year ago, what was it?

A. It's -- it's hard to give you an exact time frame because, like I said, there are instances where the response is we could not have reported this because of a compliance issue. You know, the State does not allow us to report more than seven years, five years, whatever the compliance is. So it's hard for me to recollect exactly when we should have reported something and we didn't for reasons outside of the compliance.

Q. Okay. So you're saying certain states make it

unlawful to report certain old criminal offenses, for example, right?

A. Yes.

Q. Or ones that have been sealed or expunged, correct?

A. Correct.

Q. Okay. So no business in your shoes would be permitted to make that reporting?

A. Correct.

Q. It's legally not permitted, you're saying. I'm asking for something else, where it is legally permitted to report a criminal, but you just missed it --

A. I --

Q. You missed it, you shouldn't have missed it, and then the client was upset, and said, how come you didn't catch that Diane Jones had a criminal history? Do you keep those situations tracked somehow?

A. Not that I know of.

Q. Have you personally ever dealt with one?

A. Not personally, no.

Q. And how many would you say over the course of a year, situations like that, occur companywide?

A. I don't know the number.

Q. Okay. Is it fair to say that you simply don't have any consistent or reliable data on your degree of

underreporting of lawful crimes that you could report?

A. Yes. I mean, we have data when our clients come and tell us, but there's not -- I don't know what you mean by "consistent data source."

Q. Well, I'll tell you what I mean, you seem to keep data when consumers come to you and say you mismatched me with a criminal record and it's not mine. And then you investigate it and you keep a record as to whether you said you removed the record or whether you keep it on, correct?

A. Correct, it's our disputes process.

Q. I'm wondering whether you have a similar disputes process, or other similar process, for clients of yours who are saying you've -- you've missed something, you didn't tell me that someone had a criminal history?

A. Not that I know of.

Q. All right. Looking at Ramesh 6, which is the supplemental interrogatories, I want to direct your attention to page 5.

MR. RAETHER: Sorry, you're looking -- go ahead.

Q. So it's page 5, interrogatory 6, please. Do you have that in front of you?

A. Yes.

Q. That's a question asked by Ms. Jones of RealPage, and it says, quote, state the total number of consumers with an address in the United States and its territories about whom you sold a report for each calendar year between March 6, 2014, and the present, which included one or more items of criminal record information for which the first and last name of the individual who was the subject of the report was not a character-for-character match to either the name of the offender or any of the alias names listed on the criminal record.

Do you see that?

A. Yes.

Q. Did you participate in some way in trying to determine whether there was an answer to that question?

A. Yes.

Q. And if you look on the next page, after a set of objections, it says, subject to and without waiving its objections, RealPage responds as follows, none. Do you see that?

A. Yes.

Q. And did you have something to do with coming up with the answer, "none," in response to interrogatory No. 6?

A. I was part of the team, yes.

Q. Okay. It was a team working on it. Who else was on the team?

A. No, I meant the lawyers and me. I meant, the lawyers as the team.

Q. Oh, okay. So the lawyers were working on this because it's a law case, and then from a technical point of view to search the database, it was you and you alone?

A. I had to -- there were other questions where I had to ask whether it was possible or not, but -- and I -- the answer was no, so I had to get confirmation.

Q. Okay. Tell me what you did to answer this question, "none."

A. So this is pretty straightforward since we always require the last name to be a character-for-character match. So there would have been no matches where the last name was not a character-for-character match with either the offender or the alias names listed in the report.

Q. Okay. But the question asks for situations where the first and last name are not a character-for-character match. So it's not just one or the other, it's both. Did you look into that?

A. Well, the question says, first and last name of the individual was not a character-for-character match.

We always require a character-for-character match for the last name. So irrespective of how the first name and every other name and every other matching criteria triggered, the answer is none because the last name always has to be a character-for-character match.

Q. Looking back to Ramesh 3, which is the report that RealPage prepared for Ms. Jones in August of 2017, you told me that the criminal record on page 3 matched Ms. Jones because of the name Tina Jones as an alias and a year of birth being the same, correct?

A. Yes.

Q. Okay. Well, you would agree with me that the name "Tina" does not match character-for-character with the name "Diane," wouldn't you?

A. In isolation, yes.

Q. Okay. So that's what we're looking for, we're looking for situations like this where the first name and the last name of the individual who is subject of the report, in this case Diane Jones, was not a character-for-character match to either the name of the offender -- and the name of the offender here is Toni Taylor, correct?

A. Correct.

MR. RAETHER: Objection to form.

Q. That's not a character-for-character match;

would you agree?

A. It's not a match to the offender, yes.

Q. And it's not a character-for-character match to the name Tina Jones either, is it?

A. So I think -- the last name is a character-for-character match. The question says, where first and last names are not a character-for-character match. So in this instance, the last name is a character-for-character match, so that would not come under this.

Q. Okay. So I don't think that's what the question asks, but let me elaborate. I think you're making the point that the last name Jones matches to the name Jones character-for-character, correct?

A. Yes.

Q. Okay. But the first name, Diane, does not match character-for-character with either Toni or Toni Taylor or Tina or Tina Jones, or frankly, any of the first names of this offender or any of her aliases, correct?

A. Yes.

Q. Okay. So if I wanted to answer that question, which is how many situations are there just like the plaintiff, Diane Jones', where we have some variation in the first name, where the -- the name is not a

character-for-character match to either the alias or the name of the offender, how do we go about deriving that?

A. I would have to confirm if we do have logging and see how to get that information. I would -- I -- I can't confirm that right now.

Q. Where is the data on credit reports like Ms. Jones' housed, what type of a database?

MR. RAETHER: Objection to form.

A. The reports are stored in databases, in SQL server databases, in an XML format.

Q. Okay. Do you know where, specifically, we were able to get a copy of this report that was produced about Ms. Jones and which now we've marked as Ramesh 3?

A. That specific report copy comes from the application, the screen -- the screening application, the LeasingDesk screening application, which is used to run a screen. We also have historical reports in that application where you can click a button and get the report.

Q. Okay. Would you agree with me that every time there's an application where a report is delivered to a landlord that RealPage would keep a copy of that report?

A. Yes.

Q. And those reports should look in format similar to the one we have here as Ramesh 3 for Ms. Jones,

correct?

A. Yes.

Q. What's the format that you said that the reports are in?

A. The raw data is in SQL servers. The report itself is generated from the data.

Q. Okay. You said some type of a format a moment ago, I thought you said XMF?

A. Oh, XML format.

Q. XML, okay. That's what it is.

And how many years back are these reports maintained?

A. I don't know the answer to that.

Q. Okay. Is there any information that you have that could tell us that reports are purged after a certain number of years?

A. Clients could request to remove their reports, but, again, I'm not sure of how many years.

Q. Did you make any effort to search for the thing that we're discussing here today about a situation where the first and the last name together are not a match character-for-character between the offender and the applicant?

A. So the answer is still none because the last names always have to be a character-for-character match.

I think your question is just focused on first names alone, but when we look at first names and last names of the individual, then there's never a time when both of them are not a character-for-character match because one always has to be a character-for-character match.

Q. Okay. So we're going to disagree about this because if just the last name is a character-for-character match, it simply does not mean that both the first name and the last name are?

A. Correct. But the question is -- the question is not for which the first and the last name of the individual is a character-for-character match. The question is for which the first and the last name of the individual was not a character-for-character match. So both the first name and the last name not being -- both of them not being a character-for-character match would never happen is my point.

Q. Okay. So as I said, I think we're going to disagree about what the question asks for --

A. Okay.

Q. -- but why don't we get beyond that disagreement by narrowing the question to instances in which the last name is a match, because it has to be you said, right?

A. Yes.

Q. But the first name is not a character-for-character match, so all we're focusing on is on the first name. Now did you make any effort to locate situations like that?

A. No, I did not.

Q. And are you able to make such an effort?

A. I cannot confirm if I'm able to or not.

Q. Okay. Have you, as a researcher, done any searches in the past concerning names of credit applicants?

A. I'm not sure I follow the question.

Q. Have you done any type of a research project in another context where you were asked to consider a search that included the first name of tenant applicants?

A. Again, what do you mean by "search of the first name of the tenant applicants"?

Q. I'm sorry, it's a broad question intentionally because I don't know what you do in your day-to-day activities as a researcher. But you said at the beginning that you research all sorts of matters for RealPage, so I'm wondering whether you had an occasion where part of your research needed you to pull out data that would be searching names, first names?

A. No.

Q. Are you -- is RealPage not capable of searching its servers for the data in XML format to determine whether the names of applicants -- the first names of applicants match the first names of offenders?

A. I would have to confirm that.

Q. Okay. You're not saying yes, you're not saying no, you just don't know sitting here today?

A. Yes, that is correct.

Q. And you didn't make any efforts leading up to today to find that out?

A. Yes.

Q. Okay. So I'll take you back to Ramesh 2, right, which is the 30(b)(1) deposition notice for the person familiar with RealPage's search and query capabilities regarding consumer data.

A. Um-hmm.

Q. What did you do prepare to give testimony on that subject today?

A. Can I reference 6 where -- where for all the queries that was requested, we attempted to see if we can query the database or not, and except for question No. 6, every other response was we cannot query the database. We just -- we cannot query the database to give the exact information that was asked, so that's the preparation that went into the person who queried any

databases.

Q. Okay. So your preparation to talk about the query capabilities was focused on efforts that you made to answer other interrogatory questions?

A. Yes.

Q. Other than No. 6?

Like which ones, for example?

A. No. 5 and No. 7.

Q. Okay. So let's focus on No. 5 first. This asks for the total number of consumers in the United States or territories during a certain time frame who meet a certain profile, and it's, one, one or more items of criminal record information; two, the first name of the offender as listed on the criminal record was not a character-for-character match to the first name of the individual who is the subject of the report; and three, the last name of the offender as listed in the criminal record was not a character-for-character match to the last name of the individual who was the subject of the report.

You're saying that you actually did some searches to answer that question?

A. No, I could not do searches to answer the question.

Q. And -- so what you're saying is that you didn't

do any searches, but you deduced that because, according to your search logic the last name must always match, that you're not going to be able to satisfy anybody who is in category -- who has the third condition?

A. So, yes, if the match was to an offender name, then there would not be anyone in that category because of number three, and if the match --

Q. Okay.

A. -- happened to an alias name, I don't know which alias name it's matched to, and there are instances when the alias name, last name, is the exact same last name as an offender, and that's why we cannot conduct this analysis.

Q. Okay. So I guess that's what I'm trying to get at. Is the answer that we cannot conduct the analysis, or we tried several searches and it just doesn't work, or we were -- we got results that are not conforming or overinclusive or underinclusive or whatever it was?

A. No, we cannot conduct the analysis because we don't know which alias name we matched to.

Q. Okay. Is that also the case for No. 7, why the answer is that you can't come up with an answer to that?

A. Yes.

Q. Okay. So all of your answers to the interrogatories are not based on empirical searches of

the database, it's on your understanding of the logic and how we're basically asking for an impossibility as you read the questions?

MR. RAETHER: Objection, form.

A. It's not based on my understanding of the logic, but it's based on what data there is to query and get the answer. If we don't have data, we cannot get to the answer.

Q. So separate and apart from your understanding of queryable data, did you do anything to be prepared to answer today questions about the query capabilities regarding consumer report data?

A. No.

Q. So if I were simply to ask you an open-ended question, what are the query capabilities that you have available to you, could you answer that?

A. Yes. I can tell you which record matched to which applicant, but I cannot tell you whether it was the offender name or the alias name that matched. I can tell you -- without the name that matched, we do have logging, you know, which talks about which states the offender's information came from, the -- the -- how the date of birth matched, how the names matched, but I don't have the names that did match. That sort of goes back to the issue.

Q. Is your database searchable according to the various fields that show up on these reports?

A. What do you mean by that? Could you explain that?

Q. In other words, what I mean is that -- so let's look at the Diane Jones report, which is Ramesh 3, page 3.

A. Um-hmm.

Q. And there's various categories. So the very first one is jurisdictional code, and we went over it, it was the Georgia Department of Corrections. Do you see that?

A. Yes.

Q. Are you able to search your database for data that has a jurisdictional code, Georgia Department of Corrections, in that field?

A. Yes.

Q. Okay. And how about -- you know, we talked about date of birth and how in this report it has that one-year range from January 1 through December 31; do you recall that?

A. Yes.

Q. Are you able to search your database for reports where that field is filled out in the same way?

A. Yes.

Q. Okay. Are you able to search by the name field?

A. If you give me a specific name, do you want --

Q. Yeah.

A. Yeah, yes.

Q. Okay. So if I were to say search for Toni Taylor, would you be able to do that?

A. Off -- off all the reports that we've generated that has an offender named Toni Taylor?

Q. Yes.

A. Yes.

Q. Okay. And what if it was just the last name Taylor, could you search for that?

A. Yes.

Q. Okay. Are you able to search your database for two fields at the same time? So we've talked about each one of these individually, but could you say, I want the name field for the applicant to be Jones, and I want the name field for the offender to also be Jones?

A. Yes.

Q. Okay. So we could just get a printout for all the Jones applicants and all the Jones offenders, and then compare whether the first names are the same or not, right?

A. Yes, but then we -- I'll let you finish your

question.

Q. No, you can answer the question fully. That's what I'm trying to get at.

A. So we -- if the name that matched to the applicant is the offender's name, then yes, but sometimes it's the alias name that matched, and we don't know which of the alias names matched. So that's where we run into the issue of, if it matched on an alias name -- first name of an alias name, but the alias's last name and the offender's last name are the same, it's hard to figure out systematically whether it matched on an alias name or it matched on an offender name.

Q. How would that be of any consequence, what difference does that make?

A. Because the question says, where the last name of the offender as listed on the criminal record was not a character-for-character match to the last name of the individual. It could have matched to an alias name, but the alias last name and the offender last name could be the same, which means that it's hard to answer this question. It muddies the waters a little bit.

THE VIDEOGRAPHER: Counsel, sorry to interrupt --

Q. So I don't want to have this disagreement, I

just want to focus on the query capabilities of your system, regardless of question No. 6 and how you're reading it versus how we read it.

THE VIDEOGRAPHER: Counsel, sorry to interrupt you, we've got about five minutes left on this disk, and we'll need to take a break to change it.

MR. SOUMILAS: Thank you. I got it.

Q. I guess what I'm wondering is, if we are able to search, on the one hand, the name of the applicant, Jones, and a second variable, the name of the offender, whether that name is in the offender information field or the alias information field, is that -- is that three variables or is that two variables?

A. I don't know. I think that's sort of what I'm trying to get at too. Since we don't know which name -- forget the last name. Since we don't know which name, whether it was the offender name or the alias name that it matched on --

Q. Right.

A. -- it's hard to get -- it's hard to get this information where we -- we can list all of the applicant names and all the offender names, but without the alias names, we wouldn't be doing it -- you know, giving the -- doing it justice, you'd be muddying the waters. And since we don't know which name, whether it matched on

the offender name or the alias name, and if it matched on the alias name, which of the alias names it matched on, it's hard to get to this data.

Q. Okay. Now if I simply wanted to get a copy of all of the reports sold by RealPage last month, every single one of them, and I'll do the analysis to figure out which ones match and which ones don't, are you able to just, you know, give me a list of every single report that was sold over a period of time?

A. By "report," do you mean reports like this, or raw data?

Q. Yeah, just like this. Reports like this, just like Diane Jones', but I want every single one for -- whether it's a week or a month or six months or a year, whatever the time period is.

A. It wouldn't be a query. We would have to go into the application and manually pull the reports.

Q. And are you capable of doing that?

A. Yes.

Q. Okay.

MR. SOUMILAS: Let's go off the record to change the tape.

THE VIDEOGRAPHER: We are now off the record. The time is 3:13 p.m.

(Recess taken from 3:13 to 3:23.)

THE VIDEOGRAPHER: We are now back on the record. The time is 3:23 p.m.

Q. (BY MR. SOUMILAS) All right. Ms. Ramesh, you were just testifying before we took a break that the company's able to, I think you said, manually pull all of the reports over a period of time that --

THE REPORTER: Could you -- pull all of the reports over a period of time that?

Q. That are in the format of Ramesh 3?

A. Yes. It's an extremely manual process, but yes.

Q. Is there some nonmanual process, such as a computer-generated process, which would pull the same data in a raw format?

A. Yes.

Q. And how would that work?

A. So like I mentioned, all of this data in the report is stored as XMLs in specific site databases. It's not straightforward, but we could parse through tens of thousands of site databases to get all of that XML back, and then parse the XMLs to -- into a raw data format.

Q. Now, in terms of the search capabilities, when -- what database or databases are you referring to in terms of that you're familiar of how they could be

queried or searched?
A. What do you mean by that?
Q. Well, I think you said that you prepared to testify about RealPage's search and query capabilities regarding consumer report data. If you were to do those searches yourself, what -- where would you be doing it and in what databases?
A. I cannot do the searches myself, but -- I don't have the access to touch production databases, but we would have to query production data for each particular property that's located in different servers, pull them all back into a single location, and then parse through the XMLs to get the report.
Q. Do you know what particular property would house the Jones report data that we see in Ramesh 3?
A. The Marietta Road property site database would have this -- this report.
REDAC [redacted]

REDACTED

Q. So I understand this is not something that's maintained as part of your day-to-day operations, but let's assume you just got a project from your boss, like, could you find that out? How would you go about

answering our question?

A. It would have to be a manual process. We -- get all of these XMLs that I just spoke about that are there on site databases, parse through them, and then parse through the names and -- and -- and guess.

Q. When you say "manual process," you mean have a person actually put eyeballs on one report at a time?

A. So some of it -- the pulling of the XML reports -- I mean, XML data and parsing it can be done systematically, but then to put eyes on -- yes, we would require a person to actually put eyes on it, and double metaphones is not something that a human can calculate or understand in their mind, so it would require additional ways to figure it out.

Q. Okay. So pulling the reports in XML could be done in an automated fashion; is that right?

A. It's not straightforward, it's going to take a long time, but yes, it can be done.

Q. How long a time?

A. I don't know. I don't write queries to pull XMLs.

Q. But it would be a computer query. Would you pull all of the tenant screening reports from this date to that date and the computer does that, correct?

A. Yes.

REDAC

A. This is where I struggle. It goes back to, we don't log which name, so we would have to search both offender and alias names, I guess. I'm not sure of the answer.

Q. Well, it seems to me, I think you said earlier that you could search, well, say the name Jones, when we're using last names, right? Is that right, ma'am?

A. Yes.

Q. So if you have this pool of data and then you could search for, let's say -- could you search for a match between the first name of the applicant and the first name of the offender?

A. Of the offender, yes, we could search for that.

Q. Okay. And then if we get rid of all of those that matched character-for-character, wouldn't, by

definition, all the rest of them not match character-by -- character-for-character?

A. For first names alone, yes, but again, I think -- the question also included last names, which is what -- which is why the answer was we are not able to get to it.

Q. Okay. Have you looked at any of the non-match dispute data in preparing to give testimony today?

A. No.

Q. Okay. Are you aware, sitting here today, what the volume of non-match disputes has been in recent years at RealPage?

A. Not off the top of my head, no.

Q. Have you seen any type of a document that identifies whether the number of non-match disputes has increased or decreased after the enhancement?

A. Three months after the enhancement, we did do an analysis, but nothing after that.

Q. Okay. So in the -- I guess it's been about two years -- since the enhancement, there was an analysis done one time?

A. Yes.

Q. Were you part of that analysis?

A. Yes.

Q. What type of data did it consider?

A. It considered how many non-match disputes -- disputes that are classified under the non-match category came in, and also what the results of the disputes was, which is why I was able to tell you that the disputes have gone down.

Q. How long of a period did it look at for the number of disputes and the number of removals of records?

A. I believe it went back a year, if not more. So we had year-over-year dispute information.

Q. I thought you said this was done three months after the enhancement procedure was implemented?

A. Correct, so three -- we went back from -- at the time of the analysis so we could see how much -- what was the volume of disputes prior to the enhancement and what was the volume of disputes post enhancement. We could also see what the volume of the disputes last year so that we account for seasonality.

Q. Okay. So did you compare, for example, the three months of disputes after the enhancement to the three months of disputes for the year previous for those same three months?

A. Yes, year over year, that's what I meant.

Q. And you noticed a decrease in disputes?

A. Yes.

Q. And did you also notice any change in the removals?

A. Yes.

Q. What was that change?

A. I can -- I don't have the exact numbers, but the previous year of the non-match disputes, several of them would be removed from their file. We continued to remove records from the file, but it wasn't as high as it was three months -- I mean, last year.

After the enhancement went -- went -- got in place, the number of disputes came down, and also the way we ended the dispute after the investigation was also a little different. We did not -- there were more case -- instances where we said we are not -- the record must stay on the consumer's report.

Q. Was this analysis or study kept somewhere?

A. Yes.

Q. Is -- so there's still a record of it --

A. Yes.

Q. -- if somebody wanted to review it?

And it has not been repeated in the last two years?

A. No.

Q. Did the analysis have a opinion as to what caused the decrease in the number of disputes?

A. No.

Q. Did you consider other factors that might have contributed to the lowering of disputes, other than the enhancement?

A. I'm not sure I follow your question.

Q. I'm going to try to explain. It seems to me, according to your testimony, we know that the number of disputes decreased --

A. Yes.

Q. -- following the enhancement. Did this analysis consider whether there were other factors contributing to the lowering of disputes?

A. Not specifically, no, but since this lowering of disputes tremendously followed -- followed immediately after the enhancement was put in, and we also considered the seasonality of the disputes because of the seasonality of screening applications, which is why we went year over year, but we still saw a tremendous decrease, so it was not seasonality.

REDACT

Q. So when you do things, as you said, to improve the quality of your product, do you keep some record of that, or, you know, is it just off your memory that

you're going here?

A. It's not -- it's not very well written out, but it's not just off my memory. We do have, you know, e-mails that we send out to inform others, we do have -- in cases where -- things like jurisdiction, we are dropping a jurisdiction or we don't want to match on a jurisdiction, we do have a record in our database where we -- we make a note that this jurisdiction is not being reported on anymore because of whatever the reason is. It's not in one single place, it's in various places.

Q. Okay.

MR. SOUMILAS: Let's go off the record.

THE VIDEOGRAPHER: We are now off the record. The time is 3:42 p.m.

(Recess taken from 3:42 to 3:44)

THE VIDEOGRAPHER: We are now back on the record. The time is 3:44 p.m.

Q. (BY MR. SOUMILAS) Going back to the Jones report from August 2017 that we marked as Ramesh 3, ma'am.

A. Yes.

Q. You told me you've familiarized yourself with the circumstances in which this report was generated.

A. Yes.

Q. And it did include this criminal record from

Georgia for narcotics on page 3, correct?

A. Yes.

Q. And was this record properly attributed to the plaintiff, Ms. Jones, in your judgment and experience?

A. Our system worked, and all the rules that got triggered were triggered, and with all of the information, inputs that we have and all of the information that we do have from the jurisdiction, we returned a result. I don't know if I can add any personal opinion to it.

Q. Okay. I'm not asking for your personal opinion, I'm asking whether according to your understanding of the systems and processes in place, this is the output that you would expect that happened?

A. Again, given all of the inputs and the fact that Georgia does not have a year -- does not have an exact date of birth, then yes, this is the process that we would expect.

Q. Okay. Well, the records that you obtained from Genuine Data Services from the Georgia Department of Corrections didn't have a complete date of birth, that's what you mean, right?

A. Yes, that's what I mean.

Q. Okay. In your judgment and experience, is this -- is this record on Ms. Jones' report accurate, or

is it a non-match?

A. I don't think I have any more information than what's already here to make that decision.

Q. Sitting here today as a corporate representative for RealPage, could you tell me whether the plaintiff, Ms. Jones, committed these narcotics crimes in Georgia that were listed on page 3 of her report?

A. Again, I -- I cannot. I don't have -- I don't know -- I don't have any more information than what's already in this report, and based on how the rules get triggered and just the dynamics of the matching logic, this is what was returned, and so I'm not sure how I can add a personal opinion to it.

Q. No, it's not a personal opinion, it's -- you're speaking for the company, I think your answer is you don't know whether she committed these crimes or not?

A. Yes.

Q. But you do know that the systems worked the way they were designed to result in this record matching to her background in August of 2017 when she was applying for an apartment?

A. Yes, that is correct.

MR. SOUMILAS: Okay. Let's go off the record.

THE VIDEOGRAPHER: We are now off the record. The time is 3:47 p.m.

(Recess taken from 3:47 to 3:48)

THE VIDEOGRAPHER: We are now back on the record. The time is 3:48 p.m.

Q. (BY MR. SOUMILAS) All right. Ms. Ramesh, I don't have any further questions for you. Thank you very much for your time today.

A. Thank you.

MR. RAETHER: I don't have any questions. The witness would reserve the right to read and sign.

We'll maintain this transcript, subject to the confidentiality agreement and the terms, in terms of designating. Understanding that Mr. Soumilas has a deadline coming up with the Court, we'll work with Mr. Soumilas to make those designations in time for him to meet those obligations.

MR. SOUMILAS: Okay. That sounds reasonable. We'll have the exhibits attached to this one, as the one from this morning, and I need to make some arrangements to get, at least, a rough draft right away, and I need a copy by Monday.

THE REPORTER: Yes, we can do that.

(Discussion held off the record.)

THE VIDEOGRAPHER: We are now off the

record. The time is 3:49 p.m.

(Deposition concluded at 3:49 p.m.)

STATE OF TEXAS )

I, Christine Simons, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, PAVITHRA RAMESH, was duly sworn and that the transcript of the oral deposition is a true record of the testimony given by the witness and the statements of counsel;

That review and signature was reserved;

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Certified to by me this 12th day of August, 2019.

/s/Christine Simons
Christine Simons, Texas CSR 11181
Expiration Date: 7/31/2021
Summit Court Reporting, Inc.
1500 Walnut Street, Suite 1610
Philadelphia, Pennsylvania 19102
(215)985-2400

INSTRUCTIONS TO THE WITNESS

Read your deposition over carefully. It is your right to read your deposition and make changes in form or substance. You should assign a reason in the appropriate column on the errata sheet for any change made.

After making any changes in form or substance which have been noted on the following errata sheet along with the reason for any change, sign your name on the errata sheet and date it.

Then sign your deposition at the end of your testimony in the space provided. You are signing it subject to the changes you have made in the errata sheet, which will be attached to the deposition before filing. You must sign it in front of a witness. Have the witness sign in the space provided. The witness need not be a notary public. Any competent adult may witness your signature.

Return the original errata sheet to your counsel promptly. Court rules require filing within thirty days after you receive the deposition.

ERRATA SHEET

Attach to Deposition of: Pavithra Ramesh
Taken on: August 9, 2019
In the matter of: Jones, et al. v. Realpage, Inc., et al.

PAGE LINE NO. CHANGE REASON

SIGNATURE PAGE

- - -

I hereby acknowledge that I have read the aforegoing transcript, dated August 9, 2019, and the same is a true and correct transcription of the answers given by me to the questions propounded, except for the changes, if any, noted on the Errata Sheet.

- - -

SIGNATURE: Pavithra Ramesh
Pavithra Ramesh

DATE: 09/16/2019

WITNESSED BY: Bonnie McLeigh

A

**a.m** 1:14 7:12,16
**able** 49:8 50:16 56:5 65:24 67:9 71:19 79:10 91:1 92:10 107:12 110:6,7 113:3 115:14,23 116:1,7 116:15 118:8 119:7 120:5 125:5 126:4
**above-styled** 1:13
**absence** 46:17 57:10 129:10
**Absolutely** 15:12
**access** 68:19 69:20 121:9
**account** 46:15 99:5 99:13 126:18
**accuracy** 57:8 58:16 62:13 63:19 64:1,1,12,17,19 96:14,20
**accurate** 11:4 45:2 58:21 62:24 131:25
**accurately** 91:16
**achieve** 65:15
**acknowledge** 138:5
**acquire** 21:6 23:2 28:23
**acquired** 39:4 74:23
**acquires** 17:5 20:20 37:2
**action** 5:4 135:12 135:14
**actively** 50:7
**activities** 18:3 110:20
**actual** 24:25
**ad** 12:17
**add** 71:11,17,19,20 131:9 132:14
**additional** 59:10 71:11,17,20 84:22 123:14
**address** 31:13 69:13 71:3,22 72:21 73:20 75:24 76:2 77:9,13 103:3
**adult** 136:18
**affect** 97:10
**aforegoing** 138:6
**age** 35:3 75:9 87:12 87:16 88:8
**agencies** 19:5
**agent** 47:11
**ago** 24:7 41:6 100:15,16,16 108:8
**agree** 27:1,14,15 28:12 39:1 59:14 61:3 65:7,21 66:12,25 67:11 72:12 77:18 105:12 106:1 107:20
**agreement** 133:13
**ahead** 60:8 66:8,11 81:3 86:4 102:22
**al** 5:4,4 137:3,3
**Albert** 84:17,17 85:4
**algorithm** 12:14,17 46:23 47:3,14,19 48:4,8 53:12 62:10 66:15 83:17 90:24,25 91:3
**alias** 33:16 34:4 81:6,13,13 83:6 84:18 87:16 89:13 89:21 103:10 104:19 105:9 107:1 113:9,10,11 113:20 114:19 117:6,7,8,9,12,19 117:20 118:12,17 118:22 119:1,2,2 124:13 129:18,19 129:21
**alias's** 117:9
**aliases** 106:19
**alike** 80:15
**allow** 100:21
**allowed** 68:19
**ambiguous** 16:22 34:25 59:20
**analysis** 12:17 19:24 51:24 52:5 59:6,13,17 91:2 93:19 113:13,15 113:19 119:6 125:18,20,23 126:14 127:16,24 128:11
**analytical** 97:12 98:1
**analytics** 32:6
**and/or** 9:20
**answer** 9:22 11:10 13:6 18:25 20:17 44:2 49:9 50:4,5 59:21 63:23 73:15 78:16,17 79:5 85:19 86:25 98:7 103:15,23 104:11 104:12 105:4 106:22 108:13,24 112:4,22,23 113:15,22,22 114:7,8,11,16 117:2,21 124:14 125:5 132:16
**answered** 58:5
**answering** 123:1
**answers** 113:24 138:8
**anybody** 113:3
**anymore** 129:17 130:9
**anytime** 38:9,9
**apart** 114:9
**apartment** 63:3 74:24 98:24 132:22
**apartments** 59:5
**apologies** 49:20
**appear** 27:20 49:24 50:1
**appearance** 5:11
**appearing** 49:14
**appears** 22:4,24 27:19
**applicant** 56:8 58:22 63:2 66:3 67:16 68:15 69:17 69:20 70:1,8 71:12 74:24 75:15 76:2,10,14 77:22 78:21 79:2,8,19 84:14 87:18 88:18 89:9 108:23 114:18 116:18 117:5 118:9,21 121:22 124:21
**applicant's** 54:22
**applicants** 16:17,18 40:7 47:25 58:18 60:20 61:13 64:20 66:14,22 68:19 73:17 74:1 91:17 92:5,25 110:10,15 110:17 111:3,4 116:22
**application** 28:8,9 28:15 72:9 81:17 82:20 87:8 107:15 107:15,16,18,21 119:17 122:17
**applications** 128:17
**applied** 43:11
**applies** 53:9,11
**apply** 87:4
**applying** 59:5 63:2 132:21
**appreciate** 78:13 95:1
**appropriate** 54:11 136:5
**areas** 10:6
**Arnold** 1:3 11:9
**arrangements** 133:21
**asked** 7:22 17:2 58:4 103:1 110:13 111:24
**asking** 71:16 88:13 99:11 101:11 114:2 131:11,12
**asks** 9:19 15:19 104:20 106:12 109:19 112:10
**assess** 59:12
**assign** 136:4
**associate** 3:1 15:6 47:7 66:14
**associated** 58:22 60:24
**assume** 85:9 86:18 86:23 95:24 122:24
**assuming** 57:12,15 57:21 85:1 87:1,4 87:5,7
**assumptions** 87:9 87:20,22 89:17
**assure** 63:19
**Attach** 137:2
**attached** 133:19 136:14
**attempted** 54:25 111:20
**attended** 93:12,15
**attention** 15:15 74:20 99:12 102:20
**attorney** 6:23
**attorneys** 135:12
**attributed** 131:3
**audit** 91:15,24 96:13,19
**August** 1:14 5:3 22:2,24 68:9 87:4 88:6 94:15,15 95:25 96:5,7,8,8 105:7 130:19 132:21 135:15 137:2 138:6
**automated** 122:8 123:16
**available** 17:23 24:21 29:6,9 33:23 51:2 71:21 71:22 73:25 74:18 114:16
**average** 20:18
**aware** 8:23 20:9 28:22,25 29:8 38:22 90:19 98:21 99:3 125:10

B

**B** 8:8
**bachelor's** 15:12
**back** 7:15 8:16 18:1 24:6 25:7 29:14 37:15 42:6 49:6 54:15 56:22 88:14 92:8 97:23 98:22 105:6 108:11 111:12 114:25 120:1,21 121:12 124:11 126:9,13 130:16,18 133:4
**background** 15:11 16:17,19 18:13 22:20 26:19 69:8 132:21
**backgroundchec...** 16:8 17:19 20:15
**backtrack** 39:18
**Backtracking** 38:2
**backwards** 56:10
**bad** 14:14 98:24
**balance** 46:24,24 56:15,18 57:20 65:16 67:25 97:24 98:19
**barometer** 57:9
**based** 16:24 43:22 44:12,13,16 56:1 57:4 64:21 66:17 67:1 72:22 78:6 79:25 83:16 87:19 87:25 88:5 97:1 99:18 113:25 114:5,6 132:11

**basic** 12:12 16:15 71:21
**basically** 33:8 65:16 114:2
**basis** 37:6,7 59:12 63:10 91:8
**Bates** 21:13 40:23
**beginning** 33:11 68:14 110:21
**begins** 84:3
**behalf** 1:4 5:22 8:24 10:5,7 15:17
**believe** 17:6 26:13 26:16 82:3 126:9
**belong** 47:1,2
**belonging** 67:15
**belongs** 64:4
**benefits** 91:24
**best** 51:2
**better** 46:24
**beyond** 109:21
**bias** 59:10
**big** 53:4
**biotechnology** 15:13
**birth** 31:8 32:11,22 33:1,2,6,10,13,16 33:18,23,25 34:3 34:4,5,17,19 35:2 35:4,9,11,21,22 38:3,5,13,19,24 39:2,4,7,11,12,13 39:19 43:12 46:21 59:16 69:25 71:2 71:22 72:22 73:20 75:6,9,9,19 76:11 76:17 77:17 78:8 79:23 80:7 81:19 82:17 83:3 84:15 85:10 86:22,22 87:10,12,17 88:9 88:17,18 89:3,5,7 89:9,13,21 94:3 94:12,21 95:5,16 95:21,25 96:4,22 96:25 97:10,20 105:10 114:23 115:19 121:19 129:11 131:17,21
**birthday** 94:15
**births** 77:24
**bit** 54:18 68:2 117:22
**blank** 31:21 73:8 88:21 96:10
**block** 49:14
**blocked** 49:24 51:19
**born** 84:4
**borrow** 84:10
**boss** 122:24
**bottom** 42:1
**Boulevard** 1:17 3:2
**break** 41:25 42:9 48:24 54:8,9 118:6 120:4
**Brennan** 2:8 5:15
**bring** 99:15
**brings** 83:10
**broad** 110:18
**broke** 27:17
**Brooklyn** 2:14
**brought** 6:23
**bulk** 16:6 17:5,8,14 17:22,24 20:19,22 21:8 23:2 24:25 26:11,15,19 32:2 34:7 36:5,21 37:1 37:2,6,8 38:3 53:17 54:3
**bullet** 88:15 94:1
**bunch** 32:15,16,23 32:24 33:5,5
**business** 12:19 16:16 74:14,17 93:9,10 95:15 101:7
**button** 107:18
**buys** 20:12

**C**

**C** 2:1
**cadence** 17:12,12 19:23 37:8,16 53:19,20,24
**Cadman** 2:13
**calculate** 123:12
**calendar** 103:5
**California** 2:19,23
**call** 9:8 17:14
**called** 9:13 17:6 22:5 23:19 37:2 40:24 41:6 47:4 62:9 80:17
**calls** 45:6
**Camino** 2:22
**capabilities** 9:21 111:15 112:3 114:11,15 118:1 120:23 121:4,21
**capable** 111:1 119:18
**capacity** 10:2
**carefully** 136:2
**case** 1:7 8:24 9:23 10:12,13,17,21 11:7 18:8 26:14 27:14,24 33:15 40:22 58:14 62:4 67:19 68:9,23 69:10 72:4,14 80:25 81:4 82:1 92:8 98:4 104:6 105:19 113:21 127:14
**case-by-case** 59:12 91:8
**cases** 17:25 38:17 67:16 122:18 130:5
**catch** 101:16
**categories** 8:3 115:9
**category** 39:24 113:4,6 126:3
**cause** 1:14 59:10 89:10 92:16 97:23
**caused** 67:17 82:6 127:25
**causes** 61:6 67:2
**causing** 65:22
**certain** 47:10,14 55:18 56:12 69:6 69:11 73:22 81:7 100:25 101:1 108:16 112:11,12
**certainty** 59:22
**Certified** 1:22 135:2 135:15
**certify** 135:3,10
**chain** 100:7
**chance** 10:23 98:2
**change** 60:4,15 86:22 118:6 119:22 127:1,4 136:6,9 137:4
**changed** 89:7
**changes** 14:7 19:22 136:4,7,13 138:9
**changing** 19:19,22 35:5 46:15 51:4 62:18 63:15 64:15
**character** 93:7
**character-by** 125:2
**character-by-cha...** 124:10
**character-for-cha...** 77:21 78:6,10,20 78:23 79:1,6 92:19 96:16 97:9 97:19 103:9 104:16,18,22,25 105:1,5,13,20,25 106:3,6,7,9,14,17 107:1 108:22,25 109:4,5,8,12,14 109:16 110:2 112:15,18 117:18 122:13 124:25 125:2
**characterization** 47:20
**charge** 52:9
**Chase** 3:5 5:8
**check** 41:17,23 47:20
**checks** 17:1
**chosen** 35:8
**Christine** 1:15 5:7 135:2,18
**circumstances** 130:23
**Civ** 4:12 9:14
**Civil** 1:18 5:4
**clarify** 8:21 27:11 29:21 36:4 72:24
**classified** 126:2
**clear** 35:14 64:13
**clearly** 75:11
**Cleveland** 6:25
**click** 107:18
**client** 33:3 56:8 59:11 68:15 99:25 100:5 101:15
**clients** 12:17 13:13 74:11 99:13 102:2 102:13 108:17
**close** 15:25 53:7
**closer** 45:4,13
**code** 23:23 24:3 46:9,10 48:19 115:10,15
**coding** 46:10
**Cohen** 2:12 5:19
**colleague** 5:14
**collected** 25:16,19
**collecting** 24:12
**collection** 24:19
**column** 22:13 32:10 32:11,22 136:5
**columns** 25:14
**combination** 44:23 54:1
**combinations** 88:15
**combine** 44:14 80:1 89:22 129:7
**combined** 43:16,22 44:13
**combines** 80:2
**combining** 129:9
**come** 28:19 30:12 38:3 50:13 56:17 93:23 98:22 99:12 101:15 102:3,6 106:9 113:22
**comes** 36:6 37:6 46:18 77:16 107:14
**coming** 34:12,22 63:22 103:22 133:15
**comment** 98:18
**committed** 59:4 60:24 132:6,17
**common** 79:20
**companies** 16:10 16:13
**company** 8:1 9:1 10:8 19:1 32:5 45:6 92:21 132:16
**company's** 120:5
**companywide** 101:22
**compare** 116:23 126:19
**compatible** 63:22
**competent** 136:18
**complete** 6:20 20:23 21:7 24:8 31:8 33:22,25 35:11 38:5,13,19 39:4 59:15,16 131:21
**completeness** 14:4 14:5
**complex** 46:22 58:8
**compliance** 19:22 99:17 100:20,22 100:24
**component** 95:5 97:3 122:10
**components** 78:14 78:15 80:13 95:3 95:4 97:7
**comprehensive** 16:23
**computer** 39:20 46:4 68:20 71:19 73:7 91:2 123:22

123:24 124:8
**computer-genera...** 120:13
**computerized** 124:4
**concerning** 25:2 30:16,22 31:1 39:5,25 59:15 110:9
**conclude** 45:2 82:24
**concluded** 134:2
**condition** 88:25 113:4
**conditions** 85:1 86:21
**conduct** 113:13,15 113:19
**conducted** 91:14
**conferences** 93:13
**confidentiality** 133:13
**confirm** 79:10 107:3,5 110:7 111:5
**confirmation** 104:11
**confirmed** 45:10
**conformed** 26:17 26:19 27:19
**conforming** 113:17
**connection** 5:17 6:14 14:14 69:16
**consequence** 117:14
**consider** 34:21 66:2 79:18 80:9 80:13 84:19 85:23 110:13 125:25 128:2,11
**consideration** 73:23 85:16
**considered** 65:17 77:19 81:22 83:9 83:18 90:8,12,17 90:23 91:11 122:4 126:1 128:16
**considers** 83:13
**consistent** 52:2 101:25 102:4
**consistently** 63:25
**constant** 61:19
**constantly** 35:5 62:16,17 129:13
**consultant** 15:7
**consume** 14:3
**consumer** 9:21 27:8 47:8,11 58:25 59:11 67:5 67:15 84:24 111:15 114:12 121:5
**consumer's** 27:1 44:25 45:9,21 49:15,24 50:1 52:22 86:11,12 127:15
**consumers** 40:3 62:19 64:2 102:6 103:3 112:10
**consuming** 13:8,24
**contain** 89:5
**contains** 88:18 89:3 96:4
**context** 110:13
**continue** 49:19 58:9
**continued** 127:7
**continues** 63:16
**continuing** 63:25
**contract** 20:9,13,14 20:16
**contractual** 21:4
**contributed** 128:3
**contributing** 128:12
**control** 22:20 47:19 48:3,7 73:12
**convert** 49:22
**converted** 44:19
**conviction** 24:15
**copy** 61:21,22 107:12,14,22 119:4 133:22
**corporate** 7:2 132:4
**correct** 8:22 10:8 11:20 16:15 17:6 17:7,16 19:3 22:9 22:10,16,25 23:4 27:4,21,25 28:16 28:17,20,21,23,24 29:3 30:2 32:3,8,9 33:13,17,23 34:9 34:10,13,14,19,20 36:1,6,7,14,15,18 36:19,23 37:4 42:12,13 44:7,8 45:11 47:20,25 48:1 50:10 54:23 55:11,16 57:11,14 57:23 61:16 62:14 63:1,3,8 65:1,8,12 65:13,16,20 66:3 66:18,24 67:21 68:17,18,25 69:1 69:4,9,24 70:6,10 74:6 76:11,25 77:8,10 80:10 82:19 93:10 94:18 101:5,6,9 102:10 102:11 105:10,22 105:23 106:14,20 108:1 109:10 111:8 122:7 123:24 126:13 131:1 132:23 138:7
**correction** 6:2 10:25 11:3 24:4
**corrections** 10:23 24:5,10,17 25:9 29:16 33:2 35:9 35:20 36:1,12,17 38:23 115:11,16 131:21
**Corrections'** 24:21
**correctly** 44:5 47:19
**cost** 19:25
**counsel** 3:1 5:11 8:6 41:14 117:23 118:4 135:8,10 136:21
**County** 30:4,8,16 30:19,21 31:1,3,8 31:12 33:21 35:10 36:13,17
**county-level** 17:21
**couple** 30:11 32:18 55:8
**course** 100:12 101:21
**court** 1:1,22,22 5:6 5:7 6:24 7:5 9:24 17:25 18:5 20:24 21:7 24:8,8,15,16 24:16 30:5,8,16 33:21 35:10 36:13 84:10 133:15 135:19 136:21
**courthouse** 29:2
**courthouses** 19:12 20:2
**cover** 96:2
**cracks** 92:12
**create** 76:20 81:5 89:16 93:23 97:5 97:6
**created** 42:19 83:24
**credit** 17:1 107:6 110:9
**crime** 20:24 21:7 24:9 25:6 29:6 30:22 31:1,2,4 32:7 33:22 34:8 34:17 35:22 36:12 36:18 59:15 77:23 78:23 82:17 98:23 100:6
**crimes** 32:2 39:10 40:7 55:18 58:3 59:4 60:24 81:7 98:20 102:1 132:7 132:17
**criminal** 4:14 12:15 13:8,9,25 16:6,13 16:19,24 17:5,8 17:17,20,21 18:23 19:6,10,16 20:4 20:11 22:8,23 23:2 25:2,16,18 25:24,25 26:24 28:18,20 29:9,17 29:18 34:1 37:3 38:6,18,19 39:5 40:1,6,24 41:4,12 42:9 43:8 44:3 45:11 47:15,24 49:14 51:18 54:21 55:10,11,24 56:16 58:22 59:3 60:21 61:12 63:2 64:19 66:2,14,22 67:14 74:22 75:14 76:9 79:21 82:6 83:1 84:16 87:8 88:17 89:2,4,5,8 91:16 93:17 96:4 101:1 101:12,16 102:7 102:16 103:6,11 105:8 112:13,14 112:17 117:17 122:17 130:25
**criteria** 16:24 105:3 122:12
**crux** 61:24 62:1
**CSR** 1:15 135:18
**current** 62:21 71:3
**customer** 99:5,14
**customers** 73:24 98:22
**customizable** 73:22
**cut** 22:18 23:12 32:19 38:15

D

**D** 1:3 4:10 5:3,13 6:23 8:17 22:1 69:12 83:7
**D-A-N-A** 90:12
**d/b/a** 1:8
**daily** 23:1 37:6,7
**Dallas** 15:6
**Dana** 90:12
**data** 9:21 12:9,13 12:14 13:8,8,9,11 13:25 14:1,3,5,7 15:9 16:6,6,8 17:4 17:5,8,9,14,16,22 19:11,11,18,23 20:1,4,10,12,14 20:19,23 21:5,6,8 22:22 23:2,2,15 23:18,24 24:7,15 24:24,25 25:1,5,5 25:6,15 26:1,8,11 26:14,15,19,23 27:6,8,18 28:18 28:18,23,23 29:6 29:8,16,22 30:20 31:15,25 32:4 34:7,8,12,22,23 35:7,13 36:6,10 36:13,21,22 37:1 37:2,6,8,9,14,20 37:22 38:3,4,8,12 38:17,18 39:7 40:6,15 46:16,17 46:18 51:3,4,16 52:19,23 53:17,18 54:3,4 56:11,17 56:19 57:4,7,8,11 57:25 58:2,16,24 59:7,9,10,15 62:18,24 63:22 64:15,22,25 65:7 65:10 66:17 67:23 73:6,24 74:24 75:8 77:4 82:22 82:23 88:1 101:25 102:2,4,6 107:6 108:5,6 110:23 111:2,15 114:6,7 114:10,12 115:14 119:3,11 120:14 120:17,21 121:5 121:10,15 123:9 124:19 125:8,25 129:14,16,17 131:20
**database** 24:11

100:9 104:7 107:7 111:21,23,23 114:1 115:1,14,23 116:15 120:24 121:16 130:7
**databases** 9:22 107:9,10 112:1 120:18,20,24 121:7,9 123:4
**date** 31:8 32:11,22 33:1,6,7,10,15,19 33:23,25 34:2,3,4 34:5,16,18 35:3 35:11,21,22 38:2 38:5,13,19,24 39:2,4,6,8,11,11 39:12,13,14,14,19 43:12 46:21 59:16 69:25 70:4 71:2 71:22 72:21 73:20 75:6,9,18 76:10 76:17 77:17,24 78:8 79:23 80:7 81:19,20 84:15 85:10 86:22 87:10 87:12,17 88:9,10 88:18,19 89:3,5,7 89:13,21 94:15,21 95:20,25 96:4,5 96:22,22,25 97:9 97:10,20 99:22 114:23 115:19 123:23,24 129:11 131:17,21 135:19 136:10 138:19
**dated** 138:6
**dates** 88:17 94:12 121:19
**David** 90:7
**day** 33:7,10,22 37:13 94:3 135:15
**day-to-day** 110:19 122:23
**days** 37:13,18,19 73:1 136:22
**deadline** 133:15
**dealt** 99:20 101:19
**December** 33:9 34:18 39:3 42:24 115:20
**decided** 62:8
**deciding** 19:9
**decision** 19:15 74:14,17 132:3
**decrease** 53:1,4 126:24 127:25
128:19
**decreased** 125:16 128:8
**deduced** 113:1
**defendant** 1:9 2:16 5:22 7:2 8:7
**defendant's** 4:16 98:2,10
**define** 78:15 96:1
**defined** 95:4
**definition** 64:12 67:1 125:1
**degree** 44:10 73:22 101:25
**deliver** 21:7
**delivered** 18:20 22:4 25:1 26:14 29:10,16 36:22 53:20 67:12 107:21
**deliveries** 21:8
**delivering** 20:23
**delivers** 25:5 38:5 38:12,18,19
**Department** 24:5,9 24:17,20 29:15 33:1 35:8,20 36:1 36:12,16 38:22 115:11,15 131:20
**depending** 53:25
**depends** 17:2 27:9 27:9 35:1,4 71:14 79:4 80:5,7 94:19
**deposition** 1:11 4:11,12 5:2,9,15 6:3 7:1,4,22 8:17 8:22 9:6,7,13 11:10 15:18 83:24 111:13 134:2 135:6 136:2,3,11 136:15,23 137:2
**derive** 48:17
**deriving** 91:11 107:2
**DESCRIPTION** 4:9
**designate** 7:22 9:19
**designated** 8:2,7 9:1 10:6 15:16
**designating** 133:14
**designations** 133:16
**designed** 63:19 92:21 132:20
**desk** 28:14
**Detail** 4:13
**details** 100:1
**deteriorate** 96:15 96:21
**determine** 16:18 44:10 54:21 59:3 86:10 91:16 103:15 111:2 124:1
**determining** 39:15
**detriments** 91:24
**development** 50:21
**Diane** 1:3 4:10 5:3 5:13 6:23 8:17 18:9,14 22:1 26:14 68:10 69:12 81:18,23 82:14,18 82:25 83:5,13,18 98:4,10 101:16 105:14,19 106:16 106:24 115:6 119:13 122:5
**Diego** 2:23
**difference** 26:21 117:15
**differences** 64:24
**different** 8:10 17:10 19:20 26:10,15,18 37:10 44:6,8 53:24 86:9 92:5,5 92:7,11,12 121:11 127:13
**direct** 13:20,21,23 14:18 102:19
**directly** 19:6,11,16 20:1 30:19
**director** 14:19
**disagree** 109:6,19
**disagreement** 109:22 117:25
**discharged** 18:7
**discourage** 71:9
**discovery** 9:23
**discussing** 108:20 121:19
**Discussion** 7:13 133:24
**disk** 118:6
**dismissed** 18:6
**display** 25:12 47:10 47:12 48:3,9,13 54:22 84:24 86:11 86:11
**displayed** 25:4,13 26:19,23,25 30:17
**dispute** 14:8 45:8 45:15,19 56:19 57:8,11,18 59:11
60:11 64:9,25 125:8 126:10 127:12
**disputed** 57:21 58:17 60:10,21 64:5 93:17
**disputes** 44:24 45:18,20,25 46:1 46:2 52:19,20,20 53:1,2,4 56:3,4 57:5,6,10 58:12 59:25 60:3,5,14 64:2,7,7,21,22 65:2,3,11 97:16 97:17 102:11,13 125:11,15 126:1,2 126:4,5,7,15,16 126:17,20,21,24 127:6,11,25 128:3 128:8,12,14,16
**disputing** 65:6
**District** 1:1,1 5:6,6 6:24,25
**document** 7:18 8:15 9:13,19 21:12,17,24 40:21 40:23 42:15 61:25 83:23 84:2,6 92:23 94:10 98:9 98:17 125:14
**documentation** 46:6
**documents** 8:11 11:15,16 93:6
**doing** 32:6 74:9,11 118:23,24 119:18 121:6
**double** 80:18,19,23 81:5,9,11,18,22 82:15 83:16,18,21 90:4,8,12,17,24 91:15,19,22,24 92:2,7,9,13 93:14 93:16,20,22 121:23 122:1,5,10 122:16,19,21 123:11 124:2,6,9
**draft** 133:21
**driver's** 71:18 72:1 72:5 74:16 76:4
**drop** 54:23
**dropping** 130:6
**duly** 1:13 6:7 135:5
**duties** 12:12,21
**dynamic** 51:5 61:20 63:16
**dynamics** 132:12

E

**E** 2:1,1
**e-mail** 2:7,11,15,20 2:24 3:3 42:18 100:7
**e-mails** 130:4
**earlier** 38:9 53:18 81:25 94:2 121:19 124:15
**easier** 17:15 86:17
**easily** 73:25
**easy** 49:22
**educational** 15:11
**Edward** 2:12 5:18
**edward@cml.legal** 2:15
**effect** 54:19
**efficient** 8:6
**effort** 108:19 110:3 110:6
**efforts** 111:9 112:3
**either** 17:22 29:6 31:10,15 36:16 51:11 53:16,22 62:5 75:8 103:9 104:18 105:20 106:4,17 107:1
**El** 2:22
**elaborate** 106:12
**elect** 72:19
**eliminate** 85:18
**Elsberry** 52:8
**empir-** 97:22
**empirical** 97:21 113:25
**employed** 135:11
**enables** 56:23
**encourage** 71:7
**encouraged** 70:17 72:14
**ended** 98:23 127:12
**ends** 67:15
**engineers** 50:18
**enhanced** 42:1
**enhancement** 40:18 41:11,11,14 42:11,14,17,20,22 43:7,13 44:17 45:3,23 46:3,7 47:21 49:13 50:8 52:7,12,15,24 53:9 54:18,25 55:13 58:10 60:15 60:18 61:3 62:8

63:6,6,18,19,20 63:24 64:18 65:10 65:23 66:21 67:3 67:7,19,20,22 68:4 85:18 86:6,7 86:9,15,18,24 87:23 89:17 125:16,17,20 126:12,15,16,20 127:10 128:4,10 128:15,21
**enhancements** 128:21
**ensure** 13:14 14:5 37:25 51:1 58:12 63:24 64:14,16 92:8,10 96:11 129:8
**ensuring** 63:13
**enter** 70:17
**Enterprise** 15:8
**entire** 57:7
**entirely** 34:11 89:12
**environment** 37:23 37:23,24 38:1
**equated** 122:16
**equates** 82:13
**equation** 83:4
**equivalent** 83:4,14
**errata** 136:5,9,10 136:14,20 137:1 138:10
**escalated** 99:6
**Esq** 2:4,8,12,17,21 3:1
**et** 5:4,4 137:3,3
**evaluate** 40:16
**evaluating** 62:17
**event** 92:16
**evicted** 18:4
**eviction** 18:6
**eviction-type** 16:19
**evidence** 55:19,22 55:25 56:2 97:21 97:22
**exact** 18:24,25 24:12 33:1 34:3,5 34:16 35:3,22 39:6,12,19 46:21 52:25 53:6 57:19 76:2,18 77:11,12 78:9 81:15 82:11 87:14 88:20,20,21 95:9 96:9,9,10,21 96:25 97:8,9,19 97:20,25 100:17 111:24 113:11 127:5 131:17
**exactly** 29:2 48:25 74:19 100:23
**EXAMINATION** 4:4 6:9
**examined** 6:7
**example** 35:7 37:12 73:15 80:9,22,24 81:9 84:3,13 85:6 87:5 88:2,25 89:15,23 90:6,11 95:24 99:11 101:2 112:7 126:19
**examples** 4:15 83:25 84:3 87:22
**exclude** 122:11
**excuse** 42:18 87:17
**Exhibit** 7:14 9:10 21:15 41:2 84:7 98:14
**exhibits** 4:8 133:19
**existing** 44:3
**expand** 33:18
**expect** 27:13 34:11 69:5 131:14,18
**expected** 11:10
**experience** 15:4 131:4,24
**Expiration** 135:19
**explain** 12:12 32:23 41:14,18,19 43:4 43:21 115:3 128:6
**explained** 46:8
**explains** 95:15
**explanation** 83:12
**expunged** 101:4
**extremely** 120:10
**eyeballs** 123:7
**eyes** 123:10,11

**F**

**fact** 23:15 66:19 69:6 82:16 131:15
**factor** 85:15
**factors** 128:2,11
**failed** 98:22
**fair** 101:24
**familiar** 15:22 18:8 18:15 36:25 40:14 40:17,18 79:12 80:20 99:12 111:14 120:25
**familiarized** 130:22
**far** 36:24 50:22
**fashion** 123:16
**February** 89:8
**Fed** 4:12 9:14
**Federal** 1:18
**feed** 36:5
**feedback** 13:13
**felt** 63:5
**female** 82:21 83:3
**ferreting** 65:16
**field** 33:16 34:2 38:3 39:2 70:12 70:19 71:5,11,17 72:1,5,7 73:8,18 74:5 76:24 77:1,3 115:16,24 116:2 116:18,19 118:11 118:12
**fields** 69:6 70:24 71:20,21,24 72:13 73:3,4,7,13,18 75:1 76:7,24 115:2 116:16 121:18
**fifth** 81:13,14
**figure** 14:17 48:18 55:6 58:2,3 63:17 63:18 85:16 88:13 90:20 117:11 119:6 123:14
**figuring** 90:16
**file** 17:13 45:1,21 56:22 57:2 60:11 60:22 86:12 127:7 127:8
**filed** 18:6
**filing** 136:15,21
**fill** 69:7 70:20,25 72:14 73:2,6
**filled** 115:24
**filtered** 47:15,17 49:17
**final** 43:16,18,21,23 52:11
**finally** 50:16
**financial** 12:16
**financially** 135:13
**find** 100:9 111:10 122:25
**finding** 39:21 56:14 122:18
**finds** 56:8
**fine** 51:1
**finish** 13:6 44:2 116:25
**first** 4:17 6:7 23:12 30:11 32:18 37:22 38:14 40:15 43:11 57:14,22 61:6 66:2 75:3 76:16 77:21,22 78:9,21 78:22 79:3,7,18 79:19,20 80:4,5,6 80:14,22 82:14 83:4,5 84:13 85:17 88:21 90:11 90:13 94:20 96:9 96:16 97:2,19 98:3,11,12 103:7 104:21,24 105:2 105:17 106:7,16 106:19,25 108:21 109:1,2,9,11,13 109:15 110:1,3,14 110:16,24 111:3,4 112:9,13,15 115:10 116:23 117:9 124:10,21 124:22 125:3 129:11
**fit** 26:17
**five** 37:18,19 48:21 81:14 90:6 95:6 100:21 118:5
**Fleming** 1:24
**Floor** 2:13
**focus** 17:19,20,21 77:15 112:9 118:1
**focused** 35:16 91:19,22 93:21,22 109:1 112:3
**focuses** 17:17 18:2
**focusing** 75:11 89:23 110:2
**follow** 27:3 32:24 61:5,8 110:11 128:5
**follow-me** 94:22 96:11 129:10
**followed** 27:13,20 27:24 32:15,16,24 33:5 128:14,14
**following** 57:17 128:10 135:4 136:8
**follows** 6:8 27:3,6 103:19
**forget** 118:16
**form** 12:23 15:10 25:20 26:2 28:1 29:19 32:2 34:15 35:12,23 48:6 58:4 61:1 62:15 65:19 76:12 78:24 79:9 85:5,24 87:2 88:4 89:11,19 91:18 105:24 107:8 114:4 136:4 136:7
**format** 26:10 107:10,24 108:3,7 108:9 111:2 120:9 120:14,22
**formatted** 34:7
**formatting** 63:23
**forth** 63:23 85:25 89:18
**forward** 56:6 71:1 90:6
**found** 53:2 129:18
**four** 83:2 89:23
**frame** 100:18 112:11
**Francis** 2:4,8 84:17 85:4
**frankly** 106:18
**free** 24:21 29:1
**frequently** 37:17 38:4
**front** 7:18 8:22 9:9 9:15 44:4 102:24 136:16
**full** 6:11 35:20,22 38:24 88:18 89:3 89:5 95:20 96:1,4
**fully** 117:2
**Fulton** 30:4,8,16,19 30:21,25 31:3,7 31:11 33:21 35:10 36:13,17
**functioning** 84:1
**further** 133:7 135:10,13

**G**

**GADOCSPL** 23:19
**gather** 17:25 18:23 19:10,15
**gathering** 15:20,24 40:6
**gathers** 17:9
**gauge** 45:24 52:17 58:16 66:16
**GDC** 26:8
**gender** 71:24,25 76:15,15,23 78:2 78:3 82:19 83:3 84:22 85:1 87:6 87:24 88:11 89:18 94:25 96:12 97:1

**GENERAL** 3:1
**generated** 28:13 108:6 116:8 130:23
**Genuine** 16:6 17:4 17:9,16 20:10,12 20:14,19,23 21:5 21:6 22:22 23:2 23:15,18,24 24:7 24:14 25:1,5,15 26:1,8,23 28:18 28:22 29:8,16,22 30:20 31:15,25 32:4 34:8,12,22 35:7,13 36:6,10 36:13,22 37:9,13 38:4,12,17 39:7 46:17 53:18 54:3 74:24 75:8 131:20
**GenuineDataSer...** 37:9
**Geoffrey** 84:3,15 85:3 87:9,15
**George** 84:18 87:10 87:15
**Georgia** 24:4,5,21 25:9 29:15 33:1 35:6 36:1 81:7 82:7 115:11,15 131:1,16,20 132:7
**getting** 19:11,16 20:1 68:14 70:21
**Gina** 90:4
**give** 11:6,13 19:23 35:3,3 37:5 43:16 43:20,21 69:21 71:18 80:22,24 81:16 97:25 100:17 111:17,24 116:3 119:8 125:8
**given** 33:10 53:15 131:15 135:7 138:8
**gives** 18:5 44:15 48:8
**giving** 98:23 118:23
**go** 7:8,9 8:16 21:6 24:7,9,15 39:15 41:25 43:10 49:2 50:13 54:10 60:8 66:8,10,11 70:25 73:2 77:25 78:7 81:3 83:25 84:23 86:4 88:14 91:20 92:12 97:4 100:4 102:21 107:2 119:16,21 122:18 122:25 130:12 132:24
**goes** 83:17 92:8 96:11 114:24 124:11
**going** 13:12 24:6 45:15,16 48:2,20 49:14 50:15 51:19 56:6,21 58:8 59:9 65:5 70:20 74:4,4 81:2 83:23 85:13 86:22,23 90:22 97:22,23 100:2 109:6,18 113:3 123:17 124:4 128:6 130:1,18
**Gonzalez** 14:11
**good** 6:19,21 67:10 69:19 71:15
**Google** 93:5
**gotten** 33:25 45:18
**government** 19:5 19:12 20:1 29:17 35:21
**governs** 20:10
**group** 124:2
**guess** 68:13 70:9 113:14 118:8 123:5 124:13 125:19

**H**

**half** 27:18
**Hammonton** 1:24
**hand** 52:3 76:9 118:9
**handle** 14:8 46:18
**handy** 84:9
**happen** 99:8 109:17
**happened** 57:11 98:24 99:25 113:9 131:14
**happens** 97:2
**hard** 19:19 78:12 84:20 85:12 86:13 86:14 97:3 100:17 100:22 117:11,21 118:20,20 119:3 121:25 122:19 124:7
**Hartman** 14:11
**head** 48:14 91:2,5 92:15 99:23 125:13
**heading** 98:12
**hear** 6:16 14:24 21:1 28:7
**heard** 6:15 58:24
**hearsay** 97:22 99:4
**Heights** 69:12
**held** 5:5,9 7:13 133:24
**help** 15:1 21:11 81:10 84:1
**helpful** 17:3
**Hewlett** 15:7
**high** 61:17 80:21 83:15 127:8
**higher** 55:1
**highlights** 129:22
**historical** 44:16 45:24 46:1 56:2 56:11 57:4 66:17 92:23 107:17
**historically** 44:23 45:5,14,20 57:17
**history** 17:1 22:8 46:23 92:22 101:16 102:16
**hoc** 12:17
**hold** 8:13,13 12:7 25:6
**Hollywood** 6:17
**house** 121:15
**housed** 107:7
**Huddleston** 3:5 5:8
**Hughes** 51:14,15
**human** 59:9 123:12
**hypothetical** 85:8 87:3

**I**

**ID** 72:2
**identified** 11:16
**identifies** 125:15
**identify** 21:25 69:4 81:11
**immediately** 128:15
**implementation** 52:12,24 92:17 128:20
**implemented** 43:1 43:2 126:12
**important** 27:12 30:13 36:5 72:25 86:10
**impossibility** 114:2
**improve** 50:25 62:13 96:15,21 128:25 129:1,23
**improved** 64:18
**improvements** 13:13
**improving** 61:18 62:16 64:1 128:22
**inadvertently** 13:2
**Inaudible** 20:6 22:15 23:5,10 27:22 32:13 36:8 36:10 38:10 48:10
**include** 31:4,8,12 38:23 39:10 58:21 86:6,7 130:25
**included** 12:15 16:25 103:6 110:14 125:4
**includes** 32:7 37:3 67:14 122:10
**including** 59:16
**income** 72:2
**incomplete** 85:7 87:2
**inconsistencies** 129:19
**incorrect** 82:2
**increase** 55:17
**increased** 125:16
**independently** 59:1
**INDEX** 4:1
**India** 15:12
**indicated** 34:17
**indication** 45:5
**individual** 78:15 103:8 104:25 105:18 109:3,12 109:14 112:16,19 117:19
**individually** 1:3 6:4 116:17
**inform** 130:4
**information** 14:1 15:20,24 16:11 17:10 18:1,7,23 19:6,15,21 20:11 22:12 23:11,16,25 24:10,25 25:11,11 25:16,19,23,24 26:1,8 29:4,9,15 29:18,23 30:7,16 30:21,25 31:12,17 31:22 32:1 33:4 34:12 36:11 40:2 43:9 44:13,16 47:8 53:13 69:11 69:21 70:13,23 71:12,14 73:2 76:6 79:2 82:21 83:7 84:15,22 103:7 107:4 108:14 111:24 112:13 114:22 118:11,12,21 126:10 131:7,8 132:2,10
**initial** 83:7
**initially** 15:6
**input** 27:9 74:5 84:14
**inputs** 131:7,15
**inquiry** 68:15
**instance** 1:12 39:4 61:7 78:20 85:17 106:8
**instances** 25:8,10 77:6 80:8,11,12 80:16 92:4 98:21 99:1 100:5,8,11 100:18 109:22 113:11 127:14
**instantaneous** 17:15
**INSTRUCTIONS** 136:1
**intentional** 88:16 94:11
**intentionally** 110:18
**interested** 135:14
**internal** 13:15
**internally** 28:10 38:4
**interrogatories** 4:17 98:4,11 102:19 113:25
**interrogatory** 8:14 102:23 103:23 112:4
**interrupt** 117:24 118:5
**investigate** 102:8
**investigates** 16:16
**investigation** 56:21 97:17 127:12
**investigations** 57:1 64:10
**involved** 13:24 14:2 40:18 41:10 50:11 99:25 100:15
**involving** 18:17
**irrespective** 88:11 105:2
**Irvine** 2:19
**isolate** 124:6

**isolation** 78:12 94:19 95:2 97:4 105:15
**issue** 29:24 42:2 87:24,25 99:17 100:20 114:25 117:8
**items** 103:6 112:12

J

**Jackson** 10:12,16 10:20 11:4 89:10
**Jamal** 80:10 89:10
**James** 1:3 80:9
**Jane** 90:4
**January** 33:9 34:18 39:3 115:20
**Jersey** 1:24
**Jessica** 2:21 5:22
**jessica.lohr@tro...** 2:24
**John** 2:4 5:14 6:14 6:22 8:13,13
**joined** 15:8 19:5 50:23
**Jones** 1:3 5:4,14 6:23 11:8 18:9,14 18:17 21:14 22:1 22:9 25:17 26:14 27:14,16,25 30:9 30:23 68:10 69:12 70:10 72:4 81:4 81:12,14,16 82:8 82:10,11,18,25 83:3,8 101:16 103:1 105:7,9,9 105:19 106:4,13 106:14,18 107:13 107:25 115:6 116:18,19,22,22 118:10 121:15 122:3,4,5 124:16 130:18 131:4 132:6 137:3
**Jones'** 4:10,17 7:3 8:17 22:24 26:24 28:12 29:22 30:18 98:11,11 106:24 107:7 119:13 122:16 131:25
**Jones's** 98:4
**Jr** 2:17
**jsoumilas@cons...** 2:7
**judge** 64:24
**judgment** 131:4,24
**July** 12:6
**June** 84:4,15
**jurisdiction** 17:24 23:25 24:2 33:14 33:18 35:1,4,17 81:21 129:15,16 130:5,6,7,8 131:8
**jurisdictional** 23:23 115:10,15
**jurisdictions** 17:11 19:20 32:25 35:2 35:14 37:11,14 39:17,18 53:25 54:1,5,6 62:20 129:14,20
**justice** 118:24
**justify** 87:18 97:25

K

**keep** 13:11 19:19 19:21,25 38:4 54:3,5 63:20 64:14,15 101:17 102:6,8,10 107:22 129:24
**keeping** 63:13,14
**keeps** 19:19
**kept** 127:16
**kind** 41:21 59:6 73:19
**knew** 56:4
**know** 6:15 9:9 16:12 18:24 19:4 19:8,14,18 20:17 20:18,22 21:5 22:20 23:1,22 24:1,12,14,18,20 24:23 27:5 29:5 29:11 30:15,24 31:3,6,7,10,11,14 31:19 33:20,24 35:6,19 38:16,21 38:25 40:11 41:16 41:17,17 43:12,21 46:16 48:14,25 50:4,17,22,24 51:6,8,11 53:8,13 54:9 56:11 57:16 57:19 58:8,20 59:2 60:18,23 62:2,3,5 63:9,21 64:3,3 65:5,15 72:4,6 73:9 81:5 83:17,20,22 84:22 85:12,13 86:7,7 89:8,15,24 90:1,2 90:3,3,5,7,10,11 90:15,21 91:3,5,6 91:13 92:1,15,18 92:20,24 93:12 94:7,8,14 95:14 95:24 96:11 97:16 97:21,23 99:17,18 100:13,20 101:18 101:23 102:3,17 107:11 108:13 110:19 111:7 113:9,20 114:21 115:18 117:7 118:14,15,16,23 118:25 119:8 121:14 122:14 123:20 128:7 129:14,25 130:3 131:9 132:10,17 132:19
**knowing** 55:21 56:6 56:13
**Kroub** 2:12 5:18,18
**KW** 2:8

L

**lack** 83:6 87:6
**Lakeside** 1:17 3:2
**landlord** 16:20 18:20 22:5 48:3 68:24 69:3,15,17 69:21,22 70:13,14 70:20,25 72:23 77:2 107:22
**landlord/tenant** 13:9 14:1 16:8,14 16:25 18:3,5
**landlords** 69:7 71:7 71:12 72:13,18,18 93:1
**landscape** 19:18,23 46:16 51:4 62:18 63:15 64:15
**Lauren** 2:8 5:14
**law** 104:6
**lawful** 102:1
**lawsuit** 6:23
**lawyer** 9:1
**lawyers** 11:11 104:3,4,5
**lbrennan@consu...** 2:11
**leading** 111:9
**leads** 48:4 52:14
**leasing** 47:11
**LeasingDesk** 1:8
28:5,11,14 39:9 107:16
**leave** 45:21 56:21 73:8 97:18
**led** 92:17
**left** 23:20 118:5
**legally** 101:10,11
**let's** 8:16 9:8 15:17 21:10 39:23 49:2 54:18 66:1 68:2 68:13 75:3 85:15 88:14 95:24 112:9 115:5 119:21 122:24 124:20 130:12 132:24
**letter** 124:10
**letter-for-letter** 82:12
**letters** 79:19,20 80:5
**level** 61:17 80:21 83:15
**LexisNexis** 16:9 18:2,5,7
**license** 71:18 72:1 72:5 74:16 76:5
**life** 10:8
**likelihood** 45:14 66:16 92:24 95:10
**line** 23:20 137:4
**list** 90:16,19 91:11 118:21 119:8
**listed** 7:24 8:3 22:8 31:17 34:1 41:12 61:17 103:10 104:19 112:14,17 117:17 132:7
**literature** 95:13
**little** 54:18 68:2 117:22 127:13
**lived** 76:2,14 78:1,7 84:21 94:23
**LLP** 2:12,17,21
**locate** 110:4
**located** 5:16 121:11
**location** 121:12
**log** 122:19,20 124:12
**logging** 107:3 114:21
**logic** 4:14 12:16 40:16,19,21,24 41:4,6,11,12,14 42:1,10,11 43:8 44:4,6,6,9,10,18 45:3,4,22 46:14
47:21,23 51:1 58:7 61:6,10,17 61:19,22 62:1,7,9 62:13,17,21 63:1 63:5 65:14,22,24 66:10,13,21 67:2 67:6,7,8,17 68:3 75:11,12,16 76:9 77:3,19 78:13,19 80:9,13,17,18,19 80:23 81:5,9,23 82:5,13,15,24 83:13,16 84:1,19 84:21 85:2,20,23 86:5,6,8,10,16,19 86:24 87:5,25 88:3,15 89:16 90:14,22 91:12,15 91:25 92:3,13,17 92:21 93:14,20,25 94:7,22 95:1 96:2 96:11 113:2 114:1 114:6 121:23 122:6,10,16,18 128:23,24 129:10 132:12
**Lohr** 2:21 5:22
**long** 12:1,4 18:22 19:1 48:20 50:21 61:25 91:3 92:13 123:18,19 126:6
**longer** 92:21 98:18
**look** 22:3 29:21 39:16,25 48:19 68:8 69:10 78:4 78:12 81:13 84:13 87:21 94:19 103:17 104:23 107:24 109:2 115:6 126:6
**looked** 91:20 97:5,8 97:12,14 125:7 129:18
**looking** 22:11 24:24 50:25 56:10,17 58:2 64:25 65:4 68:16 78:18 81:10 86:14 102:18,21 105:6,16,17 122:15 124:4 129:8
**looks** 43:15 68:23 70:9
**lose** 97:23
**lot** 22:20 37:3 43:9 77:25

**low** 45:14 48:4 65:18
**lower** 48:8 53:12 55:2 59:25
**lowering** 128:3,12 128:13
**lunch** 54:9

**M**

**M-A-N-J-I-T** 15:2
**ma'am** 9:15 11:22 15:11 124:17 130:20
**machine** 1:16
**machine-learning** 43:14
**MAILMAN** 2:4,8
**maintain** 17:13 133:12
**maintained** 100:8 108:12 122:23
**major** 11:1
**making** 61:18 63:15 68:24 106:13 136:7
**management** 14:20
**manager** 11:23,24 11:25 12:1,8,20 12:24,25 13:2,7
**managers** 99:5,14
**manages** 67:22
**Manjit** 14:22,25 15:2
**manual** 120:10 121:25 123:2,6
**manually** 119:17 120:5
**March** 12:3 103:5
**Marietta** 22:5 68:24 121:16
**mark** 7:6 9:5 21:12 40:25 84:5 98:8
**marked** 7:14,18 8:14,15 9:10,11 21:15,16 25:17 41:2,3,5 42:10 61:10 68:5 84:7,8 98:14,15 107:13 130:19
**Market** 2:5,9
**marketing** 13:14
**Martin** 3:1 5:24
**martin.thornthwa...** 3:3
**masked** 70:8
**master's** 15:13
**match** 43:17 47:24 59:8 61:10,12,17 61:22 62:1,7,9,13 63:1 65:17 66:20 74:22 75:1,4,14 75:16,18,21,24 76:1,3,4,8,16,17 76:18,19,20 77:6 77:7,8,9,16,19,21 78:2,3,6,8,10,11 78:20 79:7,15,18 80:3,4,6,10,14,23 81:6,11,15,16,18 81:19,23 82:14,22 82:25 83:5,8,9,11 83:14,19 84:19,24 85:3,17,23 86:25 87:9,15,15,19 88:3,5,10,16,19 88:20,21,21,22 89:10,16,22,24 90:1,4,8,13,17,23 91:1,10 92:19 93:6,23 94:3,11 96:7,9,9,16,22 97:2,5,6,9,10 103:9 104:16,18 104:22,25 105:1,5 105:13,20,25 106:2,3,6,8,9,17 107:1 108:21,25 109:4,5,8,12,14 109:16,23 110:2 111:4 112:15,18 113:2,5,7 114:24 117:18 119:7 121:21,22 122:5,9 124:3,10,21 125:1 129:17 130:6
**matched** 64:8 85:2 88:11 93:18 94:20 94:21,21 105:8 113:10,20 114:17 114:19,20,23,23 117:4,6,7,8,12,12 117:19 118:18,25 119:1,2 122:20 124:25
**matches** 45:18 67:24 79:22,23 80:7 81:13,17 82:11 83:21 91:11 93:7 94:22 96:25 97:1,19,20 104:17 106:13 122:12
**matching** 12:16 40:6,16,19,21 41:6 42:11 44:6 45:3,22 46:14 47:21,23 51:1 58:7 61:5,19 62:17,21 63:20 64:19 65:14,22,23 66:10,13,20 67:2 67:5,7,8,17 68:3 68:13 75:11,12,15 77:3,19 78:13,19 82:1,5,24 83:13 84:19 85:20,23 86:5,6,8,9,16 87:4 87:25 88:3,15 89:16 90:14,22 91:16,21 92:2,17 105:3 129:20 132:12,20
**matter** 5:3 137:3
**matters** 7:23 110:21
**maximum** 62:24 63:25 64:17
**mean** 14:4 16:4 18:11 20:4 27:5 27:12 31:23 32:17 41:9 43:19 44:21 45:17 51:17,23 53:11 60:9,12 71:15 74:13 79:24 94:22 98:1 100:2 102:2,4,5 109:8 110:16 115:3,5 119:10 121:2 123:6,9 127:9 131:22,23
**means** 24:12 33:6,9 44:22 45:13 47:7 47:14 51:20 73:17 77:16 95:24 117:21
**meant** 32:23 43:2 104:3,3 126:23
**measure** 52:18 55:23,25 64:23
**measuring** 57:8
**meet** 11:12 112:12 133:17
**Megan** 14:11 15:23
**memo** 42:19
**memorialized** 42:17
**memorized** 42:17
**memory** 129:25 130:3
**mentioned** 16:3 41:10 49:20 51:4 55:8 83:2 91:21 120:17
**mentions** 94:10
**metaphone** 80:17 80:18,19,23 81:5 81:9,11,18,22 82:15 83:16,19,21 90:4,8,13,17,24 91:15,20,22,25 92:2,7,10,13 93:14,16,20,22 121:23 122:1,5,10 122:16,20,21 124:3
**metaphones** 123:12 124:6,9
**method** 24:18
**middle** 43:11 46:19 76:16 78:9 79:23 80:3,4,4,6 81:15 81:17 83:6,7,9 87:6,7 88:1,21 94:20 96:10,10 97:2 129:11
**midway** 22:11
**mind** 87:22 123:13
**mine** 55:21 102:7
**minimally** 76:8
**minimum** 70:23 75:1 76:19
**minor** 10:25 11:2 15:14
**minus** 88:19 94:2 95:6,6,20
**minutes** 24:7 48:21 118:5
**mismatched** 102:7
**missed** 56:7 101:12 101:14,14 102:14
**missing** 27:18 47:1
**misspell** 92:25
**misstate** 95:10
**mistake** 13:1
**misuse** 92:25
**Mizrahi** 2:12 5:19
**model** 43:14 50:16
**moment** 38:2 41:6 89:23 94:2 98:18 108:7
**Monday** 133:22
**monitor** 14:4
**monitoring** 129:13
**month** 33:22 50:19 70:4 72:2 88:10 88:18 94:3 96:22 97:10 100:15 119:5,14
**monthly** 72:2
**months** 100:16 119:14 125:17 126:11,20,21,22 127:9
**morning** 6:19,21 133:20
**move** 39:23 73:9
**moved** 60:12
**moving** 40:5 90:6
**muddies** 117:22
**muddying** 118:24
**multiple** 16:4 26:11 52:13 78:14

**N**

**N** 2:1
**name** 6:11,20,21,22 14:25 28:4,10 31:12 43:11,12 71:2,22 72:21 73:19 75:4,16 76:10,16,17,17 77:16,18,21,22,22 77:22 78:5,9,9,19 78:21,21,22,22 79:1,1,3,7,7,18,19 79:23 80:3,3,4,9 81:6,12,15,15,17 82:1,10,11,14,14 83:3,5,5,6,10,13 83:14 87:6,14 88:20,21,22 90:3 90:4,7,8,12,13 92:6,25,25 94:20 94:20 96:9,10,10 96:17 97:2,9 103:7,9 104:15,17 104:21,24 105:2,2 105:3,4,9,13,14 105:17,18,20,21 106:4,5,8,13,14 106:16,25,25 107:2 108:21 109:7,9,9,11,13 109:15,15,23 110:1,3,14,17 112:13,15,17,19 113:2,5,9,10,11 113:11,12,20 114:19,19,20 116:1,3,12,18,19 117:4,5,6,9,9,9,10

117:10,12,13,16
117:18,19,20,20
118:9,10,11,15,16
118:16,17,17,25
119:1,1,2 122:3
122:12,17 124:10
124:12,16,21,22
129:11,11 136:10
**named** 116:9
**names** 14:10 43:12
46:19 77:24 78:5
79:15 80:4,6,14
80:22 81:14 87:7
88:1,11 89:13,21
90:17,18,25 91:9
91:11 92:3,6,10
92:19 97:1,2,19
103:10 104:19
106:7,19 108:25
109:1,2,2 110:9
110:24,24 111:3,3
111:4 114:23,24
116:23 117:7
118:22,22,23
119:2 121:19
122:20 123:5
124:13,17 125:3,4
129:10,18,19,21
**narcotics** 30:8,17
30:22 81:7 82:17
131:1 132:6
**narcotics-related**
30:1
**narrowing** 109:22
**need** 43:11 54:9
69:4,7 70:14
77:20 95:15 118:6
133:20,22 136:17
**needed** 63:5 110:23
**neither** 135:10
**never** 31:23,24 32:6
61:19 78:1 109:3
109:17
**nevertheless** 60:22
**new** 1:24 2:14
43:23 44:6 63:21
63:21
**noise** 22:20
**non-match** 45:10
45:15,20,24 48:5
53:1,4 55:14 57:1
57:13,17 59:25
60:14,21 66:17
67:17 93:24 125:7
125:11,15 126:1,2
127:6 132:1

**non-matches** 45:6
56:17 61:4,6
62:14 65:11,22
67:2,23 98:20
**non-matching**
55:10
**nonmanual** 120:12
**normal** 27:19,24
**normalized** 37:24
**normally** 27:20
**Northern** 1:1 5:6
6:24
**notary** 136:18
**notation** 39:3
**note** 130:8
**noted** 136:8 138:10
**notice** 4:11,12 7:3
7:21,24 8:3,17,22
8:25 9:6,7,13
15:18 39:24
111:13 127:1
**noticed** 126:24
**number** 18:24 31:5
32:1,7,10 34:8,9
48:14,17 49:10
51:23,24,25,25
52:4 53:14,16,21
53:22 54:5 55:2
55:14 59:17,24
61:4 62:14 65:2
65:11 67:23 70:7
71:4,18,23 74:8
74:16 75:22 76:5
77:12 81:14 86:25
88:2,2,25 89:15
95:7 99:2 101:23
103:2 108:16
112:10 113:7
125:15 126:7,7
127:11,25 128:7
**numbered** 1:14
**numbers** 21:13
32:4 52:25 53:6
54:2 57:19 70:16
71:8 72:19 74:12
97:25 127:5
**numerical** 48:12
54:20

**O**

**oath** 6:8
**Objection** 12:23
16:21 25:20 26:2
28:1 29:19 34:15
34:24 35:12,23
48:6 58:4 59:19

61:1 62:15 65:19
76:12 78:24 79:9
85:5,7,24 86:3
87:2 88:4 89:11
89:19 91:18
105:24 107:8
114:4
**objections** 4:16
98:3,10,12 103:18
103:19
**objective** 55:25
**obligations** 133:17
**obtain** 24:8,10,16
**obtained** 26:25
31:16 131:19
**obtains** 25:25 26:4
**obviously** 64:16
69:20
**occasion** 110:22
**occur** 100:11
101:22
**occurred** 24:16
**occurs** 40:11
**offender** 31:5,9,13
33:6 34:1,4 47:8
79:2,8 82:20
87:16 89:13
103:10 104:18
105:21,21 106:2
106:19 107:2
108:22 112:14,17
113:5,12 114:19
116:9,19 117:12
117:17,20 118:10
118:11,17,22
119:1 124:13,22
124:23
**offender's** 89:21
114:22 117:5,10
**offenders** 111:4
116:22
**offense** 25:2,12
29:10,17,24 30:1
30:8,17 31:17
38:6,20 39:5
55:20
**offenses** 55:24
101:1
**offices** 19:12
**oh** 13:24 32:20 43:2
72:11 75:13 77:7
89:4 104:5 108:9
129:1
**Ohio** 1:1 5:6 6:25
15:14 69:12
**okay** 11:6 13:4

14:15 17:3 21:17
24:1,6,14 25:15
26:22 27:11 28:12
29:14 30:20 31:20
31:25 32:20 33:8
35:18 36:24 37:20
38:2 39:23 40:9
40:10 42:22 43:3
44:5 45:22 46:3
47:13,18 48:20
49:1 54:7 56:10
56:14 57:24 58:20
61:9,21,25 63:12
65:21 66:12,25
67:10 68:23 69:19
69:25 70:19 71:4
71:7,21,25 72:4
72:11,24 73:21,23
74:14 76:7,21
77:1,17 78:13
79:5,11,14 80:2,8
80:12,19 81:10,22
82:4,8,9,23 83:12
83:20,23 84:1,9
85:15 86:17,18
87:21 88:12 89:15
89:23 90:6 93:4
93:25 96:7,13
98:16 99:1 100:8
100:25 101:7,24
104:1,5,12,20
105:12,16 106:11
106:16,22 107:11
107:20 108:7,10
108:14 109:6,18
109:20 110:8
111:6,12 112:2,9
113:8,14,21,24
115:18 116:1,6,12
116:15,21 119:4
119:20 123:15
124:1,24 125:7,10
125:19 126:19
129:6 130:11
131:11,19,24
132:24 133:18
**old** 84:17 101:1
**once** 10:11 37:20
37:22
**one-year** 95:16
115:20
**ones** 15:23 45:7
54:23 73:13,13,14
101:4 112:7 119:7
119:7 124:2
**online** 24:22 28:25

73:1
**open** 93:5
**open-ended** 114:14
**operations** 13:14
15:13 122:23
**opinion** 127:24
131:10,12 132:14
132:15
**opportunity** 10:16
**opposed** 19:6,11
19:16 24:17 35:10
38:5 39:11 92:18
94:16 95:6 96:23
**optimal** 52:4
**optional** 73:4,8,14
74:5 75:4 76:23
77:1
**oral** 1:11 135:6
**order** 9:24 11:12
69:7 70:25 72:15
74:22 75:14 88:16
124:1
**ordered** 51:10
**origin** 94:6
**original** 136:20
**origins** 94:12
**out-of-network**
16:7
**outcome** 135:14
**output** 43:23
131:14
**outside** 100:24
**overall** 12:5 67:23
**overinclusive**
113:18
**overreport** 52:2
**overreporting**
46:24 52:1 55:10
56:16 57:3 68:1
92:9 97:24 98:20
**oversee** 13:7 15:25
**oversees** 14:20
**owns** 56:8

**P**

**P** 2:1,1 9:14
**P.30(b)(1)** 4:12
**P.C** 2:4,8
**p.m** 1:15 42:4,7
49:4,7 54:13,16
119:24 120:2
130:14,17 133:2,5
134:1,2
**Packard** 15:8
**page** 4:2,9 22:3,7
22:12 29:22 30:18

30:22 31:17 73:8 73:9 79:14 83:1 94:1 102:20,23 103:17 105:8 115:6 131:1 132:7 137:4 138:1
**paid** 29:1
**Pamela** 81:22 82:1
**paper** 93:13
**parameters** 74:3
**Park** 2:18
**parse** 120:19,21 121:12,24 123:4,5
**parsing** 123:9
**part** 14:7,8 16:15 20:25 21:4,8 23:12 27:17 38:14 41:7,8 45:7 63:9 65:23 67:4 69:2 90:21 93:25 94:6 96:2,3 103:25 110:23 122:23 125:23
**partially** 70:8
**participate** 103:14
**participating** 5:15 5:17,20
**particular** 18:16 20:24 22:15 24:2 26:22 27:1 28:19 31:1,2,4 33:22 34:17 35:16,17 40:6,7 47:24 51:7 61:12 92:16 121:10,14
**parties** 135:11
**patterns** 45:24 46:1
**Pavithra** 1:11 4:3 5:2 6:6,21 135:5 137:2 138:17
**pays** 20:19
**pen** 84:9
**Pennsylvania** 1:23 2:6,10 135:20
**people** 7:23 13:16 14:9 52:13 59:4 60:23 92:20 94:23 124:4
**percent** 51:21 53:5 53:5,7 55:15 60:3 60:5 61:5 65:12
**percentage** 38:10 38:17 43:16,18 50:2 53:8,11 57:16 60:23
**period** 62:3 119:9
119:15 120:6,8 126:6
**permitted** 10:7 101:8,10,11
**perpetrator** 77:23 78:23 79:21 81:7 82:16
**perpetrators** 59:15
**person** 9:22 52:11 78:1 84:18,21 111:14,25 123:7 123:11
**personal** 131:10,11 132:14,15
**personally** 38:8 100:14 101:19,20
**perspective** 97:13 97:15
**phase** 40:5 67:6
**Philadelphia** 1:23 2:6,10 5:16 135:20
**Phone** 2:6,10,14,19 2:23 3:3
**piece** 86:15
**PII** 33:3
**Pike** 1:24
**pin** 82:4
**pinpoint** 17:8
**place** 42:22 50:8,14 50:19 57:14,22 58:10 61:15 66:20 68:3 87:23 91:4 92:14 100:9 127:11 130:10 131:13
**placed** 82:7
**places** 130:10
**placing** 40:1
**plaintiff** 4:10,17 5:13,19 8:17 18:9 18:14 22:9 68:10 81:4 82:18,25 98:3,10,11 106:24 131:4 132:6
**plaintiff's** 4:12 9:13 9:23
**Plaintiffs** 1:6,12 2:3
**play** 76:19
**Plaza** 2:13,18
**please** 5:11 6:11,12 6:13,19 9:8 12:12 13:6 21:25 23:9 32:22 36:3 40:25 71:18 84:5 95:22 102:23
**plug** 70:14
**plugging** 91:9
**plus** 88:19 94:2 95:5,6,19
**point** 27:10 49:20 64:2,6 65:15 67:10 69:19 71:15 71:16 72:24 78:12 82:22 85:8,9 86:5 104:6 106:13 109:17
**points** 82:23 129:17
**policies** 40:1
**policy** 79:11,12
**pool** 124:19
**population** 58:17 58:17 60:20 65:4 65:5,9 93:17
**portion** 56:20 64:9
**position** 12:2,10
**positions** 12:7
**possibilities** 96:1
**possible** 59:12,18 62:24 64:1,17 104:10
**post** 126:16
**potential** 18:20 69:8
**Potentially** 60:1
**precise** 78:22
**precisely** 76:22
**predominantly** 52:14
**preparation** 111:25 112:2
**prepare** 11:7,12,17 48:15 111:17
**prepared** 10:1 18:19 28:16 68:9 105:7 114:10 121:3
**prepares** 40:2
**preparing** 10:15 11:6 125:8
**presence** 46:17 57:10 83:7 129:10
**present** 3:4 77:5,7 103:5
**presentation** 95:14
**presented** 93:14
**presently** 11:19 13:16
**presume** 60:4
**pretty** 14:14 104:14
**prevent** 74:10
**prevents** 74:9
**previous** 76:1 126:21 127:6
**previously** 76:14
**pricing** 20:11
**printout** 116:21
**prior** 15:3,5 16:20 19:4 126:15
**private** 16:10,12
**problem** 13:5
**problems** 6:15
**procedure** 1:19 126:12
**procedures** 40:1
**proceeding** 135:12
**proceedings** 7:7,19 9:7 21:13
**process** 14:8 15:19 15:22 16:1,2 26:24 27:3,4,5,6 27:12,13,17,20,24 40:11,17 50:18 68:13 69:2 70:25 102:11,13,13 120:10,12,13 123:2,6 131:17
**processes** 131:13
**produced** 1:12 40:22 41:20,21 107:12
**product** 11:23,25 12:1,8,15,24,24 13:2,7,14 14:19 14:20 129:24
**production** 14:6 38:1 46:11 47:6 121:9,10
**profile** 112:12
**program** 46:3
**programmed** 91:6
**programming** 52:6
**project** 11:24 12:20 50:15,21 51:5 52:9,14 63:9,10 110:12 122:24
**projects** 40:15
**promptly** 136:21
**properly** 131:3
**properties** 74:11
**property** 16:25 17:2 69:1 73:16 121:11 121:14,16
**property's** 16:24
**propounded** 138:9
**prosecuted** 33:21
**prove** 128:24
**provide** 14:3 16:23 17:24 32:1 35:2,9 35:11,14 37:15 54:1,6 62:24 70:13 71:7,12 72:17,23 81:16 89:9,22
**provided** 18:12 35:13 70:10 73:25 87:24 88:1 136:12 136:17
**provides** 17:11,12
**providing** 71:10
**public** 15:20 16:11 16:13 17:10 18:23 136:18
**publicly** 29:6,9
**pull** 28:2 110:23 119:17 120:5,7,13 121:11 123:20,23
**pulling** 23:19,25 27:8 123:8,15
**purchased** 53:17
**purged** 108:15
**purpose** 46:12 62:12,16 94:9,10
**purposes** 7:6,19 9:6 21:13 47:4 57:20 70:9 83:24
**pursuant** 1:18 4:12 7:3 9:14
**push** 14:6 59:24
**pushed** 38:1
**put** 50:18 66:15 69:23 83:10 123:7 123:10,11 128:15

### Q

**quality** 47:19 48:3,7 129:24
**queried** 9:22 111:25 121:1
**queries** 111:20 123:20
**query** 9:20 111:14 111:21,22,23 112:3 114:6,11,15 118:1 119:16 121:4,10 123:22
**queryable** 114:10
**question** 6:13 13:22 21:2 22:22 24:6 25:21 29:11 30:12 32:19 35:15 35:16 36:25 38:15 38:16 43:6 49:9 52:10 61:8 73:12

75:10 78:18 79:5 85:19 90:7 98:7 99:15 103:1,15 104:13,20,24 106:6,12,22 109:1 109:10,10,13,19 109:22 110:11,18 111:21 112:22,24 114:15 117:1,2,16 117:22 118:2 123:1 125:4 128:5
**questioning** 41:22
**questions** 12:18 74:21 78:16 88:13 104:9 112:4 114:3 114:11 133:7,10 138:9
**quickly** 99:6
**quote** 103:2

**R**

**R** 2:1,21 4:12 9:14
**Raether** 2:17 5:21 5:21 6:14 7:10 8:9 8:13 12:23 16:21 25:20 26:2 28:1 29:19 34:15,24 35:12,23 41:16,23 48:6 58:4 59:19 60:8 61:1 62:15 65:19 76:12 78:24 79:9 85:5,7,24 86:3 87:2 88:4 89:11,19 91:18 102:21 105:24 107:8 114:4 133:10
**Ramesh** 1:11 4:3 5:2 6:4,6,21,22 7:6,17,19 8:7,12 8:23 9:8,12 10:4 13:16 21:12,17 25:18,24 28:13 39:24 41:1,4,5 42:8,10,15 49:8 54:17 61:10,25 68:5,8 69:11 74:21 79:12 81:10 82:6 84:6,9 86:1 88:14 98:9,17 102:18 105:6 107:13,25 111:12 115:6 120:3,9 121:15 130:19 133:6 135:5 137:2 138:17
**range** 33:7,19 34:18 39:8,11,14 44:17 81:20 87:17,18 96:1,24 115:20
**ranks** 99:7
**rate** 72:12
**rates** 96:20
**raw** 108:5 119:11 120:14,21
**reach** 99:4,13
**read** 114:3 118:3 133:11 136:2,3 138:6
**readily** 17:23 73:25
**reading** 118:3
**reads** 98:9
**Real** 2:22
**really** 44:15
**RealPage** 1:8,17 3:1 5:4,10,23,25 6:3,25 7:2,22 8:24 9:19 10:6,12,17 10:20 11:4,19 12:4,8,9,22 15:3,5 15:9,17 16:11,14 16:16 17:5 18:22 19:5,25 20:10,12 20:18,24 21:5,8 21:14 22:5 23:1 25:1,5,6,25 26:3,6 26:25 29:10 30:7 30:15,21 31:15 32:2 34:8 36:6 37:2 38:18 39:5 40:12 50:23 53:15 62:1 67:12 69:16 69:18,22 71:11 72:13,17,21 73:12 73:19 75:16,18,21 75:24 76:4 77:16 77:20 79:6,17,18 85:2 91:4,14 92:2 93:3,18 99:7 100:6 103:2,19 105:7 107:22 110:22 111:1 119:5 121:20 125:12 132:5 137:3
**RealPage's** 9:20 15:19 16:2 19:14 40:1 75:12 78:19 84:19 98:22 111:14 121:4
**reason** 19:14,18 26:13,16 51:7 130:9 136:5,9 137:4
**reasonable** 133:19
**reasons** 17:23 100:24
**recall** 32:9 62:10 115:21 129:5
**receive** 30:7,21 46:16 136:22
**received** 30:15 34:9 37:20,22 52:20,21
**receiving** 34:7
**Recess** 42:5 49:5 54:14 119:25 130:15 133:3
**recognize** 40:22
**recollect** 100:3,23
**record** 5:1,12 6:2 6:12,20 7:8,9,12 7:13,16 8:21 15:20 16:19 18:23 20:19,22,24 21:7 21:25 22:16,23 24:2,8,8 25:25 26:22 28:20 35:17 40:2 41:25 42:4,7 44:25 45:11,16,21 46:25 47:15 49:2 49:3,7,14 51:18 54:10,13,16,22 56:7,9,22 57:12 57:15,21 58:13 60:21,22 63:2 64:3,8 66:3 67:14 74:22 75:15 76:9 76:13 79:21 82:7 83:1 84:16 86:11 87:8 88:17,22 89:2,4,5,8 96:4 97:18 100:5 102:7 102:8,9 103:6,11 105:8 112:13,14 112:18 114:17 117:17 119:21,24 120:2 121:22 122:17 127:14,18 129:24 130:7,12 130:14,17,25 131:3,25 132:20 132:25 133:2,5,24 134:1 135:7
**records** 16:11,13 17:10,17,20,21 18:6,9,12 19:6,11 19:16 20:4,11 23:19 24:13,16,21 25:16,18,24 26:25 31:3,7,11 33:23 35:7,8,10,25 36:2 36:17,17 37:3 38:10 40:7 47:2 47:24 48:2 53:3 53:19 55:10,11,14 56:12,16 57:16 58:22 59:3,4 60:10 61:12 63:25 64:19 65:17 66:14 66:22 91:17 93:18 126:8 127:8 131:19
**redacted** 33:3
**reduce** 59:24 60:5 60:14 62:13 67:22
**reduced** 55:13
**reduces** 61:4 67:3 67:24
**reducing** 60:3 65:11
**reference** 20:22 111:19
**referenced** 40:20
**referring** 8:18 120:24
**reflected** 42:14
**regard** 21:11
**regarding** 9:21 111:15 114:12 121:5
**regardless** 118:2
**regular** 17:11,12 19:23 37:7,16 53:19,20
**regularly** 24:7
**related** 93:20 135:11
**relating** 66:2
**relationship** 21:4
**relevant** 41:21
**reliable** 101:25
**remain** 58:12
**remains** 57:2
**remember** 41:13
**remotely** 5:17
**removal** 45:11
**removals** 126:7 127:2
**remove** 66:22 108:17 127:8
**removed** 44:25 45:8,9,16 47:15 52:21 57:13,17 102:9 127:7
**removing** 53:3
**rent** 18:3 72:2,2
**rental** 17:1
**repeat** 6:13 13:22 23:6,8,8 25:21 29:7 30:14 36:3 48:11 95:22
**repeated** 127:21
**rephrase** 43:6
**report** 4:13 9:21 13:17 14:12 16:23 18:13,19,21 22:1 22:4,4,7,24 25:4 25:17 26:7,17,20 26:24 27:1,16 28:3,13,15 29:22 30:9,18,23 31:18 31:21,23 32:6,13 34:2,6 36:20 37:25 39:2,17,18 45:9 47:16 49:15 49:17,24 50:1 52:22 54:22 56:3 56:3 58:9 59:8 60:25 63:25 64:11 67:11 68:9,21 69:8,16,22 70:15 70:21 72:8,10,16 82:8 83:2 97:18 98:23 99:16,17 100:21 101:1,12 102:1 103:4,8 104:19 105:6,19 107:12,14,19,21 107:22 108:5 112:16,20 114:12 115:6,19 119:8,10 120:18 121:5,13 121:15,17 123:7 127:15 130:19,23 131:25 132:8,11
**reported** 1:16 31:24 39:17 55:14,20 56:24 57:5 58:1,6 58:13 99:19 100:19,23 130:9
**reporter** 5:7 7:6,8 8:19 9:11 20:7 21:1,16 22:17 23:12 27:23 30:11 32:14,18 36:9 38:11,14 41:3 48:11 84:8,10 98:15 120:7 133:23 135:2
**Reporters** 1:22

**reporting** 1:22 19:20 25:7 46:25 51:12 60:10 64:16 67:25 101:8 129:19 135:19
**reports** 11:8 13:20 13:21,23 14:4 16:17 39:10,16 40:2,8 50:2 51:18 53:8,12,14 58:21 70:2 97:11 107:6 107:9,17,24 108:4 108:11,15,17 115:2,24 116:8 119:5,10,12,17 120:6,8 121:21 122:11 123:9,15 123:23
**representative** 7:2 132:5
**representatives** 99:6,14
**representing** 5:19
**request** 68:20,24 69:3,7,16 70:15 72:15 74:25 108:17
**requested** 111:20
**require** 72:19,19 74:4,17 75:8,16 75:18,21,24,25 76:1,4,13,15 78:3 78:19,25 79:6,17 95:9 96:15,21,25 104:15 105:1 123:11,13 124:4 136:21
**required** 14:7 21:6 70:1,5,12,16,18 70:24,24 72:3,14 72:22 73:3,7,13 73:18 74:8 75:1,3 75:4,7 76:7,8,24 77:3,5,10,14 78:8 79:24 84:23
**requirements** 12:19
**requires** 73:19
**requiring** 97:8
**research** 15:6,13 47:4 96:20 99:16 110:12,21,23
**researcher** 110:8 110:20
**researches** 92:24
**reserve** 133:11
**reserved** 135:9
**resources** 51:2
**respect** 17:4 35:6 79:2 83:9 122:3 128:22
**responds** 103:19
**response** 100:19 103:23 111:22
**responses** 4:16 8:14 98:3,10,13
**responsibilities** 12:13,21
**responsibility** 19:9
**responsible** 15:24 52:11
**rest** 87:21 125:1
**restate** 21:2 22:17 25:22
**result** 39:21 45:15 55:17 56:4 60:10 65:3 121:23 131:9 132:20
**resulted** 44:24 45:10 82:24
**results** 46:2 56:20 57:6 64:21 113:17 126:3 128:22,24 128:25
**resume** 54:10
**Return** 136:20
**returned** 131:9 132:13
**review** 10:16 11:16 18:21 59:9 121:25 127:20 135:9
**reviewed** 10:19 11:8 18:16 38:8
**revised** 4:10,12 7:3 8:17 9:13 15:18
**Rich** 51:14
**Richardson** 1:17 3:2 5:10
**rid** 124:24
**right** 8:21 9:4,12 10:4 16:3 18:8 22:11 24:3 29:22 33:16,20 34:6 39:23 40:20 41:24 41:25 42:8 45:19 46:12 48:24 52:25 54:17 55:6,9 56:2 56:15,15 57:7,9 58:11 59:10 60:13 62:25 64:23 65:4 66:5,15,19 67:7 68:2,7,12 69:10 70:22 71:5 73:4 74:15,19,20 76:24 77:9,15,15,25 85:19 94:17,24 101:2 102:18 107:5 109:24 111:13 116:24 118:19 120:3 122:6 123:16 124:17,17 129:9 131:22 133:6,11 133:21 136:3
**Road** 22:5 68:24 121:16
**roadmap** 13:12
**Rob** 15:23
**Robert** 14:11
**rolled** 63:6 86:24
**ron.raether@trou...** 2:20
**Ronald** 2:17 5:21
**room** 11:11
**rough** 133:21
**rule** 6:3 15:18 64:10 87:6 88:23,25
**rules** 1:18 43:11,14 43:15,22 44:12,14 44:23 47:9 61:11 66:2,6,8,10,13,16 67:6 78:10 79:4 80:1 85:25 88:14 91:20 93:23 97:4 97:6 129:7 131:5 132:11 136:21
**run** 22:2 47:6 73:19 85:10 107:17 117:8
**runner** 17:25 29:2
**runs** 46:11

**S**

**S** 2:1
**S-O-H-A-L** 15:2
**s/Christine** 135:18
**sales** 97:11
**sampling** 59:2
**San** 2:23
**Sanders** 2:17,21 5:22
**satisfy** 89:1,2 113:3
**saw** 128:18
**saying** 47:13 61:9 62:25 86:8 94:16 99:8 100:25 101:10 102:14 111:6,6 112:21,25 124:1
**says** 30:1,4 32:15 91:10 94:14 96:3 98:12 103:2,18 104:24 106:6 117:16
**scale** 44:9,21,22 46:13 49:25
**scaled** 50:2
**scar** 25:11
**Scholar** 93:6
**science** 13:11 51:16
**scientist** 12:9,13,14 15:9 40:16
**score** 43:16,20,21 43:25 44:15,15,18 45:23 46:8 47:9 47:10,12,14 48:5 48:8 49:21 62:9 85:13
**scores** 44:9,12
**scoring** 12:16 45:3 45:4,13 46:13,22 47:3,13,18 48:4 53:12 62:9,12 65:14,18 66:15,23
**screen** 68:16 73:19 107:15,17
**screening** 1:8 4:13 11:8,23 12:15 14:3,20 16:23 22:1 28:5,8,9,14 28:15 40:8 68:8 68:21 69:22 70:15 72:10,15 82:8 93:8,9 95:15,17 96:14 107:15,16 123:23 128:17
**sealed** 101:4
**search** 4:14 9:20 39:20 40:24 41:4 41:12 42:9 43:8 44:4 81:23 104:7 108:19 110:14,16 111:14 113:2 115:14,23 116:1,6 116:13,15 118:9 120:23 121:4,20 121:21 122:9 124:12,16,20,20 124:23 128:23,24
**searchable** 115:1
**searched** 121:1
**searches** 16:7 110:9 112:22,23 113:1,16,25 121:6 121:8
**searching** 17:15 39:9 110:24 111:1 121:18 124:9
**seasonality** 126:18 128:16,17,19
**second** 9:6 88:14 94:1 118:10
**secondly** 34:16 75:6 77:17
**section** 31:18,20,20
**security** 31:4,16 32:1,4,7,10 34:9 59:17 70:7,9,16 71:4,8,23 72:18 72:19 73:16,17 74:8,12 75:22
**see** 9:24 15:20 22:6 23:15,20 25:17,23 26:3,5,7 27:16 28:13 29:21,23 30:5,6,17 32:11 33:4,8,15 39:2,18 40:3,22 41:20 43:9 46:23 51:5 52:11 53:1 68:12 69:11,13,25 71:25 72:7 78:15 79:15 82:4,7 83:1,25 88:23 94:4 98:2,6 99:16 103:12,20 107:4 111:20 115:12 121:15 126:14,17
**seeing** 41:13 91:9
**seen** 9:17 18:19 19:24 21:17 30:25 31:23,24 32:6 35:25 36:2,16,19 36:21 61:22,23 73:4 93:1,4 95:14 125:14
**sell** 16:10,13
**sells** 32:2 53:15 54:4
**semesters** 15:7
**seminars** 93:12
**send** 17:25 18:1 47:8 130:4
**senior** 11:23
**sense** 37:5 46:23 50:17
**sensing** 14:15
**sent** 29:2
**separate** 20:14,15

65:24 67:9 114:9
**September** 41:15 42:23,24,25 43:2 50:9,19 54:19 55:3,4 58:7,9 61:15,16 63:7
**server** 107:10
**servers** 26:12 27:7 108:5 111:2 121:11
**Service** 25:1
**Services** 16:7 17:4 17:9,16 20:10,12 20:15,19,23 21:5 21:6 22:23 23:2 23:15,18,24 24:7 24:15 25:5,15 26:1,9,23 28:19 28:23 29:8,16,23 30:20 31:16,25 32:4 34:8,12,23 35:7,13 36:6,10 36:13,22 37:10,14 38:5,12,18 39:7 46:17 53:18 54:4 74:24 75:8 131:20
**sessions** 93:15
**set** 4:17 8:11 56:1,5 61:11 66:2 74:3 85:25 98:11 103:17
**sets** 72:13
**seven** 100:21
**severs** 17:13,14
**sheet** 4:15 84:14 136:6,9,10,14,20 137:1 138:10
**shifted** 52:23
**shoes** 101:7
**short** 41:25
**shorthand** 1:16 135:2
**show** 21:12 40:21 83:23 98:6 115:2
**showed** 42:9
**side** 23:20
**sign** 133:11 136:10 136:11,15,16
**signature** 135:9 136:19 138:1,17
**significant** 56:20 64:8
**significantly** 65:12
**signing** 136:13
**similar** 74:21 90:6 92:6 102:12,13
107:24
**similarly** 1:5
**Simons** 1:15 5:7 135:2,18,18
**simply** 40:5 45:23 47:4 65:6 66:22 67:22 80:14 101:24 109:8 114:14 119:4 124:9
**single** 67:16 119:6 119:8,13 121:12 130:10
**sir** 22:14
**site** 120:18,20 121:16 123:4
**sits** 44:3
**sitting** 38:16 83:20 111:7 125:10 132:4
**situated** 1:5
**situation** 94:13 99:21 108:20
**situations** 100:15 101:17,22 104:20 105:17 106:23 110:4 122:9,15
**six** 84:2 90:11 119:14
**slight** 88:17 94:11
**Smith** 84:3,15,18 85:3 87:9,10,14 87:14
**Social** 31:4,16 32:1 32:3,7,10 34:9 59:16 70:7,16 71:4,8,22 72:18 72:19 73:16,17 74:7,12 75:21
**soft** 79:14 87:15
**software** 50:18 63:21 72:17
**Sohal** 14:22,25 15:2
**sold** 103:4 119:5,9
**somebody** 81:25 127:20
**someplace** 93:4
**soon** 38:9
**sorry** 6:13 8:19 11:24 13:1,1,4,22 14:13 21:21,24 22:19 23:6,7,14 26:5 28:6,14 29:7 36:3 37:9 42:24 44:1,2 66:7,8,11 75:10,13 79:17
81:2 87:17 92:11 96:5 102:21 110:18 117:23 118:4 122:4
**sort** 114:24 118:14
**sorts** 110:21
**Soumilas** 2:4 4:5 5:13,14 6:1,10,16 6:22 7:5,17 8:5,16 9:5 20:8 21:3 22:19 30:13 32:20 40:25 41:13,19,24 42:8 49:2,8 54:8 54:17 84:5 98:8 98:16 118:7 119:21 120:3 130:12,18 132:24 133:6,14,16,18
**sound** 80:14 92:6 92:11
**sounds** 30:13 47:19 62:7 83:17 133:18
**source** 19:2 22:12 23:10,16 24:3,5 24:24 29:18 31:16 35:21 36:11 93:5 102:4
**space** 136:12,17
**speak** 9:1,20
**speaking** 10:5 132:16
**specific** 12:18 27:8 55:5 79:22,23 85:8 93:7,15 97:7 107:14 116:3 120:18 121:18
**specifically** 24:1,14 28:22 91:19,22 93:21 96:3 107:11 122:1 128:13
**spelled** 92:6,12
**spelling** 15:1 92:5
**spend** 54:18
**spoke** 46:20 52:2 123:3
**SQL** 17:13 26:12 107:9 108:5
**SSN** 31:18,20,22,23
**SSNs** 31:24
**staff** 37:23
**staging** 37:23,24
**stale** 129:16
**standardized** 37:25
**standardizing** 14:2
**start** 15:17 20:7 27:23 32:14 36:9
38:11 68:13
**started** 12:6 50:22 50:24 51:5,7,8 81:8
**starting** 63:10
**state** 1:16 5:11 6:11 6:19 15:14 72:1 75:25 76:14 78:1 78:7 84:21 85:1 87:6,25 94:22 99:17 100:20 103:2 135:1,3
**statements** 135:8
**states** 1:1 5:5 6:24 38:23 76:1 100:25 103:3 112:11 114:21
**statistics** 15:14 52:18
**stay** 49:19 60:11 63:16 64:11 86:23 98:18 127:15
**stayed** 60:22 88:11
**staying** 62:21
**stays** 57:21
**step** 66:1
**stipulate** 8:6
**stipulated** 8:25
**stop** 70:20
**stopped** 129:20
**stored** 26:12 37:21 37:22,24 107:9 120:18
**straight** 92:18
**straightforward** 104:14 120:19 123:17
**street** 1:23 2:5,9 77:12,12 135:20
**strike** 60:19
**string-for-string** 93:7
**struggle** 124:11
**struggling** 67:4 85:21
**study** 91:23 96:14 96:19 127:16
**subject** 7:23 9:23 10:6 40:8 103:8 103:18 105:18 111:18 112:16,19 133:12 136:13
**submit** 77:2
**substance** 136:4,8
**success** 44:10,15 99:5,14
**suggest** 27:17
**Suite** 1:23 2:5,9,18 2:22 135:20
**summarize** 15:4
**summary** 15:10
**Summit** 1:22 135:19
**supervisor** 14:18
**supplemental** 24:4 24:5,11 25:10 98:3,12 102:19
**supplied** 69:15,17
**supposed** 46:7,7
**sure** 15:2,5 17:9 21:10 25:9 28:8 32:25 48:23 52:10 59:21 60:17 61:8 62:21 63:15 72:25 76:22 81:12 84:11 89:12,20 94:12 95:2 98:5 108:18 110:11 122:2,14 124:13 128:5 132:13
**survey** 59:2
**SVP** 51:16
**swear** 6:1,5
**sworn** 1:13 6:7 135:5
**system** 28:2,4,8,9 28:15 39:10 46:22 59:8 63:15 68:20 69:23 70:14 71:19 77:25 91:9 118:2 131:5
**systematically** 117:11 123:10
**systems** 131:13 132:19

**T**

**T-A-F-T** 90:9
**table** 25:12
**tables** 26:12
**Taft** 90:8
**take** 6:17 7:1 11:19 18:2 37:1 41:25 42:22 48:20,24 54:8,9 64:4 66:1 66:20 68:8 69:3 73:23 74:18 85:15 111:12 118:6 123:17
**taken** 1:13 42:5 49:5 54:14 119:25 130:15 133:3

135:13 137:2
**talk** 49:22 54:11 68:2 75:3 88:15 93:6 97:3 112:2 122:1
**talked** 53:17 94:1 96:24 115:18 116:16
**talking** 57:4 58:15 73:10 82:6 94:13 95:19
**talks** 39:25 79:14 93:25 114:21
**tape** 119:22
**tattoo** 25:11
**Taylor** 105:22 106:18 116:7,9,13
**team** 13:7 15:23 103:25 104:1,2,4
**technical** 71:16 104:6
**technique** 55:6
**technologically** 74:8,10
**technology** 51:3 63:14,21 64:14
**telephone** 2:12 5:20
**tell** 11:7 15:10 23:24 78:25 84:20 85:22 99:24 102:3 102:5,15 104:12 108:15 114:17,18 114:20 126:4 132:5
**telling** 65:10 100:5
**tells** 23:18 34:7 55:20 56:8
**ten** 53:5 95:7
**tenant** 16:17 40:7 47:24 58:18 60:20 61:12 63:2 64:20 66:3,14 67:15 68:15,19 69:4,8,8 69:19 70:13 74:1 76:10 78:21 79:19 91:17 92:24 93:8 93:9 95:15,16 96:14 110:14,17 123:23
**tend** 58:21
**Tennessee** 10:13
**tens** 120:20
**term** 16:5
**terms** 13:25 51:3,3 120:23,25 121:18
133:13,13
**territories** 103:4 112:11
**test** 54:25 55:4
**testified** 6:8 56:14
**testify** 7:23 8:2 10:1 10:7 11:17 15:16 15:19 48:15 121:4
**testifying** 8:24 120:4
**testimony** 10:5,16 10:19,20,24 11:3 11:6,13 21:11 39:25 111:17 125:8 128:7 135:7 136:12
**testing** 91:8
**Texas** 1:16,18 3:2 5:10 135:1,3,18
**Thank** 8:20 84:12 98:16 118:7 133:7 133:9
**thing** 41:5,5 51:6 108:19
**things** 17:21 18:4 43:10 73:1 74:1 76:19 77:25 78:7 121:20 129:12,23 130:5
**think** 8:10 48:4 52:16 53:21 64:13 64:18 65:10 66:12 66:19 67:10 68:4 73:1 86:5 89:4 106:5,11,12 109:1 109:18 118:14 120:5 121:3 122:3 124:8,15 125:4 132:2,16
**third** 22:7 30:17 83:1 113:4
**thirty** 136:22
**Thornthwaite** 3:1 5:24,24
**thought** 76:22 108:8 126:11
**thousands** 120:20
**three** 12:6 37:13,18 37:19 79:19,20 80:5 89:15 100:15 112:16 113:7 118:12 125:17 126:11,13,20,21 126:22 127:9
**three-page** 9:12 40:23
**thresh** 54:20
**threshold** 47:10 48:9,12 51:17 54:21 55:6,9 56:1 56:5,15,23 59:23 60:2,4,15
**thresholds** 55:1,5
**tie** 76:21 97:6
**time** 5:2 7:12,16 14:23 19:4 27:10 28:6 31:22 32:5 37:3,8,13 39:1 42:4,7 47:7 49:4,7 50:14 54:11,13,16 54:18 62:3 66:1 67:11 85:8,9,20 86:13 87:17,18 99:20 100:14,17 107:20 109:3 112:11 116:16 119:9,15,24 120:2 120:6,8 123:7,18 123:19 125:21 126:14 130:14,17 133:2,5,8,16 134:1
**times** 10:10 16:4 55:8
**Tina** 81:17 82:14 83:5,14,18 105:9 105:13 106:4,18 106:18 122:4,4
**tinker** 59:23
**title** 11:22
**today** 5:15 7:1 10:1 10:5,15 11:6,10 11:12,13,17 15:16 38:17 48:15 84:17 85:9,10,21 86:6 86:14,18,23 96:24 108:20 111:7,10 111:18 114:11 125:8,10 132:4 133:8
**today's** 5:9 7:6 9:6 21:13 94:14
**told** 35:25 36:5 66:19 76:23 105:8 122:3 130:22
**Toni** 90:13 105:21 106:17,17 116:7,9 122:4
**tons** 43:10
**tools** 13:15
**top** 31:18 43:13 44:3 46:13 48:14
66:15 69:11 91:5 92:15 99:22 125:13
**topics** 8:7,25 15:16
**total** 53:14 100:12 103:2 112:10
**touch** 121:9
**track** 38:4 52:19 54:3,5
**tracked** 101:17
**tracking** 50:6
**tradeoff** 51:25
**transaction** 18:17
**transcript** 133:12 135:6 138:6
**transcription** 138:8
**tremendous** 128:19
**tremendously** 128:14
**tried** 113:16
**tries** 16:17 46:23
**triggered** 43:15 47:9 78:11 79:4 105:4 131:6,6 132:12
**Troutman** 2:17,21 5:22
**true** 67:24 135:6 138:7
**try** 6:17 14:23 23:14 32:20 42:1 62:8 63:1 86:17 128:6
**trying** 14:17 58:2 62:6 63:17,18 64:13 78:14 85:16 88:13 90:20 95:23 103:14 113:14 117:3 118:15
**tunes** 51:1
**turn** 15:15 98:17
**turning** 74:20
**tweaking** 128:22
**tweaks** 61:18
**two** 6:17 13:20 14:9 15:6 65:24 67:9 76:7 80:14,22 85:23 88:2,3 89:1 90:25 112:13 116:16 118:13 125:19 127:22
**two-page** 84:2
**two-thirds** 51:18
**two-year** 96:24
**type** 12:21 19:24 34:22 39:11,20 59:2,17 63:5
73:24 91:14,23 93:19 96:13,19 107:7 108:7 110:12 125:14,25
**types** 45:18
**typical** 25:18,25 34:11,22
**typically** 31:25 38:23 99:4,9
**typographical-type** 11:2

**U**

**Um-hmm** 49:12 67:13 111:16 115:8
**underinclusive** 113:18
**underneath** 33:16
**underreport** 52:3 97:23
**underreported** 58:3 100:6
**underreporting** 47:1 52:1 55:9,18 55:24 56:7,12,16 56:25 57:3,25 58:1,14 60:12,13 68:1 92:8 97:24 98:19 102:1
**understand** 7:21 8:1 13:12 21:10 52:10 53:10 76:22 84:1 95:23 122:2 122:22 123:13
**understanding** 16:1 44:5 47:18 80:21 83:15 95:3 114:1,5,9 131:13 133:14
**unintentional** 88:16 94:11
**United** 1:1 5:5 6:24 103:3 112:10
**universe** 57:7
**University** 15:14 69:12
**unlawful** 101:1
**unusual** 23:15,17
**up-to-date** 14:6
**update** 27:6 37:8,10
**updated** 129:14
**updates** 17:12 26:6 37:14,15 54:2 129:16
**updating** 62:22

**upset** 101:15
**use** 16:4,6 19:15,21 35:8 48:7 52:19 74:12,13 92:2,5,5 92:6,9
**user** 67:5,8,12
**uses** 23:2,24 59:8
**usual** 26:15,18,24 27:4,5,12,17 69:2
**usually** 28:19 70:1
**UT** 15:6
**utility** 93:14

**V**

**v** 1:7 137:3
**vague** 16:21 34:24 59:19
**variable** 118:10
**variables** 118:13,13
**variances** 88:17 94:11
**variation** 95:16 106:24
**variations** 96:23
**varied** 58:8
**various** 115:2,9 130:10
**vary** 54:2
**vendor** 18:11,12 19:7,10,15,21 20:20 22:12,15,23 23:10,16 24:24
**vendors** 13:9,10,25 15:25 16:4 18:22 19:2 74:23
**versus** 5:4 10:12,17 10:20 11:4 54:22 118:3
**video** 5:2,17
**videoconference** 2:4,8
**videographer** 3:5 5:1,8 7:11,15 42:3 42:6 49:3,6 54:12 54:15 117:23 118:4 119:23 120:1 130:13,16 133:1,4,25
**Videographers** 1:22
**VIDEOTAPED** 1:11
**view** 33:3 56:12 71:16 98:1 104:7
**visibility** 95:8,12
**volume** 37:5 125:11 126:15,16,17
**VP** 3:1

**W**

**waiving** 103:18
**walk** 68:12
**walked** 11:9
**Walnut** 1:23 135:20
**want** 15:15 21:11 30:15 40:21 41:18 41:19 68:12 73:16 74:12,21 76:22 77:15 78:4 83:24 95:2 102:19 116:3 116:17,18 117:25 118:1 119:13 130:6
**wanted** 71:11,17 74:7 106:22 119:4 127:20
**wants** 16:25 69:22
**wasn't** 66:11 87:24 127:8
**waters** 117:22 118:24
**way** 14:2 18:13 19:20 25:15,18,25 26:3,3,5,6,7,7,15 26:15,18,18,22,23 27:19 30:9 34:6 43:4 49:18,22 51:5 52:2,3 55:21 56:6,13 58:20 59:6 90:16 91:10 99:13 103:14 115:24 122:9 124:4,8 127:12 129:9 132:19
**ways** 50:25 123:14
**we'll** 6:17 21:12 54:10,10,11 94:15 98:8 118:6 133:12 133:15,19
**we're** 6:14 8:18 56:21 61:18,18 63:13,14 65:4 78:18 86:23 94:13 95:19 105:16,16 108:20 109:6,18 110:2 114:2 124:17 129:8
**we've** 7:18 44:16 45:17 52:20 54:19 55:20 58:24 61:10 73:1 82:5 93:22 96:24 97:12 107:13 116:8,16 118:5 129:18,20
**website** 73:2
**week** 119:14
**went** 19:5 28:25 50:8 54:19 111:25 115:10 126:9,13 127:10,10 128:18
**Wesley** 52:8,14
**West** 2:13
**whatnot** 94:25
**why's** 87:13
**widespread** 59:13
**wishes** 73:24
**withdraw** 36:25
**witness** 1:12 4:2 6:2,4,5,15,16 8:10 8:20 41:15 84:12 133:11 135:5,7 136:1,16,16,17,18
**WITNESSED** 138:21
**wondering** 102:12 110:22 118:8 122:8
**word** 16:3 48:7
**words** 30:11 32:18 115:5
**work** 11:19 13:11 13:13,14 14:9 15:4 46:7 50:17 95:1 113:16 120:16 133:15
**worked** 12:4,14 42:12 52:15 131:5 132:19
**working** 15:3,5 32:5 42:20 51:12 52:13 95:4 104:1 104:5
**works** 13:8 62:22
**wouldn't** 57:25 63:7 105:14 118:23 119:16 124:25
**wrap** 50:16
**write** 123:20
**writing** 42:18 129:4
**written** 46:9 130:2
**wrong** 8:15
**wrote** 43:3
**www.summitrep...** 1:25

**X**

**XMF** 108:8
**XML** 107:10 108:9 108:10 111:2 120:21 123:8,9,15
**XMLs** 120:18,21 121:13,25 123:3 123:21
**Xs** 32:15,16,23,24 33:5,5

**Y**

**yeah** 11:21 29:4 36:4 56:19 71:20 116:4,5 119:12 129:2,21
**year** 15:8 33:2,7,11 33:11,12,13,17,22 35:2,9 38:6 50:20 53:15 70:4 75:9 81:21 82:17,18 83:3 86:22 87:15 87:19 88:9,19,20 89:9 94:3 95:5,6,9 95:10,11,16,19,20 96:22,23 97:10 100:12,16 101:22 103:5 105:10 119:14 126:9,18 126:21,23,23 127:6,9 128:18,18 131:16
**year-over-year** 126:10
**years** 12:6 18:24 62:8 84:17 95:6,7 100:21,21 108:11 108:16,18 125:12 125:20 127:22
**yesterday** 9:18 21:23
**York** 2:14
**younger** 94:16

**Z**

**zero** 44:19,19,21,22 45:4 49:21,22,23 49:25 60:15

**0**

**08037** 1:24

**1**

**1** 4:10 7:6,14,19 8:7 15:17 21:14 39:24 44:9 84:3 89:8 115:20
**1-1** 33:4
**1/1** 32:15,23
**1:19-cv-501-JG** 1:7 5:5
**1:36** 54:14,16
**10** 8:8
**100** 44:10,20 45:13 49:18,22
**11-page** 98:9
**11:05** 1:14 5:3
**11:09** 7:12
**11:10** 7:16
**11181** 135:18
**11201** 2:14
**11682** 2:22
**12** 8:8
**12/31** 32:16,24 33:5
**12:11** 42:4,5
**12:22** 42:5,7
**12:32** 49:4,5
**12:44** 49:5,7
**12:52** 54:13,14
**12th** 2:13 135:15
**13** 8:8
**14** 8:8
**1400** 2:18
**1500** 1:23 135:20
**15th** 22:2
**1600** 2:5,9
**1610** 1:23 135:20
**16A** 8:8
**18** 7:23
**19** 96:5
**19102** 1:23 135:20
**19103** 2:6,10
**1970** 84:4,16
**1974** 96:8
**1975** 94:16 95:25 96:7
**1976** 96:8
**1999** 89:8
**1st** 33:9 34:18 39:3 84:4,15

**2**

**2** 4:12 8:7 9:8,10,12 111:12
**2014** 62:3 103:5
**2016** 12:6
**2017** 22:2,24 41:15 42:23,25 43:2 50:9,19 54:20 55:3,4 58:7,9 61:15,16 63:7 68:9 88:6 105:7 130:19 132:21
**2017's** 87:4
**2018** 12:3
**2019** 1:14 5:3

135:15 137:2 138:7
**21** 4:13
**215** 1:24 2:6,10
**215)985-2400** 135:21
**2201** 1:17 3:2
**2510** 2:5,9

**3**

**3** 4:13 8:7 21:12,14 21:15 25:18,24 28:13 29:22 30:22 31:18 68:8 69:11 79:14 81:10 94:1 105:6,8 107:13,25 115:6,7 120:9 121:15 130:19 131:1 132:7
**3:13** 119:24,25
**3:23** 119:25 120:2
**3:42** 130:14,15
**3:44** 130:15,17
**3:47** 133:2,3
**3:48** 133:3,5
**3:49** 1:15 134:1,2
**30(b)(1)** 9:7,14 111:13
**30(b)(6)** 6:3 15:18 39:24
**300** 2:13
**31** 39:3 115:20
**31st** 33:9 34:18
**325-7243** 3:3

**4**

**4** 4:14 8:8 39:25 41:1,2,5 42:10,15 61:10,25 68:5 74:21 79:12 82:6 86:1 88:14
**40** 53:7 55:15 60:3 61:5 65:12
**400** 2:22
**41** 4:14
**424** 1:24
**447-8648** 1:24
**48** 84:17 85:11
**485** 40:23
**487** 40:24

**5**

**5** 2:18 4:15 8:8 84:6 84:7 102:20,23 112:8,9
**50** 53:5,7 55:15 60:3 61:5 65:12
**509-6044** 2:23
**567-3315** 1:24
**575-4175** 2:14
**59** 22:5

**6**

**6** 4:5,16 8:8 98:9,14 102:18,23 103:5 103:24 111:19,22 112:6 118:2
**609** 1:24
**622-2722** 2:19

**7**

**7** 4:10 8:8 112:8 113:21
**7/31/2021** 135:19
**7302** 22:5
**735-8600** 2:6,10
**74** 49:10,11,13,16 49:18,22,23,25 50:3 51:17,21,21 53:12 54:23 55:1 56:23 58:11,14 59:23 66:23 85:14 94:17
**75** 96:6
**75082** 1:18 3:2
**76** 94:16

**8**

**8** 8:8
**800** 1:24
**84** 4:15
**858** 2:23
**877** 3:3

**9**

**9** 1:14 4:12 94:15 137:2 138:6
**90** 60:5
**92130** 2:23
**92614** 2:19
**929** 2:14
**949** 2:19
**98** 4:16
**985-2400** 1:24
**9th** 5:3 94:15 95:25 96:5,7,8,8

# Exhibit 4



**Service Agreement**

This Service Agreement ("Agreement") is made this 13th day of October, 2006, (the "Effective Date") by and between RealPage, Inc., a Delaware corporation, with offices at 4000 International parkway, Carrollton, TX 75007 ("RealPage") and Backgroundchecks.com, a __S__ corporation, with offices at 12770 Coit Road, #1150, Dallas, TX 75251 ("BGC").

Whereas, RealPage and BGC entered into that certain e-backgroundchecks.com Inc. Information Gateway Agreement dated October 7, 2004 ("Current Agreement"); and

Whereas, RealPage and BGC wish to enter into a new agreement in accordance with the terms and conditions set forth herein, and incorporate into this Agreement certain of the Licenses, set forth in Section 2.3, granted to RealPage under the terms of the Current Agreement;

Whereas, the parties intend to terminate the Current Agreement as of the Effective Date; and

Whereas, BGC maintains a database of accurate and up-to-date public records, including criminal records, that it makes available to customers in an on-demand environment; and

Whereas, BGC maintains contractual relationships with data providers to collect such public records, including individual criminal and other background data; and

Whereas, after BGC collects the Data, it "normalizes" the Data by using transformation codes to impose a uniform data structure to the Data, whereupon BGC runs inquiries against the Data using search logic resident in the BGC search engine; and

Whereas, RealPage licenses to owner/operators of multifamily communities on-demand software applications and databases that facilitate management and operation of multi-family real estate communities, including without limitation the RealPage Applicant Screening Product Center; and

Whereas, RealPage wishes to use BGC as a source for Data on a private label basis for its Screening Services and to purchase certain services, all as more fully described herein; and

Whereas, BGC wishes to provide to RealPage such source data and services in accordance with the terms of this Agreement.

In consideration of the mutual covenants herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

**1. Definitions**

1.1 "Agreement" means this Services Agreement, when executed by duly authorized representatives of the parties.

1.2 BGC Application" means the BGC Internet based application that is capable of providing, on an individual case basis, access to the BGC Database using the Internet, which access shall be made available by various means including, without limitation, on an XML or DLL Pass-Through Search Basis.

1.3 "BGC Database" means the BGC criminal records on-line service and/or BGC's multiple criminal databases from around the U.S.

1.4 "BGC Data Schema" means the BGC data schema and related Documentation.

1.5 "Classification" means an individual classification of an offense in a criminal record.

1.6 "Classification Code" means the object code version, as well as related Documentation, for the Classification System.

1.7 "Classification System" means the Criminal Classification System.

1.8 "Consulting Services" has the meaning set forth in Section 9.

1.9 "Criminal Classification System" means a classification system and related documentation that classifies all offenses in criminal records into a preset group of categories.

1.10 "Current Agreement" means that certain e-backgroundchecks.com Inc. Information Gateway Agreement dated October 7, 2004.

1.11 "Data" means individual criminal and other background data obtained by RealPage from BGC, including without limitation, Normalized Data and Source Data.

1.12 "Data Providers" means the source providers for individual criminal and other background data.

1.13 "Documentation" means end user manuals, and other user documentation provided by BGC in connection with access to, use and operation of the Data, the BGC Data Schema, the Classification Codes, and the Classification System.

1.14 "End Users" means RealPage and owners and managers of real estate in the Permitted Industry, who are licensees of Screening Services.

1.15 "Gateway" shall mean a system developed by RealPage to permit BGC to deliver to RealPage Normalized Data.

1.16 "Intellectual Property Rights" means any worldwide intellectual property or proprietary rights, including but not limited to copyrights, moral rights, trademarks (including logos, slogans, trade names, service marks), patent rights (including patent applications, and disclosures, continuations, continuations-in-part, reexaminations, and reissues), rights in know-how and inventions, and trade secret rights.

1.17 "License" means the License granted in Section 2.

1.18 "Normalize" means to use BGC Transformation Codes to impose on the data a uniform data structure.

1.19 "Password" means a unique security code that, when used in conjunction with a User ID, will allow a BGC Application user to access authorized portions of the BGC Application.

1.20 "Permissible Purposes" means use of Data by End Users for purposes of applicant and employment screening or other permissible purposes under the Fair Credit Reporting Act and other comparable state and local statutes and ordinances.

1.21 "Permitted Industry" means apartments, condos, mixed used facilities, assisted living, marinas, military housing, and self-storage.

1.22 "RealPage Competitor" means those organizations identified on Exhibit A hereto.

1.23 "RealPage Data Schema" means the RealPage data schema.

1.24 "RealPage System®" means on-demand software applications and databases that facilitate management and operation of multi-family real estate communities.

1.25 "Screening Service" means the RealPage Applicant Screening Product Center, a service available on an on-demand basis that uses both a statistical and rules based system to permit its customers to evaluate the credit worthiness and criminal background of prospective tenants.

1.26 "Services" means, collectively, the Development Services and the Consulting Services.

1.27 Staging Database" shall mean a staging database maintained by RealPage on RealPage servers at the RealPage datacenter.

1.28 "System" means the Data, BGC Data Schema, the Classification Code, Classification System and the BGC Application, whether in source or object code, and all the related Documentation thereto.

1.29 "Term" means either the Initial Term or any Renewal Term as described in Section 3.

1.30 "Transformation Codes" means codes used by BGC to impose a uniform data structure to the Data.

1.31 "User ID" means a BGC Application user's identifying information.

1.32 "Website" means the BGC website at www.backgroundchecks.com, or any successor website thereto

1.33 "XML or DDL Document Type Definition" or "XML"or "DDL DTD" means specifications developed by BGC that will allow the user of an internet based application to perform the search actions allowed by BGC.

1.34 "XML or DLL Pass-Through Search Basis" means a search of the BGC Database for a name or names submitted by the user of an internet based application using the XML or DLL DTD, the result so which shall be generated by BGC and returned to the user.

**2. License.** In consideration of RealPage's payment to BGC of the Fee, RealPage shall receive the following:

2.1 System License. BGC grants to RealPage a nonexclusive, non-transferable (subject to Section 15.5 hereto), fee-bearing, worldwide license ("License") within the Permitted Industry to: (a) access, use, extract, aggregate, reproduce, modify, adapt, publish, create derivative works from, sublicense, distribute, perform, display and incorporate in other works in any form, media or technology now known or later developed the Data as a data source for the Screening Services on a private label basis (under trademarks of RealPage with attribution to BGC as agreed between the parties) solely for Permissible Purposes; (b) install and update the Data in both the Staging Database and the RealPage Criminal Database, (c) access and use the BGC Data Schema to restructure the Data to permit the search logic in the RealPage search engine to run searches against the Data; (d) once restructured, to populate the RealPage Criminal

Database with the Data to stage the Data for use as a data source for the Screening Services; (e) access and use Classification Code to run inquires through the Classification System; (f) access and use the Classification System via XML services to classify criminal offenses in records comprising the Data; (g) use, reproduce, publish, and incorporate, in whole or in part, Documentation into RealPage documentation and (h) access the BGC Application for the Permissible Purposes.

2.2 Sexual Predator, Methamphetamine (or other similar drug) Registry or Database; National Security Database. BGC grants RealPage a nonexclusive, non-transferable (subject to Section 15.5 hereto), fee bearing, worldwide license ("License"), for purposes of distribution to any third party, to access, use, extract, aggregate, reproduce, modify, adapt, publish, create derivative works from, sublicense, distribute, perform, display and incorporate in other works in any form, media or technology now known or later developed data from any BGC Sexual Predator Database or Registry, any_Methamphetamine (or other drug) Database or Registry and any National Security Database offered by BGC.

2.3 Access on an XML or DLL Pass Through Search Basis. During the Initial and any Renewal Term of this Agreement, and subject to RealPage's satisfaction of, and continuing compliance with, each and every term, condition, provision, covenant and obligation and/or requirement of RealPage under this Agreement, BGC hereby grants to RealPage a limited, non-exclusive, non-transferable (subject to Section 15.5 hereof) to access the Website, on an XML or DLL Pass-Through Search Basis.

**3. Term and Termination.**

3.1 Term. The term ("Term") of this Agreement shall commence on the Effective Date and shall expire on October 13, 2011 ("Initial Term"). Thereafter, this Agreement will renew automatically for additional three (3) year terms (each a "Renewal Term").

3.2 Termination.

(a) This Agreement may be terminated by either party (the "non-breaching party") in the event that the other party (the "breaching party") materially fails to perform or observe any material term or provision of this Agreement, and does not cure such breach in all material respects within sixty (60) days following written notice from the non-breaching party demanding correction of such breach (which notice shall describe such breach in sufficient detail to permit the breaching party to correct such breach).

(b) RealPage may terminate this Agreement for convenience at any time with thirty (30) days prior written notice to BGC. If RealPage terminates this Agreement for convenience pursuant to this provision 3.2(b) prior to the expiration of the Initial Term, RealPage shall pay to BGC a termination fee equal to $20,000 ("Early Termination Fee").

(c) BGC may terminate this Agreement effective upon the expiration of the 2nd Renewal Term with one (1) year prior written notice to RealPage.

(d) If this Agreement is (i) terminated by RealPage for any reason other than a material breach by BGC or (ii) terminated by BGC for a material breach by RealPage, then RealPage shall destroy all copies of the Data in its possession immediately upon termination, and the License granted herein shall terminate upon the effective date of termination of this Agreement.

(e) If this Agreement is terminated by BGC for any reason other than a material breach by RealPage or by RealPage for a material breach by BGC, then upon termination RealPage shall have and BGC does hereby grant to RealPage a one year, fully paid up right to continue to use the Data in its possession as of the termination date under the terms of the License for the purpose of providing Screening Services to End Users, and all other obligations of BGC shall terminate save for those that survive in accordance with Section 15.12 hereof.

(f) If more than 50% of the assets or capital stock of BGC is sold to a Competitor of RealPage, then RealPage shall have the right to terminate this Agreement at any time. Upon termination by RealPage pursuant to this Section 3.2(f), RealPage shall have and BGC does hereby grant to RealPage a one year, fully paid up right to continue to use the Data in its possession as of the termination date under the terms of the License for the purpose of providing Screening Services to End Users, and all other obligations of BGC shall terminate save for those that survive in accordance with Section 15.12 hereof.

**4. Test Period.**

4.1 BGC will deliver to RealPage for testing (a) and (b) below by November 10, 2006. BGC will deliver to RealPage (c) and (d) by November 30th, 2006:

(a) the Normalized Data with which RealPage shall populate the Staging Database;
(b) BGC Data Schema,
(c) the Classification Code for conducting inquires against the Classification System; and
(d) access to and use of the Classification System.

4.2 Upon receipt of items 4.1(a-d) above, for a period of sixty (60) days thereafter ("Test Period"), RealPage shall put the System to productive use at no charge to RealPage. During the Test Period, RealPage shall deploy the Screening Services to selective End Users in order to validate that the System can scale and otherwise meets RealPage's requirements. If during the Test Period RealPage believes, in the reasonable exercise of its discretion, that the Screening Services performed using the System cannot scale or otherwise meet RealPage's requirements, it may terminate this Agreement with thirty (30) days prior written notice to BGC, and the parties shall have no further obligation under this Agreement, other than those obligations that survive in accordance with Section 15.12 hereof. If RealPage terminates this Agreement pursuant to this Section 4.2, RealPage shall pay to BGC the Early Termination Fee of $20,000.

4.3 If RealPage terminates this Agreement pursuant to Section 4.2 above, the Current Agreement shall not terminate, but shall survive.

**5. Fees.**

5.1 Monthly Fee. Upon completion of the Test Period, and provided RealPage has not terminated this Agreement as provided above, in consideration of the Licenses, access to the System, access to the BGC Application and provision of the Services set forth herein, RealPage shall pay to BGC in arrears on a monthly basis a fee in the amount of $62,500 ("Monthly Fee"). Payment shall be due by the 5th day of each month. RealPage may reduce the Monthly Fee in accordance with Section 6.1(b)(i) below where BGC fails to add jurisdictions to the Database (if legally available), not to exceed $10,000 per month. For the Initial Term, the Fee shall be fixed and guaranteed, and RealPage shall not be subject to increase by BGC. Thereafter, during any Renewal Term, BGC shall not increase the Monthly Fee by an amount exceeding 3% per annum.

5.2 Taxes. All prices and payments in this Agreement are exclusive of all taxes, and RealPage agrees to pay all national, state, and local sales, use, value-added, and other taxes, customs duties, and similar tariffs and fees, imposed by any jurisdiction and based on this Agreement or arising due to BGC's provision of the License or Services hereunder or deliveries made directly related to the performance of this Agreement, other than taxes or other impositions levied on BGC's revenue, income or corporate existence.

5.3 Certain Fees Associated with Non OneSearch Searches and Reinvestigation of Data. RealPage shall pay BGC's then wholesale standard fees for, and BGC shall provide, (i) manual or out of network searches, (ii) non OneSearch searches and (iii) for reinvestigation of Data as provided in Section 6.4, where such reinvestigation is not necessitated by an error or defect in Data. Any request by RealPage for the reinvestigation or verification of database information that requires a manual court search will be billed at $7.00 per search plus any applicable court fee charged to BGC by the court.

5.4 No Other Fees. Other than the fees set forth in Section 5.1 through 5.3, or as otherwise agreed in writing by the parties, BGC shall impose no additional charge or fee for the License, access to the System or BGC Application, or implementation, conversion, support or any other services provided unless agreed upon in writing by RealPage.

6. **BGC Responsibilities**

6.1 Data Acquisition.

(a) BGC shall maintain during the term of this Agreement Data from those jurisdictions identified on Exhibit B hereto, as may be amended from time to time such that RealPage receives as "Data" all data included in BGC's OneSearch.

(b) BGC shall use commercially reasonable efforts to expand its Data acquisition efforts into new jurisdictions if offered by a competitor of RealPage or if reasonably requested by RealPage.

(i) RealPage will provide written notice to BGC where it discovers that a RealPage competitor is offering data from a jurisdiction not then being offered by BGC ("New Jurisdiction(s)"). BGC will use commercially reasonable efforts to acquire and add such Data with comparable attributes from such New Jurisdiction(s) to the Database, and make this new Data available to RealPage within 90 days thereafter ("Acquisition Period"). Unless the Data from the New Jurisdiction is not legally available to BGC, RealPage will deduct from Fees $1,000 per month per jurisdiction (not to exceed $10,000 per month) for each month that such Data from the New Jurisdictions is not made available after the Acquisition Period.

6.2 Initial Delivery of Data, Schema Changes. Within five (5) business days of the Effective Date:

(a) BGC shall deliver to RealPage via the Gateway the Normalized Data for replication to the Staging Database;

(b) the BGC Data Schema; and

(c) all Classification Codes.

6.3 Updates. BGC shall deliver to RealPage via the Gateway:

(a) updates to the Data within twenty (20) days of BGC's receipt of updates from Data Providers;

(b) Data no less frequently than it releases Data to its other resellers of Data;

(c) updates to the BGC Data Schema within five (5) business days after it modifies the BGC Data Schema for its own use; and

(d) updates to the Classification Code as often as it updates the Classification Code for its own uses.

BGC will document all changes included in each update to the Data, BGC Data Schema and Classification Codes, and will communicate the changes to RealPage via the Gateway before each release.

6.4 Administrative Responsibilities. In collecting, maintaining and providing Data, BGC Data Schema, that Classification Code, Classification System, and Services to RealPage, BGC will abide by Federal and State laws as they apply to resident and employment screening, including without limitation the Fair Credit Reporting Act and FACTA. RealPage may request in writing or via email BGC's assistance in reinvestigating consumer and customer disputes, subject to the provisions of Section 5.3. Reinvestigation may include, but is not limited to: the verification of criminal information from BGC's raw Data; the verification of expunged records; the verification of the categorization of a criminal offense; and the determination of why certain criminal records were not contained within the BGC Database. BGC will report the results of its reinvestigation to RealPage in writing within fifteen (15) days of RealPage's written request for reinvestigation. In the cases where reinvestigation substantiates the dispute, BGC will remove the Data from the BGC Database, BGC will use commercially reasonable standards to ensure against "repollution" of the inaccurate or incomplete Data into the Database.

6.5 Other Obligations of BGC related to Access to the BGC Database on an XML or DLL Pass-Through Search Basis.

(a) Availability. BGC shall use its reasonable best efforts to make the BGC Application available to RealPage on a continuous and uninterrupted basis 24 hours per day, 7 days per week, except for scheduled maintenance which occurs off business hours on Saturday or Sunday. BGC may temporarily suspend all

service for the purpose of repair, maintenance, back-up or improvement of any portion of the BGC Application.. However, BGC shall provide prior notice where it is reasonably practicable under the circumstances, and BGC shall restore service as soon as reasonably practicable. BGC will provide layouts and assistance as needed for data transfers. Horus of support are 8:30 a.m. to 5:30 p.m. (CST), Monday through Friday. BGC ftp site for data transfer will be available 24 hours a day.

(b) Best Efforts. BGC shall use its reasonable best efforts to provide such services and support as are reasonably required to maintain the BGC Application and BGC Databases in proper working order.

**7. RealPage Responsibilities**

7.1 Data Transformation and Storage.

(a) RealPage shall apply to the Data in the Staging Database transformation scripts to modify the Data structure from the BGC Data Schema_to the RealPage Data Schema to ensure that the Data conforms to the requirements of the RealPage Criminal Database.

(b) RealPage shall store the transformed Data in the RealPage Criminal Database.

(c) RealPage shall use the transformed Data resident in the RealPage Criminal Database to provide Screening Services to End Users.

7.2 Marketing Obligations. RealPage will use commercially reasonable efforts to market and promote the BGC Services. RealPage shall, without limitation:

(a) conduct business in a manner which reflects favorably at all times on BGC and the System, goodwill and reputation of BGC;

(b) avoid deceptive, misleading or unethical practices that are or might be detrimental to BGC or the System;

(c) refrain from making any false or misleading representations with regard to BGC or the System; and

(d) refrain from making any representations, warranties or guarantees to End Users or other third parties with respect to the specifications, features or capabilities of the Data or the System that are inconsistent with the warranties made by BGC in this Agreement or not described in the Documentation.

**8. Development Services.**

8.1 Creation of Criminal Classifications. BGC will create and deploy no later than November 30, 2006, a Criminal Classification Systems.

(a) Prior to creation of the Criminal Classification System, BGC shall supply to RealPage for RealPage's prior review and approval the proposed classification and group system that BGC intends to use to create the Criminal Classification System. During the Term of this Agreement, and other than updating the Criminal Classification System as provided in Section 8.1(B) below, BGC shall not modify the Criminal Classification System without RealPage's prior review and approval.

(b) BGC will update the Classifications (and the reference tables embodied in the Classification System) on an ongoing basis in new categories when BGC becomes aware of (i) an unclassified offense, (ii) a new category of a criminal offense or (iii) a unique designation of an offense by a reporting jurisdiction.

(c) BGC will provide to RealPage via the Gateway updates to the Classification Code within five (5) business days after BGC creates any modifications to the Classification Codes.

**9. Consulting Services**

9.1 BGC will provide the following Consulting Services to RealPage:

(a) assist and support RealPage in understanding all components of the System;

(b) maintain, update, and provide access to the Data, BGC Data Schema, Classification Code, and Classification System;

(c) through the Gateway to the Data Center(s), regularly and in accordance with a schedule mutually developed by the parties, push to RealPage updates to the Data, BGC Data Schema, and the Classification Code; and

(d) assist RealPage, subject to the provisions of Section 5.3, in the consumer dispute process by verifying the disputed information and updating Data when the dispute is resolved in the consumer's favor.

**10. Warranties; Disclaimers**

10.1 BGC Warranties. BGC represents and warrants to RealPage that:

(a) it owns or has rights to grant the License and that the Data, the BGC Data Schema, the Classification Code, the Classification System, the BGC Database and the BGC Application, and RealPage's use of the same in accordance with the terms of the License, shall not infringe any third party copyright, patent or trademark or misappropriate any third party trade secret;

(b) the Classification Code, the Classification System and the BGC Application shall operate in conformity with the Documentation therefor;

(c) the Services shall conform to the requirements set forth in any requirements document prepared in contemplation of performance of the Services and approved by BGC;

(d) it will use commercially reasonable efforts to assure the accuracy, completeness, and timeliness of the Data and the Services;

(e) it shall perform the Services in a timely, competent, professional, and workmanlike manner by senior consultants with appropriate levels of education and experience necessary to perform the Services consistent with best industry practices;

(f) the Data, BGC Data Schema, the Classification Code, Classification System, the BGC Database and the BGC Application shall contain no known computer virus or other contaminants, including any codes, instructions or hard devices that are intended to be used to access, modify, delete, damage or disable any central processing unit, network or server through which RealPage may access the Services (collectively, "Viruses");

(g) it will utilize industry standard processes for assuring system security integrity and Virus detection for the Services; and

(h) in collecting the Data, and otherwise performing its obligations under this Agreement, it shall comply with all applicable federal, state, county, and local rules, including all other state or federal laws, rules and/or regulations governing or relating to the collection, aggregation, sale or dissemination or, or the creation or use of consumer information or reports..

10.2 RealPage Warranties. RealPage represents and warrants to BGC that, in using the Data, whether through dissemination to RealPage through the Gateway or via the BGC Application, and otherwise performing its obligations under this Agreement, it shall comply with all applicable federal, state, county, and local rules, including without limitation the FCRA, and all other state or federal laws, rules and/or regulations governing or relating to the collection, aggregation, sale or dissemination of, or the creation or use of consumer information or reports.

10.3 Mutual Warranties. Each party represents and warrants to the other that it has the right, power, and capacity to execute, deliver, and perform this Agreement and to consummate the transactions contemplated hereby. Each party represents and warrants to the other that it shall comply with all applicable federal, state, and local laws and regulations as of the Effective Date or that come into effect during the Term (including without limitation the FCRA), all corresponding state laws related to the reporting of data for purposes of generating reports containing personal credit or criminal history, privacy legislation, and regulations) all in connection with the performance of its obligations and in connection with its provision of (i) in the case of BGC, the License and the Services to RealPage; and (ii) in the case of RealPage, the RealPage System and Screening Services to End Users.

10.3 DISCLAIMER. EXCEPT AS EXPRESSLY PROVIDED HEREIN, BGC HEREBY DISCLAIMS ALL ADDITIONAL WARRANTIES, WHETHER EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, WITH RESPECT TO THE APPLICATIONS OR SERVICES, INCLUDING BUT NOT LIMITED TO ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR ARISING FROM TRADE USAGE OR COURSE OF DEALING.

**11. Exclusivity.**

11.1 BGC may market and sell its services to other resident screening companies, regardless of whether they compete with RealPage.

**12. Proprietary Rights; Confidential Information**

12.1 Ownership. No transfer of ownership or any software or Data or any Intellectual Property Rights shall occur or shall be deemed to occur under this Agreement. Both parties hereby reserve all rights not expressly granted herein. BGC shall retain all right, title, and interest, including all Intellectual Property Rights, in and to the Data, Database(s), BGC Data Schema, Criminal Classification System, the Classification Code, the BGC Database and the BGC Application. RealPage shall retain all right, title, and interest, including all Intellectual Property Rights, in and to the RealPage System and the Screening Services.

12.2 Confidentiality.

(a) "Confidential Information" means any and all information disclosed by either party to the other which is marked "confidential" or "proprietary," or which the receiving party should reasonably believe to be confidential, including oral information, which is designated confidential at the time of disclosure. Confidential Information does not include any information that the receiving party can demonstrate (i) was known to it prior to its disclosure; (ii) is or becomes publicly known through no wrongful act of the receiving party; (iii) has been rightfully received from a third party authorized to make such disclosure without restriction; or (iv) is independently developed by the receiving party.

(b) Each party shall use the Confidential Information of an End User or of the other party solely as necessary to perform its obligations and exercise its rights under this Agreement, and for no other purpose whatsoever. Neither party shall disclose any Confidential Information of an End User or of the other party without such party's prior written consent. Each party shall use the same degree of care to protect the other party's Confidential Information as it uses to protect its own most highly confidential information, but in no circumstances less than a reasonable degree of care.

(c) If a receiving party is compelled by law, regulation or a court of competent jurisdiction to disclose any Confidential Information of the other party, the receiving party will promptly notify the disclosing party so that the disclosing party may seek a protective order or other appropriate remedy, and the receiving party, at the written request of the disclosing party and at the disclosing party's expense, shall provide to the disclosing party reasonable assistance in seeking such protective order or other remedy. If disclosure is ultimately required, the receiving party shall furnish only that portion of the Confidential Information that is legally required, exercise reasonable efforts to obtain assurance that it will receive confidential treatment, and continue to treat such Confidential Information in accordance with its obligations under this Agreement.

**13. Indemnity**

13.1 Mutual Indemnity. Subject to Section 14.2, each party shall indemnify, defend and hold the other harmless from and against any and all claims, demands, losses, damages, costs, expenses, and liabilities (including reasonably attorneys' fees) brought by third parties arising out of or related to its marketing, use or provision of its services (as to BGC: the Data, Database(s), BGC Data Schema, Criminal Classification System, the Classification Code, and as to RealPage: the RealPage System and Screening Services, as the case may be).

13.2 Infringement Indemnity.

(a) BGC shall defend, indemnify and hold harmless RealPage and its officers, directors, employees, and agents (each an "Indemnified Party") from and against any claim brought against such Indemnified Party or an End User by a third party that the Data, Database(s), BGC Data Schema, Criminal Classification System, the Classification Code, the BGC Database and the BGC Application, or the access to or

the use by RealPage of the License or the Services, infringes a patent or copyright or misappropriates a trade secret of such third party, and shall pay all amounts finally awarded (including settlements entered into judgment) by a court of competent jurisdiction to the extent based upon such claim.

(b) RealPage shall defend, indemnify, and hold harmless BGC and its officers, directors, employees, and agents (each an "Indemnified Party") from and against any claim brought against such Indemnified Party by a third party that the RealPage System or the Screening Services infringe a patent or copyright or misappropriates a trade secret of such third party, and shall pay all amounts finally awarded (including settlements entered into judgment) by a court of competent jurisdiction to the extent based upon such claim.

13.3 Procedure. The Indemnified Party seeking indemnification under this Section 13 shall: (i) promptly notify the other party ("Indemnitor") in writing of any claim, action, suit or other proceeding brought by third parties for which it is seeking indemnification; (ii) provide Indemnitor with sole control of the defense and/or settlement thereof; and (iii) provide Indemnitor, at Indemnitor's request and expense, with reasonable assistance and full information with respect thereto. The Indemnified Party shall have the right to participate, at its own expense, with counsel of its own choosing in the defense and/or settlement of such claim, suit or proceeding. The indemnification obligations of the parties in this Section 13 shall not apply to amounts paid in settlement of any claim, suit or proceeding if such settlement is effected without the consent of Indemnitor, which consent shall not be unreasonably withheld or delayed.

**14. Limitation of Liability**

14.1 Exclusion of Consequential Damages. TO THE MAXIMUM EXTENT ALLOWED UNDER APPLICABLE LAW, IN NO EVENT WILL EITHER PARTY BE LIABLE FOR ANY INCIDENTAL, SPECIAL, CONSEQUENTIAL, EXEMPLARY OR INDIRECT DAMAGES, INCLUDING BUT NOT LIMITED TO, COST OF COVER, LOSS OF DATA, LOSS OF PROFITS, BUSINESS INTERRUPTION, ARISING OUT OF OR RELATED TO THIS AGREEMENT, NO MATTER HOW CAUSED AND ON ANY THEORY OF LIABILITY.

14.2 Cap on Liability. OTHER THAN FOR LIABILTY ARISING THROUGH OPERATION OF THE INDEMNITY PROVISIONS HEREUNDER, IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER FOR ANY LIABILITY IN AN AMOUNT EXCEEDING THE TOTAL MONTHLY FEES PAID BY REALPAGE TO BGC DURING THE SIX MONTHS PRECEDING THE EVENT GIVING RISE TO THE LIABILITY.

**15. Miscellaneous**

15.1 Governing Law; Jurisdiction. This Agreement shall be governed by the laws of the State of Texas, excluding its principles of conflict of laws.

15.2 Entire Agreement. This Agreement, together with all Exhibits, constitutes the entire agreement between BGC and RealPage with respect to BGC Services. There are no restrictions, promises, warranties, covenants or undertakings other than those expressly set forth herein and therein. Other than for the Current Agreement that, as amended by this Agreement, is hereby ratified and confirmed, this Agreement supersedes all prior negotiations, agreements, and undertakings between the parties with respect to such matter. For avoidance of doubt, by execution of this Agreement, the parties intend and hereby do terminate the Current Agreement, which shall be of no further force or effect.

15.3 Severability. If any provision of this Agreement is held by a court of competent jurisdiction to be contrary to law, such provision will be changed and interpreted so as to best accomplish the objectives of the original provision to the fullest extent allowed by law, and if no feasible interpretation will save such provision, it shall be severed from this Agreement, and the remaining provisions remain in full force and effect.

15.4 Waiver. No delay or omission by either party to exercise any right or power it has under this Agreement shall impair or be construed as a waiver of such right or power. A waiver by either party of any breach by the other party shall not be construed to be a waiver of any succeeding breach or any other covenant by the other party. All waivers must be in writing and signed by the party waiving its rights.

15.5 Assignment. Neither party may assign this Agreement, without the prior written consent of the other party, which consent shall not be unreasonably withheld or delayed, except in connection with a merger, sale of substantially all stock of such party or the assets to which this Agreement relates, or other corporate restructuring. Any

attempted assignment of this Agreement in violation of this provision shall be void. Subject to the foregoing, this Agreement shall be binding on each party's successors and assigns.

15.6 Independent Contractors. The relationship of the parties under this Agreement shall be that of an independent contractor and nothing contained in this Agreement shall create or imply an agency or joint venture relationship between the parties.

15.7 Notices. Except as otherwise specified in this Agreement, all notices, required or permitted under this Agreement shall be in writing and shall be delivered or sent by (a) first class U.S. mail, registered or certified, return receipt requested, postage pre-paid; or (b) U.S. express mail, or other similar overnight courier service to the address first specified above. Notices shall be deemed given on the day actually received by the party to whom the notice is addressed.

15.8 Headings. Headings in this Agreement are for reference purposes only and shall not effect the interpretation or meaning of this Agreement.

15.9 Force Majeure. Notwithstanding any provision contained in this Agreement, neither party shall be liable to the other for a delay in performance to the extent such delay is beyond the reasonable control of party, including without limitation, acts of God, wars or other civil disorder; strikes; natural disasters, failure of the Internet, other power or electrical failures, or other federal, state or municipal action. This clause shall not apply to the payment of any sums due under this Agreement by either party to the other.

15.10 No Third Party Beneficiary. The provisions of this Agreement are intended or shall be construed to confer upon or give to any person or entity other than BGC and RealPage (and their permitted assignees) any rights, remedies or other benefits under or by reason of this Agreement.

15.11 Non-Solicitation. Each party agrees during the term of this Agreement and for a period of twelve (12) months following termination or expiration hereof, that it will not solicit for employment (for itself or any third party) any employee of the other party who performed any material obligation under this Agreement. If a party breaches the provision of this Section 16.11, such party shall pay the other party, as liquidated damages and not as a penalty, an amount equal to the total compensation paid by the non-breaching party to such employee during the last twelve (12) months of such individual's employment with the non-breaching party..

15.12 Survival. Sections 1, 3.2(e), 3.2(f), 5.3, 5.4, 7.3(b), 10.3, 12, 13, 14 and 15.12 shall survive.

15.13 Counterparts. This Agreement may be executed simultaneously in any number of counterparts, each of which shall be deemed an original, but all of which together constitute one and the same Agreement.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized officers in acceptance of its terms:

| **Backgroundchecks.com:** | **RealPage, Inc.:** |
|---|---|
| By: Ray W. Conrad | By: Stephen T. Winn |
| Print Name: Raymond W. Conrad | Print Name: STEPHEN T. WINN |
| Title: CEO | Title: CEO & PRESIDENT |

# Exhibit 5

**John Soumilas**

**From:** St. George, Timothy J. <Timothy.St.George@troutman.com>
**Sent:** Wednesday, August 14, 2019 11:54 AM
**To:** John Soumilas; Lauren Brennan
**Cc:** Lohr, Jessica
**Subject:** RE: Jones & Arnold v. RealPage - Revised interrogatory responses re: GDS

That's what I said, which is what makes all of this irrelevant. You can represent in your brief that this has been confirmed by counsel for RealPage. That's sufficient. It won't be contested.

**Timothy J. St. George**
troutman **sanders**
Direct: 804.697.1254
tim.st.george@troutman.com

**From:** John Soumilas <jSoumilas@consumerlawfirm.com>
**Sent:** Wednesday, August 14, 2019 11:52 AM
**To:** Lauren Brennan <LBrennan@consumerlawfirm.com>; St. George, Timothy J. <Timothy.St.George@troutman.com>
**Cc:** Lohr, Jessica <Jessica.Lohr@troutman.com>
**Subject:** RE: Jones & Arnold v. RealPage - Revised interrogatory responses re: GDS

EXTERNAL SENDER

Yeah, we need admissible evidence. An RFP response simply says you produced a contract with BGC. You previously stated that the BGC contract is actually the controlling contract for RP acquisition of criminal records data, including for GDS records such as the ones that appeared on Jones report. Is that true?

FRANCIS & MAILMAN
CONSUMER PROTECTION LITIGATION
**John Soumilas, Esquire**
1600 Market St., Suite 2510
Philadelphia, PA 19103
P 215.735.8600
F 215.940.8000
E jsoumilas@consumerlawfirm.com
**Firm Websites:**
www.consumerlawfirm.com
www.creditreportproblems.com

**From:** Lauren Brennan <LBrennan@consumerlawfirm.com>
**Sent:** Wednesday, August 14, 2019 11:40 AM
**To:** St. George, Timothy J. <Timothy.St.George@troutman.com>
**Cc:** John Soumilas <jSoumilas@consumerlawfirm.com>; Lohr, Jessica <Jessica.Lohr@troutman.com>
**Subject:** RE: Jones & Arnold v. RealPage - Revised interrogatory responses re: GDS

An RFP does not connect the dots in the way that we need. If it's not contested, let's just stipulate.

**From:** St. George, Timothy J. <Timothy.St.George@troutman.com>
**Sent:** Wednesday, August 14, 2019 11:25 AM
**To:** Lauren Brennan <LBrennan@consumerlawfirm.com>
**Cc:** John Soumilas <jSoumilas@consumerlawfirm.com>; Lohr, Jessica <Jessica.Lohr@troutman.com>
**Subject:** RE: Jones & Arnold v. RealPage - Revised interrogatory responses re: GDS

What I am saying is that we can simply amend the RFP responses in that regard. Is that good? This stipulation seems way overkill on a point not at all contested.

**Timothy J. St. George**
troutman **sanders**
Direct: 804.697.1254
tim.st.george@troutman.com

---

**From:** Lauren Brennan <LBrennan@consumerlawfirm.com>
**Sent:** Wednesday, August 14, 2019 10:37 AM
**To:** St. George, Timothy J. <Timothy.St.George@troutman.com>
**Cc:** John Soumilas <jSoumilas@consumerlawfirm.com>; Lohr, Jessica <Jessica.Lohr@troutman.com>
**Subject:** RE: Jones & Arnold v. RealPage - Revised interrogatory responses re: GDS

**EXTERNAL SENDER**

What we need is something that connects the dots between references in the testimony and written discovery responses (including the rog responses) to Genuine Data Services, and the backgroundchecks.com contract. To avoid the verification issue, how about a stipulation along the lines of the attached?

---

**From:** St. George, Timothy J. <Timothy.St.George@troutman.com>
**Sent:** Wednesday, August 14, 2019 9:39 AM
**To:** Lauren Brennan <LBrennan@consumerlawfirm.com>
**Cc:** John Soumilas <jSoumilas@consumerlawfirm.com>; Lohr, Jessica <Jessica.Lohr@troutman.com>
**Subject:** RE: Jones & Arnold v. RealPage - Revised interrogatory responses re: GDS

Can we just send a revised RFP that identifies the contract by Bates range. Seems silly to go through a new verification process.

**Timothy J. St. George**
troutman **sanders**
Direct: 804.697.1254
tim.st.george@troutman.com

---

**From:** Lauren Brennan <LBrennan@consumerlawfirm.com>
**Sent:** Tuesday, August 13, 2019 5:08 PM
**To:** St. George, Timothy J. <Timothy.St.George@troutman.com>
**Cc:** John Soumilas <jSoumilas@consumerlawfirm.com>; Lohr, Jessica <Jessica.Lohr@troutman.com>
**Subject:** Jones & Arnold v. RealPage - Revised interrogatory responses re: GDS

EXTERNAL SENDER

Hi Tim,

Nice seeing you today here in Philly.  We wanted to follow up on one issue from our August 6 call regarding RealPage's supplemental production in the Jones case.  During the call, we asked about RealPage's references in its supplemental responses to Jones Interrogatories 2 and 4 to a contract with Genuine Data Services, since the only contract produced to date is with a different entity, backgroundchecks.com.  You represented that they are the same entity, and we asked for revised interrogatory responses that make this relationship clear.  Please let us know when we can expect to receive this information – we anticipate needing to file it in connection with our class cert motion on Monday.

Thanks,
Lauren



**Lauren KW Brennan, Esquire**
1600 Market Street, Suite 2510
Philadelphia, PA 19103
P 215.735.8600
F 215.940.8000
E lbrennan@consumerlawfirm.com

Firm Websites:
www.consumerlawfirm.com
www.creditreportproblems.com

This e-mail message (and any attachments) from Troutman Sanders LLP may contain legally privileged and confidential information solely for the use of the intended recipient. If you received this message in error, please delete the message and notify the sender. Any unauthorized reading, distribution, copying, or other use of this message (and attachments) is strictly prohibited.

This e-mail message (and any attachments) from Troutman Sanders LLP may contain legally privileged and confidential information solely for the use of the intended recipient. If you received this message in error, please delete the message and notify the sender. Any unauthorized reading, distribution, copying, or other use of this message (and attachments) is strictly prohibited.

This e-mail message (and any attachments) from Troutman Sanders LLP may contain legally privileged and confidential information solely for the use of the intended recipient. If you received this message in error, please delete the message and notify the sender. Any unauthorized reading, distribution, copying, or other use of this message (and attachments) is strictly prohibited.

# Exhibit 6

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF OHIO**

| | |
|---|---|
| **DIANE D. JONES and JAMES ARNOLD,** | |
| Plaintiffs, | Case No. 1:19-cv-501-JG |
| | **DEFENDANT'S OBJECTIONS AND RESPONSES TO PLAINTIFF JONES' FIRST SET OF INTERROGATORIES** |
| v. | |
| | District Court Judge James S. Gwin |
| **REALPAGE, INC. d/b/a LEASINGDESK SCREENING,** | Magistrate Judge William H. Baughman |
| Defendant. | |

**DEFENDANT'S FIRST SUPPLEMENTAL OBJECTIONS AND RESPONSES TO PLAINTIFF JONES' FIRST SET OF INTERROGATORIES**

Pursuant to Fed. R. Civ. P. 26 and 33, Defendant RealPage, Inc. d/b/a LeasingDesk Screening, ("RealPage" or "Defendant") objects and responds to Plaintiff Diane D. Jones' ("Plaintiff") First Set of Interrogatories as follows:

**PRELIMINARY STATEMENT**

Defendant has not yet completed its investigation of the facts relating to this action, has not yet completed its discovery, and has not yet completed its preparation for trial. Consequently, the following responses are provided without prejudice to Defendant's right to introduce, at the time of trial or other proceedings, subsequently discovered information relating to the proof of presently known material facts and to introduce all information, whenever discovered, relating to

the proof of subsequently discovered material facts. However, Defendant does not assume any duty of ongoing amendment to these responses.

**OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS**

RealPage objects to the definition of "Defendant/You/Your" insofar as it includes any "agency, subsidiary(ies), parent corporation(s) and/or any of its branches, departments, employees, agents, contractual affiliates, or others connected by legal relationship, in the broadest sense." This definition is vague, ambiguous, and woefully overly broad and unduly burdensome, given that it would encompass third parties or entities, whose information and/or documents are not within RealPage's possession, custody, or control, or whose information has no relevance or bearing on the claims or defenses at issue in this matter.

**RESPONSES TO INTERROGATORIES**

1. Identify all entities, public or private, from which you have obtained any of the criminal record information that you sell about consumers, from March 6, 2014 to the present.

**ANSWER:** RealPage objects to this Interrogatory as vague, ambiguous, and overbroad, including because it is not limited to the specific claims or the tenant screening reports at issue in this action.

Subject to and without waiving any objections, RealPage obtains criminal record information from publicly available sources. The criminal record information contained in the relevant tenant screening reports was obtained from the Maryland Department of Corrections, the Nevada Department of Corrections, and the Georgia Corrections Supplemental. This information was accurately retrieved by a reputable vendor, Genuine Data Services, LLC, and thereafter provided to RealPage.

2. Identify the entity or entities, public or private, from which you obtained the criminal record information appearing on the consumer report you sold about Plaintiff Jones on or about August 28, 2017.

**ANSWER:** RealPage objects to this Interrogatory as vague and ambiguous, including with respect to the phrase "consumer report you sold."

Subject to and without waiving any objections, RealPage obtains criminal record information from publicly available sources. The criminal record information contained in the relevant tenant screening report was obtained from the Georgia Corrections Supplemental. This information was accurately retrieved by a reputable vendor, Genuine Data Services, LLC and thereafter provided to RealPage.

3. How much did you charge for the consumer report that you sold about Plaintiff Jones to Interstate Realty Management/Marietta Road?

**ANSWER:** RealPage objects to the Interrogatory as not relevant because the amount RealPage charges for consumer reports has no bearing on the claims or defenses asserted in this action. RealPage objects to this Interrogatory on the basis that it calls for trade secret, confidential business, financial, commercial or proprietary information.

**SUPPLEMENTAL ANSWER:** Subject to and without waiving its objections, RealPage states that the Marietta Road Apartment Complex pays $12 per background screening report that it generates from RealPage's software.

4. State the cost to you of obtaining the Fulton County, Georgia criminal record information appearing on the consumer report you sold about Plaintiff Jones on or about August 28, 2017.

**ANSWER:** RealPage objects to this Interrogatory as vague and ambiguous, specifically with respect to the undefined terms "cost" and "criminal record information." RealPage objects to the Interrogatory as not relevant because the cost of obtaining public record information has no bearing on the claims or defenses in this case. RealPage objects to this Interrogatory on the basis that it calls for trade secret, confidential business, financial, commercial or proprietary information.

Subject to and without waiving its objections, RealPage responds that it does not pay Genuine Data Services, LLC on a per-record basis. Therefore, it is unable to respond to this Interrogatory.

**SUPPLEMENTAL ANSWER:** Subject to and without waiving its objections, RealPage directs Plaintiffs to its contract with Genuine Data Services, LLC, which outlines the pricing terms for criminal records.

5. State the total number of consumers with an address in the United States and its Territories about whom you sold a report for each calendar year between March 6, 2014 and the present which included (i) one or more items of criminal record information, for which (ii) the first Name of the offender as listed on the criminal record was not a character-for-character match to the first name of the individual who was the subject of the report, and (iii) the last Name of the offender as listed on the criminal record was not a character-for-character match to the last name of the individual who was the subject of the report.

**ANSWER:** RealPage objects to this Interrogatory as vague and ambiguous, specifically with respect to the undefined terms "consumers," "report," "criminal record information," and "subject of the report." RealPage objects to this Interrogatory on the grounds that it is premature, overly broad, unduly burdensome, and irrelevant to the claims and defenses as they currently exist. Plaintiff's purported class has not been certified and, thus, the requested information is overbroad and irrelevant. Moreover, RealPage objects to this Interrogatory to the extent it seeks disclosure of private information of third parties who are not parties to this action, and may not even be members of a class, should a class be certified. RealPage objects to this Interrogatory on the basis that it calls for trade secret, confidential business, financial, commercial or proprietary information.

Subject to and without waiving its objections, RealPage responds that it cannot identify the information requested from its records.

6. State the total number of consumers with an address in the United States and its Territories about whom you sold a report for each calendar year between March 6, 2014 and the present which included one or more items of criminal record information, for which the first and last name of the individual who was the subject of the report was not a character for character match to either the Name of the offender or any of the alias names list on the criminal record.

**ANSWER:** RealPage objects to this Interrogatory as vague and ambiguous, specifically with respect to the undefined terms "consumers," "report," "criminal record information," "subject of the report," "offender," and "names list on the criminal record." RealPage objects to this Interrogatory on the grounds that it is premature, overly broad, unduly burdensome, and irrelevant to the claims and defenses as they currently exist. Plaintiff's purported class has not been certified

and, thus, the requested information is overbroad and irrelevant. Moreover, RealPage objects to this Interrogatory to the extent it seeks disclosure of private information of third parties who are not parties to this action, and may not even be members of a class, should a class be certified. RealPage objects to this Interrogatory on the basis that it calls for trade secret, confidential business, financial, commercial or proprietary information.

Subject to and without waiving its objections, RealPage responds as follows: none.

7. State the total number of consumers with an address in the United States and its Territories about whom you sold a report for each calendar year between March 6, 2014 and the present which included (i) one or more items of criminal record information, for which (ii) the first Name of the offender as listed on the criminal record was not a character-for-character match to the first name of the individual who was the subject of the report, (iii) the last Name of the offender as listed on the criminal record was not a character-for-character match to the last name of the individual who was the subject of the report, and (iv) the criminal record you placed on the report represented the offender's date of birth as “1/1/XXXX - 12/31/XXXX” because you did not possess the offender's month and day of birth.

**ANSWER:** RealPage objects to this Interrogatory as vague and ambiguous, specifically with respect to the undefined terms “consumers,” “report,” “criminal record information,” “subject of the report,” and “offender.” RealPage objects to this Interrogatory on the grounds that it is premature, overly broad, unduly burdensome, and irrelevant to the claims and defenses as they currently exist. Plaintiff’s purported class has not been certified and, thus, the requested information is overbroad and irrelevant. Moreover, RealPage objects to this Interrogatory to the extent it seeks disclosure of private information of third parties who are not parties to this action,

and may not even be members of a class, should a class be certified. RealPage objects to this Interrogatory on the basis that it calls for trade secret, confidential business, financial, commercial or proprietary information.

Subject to and without waiving its objections, RealPage responds that it cannot identify the information requested from its records.

8. State the total number of consumers with an address in the United States and its Territories about whom you sold a report for each calendar year between March 6, 2014 and the present which included one or more items of criminal record information, for which none of the characters of the first and last Name of the offender on the criminal record, when taken in order, matched to the first and last name of the individual who was the subject of the report, as shown in Attachment A hereto.

**ANSWER:** RealPage objects to this Interrogatory as vague and ambiguous, specifically with respect to the undefined terms "consumers," "report," "criminal record information," "subject of the report," and "offender." RealPage objects to this Interrogatory on the grounds that it is premature, overly broad, unduly burdensome, and irrelevant to the claims and defenses as they currently exist. Plaintiff's purported class has not been certified and, thus, the requested information is overbroad and irrelevant. Moreover, RealPage objects to this Interrogatory to the extent it seeks disclosure of private information of third parties who are not parties to this action, and may not even be members of a class, should a class be certified. RealPage objects to this Interrogatory on the basis that it calls for trade secret, confidential business, financial, commercial or proprietary information.

Subject to and without waiving its objections, RealPage responds that it cannot identify the information requested from its records.

9. Of the consumers comprising your response to Interrogatory No. 8, state the total number of consumers for whom (i) there was an exact match between the last name of the individual who was the subject of the report and an alias last name contained on the criminal record, but (ii) one or zero characters of the first name of the same alias contained on the criminal record, when taken in order as shown in Attachment A hereto, matched the first name of the individual who was the subject of the report.

**ANSWER:** RealPage incorporates its objections to Interrogatory No. 8. RealPage objects to this Interrogatory as vague and ambiguous, specifically with respect to the undefined terms "consumers," "individual," "subject of the report," and "alias last name contained on the criminal record." RealPage objects to this Interrogatory on the grounds that it is premature, overly broad, unduly burdensome, and irrelevant to the claims and defenses as they currently exist. Plaintiff's purported class has not been certified and, thus, the requested information is overbroad and irrelevant. Moreover, RealPage objects to this Interrogatory to the extent it seeks disclosure of private information of third parties who are not parties to this action, and may not even be members of a class, should a class be certified. RealPage objects to this Interrogatory on the basis that it calls for trade secret, confidential business, financial, commercial or proprietary information.

Subject to and without waiving its objections, RealPage responds that it cannot identify the information requested from its records.

10.     In instances where you relied on an alias name to match a criminal record to consumers who were the subject of the report, state the total number of consumers for whom (i) there was an exact match between the last name of the individual who was the subject of the report and an alias last name contained on the criminal record, but (ii) one or zero of the characters of the first name of the same alias contained on the criminal record, when taken in order as shown in Attachment A hereto, matched the first name of the individual who was the subject of the report.

**ANSWER:** RealPage objects to this Interrogatory as vague and ambiguous, specifically with respect to the undefined terms "alias name," "criminal record," "consumers," "report," "individual," "subject of the report," and "alias last name contained on the criminal record." RealPage objects to this Interrogatory on the grounds that it is premature, overly broad, unduly burdensome, and irrelevant to the claims and defenses as they currently exist. Plaintiff's purported class has not been certified and, thus, the requested information is overbroad and irrelevant. Moreover, RealPage objects to this Interrogatory to the extent it seeks disclosure of private information of third parties who are not parties to this action, and may not even be members of a class, should a class be certified. RealPage objects to this Interrogatory on the basis that it calls for trade secret, confidential business, financial, commercial or proprietary information.

Subject to and without waiving its objections, RealPage responds that it cannot identify the information requested from its records.

11.     Identify any changes you have made to any of your practices or procedures for selling reports to clients and/or subscribers, or for providing information to/consumers, since the filing of this lawsuit.

**ANSWER:** RealPage objects to this Request as vague and ambiguous, specifically with respect to the undefined terms "changes," "practices or procedures," "selling reports," and "clients and/or subscribers." RealPage objects to this Request for "all" documents as not proportional to the needs of the case, considering the factors enumerated in Fed. R. Civ. P. 26(b)(1). RealPage objects to this Request as not relevant and woefully overly broad, including as to time. RealPage also objects to this Request to the extent that it seeks information that constitutes confidential business, financial, commercial, and proprietary information, including trade secrets, absent the entry of a protective order. RealPage objects to providing the requested documentation on the basis that any such changes would constitute subsequent remedial measures not implicated by Plaintiffs' screening reports, including with respect to any changes made "since the filing of this lawsuit."

Dated: August 5, 2019

By: */s/ Timothy St. George*

Ronald I. Raether, Jr.
**Troutman Sanders LLP**
5 Park Plaza, Suite 1400
Irvine, CA 92614
Tel: (949) 622-2700
Fax: (949) 622-2739

Timothy St. George (pro hac vice)
**Troutman Sanders LLP**
1001 Haxall Point
Richmond, Virginia 23219
Telephone: (804) 697-1200
Facsimile: (804) 698-1339

Attorneys for Defendant
RealPage, Inc.

**CERTIFICATE OF SERVICE**

I hereby certify that I have served a copy of the foregoing document by electronic mail on this the 5th day of August 2019:

John Soumilas, Esq.
James A. Francis, Esq.
Lauren KW Brennan, Esq.
Francis & Mailman
Land Title Building, 19th Floor
100 South Broad Street
Philadelphia, PA 19110
Email: jfrancis@consumerlawfirm.com
jsoumilas@consumerlawfirm.com
lbrennan@consumerlawfirm.com

Daniel Cohen, Esq.
Edward Y. Kroub, Esq.
Cohen & Mizrahi LLP
300 Cadman Plaza West, 12th Floor
Brooklyn, NY 11201
Email: dan@cml.legal
edward@cml.legal

Stephen M. Bosak, Esq.
Matthew A. Dooley, Esq.
O'Toole McLaughlin Dooley & Pecora
5455 Detroit Road
Sheffield Village, OH 44054
Email: sbosak@omdplaw.com
mdooley@omdplaw.com

*/s/ Jessica R. Lohr*
Jessica R. Lohr

*Attorney for Defendant, RealPage, Inc. d/b/a Leasing Desk*

# Exhibit 7

Print

Display Disclosures in Report

**Diane D Jones**

| | | | |
|---|---|---|---|
| Address | **3494 Raymont Blvd** | Date/time | **8/28/2017 3:04:17 PM** |
| | **University Heights, OH 44118-2602, US** | RealPage Applicant Screening | **(866)934-1124** |
| | | Birth date | **8/13/xxxx** |
| | | SSN / ITIN | **xxx-xx-9799** |
| Gender | **Female** | | |

**Credit report**

| | | | | | |
|---|---|---|---|---|---|
| Name | **DIANE D JONES** | File date | **1987-08** | Run date | **8/15/2017** |
| SSN | **xxx-xx-9799** | Birth date | **8/13/xxxx** | Source | **Equifax** |
| | | | | Beacon: | **556** |

**Credit bureau warning message**

| EquifaxSAFESCAN |
|---|
| EFX: (code: S) ID SCAN: Identity Scan did not detect any alerts |
| Input address substantially matches on-file address. |
| * SSN Information: /SSN on MDB File: xxx-xx-9799(Verified)/ SSN on Inquiry: xxx-xx-9799/ Date Issued: 00-1972 in State: OH |

**Name Variation**

| Name |
|---|

**Previous addresses**

| Address | County | Reported Dates |
|---|---|---|
| Current Address:3494 Raymont Blvd University Heights OH 44118-2602 | Cuyahoga County | |
| Previous Address:3494 RAYMONT BLVD UNIVERSITY HEIGHTS OH 44118 | Cuyahoga County | From: 2017-07 To: 2015-11 |
| Previous Address:210 UNION ST APT 101 BEDFORD OH 44146 | Cuyahoga County | From: 2016-04 To: 2014-11 |
| Previous Address:22709 LAKE SHORE BLVD APT 250C EUCLID OH 44123 | Cuyahoga County | From: 2017-08 To: 2017-06 |
| Previous Address:3912 DELTA DAWN LN NORTH LAS VEGAS NV 89032 | Clark County | From: 2017-07 To: 2014-02 |
| Previous Address:21507 FRANKLIN RD MAPLE HEIGHTS OH 44137 | Cuyahoga County | From: 2016-06 To: 2010-09 |
| Previous Address:19221 SUNSET DR WARRENSVILLE HEIGHTS OH 44122 | Cuyahoga County | From: 2013-01 To: 2010-08 |
| Previous Address:2520 SIERRA BELLO AVE UNIT 104 LAS VEGAS NV 89106 | Clark County | From: 2014-04 To: 2010-08 |
| Previous Address:24950 ROCKSIDE RD BEDFORD OH 44146 | Cuyahoga County | From: 2010-08 To: 2010-08 |
| Previous Address:440 RICHMOND PARK E APT 503C RICHMOND HEIGHTS OH 44143 | Cuyahoga County | From: 2010-08 To: 2004-10 |
| Previous Address:4136 E 113TH ST CLEVELAND OH 44105 | Cuyahoga County | From: 2015-05 To: 2004-04 |

**Reported Employment**

| Employer information |
|---|
| ALLSTATE INS Addr: From: To: DataSource: |
| ADW SONS Addr: From: To: DataSource: |
| STATE FARM INSURANCE Addr: CLEVELAN OH From: To: DataSource: |

**FICO**

| Scoring Factors |
|---|
| Serious delinquency and derogatory public record or collection filed |
| Number of accounts with delinquencies |
| Length of time since derogatory public record or collection is too short |
| Length of time accounts have been established |
| THE NUMBER OF INQUIRIES ON FILE ADVERSELY AFFECTED THE SCORE |

**Financial detail totals**

, Medical, Student Loan, Bankruptcy, Rental Collections

| Applicant | FICO | Credit lmt | Unpaid bal | Open amt | Mthly pymt | 30 | 60 | 90 | Pos | Neg | Non | Inquiries |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DIANE D JONES | Equifax-Beacon: 556 | 0 | 1664 | 0 | 0 | 1 | 1 | 7 | 0 | 2 | 0 | 2 |

**Financial detail**

| | | | |
|---|---|---|---|
| **1. DEPARTMENT OF EDUCAT** | Payment Pattern: | | Rating: **Pos** |
| Acct#:(***********6999) | 90 Days Late: | Open Amt: | Status: **Closed** |

| | | | |
|---|---|---|---|
| Type: **Educational (Installment)** | 60 Days Late: | Current Limit: | Opened: **2010-02** |
| Comment:**AsAgreed** | 30 Days Late: | Current Balance: **$0.00** | Reported: **2014-12** |
| Notes: **Ignored; settings filter out Educational** | | Monthly Pmt: | Activity: |

| **2. DEPT OF ED/NELNET** | Payment Pattern: ***CCCCCCCCCCCC******** | | Rating: **Pos** |
|---|---|---|---|
| Acct#:(***********4599) | 90 Days Late:**3** | Open Amt: | Status: **Closed** |
| Type: **Educational (Installment)** | 60 Days Late:**0** | Current Limit: | Opened: **2010-02** |
| Comment:**AsAgreed** | 30 Days Late: **0** | Current Balance: **$0.00** | Reported: **2014-12** |
| Notes: **Ignored; settings filter out Educational** | | Monthly Pmt: | Activity: **2014-08** |

| **3. DEPT OF ED/NELNET** | Payment Pattern: ***********CCCCCCCCCCCC | | Rating: **Pos** |
|---|---|---|---|
| Acct#:(***********4499) | 90 Days Late:**3** | Open Amt: | Status: **Closed** |
| Type: **Educational (Installment)** | 60 Days Late:**0** | Current Limit: | Opened: **2010-02** |
| Comment:**AsAgreed** | 30 Days Late: **0** | Current Balance: **$0.00** | Reported: **2015-08** |
| Notes: **Ignored; settings filter out Educational** | | Monthly Pmt: | Activity: **2015-08** |

| **4. DEPARTMENT OF EDUCAT** | Payment Pattern: *****************C****** | | Rating: **Pos** |
|---|---|---|---|
| Acct#:(***********6899) | 90 Days Late: | Open Amt: | Status: **Closed** |
| Type: **Educational (Installment)** | 60 Days Late: | Current Limit: | Opened: **2010-02** |
| Comment:**AsAgreed** | 30 Days Late: | Current Balance: **$0.00** | Reported: **2016-06** |
| Notes: **Ignored; settings filter out Educational** | | Monthly Pmt: | Activity: **2014-12** |

| **5. FINGERHUT/WEBBANK** | Payment Pattern: **9321CC** | | Rating: **Neg** |
|---|---|---|---|
| Acct#:(************3464) | 90 Days Late:**1** | Open Amt: | Status: **Open** |
| Type: **InstallmentSalesContract (Installment)** | 60 Days Late:**1** | Current Limit: | Opened: **2014-11** |
| Comment:**Collection** | 30 Days Late: **1** | Current Balance: **$0.00** | Reported: **2015-05** |
| Notes: **Mail Order Firms** | | Monthly Pmt: **$24.00** | Activity: **2014-12** |

| **6. LVNV FUNDING LLC** | Payment Pattern: | | Rating: **Neg** |
|---|---|---|---|
| Acct#:(************3464) | 90 Days Late: | Open Amt: | Status: **Open** |
| Type: **FactoringCompanyAccount (Open)** | 60 Days Late: | Current Limit: | Opened: **2015-04** |
| Comment:**Collection** | 30 Days Late: | Current Balance: **$238.00** | Reported: **2017-08** |
| Notes: **Financial** | | Monthly Pmt: | Activity: **2014-12** |

| **7.** | Payment Pattern: | | Rating: **Neg** |
|---|---|---|---|
| Acct#:(*******70N1) | 90 Days Late: | Open Amt: | Status: **Closed** |
| Type: **Collection (Unknown)** | 60 Days Late: | Current Limit: | Opened: |
| Comment:**Collection** | 30 Days Late: | Current Balance: **$50.00** | Reported: **2017-07** |
| Notes: **Ignored; settings filter out Medical** | | Monthly Pmt: | Activity: |

| **8.** | Payment Pattern: | | Rating: **Neg** |
|---|---|---|---|
| Acct#:(*******91N1) | 90 Days Late: | Open Amt: | Status: **Closed** |
| Type: **Collection (Unknown)** | 60 Days Late: | Current Limit: | Opened: |
| Comment:**Collection** | 30 Days Late: | Current Balance: **$665.00** | Reported: **2017-07** |
| Notes: **Ignored; settings filter out Medical** | | Monthly Pmt: | Activity: |

| **9.** | Payment Pattern: | | Rating: **Neg** |
|---|---|---|---|
| Acct#:(*******92N1) | 90 Days Late: | Open Amt: | Status: **Closed** |
| Type: **Collection (Unknown)** | 60 Days Late: | Current Limit: | Opened: |
| Comment:**Collection** | 30 Days Late: | Current Balance: **$665.00** | Reported: **2017-07** |
| Notes: **Ignored; settings filter out Medical** | | Monthly Pmt: | Activity: |

| **10.** | Payment Pattern: | | Rating: **Neg** |
|---|---|---|---|
| Acct#:(***4561) | 90 Days Late: | Open Amt: | Status: **Closed** |
| Type: **Collection (Unknown)** | 60 Days Late: | Current Limit: | Opened: |
| Comment:**Collection** | 30 Days Late: | Current Balance: **$46.00** | Reported: **2017-08** |
| Notes: **Ignored; settings filter out Medical** | | Monthly Pmt: | Activity: |

**Credit inquiries**

| Party inquiring | Date |
|---|---|
| SEARS/CBNA | 2017-04-09 |
| AT & T SERVICES INC | 2016-09-19 |

**Criminal & Other Records**

Run date **8/15/2017**

**Offender information**

| ID | Jur code | Name | Birth date | SSN | Photo/Description |
|---|---|---|---|---|---|
| 1 | GADOCSPL | TAYLOR, TONI | 1/1/xxxx - 12/31/xxxx | | SEX: f RACE_ETHNIC: black HAIR: black EYE_COLOR: brown |

**Alias information** - ID column indicates association between offender and alias

| ID | Jur code | Name | Birth date | Alias | |
|---|---|---|---|---|---|
| | | | | Name/Description | Birth date |
| 1 | GADOCSPL | TAYLOR, TONI | 1/1/xxxx - 12/31/xxxx | TAYLOR, TONI YVETTE | |
| 1 | GADOCSPL | TAYLOR, TONI | 1/1/xxxx - 12/31/xxxx | THOMAS, PAMELA | |
| 1 | GADOCSPL | TAYLOR, TONI | 1/1/xxxx - 12/31/xxxx | THOMAS, SANDRA | |
| 1 | GADOCSPL | TAYLOR, TONI | 1/1/xxxx - 12/31/xxxx | JONES, PAMELA | |
| 1 | GADOCSPL | TAYLOR, TONI | 1/1/xxxx - 12/31/xxxx | JONES, TINA | |
| 1 | GADOCSPL | TAYLOR, TONI | 1/1/xxxx - 12/31/xxxx | SMITH, SANDRA | |
| 1 | GADOCSPL | TAYLOR, TONI | 1/1/xxxx - 12/31/xxxx | SMITH, TINA | |
| 1 | GADOCSPL | TAYLOR, TONI | 1/1/xxxx - 12/31/xxxx | SMITH, TONI | |
| 1 | GADOCSPL | TAYLOR, TONI | 1/1/xxxx - 12/31/xxxx | TAYLOR, PAMELA | |
| 1 | GADOCSPL | TAYLOR, TONI | 1/1/xxxx - 12/31/xxxx | TAYLOR, TONI EVETTE | |
| 1 | GADOCSPL | TAYLOR, TONI | 1/1/xxxx - 12/31/xxxx | TAYLOR, TONI Y | |
| 1 | GADOCSPL | TAYLOR, TONI | 1/1/xxxx - 12/31/xxxx | JACKSON, TINA | |
| 1 | GADOCSPL | TAYLOR, TONI | 1/1/xxxx - 12/31/xxxx | WATKINS, TONI | |

**Offense information** - ID column indicates association between offender and offense

| ID | Jur code | Disposition | Type/Level | Charge | Record Date | ORIC/ County | Note |
|---|---|---|---|---|---|---|---|
| 1 | GADOCSPL | | | S/D NARCOTICS OPIATES | | FULTON COUNTY \| Case#323494 | |

**Source and Vendor Information**

| Jur Code | Source | Vendor Information |
|---|---|---|
| GADOCSPL | Georgia Corrections Supplemental | Genuine Data Services, LLC |

**For more information on criminal codes, click here.**

| Criminal & Other Records Searched |
|---|
| National Criminal Database |
| National Sex Offender Registry |
| National Wanted Terrorist/Fugitive Database |
| Disclosure From Jurisdictions Returning Results |

**Suits & Judgments for Eviction, Possession and/or Non-Payment of Rent Report**

**No eviction filings and/or judgments found for this applicant**

**LeasingDesk Inquiries**

Consumer inquiries over the last 12 months

**Important information**

Credit Report
Criminal Disclosure
Eviction Report

3521464 Marietta Road - 7302 59

# Exhibit 8

Click here to start over (OffQryForm.jsp) | Return to previous screen

## NAME: TAYLOR, TONI

GDC ID: 0000194993

Sorry, this offender's photo is not available

---

### PHYSICAL DESCRIPTION

**YOB:** 1961
**RACE:** BLACK
**GENDER:** FEMALE
**HEIGHT:** 0'00"
**WEIGHT:** 000
**EYE COLOR:** BROWN
**HAIR COLOR:** BLACK

---

### SCARS, MARKS, TATTOOS

---

### INCARCERATION DETAILS

**MAJOR OFFENSE:** THEFT BY TAKING
**MOST RECENT INSTITUTION:** WASHINGTON STATE PRISON
**MAX POSSIBLE RELEASE DATE:** 07/06/1995

Important Release Information

**ACTUAL RELEASE DATE:** 07/06/1995
**CURRENT STATUS:** INACTIVE

---

### KNOWN ALIASES

**A.K.A.** JACKSON,TINA
**A.K.A.** JONES,PAMELA
**A.K.A.** JONES,TINA
**A.K.A.** SMITH,SANDRA
**A.K.A.** SMITH,TINA
**A.K.A.** SMITH,TONI
**A.K.A.** TAYLOR,PAMELA
**A.K.A.** TAYLOR,TONI
**A.K.A.** TAYLOR,TONI EVETTE
**A.K.A.** TAYLOR,TONI Y
**A.K.A.** TAYLOR,TONI YVETTE

**A.K.A.** THOMAS,PAMELA

**A.K.A.** THOMAS,SANDRA

**A.K.A.** WATKINS,TONI

STATE OF GEORGIA - CURRENT SENTENCES

CASE NO: 323494

**OFFENSE:** THEFT BY TAKING

**CONVICTION COUNTY:** FULTON COUNTY

**CRIME COMMIT DATE:** 10/29/1993

**SENTENCE LENGTH:** 0 YEARS, 18 MONTHS, 0 DAYS

CASE NO: 323494

**OFFENSE:** S/D NARCOTICS OPIATES

**CONVICTION COUNTY:** FULTON COUNTY

**CRIME COMMIT DATE:** N/A

**SENTENCE LENGTH:** 0 YEARS, 40 MONTHS, 0 DAYS

STATE OF GEORGIA - PRIOR SENTENCES

STATE OF GEORGIA - INCARCERATION HISTORY

**INCARCERATION BEGIN:** 01/25/1994

**INCARCERATION END:** 07/06/1995

**INCARCERATION BEGIN:** 08/02/1985

**INCARCERATION END:** 05/27/1986

**INCARCERATION BEGIN:** 12/13/1983

**INCARCERATION END:** 10/01/1984

# Exhibit 9

Z33536

RECOMMENDED
_______ YES
_______ NO

APPLICATION FOR APPOINTMENT
COUNSEL AND CERTIFICATE OF
FINANCIAL RESOURCES

STATE OF GEORGIA
vs.

IN 300
Cm Bw

BOOKING # 9113530

Taylor, Toni

DATE 5-1-91

I am charged with the following offenses: Poss Coc 2500

✓ I (can) (cannot) afford to hire a lawyer to assist me.
✓ I (do) (do not) want the court to provide me with a lawyer.
✓ I understand this information is for the court to determine whether or not to appoint a lawyer to defend me on these charges.

MAILING ADDRESS: 2291 [illegible] Apt 6-30
Jonesboro Rd Atl

DATE OF BIRTH: REDACTED-5-REDACTED AGE: 25 SOCIAL SECURITY # REDACTED 7185
HIGHEST GRADE COMPLETED IN SCHOOL: 11 EMPLOYER: U/E
TAKE HOME PAY PER MONTH: 0 IF UNEMPLOYED, HOW LONG? 3mths
DISABILITY OR OTHER INCOME PER MONTH: 6
ARE YOU MARRIED? NO SPOUSE'S EMPLOYER: —
TAKE HOME PAY PER MONTH: — NO. OF CHILDREN LIVING AT HOME: 4
AGES: 14, 12, 8, 9
DO YOU OWN A MOTOR VEHICLE: NO YEAR AND MODEL: —
— HOW MUCH DO YOU OWE ON IT: —
DO YOU OWN A HOME? — VALUE OF HOME: — RENT: 0

I HAVE READ (OR HAVE HAD READ TO ME) THE ABOVE QUESTIONS AND ANSWERS. THE INFORMATION IS TRUE AND CORRECT. I UNDERSTAND THAT ANY FALSE ANSWER MAY RESULT IN A CHARGE OF PERJURY. I WILL REIMBURSE THE COUNTY IF I BECOME FINANCIALLY ABLE TO DO SO.

x Toni Y. Taylor
DEFENDANT'S SIGNATURE

Sworn and Subscribed before me this 1 day of May, 19 91.

D. Mark Beth
Notary Public

Notary Public, Fulton County, Georgia
My Commission Expires June 27, 1994

FILED IN OFFICE
MAY 10 1991
[signature]
DEPUTY CLERK SUPERIOR COURT
FULTON COUNTY GEORGIA

ORDER APPOINTING COUNSEL

Pursuant to Section 29.2 of the Uniform Rules for the Superior Court, appointment of counsel for the above-named defendant is (GRANTED) (DENIED).

✓ The Fulton County Public Defender is appointed to represent the defendant.

_____ Private counsel is appointed to represent the defendant.

5-1-91 Dorigne Mark Beth
DATE — JUDGE, SUPERIOR COURT OF FULTON COUNTY
ATLANTA JUDICIAL CIRCUIT

BOOK 2877 PAGE 630

Distribution:
White -- Clerk of Court (file)
Blue -- Defendant
Canary -- Public Defender/Appointed Counsel

JUN 6 1991

166-92-989

FULTON_COUNTY_0001

[illegible] ROBINSON, CLERK OF SUPERIOR COURT OF FULTON COUNTY, GEORGIA
[illegible] CERTIFY THAT THE WITHIN AND FOREGOING IS A TRUE, COMPLETE
AND CORRECT COPY OF THE ORIGINAL IN SAID CASE, AS [illegible] ON FILE
AND RECORDED IN THE [illegible] OF SUPERIOR COURT
[illegible] COUNTY, CRIMINAL [illegible] GA.
WITNESS MY HAND AND SEAL [illegible] COURT THIS
9 DAY OF August [illegible] 19
[illegible] CLERK

IN THE SUPERIOR COURT FOR THE COUNTY OF FULTON

STATE OF GEORGIA

**NOTICE TO DEFENDANTS ENTERING PLEAS OF GUILTY**

You are hereby notified by the Court that you have a right to have your sentence reviewed by the Superior Courts Sentence Review Panel of Georgia. Sentences of five (5) years or more may be reviewed by this Panel for excessiveness. A letter requesting a review (or an application form) must be filed with the clerk of this court. You have thirty (30) days from the date on which your sentence is imposed in which to file for your sentence review.

This the 21st day of June, 1991.

FILED IN OFFICE
JUN 26 1991
DEPUTY CLERK SUPERIOR COURT
FULTON COUNTY GEORGIA

JUDGE LEAH SEARS-COLLINS
Atlanta Judicial Circuit

NOTICE ACKNOWLEDGED

Defendant's Signature

Z 33536
Indictment Number

BOOK 2895 PAGE 497

FILED IN OFFICE
JUN 26 1991
[signature]
DEPUTY CLERK SUPERIOR COURT
FULTON COUNTY GEORGIA

**SUPPLEMENTAL GUILTY PLEA PETITION***

(Accused is to fill in all of the blanks in his own handwriting)

233536

I HEREBY REPRESENT TO THE COURT:

1. My full name is Toni Yvette Taylor, and I request that all proceedings against me be had in that name; and I am mentally competent to make this Petition. I understand, should the plea of guilty herein tendered not be accepted and a trial follows, that the admissions made herein will not be admissible against me at that time, except for impeachment purposes.

2. I am represented by a lawyer, whose name is James Steven Purvis.

3. I will plead guilty to the charge of VGCSA 5-30.

4. I have told my lawyer all of the facts and circumstances known to me about the charges asserted in the (Indictment) (Accusation) (Special Presentment). I believe that my lawyer is fully informed on all of those matters. My lawyer has counseled and advised with me on the nature of each charge and on all possible defenses that I might have in this case.

5. I understand that I may plead "Not Guilty" to any offense charged against me. If I choose to plead "Not Guilty," the Constitutions of the United States and Georgia guarantees me: (a) the right to a speedy and public trial by jury, (b) the right to see, hear and cross-examine all witnesses called to testify against me, (c) the right to use the power and process of the Court to compel the production of any evidence, including the attendance of any witnesses in my favor, (d) the right to have the assistance of a lawyer at all stages of the proceedings, (e) that I do not have to testify against myself, and (f) I have the right to make the state prove my guilt beyond a reasonable doubt. I also understand that if I do not have enough money, and cannot obtain funds to hire an attorney, the Court will appoint an attorney to represent me.

6. I also understand that if I plead "Guilty" to the charges against me, I give up all the rights guaranteed to me, and the Court may sentence me to the same punishment as if I had pled "Not Guilty," stood trial, and been convicted of the offense by jury.

[initials]

*This Petition is only a supplement to the plea entered on the record.

BOOK 2895 PAGE 495

7. My lawyer informed me that the punishment which the law provides for the offense charged in the indictment is: imprisonment for not less than 5 or more than 30 and a fine of $________.

8. I declare that no officer or agent of any branch of government (federal, state or local), nor my lawyer, nor any other person, had made any promise of any kind to me, or within my knowledge to anyone else, that I will receive a lesser sentence, or probation, or any other form of leniency if I plead "Guilty," except as to the recommendation contained in the plea agreement offered this day by the prosecuting attorney.

9. I believe that my lawyer has completely done all that anyone could to counsel and assist me, and I AM SATISFIED WITH THE ADVICE AND GUIDANCE HE OR SHE HAS GIVEN ME.

10. I plead "Guilty" and respectfully request the Court to accept my plea of "Guilty" and to enter my plea of "Guilty."

11. I OFFER MY PLEA OF GUILTY "FREELY AND VOLUNTARILY AND OF MY OWN ACCORD AND WITH FULL UNDERSTANDING OF ALL THE MATTERS SET FORTH IN THE (INDICTMENT) (ACCUSATION) (SPECIAL PRESENTMENT) AND IN THIS PETITION, AND THIS PLEA IS WITH THE ADVICE AND CONSENT OF MY ATTORNEY.

SIGNED BY ME IN THE PRESENCE OF MY ATTORNEY, this 21 day of Jun, 19 91.

Toni L. Taylor
DEFENDANT

MY ADDRESS IS: 2241 Jones Bird Rd. #G30
atlanta GA. 30315

MY AGE IS: 29.

Signed in my presence this 21 day of Jun, 19 91.

[signature]
ATTORNEY FOR DEFENDANT

BOOK 2895 PAGE 496

CATHELENE ROBINSON, CLERK OF SUPERIOR COURT OF FULTON COUNTY, GEORGIA I, DO CERTIFY THAT THE WITHIN AND FOREGOING IS A TRUE, COMPLETE AND CORRECT COPY OF THE ORIGINAL IN SAID CASE, AS APPEARS ON FILE AND RECORDED IN THE OFFICE OF [illegible] OF SUPERIOR COURT FULTON COUNTY, CRIMINAL [illegible], GA.

WITNESS MY HAND AND SEAL OF SAID COURT THIS 9 DAY August, 2019

[signature]

DEPUTY CLERK

AFFIDAVIT AND WARRANT FOR ARREST OF PROBATIONER

STATE OF GEORGIA
VS.
TONI TAYLOR

FULTON COUNTY SUPERIOR COURT
NUMBER: Z-33536
CHARGE: VGCSA

GEORGIA, FULTON COUNTY

Personally appeared ROBERT TYLER, who, being duly sworn on oath deposes and says that TONI TAYLOR was placed on probation by this Court on the 21ST day of JUNE 19 91, upon the charge of VIOLATION GEORGIA CONTROLLED SUBSTANCE ACT

and that to the best of affiant's knowledge and belief said defendant has since violated the terms of probation in the following manner: FAILED TO RESPOND TO LETTERS/MESSAGES TO REPORT. FAILED TO COMPLY WITH COMMUNITY SERVIC SPECIAL CONDITION. FAILED TO RESPOND TO LETTERS/MESSAGES TO REPORT.

That affiant makes this affidavit for the purposes of obtaining a warrant for the arrest of said probationer in order that (he or she) may be returned to this Court to answer this charge of violation of probation.

*Sworn to and subscribed before me this* 10TH *day of* OCTOBER *19* 91.

[signature]
*Notary Public*

Notary Public, Fulton County, Georgia
My Commission Expires May 3, 1993

[signature]
ROBERT TYLER

GEORGIA, FULTON COUNTY

TO ALL AND SINGULAR, THE SHERIFFS, DEPUTY SHERIFFS, AND ALL OTHER DULY CONSTITUTED ARRESTING OFFICERS.

*Affidavit having been made that the above named defendant has violated the terms of probation, you are hereby commanded to arrest said defendant, to safely keep (him or her) until (he or she) may be brought before this Court to answer the charge of violation of probation as set forth in the foregoing affidavit.*

*THE SENTENCE OF THE DEFENDANT IS HEREBY TOLLED UNDER THE PROVISIONS OF OCGA SEC. 42-8-36 (a), AND THE SIGNING OF THIS ORDER.*

*This the* 21ST *day of* Oct *19* 91.

[signature]
*JUDGE,* LEAH SEARS COLLINS
SUPERIOR *COURT OF FULTON COUNTY*

**GEORGIA, FULTON COUNTY:**
**DILIGENT SEARCH MADE AND DEFENDANT,** Toni Taylor
**NOT TO BE FOUND IN THE JURISDICTION OF SAID COURT.**

BOOK 3029 PAGE 953

**THIS** 25th **DAY OF** OCTOBER **19** 91

FILED IN OFFICE
NOV 13 1991
DEPUTY CLERK SUPERIOR COURT
FULTON COUNTY GEORGIA
Robert Tyler
DEPUTY SHERIFF — PROBATION OFFICER
FILED IN OFFICE
OCT 28 1991
DEPUTY CLERK SUPERIOR COURT
FULTON COUNTY GEORGIA
OCT 29 1991
DOCKET NO. Z-33536
STATE OF GEORGIA
COUNTY OF FULTON
STATE
VS.
Toni Taylor
Soc. Sec. # 8571
Date of Birth: 05
Race B Sex F Hgt. 5'1" Wt. 115
FP # 359202
Expiration Date: 06-21-2006
AUTHORITY TO ARREST
Received 19
Executed 19
By
Title
10-126-585

CATHELENE ROBINSON, CLERK OF SUPERIOR COURT OF FULTON COUNTY, GEORGIA
I, DO CERTIFY THAT THE WITHIN AND FOREGOING IS A TRUE, COMPLETE AND CORRECT COPY OF THE ORIGINAL IN SAID CASE, AS APPEARS ON FILE AND RECORDED IN THE OFFICE OF [illegible] SUPERIOR COURT FULTON COUNTY, [illegible]
WITNESS MY HAND AND [illegible] THIS
9 DAY OF August, 20 19
[illegible] CLERK

WARRANT CANCELLATION NOTICE

NAME Toni Taylor INDICTMENT NO. Z-33536

ALIAS WARRANT NO.

D.O.B. REDACTED 5/ REDACTED RACE Black

APD NO. 359202 FUL. CO. NO. F.B.I. NO.

DEPT. PLACE Metro Probation

WARRANT HAS BEEN DESIGNATED:

LOCAL

STATE √

NATIONAL

1/10/92
DATE

Pamela A. Starratt
PROBATION OFFICER (Dac)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

WARRANT UPDATE NOTICE

NAME

INDICTMENT NO.

YOU ARE REQUESTED TO ENTER THE WARRANT ISSUED ON

WITH: GGIC ☐

NCIC ☐

PROBATION OFFICER

DATE

FILED IN OFFICE
JAN 23 1992
DEPUTY CLERK SUPERIOR COURT
FULTON COUNTY GEORGIA

BOOK 3073 PAGE 114

JAN 1 4 1992

0150

10-032-0784

[illegible]SON, CLERK OF S[illegible] COURT OF FULTON COUNTY, GEORGIA [illegible] THAT THE WITHIN [illegible] IS A TRU[illegible] COMPLETE AND [illegible] COPY OF THE ORIGINAL [illegible] ON FILE AND [illegible] IN THE [illegible] COURT [illegible] COUNTY [illegible]

9 DAY OF August, 20 19

DEPUTY CLERK

AFFIDAVIT AND WARRANT FOR ARREST OF PROBATIONER

STATE OF GEORGIA
VS.
TONI TAYLOR

FULTON COUNTY SUPERIOR COURT
NUMBER: Z33536
CHARGE: VGCSA

GEORGIA, FULTON COUNTY

Personally appeared ROBERT Y. JONES, who, being duly sworn on oath deposes and says that TONI TAYLOR was placed on probation by this Court on the 21st day of JUNE 1991, upon the charge of VGCSA

and that to the best of affiant's knowledge and belief said defendant has since violated the terms of probation in the following manner: FAILURE TO REPORT AND PAY AS DIRECTED BY THE COURT.

That affiant makes this affidavit for the purposes of obtaining a warrant for the arrest of said probationer in order that (~~he or~~ she) may be returned to this Court to answer this charge of violation of probation.

*Sworn to and subscribed before me this* 25th *day of* JUNE *19* 92.

Robert Y Jones
ROBERT Y. JONES

Tonya C. Barron
*Notary Public* Notary Public, Fulton County, Georgia My Commission Expires June 18, 1993

GEORGIA, FULTON COUNTY

TO ALL AND SINGULAR, THE SHERIFFS, DEPUTY SHERIFFS, AND ALL OTHER DULY CONSTITUTED ARRESTING OFFICERS.
*Affidavit having been made that the above named defendant has violated the terms of probation, you are hereby commanded to arrest said defendant, to safely keep (~~him or~~ her) until (~~he or~~/she) may be brought before this Court to answer the charge of violation of probation as set forth in the foregoing affidavit.*

*THE SENTENCE OF THE DEFENDANT IS HEREBY TOLLED UNDER THE PROVISIONS OF OCGA SEC. 42-8-36 (a), AND THE SIGNING OF THIS ORDER.*

*This the* 30th *day of* June *19* 92.

Elizabeth E. Long
*JUDGE,* ELIZABETH E. LONG
SUPERIOR *COURT OF FULTON COUNTY*

**GEORGIA, FULTON COUNTY:**
**DILIGENT SEARCH MADE AND DEFENDANT,** TONI TAYLOR
**NOT TO BE FOUND IN THE JURISDICTION OF SAID COURT.**

**THIS** 15th **DAY OF** JULY **19** 92

Robert Y Jones
**DEPUTY SHERIFF — PROBATION OFFICER**

**FILED IN OFFICE**
JUL 15 1992
William Collins
DEPUTY CLERK SUPERIOR COURT
FULTON COUNTY GEORGIA
CC:SO

BOOK 3229 PAGE 59

DOCKET NO.

**STATE OF GEORGIA**
**COUNTY OF** FULTON

**STATE**
**VS.**

Soc. Sec. # [REDACTED]8571
Date of Birth: [REDACTED]5/[REDACTED]
Race B Sex F Hgt. 5'1" Wt. 115
FP # APB# 359202
Expiration Date: 5/15/2006

**AUTHORITY TO ARREST**

**Received** ______ 19 ___
**Executed** ______ 19 ___
**By** ______
**Title** ______

pv
JUL 16 1992

10-126-585

[illegible], CLERK OF SUPERIOR COURT OF FULTON COUNTY, GEORGIA [illegible] THE WITHIN AND FOREGOING [illegible] COMPLETE [illegible] COPY OF THE [illegible] ON FILE AND RECORDED IN THE OFFIC[illegible] SUPERIOR COURT FULTON COUNTY, CRIMINAL [illegible]

WITNESS [illegible] HAND AND SEAL [illegible] COURT THIS 9 DAY OF August, 20 19

DEPUTY CLERK

WARRANT CANCELLATION NOTICE

NAME Taylor, Toni Yvette INDICTMENT NO. Z-33536

ALIAS WARRANT NO.

D.O.B. REDACTED 5 REDACTED RACE Black.

APD NO. 359202 FUL. CO. NO. F.B.I. NO.

DEPT. PLACING Metro Probation

WARRANT HAS BEEN DESIGNATED:

LOCAL

STATE ✓

NATIONAL

8/7/92
DATE

Pamela A. Starratt
PROBATIONER OFFICER (DAC)

FILED IN OFFICE

AUG 10 1992

DEPUTY CLERK SUPERIOR COURT
FULTON COUNTY GEORGIA

WARRANT UPDATE NOTICE

NAME

INDICTMENT NO.

YOU ARE REQUESTED TO ENTER THE WARRANT ISSUED ON

WITH: GGIC

NCIC

PROBATION OFFICER

BOOK 3251 PAGE 524

DATE AUG 11 1992
DZ

10-032-0784

FULTON_COUNTY_0013

CATHELENE ROBINSON, CLERK OF SUPERIOR COURT OF FULTON COUNTY, GEORGIA
I, DO CERTIFY THAT THE WITHIN AND FOREGOING IS A TRUE [illegible]
AND CORRECT COPY OF THE ORIGINAL IN SAID CASE [illegible]
[illegible] IN THE OFFICE OF [illegible] COURT
[illegible] COUNTY, GEORGIA [illegible]

[illegible] MY HAND AND SEAL [illegible] THIS
9 DAY August, 2019

[signature]

DEPUTY CLERK

bf 29 ar MCA 04-18-91
259202
087049(FCP)

Z 33536

BOOK 2224 PAGE 897

WITNESSES:

B.P.S:
W. M. Smart

Drug Transport:
J. T. Turner
C. W. Richardson

Crime Lab:
George Fontis
91-12508

Clerk's No. ............................

FULTON SUPERIOR COURT

THE STATE

vs.

TONI TAYLOR

VIOLATION GEORGIA CONTROLLED SUBSTANCES ACT

True Bill

4th day of June, 1991

Henry C. Bauer Foreman

waives copy of indictment, list of witnesses, full panel, formal arraignment, and pleads guilty

Lewis R. Slaton /LG Dist. Atty.

[signature] Deft's. Atty.

Toni T. Taylor Deft.

21st day of June, 1991

LFG

STATE OF GEORGIA, COUNTY OF FULTON.

IN THE SUPERIOR COURT OF SAID COUNTY.

**THE GRAND JURORS** selected, chosen and sworn for the County of Fulton, to-wit:

1. Henry C. Bauer, Foreman
2. [illegible]
3. Janet L. Melson, Secretary
4. Gloria Gaither, Asst. Secretary
5. [illegible]
6. [illegible]
7. [illegible]
8. Jacqueline Dunlap
9. Katie H. Gates
10. [illegible]
11. [illegible]
12. Cedric D. Hendrix
13. Castell Jackson
14. Margaret R. Jacobs
15. Jeffrey D. Johnson
16. Ardella Knott
17. Evelyn A. Latimore
18. Vita G. Maddox
19. Jean McClatchet
20. Helen P. Parker
21. Gottrel Petty
22. [illegible]
23. Angeline B. Shepard
24. Alysia Miller, 1st Alt.
25. John Carleton, 2nd Alt.

in the name and behalf of the citizens of Georgia, charge and accuse

TONI TAYLOR

with the offense of: —

VIOLATION GEORGIA CONTROLLED SUBSTANCES ACT

for that said accused, in the County of Fulton and State of Georgia, on the 11th day of April, 19 91

did unlawfully sell Cocaine to W. M. Smart, said drug being a controlled substance in Schedule II of said Act; -

contrary to the laws of said State, the good order, peace and dignity thereof.

LEWIS R. SLATON, District Attorney

Special Presentment.

BOOK 2224 PAGE 898

FULTON_COUNTY_0016

[illegible] ROBINSON, CLERK OF SUPERIOR COURT OF FULTON COUNTY, GEORGIA
I, DO CERTIFY THAT THE WITHIN AND FOREGOING IS A TRUE, COMPLETE
AND CORRECT COPY OF THE ORIGINAL IN SAID CASE, AS APPEARS ON FILE
[illegible] OF SUPERIOR COURT
[illegible]
WITNESS MY HAND AND [illegible] COURT THIS
9 DAY OF August, 20 19
[illegible]
[illegible] CLERK

FILED IN OFFICE

JAN 21 1992

DEPUTY CLERK SUP. CT.
FULTON COUNTY GEORGIA

## CERTIFICATE OF SERVICE

I have this day served a true and correct copy of the within Rule Nisi upon the named Defendant by handing the same to said Defendant in person.

This the ______ day of ______________________, 19 ____.

______________________________
DEPUTY SHERIFF - PROBATION OFFICER

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

TONI TAYLOR
APB#359202

DOCKET#Z33536

## ORDER OF REVOCATION

WHEREAS, pursuant to notice given to the Defendant, a full hearing was conducted by this Court on the date aforesaid in accordance with Code Section 42-8-38 (Ga. L. 1956, pp. 27, 32; Ga. L. 1960, p. 857, Ga. L. 1966, p. 440) and the Court has adjudged that the terms of probation have been violated in the particulars as set forth in the Petition, unless therein otherwise specified:
HAVING BEEN REPRESENTED BY ATTORNEY, PAULA PAVLOSKY, FORMAL NOTICE WAIVED AND A HEARING HELD AS DEFENDANT FAILED TO REPORT AS DIRECTED,

( ) Let it be further noted that said probation was revoked on the _____ day of ______________ 19____ for a period of ______________, and was reinstated on probation on the _____ day of ______________, 19___, under the conditions of the original Order of Probation.

NOW, THEREFORE, it is ordered and adjudged that the probation provisions in said original sentence be revoked in accordance with Code Section 42-8-38 (Ga. L. 1956, pp. 27,32; Ga. L. 1960, p. 857, Ga. L. 1966, p. 440) and the Defendant is hereby required to serve:

( ) Balance of said sentence.

(XX) *Four (4) months ~~Balance~~ of said sentence from warrant issued 10-21-91 and a return of Non est Inventus having been made on 10-25-91 in accordance with Sec. 42-8-36 of Statewide Probation Act of 1956 (as amended).

( ) Balance of said sentence, however, upon payment of balance of said fine and/or restitution in the amount of $________, said sentence shall be suspended.

( ) ______________ months/years. Upon service of said ______________, balance of said sentence shall be suspended.

(XX) *Four (4) months/~~years~~. Upon service of said four (4) months said Defendant shall be reinstated on probation under the conditions of the original Order of Probation dated 6-21-91.

( ) Balance of said sentence concurrently with sentence received in Docket ______________.

( ) Balance of said sentence and service of time is suspended.

(XX) *CREDIT TIME SERVED SINCE 10-15-91. DEFENDANT TO SERVE TIME IN FULTON COUNTY JAIL.

Said sentence shall be served in the Fulton County Jail, the Public Works Camp or such other place as the Department of Corrections may direct.

( ) It is adjudged by the Court that the defendant is to be continued on probation.

This the 9th day of JANUARY, 19 92.

[signature]
WALTER LOVETT, JR. JUDGE

SUPERIOR COURT, A. J. C.

JAN 23 1992 TT

BOOK 2290 PAGE 384

# PETITION FOR REVOCATION OF PROBATION

THE STATE
VS
TONI TAYLOR

DOCKET # Z33536
JANUARY-FEBRUARY TERM
19 92 , SUPERIOR COURT, A. J. C.

NOW COMES PAMELA STARRATT, Probation Officer of Fulton County, in the name and behalf of the State of Georgia, and brings this action against TONI TAYLOR Hereinafter called the Defendant, and shows:

I

That the Defendant entered a plea of guilty to (xxxxxxxxxxxxxf) the offense of V.G.C.S.A. at the MAY-JUNE Term, 19 91 .

II

That this Court, on the 21st day of JUNE, 1991 , did sentence the Defendant to serve as follows: Five (5) years $250 fine, $25 penalty assessment, $25 jail construction and staffing act, $10 monthly probation fee and probated.

III

That this court, by proper order, however, permitted the Defendant to serve said sentence on probation, the terms and conditions of which are fully set forth in the Order of Probation.

IV

That the Defendant has violated the terms and conditions of probation in the following particulars:

V

WHEREFORE, the State of Georgia prays that the citation for revocation of probation be served on the Defendant and that the Defendant be directed to appear before this court on a day to be fixed by the Court and at that time to show cause why probation should not be revoked.

This the ________ day of ____________________, 19____ .

PROBATION OFFICER

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

## ORDER

The foregoing Petition read and considered. The same is hereby allowed and ordered filed. Let the Defendant ______________________, be brought before me on the ______ day of ____________ 19 _____ , at _______ M. in the Fulton County Courthouse for a hearing to determine whether his probated sentence should be revoked as prayed.

Let a copy of the foregoing Petition and this Order be served on the said ______________________.

This the ______ day of ______________ 19___.

JUDGE

COURT, A.J.C.

BOOK 90 PAGE 385 10-013-181

[illegible], CLERK OF SUPERIOR COURT OF FULTON COUNTY, GEORGIA
[illegible] DO CERTIFY THAT THE WITHIN AND FOREGOING IS A TRUE, COMPLETE
[illegible] COPY OF THE ORIGINAL IN SAID CASE [illegible] ON FILE
[illegible] IN THE OFFICE [illegible] SUPERIOR COURT
[illegible]

WITNESS MY HAND AND [illegible] SAID COURT THIS
9 DAY OF August, 20 19
[signature]
[illegible] CLERK

FILED IN OFFICE
AUG 19 1992
DEPUTY CLERK SUPERIOR COURT
FULTON COUNTY GEORGIA
☐ DA JAIL ☐

## CERTIFICATE OF SERVICE

I have this day served a true and correct copy of the within Rule Nisi upon the named Defendant by delivering the same to said Defendant in person.

This the ______ day of ______________________, 19 ____.

______________________________
DEPUTY SHERIFF - PROBATION OFFICER

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

TONI (YVETTE) TAYLOR DOCKET# Z-33536
APB# 359202

## ORDER OF REVOCATION

WHEREAS, pursuant to notice given to the Defendant, a full hearing was conducted by this Court on the date aforesaid in accordance with Code Section 42-8-38 (Ga. L. 1956, pp. 27, 32; Ga. L. 1960, p. 857, Ga. L. 1966, p. 440) and the Court has adjudged that the terms of probation have been violated in the particulars as set forth in the Petition, unless therein otherwise specified: HAVING BEEN REPRESENTED BY ATTORNEY, PAULA PAVLOSKY, AND A HEARING HAVING BEEN HELD,

REASON FOR REVOCATION: FAILURE TO REPORT AS DIRECTED.

(X) Let it be further noted that said probation was revoked on the 9TH day of JANUARY 19 92 for a period of FOUR (4) MONTHS, and was reinstated on probation on the 15TH day of JANUARY, 19 92, under the conditions of the original Order of Probation.

NOW, THEREFORE, it is ordered and adjudged that the probation provisions in said original sentence be revoked in accordance with Code Section 42-8-38 (Ga. L. 1956, pp. 27,32; Ga. L. 1960, p. 857, Ga. L. 1966, p. 440) and the Defendant is hereby required to serve:

( ) Balance of said sentence.

( ) Balance of said sentence from warrant issued ______________ and a return of Non est Inventus having been made on ______________ in accordance with Sec. 42-8-36 of Statewide Probation Act of 1956 (as amended).

( ) Balance of said sentence, however, upon payment of balance of said fine and/or restitution in the amount of $________, said sentence shall be suspended.

( ) ______________ months/years. Upon service of said ______________, balance of said sentence shall be suspended.

( ) ______________ months/years. Upon service of said ______________ said Defendant shall be reinstated on probation under the conditions of the original Order of Probation dated ______________.

( ) Balance of said sentence concurrently with sentence received in Docket ______________.

( ) Balance of said sentence and service of time is suspended.

( ) ______________________________

Said sentence shall be served in the Fulton County Jail, the Public Works Camp or such other place as the Department of Corrections may direct.

(X) It is adjudged by the Court that the defendant is to be continued on probation. from warrant issued 06/30/92 & a return of Non est Inventus of 07/15/92. Enter and complete the Women's Diversion Center Program. Remain in jail pending bed space. Community Service hours are hereby deleted. Complete Crack/Cocaine Addiction Program or Drug Dealers Group as deemed necessary by probation.

This the 6TH day of AUGUST, 19 92.

[signature]
WALTER LOVETT, JR., JUDGE
SUPERIOR COURT, A. J. C.

AUG 20 1992

dac

BOOK 2350 PAGE 849

# PETITION FOR REVOCATION OF PROBATION

THE STATE
VS
TONI (YVETTE) TAYLOR

DOCKET # Z-33536
JULY/AUGUST TERM
19 92 , SUPERIOR COURT. A. J. C.

NOW COMES PAMELA A. STARRATT, Probation Officer of Fulton County, in the name and behalf of the State of Georgia, and brings this action against TONI (YVETTE) TAYLOR Hereinafter called the Defendant, and shows:

I

That the Defendant entered a plea of guilty to (XXXXXXXXXXXXXX) the offense of VGCSA at the JUNE Term, 19 91.

II

That this Court, on the 21ST day of JUNE, 19 91, did sentence the Defendant to serve as follows: FIVE (5) YEARS, $250 FINE, $25 PENALTY ASSESSMENT, $25 JAIL CONSTRUCTION AND STAFFING ACT, $10 MONTHLY PROBATION FEE, AND PROBATED. DEFENDANT TO GET GED OR HIGH SCHOOL EDUCATION. COMPLETE FORTY (40) HOURS IN A COMMUNITY SERVICE PROJECT. DRUG TESTING AND SCREENING. GET A JOB.

III

That this court, by proper order, however, permitted the Defendant to serve said sentence on probation, the terms and conditions of which are fully set forth in the Order of Probation.

IV

That the Defendant has violated the terms and conditions of probation in the following particulars:

V

WHEREFORE, the State of Georgia prays that the citation for revocation of probation be served on the Defendant and that the Defendant be directed to appear before this court on a day to be fixed by the Court and at that time to show cause why probation should not be revoked.

This the ______ day of ______________, 19____ .

______________________
PROBATION OFFICER

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

## ORDER

The foregoing Petition read and considered. The same is hereby allowed and ordered filed. Let the Defendant ______________________, be brought before me on the ______ day of ______________ 19 _____ , at _______ M. in the Fulton County Courthouse for a hearing to determine whether his probated sentence should be revoked as prayed.

Let a copy of the foregoing Petition and this Order be served on the said ______________________.

This the ______ day of ______________ 19 ____.

______________________
JUDGE
COURT, A.J.C.

BOOK 23[illegible] PAGE 850

CATHELENE ROBINSON, CLERK OF SUPERIOR COURT OF FULTON COUNTY, GEORGIA
I, DO CERTIFY THAT THE WITHIN AND FOREGOING IS A TRUE, COMPLETE
AND CORRECT COPY OF THE ORIGINAL IN SAID CASE, AS APPEARS ON FILE
AND RECORDED IN THE OFFICE OF [illegible] SUPERIOR COURT
FULTON COUNTY, GEORGIA [illegible], GA.
WITNESS MY HAND AND SEAL [illegible] COURT THIS
9 DAY OF August 20 19

DEPUTY CLERK

FILED IN OFFICE
OCT 19 1992
Martha Harrison
DEPUTY CLERK SUPERIOR COURT
FULTON COUNTY GEORGIA
☐ DA JAIL ☐

## CERTIFICATE OF SERVICE

I have this day served a true and correct copy of the within Rule Nisi upon the named Defendant by handing the same to said Defendant in person.

This the ______ day of ____________________, 19____.

______________________________
DEPUTY SHERIFF - PROBATION OFFICER

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

TONI (YVETTE) TAYLOR DOCKET# Z-33536
APB# 359202

## ORDER OF REVOCATION

WHEREAS, pursuant to notice given to the Defendant, a full hearing was conducted by this Court on the date aforesaid in accordance with Code Section 42-8-38 (Ga. L. 1956, pp. 27, 32; Ga. L. 1960, p. 857, Ga. L. 1966, p. 440) and the Court has adjudged that the terms of probation have been violated in the particulars as set forth in the Petition, unless therein otherwise specified:
HAVING BEEN REPRESENTED BY ATTORNEY, PAULA PAVLOSKY, AND A HEARING HAVING BEEN HELD,

REASON FOR REVOCATION: FAILURE TO REPORT AS DIRECTED.

(X) Let it be further noted that said probation was revoked on the 9TH day of JANUARY 19 92 for a period of FOUR (4) MONTHS, and was reinstated on probation on the 15TH day of JANUARY, 19 92, under the conditions of the original Order of Probation.

NOW, THEREFORE, it is ordered and adjudged that the probation provisions in said original sentence be revoked in accordance with Code Section 42-8-38 (Ga. L. 1956, pp. 27,32; Ga. L. 1960, p. 857, Ga. L. 1966, p. 440) and the Defendant is hereby required to serve:

( ) Balance of said sentence.

( ) Balance of said sentence from warrant issued ____________ and a return of Non est Inventus having been made on ____________ in accordance with Sec. 42-8-36 of Statewide Probation Act of 1956 (as amended).

( ) Balance of said sentence, however, upon payment of balance of said fine and/or restitution in the amount of $________, said sentence shall be suspended.

( ) ____________ months/years. Upon service of said ____________, balance of said sentence shall be suspended.

(X) FOUR (4) months/~~years~~ Upon service of said FOUR(4) MONTHS said Defendant shall be reinstated on probation under the conditions of the original Order of Probation dated 06/21/91.

( ) Balance of said sentence concurrently with sentence received in Docket ____________.

( ) Balance of said sentence and service of time is suspended.

(X) A PREVIOUS REVOCATION HEARING WAS HELD ON 08/06/92 AND THE DEFENDANT WAS CONTINUED ON PROBATION FROM WARRANT DATE 06/30/92 AND NON EST INVENTUS DATE 07/15/92. DEFENDANT WAS ORDERED TO COMPLETE THE WOMEN'S DIVERSION CENTER PROGRAM AND CRACK/COCAINE ADDICTION PROGRAM OR DRUG DEALERS GROUP AS DEEMED NECESSARY BY PROBATION. *

Said sentence shall be served in the Fulton County Jail, the Public Works Camp or such other place as the Department of Corrections may direct. *CREDIT FOR TIME SERVED SINCE 09/02/92. SENTENCE TO BE SERVED IN FULTON COUNTY JAIL. COMPLETE CRACK COCAINE ADDICTION PROGRAM AND/OR DRUG DEALERS PROGRAM AS DIRECTED BY PROBATION.

( ) It is adjudged by the Court that the defendant is to be continued on probation.

This the 24TH day of SEPTEMBER, 19 92.

[signature]
WALTER LOVETT, JR., JUDGE

SUPERIOR COURT, A. J. C.

dac OCT 2 0 1992

# PETITION FOR REVOCATION OF PROBATION

THE STATE
VS
TONI (YVETTE) TAYLOR

DOCKET # Z-33536
SEPTEMBER/OCTOBER TERM
19 92, SUPERIOR COURT, A. J. C.

NOW COMES PAMELA A. STARRATT, Probation Officer of Fulton County, in the name and behalf of the State of Georgia, and brings this action against TONI (YVETTE) TAYLOR Hereinafter called the Defendant, and shows:

I

That the Defendant entered a plea of guilty to (XXXXXXXXXXXXXXX) the offense of VGCSA at the JUNE Term, 19 91.

II

That this Court, on the 21ST day of JUNE, 19 91, did sentence the Defendant to serve as follows: FIVE (5) YEARS, $250 FINE, $25 PENALTY ASSESSMENT, $25 JAIL CONSTRUCTION AND STAFFING ACT, $10 MONTHLY PROBATION FEE, AND PROBATED.

III

That this court, by proper order, however, permitted the Defendant to serve said sentence on probation, the terms and conditions of which are fully set forth in the Order of Probation.

IV

That the Defendant has violated the terms and conditions of probation in the following particulars:

V

WHEREFORE, the State of Georgia prays that the citation for revocation of probation be served on the Defendant and that the Defendant be directed to appear before this court on a day to be fixed by the Court and at that time to show cause why probation should not be revoked.

This the ________ day of ________________, 19____.

PROBATION OFFICER

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

## ORDER

The foregoing Petition read and considered. The same is hereby allowed and ordered filed. Let the Defendant ________________, be brought before me on the ______ day of ________ ________ 19 ____, at ______ M. in the Fulton County Courthouse for a hearing to determine whether his probated sentence should be revoked as prayed.

Let a copy of the foregoing Petition and this Order be served on the said ________________.

This the______day of________19____

JUDGE
COURT, A.J.C.

2368 PAGE 095

[illegible], CLERK OF SUPERIOR COURT OF FULTON COUNTY, GEORGIA
I, DO CERTIFY THAT THE WITHIN AND FOREGOING IS A TRUE, COMPLETE
AND CORRECT COPY OF THE ORIGINAL IN SAID CASE, AS APPEARS ON FILE
AND RECORDED IN THE OFFICE OF [illegible] OF SUPERIOR COURT
FULTON COUNTY, GEORGIA [illegible]

WITNESS MY HAND AND SEAL [illegible] SAID COURT THIS
9 DAY OF August, 20 19

[signature]

DEPUTY CLERK

AFFIDAVIT AND WARRANT FOR ARREST OF PROBATIONER

STATE OF GEORGIA
VS.
TONI TAYLOR MN:YVETTE

FULTON COUNTY SUPERIOR COURT
NUMBER: Z33536
CHARGE: VGCSA

GEORGIA, FULTON COUNTY

Personally appeared ROBERT Y. JONES, who, being duly sworn on oath deposes and says that TONI TAYLOR was placed on probation by this Court on the 21st day of JUNE 1991±, upon the charge of VGCSA

and that to the best of affiant's knowledge and belief said defendant has since violated the terms of probation in the following manner: FAILURE TO REPORT AND PAY AS DIRECTED BY THE COURT.

That affiant makes this affidavit for the purposes of obtaining a warrant for the arrest of said probationer in order that (he/or she) may be returned to this Court to answer this charge of violation of probation.

*Sworn to and subscribed before me this*
9th day of FEBRUARY 19 93.

[signature]
Notary Public

[signature]
ROBERT Y. JONES

GEORGIA, FULTON COUNTY

TO ALL AND SINGULAR, THE SHERIFFS, DEPUTY SHERIFFS, AND ALL OTHER DULY CONSTITUTED ARRESTING OFFICERS.

*Affidavit having been made that the above named defendant has violated the terms of probation, you are hereby commanded to arrest said defendant, to safely keep (him or her) until (he or she) may be brought before this Court to answer the charge of violation of probation as set forth in the foregoing affidavit.*

*THE SENTENCE OF THE DEFENDANT IS HEREBY TOLLED UNDER THE PROVISIONS OF OCGA SEC. 42-8-36 (a), AND THE SIGNING OF THIS ORDER.*

*This the* 12th *day of* Feb *19*93.

[signature]
*JUDGE* ELIZABETH E. LONG
SUPERIOR *COURT OF FULTON COUNTY*

**GEORGIA, FULTON COUNTY:**
**DILIGENT SEARCH MADE AND DEFENDANT, ______**
**NOT TO BE FOUND IN THE JURISDICTION OF SAID COURT.**

**THIS ______ DAY OF ______ 19 ___**

BOOK 3761 PAGE 597

______
**DEPUTY SHERIFF — PROBATION OFFICER**

**FILED IN OFFICE**

MAR 3 1994
Martha Nolan
DEPUTY CLERK SUPERIOR COURT
FULTON COUNTY GEORGIA

Original Never Received in Criminal Division. M. Nolan

Using As orig

MAR 9 1994 pv

DOCKET NO.

**STATE OF GEORGIA**
**COUNTY OF** FULTON

**STATE**
**VS.**

Soc. Sec. # [REDACTED]571
Date of Birth: [REDACTED]8/5/[REDACTED]
Race B Sex F Hgt. 5'1 Wt. 115
FP # APB# 359202
Expiration Date: 5/2/2006

**AUTHORITY TO ARREST**

**Received** ______ 19 ___
**Executed** ______ 19 ___
**By** ______
**Title** ______

10-126-585

CATHELENE ROBINSON, CLERK OF SUPERIOR COURT OF FULTON COUNTY, GEORGIA
I, DO CERTIFY THAT THE WITHIN AND FOREGOING IS A TRUE, COMPLETE AND [illegible] COPY OF THE ORIGINAL IN SAID CASE, AS APPEARS ON FILE AND [illegible] IN THE OFFICE [illegible] OF SUPERIOR COURT [illegible], ORIGINAL [illegible]
[illegible] MY HAND AND SEAL [illegible] SAID COURT THIS
9 DAY OF August, 2019
[signature]
DEPUTY CLERK

## CERTIFICATE OF SERVICE

I have this day served a true and correct copy of the within Rule Nisi upon the named Defendant by handing the same to said Defendant in person.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

TONI TAYLOR @PAMELA JONES
APB#359202

Docket# Z-33536

## ORDER OF REVOCATION

WHEREAS, pursuant to notice given to the Defendant, a full hearing was conducted by this Court on the date aforesaid in accordance with Code Section 42-8-38 (Ga. L. 1956, pp. 27, 32; Ga. L. 1960, p. 857, Ga. L. 1966, p. 440) and the Court has adjudged that the terms of probation have been violated in the particulars as set forth in the Petition, unless therein otherwise specified: The defendant Pamela Jones @Toni Taylor having been sentenced in Superior Court on 1-7-94 for the offense of Robbery Docket# Z-59083 and receiving three (3) years to serve 18 months, balance suspended. The defendant and her attorney Andrei Howze having waived formal notice and a hearing having been held.

** ( X) Let it be further noted that said probation was revoked on the 1st day of September 19 92 for a period of four (4) months, and was reinstated on probation on the 15th day of January, 19 92, under the conditions of the original Order of Probation.

NOW, THEREFORE, it is ordered and adjudged that the probation provisions in said original sentence be revoked in accordance with Code Section 42-8-38 (Ga. L. 1956, pp. 27,32; Ga. L. 1960, p. 857, Ga. L. 1966, p. 440) and the Defendant is hereby required to serve:

( ) Balance of said sentence.

( X) ~~Balance~~ 18 months of said sentence from warrant issued 2-12-93 and a return of Non est Inventus having been made on 2-12-93 in accordance with Sec. 42-8-36 of Statewide Probation Act of 1956 (as amended).

( ) Balance of said sentence, however, upon payment of balance of said fine and/or restitution in the amount of $____, said sentence shall be suspended.

( X) Eighteen (18) months/~~years~~. Upon service of said eighteen months, balance of said sentence shall be suspended.

( -) ____ months/years. Upon service of said ____ said Defendant shall be reinstated on probation under the conditions of the original Order of Probation dated ____.

( ) Balance of said sentence concurrently with sentence received in Docket ____.

( ) Balance of said sentence and service of time is suspended.

( ) ____

Said sentence shall be served in the Fulton County Jail, the Public Works Camp or such other place as the Department of Corrections may direct.

**(X) A subsequent hearing was held on 8-6-92 and the defendant was continued on probation from the warrant dated 6-30-92 and Non est Inventus dated 7-15-92. An additional hearing was held on 9-24-92 and the defendant was revoked four (4) months and was reinstated on probation on 1-2-93.

FILED IN OFFICE
JAN 28 1994
Cheryl Anderson
DEPUTY CLERK, SUPERIOR COURT

This the 7th day of January, 19 94.

[signature]
ELIZABETH E. LONG JUDGE
SUPERIOR COURT, A. J. C.

MAR 21 1994

BOOK PAGE
02494 - 804

MJ/cs

# PETITION FOR REVOCATION OF PROBATION

THE STATE
VS
TONI TAYLOR @PAMELA JONES

DOCKET # Z-33536
January-February TERM
19 94 , Superior COURT, A. J. C.

NOW COMES ______________________, Probation Officer of Fulton County, in the name and behalf of the State of Georgia, and brings this action against TONI TAYLOR @PAMELA JONES Hereinafter called the Defendant, and shows:

I

That the Defendant entered a plea of guilty to (~~was convicted of~~) the offense of VGCSA at the May-June Term, 19 91 .

II

That this Court, on the 21st day of June , 19 91 , did sentence the Defendant to serve as follows: 5 years probation. $250FN, $25PA, $25JCSA, $10MPF. Defendant to get GED or high school education. Defendant to complete 40 hours of community service. Drug testing and screening. Defendant to get a job.

III

That this court, by proper order, however, permitted the Defendant to serve said sentence on probation, the terms and conditions of which are fully set forth in the Order of Probation.

IV

That the Defendant has violated the terms and conditions of probation in the following particulars:

______________________________

______________________________

______________________________

______________________________

V

WHEREFORE, the State of Georgia prays that the citation for revocation of probation be served on the Defendant and that the Defendant be directed to appear before this court on a day to be fixed by the Court and at that time to show cause why probation should not be revoked.

This the ________ day of ____________________, 19____ .

______________________________
PROBATION OFFICER

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

## ORDER

The foregoing Petition read and considered. The same is hereby allowed and ordered filed. Let the Defendant ______________________________, be brought before me on the ______ day of ____________ ____________________ 19 _____ , at _______ M. in the Fulton County Courthouse for a hearing to determine whether his probated sentence should be revoked as prayed.

Let a copy of the foregoing Petition and this Order be served on the said ______________________.

This the_____day of ________________19___.

______________________________
JUDGE
COURT, A.J.C.

BOOK PAGE
02494 - 805

10-013-181

[illegible]

WITNESS MY HAND AND SEAL OF SAID COURT THIS

9 DAY OF August 20 19

DEPUTY CLERK

AFFIDAVIT OF CUSTODIAN

Georgia, Fulton County.

I, the undersigned custodian of the defendant, do swear and affirm that the following is true and correct to the best of my knowledge.

jones, pamela @ smith, tina @ taylor, toni yvette

Name of defendant

was confined on case number(s) z33536 on the following dates:

Entered 4-20-91 Departed 6-22-91 Reason Prob

Entered 10-15-91 Departed 1-15-92 Reason Prob

Entered 7-21-92 Departed 8-24-92 Reason Cnt prob

Entered 9-2-92 Departed 12-22-92 Reason Cnt prob

11-4-93 1-25-94 Metro CC

The defendant spent a total of 201 days in jail, Central State Hospital, or other institution prior to date sentence was imposed.

COMMENTS:

RICHARD B. LANKFORD, Sheriff
Fulton County, Georgia

J. H. GREEN
TRANSFER SGT.

Georgia, Fulton County.

I, the undersigned Deputy Clerk of the Superior State Court, in and for said county, do hereby certify that the above is a true and complete copy of the affidavit of custodian, a part of the official record of the trial of said defendant, as appears of record and from the minutes of said court.

Given under my official signature and the seal of said

court this 1 day of APR 1994

FILED IN OFFICE

APR 05 1994

DEPUTY CLERK SUPERIOR COURT
FULTON COUNTY GEORGIA

☐ DA JAIL ☐

Deputy Clerk

BOOK 3789 PAGE 327

(Seal)

(Authority: Ga. L. 1956, pp. 161, 171 as amended (Ga. code ann. sec. 77-309); Ga. L. 1970, pp. 692-693)

34-154-187

[illegible] ROBINSON, CLERK OF SUPERIOR COURT OF FULTON COUNTY, GEORGIA
[illegible] THE WITHIN AND FOREGOING IS A TRUE, [illegible]
[illegible] COPY OF THE ORIGINAL [illegible]
[illegible] OFFICE [illegible]
[illegible]
9 [illegible] August [illegible] 19

# WARRANT CANCELLATION NOTICE

Name: _Taylor, Toni_     Indictment #: _Z 33536_

(Use indicted name in lowest indictment number when probated cases involve multiple indictments.)

Alias _Toni Yvette Taylor_

Alias _____

Name: _____     Indictment #: _____

(Indicted name on second indictment when probated cases involve multiple indictments.)

Alias _____

Alias _____

Name: _____     Indictment #: _____

Alias _____

D.O.B. _██/5/██_     Race _B lach_     Sex _female_

Fingerprint # _APB 359202_

Placed By:

## Atlanta Judicial Circuit
160 Pryor Street, Room 300
Atlanta, GA 30335

Officer _John Paul Knoth_     Unit _Court Service_
_for Rob Jones_
      (PLEASE PRINT)

Phone _656 - 5113_

Signature _____     Date _3-16-94_

FILED IN OFFICE

MAR 1 6 1994
_____ Deputy Clerk
DEPUTY CLERK SUPERIOR COURT
FULTON COUNTY GEORGIA
☐ DA                    JAIL ☐

BOOK 3771 PAGE 990

250
FULTON_COUNTY_0034



251

FULTON_COUNTY_0035

 

FINAL DISPOSITION SC-6

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA
VS.
Toni Taylor

FINAL DISPOSITION
CRIMINAL ACTION NO. Z 33536
OFFENSE(S) VGCSA
May-June TERM, 19 91

☑ PLEA:
☑ NEGOTIATED
☐ GUILTY ON COUNT(S) ____
☐ NOLO CONTENDERE ON COUNT(S) ____
☐ TO LESSER INCLUDED OFFENSE(S) ____ ON COUNT(S) ____

☐ JURY
☐ NON-JURY

☐ VERDICT:
☐ GUILTY ON COUNT(S) ____
☐ NOT GUILTY ON COUNT(S) ____
☐ GUILTY OF INCLUDED OFFENSE(S) OF ____ ON COUNT(S) ____

☐ OTHER DISPOSITION
☐ NOLLE PROSEQUI ORDER ON COUNT(S) ____
☐ DEAD DOCKET ORDER ON COUNT(S) ____
(SEE SEPARATE ORDER)

☑ DEFENDANT WAS ADVISED OF HIS/HER RIGHT TO HAVE THIS SENTENCE REVIEWED BY THE SUPERIOR COURT'S SENTENCE REVIEW PANEL

☑ FELONY SENTENCE ☐ MISDEMEANOR SENTENCE

WHEREAS, the above-named defendant has been found guilty of the above-stated offense. WHEREUPON, it is ordered and adjudged by the Court that: The said defendant is hereby sentenced to confinement for a period of Five (5) years

in the State Penal System or such other institution as the Commissioner of the State Department of Corrections or Court may direct, to be computed as provided by law. HOWEVER, it is further ordered by the Court

☑ 1) THAT the above sentence may be served on probation

☐ 2) THAT upon service of ____ the above sentence, the remainder of ____ may be served on probation PROVIDED that the said defendant complies with the following general and other conditions herein imposed by the Court as a part of this sentence.

☐ 3) THAT the above sentence be suspended.

☐ GENERAL CONDITIONS OF PROBATION

The defendant, having been granted the privilege of serving all or part of the above-stated sentence on probation, hereby is sentenced to the following general conditions of probation:

☐ 1) Do not violate the criminal laws of any governmental unit.
☐ 2) Avoid injurious and vicious habits - especially alcoholic intoxication and narcotics and other dangerous drugs unless prescribed lawfully.
☐ 3) Avoid persons or places of disreputable or harmful character.
☐ 4) Report to the Probation-Parole Supervisor as directed and permit such Supervisor to vist him (her) at home or elsewhere.
☐ 5) Work faithfully at suitable employment insofar as may be possible.
☐ 6) Do not change his (her) place of abode, move outside the jurisdiction of the Court, or leave the State for any period of time without prior permission of the Probation Supervisor.
☐ 7) Support his (her) legal dependants to the best of his (her) ability.
☐ 8) Probationer shall, from time to time upon oral or written request by any Probation Officer, produce a breath, urine, and/or blood specimen for analysis for the possible presence of a substance prohibited or controlled by any law of the State of Georgia or of the United States.

☑ OTHER CONDITIONS OF PROBATION

Deft get G.E.D or High School education

IT IS FURTHER ORDERED that the defendant pay a fine in the amount of $ 250.00 plus $50 or 10%, whichever is less pursuant to O.C.G.A. 15-21-70 plus 10% of the original fine pursuant to O.C.G.A. 15-21-90 and pay restitution in the amount of $ ____ Probation Fee $ 10.00 month and Court Costs $ ____

Defendant complete 40 hours community service.
Drug testing and screening. Deft get a job.

IT IS THE FURTHER ORDER of the Court, and the defendant is hereby advised that the Court may, at any time, revoke any conditions of this probation and/or discharge the defendant from probation. The probationer shall be subject to arrest for violation of any condition of probation herein granted. If such probation is revoked, the Court may order the execution of the sentence which was originally imposed or any portion thereof in the manner provided by law after deducting therefrom the amount of time the defendant has served on probation.

The defendant was represented by the Honorable Steven Burris Attorney at Law (Employment) (Appointment)

So ordered this 21st day of June 1991

[signature]
Judge, Fulton Superior Court

Court Reporter: Laura Lanning

CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of this Sentence of Probation has been delivered in person to the defendant and he/she instructed regarding the conditions as set forth above.

This 21 day of June 1991 J William White
Probation Officer

Copy received and instructions regarding conditions acknowledge.

This 21 day of June 1991 Toni Y. Taylor
Probationer

Filed in Office this 25th day of June 1991 Katherine Lewis Deputy Clerk

JUN 26 1991

BOOK 2224 PAGE 899

White - Clerk Goldenrod - Defendant Pink - Probation Office

[illegible] ROBINSON, CLERK OF SUPERIOR COURT OF FULTON COUNTY, GEORGIA [illegible] THAT THE WITHIN AND FOREGOING IS A TRUE, COMPLETE [illegible] OF THE ORIGINAL IN SAID CASE [illegible] ON FILE [illegible] OFFICE OF [illegible] OF SUPERIOR COURT [illegible]

WITNESS [illegible] AND SEAL OF SAID COURT THIS 9 DAY OF August, 2019

[signature]

DEPUTY CLERK

IN THE SUPERIOR COURT OF FULTON COUNTY

STATE OF GEORGIA

| | | |
|---|---|---|
| STATE OF GEORGIA | ) | CRIMINAL ACTION |
| v. | ) | |
| TONI TAYLOR | ) | FILE NO. Z-33536 |

TRANSCRIPT OF PROCEEDINGS BEFORE THE HONORABLE WALTER LOVETT, JR., ATLANTA JUDICIAL CIRCUIT, ON SEPTEMBER 24TH, 1992, AT ATLANTA, GEORGIA.

APPEARANCES:

| | |
|---|---|
| FOR THE STATE: | PAMELA STARRATT<br>VERONICA COX |
| FOR THE DEFENDANT: | PAULA PAVLOSKY<br>STEVE PHILLIPS<br>INDIGENT DEFENSE TEAM |

ELYNE R. LOUIS, CCR
CERTIFIED COURT REPORTER
5202 CHAMBLEE DUNWOODY ROAD
DUNWOODY, GEORGIA 30338

FILED IN OFFICE
AUG 02 1993
DEPUTY CLERK SUPERIOR COURT
FULTON COUNTY GEORGIA

BT

SEPTEMBER 24TH, 1992

THE COURT: NUMBER FORTY-EIGHT, TONI TAYLOR.

MS. STARRATT: YOUR HONOR, THIS IS MS. TONI TAYLOR. SHE WAS BEFORE THE COURT ON JUNE THE 21ST, 1991, FOR THE CHARGE OF Z-33536, VIOLATION GEORGIA CONTROLLED SUBSTANCES ACT.

SHE WAS SENTENCED TO FIVE YEARS PROBATION AND SHE WAS ORDERED TO GET HER HIGH SCHOOL DIPLOMA AND TO COMPLETE FORTY HOURS OF COMMUNITY SERVICE, HAVE DRUG SCREENS AND TREATMENT, AND BECOME EMPLOYED.

WE HAD A REVOCATION HEARING ON AUGUST THE 6TH, 1992, AND AT THAT TIME YOU CONTINUED ALL PROBATION WITH THE SPECIAL CONDITION THAT SHE COMPLETE THE WOMEN'S DIVERSION CENTER AND THAT SHE COMPLETE THE CRACK COCAINE AND DEALERS' PROGRAM.

SHE WAS IN THE WOMEN'S DIVERSION CENTER FOR A PERIOD OF TWO WEEKS. SHE WAS BROUGHT BACK TO FULTON COUNTY JAIL. SHE ENTERED THE FULTON COUNTY JAIL SEPTEMBER THE 2ND, 1992, BECAUSE OF NEW CHARGES, ACCUSATION NUMBER 121557.

THE COURT: THOSE CHARGES ARE THINGS THAT HAPPENED AFTER SHE LEFT THE DIVERSION CENTER?

MS. STARRATT: YES, SIR. SHE WAS IN THE

DIVERSION CENTER AND THEN SHE GOT ARRESTED FOR NEW CHARGES. SHE HAS RECEIVED TIME SERVED SINCE SEPTEMBER THE 14TH, 1992.

RECOMMENDATION IS TO REVOKE FIVE MONTHS AND REINSTATE THE BALANCE AND GIVE HER CREDIT FOR TIME SERVED SINCE SEPTEMBER THE 2ND.

MS. PAVLOSKY: YOUR HONOR, MS. TAYLOR WANTS TO ADDRESS THE COURT. SHE DOESN'T FEEL THAT SHE SHOULD HAVE FIVE MONTHS TO SERVE IN THIS CASE. SHE FEELS THAT SHE SHOULD GET CREDIT BACK FROM HER ORIGINAL INCARCERATION HERE PRIOR TO GOING TO THE DIVERSION CENTER, AND SHE WOULD LIKE TO ADDRESS YOUR HONOR REGARDING THAT.

THE COURT: OKAY. MS. TAYLOR.

MS. TAYLOR: WHEN I WAS IN STATE COURT ON THAT NEW CHARGE I DIDN'T KNOW I WAS GIVING UP MY RIGHTS FOR -- I THOUGHT SHE SAID TIME SERVED, IF I PLEADED GUILTY IT WOULD BE TIME SERVED. AND I TOLD HER I WAS ON PROBATION. YOU THE ONE WHO --

THE COURT: -- DID THE SENTENCING?

MS. TAYLOR: UH-HUH.

THE COURT: NO. THAT WAS JUDGE MATHER WHO LOOKS LIKE ME, BUT IT'S NOT ME.

MS. TAYLOR: OH.

THE COURT: WE BOTH HAVE BEARDS.

MS. TAYLOR: I'M SORRY.

THE COURT: THAT'S JUDGE MATHER, ISN'T IT?

MS. TAYLOR: SO YOUR NAME IS JUDGE LOVETT.

THE COURT: YES, DIFFERENT JUDGE.

MS. TAYLOR: JUDGE LOVETT, I HAVE FOUR KIDS AND MY MOM IS SUPPOSE TO GO INTO THE HOSPITAL.

THE COURT: THE PROBLEM IS YOU SHOULDN'T HAVE LEFT THE DIVERSION CENTER.

MS. TAYLOR: I DIDN'T LEAVE. I DIDN'T LEAVE THE DIVERSION CENTER. I WAS ON MY WAY FROM WORK AND I HAD MISSED MY BUS WHILE I WAS TALKING TO MR. MCCALL ON THE PHONE. AND I WAS WALKING DOWN THE STREET --

THE COURT: YEAH, WAIT A MINUTE.

MS. TAYLOR: AND I WAS TRYING TO GET TO THE CENTER BEFORE I BE LATE, AND I GOT INTO SOMEONE'S CAR. BUT IS THERE ANY WAY -- YOU CAN'T GIVE ME CREDIT FOR SOME OF MY TIME?

THE COURT: WHEN DID SHE COME HERE ORIGINALLY?

MS. TAYLOR: I'M SAYING THE MONTH THAT I DONE.

MS. STARRATT: TWO WEEKS.

MS. TAYLOR: BUT I WAS IN FULTON COUNTY IN JULY.

MS. PAVLOSKY: THE LAST REVOCATION HEARING WAS AUGUST 6TH. I SHOW HERE IN AUGUST THAT --

THE COURT: WELL, THAT'S TWO WEEKS -- BASICALLY THREE WEEKS. WELL, LET'S JUST MAKE IT FOUR MONTHS.

MS. TAYLOR: I'LL TAKE THAT.

THE COURT: THAT'S TWO MONTHS. I'M NOT GOING TO GO BACK TO JULY. I'LL GO FROM SEPTEMBER 2ND.

MS. TAYLOR: SO WHEN WAS MY RELEASE DATE?

THE COURT: NO -- FROM SEPTEMBER 2ND.

MS. STARRATT: FOUR MONTHS?

THE COURT: I'LL MAKE IT FOUR MONTHS FROM SEPTEMBER 2ND.

MS. STARRATT: SHE HAD THREE YEARS AND NINE MONTHS. YOU WANT TO SUSPEND THE BALANCE?

THE COURT: ISN'T THAT WHAT YOU SAID?

MS. STARRATT: NO. WE ASK THAT YOU REINSTATE THE BALANCE.

THE COURT: ALL RIGHT, MS. TAYLOR. SO I'LL REVOKE FOUR MONTHS OF YOUR PROBATION AND REINSTATE THE BALANCE AND GIVE YOU CREDIT FOR TIME SERVED SINCE SEPTEMBER THE 2ND, 1992. AFTER YOU COMPLETE THE FOUR MONTHS YOU HAVE TO REPORT BACK TO PROBATION AND IF YOU FAIL TO DO SO THEY WILL ISSUE

A WARRANT FOR YOUR ARREST - -

MS. TAYLOR: WELL, WHEN WILL MY RELEASE DATE --

MS. PAVLOSKY: -- JANUARY 1ST.

THE COURT: WELL, NOW, YOU'VE GOT TO LISTEN TO ME. AFTER YOU GO BACK ON PROBATION I WANT YOU TO DO THE CRACK COCAINE ADDICTION PROGRAM AND FOLLOW ALL THE RULES AND REGULATIONS OF THAT PROGRAM. THE FOUR MONTHS ARE TO BE SERVED HERE IN THE FULTON COUNTY JAIL. SO IT'S JANUARY 1ST.

MS. TAYLOR: OKAY. THANK YOU.

MS. PAVLOSKY: THANK YOU, YOUR HONOR.

MS. STARRATT: THANK YOU, YOUR HONOR.

(HEARING CONCLUDED)

C E R T I F I C A T E

STATE OF GEORGIA
COUNTY OF FULTON

I, ELYNE R. LOUIS, CERTIFIED COURT REPORTER FOR THE FULTON SUPERIOR COURT, HEREBY CERTIFY THAT THE FOREGOING REPRESENTS A TRUE, ACCURATE, AND COMPLETE TRANSCRIPT OF THE PROCEEDINGS IN THE WITHIN-STYLED ACTION. THIS THE 15TH DAY OF JUNE, 1993.

Elyne R. Louis
ELYNE R. LOUIS, CCR-B-993

IN THE SUPERIOR COURT OF FULTON COUNTY

STATE OF GEORGIA

STATE OF GEORGIA : CRIMINAL ACTION

V. : FILE NO. Z-33536

TONI TAYLOR :

TRANSCRIPT OF PROCEEDINGS BEFORE THE HON. WALTER LOVETT, JR., JUDGE, ATLANTA JUDICIAL CIRCUIT, ON JANUARY 9, 1992, AT ATLANTA, GEORGIA.

APPEARANCES:

FOR THE STATE: PAMELA STARRATT
PROBATION OFFICER

FOR THE DEFENDANT: PAULA PAVLOSKY, ESQ.
INDIGENT DEFENSE TEAM

SUSAN A. NORTHINGTON, RPR
OFFICIAL COURT REPORTER
505 FULTON COUNTY COURTHOUSE
ATLANTA, GEORGIA 30303

FILED IN OFFICE
JAN 14 1992
DEPUTY CLERK SUPERIOR COURT
FULTON COUNTY GEORGIA

PROCEEDINGS

JANUARY 9, 1992

(THE FOLLOWING PROCEEDINGS CONTINUED IN OPEN COURT.)

THE COURT: OKAY. WHO ELSE WE GOT? HOW ABOUT TONI TAYLOR, NUMBER 81? OKAY.

MS. STARRATT: YOUR HONOR, THIS IS MS. TAYLOR. SHE WAS BEFORE THE COURT ON JUNE 21ST, 1991, FOR THE CHARGE OF Z-33536, VIOLATION OF GEORGIA CONTROLLED SUBSTANCES ACT.

SHE WAS SENTENCED TO FIVE YEARS PROBATION, ORDERED TO COMPLETE FORTY HOURS OF COMMUNITY SERVICE. SHE NEVER REPORTED. SHE HAS COMPLETED ZERO HOURS OF COMMUNITY SERVICE.

WE ISSUED A WARRANT FOR HER ARREST OCTOBER 21, 1991.

WE HAVE FOUR YEARS AND EIGHT MONTHS REMAINING. SHE WAS ARRESTED OCTOBER 15, 1991, BECAUSE OF OUR PROBATION WARRANT.

THE COURT: WHAT DATE?

MS. STARRATT: OCTOBER 15TH.

THE COURT: OKAY.

MS. STARRATT: SHE HAD NEW CHARGES THAT WERE ALL DISMISSED OCTOBER 30TH, 1991.

SHE HAS A HOLD FOR DEKALB COUNTY.

THE RECOMMENDATION IS TO REVOKE FIVE MONTHS, REINSTATE THE BALANCE, GIVE HER CREDIT FOR ALL TIME SERVED SINCE OCTOBER 15TH.

(PAUSE IN THE PROCEEDINGS.)

MS. PAVLOSKY: YOUR HONOR, WE STIPULATE TO THOSE FACTS AND ASK THAT YOU ACCEPT THAT RECOMMENDATION.

THE COURT: THERE IS NO HOLD?

THE SHERIFF: YOUR HONOR, WE HAVE SO MANY PEOPLE BACK THERE, I DON'T KNOW WHETHER THERE IS OR NOT.

THE COURT: DO YOU HAVE A HOLD IN DEKALB COUNTY?

THE DEFENDANT: I WENT TO DEKALB COUNTY. I BEEN OVER THERE SIX WEEKS. I JUST GOT BACK LAST MONDAY. THEY DIDN'T NEVER TAKE ME TO COURT. THEY FOUND OUT THIS NAME WASN'T ME.

MS. PAVLOSKY: SO SHE WAS LOANED OUT AND CAME BACK. IT SHOWS THAT SHE WAS LOANED OUT TO DEKALB, RIGHT?

THE SHERIFF: WHAT'S YOUR BOOKING NUMBER?

THE DEFENDANT: 918 344 7.

(PAUSE IN THE PROCEEDINGS.)

(DISCUSSION OFF THE

RECORD.)

MS. STARRATT: THESE ARE HERS.

THE COURT: WHAT, THE NEW CHARGES HAVE NOT BEEN RESOLVED?

THE SHERIFF: NO.

MS. PAVLOSKY: THE CHARGES IN DEKALB?

THE SHERIFF: I'M TALKING ABOUT HERE.

MS. STARRATT: THEY WERE NOT PRESENTED TO THE GRAND JURY.

THE SHERIFF: THAT'S NOT TRUE, EITHER. THAT'S IN ERROR. THEY WERE BOUND OVER TO STATE COURT.

MS. PAVLOSKY: SHE HASN'T GONE TO COURT YET ON THEM.

THE SHERIFF: WHAT HAPPENS IS -- I'M NOT TRYING TO INTERRUPT.

THE COURT: OFF THE RECORD.

(DISCUSSION OFF THE RECORD.)

MS. STARRATT: YOUR HONOR, LET'S REVOKE FIVE MONTHS, REINSTATE THE BALANCE, GIVE HER CREDIT FOR TIME SERVED.

THE COURT: DO YOU HAVE ANY PROBLEM WITH THAT?

MS. PAVLOSKY: YOUR HONOR, THIS IS ONE OF

MS. HARRIS' CASES, IT WAS STIPULATED FOR THE FIVE MONTHS, CREDIT FROM OCTOBER 15TH.

MS. STARRATT: I HAVE NO PROBLEM WITH THAT.

THE SHERIFF: I'LL PERSONALLY MYSELF GET HER IN STATE COURT, YOUR HONOR.

THE COURT: OKAY. AND THE NEW CHARGES SHE HAS ARE JUST THOSE STATE COURT CHARGES. AND DEKALB COUNTY HAS BEEN TAKEN CARE OF?

THE SHERIFF: I ASSUME.

THE COURT: LET'S REVOKE FOUR MONTHS, REINSTATE THE BALANCE.

MS. STARRATT: YOUR HONOR, SHE WOULD NOT BE ELIGIBLE FOR ANY ALTERNATIVE BECAUSE SHE HAS PENDING NEW CHARGES.

MS. PAVLOSKY: SHE SHOULDN'T HAVE PENDING NEW CHARGES, YOUR HONOR.

IF THESE ARE MISDEMEANOR CASES, SHE SHOULD HAVE GONE TO COURT TWO WEEKS AFTER SHE WAS BOUND OVER. SHE'S BEEN HERE SINCE OCTOBER 15.

THE COURT: SHE'S BEEN HERE A LONG TIME BEFORE WE GOT TO THIS POINT.

OKAY. REVOKE FOUR MONTHS, REINSTATE THE BALANCE, CREDIT FOR TIME SERVED SINCE OCTOBER 15, 1991.

THAT FOUR MONTHS IS TO BE SERVED HERE IN THE FULTON COUNTY JAIL.

MS. PAVLOSKY: THANK YOU, YOUR HONOR.

THE SHERIFF: DID YOU SAY REINSTATE THE BALANCE, YOUR HONOR?

THE COURT: YES.

MS. TAYLOR, I WOULD LIKE TO ADVISE YOU THAT AFTER YOU COMPLETE THE FOUR MONTHS, IT IS NECESSARY FOR YOU TO REPORT BACK TO PROBATION. IF YOU FAIL TO REPORT BACK TO PROBATION, THEY'LL ISSUE A WARRANT FOR YOUR ARREST.

DO YOU UNDERSTAND THAT?

THE DEFENDANT: YES.

THE COURT: IF YOU FAIL TO COMPLY WITH WHAT THE PROBATION OFFICER TELLS YOU TO DO, THEY'LL ISSUE A WARRANT FOR YOUR ARREST.

DO YOU UNDERSTAND THAT?

THE DEFENDANT: YES.

THE COURT: IT DID NOT TAKE YOU ANYTIME TO GET OUT OF THE COURTHOUSE AND GET BACK IN TROUBLE. IF THAT HAPPENS AGAIN, YOU ARE GOING TO THE PENITENTIARY.

DO YOU UNDERSTAND THAT?

THE DEFENDANT: YES.

THE COURT: OKAY.

MS. STARRATT: THANK YOU, YOUR HONOR.

(PROCEEDINGS CONCLUDED.)

CERTIFICATE

STATE OF GEORGIA

COUNTY OF FULTON

I, SUSAN A. NORTHINGTON, OFFICIAL COURT REPORTER FOR FULTON SUPERIOR COURT, HEREBY CERTIFY THAT THE FOREGOING REPRESENTS A TRUE, ACCURATE, AND COMPLETE TRANSCRIPT OF THE PROCEEDINGS IN THE WITHIN-STYLED ACTION, JANUARY 10, 1992.

SUSAN A. NORTHINGTON, RPR, CCR A-464,
OFFICIAL COURT REPORTER, SUPERIOR COURT
OF FULTON COUNTY, ATLANTA JUDICIAL CIRCUIT

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

STATE OF GEORGIA )
 )
VS. ) CRIMINAL ACTION NO. Z-33536
 )
TONI TAYLOR )

TRANSCRIPT OF PLEA PROCEEDINGS BEFORE THE HONORABLE LEAH SEARS-COLLINS, COMMENCING ON JUNE 21, 1991, ATLANTA, GEORGIA.

APPEARANCES OF COUNSEL:

FOR THE STATE: LEE GRANT, ASSISTANT DISTRICT ATTORNEY

FOR THE DEFENDANT: STEVEN PURVIS, ASSISTANT PUBLIC DEFENDER

FILED IN OFFICE

AUG 26 1991
Benita Tate
DEPUTY CLERK SUPERIOR COURT
FULTON COUNTY GEORGIA

LAURIE LANNING
OFFICIAL COURT REPORTER
ROOM 809, FULTON COUNTY COURTHOUSE
ATLANTA, GEORGIA 30303
CERTIFICATION NO. B-761

P R O C E E D I N G S

JUNE 21, 1991

THE DISTRICT ATTORNEY: YOUR HONOR, FOR THE RECORD, A PLEA OF GUILTY HAS BEEN -- AND THIS YOUR HONOR IS NUMBER ONE ON THE INQUIRY CALENDAR. A PLEA OF GUILTY HAS BEEN ENTERED TO INDICTMENT Z-33536, STATE OF GEORGIA VERSUS TONI TAYLOR, CHARGING MISS TAYLOR WITH VGCSA SALE OF COCAINE.

WOULD YOU RAISE YOUR RIGHT HAND, PLEASE.

TONI TAYLOR,

HAVING BEEN DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

EXAMINATION

BY THE DISTRICT ATTORNEY:

Q. WOULD YOU STATE YOUR NAME FOR THE RECORD, PLEASE.

A. TONI YVETTE TAYLOR.

Q. AND TONI YVETTE TAYLOR, ARE YOU THE TONI TAYLOR NAMED IN INDICTMENT 33536 CHARGING YOU WITH SALE OF COCAINE?

A. YES, MA'AM.

Q. ALL RIGHT. AND DO YOU REALIZE THAT UNDER THE LAWS OF THE STATE OF GEORGIA, THAT OFFENSE CARRIES A PENALTY OF BETWEEN FIVE AND THIRTY YEARS' IMPRISONMENT?

HONOR, HAD THIS CASE GONE TO TRIAL, THE STATE EXPECTS THAT THE EVIDENCE WOULD SHOW THAT WHILE PATROLING A KNOWN DRUG AREA IN AN UNMARKED VEHICLE, TAYLOR, MISS TAYLOR APPROACHED INVESTIGATOR SMART AND ASKED IF HE WAS DATING. MR. SMART ANSWERED YES, AND AFTER A BRIEF CONVERSATION WITH TAYLOR, THE DEFENDANT DIRECTED HIM TO A LOCALE WHERE HE CAN -- AND I DON'T KNOW WHAT DATING MEANS. I CAN SEE YOUR CONFUSION.

APPARENTLY THAT'S PERHAPS SOME KIND OF CODE, BUT IN ANY EVENT, THIS DEFENDANT DIRECTED HIM TO A LOCALE. I BELIEVE IT WAS IN A MOTEL. THE ALAMO MOTEL, A ROOM AT THE ALAMO MOTEL, WHERE HE COULD PURCHASE DRUGS. HE GAVE HER MONEY. SHE WENT IN THE MOTEL ROOM, CAME BACK OUT WITH DRUGS.

THE COURT: WELL, I KNOW THE ALAMO.

THE DISTRICT ATTORNEY: OKAY. THE LAB REPORT SHOWS THAT THE SUBSTANCE GIVEN TO THE OFFICERS WAS POSITIVE FOR COCAINE, LESS THAN A GRAM. IN THIS CASE, WE HAVE NOT SEEN ANY PRIOR DRUG CONVICTIONS ON THIS DEFENDANT AT ALL. SHE HAS A THEFT BY SHOPLIFTING BACK FROM 4-12-90 UNDER INDICTMENT A-19126.

THE DEFENDANT'S ATTORNEY: THAT MATTER IS NOW CLOSED.

THE COURT: IT IS CLOSED.

THE DISTRICT ATTORNEY: BUT -- AND SEVERAL OTHER THEFT BY SHOPLIFTING TYPE CONVICTIONS, BUT NO DRUGS. THE STATE IS RECOMMENDING IN THIS CASE FIVE YEARS' PROBATION, $250 FINE, 40 HOURS' COMMUNITY SERVICE AND DRUG SCREENS AND TESTING.

THE COURT: ALL RIGHT. THANK YOU.

MR. PURVIS?

THE DEFENDANT'S ATTORNEY: MISS TAYLOR'S ONLY DISPUTE WITH THE FACTS IS THAT SHE SAYS THE OFFICER APPROACHED HER FIRST AND EVIDENTLY WAS TRYING TO SOLICIT A PROSTITUTION CHARGE WITH HER AND ASKED HER IF SHE WAS DATING AND DISCUSSED ACTUALLY A SEX FOR HIRE TYPE THING. SHE TURNED HIM DOWN FOR THAT AND THE OFFICER SAID CAN I GET SOME DRUGS. MISS TAYLOR SAID I DON'T DO THOSE, BUT THE OFFICER SAID DO YOU KNOW WHERE I CAN FIND SOME.

SHE AGREED TO LEAD HIM TO THE MOTEL ROOM. THE MARKED MONEY WAS NOT FOUND ON HER. SHE DOES ADMIT, THOUGH, TAKING THE UNDERCOVER OFFICER TO THE LOCATION WHERE HE WAS ABLE TO PURCHASE NARCOTICS, BUT I WOULD LIKE TO POINT OUT IN MITIGATION ANYBODY IN THAT NEIGHBORHOOD KNOWS YOU CAN GO TO THE ALALMO AND PICK UP NARCOTICS.

THE COURT: NOT THAT POLICE OFFICER.

THE DISTRICT ATTORNEY: BUT SHE WENT IN THE ROOM, CAME BACK OUT AND HANDED THE DRUGS. WHEN THE OFFICER WENT IN THE ROOM, NO ONE ELSE WAS THERE.

EXAMINATION

BY THE COURT:

Q, MS. TAYLOR, ANYTHING YOU WANT TO SAY?
A. NO.
Q. YOU UNDERSTAND THE NATURE OF THE CHARGE PENDING AGAINST YOU?
A. YES, MA'AM.
Q. AND THE CONSEQUENCES OF PLEADING GUILTY?
A. YES.
Q. ARE YOU GUILTY OF THE SALE OF COCAINE?
A. YES.
Q. ARE YOU SURE?

THE DEFENDANT'S ATTORNEY: WAIT A MINUTE.

THE DEFENDANT: I WENT AND GOT IT.

BY THE COURT:

Q. YOU WERE THE MIDDLE PERSON?
A. YES.
Q. YOU WERE --
A. I WENT AND GOT IT.

Q. YOU WHAT?
A. I WENT AND --
THE DISTRICT ATTORNEY: SHE WENT AND GOT IT.
BY THE COURT:
Q. YOU WERE FACILITATING THE TRANSACTION; IS THAT CORRECT?
A. YES, MA'AM.
Q. ALL RIGHT. DID YOU READ MY SUPPLEMENTAL GUILTY PLEA FORM?
A. YES.
Q. DID YOU UNDERSTAND IT?
A. YES.
Q. IS THERE ANYTHING YOU DIDN'T UNDERSTAND?
A. NO.
Q. ANYTHING YOU WANT TO SAY?
A. NO.
Q. ALL RIGHT. I'M SATISFIED THAT THE FACTS THAT MISS GRANT IS PREPARED TO PROVE WILL SUSTAIN YOUR PLEA OF GUILTY TO SALE OF COCAINE.
HOW OLD ARE YOU, MA'AM?
A. 29.
Q. HOW MUCH SCHOOLING HAVE YOU HAD?
A. TO THE 11TH.
Q. TO THE 11TH GRADE?

A. YES, MA'AM.

Q. WHAT KIND OF WORK DO YOU DO?

A. I USED TO WORK FOR THE RETARDATION CENTER.

Q. DOING WHAT?

A. FOR THE RETARDED KIDS.

THE DISTRICT ATTORNEY: I UNDERSTAND THAT SHE HAS FOUR CHILDREN AND IS CURRENTLY ON WELFARE.

BY THE COURT:

Q. DO YOU WORK FOR MONEY?

A. WHAT YOU MEAN?

Q. DO YOU HAVE A JOB?

A. NO, I'M EMPLOYED.

THE COURT: UNEMPLOYED. ALL RIGHT. OKAY. ALL RIGHT. I'M GOING TO ACCEPT THE STATE'S RECOMMENDATION AND SENTENCE YOU TO FIVE YEARS' PROBATION, $250 FINE, $25 PENALTY ASSESSMENT, $10 A MONTH PROBATION FEE, 10 PERCENT ASSESSMENT ON THE FINE FOR THE COUNTY JAIL CONSTRUCTION FUND, 40 HOURS OF COMMUNITY SERVICE, DRUG TESTING AND SCREENING.

AS A PROVISION OF YOUR PROBATION, YOU NEED TO EITHER FINISH HIGH SCHOOL OR GET YOUR GED AND GET A LEGITIMATE JOB.

THE DEFENDANT: YES, MA'AM.

THE DEFENDANT'S ATTORNEY: YES, YOUR HONOR.

THE COURT: I WANT TO NOTIFY YOU, MS. TAYLOR, THAT YOU HAVE THE RIGHT TO HAVE THIS SENTENCE REVIEWED BY THE SUPERIOR COURT SENTENCE REVIEW PANEL OF GEORGIA. SENTENCES OF FIVE YEARS OR MORE MAY BE REVIEWED BY THAT PANEL FOR EXCESSIVENESS.

A LETTER REQUESTING SUCH A REVIEW OR AN APPLICATION FORM WOULD HAVE TO BE FILED WITH THE CLERK OF THIS COURT AND YOU HAVE ONLY THIRTY DAYS FROM TODAY IN WHICH TO FILE FOR YOUR SENTENCE REVIEW IF YOU WISH TO HAVE YOUR SENTENCE REVIEWED.

DO YOU UNDERSTAND THAT, MISS TAYLOR?

THE DEFENDANT: YES, MA'AM.

THE COURT: ALL RIGHT. THAT'S WHAT THAT FORM THERE SAYS. THERE'S A COPY THAT YOU CAN TAKE HOME WITH YOU.

(PROCEEDINGS CONCLUDED.)

CERTIFICATE

STATE OF GEORGIA,
COUNTY OF FULTON:

I DO HEREBY CERTIFY THAT THE FOREGOING IS A TRUE, COMPLETE, AND CORRECT TRANSCRIPT OF THE PROCEEDINGS TAKEN DOWN BY ME IN THE CASE AFORESAID.

THIS CERTIFICATION IS EXPRESSLY WITHDRAWN AND DENIED UPON DISASSEMBLY OR PHOTOCOPYING OF THE FOREGOING, OR ANY PART THEREOF, INCLUDING EXHIBITS, UNLESS SAID DISASSEMBLY OR PHOTOCOPYING IS DONE BY THE UNDERSIGNED OFFICIAL COURT REPORTER AND ORIGINAL SIGNATURE AND SEAL IS ATTACHED THERETO.

THIS, THE 26TH DAY OF AUGUST, 1991.

LAURIE LANNING, CCR NO. B-761
OFFICIAL COURT REPORTER
SUPERIOR COURT OF FULTON COUNTY

# Exhibit 10

Proposed to Be Redacted Entirely

# Exhibit 11



EXHIBIT
2
8-9-19
PENGAD 800-631-6989

# RealPage LeasingDesk Screening Policies & Procedures

This document contains the current policies and procedures relating to the LeasingDesk Screening Product and interactions with consumers.

CONFIDENTIAL

CONFIDENTIAL REALPAGE/JONES 000538

282

## Table of Contents

General Introduction .......... 1

The Role of the Product Support Team .......... 1

The Role of the Screening Operations Team .......... 2

The Role of the Manager of the Screening Operations Team .......... 2

The Role of the Consumer Dispute Team .......... 2

The Role of the Legal Team .......... 2

Review and Update of Manual .......... 3

Initial Documentation of a Consumer Inquiry .......... 5

- Creating and Locating Salesforce contacts .......... 5
- Assigning an Action Plan .......... 8
- If a Third Party is Calling on Behalf of a Consumer .......... 10
- Creating the Consumer Electronic Folder .......... 11
- Classification of Consumer Inquiry – Consumer Dispute E-Mail Inbox .......... 12
- Closing the Case in Salesforce .......... 15
- Adding Count to the Daily Production Log .......... 16
- Moving E-mail Items for Completed Requests .......... 16

Consumer Query Regarding Appearance of RealPage on Consumer Report .......... 17

- A "Who is RealPage" General Query Defined .......... 17
- Responding To A "Who is RealPage" Query .......... 17
- If A Third Party is Calling on Behalf of a Consumer .......... 18
- Creating and Sending the Who Is RealPage General Query Response Letter .......... 18
- Closing the "Who is RealPage" General Query in Salesforce .......... 20

Request for Disclosure of Consumer File .......... 21

- Initial Contact from Consumer .......... 21
- If A Third Party is Calling on Behalf of a Consumer .......... 21
- Sending Instructions for Obtaining the File to the Consumer .......... 21
- Consumer Identity Verification Process .......... 23
- Creating a Copy of the Consumer File .......... 24
- Delivering a Copy of the Consumer File to the Consumer .......... 39

Close the Case in Salesforce ........ 41
Consumer Disputes ........ 42
General Process for all Consumer Disputes ........ 42
Request for Consumer Dispute Form by US Mail or Fax ........ 43
If A Third Party is Calling on Behalf of a Consumer ........ 44
Receipt of Consumer Dispute Form ........ 44
Timing of Response for All Consumer Disputes ........ 47
Consumer Disputes regarding TeleCheck Information ........ 47
Consumer Dispute regarding Credit Report ........ 51
Retrieving Disputed Items from the Consumer's Report Copy ........ 52
If Dispute involves information from CSC/Equifax ........ 56
If Dispute involves information from Experian ........ 61
Close the Case in Salesforce ........ 68
If Dispute involves information from TransUnion ........ 68
Consumer Dispute regarding Criminal Report ........ 69
Retrieving Disputed Items from the Consumer Report ........ 69
Enter the Criminal Dispute in Test Director ........ 74
Investigation of the Dispute by Consumer Dispute Team ........ 77
Communicating the Reinvestigation Results to the Consumer ........ 81
Suppression of Records and/or Changes to Information in RealPage Database ........ 82
Closing the Case in Salesforce ........ 82
Consumer Dispute involving Eviction Filings & Judgments Report ........ 83
Retrieving Items in Dispute from the Consumer's Report ........ 83
Enter the Eviction Filings & Judgments Dispute in Test Director ........ 88
Investigation of the Dispute by Consumer Dispute Team ........ 89
Communicating the Reinvestigation Results to the Consumer ........ 93
Suppression of Records and/or Changes to Information in RealPage Database ........ 93
Closing the Case in Salesforce ........ 94
Consumer Dispute involving Rental History ........ 95
Request by Consumer to Provide Copy of Updated File ........ 100
Adding a Consumer Statement to a Consumer File ........ 109
Request for Statement of Disagreement Form by US Mail or Fax ........ 109

Receipt of Statement of Disagreement Form ..... 111

Enter the Statement of Disagreement Request in Test Director ..... 112

Adding the Statement to the Consumer's File - Consumer Dispute Team ..... 113

Closing the Case in Salesforce ..... 113

Adding a Fraud Alert to a Consumer File ..... 117

Consumer Services Line ..... 118

Consumer Support Website ..... 120

Authorization for Disclosure Form ..... 131

Consumer Request for Disclosure of Consumer File Instructions ..... 133

Request for Disclosure of Consumer File Form ..... 134

Incomplete Information Notice Letter ..... 136

Report Copy Transmittal Letter ..... 137

Report Copy Response Matrix ..... 148

CONSUMER DISPUTE FORM ..... 150

Incomplete Information Letter – Dispute ..... 151

Template for TD Consumer Dispute Escalation ..... 152

Telecheck Notice Letter ..... 153

TeleCheck Non-Response Letter ..... 154

Equifax/CSC Non-Response Letter ..... 155

Experian Non-Response Letter ..... 156

TransUnion Non-Response Letter ..... 157

Reinvestigation Results Letter ..... 158

Rental History Dispute Notice Letter to Property/PMC ..... 168

Updated File & Inquiry Report Transmittal Letter ..... 169

Statement of Disagreement Transmittal Letter and Form ..... 182

Statement of Disagreement Form ..... 183

Statement of Disagreement Closing Letter ..... 184

Revision Guide ..... 185

## Consumer Dispute regarding Criminal Report

Upon receipt of information that the consumer is disputing an item related to information contained in the Criminal section of their report, the Screening Operations Specialist will use the following procedure.

## Retrieving Disputed Items from the Consumer Report

1. After the Screening Operations Specialist has verified that there is a case in Salesforce related to the consumer dispute and/or opened a case, as applicable, the Screening Operations Specialist will note in Salesforce that the consumer's information has been received and save a copy of the information to the consumer's electronic folder.

2. Select appropriate action plan associated with the type of request and "assign" the action plan. Click on this link for instructions: **Assigning an Action Plan**

   Select "sub-area" to correspond with the type of request and click "save".

The Screening Operations Specialist will create a note in Salesforce noting that all documents were received and filed in the consumer's electronic folder.

Begin working the assigned Action Plan by handling each "Open Activity" which is displayed on consumer's case:



When Screening Operations Specialist has finished the assigned open activity, they **must** "complete" the item before proceeding to the next open activity. To complete the task/ activity, click on Cls next to the activity and change status to "Completed", add any additional comments (these comments are not "internal notes) and will be available for Product Support), then click on "save" and "refresh". The next "Open Activity" will display in the case.

3. The Screening Operations Specialist will then log into the Onesite system and pull a copy of the consumer's report.

4. Locate site and site ID where applicant applied.

5. If there is no site ID provided or the site ID is incorrect, locate the site ID in Digital Dashboard.

http://asm.realpage.com/onesitedashboard/portal_frame.asp?strUser=readonly&strCat=1,4,5,6,8,9,13



6. Once the site is located log into Onesite IA.

7. After logging in the first page will be the today page. Go to the Applications snapshot, and search for applicant by name. Choose view to access the application.



8. Select "Detailed Report" tab
   - Use curser and highlight all report information. Press "ctrl" and "c" keys simultaneously to "copy data"

9. Open a new Word document and paste the report into the new Word document. Save the Word document on the computer desktop as the name of the consumer.

10. Delete all items from the report, except for: Consumer information entered by the property (located at the top of the report), Credit Bureau header information, consumer name variations, previous addresses, all jurisdictions searched and the specific criminal records the consumer is disputing.

Jon Q. Consumer

| | | | |
|---|---|---|---|
| *Address* | ***15850 Jackson Dr*** | *Date/time* | ***6/19/2010 6:20:42 PM*** |
| | ***Fontana, CA 92336-1746, US*** | *RealPage Applicant Screening* | ***(866)934-1124*** |
| *Previous Address* | ***15850 Jackson Dr*** | *Birth date* | ***01/26/1979*** |
| | ***Fontana, CA 92336-1746*** | *SSN / ITIN* | ***xxx-xx-xxxx*** |
| *Gender* | | *Driver's license* | ***CA BXXXXXXX*** |

Credit report

| | | | | | |
|---|---|---|---|---|---|
| Name | **JON Q CONSUMER** | File date | | Run date | **4/22/2010** |
| SSN | **xxx-xx-xxxx** | Birth date | **1979** | Source | **Experian** |
| | | | | National Risk: | **679** |

**Name Variation**

| Name |
|---|
| JON Q CONSUMER |

**Previous addresses**

| Address | Reported Dates |
|---|---|
| Current Address:15850 Jackson Dr Fontana CA 92336-1746 | |
| Previous Address:15850 JACKSON DR FONTANA CA 923361746 | From: 2009-09 To: 2003-01 |
| Previous Address:5594 GREENGRASS CT APT F MIRA LOMA CA 917524291 | From: 2009-02 To: 2008-12 |
| Previous Address:22357 BLUE LUPINE CIR GRAND TERRACE CA 923135467 | From: 2008-03 To: 2007-03 |

Criminal report

**Offender information**

| ID | Jur code | Name | Birth date | SSN | Photo/Description |
|---|---|---|---|---|---|
| 1 | TXCTYTARRANT | CONSUMER, JEAN | 12/15/1951 | | SEX: f HEIGHT: 5 ft 3 in RACE_ETHNIC: white HAIR: blonde EYE_COLOR: green |

**Alias information** - ID column indicates association between offender and alias

| ID | Jur code | Name | Birth date | Alias | |
|---|---|---|---|---|---|
| | | | | Name/Description | Birth date |
| 1 | TXCTYTARRANT | CONSUMER, JEAN | 12/15/1951 | CONSUMER, ALICE GEANNIE | |

**Offense information** - ID column indicates association between offender and offense

| ID | Jur code | Disposition | Class | Charge | Offense/ File date | ORIC/ County | Note |
|---|---|---|---|---|---|---|---|
| 1 | TXCTYTARRANT | CONVICTED\| 24M | M | DRIVING WHILE INTOXICATED | 05/12/1997 | TARRANT CO CRIMINAL CRT 1 \| Case#0645075 | |

11. The Screening Operations Specialist will review all criminal records to determine if any of the criminal records displayed could be "non-match" record(s). A criminal non-match is a dispute from a consumer that a criminal record showing on their consumer report does not belong to them. The Screening Operations Specialist will also contact the property and advise that the Consumer Dispute Team has received a consumer dispute

for the applicant and we are currently expediting for a swift resolution. The Screening Operations Specialist will contact the consumer by phone, if a phone contact number has been provided and advise 1) All information is received and we are working on the reinvestigation, or 2) That we need additional information (e.g., driver's license) to assist in the resolution.

a. If the Screening Operations Specialist determines one (1) or more of the displayed criminal records are possible "non-match" record(s) they should escalate in Test Director for the Consumer Dispute Team to respond with the official response to the consumer and property.

## Enter the Criminal Dispute in Test Director

After the case has been entered in Salesforce and the Word document showing the Criminal item(s) in dispute from the consumer's report has been prepared, the Screening Operations Specialist will open a case in Test Director.

1. Open the Word Document titled "**Template for TD Consumer Dispute Escalation**".
2. If the dispute is a potential non-match dispute, the Screening Operations Specialist will use the bottom half of the **Template for TD Consumer Dispute Escalation** form by entering the Salesforce case number, the Consumer Name, a brief description of the dispute, and completing the Account Name (Property Name), Parent Account Name (PMC Name), Account Number (Site ID) and Parent Account Number (PMC ID) as follows:

SF00263794 Joe Consumer; Consumer wants to dispute criminal information on his report; 2-High

Priority: 2-High

Description of Problem: says criminal record not his "ID #1-4: the birth year is inaccurate, ID # 5-7: Never lived in Richmond County or area during offense file date"

Account Name: The Colonies Apts
Parent Account Name: JPECK Property Mgmt LLC dba Peck Mgmt
Account Number: 2031065
Parent Account Number: 2031060
Build Number:
Version Number: 3.1
OneSite Center: Screening Query

3. If the dispute is relating to Criminal but is not a potential non-match dispute, the Screening Operations Specialist will complete the template at the top of the form by entering the Salesforce case number, the Consumer Name, a brief description of the dispute, and completing the Account Name (Property Name), Parent Account Name (PMC Name), Account Number (Site ID) and Parent Account Number (PMC ID) as follows:

SF00328126 Joe Consumer; Consumer wants to dispute criminal information on his report; 3-Medium

Priority: 3-Medium

Description of Problem: Consumer wants to dispute criminal record as it should be reporting as dismissed

Account Name: The Avery on Southwestern
Parent Account Name: Zom Residential Services
Account Number: 2105639
Parent Account Number: 1051736
Build Number:
Version Number: 3.1
OneSite Center: Screening Query

4. Open Test Director and login using the Test Director password and login assigned.
5. Click on "New Defect". Entering a "New Defect" is the only way to enter a case in Test Director.
6. Cut and paste the information from the Template for TD Consumer Dis esc in the "Description" field and enter information in other required fields in the New Defect tab as follows.



7. Attach to the New Defect the consumer Word document that reflects the items in dispute from the consumer's report and also all information received from the consumer, which can be located in the consumer's electronic folder.
8. Assign the Test Director New Defect to the Consumer Dispute Team and click "Save".
9. Enter the Test Director Defect Number (the Test Director Defect Number is simply the unique case number that is assigned to a case entered into Test Director) in the Salesforce case for the dispute in the field titled "Defect Number" and change the Salesforce status to "Escalated to Development". Add a "Case Comment" in Salesforce stating "Escalated to CDT for review."
10. Add the Test Director Defect Number to the subject line of the inbound e-mail/fax/letter in the Consumer Dispute Inbox and change the e-mail category to "Escalated to CDT".
11. The Screening Operations Specialist must run a Query from Test Director on a daily basis to determine items that have been escalated to development but not yet closed.

## Investigation of the Dispute by Consumer Dispute Team

1. Once the Screening Operations Specialist has assigned the Test Director Defect to the Consumer Dispute Team, the Test Director system will generate an e-mail notifying the Consumer Dispute Team of the dispute. The Consumer Dispute Team will then conduct an investigation of the dispute. The Consumer Dispute Team will investigate the dispute within a reasonable amount of time after receiving the e-mail notice of the dispute from Test Director, in order to allow the Screening Operations Team the ability to respond to the consumer's dispute within 30 days from RealPage's receipt of notice of the dispute.

2. If the Consumer is disputing that the record is a non-match, once the Consumer Dispute Team has conducted its investigation and determined whether or not a record is a match to the consumer, the Consumer Dispute Team will notify the Manager of Screening Operations via e-mail and the Manager of Screening Operations will review the record and confirm whether or not they agree with the conclusion of the investigation by the Consumer Dispute Team. If the Manager of Screening Operations agrees with the conclusion of the Consumer Dispute Team, the conclusion will be noted in Test Director. In the event the Consumer Dispute Team and the Manager of Screening Operations do not agree on the result of the investigation, the information relevant to the dispute will be escalated to the President of LeasingDesk for a final decision. Once agreement has been reached and/or the President of LeasingDesk has made a final decision, the Consumer Dispute Team will change the owner of the Test Director Defect to Screening Operations and will note their suggested response to the RealPage customer (the property) and the consumer in Test Director. Some examples of responses to the property and/or consumer depending on the results of the investigation are as follows:

   a. In the event the Consumer Dispute Team determines that the record is not a match to the consumer as a result of its investigation:

      Sample responses to property:
      *The criminal information included in the report was derived from public records based on an exact match on last name, phonetic match on first name and exact date of birth. Based upon our investigation, we have determined that the record reported does not belong to your applicant and the record will be removed from the applicant's file.*

      *The criminal information included in the report was derived from public records based on an exact match on last name, first name and date of birth. Based upon our investigation and due to the discrepancies in physical description of the offender and the applicant's driver's license description, we have determined that the record reported does not belong to your applicant and the record will be removed from the applicant's file.*

*The criminal information included in the report was derived from public records based on an exact match on last name, first name and date of birth. Based upon our investigation and a manual court search of the public records, we have determined that the record reported does not belong to your applicant and the record will be removed from the applicant's file.*

Sample responses to consumer:

*The criminal information included in the report provided to XYZ apartment community on XX/YY/ZZZZ was derived from public records from the XXXXXXXXXXXXXXX county courts based upon an exact match of last name and date of birth and a phonetic match on first name. Based upon our investigation, we have determined that the record does not belong to you and the record will be removed from your file.*

*The criminal information included in the report provided to XYZ apartment community on XX/YY/ZZZZ was derived from public records from the XXXXXXXXXXXXXXX county courts based upon an exact match of last name, first name and date of birth. Based upon our investigation and due to the discrepancies in physical description of the offender and your driver's license description, we have determined that the record does not belong to you and the record will be removed from your file.*

*The criminal information included in the report provided to XYZ apartment community on XX/YY/ZZZZ was derived from public records from the XXXXXXXXXXXXXXX county courts based upon an exact match of last name, first name and date of birth. Based upon our investigation and a manual court search of the public records, we have determined that the record does not belong to you and the record will be removed from your file.*

The Consumer Dispute Team will then assign the Test Director Defect back to the Screening Operations Specialist who will complete the Reinvestigation Results Letter, including the recommended text from the Consumer Dispute Team, and send the letter to the consumer and notify the apartment community in accordance with the **Communicating the Reinvestigation Results to the Consumer** procedure below.

The Consumer Dispute Team will also then add the record to the RealPage criminal suppression database in accordance with the **Suppression of Records and/or Changes to Information in RealPage Database** procedure below.

b. In the event the Consumer Dispute Team determines that the record does belong to the consumer as a result of its investigation:

Suggested response to consumer:

*The criminal information included in the report provided to XYZ apartment community on XX/YY/ZZZZ was derived from public records from the XXXXXXXXXXXXXXX county courts based upon an exact match of last name, first name and date of birth. Based upon our investigation and a manual court search of the public records, we have confirmed that the record is accurate.*

*If you believe that these records do not belong to you, we recommend that you contact the XXXXXXXXXXXX County Clerk to refute your association with the cases reported.*

*If you have additional information related to the record being reported that you have not previously provided (such as court documents), you may provide those to us at the address for LeasingDesk contained in this letter. Please also reference the Salesforce case number noted above.*

The Consumer Dispute Team will then assign the Test Director Defect back to the Screening Operations Specialist who will complete the Reinvestigation Results Letter, including the recommended text from the Consumer Dispute Team, and send the letter to the consumer and notify the apartment community in accordance with the **Communicating the Reinvestigation Results to the Consumer** procedure below.

3. In the event the consumer is disputing that the information contained in the criminal record that is being reported is incorrect or that the criminal record being reported was sealed and/or expunged, the Consumer Dispute Team will, upon conclusion of its investigation, change the owner of the Test Director Defect to Screening Operations and will note their suggested response to the RealPage customer (the property) and the consumer in Test Director, based upon the results of the investigation. Some examples of responses to the property and/or consumer depending on the results of the investigation are as follows:

For cases of updated disposition and/or classification information – Notice to Consumer and Property:

*The criminal section of the report provided to XYZ apartment community on XX/YY/ZZZZ was derived from public records from the XXXXXXXXXXXXXXX county courts based upon an exact match of last name, first name and date of birth. Based upon the information you have provided and our investigation, we have determined that the information in the report should*

*be updated and we have updated the record to show that the [disposition][classification] was [INSERT CORRECT DISPOSITION/CLASSIFICATION INFORMATION][EXAMPLE: disposition was "Dismissed"].*

For cases of expunged/sealed records:
*The criminal section of the report provided to XYZ apartment community on XX/YY/ZZZZ was derived from public records from the XXXXXXXXXXXXXX county courts based upon an exact match of last name, first name and date of birth. Based upon the information you have provided and our investigation, we have determined that the record reported was [sealed][expunged] and this record will be removed from your file.*

For cases of expunged/sealed records – Notice to Property:
*The criminal section of the report provided to you regarding [INSERT NAME OF CONSUMER] on XX/YY/ZZZZ was derived from public records from the XXXXXXXXXXXXXX county courts based upon an exact match of last name, first name and date of birth. Based upon our investigation, we have determined that the record should be removed from the consumer's file.*

The Consumer Dispute Team will then assign the Test Director Defect back to the Screening Operations Specialist who will complete the Reinvestigation Results Letter, including the recommended text from the Consumer Dispute Team, and send the letter to the consumer and notify the apartment community in accordance with the **Communicating the Reinvestigation Results to the Consumer** procedure below.

The Consumer Dispute Team will also then add the record to the RealPage expunged/changed offenders database in accordance with the **Suppression of Records and/or Changes to Information in RealPage Database** procedure below.

For cases where the criminal record is determined to be accurate as reported, suggested response to consumer:

*The criminal information included in the report provided to XYZ apartment community on XX/YY/ZZZZ was derived from public records from the XXXXXXXXXXXXXX county courts based upon an exact match of last name, first name and date of birth. Based upon our investigation, we have confirmed that the record is accurate.*

*If you believe that these records do not belong to you, we recommend that you contact the XXXXXXXXXXXX County Clerk to refute your association with the cases reported.*

*If you have additional information related to the record being reported that you have not previously provided (such as court documents), you may provide those to us at the address for LeasingDesk contained in this letter. Please also reference the Salesforce case number noted above.*

The Consumer Dispute Team will then assign the Test Director Defect back to the Screening Operations Specialist who will complete the Reinvestigation Results Letter, including the recommended text from the Consumer Dispute Team, and send the letter to the consumer in accordance with the **Communicating the Reinvestigation Results to the Consumer** procedure below.

## Communicating the Reinvestigation Results to the Consumer

1. Within 5 business days of the Screening Dispute Specialist being notified by the Consumer Dispute Team of the results of the investigation, but in no event less than 30 days after receipt of the dispute from the consumer, the Screening Operations Specialist will complete the **Reinvestigation Results Letter** and transmit the letter to the consumer. If the investigation resulted in a correction to the consumer's report, the Screening Operations Specialist will also notify the apartment community by e-mail of the results and note such notification in the "Case Comments" section of the Salesforce case for the consumer. The e-mail to the property should be saved in the consumer's electronic folder and/or Salesforce case. If there is not an e-mail address for the apartment community, "No Email" should be noted in the comments and the Screening Operations Specialist should note that the apartment community was informed by phone and the name of the person at the apartment community to whom they gave the results.
2. Once the Reinvestigation Results Letter has been sent to the consumer and the apartment community has been notified, the Salesforce ticket should be closed by the Screening Operations Specialist. The Supervisor of the Screening Operations Team is responsible for reviewing all tickets entered as a Criminal Non-Match Dispute or other Criminal dispute on a bi-weekly basis in Salesforce to determine if the timeframe for the response to the consumer is being met.
3. The Screening Operations Specialist should then close the case in Salesforce in accordance with the
4. **Closing the Case in** Salesforce procedure below.
    a. Exception: If the response by CDT indicates the record(s) will be changed and/or removed, the Screening Operations Specialist will continue to follow the Action Plan and complete assigned task(s). After the final task has been completed, the case should

close automatically.

## Suppression of Records and/or Changes to Information in RealPage Database

If the investigation of a consumer criminal dispute results in changes of information to the record being reported, the Consumer Dispute Team will create a SQL script to update the database with the correct information and will provide the SQL script to the RealPage database administrator to update the record in the database (which updates occur on a weekly basis) and to add the case information to the RealPage expunged/changed offenders database for the RealPage data acquisition team to use on updates for the jurisdiction reporting the judgment.

If the investigation of a consumer criminal dispute results in the removal of a record from a consumer's file, the Consumer Dispute Team will notify the RealPage database administrator to add the record to the RealPage criminal suppression database.  Updates to the RealPage criminal suppression database will take place on a weekly basis.

Once the suppression has been completed, the CDT will notify the Screening Operations Specialists that the record(s) suppression and/or update has been completed. The Screening Operations Specialist will update Salesforce and complete the Action Plan.

## Closing the Case in Salesforce

Before closing a consumer's case in Salesforce, the Screening Operations Specialist will review the dispute information provided by the consumer to ensure that all items in dispute by the consumer have been investigated and a response has been provided.  If all items disputed by the consumer have been investigated and a response to the consumer has been provided for each item, the Salesforce case should be closed.  To Close a Case in Salesforce, complete the last open activity (scheduled task) and the case should automatically change to complete once the task is done.

To close the consumer's Salesforce ticket, the Screening Operations Specialist should use the following processes.  See **Closing the Case in Salesforce**, **Adding Count to the Daily Production Log** and **Moving E-mail Items for Completed Requests** for details on how to complete these processes.

# Exhibit 12

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO

DIANE D. JONES and JAMES ARNOLD, individually and on behalf of themselves and all others similarly situated, :

Plaintiffs, :

v. : Case No. 1:19-cv-501-JG

REALPAGE, INC., d/b/a LEASINGDESK SCREENING, :

Defendant. :

VIDEOTAPED AND ORAL DEPOSITION OF BECKY BOYST, produced as a witness at the instance of the Plaintiffs, and duly sworn, was taken in the above-styled and -numbered cause on August 9, 2019, from 9:10 a.m. to 10:48 a.m., before Christine Simons, CSR in and for the State of Texas, reported by machine shorthand, at RealPage, Inc., 2201 Lakeside Boulevard, Richardson, Texas, 75082, pursuant to the Federal Rules of Civil Procedure.

SUMMIT COURT REPORTING, INC.
Certified Court Reporters and Videographers
1500 Walnut Street, Suite 1610
Philadelphia, Pennsylvania 19102
424 Fleming Pike, Hammonton, New Jersey 08037
(215) 985-2400 * (609) 567-3315 * (800) 447-8648
www.summitreporting.com

A P P E A R A N C E S

FOR THE PLAINTIFFS:

By: John Soumilas, Esq. (via videoconference)
FRANCIS & MAILMAN, P.C.
1600 Market Street
Suite 2510
Philadelphia, Pennsylvania 19103
Phone: (215) 735-8600
E-mail: jsoumilas@consumerlawfirm.com

By: Lauren KW Brennan, Esq. (via videoconference)
FRANCIS & MAILMAN, P.C.
1600 Market Street
Suite 2510
Philadelphia, Pennsylvania 19103
Phone: (215) 735-8600
E-mail: lbrennan@consumerlawfirm.com

By: Edward Kroub, Esq. (via telephone)
COHEN & MIZRAHI LLP
300 Cadman Plaza West
12th Floor
Brooklyn, New York 11201
Phone: (929) 575-4175
E-mail: edward@cml.legal

FOR THE DEFENDANT:

By: Ronald I. Raether, Jr., Esq.
TROUTMAN SANDERS, LLP
5 Park Plaza
Suite 1400
Irvine, California 92614
Phone: (949) 622-2722
E-mail: ron.raether@troutman.com

By: Jessica R. Lohr, Esq.
TROUTMAN SANDERS, LLP
11682 El Camino Real
Suite 400
San Diego, California 92130
Phone: (858) 509-6044
E-mail: jessica.lohr@troutman.com

By: Martin Thornthwaite, Esq.
VP, ASSOCIATE GENERAL COUNSEL, REALPAGE, INC.
2201 Lakeside Boulevard
Richardson, Texas 75082
Phone: (877) 325-7243 E-mail:
martin.thornthwaite@realpage.com

ALSO PRESENT:

Chase Huddleston, Videographer

INDEX

| WITNESS | PAGE |
|---|---|
| BECKY BOYST | |
| EXAMINATION | |
| By Mr. Soumilas | 6 |

EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 - | Plaintiff Diane D. Jones Revised Notice of Deposition | 7 |
| 2 - | RealPage LeasingDesk Screening Policy & Procedures | 14 |
| 3 - | Defendant's Objections and Responses to Plaintiff Arnold's First Set of Interrogatories | 18 |
| 4 - | App Group ID 59 Activity Log | 23 |
| 5 - | Diane D. Jones Consumer Dispute Form | 34 |
| 6 - | September 11, 2017, Letter to Diane D. Jones | 47 |

THE VIDEOGRAPHER: We are now on the record for the video deposition of Becky Boyst. The date is August 9th, 2019. The time is 9:10 a.m. In the matter of Diane D. Jones and James Arnold versus RealPage, Inc., et al, being held in the United States District Court for the Northern District of Ohio, Case No. 1:19-cv-501-JG.

This deposition is taking place at RealPage, Inc., in Richardson, Texas.

My name is Chase Huddleston, I'm the legal video specialist. The court reporter today is Christine Simons.

Would counsel please state their appearance for the record.

MR. SOUMILAS: For the plaintiff, Diane D. Jones, John Soumilas. My colleague, Lauren Brennan, is here with me today in Philadelphia. We are participating via video link.

MR. RAETHER: Ronald Raether and Jessica Lohr, Troutman Sanders, for defendant, RealPage, Inc.

MR. THORNTHWAITE: Martin Thornthwaite for RealPage, Inc.

MR. SOUMILAS: One correction point before we swear in the witness. This is a Rule 30(b)(6) deposition in part, at least, a 30(b)(6) deposition of

the defendant, RealPage. It is not a deposition of Ms. Boyst in her personal capacity.

BECKY BOYST,

after having been first duly sworn, was examined and testified on her oath as follows:

EXAMINATION

BY MR. SOUMILAS:

Q. Would you please state your complete name for the record, ma'am.

A. Rebecca Ann Boyst.

Q. Ms. Boyst, we met off the record just a moment ago. My name is John Soumilas. I am an attorney for Diane D. Jones, who has brought a lawsuit against RealPage in the United States District Court for the Northern District of Ohio in Cleveland.

I am here today to take your deposition pursuant to a notice of deposition by Ms. Jones which asked for RealPage to identify one or more corporate representatives to testify on certain topics. So we did not ask for you by name, but the company has designated you to testify on three topics here today. Do you understand that?

A. I do.

Q. And have you seen that revised notice of deposition that lists the topics?

A. I have.

Q. Let me show it to you again and mark it for the record for purposes of today's proceedings as Boyst 1, please.

THE REPORTER: I will mark it now.

(Exhibit No. 1 marked.)

Q. And Ms. Boyst, it's my understanding that you are designated today by RealPage, Inc., to testify under this notice of deposition as to Topic 9, which are RealPage's policies and procedures for determining that a criminal record is a, quote, non-match, end quote, to the individual who is the subject of the report. Are you prepared to testify on that topic?

A. Yes, sir.

Q. Also, as to Topic 15, which states RealPage's policies and procedures for ensuring that after RealPage -- RealPage revises a consumer report about an individual to remove a criminal record after investigation, that the criminal record is not included on subsequent reports about that same individual. Do you see that?

A. I do see it.

Q. And are you prepared to testify on that topic?

A. Correct.

Q. And, finally, as to Topic 16C of this notice,

which reads, RealPage's interactions with plaintiffs, including but not limited to -- and I'm going back down to C, RealPage's communications with plaintiffs related to their requests for their files, including but not limited to RealPage's responses. Do you see that?

A. I do see that.

Q. And are you prepared to testify on that third topic as well?

A. Yes, sir.

Q. Now, Ms. Boyst, have you previously given any testimony as a corporate representative on behalf of RealPage in the manner you're giving testimony today?

A. I have not.

Q. Have you ever given any testimony under oath in your life in any capacity?

A. I have not.

Q. Today's proceeding is a formal one, and although we are in separate conference rooms, you in Texas and me in Pennsylvania, we are creating a record for the Court, and you have taken an oath that requires you to tell the whole truth, just like -- just like we were -- as if we were in court today in front of a judge and jury. Do you understand that?

A. I do, sir.

Q. All right. Ms. Boyst, let's just begin with

some basic background information. Do I take it that you work for RealPage, Inc., in some capacity?

A. I do, sir.

Q. Do you have a title?

A. I'm sorry?

Q. Do you have a title?

A. I am the operations manager.

Q. How long have you been operations manager at RealPage?

A. A little over a year.

Q. How long have you worked for RealPage overall in your career?

A. I joined in July of 2012.

Q. And in summary form, could you tell us what are the other positions you had at RealPage before you became the operations manager?

A. Yes, sir. I was a supervisor before -- in the operations area before I became a manager.

Q. What are your basic day-to-day responsibilities in the operations area, either as a supervisor, or most recently, as a manager?

A. We process disputes or requests for consumers where there is a discrepancy or in -- in the information that the consumer believes is accurate versus what is on the screening report, or when they want a copy of a

screening report.

Q. And are you familiar with the policies and procedures at RealPage for answering those types of requests for consumers?

A. Yes, sir.

Q. And I take it, you are specifically familiar with the type of dispute that is characterized as a non-match at RealPage?

A. I am.

Q. And you're familiar with the policies and procedures for investigating non-matches and dealing with those type of situations?

A. I am generically familiar, I am not in-detail familiar with the investigation process.

Q. Do you have people reporting to you, Ms. Boyst, as the operations manager?

A. I do.

Q. How many?

A. I have about ten people reporting to me.

Q. And are those folks also engaged in assisting consumers who have disputes about their background reports or who wish to see them and see what is being reported about them?

A. Yes, sir.

Q. Also, in summary form, Ms. Boyst, would you

tell us what your educational background is? Let's start with high school.

A. I graduated from high school in Greensboro, North Carolina. I attended college and graduated from college in North Carolina.

Q. And would you just please tell us what you studied in college and when you graduated?

A. Oh, Lord. I can't even remember when I graduated. I can tell you it took me ten years to get through, but I can't tell you when I graduated.

Q. Did you have a major, ma'am, or a concentration in your studies?

A. History.

Q. What was the name of the college?

A. University of North Carolina at Greensboro.

Q. And since graduating with a history degree from UNC Greensboro, have you attended any other college-level or university-level schooling?

A. I have not.

Q. Where is your office presently, ma'am?

A. It is in Richardson in the RealPage corporate headquarters.

Q. And have you worked at the Richardson, Texas, RealPage headquarters since you joined the company in 2012?

A. I have.

Q. In preparing to give testimony today in this case, did you have a chance to review the interactions that RealPage had with Diane Jones, my client?

A. I did.

Q. And you reviewed both requests for information for her file and also her dispute about some information in her file?

A. That is correct.

Q. Are you familiar with the policies and procedures that RealPage would have followed in dealing with Ms. Jones in that -- with those interactions?

A. That's correct.

Q. Okay. And how about Mr. James Arnold, did you review interactions between RealPage and him as well?

A. I did.

Q. (Inaudible.)

THE REPORTER: Can you repeat the question? It broke up.

Q. Yes. With respect to Mr. Arnold, did you also review any requests he made of RealPage to see his file and also any disputes he may have made with RealPage about his file?

A. I did.

Q. All right. So we'll get right into the areas,

Ms. Boyst, where you are designated to testify, and let's begin with the policies and procedures related to non-match situations. When is the first time at RealPage you heard the term "non-match"?

A. I would say 2013, '14.

Q. And in what context?

A. The context is the record doesn't match the applicant.

Q. So am I correct that at RealPage a non-match is a situation where the criminal record showing on a tenant applicant's report does not belong to them?

A. It is -- that is correct.

Q. All right. And, in fact, RealPage has a policies and procedure manual that discusses how to deal with non-match situations, correct?

A. That is correct.

Q. All right. Let me show you a portion of that manual, which I would like to mark as Boyst 2 for purposes of today.

MR. SOUMILAS: And to the court reporter, this is a document that reads on the first page, RealPage LeasingDesk Screening Policies and Procedures. It begins at page 538 and goes through 541 and then it picks up again at 610 and goes to 623. Please let me know when we have Boyst 2 marked for the record.

(Exhibit No. 2 marked.)

THE REPORTER: I have it marked.

MR. SOUMILAS: Thank you.

Q. Ms. Boyst, do you recognize the contents of the document that I put in front of you as Boyst 2?

A. I do.

Q. And just to create the record of what we're doing here is that I have a cover page and the table of contents for what appears to be the RealPage LeasingDesk Screening Policies and Procedures. Do you agree with that?

A. Yes, I do.

Q. Have these policies and procedures been in place for as long as you've been with the company from 2012 to the present?

A. Could you ask that question again, please?

Q. When is the first time you became familiar with this policies and procedures handbook in your time at RealPage?

A. There was a handbook in 2012.

Q. Okay. And is what we have with us today the present version of the handbook?

A. Just one minute, sir.

Q. Okay.

A. It is the present version.

Q. All right. Now, I want to show you in the Table of Contents, there's a section of the handbook that says, consumer disputes. Do you see that?

A. Correct.

Q. And then beginning on page 69 of the handbook, there is a section called Consumer Dispute Regarding Criminal Report. Do you see that?

A. I do.

Q. And -- (inaudible).

THE REPORTER: Can you start that question? The question broke up.

MR. SOUMILAS: I'm sorry, I'll try that again.

Q. Do you agree with me, Ms. Boyst, that at pages 69 through 82 of this manual, we see the company policies and procedures regarding consumer disputes regarding criminal reports?

A. That is correct.

Q. And have those policies and procedures about disputes of criminal reports been in place since you were handling consumer disputes in the 2013 and 2014 timeframe?

A. Yes, there are policies and procedures in place.

Q. And you told me that from that time period,

2013 to 2014, you had become familiar with a concept of a non-match at RealPage, correct?

A. That is correct.

Q. All right. Now, the other part of this exhibit includes those pages from the manual, pages 69 through 82, which have to do with consumer disputes regarding criminal reports, correct?

A. Yes, sir.

Q. And in several instances within that section, the concept of the non-match is -- is discussed, correct?

A. Correct.

REDAC

Do you see that?

A. I do.

Q. Now, in the time you have been in operations, am I correct that on occasion these type of disputes about non-matches are made by consumers to RealPage,

correct?

A. That is correct.

Q. And are you familiar, Ms. Boyst, with whether the company tracks the number of these disputes made by consumers about situations that we are calling a non-match?

A. We do track based on when a consumer states that they have a non-match dispute.

Q. Okay. And could you -- would you be able to search some record to tell us from year to year how many non-match disputes RealPage receives from consumers?

A. We can do that.

Q. What computer or what record would you search to be able to answer the question about the number of non-match disputes by year?

A. That would be the count of non-match disputes received by the consumer that we show in our tracking log.

Q. I'm sorry, did you say the tracking log, ma'am?

A. Correct.

Q. Is the tracking log something within a computer system at RealPage?

A. It is.

Q. Is it part of the Salesforce system?

A. It is.

Q. And in preparing to give testimony today, did you review any information as to how many non-match disputes have been tracked in the tracking log in recent years?

A. We did review that, yes, sir.

Q. And do you have information today, ma'am, about the number of non-match disputes received by RealPage, say, this year in 2019?

A. I don't remember that number right off the top of my head.

Q. Okay. But you would be able to retrieve it if you wanted to?

A. Yes, sir.

Q. Okay. I want to show you another document that was produced in this case as part of the case. It is -- it's called Defendant's Objections and Responses to Plaintiff Arnold's First Set of Interrogatories.

MR. SOUMILAS: Would you please locate that, Ms. Reporter, and mark it as Boyst 3 for purposes of today.

THE REPORTER: Yes.

(Exhibit No. 3 marked.)

THE REPORTER: I have it marked.

MR. SOUMILAS: Please let me know when you have a chance to review that.

THE REPORTER: I have it marked now.

MR. SOUMILAS: Okay. Thank you.

Q. Ms. Boyst, have you seen this document before just now?

A. One minute, sir. Yes, sir.

Q. I didn't hear that, you said you have reviewed them before?

A. I have seen it, yes.

Q. And when was that?

A. In the last day or two.

Q. I'm going to direct your attention to page 5 of that document. There's a supplemental answer there at the top that says, without -- subject to and without waiving its objections, RealPage states that it received 17,104 criminal non-match disputes from consumers during the requested time period. And if you look at the question, the requested time period asks for March 6th, 2014, to the present. Do you see that?

A. I do see it.

Q. Is that -- are you able to tell us based on your position as a general manager whether this information about the non-match disputes appears to be correct to you?

A. It does appear to be correct.

Q. All right. And if we wanted to change that

time period, let's say, from March 2017 through the present, we would be able to derive at the number for that time period by just looking at the tracking log within the Salesforce system?

A. We would be able to do that, sir.

Q. And just sticking with this document a little bit longer, if you'd please look at page 6 of it and the supplemental answers on that page, it appears to say that of the 17,104 consumer criminal non-match disputes, RealPage removed records in 11,232 of the cases.

Do you see that?

A. I see that.

Q. And would I be correct in inferring that if RealPage is removing the criminal records from the consumer's file, that means that it's a confirmed case of a non-match and that the criminal record really does not match the consumer?

MR. RAETHER: Objection, vague and ambiguous.

Q. You can answer it. You can answer the question, ma'am. Go ahead.

MR. RAETHER: You can answer.

A. Can you restate that question, please?

Q. Sure. And before I restate the question, let me just tell you that the rules of a deposition are a

little bit different from the rules of court. So if you hear an objection, you still have to answer my questions unless your lawyer specifically tells you not to answer, and I don't hear him telling you not to answer.

Okay. So here's my question again: Given that in 11,232 cases of the 17,104 disputes, RealPage removed the records from the disputing consumer's file, do you think it's correct that the reason RealPage removed the records is because the records didn't match the consumer in the first place?

MR. RAETHER: Objection, vague and ambiguous.

You can answer.

A. I would say that would be logical.

Q. Right. Because if the record were to actually match the consumer, you wouldn't remove it from the file, correct?

MR. RAETHER: Objection to form.

A. Yes.

Q. But the fact that RealPage is removing the record indicates that it doesn't match, and therefore, it's a confirmed case of a non-match. Would you agree with that?

MR. RAETHER: Objection to form.

A. Again, yes.

Q. And that is, in fact, the policy at RealPage, is it not, that when we have a confirmed non-match, the non-matching criminal record should be removed from that consumer's file, isn't it?

A. That is correct.

[redacted]

MR. RAETHER: Objection, vague and ambiguous.

A. That is correct in our policy.

Q. I'm sorry, did you say that is correct in our policy?

A. That is correct, in our policy we remove those.

Q. Right. And so that has been the case for as long as you've been there, when we have a criminal record not matching to a consumer, then it's got to be removed from that consumer's file?

A. That is correct.

Q. Would you agree?

All right. And now are you familiar with the type of things that cause a criminal record to be associated with a consumer's file in the first instance, which causes the non-match?

A. I'm not aware of the matching logic.

Q. All right. Well, we'll take that up with one of your accountants.

What you do know is that when there is a dispute and you're able to determine that the record is non-matching, you remove it, correct?

A. That is correct.

Q. Am I also correct, Ms. Boyst, that in those instances your team would indicate that within the computer system that we have a case of a non-match?

A. That is correct.

Q. All right. I want to show you another document that we're going to call Boyst 4 for purposes of today. It's a one-page document, and it has Bates number 56 on it. Please let me know when you have that.

THE REPORTER: What does the front of the document look like?

MR. SOUMILAS: It's an activity log. It says, app group ID 59 on the top left.

(Exhibit No. 4 marked.)

THE REPORTER: I have it marked.

MR. SOUMILAS: Thank you.

Q. Now Ms. Boyst, have you seen this document in preparing to give testimony today?

A. I am not sure without looking at all of the documents, but...

Q. Okay. Are you generally familiar with this type of an activity log?

A. I am.

Q. Where does this activity log come from within your systems?

A. It is a part of the software that the client uses when they process screening applications.

Q. All right. So this is situations where -- when you say "the client," you mean landlords want to go through the system to process a tenant's application?

A. That is correct.

Q. And is the activity log supposed to list all the activity that happens in connection with that type of a tenant application?

A. It lists only the activity notes that are put -- the activity log only shows the notes that are put in.

Q. All right. Are you familiar -- are you able to read logs like this? Have you seen them before in your day-to-day work?

A. Yes, sir.

Q. And does this particular log tell us that on August 15, 2017, an application was submitted by a Diane Jones?

A. It does.

Q. All right. And it looks like six days later on August 21st, there's a note that there was offender information viewed. Do you see that?

A. I do.

Q. Does that mean that some type of a criminal record came back for Ms. Jones?

A. Yes, sir.

Q. And it was viewed by the landlord?

A. That is correct.

Q. All right. And then it says on the same day, August 21, that a denial letter was printed for Diane Jones. What does that mean?

MR. RAETHER: Objection. I think it's a different date, John. You said the same day, it's the 28th and the 21st.

MR. SOUMILAS: So I'm sorry, maybe I'm reading it incorrectly.

Q. I see it as August 21st, 2017, denial letter was printed for Diane Jones; is that correct?

A. That is correct.

Q. Okay. And that was the same date that the offender information was viewed by the landlord; correct?

A. That is correct.

Q. Okay. And would you just explain for the

record what it means that a denial letter was printed for, in this case, Ms. Jones?

A. It means an adverse action letter was printed for the consumer.

Q. Okay. And is that part of something that's built into the system when a landlord wishes to take adverse action against a consumer that a letter will be generated?

A. Yes, a letter will be generated.

Q. Okay. And it's called a denial letter, you're being denied the apartment, is that what's going on here?

A. That's the way it's labeled here, yes.

Q. All right. And then a few days later on August 29th, we see that there is a dispute being generated for Ms. Jones, correct?

A. That is correct.

Q. So let's focus on that line. It says, consumer dispute non-match. Do you see that?

A. I do.

Q. So now does that mean that someone at RealPage has categorized Ms. Jones' dispute as one of these situations that we've been calling a non-match situation today?

A. That means the consumer submitted a dispute

where she said the records do not belong to her.

Q. Okay. And I guess what I'm trying to figure out is, when we see the entry here in the activity log, consumer disputes non-match, is that something that someone at RealPage enters, or did Ms. Jones actually use the words "non-match"?

A. It is part of the form that she submitted, and it is the section of that form where she responded.

Q. Okay. So if there is a form submitted that checks off the section that says, criminal record doesn't belong to me, the system will know to categorize that type of a dispute as a non-match?

A. That is correct.

Q. All right. Got you. And then it continues, we have determined that the something, and then it cuts off; do you see that?

A. I do.

Q. Do you know why that's cut off?

A. That is a wrapped field.

Q. Okay. Are you able to see the complete field?

A. I am not at this point.

Q. You are not.

In preparing to give testimony today, do you know what was determined with respect to Ms. Jones in connection with her non-match dispute?

A. It -- yes, we removed the record.
Q. Okay. So it was determined that the record didn't match her?
A. That's correct.
Q. Do you know why it was determined that the criminal record did not match Ms. Jones?
A. I do not know.
Q. Okay. And then on the same day, August 29th, 2017, we see the entry, reversed final decision, internal override. Do you see that?
A. I do.
Q. Is that an indication to you that it was determined that in Ms. Jones' case, the criminal record was a non-match and therefore should be removed from her file?
A. That is correct.
Q. All right. And then if you continue looking down the log, it looks like Ms. Jones' application is resubmitted. Is that what's going on?
A. It's rescored, yes, sir.
Q. And then by October 11, 2017, the application is approved by the landlord; is that what's going on there?
A. That is correct.
Q. Okay. So now that the criminal history was

removed from her file, the application went from a denied to an approved. Would you agree with that statement?

A. That is correct.

Q. Okay. And when you were testifying a little while ago about the 17,000 disputes of a non-match in connection with Boyst 3, do you know where that data comes from?

A. I do. It comes from the Salesforce system.

Q. Okay. And that is a different system than the activity log that we see here, correct?

A. I'm sorry, can you ask that question one more time?

Q. Yes. Is the Salesforce system -- is the Salesforce system, which was used to derive the number of 17,000-plus non-match disputes, a different computer system than the computer system that generated Boyst 4, the activity log?

A. That is correct.

Q. Do you know whether in the -- and I'm sorry, what did you call the system from which the activity log is generated?

A. It is the software system that the clients use.

Q. Got it. In connection with the software system used by clients, if a consumer is disputing a non-match,

is it supposed to show up in the same fashion as we see it for Ms. Jones on August 29th, 2017?

MR. RAETHER: Objection to form.

A. Yeah, I'm not sure exactly what you're asking me.

Q. I'm asking you whether the way the system works is that, for every case of a disputed non-match, there's supposed to be an entry in the activity log that says, consumer disputes non-match, just like we see for Ms. Jones dated August 29, 2017?

A. That's correct.

Q. And in every case where the criminal record is removed, is the software system for clients supposed to have the entry, reverse final decision, just like we see for Ms. Jones?

A. I'm not really sure.

Q. Okay. Now the Salesforce system that you testified about earlier, would that system categorize non-match disputes like Ms. Jones' in a particular way?

A. Only as the non-match category where the consumer submitted it.

Q. Okay. So there's a non-match category within Salesforce where we could search for non-match disputes?

A. If the consumer submitted it that way and identified it, it will show it as a non-match in

Salesforce.

Q. And -- (inaudible).

THE REPORTER: The beginning of that broke up. The beginning of the question broke up. Can you repeat it? The beginning of the question broke up.

Q. What I said is, presumably, if we were to look within the Salesforce system for non-match disputes in August of 2017, we should be able to locate Ms. Jones' dispute of a non-match, correct?

A. That is correct.

Q. Would the Salesforce system also tell us the categories when the non-match was confirmed and the record was removed?

A. No.

[redacted]

A. That would be by a report that's run from Salesforce.

Q. Okay. So what report would tell us the number of removals?

A. It would be the same report that we use to pull the overall numbers.

Q. Got it. Okay. So that data, about both disputes and removals, is available within Salesforce as well, correct?

A. It is.

Q. Okay. Now other than the software system for clients, about which you testified in connection with Boyst 4, and the Salesforce system that you testified in connection with Boyst 3, are you aware of any other computer system at RealPage which would track the number of non-match disputes and removals?

A. I am not.

Q. All right. Am I correct that at RealPage non-match situations are always tracked in connection with consumer disputes?

A. Correct.

Q. Are you aware of any type of a survey or any type of a study that searched for non-matches, even in cases where a consumer did not dispute directly with RealPage?

A. No, I am not.

Q. In your seven years at the company, are you ever aware of a scenario where the company just audited 500 of its reports or a thousand of its reports or some

other number, independent of consumer disputes, to look for non-matches?

A. I am not.

Q. Okay. Do you know whether anyone within operations ever considered doing that type of a audit for non-matches?

A. I do not know, sir.

Q. Now with respect to the number of confirmed non-matches that we have, if we wanted to get the name and address of the tenant applicant, that information would also be within the Salesforce system, correct?

A. If it was provided to us, correct.

Q. Okay. And are you familiar with the policies and procedures about what type of information is generally required in terms of a name and address for an application to get started?

A. On the application-submitted side, no, I am not.

Q. Okay. Now with respect to Ms. Jones, am I correct that she didn't submit a dispute -- a dispute form?

A. Can you repeat that, please?

Q. Yeah, let me see if a document would help.

MR. SOUMILAS: Let's please mark as Boyst 5 the form, consumer dispute, that's at Bates 41 and 42.

Q. Let me know when you have that in front of you, ma'am.

(Exhibit No. 5 marked.)

THE REPORTER: I have marked it.

Q. Have you seen Boyst 5 in preparing to give testimony today, Ms. Boyst?

A. I have seen this form, yes.

Q. Okay. And does it appear to be in the format you use at RealPage for processing consumer disputes?

A. It is.

Q. How does a consumer get access to a form like this in order to lodge a dispute?

A. A consumer can file a dispute in several ways. One of them is through the web portal, the other one is to call us and provide us with a statement that says they want to dispute an action on their report.

Q. Okay. And would -- would either of those situations result in the creation of a form consumer dispute, whether it's through the portal or through the phone?

A. It would.

Q. And for this particular dispute of Ms. Jones, do you know whether it was generated through the web portal or through a phone conversation?

A. I can't recall without looking at the case.

Q. Okay. If you look at the second page of the document, ma'am, there's some language written at the top, it says, if you are disputing a criminal charge, please provide the specific cases you wish to dispute as well as the reasons, and then underneath that section, it says, consumer is disputing non-match records stating that she has never lived in Georgia. Do you see that?

A. I do see it.

Q. (Inaudible.)

THE REPORTER: Mr. --

MR. RAETHER: I don't think you can talk over each --

THE REPORTER: You broke up, can you repeat the question?

MR. SOUMILAS: Yes, I'm sorry.

Q. Given that entry on the second page, could you tell, Ms. Boyst, whether this was a dispute through the web portal or through the phone?

A. It was through the phone.

Q. Okay. And then a -- an operator at RealPage would have used this language of consumer is disputing non-match records, correct?

A. That is correct.

Q. Because that's internal lingo, the operator would know that type of a dispute. It's unlikely that

Ms. Jones would use the word "non-match," correct?

MR. RAETHER: Objection, form, calls for speculation.

A. I would --

Q. Yeah, let me try it again. How would you know -- why do you say that it was through a call and that the operator would have used this language?

A. Because it says, stating that she has never lived in Georgia.

Q. Okay. Are there situations where a consumer calls about some type of a criminal dispute, but the operator handling the call decides not to label it as a non-match?

A. There are.

Q. So it could happen where, in the judgment of the operator, the dispute is of some different nature, not a non-match nature?

A. I would not say that, no.

Q. Are there any situations that you've been aware of in your years at the company where an operator made a mistake in characterizing a dispute?

A. Honestly, I do not recall.

Q. You do agree that in this case the dispute was properly characterized for Ms. Jones as a non-match, correct?

A. That is correct.

Q. Do you agree that it was a non-match situation in this case --

A. It is.

Q. -- of Ms. Jones?

A. It is.

MR. RAETHER: You just need to wait for the question, especially given the telephone communication --

THE WITNESS: Okay. I'm sorry.

MR. RAETHER: -- issues we're having.

Hey, John, when you get to a good point, can we have a break? We've been going about an hour.

MR. SOUMILAS: So this is a good point. How about, do you want a break now?

MR. RAETHER: Let's do maybe five minutes.

MR. SOUMILAS: That's fine. I'm going to put the phone on mute but keep the connection going.

THE VIDEOGRAPHER: We are now off the record. The time is 10:09 a.m.

(Recess taken from 10:09 to 10:25 a.m.)

THE VIDEOGRAPHER: We are now back on the record. The time is 10:25 a.m.

Q. (BY MR. SOUMILAS) Ms. Boyst, let's spend a few more minutes with a dispute form that we've marked as

Boyst 5. Do you have still have that in front of you?

A. I do.

Q. Okay. (Inaudible) dispute form was generated as a result of a telephone call because of the description that we see on the second page about the nature of the dispute, correct?

THE REPORTER: The beginning of the question broke up.

Q. Let me try again. With respect to the dispute form that we have as Boyst 5, you said that we know that was generated as a result of a telephone call because of how the dispute is characterized on the second page, correct?

A. Correct.

Q. That characterization was made by a RealPage employee who took Ms. Jones' call?

A. Could you repeat that question, please?

Q. Yes. Would you agree with me that the characterization that we see on page 2 of Boyst 5 would have been made by a RealPage employee?

A. Correct.

Q. Now, if the dispute was generated through a web portal, would the language that we see on page 2 be the consumer's actual words that they typed into the web portal?

A. They would be the consumer's words, yes.

Q. Okay. What I'm trying to do is understand how the dispute form and the words used, either by the consumer herself or by the agent at RealPage taking the call, translates to some entry into the Salesforce system which characterizes the dispute as, quote, a non-match.

A. And your question is?

Q. My question is, is it a person at RealPage that enters the dispute into the system as a non-match?

A. The -- if it is a web system, it is auto sent and characterized as a non-match.

Q. And if it's a telephone call?

A. If it's a telephone call and the consumer says the record does not belong to them, it is entered as a non-match.

Q. By a RealPage employee?

A. Correct.

Q. Yeah. So those are the two scenarios in which we would see a characterization of a non-match within Salesforce, either an auto-generated one through the web portal or a manually generated one through a RealPage employee --

A. That's correct.

Q. -- correct?

Now going back to Boyst 3 for a moment and look at page 6 again, where we have that statistical information about the number of non-match disputes and the number of removals; do you recall that?

A. I do.

Q. And at least according to my calculator, it looks like about two-thirds -- in two-thirds of the cases, the criminal record is removed. Does that look about right to you?

A. Yes.

Q. In the remaining one-third of the cases where the criminal record is not removed, could you confirm for us today that in those cases the tenant applicant actually committed the crime?

A. I cannot.

Q. Okay. Is the fact that a record is not removed following a non-match dispute an indication that the disputing consumer is actually the criminal?

A. No, sir.

Q. Is the fact that a record is not removed simply an indication that, according to RealPage's matching criteria, there's enough personal identifiers matching between the criminal record and the consumer who is applying for an apartment?

MR. RAETHER: Objection, lack of

foundation, calls for speculation.

A. Can you restate that, please?

Q. Yes. What does it mean when, in about a third of the cases, the record is not removed, what does that indicate to you?

A. It indicates that some portion of that record was accurate.

Q. Some portion of the record was accurate?

A. Correct.

Q. So that means that some part of the criminal record has information on it that's the same as the tenant applicant?

A. That would be correct.

Q. But not all of the information matches, correct?

A. I don't know that.

Q. How come you don't know the answer to that?

A. Because I don't remember all of that.

Q. Okay. You're certainly not here today to testify that for the one-third or so of the records that stay on that that means that those people committed crimes, it just means that some part of the criminal record has some information that matches?

MR. RAETHER: Objection to form.

Q. Is that your testimony?

A. Can you say that, again, please?

Q. Yeah. By saying only that some part of the criminal record matches, that's not the same thing as saying that those people actually committed the crimes?

A. I don't know the answer to that.

Q. Okay. Has RealPage ever conducted any type of an audit or a study to determine what percentage of the non-match disputes which result in the record not being removed are situations where the applicant actually committed a crime and has that criminal record about them?

A. I do not know.

Q. Have you ever heard of any type of an audit or a study to look at what's going on with the non-match situations where the record is not removed?

A. I have not.

Q. Okay. I take it if the criminal record is not removed, then it just stays on that person's file at RealPage, correct?

MR. RAETHER: Objection to form.

A. I would not that say.

Q. Okay. So what happens in situations of a dispute of a non-match where RealPage does not remove the criminal record?

A. I don't know the answer to that.

Q. Do you know what happens in situations where there's a dispute of a non-match and then RealPage decides to remove a criminal record, like it did with Ms. Jones?

A. I'm not sure what you're asking me.

Q. I'm asking you what happens to that record, is there some procedure in place as to how to deal with that record appearing on that applicant's report in the future?

A. There is.

Q. Okay. Could you tell me what happens, what's the procedure?

A. In a conversation with another colleague, I understand those records that are removed are put into a table and any subsequent data is run against that table, if the record is there, it is automatically removed.

Q. Okay. You said you learned this by speaking with a colleague?

A. That is correct.

Q. Who was that?

A. I'm sorry?

Q. What's the name of the person you spoke with?

A. I don't remember.

Q. (Inaudible.)

THE REPORTER: Could you repeat the

question?

MR. SOUMILAS: Yes.

Q. When did you speak with this colleague?

A. Yesterday.

Q. All right. Is it somebody who you generally interact with at RealPage, or is it somebody that you've never seen before?

A. I do not generally interact with that person.

Q. Okay. Other than speaking with this colleague yesterday, whose name you don't remember, did you do anything else to prepare to testify about Area 15 of the Notice of Deposition, which calls for testimony on the policies and procedures for ensuring that after RealPage revises a consumer report about an individual to remove a criminal record after area investigation, that the criminal record is not included on subsequent reports about that same individual?

A. I did not.

Q. Do you, in your line of work, regularly work with this table that you just mentioned?

A. I do not.

Q. Do you know whether there's some way of searching within Salesforce for situations where a record was removed after a non-match dispute, but then there was a -- a report down the road that included it?

A. I'm not aware of a report like that.

Q. Did you even look into that to see if it was possible?

A. I did not.

Q. All right. As far as you could tell concerning your -- RealPage's interactions with Ms. Jones, were her interactions with your part of the business that deals with the disclosures and disputes typical?

MR. RAETHER: Objection, vague and ambiguous.

Q. Do you understand the question?

A. Can you repeat it in a different way, please?

Q. Was there anything unusual about how Ms. Jones communicated with RealPage about her background report?

A. It was not.

Q. Was there anything unusual about how Ms. Jones' dispute was processed as a non-matching dispute?

A. No, sir.

Q. Was there anything unusual about how RealPage decided to remove the criminal records after it confirmed that it was a non-match?

A. Can you restate that? The first part of it cut out.

Q. Was there anything unusual about the part of the process where RealPage decided that it was going to

remove a non-matching criminal record?

A. I don't know the answer to that because I didn't do that investigation.

Q. All right. Is there any part of Ms. Jones' interactions with RealPage that you considered to have been abnormal or not standard operating procedure?

A. No, sir.

Q. With respect to her requests for a copy of her file, do you know whether Ms. Jones requested that RealPage mail to her a copy of her file?

A. I do not know.

Q. Okay. But that's your department that would handle that type of a request, correct?

A. That is correct.

Q. Okay. If a consumer were to make a request for their file, how would your department usually provide that file to the consumer?

MR. RAETHER: Objection to form.

Go ahead.

A. The consumer asks us -- determines how they want to receive the file.

Q. Okay. And could that be by e-mail or by regular mail?

A. Could what be by e-mail or regular mail?

Q. Could the file be delivered to the consumer

either by e-mail or regular mail?

A. Yes, it can.

Q. Any other way besides those two forms of communication?

A. Those are the two forms of communication.

Q. Do you know whether RealPage mailed to Ms. Jones information about her background report to a University Heights, Ohio, address where she lived?

A. I don't recall.

Q. Do you know whether, after her dispute, RealPage communicated with Ms. Jones via mail to her University Heights, Ohio, address where she lived?

A. I do not know, sir.

Q. Let me show you one more document, which we'll mark as Boyst 6 for purposes of today. It's Bates number 46 through 49.

(Exhibit No. 6 marked.)

THE REPORTER: I have it marked.

MR. SOUMILAS: Okay.

Q. And is this a type of document that you've seen before in your day-to-day work with RealPage?

A. It is.

Q. And what is this document?

A. It is a request for a file copy.

Q. Okay. And it appears to be mailed to a

Diane D. Jones at a University Heights, Ohio, address, correct?

A. That's what I'm reading.

Q. And this would be one of the typical ways in which RealPage communicates with consumers who want information from your department?

A. That is correct.

Q. All right.

MR. SOUMILAS: Why don't we go off the record for a moment, please. I think I'm just about done.

THE VIDEOGRAPHER: We are now off the record. The time is 10:44 a.m.

(Recess taken from 10:44 to 10:46.)

THE VIDEOGRAPHER: We are now back on the record. The time is 10:46 a.m.

MR. SOUMILAS: Ms. Boyst, I don't have anything further for you. Thank you very much for your time this morning.

THE VIDEOGRAPHER: We are now off the record --

MR. RAETHER: Hold on, hold on. So I don't have any questions. The witness would like to read and sign.

I think there's a protective order in

place, John, that prescribes the procedure for designating confidentiality, and we'll follow that process outlined in the protective order.

MR. SOUMILAS: So there is no protective order in this case, but there is a confidentiality agreement, and if it does provide any procedure for marking things confidential, please let us know very promptly. As you know, we have a filing deadline within a week, so we need to know how to deal with that early part of next week.

My only request is that the exhibits, which we marked as Boyst 1 through 6, be made part of the transcript and attached to it. Thank you.

MR. RAETHER: My apologies for misspeaking. It's a confidentiality agreement, and we'll work with you, John, to help you meet the Court's deadline.

MR. SOUMILAS: Okay. Thank you. So are we prepared to go off the record for this witness?

MR. RAETHER: Yes.

THE VIDEOGRAPHER: We are now off the record. The time is 10:48 a.m.

(Deposition concluded at 10:48 a.m.)

STATE OF TEXAS )

I, Christine Simons, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, BECKY BOYST, was duly sworn and that the transcript of the oral deposition is a true record of the testimony given by the witness and the statements of counsel;

That review and signature was reserved;

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Certified to by me this 12th day of August, 2019.

/s/Christine Simons
Christine Simons, Texas CSR 11181
Expiration Date: 7/31/2021
Summit Court Reporting, Inc.
1500 Walnut Street, Suite 1610
Philadelphia, Pennsylvania 19102
(215)985-2400

INSTRUCTIONS TO THE WITNESS

Read your deposition over carefully. It is your right to read your deposition and make changes in form or substance. You should assign a reason in the appropriate column on the errata sheet for any change made.

After making any changes in form or substance which have been noted on the following errata sheet along with the reason for any change, sign your name on the errata sheet and date it.

Then sign your deposition at the end of your testimony in the space provided. You are signing it subject to the changes you have made in the errata sheet, which will be attached to the deposition before filing. You must sign it in front of a witness. Have the witness sign in the space provided. The witness need not be a notary public. Any competent adult may witness your signature.

Return the original errata sheet to your counsel promptly. Court rules require filing within thirty days after you receive the deposition.

ERRATA SHEET

Attach to Deposition of: Becky Boyst
Taken on: August 9, 2019
In the matter of: Jones, et al. v. Realpage, Inc., et al.

PAGE LINE NO. CHANGE REASON

SIGNATURE PAGE

- - -

I hereby acknowledge that I have read the aforegoing transcript, dated August 9, 2019, and the same is a true and correct transcription of the answers given by me to the questions propounded, except for the changes, if any, noted on the Errata Sheet.

- - -

SIGNATURE: ____________________________
Becky Boyst

DATE: ____________________________

WITNESSED BY: ____________________________

A

**a.m** 1:14,15 5:3 37:20,21,23 48:13 48:16 49:21,22
**able** 17:9,14 18:11 19:20 20:2,5 23:4 24:18 27:20 31:8 31:20
**abnormal** 46:6
**above-styled** 1:13
**access** 34:11
**accountants** 23:2
**accurate** 9:24 41:7 41:8
**acknowledge** 53:5
**action** 26:3,7 34:16 50:12,14
**activity** 4:15 23:17 24:2,4,12,13,15 24:16 27:3 29:11 29:18,21 30:8
**actual** 38:24
**address** 33:10,15 47:8,12 48:1
**adult** 51:18
**adverse** 26:3,7
**aforegoing** 53:6
**agent** 39:4
**ago** 6:12 29:6
**agree** 14:10 15:14 21:22 22:20 29:2 36:23 37:2 38:18
**agreement** 49:6,15
**ahead** 20:21 46:19
**al** 5:5 52:3,3
**ambiguous** 20:19 21:12 22:10 45:10
**Ann** 6:10
**answer** 17:14 19:12 20:20,20,22 21:2 21:3,4,13 41:17 42:5,25 46:2
**answering** 10:3
**answers** 20:8 31:16 31:17 53:8
**apartment** 26:11 40:24
**apologies** 49:14
**app** 4:15 23:18
**appear** 19:24 34:8
**appearance** 5:13
**appearing** 43:8
**appears** 14:9 19:22 20:8 47:25
**applicant** 13:8 33:10 40:13 41:12 42:9
**applicant's** 13:11 43:8
**application** 24:10 24:14,23 28:18,21 29:1 33:16
**application-sub...** 33:17
**applications** 24:7
**applying** 40:24
**appropriate** 51:5
**approved** 28:22 29:2
**area** 9:18,20 44:11 44:15
**areas** 12:25
**Arnold** 1:3 5:4 12:14,20
**Arnold's** 4:14 18:17
**asked** 6:18
**asking** 30:4,6 43:5 43:6
**asks** 19:17 46:20
**assign** 51:4
**assisting** 10:20
**ASSOCIATE** 3:1
**associated** 22:23
**Attach** 52:2
**attached** 49:13 51:14
**attended** 11:4,17
**attention** 19:11
**attorney** 6:12
**attorneys** 50:12
**audit** 33:5 42:7,13
**audited** 32:24
**August** 1:14 5:3 24:23 25:2,11,18 26:15 28:8 30:2 30:10 31:8 50:15 52:2 53:6
**auto** 39:11
**auto-generated** 39:21
**automatically** 43:16
**available** 32:4
**aware** 22:25 32:10 32:18,24 36:19 45:1

B

**back** 8:2 25:6 31:15 37:22 40:1 48:15
**background** 9:1 10:21 11:1 45:14 47:7
**based** 17:7 19:20
**basic** 9:1,19
**Bates** 16:14 23:13 33:25 47:15
**Becky** 1:11 4:3 5:2 6:3 50:5 52:2 53:17
**beginning** 15:5 31:3,4,5 38:7
**begins** 13:23
**behalf** 1:4 8:11
**believes** 9:24
**belong** 13:11 16:20 27:1,11 39:15
**bit** 20:7 21:1
**bottom** 16:15
**Boulevard** 1:17 3:2
**Boyst** 1:11 4:3 5:2 6:2,3,10,11 7:3,7 8:10,25 10:15,25 13:1,18,25 14:4,5 15:14 17:3 18:19 19:3 23:7,12,22 29:7,17 31:15 32:9,10 33:24 34:5,6 35:17 37:24 38:1,10,19 40:1 47:15 48:17 49:12 50:5 52:2 53:17
**break** 37:13,15
**Brennan** 2:8 5:16
**broke** 12:19 15:11 31:3,4,5 35:13 38:8
**Brooklyn** 2:14
**brought** 6:13
**built** 26:6
**business** 45:7

C

**C** 2:1 8:3
**Cadman** 2:13
**calculator** 40:6
**California** 2:19,23
**call** 23:12 29:21 34:15 36:6,12 38:4,11,16 39:5 39:13,14
**called** 15:6 18:16 26:10
**calling** 17:5 26:23
**calls** 36:2,11 41:1 44:12
**Camino** 2:22
**capacity** 6:2 8:15 9:2
**career** 9:12
**carefully** 51:2
**Carolina** 11:4,5,15
**case** 1:7 5:6 12:3 18:15,15 20:15 21:22 22:7,15 23:9 26:2 28:13 30:7,12 34:25 36:23 37:3 49:5
**cases** 20:10 21:6 31:19 32:20 35:4 40:8,11,13 41:4
**categories** 31:12
**categorize** 27:11 30:18
**categorized** 26:22
**category** 30:20,22
**cause** 1:14 22:22
**causes** 22:24
**certain** 6:19
**certainly** 41:19
**Certified** 1:22 50:2 50:15
**certify** 50:3,10
**chance** 12:3 18:25
**change** 19:25 51:6 51:9 52:4
**changes** 51:4,7,13 53:9
**characterization** 38:15,19 39:20
**characterized** 10:7 36:24 38:12 39:12
**characterizes** 39:6
**characterizing** 36:21
**charge** 35:3
**Chase** 3:5 5:10
**checks** 27:10
**Christine** 1:15 5:11 50:2,18
**Civil** 1:18
**Cleveland** 6:15
**client** 12:4 24:6,9
**clients** 29:23,25 30:13 32:8
**COHEN** 2:12
**colleague** 5:16 43:13,18 44:3,9
**college** 11:4,5,7,14
**college-level** 11:18
**column** 51:5
**come** 24:4 41:17
**comes** 29:8,9
**committed** 40:14 41:21 42:4,10
**communicated** 45:14 47:11
**communicates** 48:5
**communication** 37:9 47:4,5
**communications** 8:3
**company** 6:20 11:24 14:14 15:15 17:4 32:23,24 36:20
**competent** 51:18
**complete** 6:8 27:20
**computer** 17:13,21 23:9 29:16,17 32:11
**concentration** 11:11
**concept** 16:1,10
**concerning** 45:5
**concluded** 49:22
**conducted** 42:6
**conference** 8:18
**confidential** 49:7
**confidentiality** 49:2 49:5,15
**confirm** 40:12
**confirmed** 20:15 21:22 22:2 31:12 33:8 45:21
**connection** 24:13 27:25 29:7,24 32:8,10,15 37:18
**considered** 33:5 46:5
**consumer** 4:16 7:17 9:24 15:3,6 15:16,21 16:6,19 16:20 17:7,17 20:9,17 21:10,16 22:17 26:4,7,18 26:25 27:4 29:25 30:9,21,24 31:18 32:16,20 33:1,25 34:9,11,13,18 35:6,21 36:10 39:4,14 40:18,23 44:14 46:15,17,20 46:25
**consumer's** 20:15 21:7 22:4,18,23 38:24 39:1
**consumers** 9:22

10:4,21 16:25 17:5,11 19:15 48:5
**contents** 14:4,9 15:2
**context** 13:6,7
**continue** 28:17
**continues** 27:14
**conversation** 34:24 43:13
**copy** 9:25 46:8,10 47:24
**corporate** 6:18 8:11 11:21
**correct** 7:24 12:9 12:13 13:9,12,15 13:16 15:4,18 16:2,3,7,11,12,24 17:1,2,20 19:23 19:24 20:13 21:8 21:17 22:5,8,11 22:12,14,19 23:5 23:6,7,10 24:11 25:9,19,20,23,24 26:16,17 27:13 28:4,16,24 29:4 29:11,19 30:11 31:9,10 32:5,14 32:17 33:11,12,20 35:22,23 36:1,25 37:1 38:6,13,14 38:21 39:18,24,25 41:9,13,15 42:19 43:19 46:13,14 48:2,7 53:7
**correction** 5:23
**counsel** 3:1 5:13 50:8,10 51:21
**count** 17:16
**court** 1:1,22,22 5:6 5:11 6:14 8:20,22 13:20 21:1 50:19 51:21
**Court's** 49:16
**cover** 14:8
**create** 14:7
**creating** 8:19
**creation** 34:18
**crime** 40:14 42:10
**crimes** 41:22 42:4
**criminal** 7:11,18,19 13:10 15:7,17,20 16:7,16,17,18,19 19:15 20:9,14,16 22:3,16,22 25:5 27:10 28:6,13,25 30:12 31:18 35:3 36:11 40:8,12,18 40:23 41:10,22 42:3,10,17,24 43:3 44:15,16 45:20 46:1
**criteria** 40:22
**CSR** 1:15 50:18
**cut** 27:18 45:22
**cuts** 27:15

D

**D** 1:3 4:10,16,17 5:4 5:15 6:13 48:1
**d/b/a** 1:8
**data** 22:6 29:7 32:3 43:15
**date** 5:2 25:14,21 50:19 51:10 53:19
**dated** 30:10 53:6
**day** 19:10 25:10,14 28:8 50:15
**day-to-day** 9:19 24:20 47:21
**days** 25:1 26:14 51:22
**deadline** 49:8,16
**deal** 13:14 43:7 49:9
**dealing** 10:11 12:11
**deals** 45:7
**decided** 45:20,25
**decides** 36:12 43:3
**decision** 28:9 30:14
**defendant** 1:9 2:16 5:20 6:1
**Defendant's** 4:13 18:16
**degree** 11:16
**delivered** 46:25
**denial** 25:11,18 26:1,10
**denied** 26:11 29:2
**department** 46:12 46:16 48:6
**deposition** 1:11 4:11 5:2,8,25,25 6:1,16,17,25 7:9 20:25 44:12 49:22 50:6 51:2,3,11,15 51:23 52:2
**derive** 20:2 29:15
**description** 4:9 38:5
**designated** 6:20 7:8 13:1
**designating** 49:2
**determine** 16:17 23:4 31:20 42:7
**determined** 27:15 27:24 28:2,5,13
**determines** 46:20
**determining** 7:10
**Diane** 1:3 4:10,16 4:17 5:4,15 6:13 12:4 24:23 25:12 25:19 48:1
**Diego** 2:23
**different** 21:1 25:14 29:10,16 36:16 45:12
**direct** 19:11
**directly** 32:20
**disclosures** 45:8
**discrepancy** 9:23
**discussed** 16:10
**discusses** 13:14
**displayed** 16:17
**dispute** 4:16 10:7 12:7 15:6 16:19 17:8 23:4 26:15 26:19,22,25 27:12 27:25 31:9 32:20 33:20,20,25 34:12 34:13,16,19,22 35:4,17,25 36:11 36:16,21,23 37:25 38:3,6,9,12,22 39:3,6,10 40:17 42:23 43:2 44:24 45:17,17 47:10
**disputed** 30:7
**disputes** 9:22 10:21 12:22 15:3,16,20 15:21 16:6,24 17:4,11,15,16 18:3,7 19:15,22 20:9 21:6 27:4 29:6,16 30:9,19 30:23 31:7,18,21 32:4,12,16 33:1 34:9 40:3 42:8 45:8
**disputing** 21:7 29:25 35:3,6,21 40:18
**District** 1:1,1 5:5,6 6:14,15
**document** 13:21 14:5 18:14 19:3 19:12 20:6 23:11 23:13,16,22 33:23 35:2 47:14,20,23
**documents** 23:25
**doing** 14:8 33:5
**duly** 1:13 6:4 50:5

E

**E** 2:1,1
**e-mail** 2:7,11,15,20 2:24 3:3 46:22,24 47:1
**earlier** 30:18
**early** 49:9
**educational** 11:1
**Edward** 2:12
**edward@cml.legal** 2:15
**either** 9:20 34:17 39:3,21 47:1
**El** 2:22
**employed** 50:11
**employee** 38:16,20 39:17,23
**engaged** 10:20
**ensuring** 7:16 44:13
**entered** 39:15
**enters** 27:5 39:10
**entry** 27:3 28:9 30:8 30:14 35:16 39:5
**errata** 51:5,9,10,14 51:20 52:1 53:10
**especially** 37:8
**Esq** 2:4,8,12,17,21 3:1
**et** 5:5 52:3,3
**exactly** 30:4
**EXAMINATION** 4:4 6:6
**examined** 6:4
**example** 16:13
**exhibit** 7:6 14:1 16:4 18:22 23:19 34:3 47:17
**exhibits** 4:8 49:11
**Expiration** 50:19
**explain** 25:25

F

**fact** 13:13 21:20 22:1 40:16,20
**familiar** 10:2,6,10 10:13,14 12:10 14:17 16:1 17:3 22:21 24:1,18 33:13
**far** 45:5
**fashion** 30:1
**Federal** 1:18
**field** 27:19,20
**figure** 27:2
**file** 12:7,8,21,23 20:15 21:7,17 22:4,18,23 28:15 29:1 34:13 42:18 46:9,10,16,17,21 46:25 47:24
**files** 8:4
**filing** 49:8 51:15,21
**final** 28:9 30:14
**finally** 7:25
**financially** 50:13
**fine** 37:17
**first** 4:14 6:4 13:3 13:21 14:17 18:17 21:10 22:23 45:22
**five** 37:16
**Fleming** 1:24
**Floor** 2:13
**focus** 26:18
**folks** 10:20
**follow** 49:2
**followed** 12:11
**following** 40:17 50:4 51:8
**follows** 6:5
**form** 4:16 9:14 10:25 21:18,24 27:7,8,9 30:3 33:21,25 34:7,11 34:18 36:2 37:25 38:3,10 39:3 41:24 42:20 46:18 51:4,7
**formal** 8:17
**format** 34:8
**forms** 47:3,5
**foundation** 41:1
**FRANCIS** 2:4,8
**front** 8:22 14:5 23:15 34:1 38:1 51:16
**further** 48:18 50:10 50:13
**future** 43:9

G

**general** 3:1 19:21
**generally** 24:1 33:15 44:5,8
**generated** 26:8,9 26:16 29:17,22 34:23 38:3,11,22

39:22
**generically** 10:13
**Georgia** 35:7 36:9
**give** 12:2 18:1 23:23 27:23 34:5
**given** 8:10,14 21:5 35:16 37:8 50:7 53:8
**giving** 8:12
**go** 20:21 24:9 46:19 48:9 49:18
**goes** 13:23,24
**going** 8:2 19:11 23:12 26:11 28:19 28:22 37:13,17,18 40:1 42:14 45:25
**good** 37:12,14
**graduated** 11:3,4,7 11:9,10
**graduating** 11:16
**Greensboro** 11:3 11:15,17
**group** 4:15 23:18
**guess** 27:2

H

**Hammonton** 1:24
**handbook** 14:18,20 14:22 15:2,5
**handle** 46:13
**handling** 15:21 36:12
**happen** 36:15
**happened** 22:7
**happens** 24:13 42:22 43:1,6,11
**head** 18:10
**headquarters** 11:22 11:24
**hear** 19:6 21:2,4
**heard** 13:4 42:13
**Heights** 47:8,12 48:1
**held** 5:5
**help** 33:23 49:16
**Hey** 37:12
**high** 11:2,3
**history** 11:13,16 28:25
**hold** 48:22,22
**Honestly** 36:22
**hour** 37:13
**Huddleston** 3:5 5:10

I

**ID** 4:15 23:18
**identified** 30:25
**identifiers** 40:22
**identify** 6:18
**in-detail** 10:13
**inaudible** 12:17 15:9 31:2 35:9 38:3 43:24
**included** 7:19 44:16 44:25
**includes** 16:5
**including** 8:2,4
**incorrectly** 25:17
**independent** 33:1
**INDEX** 4:1
**indicate** 23:8 41:5
**indicates** 21:21 41:6
**indication** 28:12 40:17,21
**individual** 7:12,18 7:20 44:14,17
**individually** 1:3
**inferring** 20:13
**information** 9:1,23 12:6,7 18:2,6 19:22 25:3,22 33:10,14 40:3 41:11,14,23 47:7 48:6
**instance** 1:12 22:23
**instances** 16:9 23:8
**INSTRUCTIONS** 51:1
**interact** 44:6,8
**interactions** 8:1 12:3,12,15 45:6,7 46:5
**interested** 50:14
**internal** 28:10 35:24
**Interrogatories** 4:14 18:17
**interrogatory** 31:16
**investigating** 10:11
**investigation** 7:19 10:14 44:15 46:3
**Irvine** 2:19
**issues** 37:11

J

**James** 1:3 5:4 12:14
**Jersey** 1:24
**Jessica** 2:21 5:19
**jessica.lohr@tro...** 2:24
**John** 2:4 5:16 6:12 25:14 37:12 49:1 49:16
**joined** 9:13 11:24
**Jones** 1:3 4:10,16 4:18 5:4,16 6:13 6:17 12:4,12 24:24 25:6,12,19 26:2,16 27:5,24 28:6 30:2,10,15 33:19 34:22 36:1 36:24 37:5 43:4 45:6,13 46:9 47:7 47:11 48:1 52:3
**Jones'** 26:22 28:13 28:18 30:19 31:8 38:16 45:16 46:4
**Jr** 2:17
**jsoumilas@cons...** 2:7
**judge** 8:22
**judgment** 36:15
**July** 9:13
**jury** 8:23

K

**keep** 37:18
**know** 13:25 18:24 23:3,14 27:11,18 27:24 28:5,7 29:7 29:20 33:4,7 34:1 34:23 35:25 36:6 38:10 41:16,17 42:5,12,25 43:1 44:22 46:2,9,11 47:6,10,13 49:7,8 49:9
**Kroub** 2:12
**KW** 2:8

L

**label** 36:12
**labeled** 26:13
**lack** 40:25
**Lakeside** 1:17 3:2
**landlord** 25:8,22 26:6 28:22
**landlords** 24:9
**language** 35:2,21 36:7 38:23
**Lauren** 2:8 5:16
**lawsuit** 6:13
**lawyer** 21:3
**lbrennan@consu...** 2:11
**learned** 43:17
**LeasingDesk** 1:8 4:12 13:22 14:9
**left** 23:18
**legal** 5:10
**let's** 8:25 11:1 13:2 20:1 26:18 33:24 37:16,24
**letter** 4:17 25:11,18 26:1,3,7,9,10
**life** 8:15
**limited** 8:2,5
**line** 26:18 44:19 52:4
**lingo** 35:24
**link** 5:18
**list** 24:12
**lists** 6:25 24:15
**little** 9:10 20:6 21:1 29:5
**lived** 35:7 36:9 47:8 47:12
**LLP** 2:12,17,21
**locate** 18:18 31:8
**lodge** 34:12
**log** 4:15 17:18,19 17:21 18:3 20:3 23:17 24:2,4,12 24:16,22 27:3 28:18 29:11,18,21 30:8
**logic** 22:25
**logical** 21:14
**logs** 24:19
**Lohr** 2:21 5:20
**long** 9:8,11 14:14 22:16
**longer** 20:7
**look** 19:16 20:7 23:16 31:6,16 33:1 35:1 40:2,8 42:14 45:2
**looking** 20:3 23:24 28:17 31:15 34:25
**looks** 25:1 28:18 40:7
**Lord** 11:8

M

**ma'am** 6:9 11:11,20 17:19 18:6 20:21 31:16 34:2 35:2
**machine** 1:16
**mail** 46:10,23,24 47:1,11
**mailed** 47:6,25
**MAILMAN** 2:4,8
**major** 11:11
**making** 51:7
**manager** 9:7,8,16 9:18,21 10:16 19:21
**manner** 8:12
**manual** 13:14,18 15:15 16:5,13
**manually** 39:22
**March** 19:17 20:1
**mark** 7:2,5 13:18 18:19 33:24 47:15
**marked** 7:6 13:25 14:1,2 18:22,23 19:1 23:19,20 34:3,4 37:25 47:17,18 49:12
**Market** 2:5,9
**marking** 49:7
**Martin** 3:1 5:21
**martin.thornthwa...** 3:3
**match** 13:7 20:17 21:9,16,21 28:3,6
**matches** 41:14,23 42:3
**matching** 22:17,25 40:21,22
**matter** 5:3 52:3
**mean** 24:9 25:5,12 26:21 41:3
**means** 20:15 26:1,3 26:25 41:10,21,22
**meet** 49:16
**mentioned** 44:20
**met** 6:11
**minute** 14:23 19:5
**minutes** 37:16,25
**misspeaking** 49:14
**mistake** 36:21
**MIZRAHI** 2:12
**moment** 6:11 40:1 48:10
**morning** 48:19
**mute** 37:18

N

**N** 2:1
**name** 5:10 6:8,12 6:20 11:14 33:9 33:15 43:22 44:10 51:10
**nature** 36:16,17 38:6
**need** 37:7 49:9

51:17
**neither** 50:10
**never** 35:7 36:8 44:7
**New** 1:24 2:14
**non-match** 7:11 10:8 13:3,4,9,15 16:2,10,18,18 17:6,8,11,15,16 18:2,7 19:15,22 20:9,16 21:22 22:2,24 23:9 26:19,23 27:4,6 27:12,25 28:14 29:6,16,25 30:7,9 30:19,20,22,23,25 31:7,9,12,18,21 32:12,15 35:6,22 36:1,13,17,24 37:2 39:7,10,12 39:16,20 40:3,17 42:8,14,23 43:2 44:24 45:21
**non-matches** 10:11 16:25 32:19 33:2 33:6,9
**non-matching** 22:3 23:5 45:17 46:1
**North** 11:4,5,15
**Northern** 1:1 5:6 6:15
**notary** 51:18
**note** 16:14 25:2
**noted** 51:8 53:10
**notes** 24:15,16
**notice** 4:11 6:17,24 7:9,25 44:12
**number** 16:14 17:4 17:14 18:7,9 20:2 23:13 29:15 31:24 32:11 33:1,8 40:3 40:4 47:16
**numbered** 1:14
**numbers** 32:2

**O**

**oath** 6:5 8:14,20
**objection** 20:18 21:2,11,18,24 22:9 25:13 30:3 36:2 40:25 41:24 42:20 45:9 46:18
**objections** 4:13 18:16 19:14
**occasion** 16:24
**October** 28:21
**offender** 25:2,22
**office** 11:20
**Oh** 11:8
**Ohio** 1:1 5:6 6:15 47:8,12 48:1
**Okay** 12:14 14:21 14:24 17:9 18:11 18:14 19:2 21:5 22:6 24:1 25:21 25:25 26:5,10 27:2,9,20 28:2,8 28:25 29:5,10 30:17,22 31:15,24 32:3,7 33:4,13,19 34:8,17 35:1,20 36:10 37:10 38:3 39:2 40:16 41:19 42:6,17,22 43:11 43:17 44:9 46:12 46:15,22 47:19,25 49:17
**one-page** 23:13
**one-third** 40:11 41:20
**operating** 46:6
**operation** 16:16
**operations** 9:7,8,16 9:18,20 10:16 16:23 33:5
**operator** 35:20,24 36:7,12,16,20
**oral** 1:11 50:6
**order** 34:12 48:25 49:3,5
**original** 51:20
**outcome** 50:14
**outlined** 49:3
**overall** 9:11 32:2
**override** 28:10

**P**

**P** 2:1,1
**P.C** 2:4,8
**page** 4:2,9 13:21,23 14:8 15:5 16:13 16:15 19:11 20:7 20:8 31:17,17 35:1,16 38:5,12 38:19,23 40:2 52:4 53:1
**pages** 15:14 16:5,5
**Park** 2:18
**part** 5:25 16:4 17:24 18:15 24:6 26:5 27:7 41:10,22 42:2 45:7,22,24 46:4 49:10,12
**participating** 5:18
**particular** 24:22 30:19 34:22
**parties** 50:11
**Pennsylvania** 1:23 2:6,10 8:19 50:20
**people** 10:15,19 41:21 42:4
**percent** 22:7
**percentage** 42:7
**period** 15:25 19:16 19:17 20:1,3
**person** 39:9 43:22 44:8
**person's** 42:18
**personal** 6:2 40:22
**Philadelphia** 1:23 2:6,10 5:17 50:20
**phone** 2:6,10,14,19 2:23 3:3 34:20,24 35:18,19 37:18
**picks** 13:24
**Pike** 1:24
**place** 5:8 14:14 15:20,24 21:10 43:7 49:1
**plaintiff** 4:10,14 5:15 18:17
**plaintiffs** 1:6,12 2:3 8:1,3
**Plaza** 2:13,18
**please** 5:13 6:8 7:4 11:6 13:24 14:16 18:18,24 20:7,23 23:14 33:22,24 35:4 38:17 41:2 42:1 45:12 48:10 49:7
**point** 5:23 27:21 37:12,14
**policies** 7:10,16 10:2,10 12:10 13:2,14,22 14:10 14:13,18 15:16,19 15:23 33:13 44:13
**policy** 4:12 22:1,11 22:13,14
**portal** 34:14,19,24 35:18 38:23,25 39:22
**portion** 13:17 41:6 41:8
**position** 19:21
**positions** 9:15
**possible** 45:3
**prepare** 44:11
**prepared** 7:13,23 8:7 49:18
**preparing** 12:2 18:1 23:23 27:23 34:5
**prescribes** 49:1
**present** 3:4 14:15 14:22,25 19:18 20:2
**presently** 11:20
**presumably** 31:6
**previously** 8:10
**printed** 25:11,19 26:1,3
**procedure** 1:19 13:14 43:7,12 46:6 49:1,6
**procedures** 4:12 7:10,16 10:3,11 12:11 13:2,22 14:10,13,18 15:16 15:19,23 33:14 44:13
**proceeding** 8:17 50:12
**proceedings** 7:3
**process** 9:22 10:14 24:7,10 45:25 49:3
**processed** 45:17
**processing** 34:9
**produced** 1:12 16:14 18:15
**promptly** 49:8 51:21
**properly** 36:24
**propounded** 53:9
**protective** 48:25 49:3,4
**provide** 34:15 35:4 46:16 49:6
**provided** 33:12 51:12,17
**public** 51:18
**pull** 32:1
**purposes** 7:3 13:19 18:19 23:12 47:15
**pursuant** 1:18 6:17
**put** 14:5 24:16,17 37:18 43:14

**Q**

**question** 12:18 14:16 15:10,11 17:14 19:17 20:21 20:23,24 21:5 29:12 31:4,5 35:14 37:8 38:8 38:17 39:8,9 44:1 45:11
**questions** 21:2 48:23 53:9
**quote** 7:11,11 39:6

**R**

**R** 2:1,21
**Raether** 2:17 5:19 5:19 20:18,22 21:11,18,24 22:9 25:13 30:3 35:11 36:2 37:7,11,16 40:25 41:24 42:20 45:9 46:18 48:22 49:14,19
**read** 24:19 48:23 51:2,3 53:6
**reading** 25:17 48:3
**reads** 8:1 13:21
**Real** 2:22
**really** 20:16 30:16
**RealPage** 1:8,17 3:1 4:12 5:4,9,20 5:22 6:1,14,18 7:8 7:17,17 8:12 9:2,9 9:11,15 10:3,8 11:21,24 12:4,11 12:15,21,22 13:4 13:9,13,22 14:9 14:19 16:2,25 17:11,22 18:7 19:14 20:10,14 21:6,8,20 22:1 26:21 27:5 31:19 32:11,14,21 34:9 35:20 38:15,20 39:4,9,17,22 42:6 42:19,23 43:2 44:6,13 45:14,19 45:25 46:5,10 47:6,11,21 48:5 52:3
**RealPage's** 7:10,15 8:1,3,5 40:21 45:6
**reason** 21:8 51:5,9 52:4
**reasons** 35:5
**Rebecca** 6:10
**recall** 34:25 36:22 40:4 47:9
**receive** 46:21 51:22
**received** 17:17 18:7 19:14

**receives** 17:11
**Recess** 37:21 48:14
**recognize** 14:4
**record** 5:1,14 6:9 6:11 7:3,11,18,19 8:19 13:7,10,25 14:7 16:18,19 17:10,13 20:16 21:15,21 22:3,17 22:22 23:4 25:6 26:1 27:10 28:1,2 28:6,13 30:12 31:13,21 37:20,23 39:15 40:8,12,16 40:20,23 41:4,6,8 41:11,23 42:3,8 42:10,15,17,24 43:3,6,8,16 44:15 44:16,24 46:1 48:10,13,16,21 49:18,21 50:7
**records** 16:16,17 20:10,14 21:7,9,9 27:1 31:19 35:6 35:22 41:20 43:14 45:20
**regarding** 15:6,16 15:17 16:6
**regular** 46:23,24 47:1
**regularly** 44:19
**related** 8:3 13:2 50:11
**remaining** 40:11
**remember** 11:8 18:9 41:18 43:23 44:10
**removal** 31:21
**removals** 31:25 32:4,12 40:4
**remove** 7:18 21:16 22:14 23:5 42:23 43:3 44:14 45:20 46:1
**removed** 20:10 21:7,9 22:3,18 28:1,14 29:1 30:13 31:13,19 40:8,12,16,20 41:4 42:9,15,18 43:14,16 44:24
**removing** 20:14 21:20
**repeat** 12:18 31:5 33:22 35:13 38:17 43:25 45:12
**report** 7:12,17 9:25 10:1 13:11 15:7 16:20 31:22,24 32:1 34:16 43:8 44:14,25 45:1,14 47:7
**reported** 1:16 10:23
**reporter** 5:11 7:5 12:18 13:20 14:2 15:10 18:19,21,23 19:1 23:15,20 31:3 34:4 35:10 35:13 38:7 43:25 47:18 50:2
**Reporters** 1:22
**reporting** 1:22 10:15,19 50:19
**reports** 7:20 10:22 15:17,20 16:7 32:25,25 44:16
**representative** 8:11
**representatives** 6:19
**request** 46:13,15 47:24 49:11
**requested** 19:16,17 46:9
**requests** 8:4 9:22 10:4 12:6,21 46:8
**require** 51:21
**required** 33:15
**requires** 8:20
**rescored** 28:20
**reserved** 50:9
**respect** 12:20 27:24 33:8,19 38:9 46:8
**responded** 27:8
**responses** 4:13 8:5 18:16
**responsibilities** 9:19
**restate** 20:23,24 41:2 45:22
**resubmitted** 28:19
**result** 34:18 38:4,11 42:8
**resulted** 31:21
**retrieve** 18:11
**Return** 51:20
**reverse** 30:14
**reversed** 28:9
**review** 12:3,15,21 16:16 18:2,5,25 50:9
**reviewed** 12:6 19:6
**revised** 4:10 6:24
**revises** 7:17 44:14
**Richardson** 1:17 3:2 5:9 11:21,23
**right** 8:25 12:25,25 13:13,17 15:1 16:4 18:9 19:25 21:15 22:15,21 23:1,11 24:8,18 25:1,10 26:14 27:14 28:17 32:14 40:9 44:5 45:5 46:4 48:8 51:3
**road** 44:25
**ron.raether@trou...** 2:20
**Ronald** 2:17 5:19
**rooms** 8:18
**Rule** 5:24
**rules** 1:18 20:25 21:1 51:21
**run** 31:22 43:15

**S**

**S** 2:1
**s/Christine** 50:18
**Salesforce** 17:24 20:4 29:9,14,15 30:17,23 31:1,7 31:11,23 32:4,9 33:11 39:5,21 44:23
**San** 2:23
**Sanders** 2:17,21 5:20
**saying** 42:2,4
**says** 15:3 16:15 19:13 23:18 25:10 26:18 27:10 30:8 34:15 35:3,6 36:8 39:14
**scenario** 32:24
**scenarios** 39:19
**school** 11:2,3
**schooling** 11:18
**screening** 1:8 4:12 9:25 10:1 13:22 14:10 16:15 24:7
**search** 17:10,13 30:23
**searched** 32:19
**searching** 44:23
**second** 35:1,16 38:5,12
**section** 15:2,6 16:9 27:8,10 35:5
**see** 7:21,22 8:5,6 10:22,22 12:21 15:3,7,15 16:21 19:18,19 20:11,12 25:3,18 26:15,19 27:3,16,20 28:9 28:10 29:11 30:1 30:9,14 33:23 35:7,8 38:5,19,23 39:20 45:2
**seen** 6:24 19:3,8 23:22 24:19 34:5 34:7 44:7 47:20
**sent** 39:11
**separate** 8:18
**September** 4:17
**Set** 4:14 18:17
**seven** 32:23
**sheet** 51:6,9,10,14 51:20 52:1 53:10
**shorthand** 1:16 50:2
**show** 7:2 13:17 15:1 17:17 18:14 23:11 30:1,25 47:14
**showing** 13:10 16:19
**shows** 24:16
**side** 33:17
**sign** 48:24 51:10,11 51:15,16
**signature** 50:9 51:19 53:1,17
**signing** 51:13
**similarly** 1:5
**Simons** 1:15 5:12 50:2,18,18
**simply** 40:20
**sir** 7:14 8:9,24 9:3 9:17 10:5,24 14:23 16:8 18:5 18:13 19:5,5 20:5 24:21 25:7 28:20 33:7 40:19 45:18 46:7 47:13
**situated** 1:5
**situation** 13:10 26:23 37:2
**situations** 10:12 13:3,15 17:5 24:8 26:23 32:15 34:18 36:10,19 42:9,15 42:22 43:1 44:23
**six** 25:1
**software** 24:6 29:23,24 30:13 32:7
**somebody** 44:5,6
**sorry** 9:5 15:12 17:19 22:12 25:16 29:12,20 35:15 37:10 43:21
**Soumilas** 2:4 4:5 5:15,16,23 6:7,12 13:20 14:3 15:12 18:18,24 19:2 23:17,21 25:16 33:24 35:15 37:14 37:17,24 44:2 47:19 48:9,17 49:4,17
**space** 51:12,17
**speak** 44:3
**speaking** 43:17 44:9
**specialist** 5:11 16:16
**specific** 35:4
**specifically** 10:6 21:3
**speculation** 36:3 41:1
**spend** 37:24
**spoke** 43:22
**standard** 46:6
**start** 11:2 15:10
**started** 33:16
**state** 1:16 5:13 6:8 50:1,3
**statement** 29:3 34:15
**statements** 50:8
**states** 1:1 5:5 6:14 7:15 17:7 19:14
**stating** 35:6 36:8
**statistical** 40:2
**stay** 41:21
**stays** 42:18
**sticking** 20:6
**Street** 1:23 2:5,9 50:20
**studied** 11:7
**studies** 11:12
**study** 32:19 42:7,14
**subject** 7:12 19:13 51:13
**submit** 33:20
**submitted** 24:23 26:25 27:7,9 30:21,24
**subsequent** 7:20 43:15 44:16

**substance** 51:4,8
**Suite** 1:23 2:5,9,18 2:22 50:20
**summary** 9:14 10:25
**Summit** 1:22 50:19
**supervisor** 9:17,20
**supplemental** 19:12 20:8 31:17
**supposed** 24:12 30:1,8,13
**sure** 20:24 23:24 30:4,16 43:5
**survey** 32:18
**swear** 5:24
**sworn** 1:13 6:4 50:5
**system** 17:22,24 20:4 23:9 24:10 26:6 27:11 29:9 29:10,14,15,17,17 29:21,23,24 30:6 30:13,17,18 31:7 31:11 32:7,9,11 33:11 39:6,10,11
**systems** 24:5

**T**

**table** 14:8 15:2 43:15,15 44:20
**take** 6:16 9:1 10:6 23:1 26:6 42:17
**taken** 1:13 8:20 37:21 48:14 50:13 52:2
**talk** 35:11
**team** 23:8
**telephone** 2:12 37:8 38:4,11 39:13,14
**tell** 8:21 9:14 11:1,6 11:9,10 17:10 19:20 20:25 24:22 31:11,24 35:17 43:11 45:5
**telling** 21:4
**tells** 21:3
**ten** 10:19 11:9
**tenant** 13:11 24:14 33:10 40:13 41:12
**tenant's** 24:10
**term** 13:4
**terms** 33:15
**testified** 6:5 30:18 32:8,9
**testify** 6:19,21 7:8 7:13,23 8:7 13:1 41:20 44:11
**testifying** 29:5
**testimony** 8:11,12 8:14 12:2 18:1 23:23 27:23 34:6 41:25 44:12 50:7 51:12
**Texas** 1:16,18 3:2 5:9 8:19 11:23 50:1,3,18
**Thank** 14:3 19:2 23:21 48:18 49:13 49:17
**thing** 42:3
**things** 22:22 49:7
**think** 21:8 25:13 35:11 48:10,25
**third** 8:7 41:3
**thirty** 51:22
**Thornthwaite** 3:1 5:21,21
**thousand** 32:25
**three** 6:21
**time** 5:3 13:3 14:17 14:18 15:25 16:23 19:16,17 20:1,3 29:13 37:20,23 48:13,16,19 49:21
**timeframe** 15:22
**title** 9:4,6
**today** 5:11,17 6:16 6:21 7:8 8:12,22 12:2 13:19 14:21 18:1,6,20 23:12 23:23 26:24 27:23 34:6 40:13 41:19 47:15
**today's** 7:3 8:17
**told** 15:25
**top** 18:9 19:13 23:18 35:3
**topic** 7:9,13,15,23 7:25 8:8
**topics** 6:19,21,25
**track** 17:7 32:11
**tracked** 18:3 32:15
**tracking** 17:17,19 17:21 18:3 20:3
**tracks** 17:4
**transcript** 49:13 50:6 53:6
**transcription** 53:8
**translates** 39:5
**Troutman** 2:17,21 5:20
**true** 50:6 53:7
**truth** 8:21
**try** 15:12 36:5 38:9
**trying** 27:2 39:2
**two** 19:10 39:19 47:3,5
**two-thirds** 40:7,7
**type** 10:7,12 16:24 22:22 24:2,13 25:5 27:12 32:18 32:19 33:5,14 35:25 36:11 42:6 42:13 46:13 47:20
**typed** 38:24
**types** 10:3
**typical** 45:8 48:4

**U**

**UNC** 11:17
**underneath** 35:5
**understand** 6:22 8:23 39:2 43:14 45:11
**understanding** 7:7
**United** 1:1 5:5 6:14
**University** 11:15 47:8,12 48:1
**university-level** 11:18
**unusual** 45:13,16 45:19,24
**use** 27:6 29:23 32:1 34:9 36:1
**uses** 24:7
**usually** 46:16

**V**

**v** 1:7 52:3
**vague** 20:18 21:11 22:9 45:9
**version** 14:22,25
**versus** 5:4 9:24
**video** 5:2,11,18
**videoconference** 2:4,8
**Videographer** 3:5 5:1 37:19,22 48:12,15,20 49:20
**Videographers** 1:22
**VIDEOTAPED** 1:11
**viewed** 25:3,8,22
**VP** 3:1

**W**

**wait** 37:7
**waiving** 19:14
**Walnut** 1:23 50:20
**want** 9:25 15:1 18:14 23:11 24:9 34:16 37:15 46:21 48:5
**wanted** 18:12 19:25 33:9
**way** 26:13 30:6,19 30:24 44:22 45:12 47:3
**ways** 34:13 48:4
**we'll** 12:25 23:1 47:14 49:2,15
**we're** 14:7 23:12 37:11
**we've** 26:23 37:13 37:25
**web** 34:14,23 35:18 38:22,24 39:11,21
**week** 49:9,10
**went** 29:1
**West** 2:13
**wish** 10:22 35:4
**wishes** 26:6
**witness** 1:12 4:2 5:24 37:10 48:23 49:18 50:5,7 51:1 51:16,16,17,18
**WITNESSED** 53:21
**word** 36:1
**words** 27:6 38:24 39:1,3
**work** 9:2 24:20 44:19,19 47:21 49:15
**worked** 9:11 11:23
**works** 30:6
**wouldn't** 21:16
**wrapped** 27:19
**written** 35:2
**www.summitrep...** 1:25

**X**

**Y**

**Yeah** 30:4 33:23 36:5 39:19 42:2
**year** 9:10 17:10,10 17:15 18:8
**years** 11:9 18:4 32:23 36:20
**yesterday** 44:4,10
**York** 2:14

**Z**

**0**

**08037** 1:24

**1**

**1** 4:10 7:3,6 49:12
**1:19-cv-501-JG** 1:7 5:7
**10:09** 37:20,21
**10:25** 37:21,23
**10:44** 48:13,14
**10:46** 48:14,16
**10:48** 1:15 49:21,22
**11** 4:17 28:21
**11,232** 20:10 21:6 31:19
**11181** 50:18
**11201** 2:14
**11682** 2:22
**12th** 2:13 50:15
**14** 4:12 13:5
**1400** 2:18
**15** 7:15 24:23 44:11
**1500** 1:23 50:20
**1600** 2:5,9
**1610** 1:23 50:20
**16C** 7:25
**17,000** 29:6
**17,000-plus** 29:16
**17,104** 19:15 20:9 21:6 31:18
**18** 4:13
**19102** 1:23 50:20
**19103** 2:6,10

**2**

**2** 4:12 13:18,25 14:1,5 38:19,23
**2012** 9:13 11:25 14:15,20
**2013** 13:5 15:21 16:1
**2014** 15:21 16:1 19:18
**2017** 4:17 20:1 24:23 25:18 28:9 28:21 30:2,10 31:8
**2019** 1:14 5:3 18:8 50:15 52:2 53:7
**21** 25:11
**215** 1:24 2:6,10
**215)985-2400** 50:21
**21st** 25:2,15,18
**2201** 1:17 3:2
**23** 4:15
**2510** 2:5,9

**28th** 25:15
**29** 30:10
**29th** 26:15 28:8 30:2

**3**

**3** 4:13 18:19,22 29:7 31:15 32:10 40:1
**30(b)(6)** 5:24,25
**300** 2:13
**325-7243** 3:3
**34** 4:16

**4**

**4** 4:15 23:12,19 29:17 32:9
**400** 2:22
**41** 33:25
**42** 33:25
**424** 1:24
**447-8648** 1:24
**46** 47:16
**47** 4:17
**49** 47:16

**5**

**5** 2:18 4:16 19:11 33:24 34:3,5 38:1 38:10,19
**500** 32:25
**509-6044** 2:23
**538** 13:23
**541** 13:23
**56** 23:13
**567-3315** 1:24
**575-4175** 2:14
**59** 4:15 23:18

**6**

**6** 4:5,17 20:7 31:17 40:2 47:15,17 49:12
**609** 1:24
**610** 13:24
**614** 16:14
**622-2722** 2:19
**623** 13:24
**65** 22:7
**69** 15:5,15 16:5
**6th** 19:17

**7**

**7** 4:10
**7/31/2021** 50:19
**73** 16:13
**735-8600** 2:6,10
**75082** 1:18 3:2

**8**

**800** 1:24
**82** 15:15 16:6
**858** 2:23
**877** 3:3

**9**

**9** 1:14 7:9 52:2 53:6
**9:10** 1:14 5:3
**92130** 2:23
**92614** 2:19
**929** 2:14
**949** 2:19
**985-2400** 1:24
**9th** 5:3

# Exhibit 13

| INTERSTATE REALTY MANAGEMENT | Marietta Road High-rise<br>2295 Marietta Rd NW Atlanta, GA 30318<br>Phone: 404.606.7803/Fax:404.724.4178<br>For TTY/Relay Service Dial 711 |
|---|---|

Date: Diane D. Jones

RE: Suitability Denial Notice – Criminal History

Diane D. Jones:

Please be advised that we have determined that you will be denied or determined ineligible for housing program assistance because you or a member of your household have an unacceptable record of criminal and/or drug related activity. We have attached the criminal history record which includes the offense which this decision is based. Specifically, the denial is based on the following offenses: **See attached.**

You have the right to an informal review if you disagree with this decision. If you request an informal review, management will schedule an informal review with a person who did not make the decision. Informal reviews are held by appointment only. **You have ten (10) days form the date of receipt of this letter (which shall be deemed to be no later than thirteen (13) days form the date of this letter) to request review in writing.**

For your convenience, we have included an Informal Review Request Form that you may complete and return to the management office. If you require further assistance with making a written request, your may come into the management office before the end of the ten (10) day period to request assistance with your written request. Written requests for an informal review must be mailed to the following address listed above. If you do submit a written request for an informal review within this time period, the decision will be considered final.

Prior to the informal review, you may request an opportunity to examine your application file and to copy any relevant documents at your cost. At the informal review, you may present evidence of mitigating circumstances, the severity of the crime, rehabilitation or any facts that show you would not pose a danger to the community. You may also bring witnesses, representative, (including attorneys) or letters of support to the informal review. In the event we present any witnesses, you will have a right to cross-examine them.

If you did not commit the criminal offense and you have been cleared of criminal charges, you must bring to the hearing document showing the final disposition of the charges.

If you have questions about the informal review process or if you require a reasonable accommodation with respect to the review process due to a disability, please contact 404.609.7803.

Sincerely,

*Janice R. Hall*

Janice Hall
Property Manager

# Exhibit 14



Case
SF04314009

Customize Page | Printable View | Help for this Page

Show Feed

Case Comments [3] | CDT Case Note [2] | DocuSign Status [0] | Articles [0] | Action Plans [1] | Emails [2] | Open Activities [0] | Activity History [11] | Case History [16] | Attachments [0] | Related Cases [0] | Custom History Tracking [0]

**Case Detail** Edit | Delete | Close Case | Clone | Sharing | Create Action Plan | Request Additional Information

| | | | |
|---|---|---|---|
| Case Number | SF04314009 [View Hierarchy] | Case Record Type | Consumer Screening [Change] |
| Contact Name | Diane D Jones | Saturday | ☐ |
| Account Name | Consumer-Realpage | Sunday | ☐ |
| Case Owner | Screening - Consumer [Change] | Date/Time Opened | 8/28/2017 2:44 PM |
| Contact Phone | (216) 640-5419 | Date/Time Closed | 8/29/2017 9:26 AM |
| Contact Email | facialcleanse13@gmail.com | Area | CON: Consumer |
| Time Zone | Eastern | Sub-Area | CON: Dispute - Pilot |
| Defect Number Legacy | | Status | Completed |
| Subject | CON: Dispute - Pilot | Priority | P2 - High |
| Description | Consumer Disputing Criminal Non Match | Case Origin | Phone |
| Screening Property | MARIETTA ROAD - 7302 | Delivery Preference | Email |
| Site Loc-Acct#-PMC | ATLANTA GA 3521464 MICHAELS MANAGEMENT-AFFORDABLE, LLC | Closed When Created | ☐ |
| Instruction Letter Sent | ✓ | Business Days | 2 |
| BBB Complaint | ☐ | Business Days Worked from Now | 495 |
| BBB Case Number | | Action Plan Start Date | 8/28/2017 |
| Social Media Request | | Days Open | 1.00 |
| Social Media Received Date | | Action Plan Days Open | 1.00 |
| | | Case Cycle | |
| Parent PMC | | Alert | ✓ |
| Contact is VIP | ☐ | Escalated to Legal | ☐ |
| Special States | | Days in Status | 691 |
| Parent Account Owner | | FCRA Start Date | 8/28/2017 |
| PROPERTY TYPES | | Preferred Method of Contact | |
| Closed Date | 8/29/2017 | Existing SF Case Number | |
| Parent Case | | Docusign Envelope | |
| Inquiry Dates | | | |

REALPAGE/JONES 000166

**Custom Links**

Digital Dashboard | OneSite IA | Report Manager
Equifax | Experian | TransUnion
DNB | Domin 8

G Drive Folder: Consumer Dispute Electronic Records 2017\1-Criminal Non-Match\Jones, Diane D 9799

G Drive Link: Link

**▼ Screening Detail**

| | | | |
|---|---|---|---|
| Identity Theft | ☐ | Sent Non-Response Letter | ☐ |
| Identity Theft Date/Time | | Non-Response Letter Sent Date and Time | |
| Attorney/Firm Name | | Sent Post-Closure Vendor Response | ☐ |
| Rental History 2nd Notice | ☐ | Post-Closure Date and Time | |
| 2nd Notice Sent | | | |

**▼ CDT**

| | | | |
|---|---|---|---|
| | | CDT Escalation | |
| Suppressed | Completed | Updated | |
| CDT Consumer Comments | The criminal information included in the report provided to Marietta Road apartment community on 8/15/2017 was derived from public records from the Georgia Dept of Corrections (SPL). Based upon our investigation, we have determined that the records do not belong to you and the records will be removed from your file. | CDT Client Comments | The criminal information included in the report provided on 8/15/2017 was derived from public records. Based upon our investigation, we have determined that the records reported do not belong to your applicant and the records will be removed from the applicants file. |
| Days in Escalation | 0 | Days Pending SUPPRESSION | 0 |
| Days Pending UPDATE | 0 | SUPPRESSION/UPDATE NOTES | non match based on name |

**▼ System Information**

| | | | |
|---|---|---|---|
| Created By | MarcoAngelo Losantas, 8/28/2017 2:44 PM | Last Modified By | RaymondJohn Eustaquio, 8/29/2017 9:26 AM |
| | | Last Modified By Owner | |

**▼ Bulk Task Section**

**Tasks** Update Tasks Refresh Tasks

| Id | Subject | Status | Owner | Comments |
|---|---|---|---|---|
| 00T3700001IWk6bEAD | Obtain Consumer info- Set Dispute Type | Completed | RaymondJohn Eust | |
| 00T3700001IWkOHEA1 | Review Screening /Escalate to CDT | Completed | RaymondJohn Eust | |
| 00T3700001IWkSvEAL | Call | Completed | RaymondJohn Eust | Left detailed VM to consumer and advise that dispute h |
| 00T3700001IWkfBEAT | CDT Results/Response Entered | Completed | Jennifer Castillo | |
| 00T3700001IXQrdEAH | Record Suppressed Updated | Completed | Jennifer Castillo | |
| 00T3700001IXQreEAH | Notify Client Update OneSite | Completed | RaymondJohn Eust | |
| 00T3700001IXQrfEAH | Send Closing Letter to Consumer | Completed | RaymondJohn Eust | |
| 00T3700001IXkQyEAL | Call | Completed | RaymondJohn Eust | Spoke to Aisha (Leasing Agent) and provided the resul |
| 00T3700001IXliuEAD | Call | Completed | RaymondJohn Eust | Left detailed VM to consumer informing the result on h |
| 00T3700001IXm3yEAD | Email: Consumer Dispute Results for Diane D Jones - ( | Closed Cancelled | RaymondJohn Eust | Additional To: facialcleanse13@gmail.com CC: BCC: ra |
| 00T3700001IXmDjEAL | Email: Diane D Jones - LeasingDesk Screening Consur | Closed Cancelled | RaymondJohn Eust | Additional To: mariettaroad@tmo.com CC: BCC: raymo |



**Case Comments** [New] Case Comments Help

| Action | Public | Comment |
|---|---|---|
| Edit \| Del \| Make Public | | **Created By: RaymondJohn Eustaquio (8/29/2017 9:18 AM)**<br>Outbound Email: sent consumer and property reinvestigation results; added activity note in OneSite |
| Edit \| Del \| Make Public | | **Created By: Terry Heronime (8/28/2017 3:06 PM) \| Last Modified By: Terry Heronime (8/28/2017 3:12 PM)**<br>Direct Call - Took phone call from Marco, verified consumer's identity with PII (SSN and DOB) and followed along with the information the consumer was providing. She stated that records were reporting for names that weren't even hers from a place she's never been. I informed the consumer that we would escalate this as a NM case and have a response in 24 hours.<br><br>DOB: 08/13/1961<br><br>SSN: xxx-xx-9799 |
| Edit \| Del \| Make Public | | **Created By: MarcoAngelo Losantas (8/28/2017 2:50 PM)**<br>Consumer wants to speak wit ha supervisor. She is asking on how our software works because it pulled up information that are incorrect. Already said tat she can file a dispute so we can check if its really not her. Consumer insist on speaking to a supervisor because if not she will be contacting her lawyer.<br><br>[8/28/2017 2:48 PM] Terry Heronime:<br>1 sec<br>[8/28/2017 2:48 PM] MarcoAngelo Losantas:<br>thanks<br>[8/28/2017 2:49 PM] Terry Heronime:<br>1016211<br>[8/28/2017 2:49 PM] MarcoAngelo Losantas:<br>thank you |

**CDT Case Note** [New CDT Case Note] CDT Case Note Help

| Action | CDT Case Notes Name | CDT Note | Created Date | Created By |
|---|---|---|---|---|
| | CDTNotes-34947 | **Updated**<br>3521464 Marietta Road - 7302 59<br>Consumer disputing non-match criminal records.<br>Date of Birth: 8/13/1961<br>Last 4 of Social: xxx - xx - 9799 | 8/28/2017 | RaymondJohn Eustaquio, 8/28/2017 4:03 PM |
| | CDTNotes-34945 | Consumer disputing non-match criminal records.<br>Date of Birth: 8/13/1961<br>Last 4 of Social: xxx - xx - 9799 | 8/28/2017 | RaymondJohn Eustaquio, 8/28/2017 4:02 PM |

**DocuSign Status** DocuSign Status Help

No records to display

**Articles** [Find Articles] Articles Help

No Articles Attached

**Action Plans** [New Action Plan] Action Plans Help

| Action | Action Plan Name | Start Date | Step Total | WhatId | Owner Last Name | Overall Task Status | Last Modified Date |
|---|---|---|---|---|---|---|---|
| Edit \| Del | CON: Dispute - Pilot - | 8/28/2017 | 6 | | Eustaquio | 6 of 6 Completed | 8/29/2017 |

3 | Page

REALPAGE/JONES 000168

366

**Emails** [Send an Email] Emails Help

| Action | Status | | Subject | Email Address | Message Date |
|---|---|---|---|---|---|
| Reply \| To All \| Del | Sent | | Consumer Dispute Results for Diane D Jones - Case # SF04314009 [ ref: 00D0... *Dear Diane D Jones, Thank you for contacting us regarding your issue. We wou...* | facialcleanse13@gmail.com | 8/29/2017 9:24 AM |
| Reply \| To All \| Del | Sent | | Diane D Jones - LeasingDesk Screening Consumer Dispute Reinvestigation Result... *Recently, LeasingDesk Screening received a Consumer Dispute from applicant Di...* | mariettaroad@tmo.com | 8/29/2017 9:21 AM |

**Open Activities** [New Task] [New Event] Open Activities Help

No records to display

**Activity History** [Log a Call] [Mail Merge] [Send an Email] [View All] Activity History Help

| Action | Subject | Name | Assigned To | Last Modified Date/Time | Completed Date | Comments (Short) | Time in Minutes | Call Duration |
|---|---|---|---|---|---|---|---|---|
| Edit \| Del | Send Closing Letter to Consumer | | RaymondJohn Eustaquio | 8/29/2017 9:25 AM | 8/29/2017 | | | |
| Edit \| Del | Notify Client Update OneSite | | RaymondJohn Eustaquio | 8/29/2017 9:25 AM | 8/29/2017 | | | |
| Edit \| Del | Email: Consumer Dispute Results for Diane D Jones - Case # SF04314009 [ ref: 00D00heZB. 50037DNtLS:ref ] | Diane D Jones | RaymondJohn Eustaquio | 8/29/2017 9:24 AM | | | | |
| Edit \| Del | Email: Diane D Jones - LeasingDesk Screening Consumer Dispute Reinvestigation Results [ ref: 00D00heZB. 50037DNtLS:ref ] | | RaymondJohn Eustaquio | 8/29/2017 9:21 AM | | | | |
| Edit \| Del | Call | Diane D Jones | RaymondJohn Eustaquio | 8/29/2017 9:18 AM | 8/29/2017 | Left detailed VM to consumer informing the result on his dispute, mentioned that email will be sent shortly. | | |
| Edit \| Del | Call | Diane D Jones | RaymondJohn Eustaquio | 8/29/2017 9:15 AM | 8/29/2017 | Spoke to Aisha (Leasing Agent) and provided the result on consumer's dispute. | | |
| Edit \| Del | Record Suppressed Updated | | Jennifer Castillo | 8/29/2017 5:07 AM | 8/29/2017 | | | |
| Edit \| Del | Obtain Consumer info- Set Dispute Type | | RaymondJohn Eustaquio | 8/29/2017 5:07 AM | 8/28/2017 | | | |
| Edit \| Del | Call | Diane D Jones | RaymondJohn Eustaquio | 8/28/2017 4:07 PM | 8/28/2017 | Left detailed VM to consumer and advise that dispute has been forwarded for research | | |
| Edit \| Del | CDT Results/Response Entered | | Jennifer Castillo | 8/29/2017 5:07 AM | 8/29/2017 | | | |
| Edit \| Del | Review Screening /Escalate to CDT | | RaymondJohn Eustaquio | 8/29/2017 5:07 AM | 8/28/2017 | | | |



**Case History**

| Date | User | Connection | Action |
|---|---|---|---|
| 8/29/2017 9:26 AM | RaymondJohn Eustaquio | | Changed **Status** from Closing letter/Resp Sent Consumer/Atty to **Completed**. |
| | | | Closed. |
| 8/29/2017 9:24 AM | RaymondJohn Eustaquio | | Changed **Status** from Suppress/Update Completed to **Closing letter/Resp Sent Consumer/Atty**. |
| 8/29/2017 5:07 AM | Jennifer Castillo | | Changed **Status** from Results Entered/Received -CDT/Vendor/Leg to **Suppress/Update Completed**. |
| 8/29/2017 5:07 AM | Jennifer Castillo | | Changed **Status** from Waiting on CDT/ Vendor/Leg to **Results Entered/Received -CDT/Vendor/Leg**. |
| 8/28/2017 4:09 PM | RaymondJohn Eustaquio | | Changed **Status** from "Confirmed Cons Identity Info Complete" to **Waiting on CDT/ Vendor/Leg**. |
| 8/28/2017 4:09 PM | RaymondJohn Eustaquio | | Changed **Status** from Waiting on CDT/ Vendor/Leg to **"Confirmed Cons Identity Info Complete"**. |
| 8/28/2017 4:08 PM | RaymondJohn Eustaquio | | Changed **Status** from "Confirmed Cons Identity Info Complete" to **Waiting on CDT/ Vendor/Leg**. |
| 8/28/2017 4:08 PM | RaymondJohn Eustaquio | | Changed **Status** from New to **"Confirmed Cons Identity Info Complete"**. |
| 8/28/2017 3:51 PM | Terry Heronime | | Changed **Priority** from P1 - Critical to **P2 - High**. |
| 8/28/2017 3:07 PM | Terry Heronime | | Changed **Subject** from CON: Dispute - Not Determined to **CON: Dispute - Pilot**. |
| | | | Changed **Sub-Area** from CON: Dispute - Not Determined to **CON: Dispute - Pilot**. |
| | | | Changed **Priority** from Medium to **P1 - Critical**. |
| 8/28/2017 2:44 PM | MarcoAngelo Losantas | | Changed **Subject** to **CON: Dispute - Not Determined**. |
| | | | Changed **Case Owner** from MarcoAngelo Losantas to **Screening - Consumer**. |
| | | | Created. |

Case History Help

**Attachments** Attach File — Attachments Help

No records to display

**Related Cases** New Case | Close | Change Owner | Change Status — Related Cases Help

No records to display

**Custom History Tracking** — Custom History Tracking Help

No records to display

**Dispute Results for SF04314009:**

**Email Message Detail** Reply | Reply To All | Forward | Delete — [ Previous | Email Message List | Next

**Information**

| | | | |
|---|---|---|---|
| Parent Case | SF04314009 | Status | Sent |
| Message Date | 8/29/2017 9:24 AM | Last Modified By | RaymondJohn Eustaquio, 8/29/2017 9:24 AM |
| Created By | RaymondJohn Eustaquio, 8/29/2017 9:24 AM | | |

**Address Information**

| | |
|---|---|
| From Address | consumer.relations@leasingdesk.com |
| From Name | Consumer Relations |
| To Address | facialcleanse13@gmail.com |
| CC Address | |
| BCC Address | raymondjohn.eustaquio@realpage.com |

Dear Diane D Jones,

Thank you for contacting us regarding your issue. We would appreciate your feedback by clicking this live link.

Thank you for notifying LeasingDesk Screening regarding the accuracy and/or completeness of certain information that is contained in your consumer file. LeasingDesk does not change information contained in a consumer file if the disputed information is accurate. If LeasingDesk Screening's investigation reveals that the disputed information is inaccurate, incomplete, or cannot be verified, then LeasingDesk Screening will delete or correct the disputed information.

LeasingDesk Screening has investigated your dispute and has notified the sources of the disputed information. Our investigation is now complete. The investigation performed by LeasingDesk Screening **revealed that the disputed information is inaccurate, incomplete, or cannot be verified. LeasingDesk Screening has reported the findings of our investigation to the Marietta Road - 7302 community. The apartment community makes a decision based**

**upon many factors. You may want to review the findings of the reinvestigation with Marietta Road - 7302 and we encourage you to do so.**

Here is a summary of the results of our investigation:

**The criminal information included in the report provided to Marietta Road apartment community on 8/15/2017 was derived from public records from the Georgia Dept of Corrections (SPL). Based upon our investigation, we have determined that the records do not belong to you and the records will be removed from your file.**

You have the right to file with LeasingDesk Screening a brief statement disputing any of the information contained in your file. If you choose to do so, then LeasingDesk Screening will include the statement or a summary of it in future reports that LeasingDesk Screening prepares.

Upon your request, LeasingDesk Screening will provide to you a description of the procedures used to determine the completeness and accuracy of the information in your file, including the name, business address, and telephone number of anyone who furnished information to LeasingDesk Screening. LeasingDesk Screening also will provide to individuals who have received a copy of your consumer report within the past twelve months (1) a copy of your statement or a summary of it, or (2) notice that certain information, if any, has been revised or deleted from our file.

Enclosed is a summary of your rights under the Fair Credit Reporting Act and certain other documents that may be required if you are a resident of a state that may require LeasingDesk Screening to provide you with additional information. Please feel free to contact us with any questions you may have regarding this matter at (866) 934-1124 during normal business hours. You also may contact us in writing at LeasingDesk Screening, Consumer Relations, 2201 Lakeside Blvd. Richardson, Texas 75082-4305.

Sincerely,

LeasingDesk Screening
Consumer Relations
2201 Lakeside Blvd.
Richardson, Texas 75082-4305
1-866-934-1124

Reply | Reply To All | Forward | Delete

**Attachments**

| Action | File Name | Size | Last Modified | Created By |
|---|---|---|---|---|
| Edit \| View \| Del | FCRA Summary of Rights rev 09-2016.pdf | 463KB | 8/29/2017 9:24 AM | RaymondJohn Eustaquio |

**Email Message Detail** Reply | Reply To All | Forward | Delete [ Previous | Email Message List | Next ]

**Information**

| | | | |
|---|---|---|---|
| Parent Case | SF04314009 | Status | Sent |
| Message Date | 8/29/2017 9:21 AM | Last Modified By | RaymondJohn Eustaquio, 8/29/2017 9:21 AM |
| Created By | RaymondJohn Eustaquio, 8/29/2017 9:21 AM | | |

**Address Information**

| | |
|---|---|
| From Address | consumer.relations@leasingdesk.com |
| From Name | Consumer Relations |
| To Address | mariettaroad@tmo.com |
| CC Address | |
| BCC Address | raymondjohn.eustaquio@realpage.com |

Recently, LeasingDesk Screening received a Consumer Dispute from applicant Diane D Jones. Today we are emailing, Marietta Road - 7302, to inform of the following reinvestigation results:

***The criminal information included in the report provided on 8/15/2017 was derived from public records. Based upon our investigation, we have determined that the records reported do not belong to your applicant and the records will be removed from the applicants file.***

**We have added an activity note in OneSite. PLEASE do not rerun the applicant's screening, instead please contact your corporate office or regional manager for a further review of this application.**

Thank you,

LeasingDesk Screening
Consumer Relations
2201 Lakeside Blvd.
Richardson, Texas 75082-4305
1-866-934-1124

*This information is for LeasingDesk Screening client use only. Please do not forward.

**Case Detail**

| | | | |
|---|---|---|---|
| Case Number | SF04335198 [View Hierarchy] | Case Record Type | Consumer Screening [Change] |
| Contact Name | Diane D Jones | Saturday | ☐ |
| Account Name | Consumer-Realpage | Sunday | ☐ |
| Case Owner | Screening - Consumer [Change] | Date/Time Opened | 9/10/2017 4:27 PM |
| Contact Phone | (216) 640-5419 | Date/Time Closed | 9/11/2017 1:12 PM |
| Contact Email | facialcleanse13@gmail.com | Area | CON: Consumer |
| Time Zone | Eastern | Sub-Area | CON: Dispute - Updated File Copy |
| Defect Number Legacy | | Status | Completed |
| Subject | CON: Dispute - Updated File Copy | Priority | Medium |
| Description | Consumer requested for updated file copy | Case Origin | Email |
| Screening Property | MARIETTA ROAD - 7302 | Delivery Preference | Email |
| Site Loc-Acct#-PMC | ATLANTA GA 3521464 MICHAELS MANAGEMENT-AFFORDABLE, LLC | Closed When Created | ☐ |
| Instruction Letter Sent | ☑ | Business Days | 1 |
| BBB Complaint | ☐ | Business Days Worked from Now | 485 |
| BBB Case Number | | Action Plan Start Date | 9/8/2017 |
| Social Media Request | | Days Open | 1.00 |
| Social Media Received Date | | Action Plan Days Open | 3.00 |
| | | Case Cycle | |
| Parent PMC | | Alert | ☑ |
| Contact is VIP | ☐ | Escalated to Legal | ☐ |
| Special States | | Days in Status | 678 |
| Parent Account Owner | | FCRA Start Date | 9/8/2017 |
| PROPERTY TYPES | | Preferred Method of Contact | |

| Case | Closed Date | 9/11/2017 | Existing SF Case Number | |
|---|---|---|---|---|
| | Parent Case | | Docusign Envelope | |
| | Inquiry Dates | | | |

Case Comments[1] | CDT Case Note[0] | DocuSign Status[0] | Articles[0] | Action Plans[1] | Emails[1] | Open Activities[0] | Activity History[6] | Case History[8] | Attachments[0] | Related Cases[0] | Custom History Tracking[0]

**Custom Links**

| | | | |
|---|---|---|---|
| | Digital Dashboard | OneSite IA | Report Manager |
| | Equifax | Experian | TransUnion |
| | DNB | Domin 8 | |
| G Drive Folder | Consumer Dispute Electronic Records 2017\Jones, Diane D 9799 | | |
| G Drive Link | Link | | |

**▼ Screening Detail**

| | | | |
|---|---|---|---|
| Identity Theft | ☐ | Sent Non-Response Letter | ☐ |
| Identity Theft Date/Time | | Non-Response Letter Sent Date and Time | |
| Attorney/Firm Name | | Sent Post-Closure Vendor Response | ☐ |
| Rental History 2nd Notice | ☐ | Post-Closure Date and Time | |
| 2nd Notice Sent | | | |

**▼ CDT**

| | | | |
|---|---|---|---|
| | | CDT Escalation | |
| Suppressed | | Updated | |
| CDT Consumer Comments | | CDT Client Comments | |
| Days in Escalation | 0 | Days Pending SUPPRESSION | 0 |
| Days Pending UPDATE | 0 | SUPPRESSION/UPDATE NOTES | |

**▼ System Information**

| | | | |
|---|---|---|---|
| Created By | Lahainie Crisostomo, 9/10/2017 4:27 PM | Last Modified By | Terry Heronime, 9/11/2017 1:12 PM |
| | | Last Modified By Owner | |

**▼ Bulk Task Section**

**Tasks** Update Tasks Refresh Tasks

| Id | Subject | Status | Owner | Comments |
|---|---|---|---|---|
| 00T3700001Je6upEAB | Review Con Identity Info - Set Dispute Type | Completed | Terry Heronime | |
| 00T3700001Je6uqEAB | Create Inquiry Report/Consumer File | Completed | Terry Heronime | |
| 00T3700001Je6urEAB | Verify - Updated File Reflects Re-investigation results | Completed | Terry Heronime | |
| 00T3700001Je6usEAB | Send Updated Consumer File and Inquiry Report to Co | Completed | Terry Heronime | |
| 00T3700001Je78REAR | Email: Consumer Request for Disclosure of Consumer I | Closed Cancelled | Terry Heronime | Additional To: facialcleanse13@gmail.com CC: BCC: At |
| 00T3700001Je7EZEAZ | Send Updated Consumer File and Inquiry Report to Pr | Completed | Terry Heronime | |



**Case Comments** [New] Case Comments Help

| Action | Public | Comment |
|---|---|---|
| Edit \| Del \| Make Public | | Created By: Terry Heronime (9/11/2017 1:11 PM)<br>OB Email - updated file/inquiry |

**CDT Case Note** [New CDT Case Note] CDT Case Note Help

No records to display

**DocuSign Status** DocuSign Status Help

No records to display

**Articles** [Find Articles] Articles Help

No Articles Attached

**Action Plans** [New Action Plan] Action Plans Help

| Action | Action Plan Name | Start Date | Step Total | WhatId | Owner Last Name | Overall Task Status | Last Modified Date |
|---|---|---|---|---|---|---|---|
| Edit \| Del | CON: Dispute - Updated File Copy - | 9/8/2017 | 5 | | Heronime | 5 of 5 Completed | 9/11/2017 |

**Emails** [Send an Email] Emails Help

| Action | Status | | Subject | Email Address | Message Date |
|---|---|---|---|---|---|
| Reply \| To All \| Del | Sent | | Consumer Request for Disclosure of Consumer File for Diane D Jones - SF043351...<br>*Dear Diane D Jones, You recently applied to Marietta Road - 7302. A copy of t...* | facialcleanse13@gmail.com | 9/11/2017 1:10 PM |

**Open Activities** [New Task] [New Event] Open Activities Help

No records to display

3

REALPAGE/JONES 000175

373



## Activity History

Log a Call | Mail Merge | Send an Email | View All — Activity History Help

| Action | Subject | Name | Assigned To | Last Modified Date/Time | Completed Date | Comments (Short) | Time in Minutes | Call Duration |
|---|---|---|---|---|---|---|---|---|
| Edit \| Del | Email: Consumer Request for Disclosure of Consumer File for Diane D Jones - SF04335198 [ ref:_00D00heZB._50037DYWPo:ref ] | Diane D Jones | Terry Heronime | 9/11/2017 1:10 PM | | | | |
| Edit \| Del | Send Updated Consumer File and Inquiry Report to Property | | Terry Heronime | 9/11/2017 1:12 PM | 9/11/2017 | | | |
| Edit \| Del | Send Updated Consumer File and Inquiry Report to Consumer | | Terry Heronime | 9/11/2017 1:12 PM | 9/11/2017 | | | |
| Edit \| Del | Verify - Updated File Reflects Re-investigation results | | Terry Heronime | 9/11/2017 1:12 PM | 9/11/2017 | | | |
| Edit \| Del | Create Inquiry Report/Consumer File | | Terry Heronime | 9/11/2017 1:11 PM | 9/11/2017 | | | |
| Edit \| Del | Review Con Identity Info - Set Dispute Type | | Terry Heronime | 9/11/2017 1:11 PM | 9/11/2017 | | | |

## Case History

Case History Help

| Date | User | Connection | Action |
|---|---|---|---|
| 9/11/2017 1:12 PM | Terry Heronime | | Changed **Status** from Send Final Response to Client to **Completed**. |
| | | | Closed. |
| 9/11/2017 1:12 PM | Terry Heronime | | Changed **Status** from New to **Send Final Response to Client**. |
| 9/11/2017 1:11 PM | Terry Heronime | | Changed **Status** from Inquiry Report/ consumer File created to **New**. |
| 9/11/2017 1:11 PM | Terry Heronime | | Changed **Status** from New to **Inquiry Report/ consumer File created**. |
| 9/10/2017 4:27 PM | Lahainie Crisostomo | | Changed **Subject** to **CON: Dispute - Updated File Copy**. |
| | | | Changed **Case Owner** from Lahainie Crisostomo to **Screening - Consumer**. |
| | | | Created. |

## Attachments

Attach File — Attachments Help

No records to display

## Related Cases

New Case | Close | Change Owner | Change Status — Related Cases Help

No records to display

## Custom History Tracking

Custom History Tracking Help

No records to display

## Email Message Detail

Reply | Reply To All | Forward | Delete — [ Previous | Email Message List | Next

### Information

| | | | |
|---|---|---|---|
| Parent Case | SF04335198 | Status | Sent |
| Message Date | 9/11/2017 1:10 PM | Last Modified By | Terry Heronime, 9/11/2017 1:10 PM |
| Created By | Terry Heronime, 9/11/2017 1:10 PM | | |

### Address Information

| | |
|---|---|
| From Address | consumer.relations@leasingdesk.com |
| From Name | Consumer Relations |
| To Address | facialcleanse13@gmail.com |
| CC Address | |
| BCC Address | i |

Dear Diane D Jones,

You recently applied to Marietta Road - 7302. A copy of the consumer file that LeasingDesk Screening maintains on you is attached to this e-mail. You also will find attached to the letter the Federal Trade Commission's "A Summary of Your Rights under the Fair Credit Reporting Act" and other important information about your rights. **The attached document is password protected. The password is your last name (all lower case) and last 4 digits of your social security number.**

If you have any question concerning your consumer file, you can contact LeasingDesk Screening toll-free at (866) 934-1124.

Sincerely,

Consumer Relations
LeasingDesk Screening
2201 Lakeside Boulevard
Richardson, Tx 75082-4305
(866) 934-1124

Attachments: Consumer File
FTC Summary of Rights
Summary of rights under state law
Statement Regarding Security Freeze

**Attachments**

| Action | File Name | Size | Last Modified | Created By |
|---|---|---|---|---|
| Edit \| View \| Del | Updated File - Report Transmittal Letter Diane D Jones SF04335198.pdf | 512KB | 9/11/2017 1:10 PM | Terry Heronime |
| Edit \| View \| Del | FCRA Summary of Rights rev 09-2016.pdf | 463KB | 9/11/2017 1:10 PM | Terry Heronime |
| Edit \| View \| Del | Updated ConsumerInquiryReport Diane D Jones SF04335198.pdf | 16KB | 9/11/2017 1:10 PM | Terry Heronime |



Case
SF04320183

Customize Page | Printable View | Help for this Page

Show Feed

Case Comments [2] | CDT Case Note [0] | DocuSign Status [0] | Articles [0] | Action Plans [1] | Emails [1] | Open Activities [0] | Activity History [13] | Case History [10] | Attachments [0] | Related Cases [0] | Custom History Tracking [0]

**Case Detail** Edit | Delete | Close Case | Clone | Sharing | Create Action Plan | Request Additional Information

| | | | |
|---|---|---|---|
| Case Number | SF04320183 [View Hierarchy] | Case Record Type | Consumer Screening [Change] |
| Contact Name | Diane D Jones | Saturday | |
| Account Name | Consumer-Realpage | Sunday | |
| Case Owner | Screening - Consumer [Change] | Date/Time Opened | 8/31/2017 11:20 AM |
| Contact Phone | (216) 640-5419 | Date/Time Closed | 9/4/2017 11:07 AM |
| Contact Email | facialcleanse13@gmail.com | Area | CON: Consumer |
| Time Zone | Eastern | Sub-Area | CON: Dispute - Request for Disclosure 15 |
| Defect Number Legacy | | Status | Completed |
| Subject | CON: Dispute - Request for Disclosure 15 | Priority | Medium |
| Description | report copy request | Case Origin | Email |
| Screening Property | MARIETTA ROAD - 7302 | Delivery Preference | Email |
| Site Loc-Acct#-PMC | ATLANTA GA 3521464 MICHAELS MANAGEMENT-AFFORDABLE, LLC | Closed When Created | |
| Instruction Letter Sent | ✓ | Business Days | 3 |
| BBB Complaint | | Business Days Worked from Now | 492 |
| BBB Case Number | | Action Plan Start Date | 8/31/2017 |
| Social Media Request | | Days Open | 4.00 |
| Social Media Received Date | | Action Plan Days Open | 4.00 |
| | | Case Cycle | |
| Parent PMC | | Alert | ✓ |
| Contact is VIP | | Escalated to Legal | |
| Special States | | Days in Status | 685 |
| Parent Account Owner | | FCRA Start Date | 8/31/2017 |
| PROPERTY TYPES | | Preferred Method of Contact | |
| Closed Date | 9/4/2017 | Existing SF Case Number | |
| Parent Case | | Docusign Envelope | |
| Inquiry Dates | | | |





▼ Bulk Task Section

**Tasks** Update Tasks | Refresh Tasks

| Id | Subject | Status | Owner | Comments |
|---|---|---|---|---|
| 00T3700001J2V8aEAF | Receive/Review Con Identity Info - Set Dispute Type | N/A | Edmundo Guillermo | |
| 00T3700001J2VloEAF | Email: Consumer Request for Disclosure of Consumer I | Completed | Edmundo Guillermo | Additional To: facialcleanse13@gmail.com CC: BCC: At |
| 00T3700001J2VnUEAV | Send Incomplete Information Notice Letter - Optional | N/A | Edmundo Guillermo | |
| 00T3700001J2VnVEAV | Confirm Receipt of Information Necessary to Process R | Completed | Edmundo Guillermo | |
| 00T3700001J2VnWEAV | Confirm Receipt of Authorization for Third Party Disclo: | N/A | Edmundo Guillermo | |
| 00T3700001J2VpbEAF | Create Inquiry Report | Completed | Edmundo Guillermo | |
| 00T3700001J2VpcEAF | Pull Report Copy (Optional - if within 60 days of Screel | Completed | Edmundo Guillermo | |
| 00T3700001J2VpdEAF | Create Consumer File | Completed | Edmundo Guillermo | |
| 00T3700001J2VqxEAF | Escalate to CDT/Vendor/Legal - Optional | N/A | Edmundo Guillermo | |
| 00T3700001J2VqyEAF | Suppression/Update Completed CDT - Optional | N/A | Edmundo Guillermo | |
| 00T3700001J2VqzEAF | Verify Updated File Reflects CDT Results - Optional | N/A | Edmundo Guillermo | |
| 00T3700001J2Vr0EAF | Create Report/File Copy Transmittal Letter | Completed | Edmundo Guillermo | |
| 00T3700001J2VsoEAF | Send Response to Consumer | Completed | Edmundo Guillermo | |

Edit | Delete | Close Case | Clone | Sharing | Create Action Plan | Request Additional Information

**Case Comments** New — Case Comments Help

| Action | Public | Comment |
|---|---|---|
| Edit \| Del \| Make Public | | **Created By: Edmundo Guillermo (9/4/2017 11:07 AM)** OB email Report/File copy |
| Edit \| Del \| Make Public | | **Created By: RaymondJohn Eustaquio (8/31/2017 11:25 AM) \| Last Modified By: RaymondJohn Eustaquio (8/31/2017 11:29 AM)** **Internal Notes ** flagged alert pilot case included SF04314009 / consumer is requesting for an updated file copy. Email received |

**Action Plans** New Action Plan — Action Plans Help

| Action | Action Plan Name | Start Date | Step Total | WhatId | Owner Last Name | Overall Task Status | Last Modified Date |
|---|---|---|---|---|---|---|---|
| Edit \| Del | CON: Dispute - Request for Disclosure 15 - | 8/31/2017 | 12 | | Guillermo | 12 of 12 Completed | 9/4/2017 |

**Emails** Send an Email — Emails Help

| Action | Status | | Subject | Email Address | Message Date |
|---|---|---|---|---|---|
| Reply \| To All \| Del | Sent | | Consumer Request for Disclosure of Consumer File for Diane D Jones - SF043201... *Dear Diane D Jones, You recently applied to Marietta Road. A copy of the cons...* | facialcleanse13@gmail.com | 9/4/2017 11:05 AM |

**Open Activities** New Task | New Event — Open Activities Help

No records to display

2 | P a g e

REALPAGE/JONES 000179

377



## Activity History

Log a Call | Mail Merge | Send an Email | View All — Activity History Help

| Action | Subject | Name | Assigned To | Last Modified Date/Time | Completed Date | Comments (Short) | Time in Minutes | Call Duration |
|---|---|---|---|---|---|---|---|---|
| Edit \| Del | Send Response to Consumer | | Edmundo Guillermo | 9/4/2017 11:07 AM | 9/4/2017 | | | |
| Edit \| Del | Create Report/File Copy Transmittal Letter | | Edmundo Guillermo | 9/4/2017 11:06 AM | 9/4/2017 | | | |
| Edit \| Del | Verify Updated File Reflects CDT Results - Optional | | Edmundo Guillermo | 9/4/2017 11:06 AM | | | | |
| Edit \| Del | Suppression/Update Completed CDT - Optional | | Edmundo Guillermo | 9/4/2017 11:06 AM | | | | |
| Edit \| Del | Escalate to CDT/Vendor/Legal - Optional | | Edmundo Guillermo | 9/4/2017 11:06 AM | | | | |
| Edit \| Del | Create Consumer File | | Edmundo Guillermo | 9/4/2017 11:06 AM | 9/4/2017 | | | |
| Edit \| Del | Pull Report Copy (Optional - if within 60 days of Screen) | | Edmundo Guillermo | 9/4/2017 11:06 AM | 9/4/2017 | | | |
| Edit \| Del | Create Inquiry Report | | Edmundo Guillermo | 9/4/2017 11:06 AM | 9/4/2017 | | | |
| Edit \| Del | Email: Consumer Request for Disclosure of Consumer File for Diane D Jones - SF04320183 [ ref:_00D00heZB._50037DPIlb:ref ] | Diane D Jones | Edmundo Guillermo | 9/4/2017 11:06 AM | 9/4/2017 | Additional To: facialcleanse13@gmail.com CC: BCC: Attachment: ConsumerInquiryReport Diane D Jones SF04320183.pdf, Diane D Jones Client View.pdf, FCRA Summary of Rights rev 09-2016.pdf, Report Copy Transmittal Letter for Diane D Jones SF04320183.pdf Subjec | | |
| Edit \| Del | Confirm Receipt of Information Necessary to Process Request (& Populate FCRA Start Date) | | Edmundo Guillermo | 9/4/2017 11:06 AM | 9/4/2017 | | | |
| Edit \| Del | Confirm Receipt of Authorization for Third Party Disclosure Form - Optional | | Edmundo Guillermo | 9/4/2017 11:06 AM | | | | |
| Edit \| Del | Send Incomplete Information Notice Letter - Optional | | Edmundo Guillermo | 9/4/2017 11:06 AM | | | | |
| Edit \| Del | Receive/Review Con Identity Info - Set Dispute Type | | Edmundo Guillermo | 9/4/2017 11:06 AM | | | | |

## Case History

Case History Help

| Date | User | Connection | Action |
|---|---|---|---|
| 9/4/2017 11:07 AM | Edmundo Guillermo | | Changed **Status** from Ready to Send Response to **Completed**. |
| 9/4/2017 11:06 AM | Edmundo Guillermo | | Changed **Status** from Consumer File Created to **Ready to Send Response**. |
| 9/4/2017 11:06 AM | Edmundo Guillermo | | Changed **Status** from Confirmed Cons Identity/Info Complete to **Consumer File Created**. |
| 9/4/2017 11:06 AM | Edmundo Guillermo | | Changed **Status** from Confirmed Auth for Third Party Complete to **Confirmed Cons Identity/Info Complete**. |
| | | | Changed **Status** from New to **Confirmed Auth for Third Party Complete**. |
| 9/4/2017 11:06 AM | Edmundo Guillermo | | Changed **Status** from Waiting for Consumer Information to **New**. |
| 9/4/2017 11:06 AM | Edmundo Guillermo | | Changed **Status** from New to **Waiting for Consumer Information**. |
| 8/31/2017 11:20 AM | RaymondJohn Eustaquio | | Changed **Subject** to **CON: Dispute - Request for Disclosure 15**. |
| | | | Changed **Case Owner** from RaymondJohn Eustaquio to **Screening - Consumer**. |
| | | | Created. |

## Attachments

Attach File — Attachments Help

No records to display

## Related Cases

New Case | Close | Change Owner | Change Status — Related Cases Help

No records to display

## Custom History Tracking

Custom History Tracking Help

No records to display





Bulk Task Section

Tasks

Update Tasks | Refresh Tasks

| Id | Subject | Status | Owner | Comments |
|---|---|---|---|---|
| 00T3700001J2V8aEAF | Receive/Review Con Identity Info - Set Dispute Type | N/A | Edmundo Guillermo | |
| 00T3700001J2VloEAF | Email: Consumer Request for Disclosure of Consumer I | Completed | Edmundo Guillermo | Additional To: facialcleanse13@gmail.com CC: BCC: At |
| 00T3700001J2VnUEAV | Send Incomplete Information Notice Letter - Optional | N/A | Edmundo Guillermo | |
| 00T3700001J2VnVEAV | Confirm Receipt of Information Necessary to Process R | Completed | Edmundo Guillermo | |
| 00T3700001J2VnWEAV | Confirm Receipt of Authorization for Third Party Disclo: | N/A | Edmundo Guillermo | |
| 00T3700001J2VpbEAF | Create Inquiry Report | Completed | Edmundo Guillermo | |
| 00T3700001J2VpcEAF | Pull Report Copy (Optional - if within 60 days of Screei | Completed | Edmundo Guillermo | |
| 00T3700001J2VpdEAF | Create Consumer File | Completed | Edmundo Guillermo | |
| 00T3700001J2VqxEAF | Escalate to CDT/Vendor/Legal - Optional | N/A | Edmundo Guillermo | |
| 00T3700001J2VqyEAF | Suppression/Update Completed CDT - Optional | N/A | Edmundo Guillermo | |
| 00T3700001J2VqzEAF | Verify Updated File Reflects CDT Results - Optional | N/A | Edmundo Guillermo | |
| 00T3700001J2Vr0EAF | Create Report/File Copy Transmittal Letter | Completed | Edmundo Guillermo | |
| 00T3700001J2VsoEAF | Send Response to Consumer | Completed | Edmundo Guillermo | |

Edit | Delete | Close Case | Clone | Sharing | Create Action Plan | Request Additional Information

Case Comments

New

Case Comments Help

| Action | Public | Comment |
|---|---|---|
| Edit \| Del \| Make Public | | **Created By:** Edmundo Guillermo **(9/4/2017 11:07 AM)**<br>OB email Report/File copy |
| Edit \| Del \| Make Public | | **Created By:** RaymondJohn Eustaquio **(8/31/2017 11:25 AM) \| Last Modified By:** RaymondJohn Eustaquio **(8/31/2017 11:29 AM)**<br>**Internal Notes **<br>flagged alert pilot case included SF04314009 / consumer is requesting for an updated file copy. Email received |

4 | Page

379

REALPAGE/JONES 000181

# Exhibit 15

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**

**DIANE D. JONES, individually and on behalf of herself and all others similarly situated,**

Plaintiff,

v.

**REALPAGE, INC. d/b/a LEASINGDESK SCREENING,**

Defendant.

Case No. 3:19-cv-02087-B

**DEFENDANT'S FIRST SUPPLEMENTAL OBJECTIONS AND RESPONSES TO PLAINTIFF JONES' SECOND SET OF INTERROGATORIES**

District Court Judge Jane J. Boyle

Magistrate Judge Irma C. Ramirez

Pursuant to Fed. R. Civ. P. 26 and 33, Defendant RealPage, Inc. d/b/a LeasingDesk Screening, ("RealPage" or "Defendant") supplements its objections and responses to Plaintiff Diane D. Jones' ("Plaintiff") Second Set of Interrogatories as follows:

**PRELIMINARY STATEMENT**

RealPage has not yet completed its investigation of the facts relating to this action, has not yet completed its discovery, and has not yet completed its preparation for trial. Consequently, the following responses are provided without prejudice to RealPage's right to introduce, at the time of trial or other proceedings, subsequently discovered information relating to the proof of presently known material facts and to introduce all information, whenever discovered, relating to the proof of subsequently discovered material facts. However, RealPage does not assume any duty of ongoing amendment to these responses.

**OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS**

RealPage objects to the definition of "Defendant," "You," and "Your" insofar as it includes any "agency, subsidiary(ies), parent corporation(s) and/or any of its branches, departments, employees, agents, contractual affiliates, or others connected by legal relationship, in the broadest sense." This definition is vague, ambiguous, and woefully overly broad and unduly burdensome, given that it would encompass third parties or entities, whose information and/or documents are not within RealPage's possession, custody, or control, or whose information has no relevance or bearing on the claims or defenses at issue in this matter.

**RESPONSES TO INTERROGATORIES**

12. State the total number of consumers with an address in the United States and its Territories about whom you sold a report for each calendar year between March 6, 2017 and the present which included one or more items for criminal record information, and from whom you subsequently received a dispute or other communication stating that the criminal record information did not pertain or belong to them, or which RealPage interpreted as a "nonmatch" dispute.

**ANSWER:** RealPage objects to this Interrogatory as vague and ambiguous, including with respect to the undefined terms "criminal record information," "dispute," "other communication," and "interpreted as a nonmatch." RealPage objects to this Interrogatory on the grounds that it is premature, overly broad, unduly burdensome, and irrelevant to the claims and defenses as they currently exist. Plaintiff's purported class has not been certified and, thus, the requested information is overbroad and irrelevant. RealPage objects to this Interrogatory on the basis that it calls for trade secret, confidential business, financial, commercial or proprietary information.

**<u>The following response is designated as "Confidential."</u>** REDACTED

**<u>SUPPLEMENTAL ANSWER</u>: <u>The following response is designated as "Confidential."</u>** REDACTED

13. Of the consumers who comprise your response to Interrogatory No. 1, state the total number of consumers for whom you determined following a reinvestigation was a "nonmatch" on the criminal record on the report.

**<u>ANSWER</u>:** RealPage objects to this Interrogatory as vague and ambiguous on the whole given its reference to Interrogatory No. 1, which states: "Identify all entities, public or private, from which you have obtained any of the criminal record information that you sell about consumers, from March 6, 2014 to the present." For the purposes of providing a response, RealPage assumes that this Interrogatory intended to reference Interrogatory No. 12 and incorporates its objections to Interrogatory No. 12. RealPage objects to this Interrogatory as vague and ambiguous, including with respect to the phrase "for whom you determined following a reinvestigation was a 'nonmatch' on the criminal record." RealPage objects to this Interrogatory on the grounds that it is premature, overly broad, unduly burdensome, and irrelevant to the claims and defenses as they currently exist. Plaintiff's purported class has not been certified and, thus, the requested information is overbroad and irrelevant. RealPage objects to this Interrogatory on the basis that it calls for trade secret, confidential business, financial, or proprietary information.

**<u>The following response is designated as "Confidential."</u>** REDACTED

**<u>SUPPLEMENTAL ANSWER</u>: <u>The following response is designated as "Confidential."</u>** REDACTED

14. Of the consumers who comprise your response to Interrogatory No. 1, state the total number of consumers for whom you removed the criminal record information from the consumer's report following the consumer's dispute or communication.

**<u>ANSWER</u>:** RealPage objects to this Interrogatory as vague and ambiguous on the whole given its reference to Interrogatory No. 1, which states: "Identify all entities, public or private, from which you have obtained any of the criminal record information that you sell about consumers, from March 6, 2014 to the present." For the purposes of providing a response, RealPage assumes that this Interrogatory intended to reference Interrogatory No. 12 and incorporates its objections to Interrogatory No. 12. RealPage objects to this Interrogatory as vague and ambiguous, specifically with respect to the phrase "for whom you removed the criminal record information from the consumer's report following the consumer's dispute or communication." RealPage objects to this Interrogatory on the grounds that it is premature, overly broad, unduly burdensome, and irrelevant to the claims and defenses as they currently exist. Plaintiff's purported class has not been certified and, thus, the requested information is overbroad and irrelevant.

RealPage objects to this Interrogatory on the basis that it calls for trade secret, confidential business, financial, or proprietary information.

**The following response is designated as "Confidential."** REDACTED

**SUPPLEMENTAL ANSWER: The following response is designated as "Confidential."** REDACTED

15. State the total number of consumers about whom you provided a consumer report to a third party from March 6, 2017 to the present which included one or more items of criminal record information for which the Name of the individual who was the subject of the report was not a character for character match to neither the Name of the offender or any of the alias Names listed on the criminal record.

**ANSWER:** RealPage objects to this Interrogatory as vague and ambiguous on the whole. RealPage objects to this Interrogatory on the basis that it seeks information not tied to the allegations in Plaintiff's Second Amended Complaint, including the proposed class definitions. RealPage objects to this Interrogatory on the grounds that it is premature, overly broad, unduly burdensome, and irrelevant to the claims and defenses as they currently exist. Plaintiff's purported class has not been certified and, thus, the requested information is overbroad and irrelevant. RealPage objects to this Interrogatory on the basis that it calls for trade secret, confidential business, financial, or proprietary information.

Subject to and without waiving its objections, RealPage responds as follows: none.

16. State the total number of consumers with an address in the United States and its Territories about whom you sold a report for each calendar year between March 6, 2017 and the present which included one or more items of criminal record information, for which (i) the first name of the offender as listed on the criminal record was not a character-for-character match to the first name of the individual who was the subject of the report, and (ii) the criminal record you placed on the report represented the offender's date of birth as "1/1/XXXX – 12/31/XXXX."

**ANSWER:** RealPage objects to this Interrogatory as vague and ambiguous on the whole. RealPage objects to this Interrogatory on the basis that it seeks information not tied to the allegations in Plaintiff's Second Amended Complaint, including the proposed class definitions. RealPage objects to this Interrogatory on the grounds that it is premature, overly broad, unduly burdensome, and irrelevant to the claims and defenses as they currently exist. Plaintiff's purported class has not been certified and, thus, the requested information is overbroad and irrelevant. RealPage objects to this Interrogatory on the basis that it calls for trade secret, confidential business, financial, or proprietary information.

17. State the total number of consumers with an address in the United States and its Territories about whom you sold a report for each calendar year between March 6, 2017 and the present which included one or more items of criminal record information, for which (i) three or more characters, when taken in order, of the first name of the offender did not match the characters, when taken in order, of the first name of the individual who was the subject of the report, and (ii) the criminal record you placed on the report represented the offender's date of birth as "1/1/XXXX – 12/31/XXXX".

**<u>ANSWER</u>:** RealPage objects to this Interrogatory as vague and ambiguous on the whole. RealPage objects to this Interrogatory on the basis that it seeks information not tied to the allegations in Plaintiff's Second Amended Complaint, including the proposed class definitions. RealPage objects to this Interrogatory on the grounds that it is premature, overly broad, unduly burdensome, and irrelevant to the claims and defenses as they currently exist. Plaintiff's purported class has not been certified and, thus, the requested information is overbroad and irrelevant. RealPage objects to this Interrogatory on the basis that it calls for trade secret, confidential business, financial, or proprietary information.

Dated: January 10, 2019

By: */s/ Timothy St. George*

Ronald I. Raether, Jr. (*pro hac vice*)
Jessica R. Lohr (*pro hac vice*)
**Troutman Sanders LLP**
5 Park Plaza, Suite 1400
Irvine, CA 92614
Tel: (949) 622-2700
Fax: (949) 622-2739

Timothy St. George (*pro hac vice*)
**TROUTMAN SANDERS LLP**
1001 Haxall Point
Richmond, Virginia 23219
Telephone: (804) 697-1200
Facsimile: (804) 698-1339

*Attorneys for Defendant*
*RealPage, Inc.*

**VERIFICATION**

I, Manjit Sohal, state that I have read the foregoing RealPage, Inc.'s First Supplemental Responses to Plaintiff Jones' Second Set of Interrogatories ("Responses"), and that while I do not have personal knowledge of all of the facts recited in these Responses, the information contained has been collected and made available to me by others, and these Responses are true to the best of my knowledge, information, and belief based upon the information made available to me; and that these Responses are verified on behalf of RealPage, Inc. in this litigation.

Executed on January 8, 2020

Manjit Sohal

**CERTIFICATE OF SERVICE**

I hereby certify that I have served a copy of the foregoing document by electronic mail and U.S. first class mail on this the 10th day of January 2020:

John Soumilas, Esq.
James A. Francis, Esq.
Lauren KW Brennan, Esq.
Francis & Mailman
Land Title Building, 19th Floor
100 South Broad Street
Philadelphia, PA 19110
Email: jfrancis@consumerlawfirm.com
jsoumilas@consumerlawfirm.com
lbrennan@consumerlawfirm.com

Michael A. Caddell
Cynthia B. Chapman
Amy E. Taylor
Caddell & Chapman
628 East 9th Street
Houston, TX 77007
Email: mac@caddellchapman.com
cbc@caddellchapman.com
aet@caddellchapman.com

Daniel Cohen, Esq.
Edward Y. Kroub, Esq.
Cohen & Mizrahi LLP
300 Cadman Plaza West, 12th Floor
Brooklyn, NY 11201
Email: dan@cml.legal
edward@cml.legal

Stephen M. Bosak, Esq.
Matthew A. Dooley, Esq.
O'Toole McLaughlin Dooley & Pecora
5455 Detroit Road
Sheffield Village, OH 44054
Email: sbosak@omdplaw.com
mdooley@omdplaw.com

*/s/ Jessica R. Lohr*
Jessica R. Lohr

*Attorney for Defendant, RealPage, Inc. d/b/a Leasing Desk*

# Exhibit 16

Proposed to Be Redacted Entirely

# Exhibit 17

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS

DIANE D. JONES, individually and on behalf of herself and all others similarly situated,

Plaintiff,

vs.

REALPAGE, INC., d/b/a LEASINGDESK SCREENING,

Defendant.

No.: 3:19-cv-02087-B

- CONFIDENTIAL -

\- - -

VOLUME II

\- - -

Remote video conference deposition of MANJITSINGH SOHAL, taken on Friday, April 17, 2020, beginning at approximately 10:02 a.m., before Donna M. Ray, Certified Court Reporter and Notary Public.

\- - -

SUMMIT COURT REPORTING, INC.
Certified Court Reporters and Videographers
1500 Walnut Street, Suite 1610
Philadelphia, Pennsylvania 19102
424 Fleming Pike, Hammonton, New Jersey 08037
(215) 985-2400 * (609) 567-3315 * (800) 447-8648
www.summitreporting.com

APPEARANCES:

(VIA REMOTE VIDEO CONFERENCE)
FRANCIS, MAILMAN & SOUMILAS, P.C.
BY: JOHN SOUMILAS, ESQUIRE
1600 Market Street, Suite 2510
Philadelphia, Pennsylvania 19103
(215) 735-8600
Jsoumilas@consumerlawfirm.com
-- Representing Plaintiff

(VIA REMOTE VIDEO CONFERENCE)
TROUTMAN SANDERS, LLP
BY: TIMOTHY J. ST. GEORGE, ESQUIRE
1001 Haxall Point
15th Floor
Richmond, Virginia 23219
(804) 697-1200
Timothy.St.George@Troutman.Com
-- Representing Defendant

ALSO PRESENT:

(VIA REMOTE VIDEO CONFERENCE)
Jeff Kabacinski

INDEX

| WITNESS | PAGE |
|---|---|
| MANJITSINGH SOHAL | |
| EXAMINATION | |
| BY: Mr. Soumilas | 89 |

EXHIBITS

(Retained By Counsel.)

| NO. | DESCRIPTION | FIRST PAGE REFERENCED |
|---|---|---|
| Exhibit 4 | Defendant's Third Supplemental Objections and Responses | 92 |
| Exhibit 5 | Computer Query | 97 |
| Exhibit 6 | List of Hypothetical Names | 104 |
| Exhibit 7 | Tenant Screening Report | 108 |

\- - -

(Whereupon, Exhibits 4 through 7 were marked for identification.)

\- - -

MANJITSINGH SOHAL, after having been duly sworn, was examined and testified as follows:

\- - -

EXAMINATION

\- - -

BY MR. SOUMILAS:

Q. Mr. Sohal, good morning.

A. Good morning.

Q. My name is John Soumilas. I'm one of the attorneys for Diane D. Jones who's brought a lawsuit against RealPage, Inc.

Today in this case, through the agreement of all the lawyers, we are connected through a video link in order to take your deposition in that matter. We would ordinarily do it in a different way where some of us would be together or certainly the court reporter would be with you, but under the circumstances of the pandemic going on in the world right now, we are all linked through a Zoom video feed.

Particularly for that reason, if you do not hear me or if a connection is interrupted in any way, would you do your best to just let me know?

A. Yes.

Q. Right now we seem to be seeing and hearing each other perfectly. So I'm going to assume that unless you tell me that there's some problem, and then we'll try to correct it as soon as we can.

Okay?

A. Yes.

Q. Also, you are under oath just as if we were in court in front of a judge and jury today. So, therefore, you are required to testify truthfully under penalty of perjury.

Do you understand that?

A. Yes.

Q. Now, Mr. Sohal, do you recall giving a deposition previously in this case, Jones versus RealPage, back in February of this year?

A. Yes.

Q. And have you had occasion to review the transcript of that deposition which you gave on February 11, 2020?

A. Yes.

Q. I will represent to you that since that deposition took place the parties in this case returned to court and the court directed RealPage to provide a revised answer to an interrogatory, number 15, about which you had testified about back in February.

Do you remember giving an answer about that interrogatory?

A. Yes.

Q. In fact, you are the person that verified that interrogatory response, correct?

A. Yes.

Q. Okay. Well, do I understand that since the court's order of March 19, 2020, I'll represent for the docket -- for the record, excuse me, that's docket 120 in the case, that RealPage has had an opportunity to recalculate the answer to interrogatory 15?

A. Yes.

Q. Okay. And what I wish to do is to turn to that revised answer and talk about it a little bit to make sure that the recalculation was done in a manner as directed by the court.

Okay?

A. Okay.

Q. Let me show you -- well, before I even do that, I will represent for the record that I am treating this deposition today as the second part of your deposition. Since the first part had three exhibits, I will pick up today with Exhibit 4 as if we're continuing in the same sequence. That's just a clarification for the record. It's not a question.

Let me show you, Mr. Sohal, what I've marked for purposes of today as Exhibit Sohal 4, which is the defendant's third supplemental objections and responses to plaintiff Jones' second set of interrogatories.

Do you have that available?

A. I can see it on my screen.

Is that the one?

Q. Yes, sir. It's the one projecting on your screen right now that says Exhibit 4 on the top right-hand side.

Do you see that?

A. Yes.

Q. Let's scroll down within that exhibit, please, to the question that is what we have called interrogatory number 15. I will read it for the record. It requests for the defendant to "State

the total number of consumers about whom you provided a consumer report to a third party from March 6, 2017 to the present which included one or more items of criminal record information for which the Name of the individual who was the subject of the report was not a character-for-character match to either the Name of the offender or any of the alias names listed on the criminal record."

Do you see that question?

A. Yes.

Q. I want to scroll down further in the document to not just the answer, but on the next page, there is a supplemental answer.

Do you see that?

A. Yes.

Q. And if we can just scroll up just a little bit, please, above the supplemental answer. The paragraph immediately before that supplemental answer reads, "Notwithstanding these objections," that the defendant RealPage has made, "pursuant to the court's order at docket number 120, RealPage provides the following response to this interrogatory, as clarified by that order. For these responses, 'Name' is defined as: 'First and last name taken together.'"

Do you see that?

A. Yes.

Q. Okay. So just to connect the dots, this is the court order that directed RealPage to recalculate that response, and am I correct, Mr. Sohal, that the answer we see in the paragraph immediately after the supplemental answer heading is the correct response to interrogatory 15 as clarified by the court order?

And will you scroll up a little bit so we can see the full paragraph there. So not -- the supplemental answer, please. I want to make sure that the witness is looking at the supplemental answer. There we go.

REDACTED



Page 95
MANJITSINGH SOHAL-VOLUME II-CONFIDENTIAL

REDACT [redacted]

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

406



**MANJITSINGH SOHAL-VOLUME II-CONFIDENTIAL**

1    REDACTED

REDACTED

Q. Okay. So I want to go through a couple of examples that we had talked about during your deposition the first time around to make sure that I understand how this search works, but, actually, before we even get there, let me show you an exhibit that we marked as five for purposes of today. I understand it to be the computer query

that led to these results.

Are you able to see Exhibit 5 on your screen, Mr. Sohal?

A. Yes.

Q. And will you please scroll through the entire exhibit, Mr. Sohal. I will represent for the record that it's -- it was produced to us with Bates stamp numbers on it 814 through 847.

MR. ST. GEORGE: John, I think he has a version on his computer. Do you want him to just scroll through his version at his pace? It's a little clunky with someone else operating the scroll bar.

MR. SOUMILAS: Yes. That's totally fine, counsel.

BY MR. SOUMILAS:

Q. So, Mr. Sohal, if you have a copy of that computer query that you can scroll through yourself, I'd like you to do that and let me know when you're done looking at it. I'm going to have some questions at the end.

A. Yes.

Q. Okay. Sir, is that the computer query that someone at RealPage ran in order to derive the

supplemental answer to interrogatory 15 that we were just talking about a moment ago with reference to Exhibit 4?

A. Yes. These are the queries that were used to extract the numbers that were part of the interrogatory 15.

Q. Okay. Did someone at RealPage prepare these queries?

A. Yes.

Q. Who did it?

A. This was done by our DBA, database administrator.

Q. Are you yourself personally able to read these queries, Mr. Sohal?

A. Yes.

Q. Okay. And did you have any input in creating the queries before they were run?

A. Yes.

Q. All right. And are you satisfied that based on your understanding of how such queries work that they derive the correct answer for the total number of reports which met those two conditions, both of those conditions, in the supplemental answer to interrogatory 15?

A. Yes.

Q. How long did the query take to run, sir?

A. I mean, the whole thing took several weeks. So we go through an elaborate process of extracting data from the historical data. And then it goes through the queries, which take, you know, hours and some queries take minutes, but you can assume that it was at least a couple of weeks. I don't have an exact time it took, but from start to end definitely it took several weeks.

Q. Okay. And in which -- against which database were the queries run?

A. This was run on our data warehouse where we keep all the historical data on screening reports.

Q. So the data warehouse would have historical data about screening reports for particular tenant applicants which were prepared over the course of this time period we're looking at from 2017 through 2020?

A. That's correct.

Q. Okay. And approximately how much computer time did it take once the queries were prepared for the answer to be derived?

MR. ST. GEORGE: Object to form.

THE WITNESS: As I said earlier, I

mean, the whole process took several weeks, which was part of finding the requirement, what needs to be queried, and then actually writing the queries and then executing the queries. And some of this is -- you have to do it creatively. You have to run it and then you find issues or bugs and then you have to go back. So it's very hard to keep track of specific computer time.

BY MR. SOUMILAS:

Q. Okay. Are you satisfied that any bugs or any problems were corrected before the final answer was derived?

A. Yes. I'm satisfied. I went through the QA of the final results.

[redacted]

Page 102
MANJITSINGH SOHAL-VOLUME II-CONFIDENTIAL

REDACT [redacted]

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

413



REDACTED

Q. All right. Am I correct that typically the historical reports, screening reports that RealPage prepares, would have some identifying information about the applicant over and above the name?

MR. ST. GEORGE: Object to form.

THE WITNESS: You mean what the applicant inputs themselves, or this is a

system generated -- I'm not clear about the question.

BY MR. SOUMILAS:

Q. Sure. I'll try it again.

Do you see how the answer to -- the supplemental answer to interrogatory 15 talks about the name input by the property for a particular tenant applicant?

A. Yes.

Q. Am I correct that in that process of inputting data, the property or property manager would typically also include an address, a social security number or a date of birth for the applicant?

A. Social security is not mandatory for all applicants. We ask for an address and date of birth.

Q. Okay. Let's -- since this question focuses on the name, I want to focus on that next. With reference to Exhibit 6, if we can please pull that up for the witness.

Mr. Sohal, I'll represent to you that this was an exhibit that we used with your first deposition. If you'll notice, it says Exhibit 3 on the very top right with a February 11, 2020 date.

Do you see that?

A. Yes.

Q. What I want to do for purposes of clarity is re-mark this exhibit as Exhibit 6, which I do with today's date, but I'm going to leave the old exhibit sticker on so there's no confusion.

Okay?

A. Okay.

Q. And what I want to do is I want to go through this list of 10 names that we talked about with your previous deposition and see whether the revised answer to interrogatory 15 still has these names falling in within the response or outside of the response.

Okay?

A. Okay.

Q. Specifically, we're talking about the REDACTED What I'm trying to figure out is whether these hypothetical names that we have here in the demonstrative exhibit are within that total figure or they would fall outside of it.

Okay?

A. Okay.

Q. So if the -- in example one the tenant applicant name is Geoffrey Smith and the criminal

record name is George Smith and there are no aliases at all for that record, would that fall in within the revised response to interrogatory 15?

A. It would fall in the response.

Q. Okay. And just so that our record is clear, sir, because we have used these names before, it would also fall within the revised response that you gave us following the court's order, right?

A. Yes.

Q. Okay. And is that the case for all of the other names that we went through previously at 1 through 10? Would all of those scenarios fall within the revised response to interrogatory 15 as well?

MR. ST. GEORGE: Object to form.

THE WITNESS: Yes. All of these would be in the revised response.

MR. SOUMILAS: All right. Counsel, was your objection that this was compound or do you have some other objection to the form?

MR. ST. GEORGE: My objection is that your question lacks foundation because it assumes that -- it's ambiguous

and it lacks foundation because your question assumes that these people -- that these names here would be matched by a leasing desk. So I wanted to clarify and preserve the record that this is a purely hypothetical exercise based on a simple comparison of names.

So that was the basis for my objection.

MR. SOUMILAS: Okay. So thank you for that clarification. I want to make sure that our record is clear on that.

BY MR. SOUMILAS:

Q. So, Mr. Sohal, this list of 10 names is a hypothetical list of names because we don't know the actual names among that population REDACTED, but what I'm trying to get at is whether with these hypothetical names if there was a tenant applicant whose name was Geoffrey Smith at number one and a criminal record for a George Smith with no alias, the way you run -- you ran the query to get the revised response to interrogatory 15 would put that name within the population REDACTED, correct?

A. That's correct.

Q. And that is the case for the other nine

hypothetical names within Exhibit 6 as well, that if these were the actual names run and that -- the result would be the name? They would all fall within the response to interrogatory 15?

A. That's correct.

Q. Now, with respect to the actual names, REDACTED did you run any type of analysis or an examination on those names?

A. I did some spot checks to make sure the data was complying with the initial requirements. I didn't check all REDACTED, but I checked probably a handful just to make sure.

Q. And did your spot checking result in a finding that the two requirements were being met?

A. Yes.

Q. Okay. As they would be met for all 10 of these names if they had been in that population, correct?

A. Correct.

Q. Now, let's go to Exhibit 7, which is the tenant screening report that RealPage prepared for the plaintiff in this case, Diane D. Jones, back on August 28, 2017. I'll represent to you, Mr. Sohal, that this was previously marked as Ramesh 3 in a deposition of another witness in this matter.

Have you seen this document before?

A. I saw it once the exhibits were sent yesterday.

Q. All right. And it does appear to be in the form of a RealPage tenant screening report; is that correct?

A. Yes.

Q. Now, it identifies the applicant right up front, Diane D. Jones, with an address at University Heights in Ohio.

Do you see that?

A. Yes.

Q. And for this particular applicant it appears that we have both a social security number, even though it's not required, and also a date of birth of August 13th and then the year is masked; is that correct?

A. Yes.

Q. Okay. Let's, please, scroll down to the third page of that report, which includes the criminal record.

What I want to do, Mr. Sohal, is just understand for sure how the revised answer to interrogatory 15 would work in a scenario exactly like this one where the applicant is Diane Jones

and you see there that there is a criminal record found. The offender information is Toni Taylor.

Do you see that?

A. Yes.

Q. Then there is a second field called alias information, and it appears that Toni Taylor has -- it looks to me like 13 different alias names that she has used at some point or another.

Does that look correct?

A. Yes.

Q. Now, the way the answer -- the revised answer to interrogatory 15 operates is that the property input name would be Diane Jones?

A. Yes.

Q. Okay. And then the offender name would be Toni Taylor, correct?

A. Yes.

Q. So the first condition in interrogatory 15 is satisfied that we do not have a character-for-character name match between Diane Jones and Toni Taylor, correct?

A. Yes.

Q. And then the second condition in interrogatory 15 is also satisfied because Diane Jones does not match character-for-character to any

of these 13 alias names that we see listed on page three of the report, correct?

A. Yes.

Q. So in this case of the plaintiff Diane Jones, she would fall within that population of REDACTED, correct?

A. Correct.

Q. Okay. I want to go back to Exhibit 4, please. I want to look at the second paragraph of the supplemental answer.

If you could scroll up just a little bit so we can see the entire second paragraph. Thank you.

Now, Mr. Sohal, I'm focusing on the paragraph that begins, "In further response, RealPage states."

Do you see that?

A. Yes.

Q. Okay. So I'll just note for the record right here that I don't know that we asked that question or that it's responsive to interrogatory 15 or that the court ordered it. So I don't know that it's an admissible answer, but in the event it is, I want to ask you some questions about it so that I understand.

Page 112
MANJITSINGH SOHAL-VOLUME II-CONFIDENTIAL

REDACTED

[redacted]

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

423



Page 113
MANJITSINGH SOHAL-VOLUME II-CONFIDENTIAL

REDACTED

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

424



Page 114
MANJITSINGH SOHAL-VOLUME II-CONFIDENTIAL

REDACTED

[redacted]

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

425



**MANJITSINGH SOHAL-VOLUME II-CONFIDENTIAL**



1  REDACTED

**MANJITSINGH SOHAL-VOLUME II-CONFIDENTIAL**



1  REDACTED

Page 117
MANJITSINGH SOHAL-VOLUME II-CONFIDENTIAL

REDACTED

[redacted]

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

428





REDACT

Q. Okay. And would RealPage have any way of knowing whether Equifax may have completely mixed up the plaintiff, Diane Jones, with a total stranger named Tina Smith and that's the reason why there is a name variation there?

A. I'm sorry. Could you repeat the question?

Q. Yes.

Have you ever heard that the national

bureaus on occasion just mix the files up of people who might have similar social security numbers or other characteristics?

MR. ST. GEORGE: Object to form.

THE WITNESS: I can't say one way or the other.

BY MR. SOUMILAS:

Q. Okay. Have you ever heard of that in your experience of working for RealPage, that on occasion that it has happened, the national bureaus mix up the identities of consumers?

MR. ST. GEORGE: Object to form.

THE WITNESS: I can't answer that question one way or the other.

BY MR. SOUMILAS:

Q. In the hypothetical that I asked you about whether -- you know, what would happen in the scenario if Diane Jones had an additional name of Tina Jones, you would not be able to answer whether Tina -- I'm sorry. Let me do that question again.

In the scenario that I previously asked you where the plaintiff, Diane Jones, would have an additional name on her Equifax file of Tina Smith, would you agree with me that you would have no way of knowing one way or the other whether Diane Jones

and Tina Smith are one in the same person?

A. I still don't understand the question. Sorry.

Q. So let me see if I can break it down.

In the case of the plaintiff, Diane Jones, it appeared as if Equifax did not provide any additional names for her, although it provided some additional addresses, correct?

A. Correct.

Q. Okay. I'm asking you hypothetically if Equifax had provided an additional name of Tina Smith for the plaintiff in this case, Diane Jones, would RealPage have any way of being able to tell based on that data whether Tina Smith and Diane Jones are the same person or whether Equifax has some error in its record?

MR. ST. GEORGE: Object to form.

THE WITNESS: We rely on the credit bureaus to provide information, and name changes are fairly common whether due to a life event or otherwise. So there's no reason to not trust the data based on just the name.

BY MR. SOUMILAS:

Q. So if in my example Equifax gave you the

name Tina Smith as an additional name, RealPage would just accept that at face value and assume that Diane Jones and Tina Smith are the same person?

MR. ST. GEORGE: Object to the form.

THE WITNESS: I mean, we do use the credit names that are returned from the credit bureaus. So the answer is yes.

BY MR. SOUMILAS:

REDACT   

**MANJITSINGH SOHAL-VOLUME II-CONFIDENTIAL**



1   REDACTED

**MANJITSINGH SOHAL-VOLUME II-CONFIDENTIAL**

1    REDACTED

MR. ST. GEORGE: Object to form.

BY MR. SOUMILAS:

Q. Are you aware of any type of an analysis or a study at RealPage as to whether the additional names, if any, provided by the consumer reporting agencies to RealPage as part of the screening process are actually correct additional names for the applicant, and by that I mean, a name that the applicant has actually used?

MR. ST. GEORGE: Object to form.

THE WITNESS: Could you repeat the question? I'm sorry. I didn't understand.

BY MR. SOUMILAS:

Q. Okay. I'm trying to figure out whether for the additional names that RealPage obtains from one or more of the credit agencies, whether you are aware of any type of a study or analysis at RealPage focusing in on those additional names in order to determine whether the applicant, in fact, had used the additional name provided by the credit agency?

A. I don't know of any study. That doesn't mean it wasn't done, but I'm not aware.

Q. Okay. So I think that answers all of my

questions on this supplemental response, sir. So with that, I'm going to close the record of your deposition.

MR. SOUMILAS: Ideally, what I would like is a second volume of your deposition with today's date and attaching the additional Exhibits 4 through 7 which we also used in connection with your testimony. With that, I rest.

MR. ST. GEORGE: This is Tim St. George. I don't have any further questions for the witness. The witness will read and sign.

We'll make confidential designations consistent with the protective order.

MR. SOUMILAS: That's very good. Thank you. Let's go off the record.

\- - -

(Whereupon, the proceedings concluded at approximately 4:17 p.m.)

\- - -

CERTIFICATE

I, Donna M. Ray, a Certified Court Reporter, hereby certify that the testimony and the proceedings in the foregoing matter taken on the date hereinbefore stated are contained fully and accurately in the stenographic notes taken by me and constitutes a true and correct transcript of the same.

____________________

DONNA M. RAY,
Certified Court Reporter and
Registered Professional Reporter.

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means unless under the direct control and/or direction of the certifying shorthand reporter.)

INSTRUCTIONS TO WITNESS

Read your deposition over carefully. It is your right to read your deposition and make changes in form or substance. You should assign a reason in the appropriate column on the errata sheet for any change made.

After making any changes in form or substance which have been noted on the following errata sheet along with the reason for any change, sign your name on the errata sheet and date it.

Then sign your deposition at the end of your testimony in the space provided. You are signing it subject to the changes you have made in the errata sheet, which will be attached to the deposition before filing. You must sign it in front of a witness. Have the witness sign in the space provided. The witness need not be a notary public. Any competent adult may witness your signature.

Return the original errata sheet to your counsel promptly. Court rules require filing within 30 days after you receive the deposition.

ERRATA SHEET

Attach to Deposition of: MANJITSINGH SOHAL

Taken on: Friday, April 17, 2020

In the matter of: Jones vs. RealPage

PAGE LINE NO. CHANGE REASON THEREFOR

SIGNATURE PAGE

\- - -

I hereby acknowledge that I have read the foregoing transcript, dated Friday, April 17, 2020, and the same is a true and correct transcription of the answers given by me to the questions propounded, except for the changes, if any, noted on the errata sheet.

\- - -

SIGNATURE: ______________________

MANJITSINGH SOHAL

DATE: 5/22/2020

WITNESSED BY: s/Bonnie Leigh

A

**a.m** 86:16
**able** 98:2 99:13 119:19 120:13
**accept** 121:2 123:22
**accurately** 126:6
**acknowledge** 129:3
**actual** 107:16 108:2 108:6
**additional** 112:25 115:24 116:1,13 116:24 117:16 118:15 119:18,23 120:7,8,11 121:1 123:3,13,19,22,23 124:4,7,16,19,21 125:7
**address** 104:12,16 109:9 115:6
**addresses** 120:8
**administrator** 99:12
**admissible** 111:23
**adult** 127:19
**agencies** 113:2,7,8 113:13,19 114:16 115:25 116:5,14 123:20 124:6,17
**agency** 113:10,21 114:10,13,17 116:25 123:4 124:22
**ago** 99:2
**agree** 119:24 121:16 122:23
**agreement** 89:17
**alias** 93:8 95:19 97:12 107:20 110:5,7 111:1 112:15 118:16 121:16,23 122:6 122:13 123:5,15
**aliases** 106:2 116:20 117:11,14 117:23,24 118:6
**ambiguous** 106:25
**analysis** 108:7 124:3,18
**and/or** 112:25 115:24 116:12,15 126:19
**answer** 91:4,7,17 91:21 93:12,13,17 93:19 94:6,7,12 94:14,18 95:5,10 95:21,24 99:1,21 99:24 100:23 101:13,18 104:5,6 105:12 109:23 110:11,12 111:10 111:23 112:7,10 115:22,22 119:13 119:19 121:8
**answers** 94:21 124:25 129:6
**apartments** 103:8
**appear** 109:4 115:12
**APPEARANCES** 87:1
**appeared** 97:7 120:6
**appears** 109:14 110:6 118:5
**applicant** 96:3,22 102:23 103:21,25 104:8,14 105:25 107:18 109:8,13 109:25 113:11 116:5,17,18 121:21 122:4 123:24 124:8,9,20
**applicants** 100:17 104:16
**applied** 102:23
**apply** 126:17
**appropriate** 127:6
**approximately** 86:16 100:21 122:21 123:1 125:20
**April** 86:15 128:3 129:4
**arrive** 112:19
**asked** 111:20 119:16,21
**asking** 120:10
**assign** 127:5
**assume** 90:7 100:7 117:16 118:1 121:2
**assumes** 106:25 107:2
**assumption** 123:10
**Attach** 128:2
**attached** 127:15
**attaching** 125:6
**attorneys** 89:15
**August** 108:23 109:16
**available** 92:14
**aware** 124:3,18,24

B

**back** 90:20 91:5 101:8,17 108:22 111:8 113:20,22 113:23 115:20 121:10
**backup** 114:24
**bar** 98:14
**based** 99:20 107:6 120:14,22
**basis** 107:8
**Bates** 98:8
**beginning** 86:16
**begins** 94:15,24 95:3 111:15
**behalf** 86:4
**best** 90:3
**birth** 104:13,17 109:16 114:4
**bit** 91:21 93:17 94:10 111:11 114:3 122:18
**bottom** 112:10
**break** 120:4
**breaking** 122:1
**broader** 112:19
**brought** 89:15
**bugs** 101:8,12
**bureau** 114:5,24 115:1 122:11 123:14
**bureaus** 119:1,10 120:19 121:8,20 122:3
**business** 113:12

C

**call** 114:20
**called** 92:23 110:5
**carefully** 127:3
**case** 89:17 90:19 91:2,16 96:12 106:11 107:25 108:22 111:4 114:18,25 115:2 116:6,23 117:12 118:9 120:5,12
**cases** 114:22
**certainly** 89:21
**CERTIFICATE** 126:1
**certification** 126:16
**Certified** 86:17,21 126:2,13
**certify** 126:3
**certifying** 126:19
**cetera** 94:17 95:4
**change** 127:7,10 128:5
**changes** 120:20 127:4,8,14 129:7
**character-for-cha...** 93:6 95:16,18 97:5,12 110:20,25 112:12,14 117:22
**characteristics** 119:3
**check** 103:6 108:11
**checked** 108:11
**checking** 108:13
**checks** 108:9
**chose** 118:4
**circumstances** 89:23
**clarification** 92:7 107:11
**clarified** 93:23 94:9 95:6
**clarify** 107:4
**clarity** 105:3
**clear** 104:1 106:6 107:12
**client** 114:23
**close** 125:2
**clunky** 98:12
**column** 127:6
**common** 103:7 120:20
**comparison** 107:7
**competent** 127:19
**completely** 118:19
**complying** 108:10
**compound** 106:20
**computer** 88:14 97:25 98:10,19,24 100:21 101:10
**concluded** 125:20
**condition** 97:10 110:18,23
**conditions** 96:8 97:4,16 99:23,23 101:20,20 112:9
**conference** 86:14 87:3,8,16
**confidential** 86:11 125:14
**confusion** 105:6
**connect** 94:3
**connected** 89:18
**connection** 90:2 114:11 125:8
**considered** 122:12
**considering** 112:21
**consistent** 125:15
**constitutes** 126:7
**consumer** 93:2 113:1,7,13,19 115:25 116:14,25 123:20 124:5
**consumers** 93:1 119:11
**contained** 126:5
**continuing** 92:6
**control** 126:19
**copy** 98:18
**correct** 90:9 91:11 94:5,8,17 95:5 96:14,15,20 97:2 97:8,9,14,15,17 97:18 99:21 100:20 101:22 103:18 104:10 107:23,24 108:5 108:18,19 109:6 109:17 110:9,16 110:21 111:2,6,7 112:7,8,16,17,20 115:4,5,9,10,19 117:24,25 118:16 118:17 120:8,9 121:24 122:7,8,13 122:14 123:16,21 123:23,24,25 124:7 126:7 129:5
**corrected** 101:13
**correctly** 95:21 115:14 123:2
**counsel** 88:9 98:16 106:19 127:22
**couple** 97:19 100:7
**course** 100:18
**court** 86:1,17,21,21 89:22 90:13 91:3 91:3,23 94:4,9 111:22 126:2,13 127:22
**court's** 91:14 93:21 95:6 106:8
**creating** 99:17
**creatively** 101:6
**credit** 113:11,21 114:4,10,21 115:1 116:19 120:18 121:7,8 123:3 124:17,21
**criminal** 93:4,8

95:13,17,20 97:6 97:13 105:25 107:20 109:21 110:1 112:13,15 121:23 123:15
**customers** 94:16 95:4,11,25 96:18

D

**D** 86:3 89:15 108:22 109:9
**d/b/a** 86:8
**data** 100:4,4,12,13 100:15,16 104:11 108:10 120:14,22
**database** 99:11 100:11
**date** 104:13,16,25 105:5 109:15 114:4 125:6 126:5 127:11 129:14
**dated** 129:4
**days** 127:23
**DBA** 99:11
**defendant** 86:9 87:12 92:25 93:20
**defendant's** 88:12 92:11
**define** 96:12
**defined** 93:24
**defining** 112:18
**definitely** 100:9
**demonstrative** 105:20
**depends** 113:10
**deposition** 86:14 89:19 90:19,23 91:2 92:3,4 97:21 104:24 105:11 108:25 125:3,5 127:3,4,12,16,23 128:2
**derive** 98:25 99:21
**derived** 100:23 101:14
**DESCRIPTION** 88:11
**designations** 125:14
**desk** 107:4
**determine** 124:20
**Diana** 117:7,17,21
**Diane** 86:3 89:15 108:22 109:9,25 110:13,20,24 111:4 117:6,21
118:11,20 119:18 119:22,25 120:5 120:12,14 121:3
**difference** 122:15 122:21,25
**different** 89:20 102:24 110:7 118:3
**direct** 126:18
**directed** 91:3,23 94:4
**direction** 126:19
**displayed** 115:17
**DISTRICT** 86:1,1
**docket** 91:15,16 93:21 95:7
**document** 93:12 109:1
**dominant** 114:21
**Donna** 86:16 126:2 126:12
**dots** 94:3
**due** 120:20
**duly** 89:6
**duplicate** 103:12
**duplicates** 102:18 103:3,15,16

E

**E** 117:6
**earlier** 100:25
**either** 93:7 116:19 117:22 121:22 122:5 123:4,14
**elaborate** 100:3
**entered** 116:18
**entire** 98:6 111:12
**enumerated** 112:9
**Equifax** 113:14 114:5,9,15,19,20 115:4,6 117:4,16 118:2,10,16,19 119:23 120:6,11 120:15,25
**errata** 127:6,9,11 127:15,21 128:1 129:8
**error** 120:16
**ESQUIRE** 87:4,9
**essentially** 96:17
**et** 94:16 95:4
**event** 111:23 120:21 121:19 122:2,9
**exact** 100:8
**exactly** 109:24
**examination** 88:4 89:9 108:8
**examined** 89:6
**example** 105:24 114:15 120:25
**examples** 97:20
**exclusively** 123:19
**excuse** 91:15
**executing** 101:5
**exercise** 107:6 116:16
**exhibit** 88:12,14,15 88:16 92:5,10,18 92:22 97:24 98:2 98:6 99:3 101:17 104:20,23,24 105:4,4,6,20 108:1,20 111:8 113:23 115:21 117:13 118:5 121:10
**exhibits** 88:8 89:2 92:5 109:2 125:7
**Experian** 113:14 114:15
**experience** 119:9
**extract** 99:5
**extracting** 100:4

F

**face** 121:2 123:23
**fact** 91:10 96:24 124:20
**fairly** 120:20
**fall** 105:21 106:2,4 106:7,13 108:3 111:5 117:1,3,8 118:11
**fallback** 114:25
**falling** 105:13
**February** 90:20,24 91:6 95:12 96:9 101:21 104:25
**feed** 89:25
**field** 110:5 115:11 115:13,15,18 118:2
**figure** 97:16 102:15 102:21 103:4,11 105:18,18,21 112:1,2,19 122:16 122:19,20 124:15
**figures** 123:1
**figuring** 103:15
**file** 119:23
**files** 119:1
**filing** 127:16,22
**final** 101:13,16
**find** 101:7
**finding** 101:2 108:14
**fine** 98:16
**first** 88:10 92:4 93:24 94:15 95:3 96:13,23 97:21 104:23 110:18 114:2 115:8 122:19 123:7,12
**five** 97:24
**Fleming** 86:23
**Floor** 87:10
**focus** 104:19
**focuses** 104:19
**focusing** 111:14 124:19
**following** 93:22 106:8 127:9
**follows** 89:7
**foregoing** 126:4,16 129:4
**form** 100:24 103:23 106:16,22 109:5 119:4,12 120:17 121:5 124:1,10 127:5,8
**found** 110:2
**foundation** 106:24 107:1
**FRANCIS** 87:3
**frequently** 116:4
**Friday** 86:15 128:3 129:4
**front** 90:13 109:9 127:17
**frozen** 102:3,13
**full** 94:11
**fully** 126:5
**further** 93:11 94:24 111:15 116:11 125:11

G

**generate** 96:19
**generated** 94:16 95:4,11,25 101:19 104:1 112:1,23
**Geoffrey** 105:25 107:19
**George** 87:9 98:9 100:24 102:3,9 103:23 106:1,16 106:23 107:20
119:4,12 120:17 121:5 124:1,10 125:10,11
**give** 96:18
**given** 96:25 129:6
**giving** 90:18 91:7
**go** 94:14 97:19 100:3 101:8 105:9 108:20 111:8 113:23 115:20 125:17
**goes** 100:5 113:20
**going** 89:23 90:7 96:12 98:21 101:17 105:5 121:10 125:2
**good** 89:12,13 125:16
**guess** 114:20

H

**Hammonton** 86:23
**handful** 108:12
**happen** 96:21 116:9 119:17
**happened** 119:10
**happens** 116:9
**hard** 101:9
**Haxall** 87:9
**heading** 94:7
**hear** 90:2 102:4,6,7
**heard** 118:25 119:8
**hearing** 90:6
**Heights** 109:10
**hereinbefore** 126:5
**historical** 100:4,13 100:16 103:19
**hours** 100:6
**hypothetical** 88:15 105:19 107:6,15 107:18 108:1 117:15 119:16
**hypothetically** 103:14 120:10

I

**Ideally** 125:4
**identification** 89:3
**identified** 113:1 115:24 116:13
**identifies** 109:8
**identifying** 103:20
**identities** 119:11
**II** 86:12
**illustration** 113:25
**immediately** 93:18

94:7
**include** 103:14 104:12
**included** 93:3 95:13 102:25 117:18
**includes** 103:12 109:20
**INDEX** 88:1
**individual** 93:5 95:15 115:23 116:12
**individually** 86:3
**information** 93:4 95:14 102:25 103:21 110:2,6 113:11,18,22 115:7 120:19
**initial** 108:10
**input** 95:15 96:16 96:24 97:1,11 99:16 104:7 110:13 115:23 116:12 121:13
**inputs** 103:25 113:17
**inputting** 104:11
**inquiry** 96:2
**INSTRUCTIONS** 127:2
**interpreting** 123:1
**interrogatories** 92:13
**interrogatory** 91:4 91:8,11,18 92:24 93:23 94:8,18 95:6 99:1,6,24 104:6 105:12 106:3,14 107:22 108:4 109:24 110:12,18,24 111:21
**interrupted** 90:2
**issue** 115:1
**issues** 101:7
**items** 93:4 95:13

J

**J** 87:9
**Jeff** 87:16
**Jersey** 86:23
**John** 87:4 89:14 98:9 102:3
**Jones** 86:3 89:15 90:19 108:22 109:9,25 110:13 110:21,25 111:5 113:24 114:11,18 115:3,7,17 116:7 116:23 117:6,7,17 117:21,21 118:1 118:11,20 119:18 119:19,22,25 120:5,12,15 121:3 122:9 128:4
**Jones'** 92:12
**Jsoumilas@cons...** 87:6
**judge** 90:13
**jury** 90:13

K

**Kabacinski** 87:16
**keep** 100:13 101:9
**kind** 114:25 123:8
**know** 90:4 98:20 100:5 103:10,13 107:15 111:20,22 114:18 116:4 117:10 119:17 121:13,19 124:23
**knowing** 118:19 119:25

L

**lacks** 106:24 107:1
**landlord** 96:2
**language** 113:3
**lawsuit** 89:16
**lawyers** 89:18
**leasing** 107:4
**LEASINGDESK** 86:8
**leave** 105:5
**led** 98:1
**let's** 92:22 95:2,9 95:23 104:18 108:20 109:19 113:23,24 114:2 115:20 116:21 117:4,5,12 118:1 118:3 125:17
**life** 120:21
**LINE** 128:5
**link** 89:19
**linked** 89:24
**list** 88:15 105:10 107:14,15 112:13 117:14
**listed** 93:8 95:17,19 97:6,13 111:1 112:13,15 121:22
**little** 91:21 93:16 94:10 98:12 111:11 114:3 122:18
**LLP** 87:8
**long** 100:1
**look** 110:9 111:9 117:10,14
**looked** 102:12
**looking** 94:13 97:3 98:21 100:18 115:23 118:5
**looks** 110:7 115:2
**lost** 102:1
**lot** 116:9
**lower** 112:2

M

**M** 86:17 126:2,12
**MAILMAN** 87:3
**making** 96:2 127:8
**manager** 96:2 104:11 112:22
**mandatory** 104:15
**Manjit** 96:22
**MANJITSINGH** 86:15 88:3 89:5 128:2 129:12
**manner** 91:23
**March** 91:14 93:3 95:12 96:8 101:21 112:5,6
**marked** 89:3 92:10 97:24 108:24
**Market** 87:4
**masked** 109:16
**match** 93:6 95:16 95:19 97:5,12 110:20,25 112:12 112:14 117:22 118:15 121:15,22 122:5 123:4,6,8 123:13
**matched** 107:3 116:19
**math** 122:23
**matter** 89:20 108:25 126:4 128:4
**mean** 100:2 101:1 103:24 116:14,15 121:6 123:6 124:8 124:24
**means** 113:6 116:16 126:18
**meet** 96:8 101:19
**message** 114:5
**met** 97:4 99:22 108:14,16
**minutes** 100:6
**mix** 119:1,11
**mixed** 118:19
**moment** 94:23 99:2 101:18 113:24
**morning** 89:12,13
**moving** 103:9
**multiple** 102:24 103:1,8

N

**N** 96:12
**name** 89:14 93:5,7 93:25 95:14,16 96:11,13,16,17,23 96:24,25 97:5,6 97:10 103:22 104:7,19 105:25 106:1 107:19,23 108:3 110:13,15 110:20 112:12,18 112:22,23 113:17 115:11,16,17,23 116:1,5,11,18,20 116:24 117:5,5,16 118:2,3,3,4,9,15 118:22 119:18,23 120:11,19,23 121:1,1,14,15,20 121:21,22 122:3,4 122:5,12,13 123:3 123:5,7,7,12,13 123:14,19,23,24 124:8,21 127:11
**Name'** 93:24
**named** 118:21
**names** 88:15 93:8 95:19 97:13 105:10,13,19 106:6,12 107:3,7 107:14,15,16,18 108:1,2,6,8,17 110:7 111:1 112:15,25 115:24 116:1,13,19 117:11,14 118:16 120:7 121:7,16,23 122:6 123:5,15 124:5,7,16,19
**national** 113:1,7,13 113:18 114:10,16 115:25 116:13,25 118:25 119:10 121:20 122:3
**need** 97:17 127:18
**needs** 101:3
**neither** 116:18
**New** 86:23
**nine** 107:25
**non-match** 122:12
**NORTHERN** 86:1
**notary** 86:17 127:18
**note** 111:19
**noted** 127:9 129:7
**notes** 126:6
**notice** 104:24
**Notwithstanding** 93:19
**number** 91:5 92:24 93:1,21 95:15,18 97:4 99:22 101:19 101:24 104:13 107:19 109:14 112:10 114:4 121:13
**numbers** 94:19 98:8 99:5 119:2

O

**oath** 90:12
**Object** 100:24 103:23 106:16 119:4,12 120:17 121:5 124:1,10
**objection** 106:20 106:21,23 107:9
**objections** 88:13 92:12 93:19
**obtains** 124:16
**obviously** 102:25
**occasion** 90:22 119:1,10
**offender** 93:7 95:17 97:6 110:2,15 112:13 116:20 117:11,14 121:15 121:16,22 122:6 122:12 123:5,14
**Ohio** 109:10
**Okay** 90:10 91:13 91:20,24,25 94:3 94:22 95:2 96:7 96:11,21 97:3,19 98:24 99:7,16 100:10,21 101:12 101:17 102:12,20 103:3,10 104:18 105:7,8,15,16,22 105:23 106:5,11

107:10 108:16 109:19 110:15 111:8,19 112:21 113:16,23 115:2 115:20 116:10,21 117:4,12,20 118:14,18 119:8 120:10 121:10 122:15 123:18 124:15,25
**old** 105:5
**once** 100:22 109:2
**ones** 103:16
**operates** 110:12
**operating** 98:13
**opportunity** 91:17
**opposed** 116:6
**order** 89:19 91:14 93:21,23 94:4,9 95:6 96:4,18 98:25 106:9 124:20 125:15
**ordered** 111:22
**ordinarily** 89:20
**original** 127:21
**outside** 105:13,21 117:2 118:12,13 118:14
**overall** 101:18

**P**

**P.C** 87:3
**p.m** 125:20
**pace** 98:12
**page** 88:2,10 93:13 109:20 111:1 114:2 115:8 117:15 128:5 129:1
**pandemic** 89:23
**paragraph** 93:18 94:6,11,15,17,23 94:23 95:3 111:9 111:12,15 115:21 122:19,20
**paragraphs** 94:20
**part** 92:3,4 99:5 101:2 116:15 124:6
**particular** 96:3 100:17 104:7 109:13 113:8
**Particularly** 90:1
**parties** 91:2
**parts** 95:24
**party** 93:2
**penalty** 90:15
**Pennsylvania** 86:22 87:5
**people** 102:15,19 102:20,22 103:8 107:2 119:1
**percentage** 116:8
**perfectly** 90:7
**period** 100:18 112:5,7
**perjury** 90:15
**person** 91:10 96:5 96:13 102:17 103:12 120:1,15 121:4
**person's** 97:7
**personally** 99:13
**Philadelphia** 86:22 87:5
**pick** 92:5
**Pike** 86:23
**place** 91:2
**plaintiff** 86:6 87:6 92:12 108:22 111:4 118:11,20 119:22 120:5,12
**please** 92:23 93:17 94:12 98:5 104:20 109:19 111:9 114:1 117:13
**plus** 123:7
**point** 87:9 110:8
**population** 107:16 107:23 108:17 111:5 117:1,8 118:11 121:11,12 123:11,18
**predicated** 123:19
**prepare** 99:7
**prepared** 100:17,22 108:21
**prepares** 103:20
**present** 87:15 93:3
**preserve** 107:5
**previous** 105:11
**previously** 90:19 106:12 108:24 119:21
**primary** 115:1,3,3
**probably** 108:12
**problem** 90:8
**problems** 101:13
**proceedings** 125:19 126:4
**process** 100:3 101:1 104:10
124:7
**produced** 98:7
**Professional** 126:14
**profile** 121:12
**projecting** 92:17
**promptly** 127:22
**properties** 102:24
**property** 95:15 96:1 96:17,24,25 97:11 104:7,11,11 110:13 112:22 113:17,17 115:24 116:12,19 121:14
**propounded** 129:7
**protective** 125:15
**provide** 91:4 120:6 120:19
**provided** 93:2 94:19 113:21 116:24 117:5,17 120:7,11 121:14 121:20 122:3,10 123:3,14,20 124:5 124:21 127:13,18
**provider** 114:21
**provides** 93:22
**public** 86:17 127:19
**pull** 104:20 117:13
**purely** 107:5
**purposefully** 118:4
**purposes** 92:10 97:24 105:3
**pursuant** 93:20
**put** 107:22 112:22

**Q**

**QA** 101:16
**queried** 101:3
**queries** 99:4,8,14 99:17,20 100:5,6 100:11,22 101:4,5
**query** 88:14 97:25 98:19,24 100:1 107:21
**question** 92:8,23 93:9 102:2,13 104:2,18 106:24 107:2 111:21 118:23 119:14,20 120:2 124:12
**questions** 98:22 111:24 125:1,12 129:6

**R**

**Ramesh** 108:24
**ran** 98:25 107:21
**Ray** 86:17 126:2,12
**re-mark** 105:4
**read** 92:24 95:21 99:13 125:13 127:3,4 129:3
**reading** 115:14
**reads** 93:19
**really** 103:6
**RealPage** 86:8 89:16 90:20 91:3 91:16 93:20,21 94:4 95:11,25 96:3 98:25 99:7 103:20 108:21 109:5 111:16 113:6,12 114:13 115:3 118:18 119:9 120:13 121:1,14 122:3 123:3 124:4,6,16 124:19 128:4
**RealPage's** 94:16 95:3 97:1
**reason** 90:1 117:20 118:21 120:22 127:5,10 128:5
**recalculate** 91:17 94:5
**recalculation** 91:22
**recall** 90:18
**receive** 127:23
**record** 91:15 92:2,7 92:25 93:4,8 95:14,17,20 97:7 97:13 98:7 106:1 106:2,5 107:5,12 107:20 109:21 110:1 111:19 112:13,15 120:16 121:23 123:15 125:2,17
**reference** 99:2 104:20
**REFERENCED** 88:11
**referring** 94:25
**Registered** 126:14
**relate** 102:16
**relates** 102:21
**rely** 114:22 120:18
**remember** 91:7
**Remote** 86:14 87:3 87:8,16
**repeat** 102:2 118:23
121:25 124:11
**report** 88:16 93:2,6 96:4 97:8 103:2 108:21 109:5,20 111:2 113:21,24 114:2,11,14 116:17 118:16
**reporter** 86:17 89:22 126:2,13,14 126:20
**Reporters** 86:21
**reporting** 86:21 113:2,7,13,19 114:10 115:25 116:14,25 123:4 123:20 124:5
**reports** 94:16 95:4 95:12,25 96:7,19 99:22 100:14,16 101:19,24 102:16 102:21 103:12,19 103:19 112:1 114:21,21 116:17 122:22
**represent** 91:1,14 92:2 98:6 104:22 108:23
**Representing** 87:6 87:12
**reproduction** 126:17
**request** 114:23
**requests** 92:25
**require** 127:22
**required** 90:14 109:15
**requirement** 101:3
**requirements** 108:10,14
**respect** 108:6
**response** 91:11 93:22 94:5,8,24 105:13,14 106:3,4 106:8,14,18 107:22 108:4 111:15 116:11 125:1
**responses** 88:13 92:12 93:24
**responsive** 111:21
**rest** 125:9
**result** 108:3,13 122:11
**results** 98:1 101:16
**Retained** 88:9
**return** 115:6 127:21

**returned** 91:3 113:11 121:7
**review** 90:22
**revised** 91:4,21 105:12 106:3,7,14 106:18 107:22 109:23 110:11
**Richmond** 87:10
**right** 89:24 90:6 92:18 94:20 95:9 99:19 103:18 104:25 106:9,19 109:4,8 111:20 114:3 123:10 127:4
**right-hand** 92:19
**roughly** 122:21
**rules** 127:22
**run** 99:17 100:1,11 100:12 101:7 107:21 108:2,7 113:16

**S**

**safe** 114:5
**SANDERS** 87:8
**satisfied** 97:17 99:19 101:12,15 110:19,24
**saw** 109:2
**saying** 103:5
**says** 92:18 95:11 95:24 97:4 104:24 114:5 115:11,22 116:11
**scan** 114:6
**scenario** 96:22 103:7 109:24 119:18,21 123:2
**scenarios** 106:13
**screen** 92:15,18 98:3
**screening** 86:8 88:16 96:4,19 97:8 100:13,16 103:19 108:21 109:5 113:20 124:6
**scroll** 92:22 93:11 93:16 94:10 98:5 98:11,13,19 109:19 111:11 114:1,2 122:17
**search** 97:22
**second** 92:3,12 94:22,23 97:10 102:13 110:5,23 111:9,12 115:21 122:20 125:5
**security** 104:13,15 109:14 114:4 119:2
**see** 92:15,20 93:9 93:14 94:1,6,11 98:2 104:5 105:1 105:11 109:11 110:1,3 111:1,12 111:17 112:3 113:3,21 114:7 115:8 117:24 118:7 120:4 121:11 122:17
**seeing** 90:6
**seen** 109:1
**sent** 109:2
**separate** 102:15,19 102:20,22 103:2
**sequence** 92:6
**set** 92:13
**sheet** 127:6,9,11,15 127:21 128:1 129:8
**shop** 103:8
**shorthand** 126:20
**show** 92:1,9 97:23
**side** 92:19
**sign** 125:13 127:10 127:12,16,17
**signature** 127:20 129:1,11
**signing** 127:13
**similar** 119:2
**similarly** 86:4
**simple** 107:6
**simplistic** 123:8
**single** 114:14
**sir** 92:17 98:24 100:1 102:15 106:6 118:7 122:23 125:1
**sit** 103:10
**situated** 86:5
**situation** 96:1
**slightly** 112:18
**Smith** 105:25 106:1 107:19,20 118:4 118:10,21 119:23 120:1,12,14 121:1 121:3
**social** 104:12,15 109:14 114:3 119:2
**Sohal** 86:15 88:3 89:5,12 90:18 92:9,10 94:6 96:22 98:3,6,18 99:14 104:22 107:14 108:23 109:22 111:14 128:2 129:12
**soon** 90:9
**sorry** 102:12 118:23 119:20 120:3 122:2,16 124:12
**Soumilas** 87:3,4 88:5 89:11,14 98:15,17 101:11 102:5,11 104:3 106:19 107:10,13 119:7,15 120:24 121:9 124:2,14 125:4,16
**space** 127:13,18
**specific** 101:9 116:8
**Specifically** 105:17
**spot** 108:9,13
**St** 87:9 98:9 100:24 102:3,9 103:23 106:16,23 119:4 119:12 120:17 121:5 124:1,10 125:10,10
**stamp** 98:8
**start** 100:8
**State** 92:25
**stated** 126:5
**statement** 121:25
**states** 86:1 111:16
**stenographic** 126:6
**stick** 95:2
**sticker** 105:6
**stranger** 118:21
**Street** 86:22 87:4
**study** 124:4,18,23
**subject** 93:5 127:14
**substance** 127:5,8
**suggested** 123:8
**Suite** 86:22 87:4
**SUMMIT** 86:21
**supplemental** 88:12 92:11 93:13 93:17,18 94:7,12 94:13,17 95:5 99:1,24 101:18 104:6 111:10 115:22 125:1
**suppose** 122:15
**sure** 91:22 94:12 95:10,23 97:21 103:13 104:4 107:12 108:9,12 109:23 112:24 113:5 114:24 116:21
**sworn** 89:6
**system** 96:3 97:1 103:1 104:1

**T**

**take** 89:19 100:1,5 100:6,22
**taken** 86:15 93:25 96:13,23 126:4,6 128:3
**talk** 91:21
**talked** 97:20 105:10
**talking** 96:1 99:2 105:17 113:8
**talks** 104:6
**Taylor** 110:2,6,16 110:21 117:23,23 118:6
**tell** 90:8 114:9 120:13
**tenant** 88:16 96:3,4 96:19,21 97:7 100:17 104:8 105:24 107:18 108:21 109:5
**testified** 89:6 91:5
**testify** 90:14
**testimony** 125:9 126:3 127:13
**TEXAS** 86:1
**thank** 107:10 111:12 125:17
**THEREFOR** 128:5
**thing** 100:2 116:2
**think** 98:9 114:2 124:25
**third** 88:12 92:11 93:2 109:20
**three** 92:4 111:2 113:12 114:15 117:15
**Tim** 125:10
**time** 95:2 97:21 100:8,18,22 101:10 112:5,6 117:13
**times** 102:24 103:1
**TIMOTHY** 87:9
**Timothy.St.Geor...** 87:11
**Tina** 118:3,10,21 119:19,20,23 120:1,11,14 121:1 121:3
**today** 89:17 90:13 92:3,5,10 97:25 103:10
**today's** 105:5 125:6
**together.'** 93:25
**Toni** 110:2,6,16,21 117:23,23 118:6
**top** 92:18 104:25 122:17
**total** 93:1 99:22 101:24 105:20 118:20
**totally** 98:15 118:3
**track** 101:9
**transcript** 90:23 126:7,17 129:4
**transcription** 129:5
**TransUnion** 113:14
**treated** 123:6
**treating** 92:3
**TROUTMAN** 87:8
**true** 126:7 129:5
**trust** 120:22
**truthfully** 90:15
**try** 90:9 102:13 104:4
**trying** 105:18 107:17 124:15
**turn** 91:20
**two** 94:19,20 95:18 96:8 97:3 99:22 101:19 108:14 112:9,10 122:25
**type** 108:7 124:3,18
**typically** 103:18 104:12

**U**

**underneath** 114:3
**understand** 90:16 91:13 95:10,23 97:22,25 109:23 111:25 112:24 113:5 116:10,21 120:2 121:11 124:13
**understanding** 99:20
**UNITED** 86:1
**University** 109:10

**upper** 96:12
**use** 113:25 114:14 114:23 121:6
**uses** 114:13

**V**

**value** 121:2 123:23
**variation** 115:12,16 115:17 116:1,5,6 117:5,6 118:2,10 118:22 121:20,21 122:4,4,10
**verified** 91:10
**version** 98:10,12
**versus** 90:19
**video** 86:14 87:3,8 87:16 89:19,24
**Videographers** 86:21
**Virginia** 87:10
**volume** 86:12 125:5
**vs** 86:7 128:4

**W**

**Walnut** 86:22
**want** 93:11 94:12 97:19 98:11 104:19 105:3,9,9 107:11 109:22 111:8,9,24 113:5 114:23 117:15
**wanted** 107:4
**warehouse** 100:12 100:15
**warning** 114:5
**wasn't** 124:24
**way** 89:21 90:3 103:11,15 107:21 110:11 112:19 118:18 119:5,14 119:24,25 120:13
**we'll** 90:9 94:22 125:14
**we're** 92:6 96:12 97:3 100:18 105:17 112:18,21 123:10
**weeks** 100:3,7,9 101:2
**went** 101:15 106:12 115:3
**wish** 91:20
**witness** 88:2 94:13 100:25 103:24 104:21 106:17 108:25 119:5,13 120:18 121:6 124:11 125:12,12 127:2,17,17,18,19
**WITNESSED** 129:17
**work** 99:21 109:24
**working** 119:9
**works** 97:22
**world** 89:23
**wouldn't** 103:17
**writing** 101:4
**www.summitrep...** 86:24

**X**

**Y**

**year** 90:20 109:16
**yesterday** 109:3

**Z**

**Zoom** 89:24

**0**

**08037** 86:23

**1**

**1** 106:12
**10** 105:10 106:13 107:14 108:16
**10:02** 86:16
**1001** 87:9
**104** 88:15
**108** 88:16
**11** 90:24 104:25
**120** 91:16 93:21 95:7
**13** 110:7 111:1 117:24
**13th** 109:16
**15** 91:5,18 92:24 94:8,18 95:6 99:1 99:6,24 104:6 105:12 106:3,14 107:22 108:4 109:24 110:12,18 110:24 111:22
**1500** 86:22
**15th** 87:10
**1600** 87:4
**1610** 86:22
**17** 86:15 128:3 129:4
**18,000** 122:22 123:1,12,18
**19** 91:14
**19102** 86:22
**19103** 87:5

**2**

**2017** 93:3 95:12 96:9 100:19 101:21 108:23 112:6
**2020** 86:15 90:24 91:14 95:13 96:9 100:19 101:21 104:25 112:6 128:3 129:4
**215** 86:23 87:5
**23219** 87:10
**25** 95:12 96:9 101:21 112:6
**2510** 87:4
**28** 108:23

**3**

**3** 104:24 108:24
**3:19-cv-02087-B** 86:6
**30** 127:23

**4**

**4** 88:12 89:2 92:5 92:10,18 99:3 101:17 111:8 115:21 121:10 125:7
**4:17** 125:20
**424** 86:23
**447-8648** 86:23

**5**

**5** 88:14 98:2
**567-3315** 86:23

**6**

**6** 88:15 93:3 95:12 96:8 101:21 104:20 105:4 108:1 112:5
**609** 86:23
**697-1200** 87:11

**7**

**7** 88:16 89:2 108:20 113:23 117:13 118:5 125:7
**735-8600** 87:5
**76,000** 118:12
**76,736** 112:2,19 116:17 117:1,3,9 117:19 121:11 122:21

**8**

**800** 86:23
**804** 87:11
**814** 98:8
**847** 98:8
**89** 88:5

**9**

**92** 88:12
**93** 122:16
**94,000** 108:11
**94,552** 94:16 95:4 95:12,25 96:7 97:16 101:20 102:15,21,22 103:4,11 105:18 107:16,23 108:7 111:6 122:20
**97** 88:14
**985-2400** 86:23

# Exhibit 18

Proposed to Be Redacted Entirely

# Exhibit 19

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

DIANE D. JONES, individually and on behalf of herself and all others similarly situated,

Plaintiff,

v.

Civ. No. 1:19-cv-501-JG

REALPAGE, INC. d/b/a LEASINGDESK SCREENING,

Defendant.

ORAL DEPOSITION OF LAURA LEE CASTIGLIONE, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and -numbered cause on the 13th day of December, 2019, from 10:03 a.m. to 1:27 p.m., before Ashley Trevino, CSR in and for the State of Texas, reported by machine shorthand, at RealPage, Inc., 2201 Lakeside Boulevard, Richardson, Texas, pursuant to the Federal Rules of Civil Procedure.

- - -

SUMMIT COURT REPORTING, INC.
Certified Court Reporters and Videographers
1500 Walnut Street, Suite 1610
Philadelphia, Pennsylvania 19102
424 Fleming Pike, Hammonton, New Jersey 08037
(215) 985-2400 * (800) 447-8648 * (609) 567-3315
www.summitreporting.com

A P P E A R A N C E S

FOR THE PLAINTIFFS:

FRANCIS, MAILMAN, SOUMILAS, P.C.
By: John Soumilas, Esquire (Via videoconference)
1600 Market Street
Suite 2510
Philadelphia, Pennsylvania 19103
(215) 735-8600
jsoumilas@consumerlawfirm.com

FOR THE DEFENDANT:

TROUTMAN SANDERS, LLP
By: Ronald I. Raether, Jr., Esquire
5 Park Plaza
Suite 1400
Irvine, California 92614
(949) 622-2700
ron.raether@troutman.com

INDEX

WITNESS PAGE

LAURA LEE CASTIGLIONE

EXAMINATION

By: Mr. John Soumilas 4

EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Policy Document Bate Stamped 790-794 | 15 |

LAURA LEE CASTIGLIONE,

having been first duly sworn, testified as follows:

EXAMINATION

BY MR. SOUMILAS:

Q. Please state your complete name for record, ma'am.

A. Laura Lee Castiglione.

Q. Ms. Castiglione, my name is John Soumilas. I'm an attorney for Diane D. Jones who has brought a lawsuit against RealPage, Inc. The case is presently pending in the Northern District of Texas and through the agreement of RealPage's lawyers, I am here today through a video link from my office in Philadelphia to take your deposition in that case. I understand that you're in RealPage's offices today in Richardson, Texas; is that correct?

A. Yes.

Q. And, ma'am, have you ever given a deposition before or testimony under oath?

A. Yes.

Q. How many times?

A. Less than five.

Q. All right. And what is the most recent time?

A. I believe -- I don't recall exactly, it would have been late -- late 2009 or '10.

Q. All right. Well, it's been a while.

A. Yes.

Q. So I'll give you a refresher of some of the important rules, and the most important rule is that you took an oath subject to the penalty of perjury to tell the whole truth today. Do you understand?

A. Yes.

Q. And even though you're in an office in Texas and I'm in one in Pennsylvania, the proceeding today is a formal one on the record and you have to testify just as if we were in front of a judge and jury. Do you understand that?

A. Yes.

Q. I will ask you a series of questions to find out why you've been identified as a potential witness in this case and what you know relevant to the case, and then I'll give you an opportunity after each question to state your complete answer and we'll proceed in that fashion, okay?

A. Okay.

Q. Especially because we have an audio and visual connection today, if you just don't hear my question, any question, or if a connection is not good or you just did hear me but you didn't understand what I was asking, will you please let me know?

A. Yes.
Q. In those cases I'll do my best to rephrase the question or restate it in a fashion so that we're communicating clearly, okay?
A. Okay.
Q. Is there any reason, Ms. Castiglione, why you can't give your best testimony today?
A. No. There's no reason.
Q. Okay. You said you have given testimony maybe five or so times in the past. Was that in relation with any job you held at RealPage?
A. No. It was not.
Q. Was that in relation to a previous job or were these personal matters?
A. In previous employment.
Q. Okay. Well, let's get a little bit into your professional background. Do you presently work for RealPage?
A. Yes.
Q. Okay. And where is your office located?
A. In Richardson, where we are today, 2201 Lakeside Drive.
Q. How long overall have you worked for RealPage?
A. Two years and eight months.
Q. Has all that time been at the Richardson,

Texas, location?

A. Yes.

Q. And, ma'am, do you presently have a title at RealPage?

A. Yes, manager of screening business operations.

Q. Have you held any other titles in your two and a half years or so at RealPage?

A. Yes, two others.

Q. So, let's do them in reverse chronological order. What was the title immediately before the manager screening business operations position that you're presently holding?

A. Team lead for dispute investigations.

Q. Okay. And then you had one prior title to that when you first joined the company?

A. Yes. Dispute investigator.

Q. All right. Would you please tell us in summary form what your basic duties and responsibilities are in the manager position that you're currently holding?

A. Yes. I oversee the investigative team for consumer dispute investigations that relate to criminal and civil issues.

Q. How many people work on that team?

A. Overall, there are six employees that report to me.

Q. All right. And do those six employees handle investigations based on disputes made by consumers?

A. Yes, but not all. So, two of them do.

Q. And what do the other four do on your team?

A. They are criminal researchers and civil researchers.

Q. And what does that mean to be a researcher at RealPage?

A. It's a different product that they work for, and they do screening research for records that are reported.

Q. I'm sorry, when you say, a different product, what do you mean?

A. It's a different product area that we work for, not -- it's a screening product but not the LeasingDesk screening product.

Q. Okay. So LeasingDesk is the product that is related to background reports for tenant screening purposes?

A. Yes.

Q. Okay. And some of the people who report to you also do research and work related to other products sold by RealPage, correct?

A. Correct.

Q. Is that -- the people who report to you, the

six of them, is that the sum total of employees at RealPage who are involved in the investigation process of consumer disputes or are there additional employees who also have those duties?

A. I'm sorry, could you say that one more time?

Q. Yes. So I understood that the six people who report to you are on your team related to consumer disputes; is that correct?

A. Yes.

Q. And what I'm trying to understand is whether there's any other team or any other group of people who also deal with investigating consumer disputes or whether your team is the entire team at RealPage for that purpose?

A. So just to clarify, consumer disputes and investigations are separate entities. I have the investigative portion of consumer disputes for LeasingDesk screening for criminal.

Q. And that's what I'm trying to understand. In RealPage, what's the difference between the dispute team and the investigative team?

A. The dispute team is -- there's a consumer operations group that handles what are called disputes. Now, they don't necessarily investigate, they do the processing and the compilation of information. The

investigative piece for criminal items falls to my team, the investigative team.

Q. Okay. I think I understand. So there is a separate team, but their role is statistical in nature or you said they process information, correct?

A. Right. They receive it from a consumer and they compile it into a -- into documentation. There are other types of disputes that happen at RealPage, but the criminal dispute investigation piece is my team's responsibility. So what's compiled by a consumer dispute team, if it is criminal and requires investigation, comes to my team.

Q. That's helpful. Thank you.

So how many people work at RealPage on the consumer dispute team?

A. I'm not certain the number.

Q. And am I correct that in certain instances where it's determined that it's a criminal record that is the subject of a dispute that requires an investigation, those types of disputes would be forwarded on to your team for investigation?

A. Yes.

Q. Then am I accurate that your team of six would handle all criminal dispute investigations at RealPage?

A. Not necessarily. Those that are assigned to

us, yes.

Q. Are there additional teams or additional divisions that handle investigations into disputes by consumers about criminal records?

A. For LeasingDesk screening, no.

Q. Okay. When you said that earlier in your career at RealPage as dispute investigator, were you one of those people who are currently on your team and who would investigate consumer disputes of criminal records?

A. Yes.

Q. So you have firsthand knowledge of that process, how that investigation is conducted, correct?

A. Yes.

Q. And then you also presently have a manager or supervisory role for those same type of investigations into consumer disputes of criminal records?

A. Yes.

Q. We're going to get back to that a little bit later today, but I want to get a little better understanding of your overall background.

So before you joined RealPage, what sort of work were you doing?

A. I was in law enforcement as a civilian employee.

Q. Who did you work for?

A. I worked originally for the Rowlett, Texas, police department for fifteen years, and after that I consulted with the North Texas Emergency Communications Center in Carrollton, Texas.

Q. And how long did you do that, the consulting?

A. For a year.

Q. And then immediately after the year of consulting you joined RealPage?

A. No, not immediately, it was the next job that I had, but I didn't transition immediately.

Q. Okay. Will you just explain?

A. Yes, I took some time off.

Q. Okay. You said you had a civil job with the police department for fifteen years, what was that?

A. I was a communications center manager. So I managed police, fire, EMS dispatch, and the 911 center.

Q. Got it. In your time in working in law enforcement, did you have any specific responsibilities related to criminal records?

A. Yes.

Q. And what is your experience with criminal records maintained by courts, for example?

A. Frequently was -- well, we housed and entered all warrants that were issued from our court. We confirmed any warrant that was called in for and we

managed that whole process of warrant confirmation and clearance entry.

Q. Okay. Any other type of arrests for police or court records related to crimes that you dealt with on a regular basis while you were in the law enforcement field?

A. Well, yes, we accessed them continuously, daily, as part of our -- as part of police dispatch, we were continually running individuals and confirming warrants.

Q. And you said this was on a daily basis?

A. When I originally started as a dispatcher, yes. I eventually managed the team, but my team did that on a continual basis.

Q. And when you say, running individuals, would you please explain for the record what you mean by that?

A. Sure. So, as a result of an encounter with law enforcement, running their name and information through the state and national database, law enforcement databases for warrants and information.

Q. And when you say, running their name and information, what specifically do you mean?

A. Their name and date of birth.

Q. Ms. Castiglione, other than your experience with law enforcement and law enforcement consulting that

we've talked about, do you have any other type of work experience prior to joining RealPage?

A. No.

Q. What is your educational background, ma'am?

A. I graduated in December of 2014 with a bachelor's degree from the University of North Texas, and an associate's degree from Dallas County Community College in 2012.

Q. Thank you. You said you gave some testimony for a prior employer years ago. Who was that?

A. Rowlett Police Department.

Q. And in what context did you give testimony under oath, was it in court?

A. Yes.

Q. What type of proceeding was it that involved your testimony?

A. Trials. So I would be as the --

Q. I'm sorry, go on.

A. I test- -- the last one I recall I was also involved in searching prisoners in the jail, female prisoners in the jail, and it was a fight, so it was a trial for that.

Q. Okay. So on occasion when there were criminal proceedings brought by the prosecutor's office, they needed you as a witness in one of the cases?

A. Yes.
Q. Am I correct that you've never given testimony under oath on behalf of RealPage before?
A. That's correct.
Q. That would be trials, depositions, hearings, never?
A. Never.
Q. Okay. And have you been asked by RealPage as part of your job to sign any documents under penalty of perjury, like legal documents in a lawsuit, for example, such as interrogatory responses or affidavits?
A. I don't -- I don't recall. I don't recall. Not that I -- no, not that I recall.
Q. Okay. Did you do anything to prepare to give testimony today in the Jones case?
A. I did, yes.
Q. What did you do?
A. I met yesterday with Mr. Raether to get an -- some information on what -- the reason that I was called for and to look over some procedures and provide a procedure that I had written, just a brief explanation, and some discussion of what to expect.
(Exhibit No. 1 marked.)
Q. Okay. And for the record, we have a document marked as Exhibit Castiglione 1 today. It has Bates

stamp number 790 through 794 on the bottom right. Would you please take a look at that?

A. Yes.

THE WITNESS: Thank you.

A. Okay.

Q. Ms. Castiglione, is this the policy document that you just referenced reviewing yesterday with RealPage's attorney, Mr. Raether?

A. Yes, I did provide this after our discussion.

Q. Okay. And this one on the front page says, prepared by Lee Castiglione. That's you?

A. Correct.

Q. Okay. Other than this investigative methods policy document, did you review any other documents in preparing to give testimony today?

A. Yes.

Q. What else did you review?

A. I read the -- sorry, I don't recall the name of it. The documentation from the court, the updated case information filing. Briefly discussed and --

MR. RAETHER: Let me just caution you, you don't disclose what you and I discussed, that's attorney-client privilege.

THE WITNESS: Sorry.

MR. RAETHER: You can identify the

documents.

THE WITNESS: Okay.

Q. So that's right, Ms. Castiglione, I'm just trying to see what documents you looked at to prepare to give testimony. So you said -- you said something from the court. Are you talking about Ms. Jones' lawsuit, the complaint to get this lawsuit started?

A. No.

Q. Are you talking about criminal records that were on Ms. Jones' RealPage background report which she disputed with RealPage?

A. I looked at the -- yes. The screening report.

Q. And the screening report is the RealPage report about the plaintiff in this case, Diane Jones?

A. Yes.

Q. Okay. And did you look at any of the underlying criminal records or anything that was placed on Ms. Jones' screening report?

A. I looked at what was contained on the screening report, including the records that appeared on the screening report.

Q. So you would agree with me that there was a record that appeared on Ms. Jones' screening report that was a criminal record from Georgia; do you recall that?

A. Yes.

Q. I'm trying to get a sense of whether you reviewed any court documents from Georgia related to that crime or whether you were simply looking at the screening report on Ms. Jones prepared by RealPage?

A. So yesterday I looked at the screening report only.

Q. Okay. Have you seen that before yesterday for Ms. Jones?

A. Yes.

Q. When?

A. I don't recall -- I don't recall when. I don't recall.

Q. Did you personally, Ms. Castiglione, have anything to do with investigating any dispute made by Ms. Jones to RealPage?

A. No.

Q. Have you ever interacted directly with the plaintiff, Ms. Jones, in any way, over the phone, write to her, anything?

A. No.

Q. Did you have anything to do in the preparation of the screening report about her that was sold to a landlord in the Cleveland area?

A. No.

Q. Okay. Am I correct, then, that you have no

firsthand interactions or knowledge concerning the plaintiff in this matter, Diane Jones?

A. As far as the screening and investigation, no.

Q. All right. Did you have any other firsthand knowledge in processing any report or any information concerning the plaintiff, Ms. Jones?

A. No.

Q. Okay. That's one thing I'm trying to figure out, whether you're an eyewitness, if you will, to something that happened directly with Ms. Jones, and it sounds to me like you're not, you are not aware that there was a report about her, or that she made a dispute or anything like that before this lawsuit was brought?

A. That is correct.

Q. Okay. During your day-to-day operations of working at RealPage, you never came across Ms. Jones or her file, or her dispute, nothing like that?

A. Correct.

REDACT [redacted]

**LAURA LEE CASTIGLIONE**



1    REDACTED

**LAURA LEE CASTIGLIONE**



1   REDACTED

Page 22
LAURA LEE CASTIGLIONE

REDACT [redacted]

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

475



Page 23
LAURA LEE CASTIGLIONE

REDAC

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

476



Page 24
LAURA LEE CASTIGLIONE

REDACTED [redacted]

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

477



Q. All right. Ms. Castiglione, do you know a Becky Boyst?
A. Yes.
Q. How do you know her?
A. She is a colleague of mine in screening operations.
Q. And how long have you known Ms. Boyst?
A. I have known her since I started. I met her when I started.
Q. How frequently do you work with her?
A. Today -- how frequently do I work with her?
Q. Yes.
A. We encounter each other daily.
Q. Okay. And is she a part of your team?
A. No.
Q. Where does she work within screening operations relative to your team?
A. Courtney Grosse is the director of screening operations and in that umbrella is screening consumer operations which is Becky -- Becky manages that team, and screening business operations, which is the team that I manage. So we're managers --
Q. Okay.
A. -- both managers in screening operations.
Q. Got it. So you and Ms. Boyst have parallel

positions, if you will, but in different divisions?

A. Correct.

Q. Of screening operations.

A. Correct.

Q. All right. I understand.

Now, I'm going to ask you a few questions that sounds to me are not within your area, but correct me if I'm wrong because I want to make sure I understand your background and what you do at RealPage.

Do you presently or did you ever in your time at RealPage have a job concerning the initial preparation of screening reports to be delivered to a potential landlord?

A. No.

Q. Do you now or did you ever in the past have anything to do with creating the matching logic used at RealPage to match a particular criminal record to a particular tenant applicant in the initial preparation of the screening report for a landlord?

A. No.

Q. So am I correct that the part of the business that you work in relates only to those situations where a consumer finds out that a screening report that was prepared about them had some information on it that the consumer believes is not correct and that they're going

to make a dispute to RealPage about that information?
MR. RAETHER: Objection to form.
A. Can you state that one more time, please.
Q. Yes. Is your experience with RealPage exclusively related to situations where consumers are going to make a dispute about a report, screening report, that has already been prepared and delivered to someone?
A. It is after a consumer has initiated a dispute for criminal records.
Q. Okay. Is that typically done where there is a criminal record on a report that a consumer sees and they disagree with it, they think it shouldn't be there?
MR. RAETHER: Objection, form.
A. I don't know if -- I don't know at what point they're making that decision. I know that it is a consumer initiated dispute.
Q. Okay. Do you know how many disputes overall from consumers RealPage receives in any given year?
A. No.
Q. Do you know the percentage of consumers who make a dispute in relation to the overall number of reports sold by RealPage?
A. No.
REDAC [redacted]

Page 28
LAURA LEE CASTIGLIONE

REDACTED [redacted]

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

481



**LAURA LEE CASTIGLIONE**



1    REDACTED

Page 30
LAURA LEE CASTIGLIONE

REDAC [redacted]

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

483



Page 31
LAURA LEE CASTIGLIONE

[redacted]?

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com
484



Page 32
LAURA LEE CASTIGLIONE

REDAC [redacted]

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

485



Page 33
LAURA LEE CASTIGLIONE

REDACT [redacted]

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com
486



Page 34
LAURA LEE CASTIGLIONE

REDACTED [redacted]

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

487



**LAURA LEE CASTIGLIONE**

1   REDACTED



Page 36
LAURA LEE CASTIGLIONE

REDAC

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

489



Page 37
LAURA LEE CASTIGLIONE

REDACTED

[redacted]

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com
490



Page 38
LAURA LEE CASTIGLIONE

REDAC [redacted]

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com
491



Page 39
LAURA LEE CASTIGLIONE

REDACTED

[redacted]

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

492



Page 40

LAURA LEE CASTIGLIONE

REDAC [redacted]

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

493



Page 41
LAURA LEE CASTIGLIONE

REDACTED [redacted]

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

494



**LAURA LEE CASTIGLIONE**



1    REDACTED

**LAURA LEE CASTIGLIONE**

1   REDACTED



Page 44
LAURA LEE CASTIGLIONE

REDACTED
[redacted]

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com
497



**LAURA LEE CASTIGLIONE**



1   REDACTED

REDACTED

Q. Right. That's what I'm trying to get at, okay. So we can go off the record and take a break now that we finished that thought. How long do you need?

MR. RAETHER: Let's take ten minutes.

MR. SOUMILAS: Sure. That's reasonable. I'll be back here in ten.

(Break taken at 11:20 a.m. to 11:39 a.m.)

MR. SOUMILAS: Let's go back on the record.

REDAC

Page 47
LAURA LEE CASTIGLIONE

REDACTED [redacted]

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

500



**LAURA LEE CASTIGLIONE**



1    REDACTED

Page 49
LAURA LEE CASTIGLIONE

REDACTED [redacted]

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

502



Page 50
LAURA LEE CASTIGLIONE

REDACTED

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

503



Page 51
LAURA LEE CASTIGLIONE

REDACTED [redacted]

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

504





**LAURA LEE CASTIGLIONE**

1  REDACTED

**LAURA LEE CASTIGLIONE**



1   REDACTED

**LAURA LEE CASTIGLIONE**

1   REDACTED



**LAURA LEE CASTIGLIONE**

1   REDACTED



Page 56
LAURA LEE CASTIGLIONE

REDACT [redacted]

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

509



Page 57
LAURA LEE CASTIGLIONE

REDACTED [redacted]

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

510



Page 58
LAURA LEE CASTIGLIONE

REDACTED

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

511



Page 59
LAURA LEE CASTIGLIONE

REDACTED

[redacted]

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

512



Page 60
LAURA LEE CASTIGLIONE

REDACTED

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

513



**LAURA LEE CASTIGLIONE**

1    REDACTED



Page 62
LAURA LEE CASTIGLIONE

REDACT [redacted]

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

515



**LAURA LEE CASTIGLIONE**



1    REDACTED

**LAURA LEE CASTIGLIONE**



1    REDACTED

**LAURA LEE CASTIGLIONE**



1    REDACTED

Page 66
LAURA LEE CASTIGLIONE

REDACT [redacted]

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

519



Page 67
LAURA LEE CASTIGLIONE

REDACTED

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

520



Page 68
LAURA LEE CASTIGLIONE

REDACT [redacted]

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com
521



Page 69
LAURA LEE CASTIGLIONE

REDACTED [redacted]

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

522



Page 70
LAURA LEE CASTIGLIONE

[redacted]

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

523



Page 71
LAURA LEE CASTIGLIONE

REDACT [redacted]

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

524



Page 72
LAURA LEE CASTIGLIONE

REDAC [redacted]

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

525



Page 73
LAURA LEE CASTIGLIONE

REDACTED

[redacted]

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

526



Page 74
LAURA LEE CASTIGLIONE

REDACTED

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

527



Page 75
LAURA LEE CASTIGLIONE

REDAC [redacted]

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

528



Page 76
LAURA LEE CASTIGLIONE

REDACTED [redacted]

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

529



Page 77
LAURA LEE CASTIGLIONE

REDACT [redacted]

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com
530



Page 78
LAURA LEE CASTIGLIONE

REDACTED

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

531



Page 79
LAURA LEE CASTIGLIONE

REDACT [redacted]

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

532



**LAURA LEE CASTIGLIONE**



1    REDACTED

Page 81
LAURA LEE CASTIGLIONE

REDACT [redacted]

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

534



MR. RAETHER: John, when you get to a good place for a break, we've been going for over an hour.

MR. SOUMILAS: Sure. How long a break do you think you want?

MR. RAETHER: Let's go off the record.

(Break taken from 12:38 p.m. to 12:51 p.m.)

Page 83
LAURA LEE CASTIGLIONE

REDACTED [redacted]

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

536



Page 84
LAURA LEE CASTIGLIONE

REDACTED

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

537



**LAURA LEE CASTIGLIONE**

1   REDACTED

Page 86
LAURA LEE CASTIGLIONE

REDACTED

[redacted]

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

539



Page 87
LAURA LEE CASTIGLIONE

REDACTED

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

540



Page 88
LAURA LEE CASTIGLIONE

REDACTED [redacted]

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

541



Page 89
LAURA LEE CASTIGLIONE

REDACTED

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

542



**LAURA LEE CASTIGLIONE**



1   REDACTED

Page 91
LAURA LEE CASTIGLIONE

REDACTED

[redacted]

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

544



**LAURA LEE CASTIGLIONE**



1    REDACTED

Page 93
LAURA LEE CASTIGLIONE

REDACT [redacted]

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

546



Page 94
LAURA LEE CASTIGLIONE

REDAC

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

547



Page 95
LAURA LEE CASTIGLIONE

REDACTED [redacted]

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

548



**LAURA LEE CASTIGLIONE**

1   REDACTED



Page 97
LAURA LEE CASTIGLIONE

REDACTED [redacted]

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

550



Page 98
LAURA LEE CASTIGLIONE

REDACTED

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

551



**LAURA LEE CASTIGLIONE**



1   REDACTED

REDACTED

Q. All right. So those are all the questions that I have for today, ma'am. And I would just ask that Exhibit Castiglione 1 be attached to your transcript. And I'll turn you over to your counsel if he has any questions.

MR. RAETHER: So I have no questions. The witness would like to read and sign, and the transcript will be subject to the protective order and the process outlined in that order for review and designation of confidentiality.

MR. SOUMILAS: Okay. Let us know promptly, please, what you might think is confidential in this transcript and we'll treat it according to the order.

So with that said, we're off the record. Thank you, everybody.

THE REPORTER: Wait one second, please.

MR. RAETHER: Hey, John. Hey, John.

MR. SOUMILAS: Yeah?

THE REPORTER: Can I get your orders on the record, please.

MR. RAETHER: She wants your order.

MR. SOUMILAS: So we have a standing order through Summit. That's who you're there for today, right?

THE REPORTER: Yes. Okay. That's all I needed.

MR. SOUMILAS: The standard from Summit. They know exactly what that is.

MR. RAETHER: We just want the mini. She'll read and sign. You can communicate through me for that.

\- - -

(Wherupon, the proceedings concluded at approximately 1:27 p.m.)

STATE OF TEXAS )

I, Ashley Trevino, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, LAURA LEE CASTIGLIONE, was duly sworn by me and that the transcript of the oral deposition is a true record of the testimony given by the witness and the statements of counsel;

That review and signature was reserved;

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Certified to by me this 2nd day of January, 2020.

__________________________________

Ashley Trevino, Texas CSR 9295
Expiration Date: 12/31/20
Summit Court Reporting, Inc.
1500 Walnut Street
Suite 1610
Philadelphia, Pennsylvania 19102
Phone: 215.985.2400

INSTRUCTIONS TO THE WITNESS

Read your deposition over carefully. It is your right to read your deposition and make changes in form or substance. You should assign a reason in the appropriate column on the errata sheet for any change made.

After making any changes in form or substance which have been noted on the following errata sheet along with the reason for any change, sign your name on the errata sheet and date it.

Then sign your deposition at the end of your testimony in the space provided. You are signing it subject to the changes you have made in the errata sheet, which will be attached to the deposition before filing. You must sign it in front of a witness. Have the witness sign in the space provided. The witness need not be a notary public. Any competent adult may witness your signature.

Return the original errata sheet to your counsel promptly. Court rules require filing within thirty days after you receive the deposition.

ERRATA SHEET

Attach to Deposition of: Laura Lee Castiglione
Taken on: December 13, 2019
In the matter of: Jones v. RealPage, Inc., et al.

PAGE LINE NO. CHANGE REASON

SIGNATURE PAGE

- - -

I hereby acknowledge that I have read the aforegoing transcript, dated December 13, 2019, and the same is a true and correct transcription of the answers given by me to the questions propounded, except for the changes, if any, noted on the Errata Sheet.

- - -

SIGNATURE: ______________________
Laura Lee Castiglione

DATE: ______________________

WITNESSED BY: ______________________

A
a.m 1:15 46:15,15
able 38:21 39:3,10 45:9,14 55:8 56:5 56:7 62:2,6,24 63:6 66:7 77:5,9 77:14 80:6 86:4 95:19 96:25 98:17
above-styled 1:14
absolute 58:3
access 72:25 79:19 80:18
accessed 13:7
accomplish 54:1
accuracy 35:10,18 36:4,20,21 37:5 39:3 73:10 76:24
accurate 10:23 32:16 39:17 40:14 40:15,23,25 46:20 47:2,5,21 58:12 62:4,15 74:19 78:13,14 80:10,11 81:2 83:2,9 98:24
accusations 64:13
acknowledge 105:5
action 102:12,14
actual 36:21 48:25 67:14
add 49:25 73:25
additional 9:3 11:2 11:2 72:11
additionally 96:16
address 69:14 93:8 96:1,8 99:18
addresses 69:21 70:20 91:20 93:16 94:21
administration 51:1
administrative 50:25
adult 103:18
affidavits 15:11
aforegoing 105:6
ago 14:10 21:21 28:8
agree 17:22 43:19 46:18,24 50:18 54:19 56:2 59:7 68:22 71:10 80:21 93:13,23 94:1,9 94:12 95:7
agreement 4:11
ahead 50:10 62:19 64:17
al 104:3
alias 93:9 96:17
aliases 93:16
alike 90:19,23 91:3 91:7
altered 62:9
and/or 92:14
answer 5:18 34:21 44:20 52:2 73:9 78:3 79:1 90:18 97:6
answered 59:14 67:1
answers 105:8
anybody 24:17 31:4
anyway 39:23 40:24
apartment 44:5
apologize 72:15
appear 64:19
appearance 78:9
appeared 17:20,23
applicable 89:4
applicant 26:18 55:8 71:20
applied 44:5
applies 86:8,9
apply 65:13 77:1 88:19
appropriate 37:15 64:12 70:16 71:12 71:24 72:4,19 74:9,16 76:3 103:5
approval 24:20,23
approximately 31:3 101:18
area 8:14 18:23 26:7
arrest 68:25
arrested 93:6
arrests 13:3
Ashley 1:16 102:2 102:20
aside 53:4
asked 15:8 20:18 59:13 66:25
asking 5:24 58:20 58:21,22 89:9 96:9 99:23,25
assessment 100:1
assign 103:4
assigned 10:25 41:10 48:4,22
assignment 51:2
associate's 14:7
associated 96:17
assume 44:4 95:12
assumes 62:20
assurance 99:1
Attach 104:2
attached 100:12 103:14
attempt 37:10 44:15 67:21 76:11 97:2 98:3,11
attempted 41:11
attorney 4:9 16:8
attorney-client 16:23
attorneys 19:24 102:12
audio 5:21
author 24:9,11 51:18,20
authored 23:25 49:18 50:19 53:14 53:16 66:4
authority 69:1
availability 58:14 76:13 79:13,19
available 38:2,7 41:13,16 44:16,16 56:9 58:2,7,24 60:14 63:17 70:7 70:10,24 74:18 77:15,16 93:17 94:22 95:9 98:4,8 98:25
avenues 75:10
avoid 86:13
aware 19:11 81:1 81:13 83:10
B
bachelor's 14:6
back 11:18 36:8 39:11 42:19,24 46:14,16 49:18 65:3 70:6 73:18 75:2,8,13 82:25 83:7
background 6:17 8:18 11:20 14:4 17:10 23:2,4 26:9 81:17
Backgroundchec... 73:14
badgering 64:11
base 61:7
based 8:2 24:14 38:3 45:13 48:23 52:8 56:8 58:13 59:15 61:23 77:14 85:4,19 89:11,16 89:19,21,22 90:1 90:3,5 94:7 96:4,8
basic 7:18
basically 29:16 60:10 86:4
basis 13:5,11,14 30:14 56:22 64:8 64:18 81:22
Bate 3:10
Bates 15:25
Becky 25:2,20,20
behalf 1:3 15:3
belief 56:20,21,23 57:6
beliefs 56:13
believe 4:24 32:7 55:7 56:7,13 57:10 61:9 64:24 64:24
believes 26:25
belong 32:14 34:16 35:2 39:6 40:20 41:1,6 45:2,10,13 45:24 55:4,10,13 55:16,18 57:17 63:14,22 65:6 68:4 80:6 86:17 87:5
belonged 63:1
belonging 40:22 81:9
belongs 32:16 37:6 38:23 39:21 41:7 41:20 55:7,17,23 56:6,8 64:25 65:24 77:6,10 86:18
best 6:2,7 58:24 81:6
better 11:19 77:19
BGC 72:25 73:6,13 74:13 76:5 89:12 89:17
birth 13:23 65:18 69:14 70:21 91:20 93:17 94:20 95:12 95:13,15 96:10,11 96:11 97:25 98:2 98:4,5,13,13,15 99:7,7,17,17,20
bit 6:16 11:18 37:12
born 95:25
boss 20:25
bottom 16:1 62:3,5 62:14
Boulevard 1:18
Boyst 25:2,7,25
break 44:18,19 46:10,15 51:4 82:8,9,12
brief 15:21
Briefly 16:20
brought 4:9 14:24 19:13
bucket 52:16
buckets 52:7
bulk 49:25
business 7:5,11 25:21 26:21 32:9 36:14 73:15
C
C 2:1
California 2:12
call 42:1 72:10,16 72:20 75:2 89:21 89:22,24
called 9:23 12:25 15:19 49:1 51:22
calling 72:19 76:4
calls 74:13
career 11:7
carefully 103:2
Carrollton 12:4
case 4:10,14 5:16 5:16 15:15 16:19 17:14 19:20 27:25 30:7 36:22 37:6 40:5,13,15 42:5 48:11 49:13,17 59:12,16 60:11 64:1 65:22 66:9 68:2,10 69:2 71:21 74:4,10,10 75:8 77:24 85:2 87:15,17,18,20 88:1 89:7,11,16
cases 6:2 14:25 44:13 47:20 52:3 55:16,19,20,24 56:4 64:20 71:5 80:21
Castiglione 1:12 3:3 4:1,7,8 6:6 13:24 15:25 16:6 16:11 17:3 18:13 20:11 21:18,23 22:16 24:1,9 25:1 28:8 29:8,11 31:14,20,24 35:20

37:24 46:17 49:20 64:18 75:15 82:13 82:14 100:12 102:5 104:2 105:17
**categorization** 49:15
**category** 48:4,6 49:1,25 99:9,11 100:2,4
**cause** 1:14
**caution** 16:21
**center** 12:4,15,16
**certain** 10:16,17 23:5 39:19 57:18 61:23 78:14 80:9 82:4
**certainty** 57:16 58:3
**Certified** 1:22 102:2 102:15
**certify** 102:3,10
**cetera** 50:2 69:3 70:5
**change** 24:22 28:23 29:10,12 39:17 40:17 54:16,17 84:3,15,20 85:13 87:9,13 88:3,9,17 89:15,20,25 90:3 90:5 103:6,9 104:4
**changed** 89:10
**changes** 49:25 103:4,7,13 105:9
**chronological** 7:9
**circumstance** 62:8 63:9 80:19 92:1
**circumstances** 23:18 39:19,20 62:23 70:17 81:1 97:10
**city** 96:2 99:18
**Civ** 1:6
**civil** 1:19 7:22 8:5 12:13 69:2
**civilian** 11:23
**claim** 55:10 86:17
**claiming** 85:5
**clarification** 72:11
**clarify** 9:15 31:21 36:11 84:19
**class** 52:11
**classification** 42:8 42:14,16 43:12 48:2,18 49:12
50:25 51:5 52:17 66:18
**classified** 19:23 42:2,6 48:12 51:11 52:6,25 53:1
**classifies** 43:16 65:22 66:9
**classify** 43:5 52:3 52:12 66:1 77:18 78:1
**clear** 77:25 80:17
**clearance** 13:2
**clearly** 6:4 61:22
**clerk** 70:5 72:10,16 72:19,20 74:13 75:2 76:5 77:21 84:5,11,17 85:7 88:6,10,23,24 89:3,6,21,22,24
**Cleveland** 18:23
**close** 83:24 98:20
**collaborate** 24:17
**colleague** 25:5
**College** 14:8
**column** 103:5
**come** 20:14 62:2 94:25
**comes** 10:12 48:11 49:13 51:11,14 56:14 86:2
**commit** 33:21 34:17 38:13 40:20 44:7 86:18
**committed** 39:5
**communicate** 101:14
**communicating** 6:4
**communications** 12:3,15 89:11
**Community** 14:7
**company** 7:15 73:16
**compare** 69:7
**competent** 103:18
**compilation** 9:25
**compile** 10:7 74:2
**compiled** 10:10 33:25
**complaint** 17:7
**complete** 4:5 5:18 31:22 42:20,23 98:1,3
**completion** 66:6
**computer-based** 90:21
**concerned** 57:3
**concerning** 19:1,6 21:13,16 22:9 26:11
**concerns** 77:13 78:5
**conclude** 98:18
**concluded** 101:18
**concludes** 43:20 45:1
**conclusion** 45:3 46:18,25 47:8 65:23 66:10 67:2 83:6,18
**conduct** 22:14 23:15 29:24 32:22 35:5 74:18
**conducted** 11:12
**conducting** 31:25 36:3
**conducts** 31:5
**confidence** 79:7,9 98:20 99:4 100:3
**confident** 79:2,18 98:22 99:9
**confidential** 100:21
**confidentiality** 100:19
**confirm** 37:20 39:10 41:16 45:9 74:1 79:14
**confirmation** 13:1
**confirmed** 12:25 37:21 79:17
**confirming** 13:9 57:13 65:15
**confirms** 88:24
**confuse** 50:23
**connection** 5:22,23 76:2 97:8
**consider** 48:9 56:3 61:2 74:10 92:1,2 92:8 93:14,23 94:15 95:15 97:12
**considered** 56:17 57:3,14 86:12 98:23
**considering** 86:14
**consulted** 12:3
**consulting** 12:5,8 13:25
**consumer** 7:21 9:3 9:7,12,15,17,22 10:6,10,15 11:9 11:16 19:21,23 25:19 26:23,25
27:9,12,17,25 29:24 30:13,18 31:9,12 32:4,12 32:17,24 33:14,19 33:24 34:2,11,22 35:1,16 37:7 38:11 40:19 41:5 41:6 42:24,25 43:1,4,7,14,16,22 44:4,12 45:13 48:4,12,19,23 49:9,16 50:14 51:22 52:6,9 53:13,22 54:22 55:4,13,16,23 56:6,8,16 57:2,8 57:17,19 58:14,17 59:10,11 61:2,22 61:24 62:10,13 63:1,7,13,22 64:22,23,25 65:9 65:16,25 67:20 69:18 74:6,23 75:7 77:6,10 78:24 79:17,20 86:2 87:18 88:1,8 88:13,16 90:24 91:16 92:7 94:8 95:6,9,18,23 96:4 98:10,19 99:2,6 100:4,5
**consumer's** 32:20 34:5 40:24 43:23 46:21 47:3 48:21 50:22 54:7 82:25 83:8
**consumers** 8:2 11:4 27:5,19,21 34:14 60:12,19,22 61:8,16 68:5 72:1 85:23 86:9 88:21 98:1
**contacts** 32:12 70:5
**contain** 69:18
**contained** 17:19 73:11
**contending** 35:1
**context** 14:12 37:13 71:17 94:18
**continual** 13:14
**continually** 13:9
**continuously** 13:7
**conviction** 81:4
**correct** 4:16 8:23 8:24 9:8 10:5,17 11:12 15:2,4
16:12 18:25 19:14 19:18 20:5,6,8,9 20:12,13 22:12 23:8 26:2,4,7,21 26:25 28:16 30:3 30:8 32:9,10,24 33:17,23 34:8,9 34:14 35:6,7,11 35:21 38:15,16 39:14,15,18 45:11 46:1 47:11 50:5 53:15 56:1,18 57:23 62:23 68:14 68:16,19 69:3 70:22 71:9,14 72:19,22 73:19 74:14 76:19 87:10 91:17,21 94:23 105:7
**corrections** 69:2 93:7
**correctly** 36:2
**counsel** 100:13 102:8,10 103:21
**count** 63:23
**county** 14:7 69:2
**couple** 92:17
**course** 38:17
**court** 1:1,22,22 12:24 13:4 14:13 16:19 17:6 18:2 40:5,11,12 44:16 53:6 55:9 56:15 58:2 61:19,21 62:10,11,20 63:16 65:1 66:15 68:24 69:24 70:19,23 71:7 72:10,20 74:11 75:3,4 76:4 79:14,15,18 80:18 80:23 84:2,3,7,9 85:5,8,11,21,25 86:2,3,8,20 87:18 88:2,5,23,25 89:2 89:24,24 93:4,17 102:21 103:21
**Courtney** 20:20 24:21 25:18
**courts** 12:22 56:9 98:12
**created** 51:5
**creates** 49:10
**creating** 26:16
**credit** 69:20 83:8
**crime** 18:3 33:21 34:17 38:13 39:6

40:20 44:7 86:19
**crimes** 13:4
**criminal** 7:21 8:5 9:18 10:1,9,11,18 10:24 11:4,9,16 12:19,21 14:23 17:9,17,24 22:2 22:10,14,20 23:3 23:6,21 26:17 27:10,12 28:1,10 28:20 29:3,25 30:2,2,19,23 31:6 31:12,18,25 32:13 33:1,20 34:15,23 35:2,10 36:22 37:5 38:5,12,22 39:6,16,21 42:9 43:20 44:6,10,24 45:10 46:19,20 47:1,9,20 48:8 49:1 50:1,4,11,20 51:22 52:10,10,19 52:20,20,25 53:1 53:9,17,19 54:4,6 54:21 55:15,19,23 56:4 57:1,11 58:25 59:9,10 63:12,22 64:21 65:9,24 66:4,5,10 66:22,23 67:6,12 68:3,18 72:22 73:6,15 74:19 75:3 76:10 78:9 78:10,12,24 81:2 81:9,23 82:16,20 82:24 83:5,19 86:16 87:5,7 89:16 90:8,24 91:16,23,24 92:8 95:6,12,24 96:3 96:17 97:25 98:9 99:5 100:3
**criteria** 51:18,20
**CSR** 1:16 102:20
**current** 81:11 87:17
**currently** 7:19 11:8 29:24

**D**

**D** 1:3 4:9
**d/b/a** 1:7
**daily** 13:8,11 25:13
**Dallas** 1:2 14:7
**data** 34:3 45:7,17 45:18,20,25 46:4 47:13,14,17,19,23 49:25 50:16 51:11 54:16 58:24 77:14 77:16,19 78:5,11 79:10,23,24 89:16 89:19
**database** 13:19
**databases** 13:20
**date** 13:23 21:4 65:18 69:14 95:12 95:13,15 96:11 98:1,2,3,13 99:17 102:21 103:10 105:19
**dated** 105:6
**dates** 70:20 91:20 93:16 94:20 95:17
**David** 91:11
**day** 1:15 30:11 85:15 102:15
**day-to-day** 19:15
**days** 103:22
**deal** 9:12 49:12
**deals** 30:5 33:7
**dealt** 13:4
**December** 1:15 14:5 21:5 23:14 28:14 95:11,13,14 95:16 104:2 105:6
**decide** 66:23
**decision** 27:16 46:3 66:13,17 92:12 98:23
**Defendant** 1:9 2:9
**defendant's** 91:24
**deferral** 85:17 87:17 88:4
**define** 68:21,24 90:9,17 99:23
**defined** 84:2
**definitely** 74:20
**definition** 69:4 85:22 86:8
**definitions** 84:1 86:24,25
**definitive** 65:2 72:7 78:17 96:23
**definitively** 58:16 79:22 80:1
**degree** 14:6,7 79:6 79:8 98:20 99:3 100:3
**delivered** 26:12 27:7
**department** 12:2,14 14:11 42:15 53:7 53:10 56:18 57:3 67:11,17 69:1,2 82:20 83:18 93:7 93:7
**deposition** 1:12 4:14,18 20:12 102:7 103:2,3,11 103:15,23 104:2
**depositions** 15:5
**described** 54:6 88:21
**describing** 89:1
**description** 3:9 21:1
**designation** 100:18
**despite** 63:7
**details** 82:4
**determination** 51:2 66:5
**determine** 35:15 43:6 44:24 45:23 51:10 59:16,23 60:2 62:6,25 64:2 64:3 65:11 67:3,5 67:18 74:4 79:9 91:3 93:3 94:4 95:19 96:3 98:8
**determined** 10:18 23:19 42:9 45:5 53:24 55:3,12 62:14 63:21 64:20 83:1
**determines** 44:8 54:21
**determining** 83:21 91:4
**Diane** 1:3 4:9 17:14 19:2 95:20,23 96:12 97:13,17,18
**difference** 9:20 87:4
**different** 8:9,12,14 26:1 33:10 37:13 41:7,20 54:18 56:9 61:23 62:10 76:13 83:16 87:12 92:15,16 93:25 94:6,10,12,13 95:17 97:4,19,21 97:23 99:16
**differentiate** 84:13 88:14 89:7
**differs** 37:25
**diligence** 37:9
**direct** 70:4
**directive** 20:17
**directly** 18:17 19:10 20:23 34:22 60:14 67:21 96:24
**director** 20:22 25:18
**disagree** 27:13
**disclose** 16:22
**discussed** 16:20,22 29:1
**discussion** 15:22 16:9
**discussions** 42:5
**dismissal** 85:17 87:20,21 88:4
**dismissed** 88:1
**dispatch** 12:16 13:8
**dispatcher** 13:12
**disposition** 84:4,15 84:20 85:13,20 87:9,13,15,15,20 88:3,17 89:7,11 89:16,21 90:3,5
**disprove** 32:4,16 35:9 36:3,16,21 37:5,11,25
**disproven** 38:8
**disproving** 35:18 36:19
**dispute** 7:13,16,21 9:20,22 10:9,11 10:15,19,24 11:7 18:14 19:12,17,23 21:22 24:7,8 27:1 27:6,9,17,22,25 31:9,12,18 32:17 33:17 34:5,12,15 34:23 35:6,12,13 37:6 38:11,23 39:2,5,22 40:23 41:18,25 42:10 43:8,22 44:5 48:9 48:21 49:10 60:17 60:23 61:2 64:23 66:21 67:3 70:14 72:3 73:6 76:10 76:14 84:4,15 85:13,24 86:11,16 87:9,14 89:4 91:17 92:10 94:7
**disputed** 17:11 31:6 35:18 41:24 42:9 43:21 45:24 47:20 62:25
**disputes** 8:2 9:3,8 9:12,15,17,23 10:8,20 11:3,9,16 19:21,23 24:6 27:18 29:25 30:2 30:13 32:23 33:8 33:22 35:1 52:25
**disputing** 34:11 41:5 44:25 50:22 54:7 65:25 68:5 90:23
**District** 1:1,1 4:11
**DIVISION** 1:2
**divisions** 11:3 26:1
**document** 3:10 15:24 16:6,14 20:11,15,16 21:1 21:5,12,16,23 22:16,21 23:13,22 24:1,10,18 28:22 29:19 31:13,20 32:8,18,24 33:1 35:20 36:2,12,21 37:3 49:18 61:19 61:21,21,22,24 62:9,10 68:22 75:15 82:14 85:5 86:14 87:19 88:19 88:20,22,25 89:2
**documentation** 10:7 16:19 71:21 72:2
**documented** 71:20
**documents** 15:9,10 16:14 17:1,4 18:2 61:10,11 79:21 86:8,10 88:2
**doing** 11:22 58:18 90:12 94:14
**door** 83:25
**Double** 90:8,10,15
**double-check** 73:19
**draft** 22:15
**drafted** 20:10 21:18 24:19
**Drive** 6:22
**due** 37:9 82:19
**duly** 1:13 4:2 102:5
**duplication** 40:9
**duplicatively** 40:7
**duties** 7:18 9:4

**E**

**E** 2:1,1
**e-mail** 72:24 73:5
**ear** 91:3
**earlier** 11:6 48:7 54:6 77:18
**educational** 14:4

**effective** 21:4
**eight** 6:24 28:4
**either** 36:3 51:25 59:6
**eliminate** 50:15
**Emergency** 12:3
**employed** 102:11
**employee** 11:24 29:22 76:9
**employees** 7:24 8:1 9:1,3 30:1,9
**employer** 14:10
**employment** 6:15
**EMS** 12:16
**encounter** 13:17 25:13
**enforcement** 11:23 12:18 13:5,18,19 13:25,25
**entered** 12:23
**entire** 9:13 28:3 90:12
**entirely** 41:20
**entities** 9:16
**entries** 40:6
**entry** 13:2 40:16 78:9,10,12 85:19
**equal** 48:5
**equivocating** 59:22
**errata** 103:5,9,10 103:14,20 104:1 105:10
**Especially** 5:21
**Esquire** 2:4,10
**essentially** 20:25
**establishing** 71:20
**et** 50:2 69:3 70:5 104:3
**event** 43:19
**eventually** 13:13
**everybody** 100:24
**eviction** 33:2,8,14 33:16 35:10 36:22 37:6 72:21 81:23
**evictions** 73:23 74:1
**evidence** 65:21 67:14 68:2,9
**evident** 65:24
**exact** 80:8
**exactly** 4:24 39:4 45:19 52:2 55:1 101:12
**EXAMINATION** 3:4 4:3
**example** 12:22 15:10 24:13 38:11 40:2,12 45:25 61:20 69:7 70:19 75:9 84:14,23,25 85:10,15 86:15 87:16,25 91:4 92:6 98:4,12
**excluded** 98:14
**exclusively** 27:5
**exhaust** 76:1
**exhausted** 53:13,21 74:5,23 75:2,7,16 75:18,24
**Exhibit** 15:23,25 100:12
**EXHIBITS** 3:8
**expect** 15:22 65:13
**expectation** 46:5
**experience** 12:21 13:24 14:2 20:3 23:5 24:14 27:4 60:21 61:5
**experienced** 83:12
**Expiration** 102:21
**explain** 12:11 13:16 55:6
**explanation** 15:21
**explore** 79:5
**extraneous** 40:16
**eyewitness** 19:9

F

**face** 97:15,16
**fact** 39:5 40:23 45:1 63:22 64:21 68:4 85:12
**fact-based** 36:15
**factors** 74:3,14 92:2 94:3,19 95:4 98:17,25
**fair** 21:1
**fall** 100:1
**falls** 10:1
**false** 79:21
**familiarity** 23:6
**far** 19:3 29:5,18 50:24 52:21 57:2
**fashion** 5:19 6:3
**Federal** 1:19
**feel** 36:24 64:1
**female** 14:20
**field** 13:6
**fifteen** 12:2,14
**fight** 14:21
**figure** 19:8 22:18 23:10 28:18 31:16 48:14 61:18 79:10
**file** 19:17 39:23 40:24 43:23 44:10 45:3 46:1,6,21 47:3,6,10,10 50:22 53:13,22 54:22 55:25 72:3 74:6,23 75:7 77:8 77:11 78:13 82:25 84:5,11 88:6,10
**filed** 84:14,16,17,18 85:7 89:3
**filing** 16:20 60:17 103:15,21
**filings** 69:3
**filled** 85:1,3
**final** 24:20,20,23
**financially** 102:13
**find** 5:14 22:1 56:25 59:9 60:15 63:11 86:20 91:23 92:18 93:11,11 96:16 97:8 98:17
**finding** 49:5,6 68:3 83:21 88:20
**findings** 36:15 58:23 74:3
**finds** 26:23 40:21 87:6
**finish** 34:21 42:18 44:20 54:2 73:9
**finished** 46:11
**fire** 12:16
**first** 4:2 7:15 20:5 21:11,12,15 32:7 48:18 84:7 91:25 92:9,16 99:16
**firsthand** 11:11 19:1,4
**five** 4:22 6:10 31:3
**Fleming** 1:24
**flesh** 44:3
**focus** 53:6 82:15
**focusing** 38:20
**folks** 20:7
**follow** 31:22,23
**follow-up** 92:17
**followed** 31:11 35:20
**following** 24:19 67:11 102:4 103:8
**follows** 4:2
**force** 35:16
**forgot** 83:24
**form** 7:18 21:14 22:25 27:2,14 36:7 41:9,22 42:11 43:9,24 44:11 45:4 46:2 51:13 54:18,24 57:5 59:19 60:6 62:17 64:5 66:12 68:6 72:13 74:25 76:7 79:12 85:1 86:23 87:11 88:12 88:16 89:18 90:16 92:11 94:17 96:5 96:13 99:13,21 100:7 103:4,7
**formal** 5:10
**former** 95:3
**forth** 23:16 31:13 31:19 76:21
**forthright** 57:25
**forwarded** 10:21
**four** 8:4 65:18
**FRANCIS** 2:4
**fraudulent** 61:10
**frequently** 12:23 25:10,11 38:17 60:12 65:22 81:22
**front** 5:11 16:10 49:19 57:7 67:16 78:8 94:24 103:16
**fulfilling** 35:17
**full** 98:12
**fully** 44:4
**further** 82:14 93:22 102:10,13

G

**G-E-O-R-G-E** 91:25
**G-I-N-A** 91:5
**gain** 71:19
**gap** 58:23 59:2,4,6
**generalized** 86:24
**generally** 20:1
**genuine** 62:7
**George** 91:25 92:7 92:14,20 93:2,14 93:24 94:1
**Georgia** 17:24 18:2 96:1 99:8
**getting** 40:18,19 59:18,20,22 63:25 86:5
**Gina** 91:4,7
**give** 5:3,17 6:7 14:12 15:14 16:15 17:5 34:7 35:16 61:8 75:11 83:24 84:23 85:10 88:2 95:21
**given** 4:18 6:9 15:2 27:19 30:20 43:16 57:1,2 82:20 91:16 94:7 102:7 105:8
**gives** 99:1
**giving** 64:19 86:5
**go** 14:18 21:11 32:6 36:5,8 37:10 41:11 46:10,16 49:18 50:10,15 52:7 54:3 57:9 62:19 64:17 67:21 68:18 70:6,21 71:7 73:18,24 75:2,13 77:4 79:14 82:11,25 88:4,23 89:1 93:4 93:4,6,22 97:1
**goes** 75:8 87:6
**going** 11:18 26:6,25 27:6 28:23 38:24 39:7,17,18,20,22 41:8,21 43:1,5 47:18 60:14 62:3 64:15 70:21 76:12 76:22,24,25 77:7 77:12 82:8 87:8 87:23 88:17 93:1 94:25 97:17
**good** 5:23 82:7
**Gorton** 30:10,15,20 30:23 31:17
**gotten** 61:19
**government** 69:1
**graduated** 14:5
**Grosse** 20:20,21 23:19 24:21,22 25:18
**group** 9:11,23 23:24 24:2
**guess** 87:9
**guessing** 63:18
**guide** 32:1 71:11
**guidelines** 32:7 48:23
**guides** 74:21

H

**half** 7:7 21:21 61:1
**Hammonton** 1:24
**hand** 42:19,24
**handle** 8:1 10:24 11:3 28:10 30:12 30:15 33:8 97:4

**handles** 9:23 30:20
 33:10
**happen** 10:8 38:24
 81:16,19 82:6
**happened** 19:10
 29:5
**happening** 82:2,4
**happens** 33:13,17
 38:15 43:11 51:2
 79:24 81:14,19
 82:5 92:16
**head** 85:2
**hear** 5:22,24
**heard** 82:2 83:13,14
 83:17
**hearings** 15:5
**held** 6:11 7:6
**help** 48:15 72:6
**helpful** 10:13 30:22
**helps** 72:6
**Hey** 101:1,1
**high** 33:6 65:13,14
 67:18 68:16 76:8
 77:2 79:6 99:3
 100:2
**hired** 20:5 23:1,3
 29:22
**history** 69:20
**hold** 58:10
**holding** 7:12,19
**hope** 41:3
**hour** 82:8
**housed** 12:23
**Huh** 37:14
**human** 91:3
**hung** 36:19 63:24
 63:25
**hypothetical** 60:8
 95:22

**I**

**IA** 50:2,15 54:4
**ID** 69:7,10,13 76:3
 91:15,19
**identifiable** 39:11
 67:22 79:16
**identified** 5:15
 19:19
**identifier** 65:3
**identify** 16:25
**identifying** 65:17
 69:11,13 71:6
 98:5
**identity** 54:15 71:14
 71:19 87:24
**immediately** 7:10

12:7,9,10 35:23
 92:13
**important** 5:4,4
 32:3
**in-depth** 92:23
**inability** 38:3 80:18
**inaccurate** 60:24
 63:6 80:12
**include** 34:10 84:4
 84:11
**includes** 68:24
**including** 17:20
 19:22 71:20
**incomplete** 47:5
 60:7 61:2,17,18
 77:22
**incorrect** 60:13
 83:22
**incredibly** 100:2
**INDEX** 3:1
**indicate** 51:21
**indicating** 65:8
**indication** 64:24
**indicative** 48:25
 57:16
**individual** 37:21
 41:1,25 44:14
 49:14 54:15 57:8
 60:11 79:15 80:6
 80:10,12,20
**individually** 1:3
 58:13
**individuals** 13:9,15
**industry** 81:18
**info** 70:3 71:21
**information** 9:25
 10:5 13:18,20,22
 15:19 16:20 19:5
 26:24 27:1 34:10
 35:15,16 37:10,20
 37:21 38:2,4,7,9
 39:11,11 41:12,13
 41:13,16,19,19
 44:1,15 45:7 51:3
 58:1,8 60:12,14
 60:20,22,23 61:8
 62:21,22 63:17
 65:15,16 67:22
 69:11,14,18 71:6
 73:5,11,16,19,25
 74:1,3,11,18 75:5
 75:9 76:11,13
 77:10 78:8 79:15
 79:17,20,25 80:18
 80:20,23 81:11,12
 81:18,20,21 82:1

89:25 91:21 93:9
 95:8 98:5,8
**informed** 22:3
**initial** 26:11,18
**initiated** 27:9,17
**insight** 71:19
**instance** 1:13 38:24
**instances** 10:17
 38:1 45:12 54:12
 54:13 55:15 60:25
 61:16 62:2 63:20
 71:24 72:4,18
**instructing** 66:21
**INSTRUCTIONS**
 103:1
**interacted** 18:17
**interactions** 19:1
**interested** 102:14
**internally** 79:2
**Internet** 86:6
**interrogatory** 15:11
**investigate** 9:24
 11:9 28:2,19 30:1
 30:2 32:5 34:24
 42:5,21 44:14
 49:13 56:14 58:13
 78:10,12 92:13,18
 92:20 94:8
**investigated** 39:8
 41:10,23 43:7
 46:22 50:13 55:3
 56:4 66:15 78:16
 98:23
**investigating** 9:12
 18:14 22:2 31:11
 34:4 42:21 94:20
**investigation** 9:2
 10:9,12,20,21
 11:12 19:3,22
 21:24 22:9,19
 23:15,20 31:9,17
 31:19 32:23 33:25
 34:1,8 35:5,14
 36:3,6 37:9 39:7
 40:21 41:4 42:18
 42:20,22 43:2,20
 43:25 44:8,13
 45:1,3,5,14,23
 47:8 48:8 49:14
 49:19,22 50:5
 53:8,24 54:20
 55:12 56:24,25
 57:19,20 58:9,11
 58:19 59:7,25
 62:14 65:23 66:6
 66:11,17 67:2,11

68:14 71:25 72:5
 72:9,18 73:4 74:9
 74:17,18,21 75:3
 76:2,10,18 77:5
 78:22 79:22 80:2
 80:7 81:5,25
 83:18 86:1,11
 90:7,13,22 91:9
 91:13,14 92:9,23
 93:24 94:14 95:5
 95:9,19 96:2,6,14
 96:19,20,24 97:3
 97:11 98:7,16,18
 99:15
**investigations** 7:13
 7:21 8:2 9:16
 10:24 11:3,15
 20:4,8 21:13
 22:14,20 23:2,21
 24:2,7,8 28:10,23
 29:9,10,12,24
 30:12,19,23 31:5
 31:25 33:4 42:8
 43:6 46:19,25
 53:7 69:6 70:14
 83:6 90:13
**investigative** 7:20
 9:17,21 10:1,2
 16:13 21:17 24:12
 32:2,18,19 35:24
 36:11,12,16,20
 49:6,11 53:20
 57:24 58:23 64:20
 67:24 74:2 77:1
 91:1 97:1,24
**investigator** 7:16
 11:7 21:22 29:2,3
 35:13 37:6 38:21
 39:2 66:13,21
 67:3,5 76:9,15
 87:6 89:4 93:19
 100:1
**investigators** 29:5
 35:13 68:13 86:20
 88:11,20 89:10,15
 89:20 90:3
**involved** 9:2 14:15
 14:20 21:2
**involving** 28:1
**irrational** 56:23
 57:6
**irrespective** 77:2
**Irvine** 2:12
**issue** 87:7
**issued** 12:24
**issues** 7:22

**items** 10:1 29:4

**J**

**J-A-N-E** 91:6
**jail** 14:20,21
**Jamal** 94:11,16
 95:1
**James** 94:10,15,24
 95:1
**Jane** 91:6,7
**January** 102:15
**Jeffrey** 92:1,8,14,21
 93:2,14,25 94:2
**Jersey** 1:24
**job** 6:11,13 12:9,13
 15:9 22:22 23:6
 23:12 26:11 59:8
 60:3 93:19
**John** 2:4 3:5 4:8
 72:14 82:7 101:1
 101:1
**join** 23:11
**joined** 7:15 11:21
 12:8 21:20
**joining** 14:2
**Jones** 1:3 4:9 15:15
 17:14 18:4,8,15
 18:18 19:2,6,10
 19:16 30:7 91:5,6
 95:20,24 96:12,18
 99:7,16 104:3
**Jones'** 17:6,10,18
 17:23 19:20
**Jr** 2:10
**jsoumilas@cons...**
 2:7
**judge** 5:11 84:21
 85:6,16 88:6,15
 88:18
**judicial** 84:4,11
 86:21 88:9
**jurisdiction** 69:24
**jury** 5:11
**justice** 23:3

**K**

**keep** 64:12 77:7,10
 87:22
**kept** 63:7
**kind** 91:2
**know** 5:16,25 23:18
 25:1,4 27:15,15
 27:16,18,21 29:18
 30:18 33:24,25
 34:23 38:17 42:13
 43:11 44:12 45:19

49:8,10 51:5,9,25 52:1,2,14,21,22 52:23,24 53:9 56:23 58:20,24 59:4,17,18 61:8 61:14 63:20 64:6 64:9 67:13 68:1 73:8 77:20 79:23 82:19,23 89:1,3,5 90:10 93:2 100:20 101:12
**knowledge** 11:11 19:1,5,21,25 23:1 81:6,15 82:3
**known** 25:7,8

**L**

**lack** 41:18
**lacking** 77:23 81:11
**laid** 23:14 24:23
**Lakeside** 1:18 6:22
**landlord** 18:23 26:13,19 38:13
**language** 47:25
**late** 4:25,25
**Laura** 1:12 3:3 4:1,7 102:5 104:2 105:17
**law** 11:23 12:17 13:5,17,19,25,25
**lawsuit** 4:9 15:10 17:6,7 19:13
**lawyers** 4:12
**lay** 24:12 38:25
**lead** 7:13 24:4,5
**leadership** 20:17
**leads** 53:13
**learned** 22:19,22 28:15
**LeasingDesk** 1:8 8:15,17 9:18 11:5 30:3,4,19 31:6 73:6
**leave** 39:18 40:13 78:13,16
**Lee** 1:12 3:3 4:1,7 16:11 102:5 104:2 105:17
**legal** 15:10 36:17
**let's** 6:16 7:9 32:6 36:25 38:10 44:3 44:4 46:12,16 51:4 53:4,6 82:11 82:15 86:15 87:25 91:23 95:11,14 99:7
**level** 33:6,6 62:21 63:16 73:4 76:8 77:2
**LexisNexis** 72:25 73:22,25 74:13 76:5
**limitations** 31:8 78:6
**limited** 30:14 58:8 77:13
**LINE** 104:4
**link** 4:13 37:20 38:4 45:14 54:15 56:10 57:9,12,24 58:1 58:16,25 60:16 63:11,13 65:17 66:7 72:8 73:25 78:18,24 79:3,14 79:22 80:2 93:10 94:4 95:6 96:1,15 96:18,24 97:2,2,7 99:1,8,10,12,18
**linked** 92:21 95:2
**linking** 99:5
**links** 65:3 71:20 93:20
**list** 76:6
**little** 6:16 11:18,19 44:3 82:13
**LLP** 2:10
**located** 6:20
**location** 7:1
**locations** 72:7
**logic** 26:16 90:8,10 90:15,22 91:2
**long** 6:23 12:5 25:7 46:11 82:9
**look** 15:20 16:2 17:16 23:16 49:24 58:15 59:8,25 69:6 71:24 92:12 93:1,12,15,21 94:3,19,20,20
**looked** 17:4,12,19 18:5 60:3
**looking** 18:3 56:15 59:16 62:11 95:4 97:15,16,18
**looks** 39:2 91:15
**lot** 92:2
**loud** 97:20,22

**M**

**ma'am** 4:6,18 7:3 14:4 20:14 21:4 30:11 59:15 64:9 75:22 79:5 100:11
**machine** 1:17
**MAILMAN** 2:4
**maintain** 36:14
**maintained** 12:22
**making** 27:16 32:17 38:23 39:5,22 40:23 41:18,25 42:10,16 43:7,22 48:9 64:13 91:17 103:7
**manage** 25:22
**managed** 12:16 13:1,13
**manager** 7:5,11,19 11:14 12:15 22:3 22:5,23 24:2 28:15 29:21
**managers** 25:22,24
**manages** 25:20
**manipulated** 61:11
**marked** 15:23,25
**Market** 2:5
**match** 26:17 41:25 42:10 43:7,22 48:5,9 50:4,14 53:24,25 54:21 56:16 57:1,1,19 58:4 59:9,11 60:2 60:11 61:20 64:4 65:8,11,11 66:7 67:19,22 77:20 79:3,7,18 91:16 92:1,9 93:14 94:22 96:3 97:25 98:9,19 99:16,17 99:24 100:3,5
**matches** 38:22 57:8 60:5,5 64:21 65:16 67:12,15 79:16
**matching** 26:16 87:24 93:21
**matter** 19:2 104:3
**matters** 6:14
**McCoy** 22:6,8,10 23:11,17 28:15 29:1
**mean** 8:7,13 13:16 13:22 21:11 37:7 43:13 48:3 49:2,3 49:5,7,11 50:11 52:21 53:16 56:12 58:3,5 60:17 62:5 65:5,6 67:25 72:15 75:11,20 77:16 79:13 80:2 80:4,5,19 84:7,9 84:23 87:14 90:17
**meaning** 38:5 71:22
**means** 50:20 51:25 52:1,3,4 53:10 54:13 58:6 59:10 63:13 87:15
**meant** 47:14 72:14
**media** 70:4,22 71:8
**member** 65:14
**memorialize** 29:9
**met** 15:18 25:8
**Metaphone** 90:8,10 90:15
**method** 29:12 50:17 54:3,8 65:4 67:24
**methodology** 76:17 76:21,23 78:3,23 79:11 80:9 90:7
**methods** 16:13 21:17 29:15 53:12 53:22 54:9 74:5 74:22 75:1,7,15 75:23 76:1 77:1
**mid** 33:6
**middle** 44:20
**mind** 53:5 56:14 62:2
**mine** 25:5 44:9 87:8
**mini** 101:13
**minutes** 46:12
**mischaracterize** 64:16
**mischaracterizes** 60:7
**mislead** 62:13
**misleading** 60:13 60:20 61:8 63:8
**misspoke** 72:15
**mistake** 33:16,22 34:17 38:14 41:6
**mistaken** 81:10,25
**modified** 61:20,24 61:25
**modify** 85:4,17,18
**modifying** 54:18
**moment** 28:8 38:21 67:16 83:24 84:2
**month** 38:18 43:17 82:21 98:2
**monthly** 30:21,22 30:24 31:2
**months** 6:24 28:4
**motion** 84:13,16,19 85:1,3,16 86:5,14 89:8
**moving** 76:3
**multiple** 40:1,8

**N**

**N** 2:1
**name** 4:5,8 13:18 13:21,23 16:18 44:9 69:14,21 87:7 91:11,11,25 92:1,4,7,7,9,16,16 92:21 93:15,21,22 93:24,25,25 94:1 94:2,10,10,10,15 94:16,24,25 95:20 95:21,23,24 96:12 97:12,12,12 99:6 99:7,16,16,20 103:10
**named** 91:5
**names** 30:9 70:20 90:19,23 91:3,10 91:19 92:25 93:9 94:12,13
**narrow** 72:6
**national** 13:19
**nature** 10:4 34:4,11
**necessarily** 9:24 10:25 31:21 69:16 69:17
**necessary** 31:22 70:3,13 72:11
**need** 20:25 21:24 23:5 44:19 46:11 52:1 70:21 71:7 86:3,20 88:4,24 93:15 94:3 103:17
**needed** 14:25 101:10
**neither** 102:10
**neutral** 36:14
**never** 15:2,6,7 19:16 81:6,14,16 82:2 83:11,12,13 86:19 93:20,21
**nevertheless** 65:23
**New** 1:24
**news** 70:4,22 71:7
**nine-step** 69:6
**non** 50:8 55:2
**nonmatch** 42:1,4 42:14,16 43:10 47:25 48:3,3,10 48:11,12,18,21,21 49:2,6,10 50:12

50:20,23,24 51:5 51:12,19,21 52:7 52:12,18,25 53:17 57:15 58:3 59:24 60:9,10 63:15,21 63:24 64:3,21,23 65:22 66:1,5,10 66:16,19,22,23 67:7 76:25 77:19 78:1 79:9 80:17 80:19 83:19
**nonmatched** 19:23 48:25
**nonmatches** 42:8 43:5,16 50:1 52:3 53:9,19 54:23 56:3,17 57:4 60:4 60:5 66:4 67:12 68:3 77:14,17 82:16,20,24
**nonmatching** 93:21
**North** 12:3 14:6
**Northern** 1:1 4:11
**notary** 103:18
**note** 21:4
**noted** 103:8 105:10
**notifies** 47:8,22
**notify** 43:1 45:20,25 46:4,8 47:13,17 47:19 50:16
**number** 3:9 10:16 16:1 27:22 35:19 61:10 69:15 99:19
**numbered** 1:14
**numbers** 70:20 91:21 94:21

**O**

**oath** 4:19 5:5 14:13 15:3 64:9
**object** 64:15
**Objection** 21:14 22:25 27:2,14 36:7 41:9,22 42:11 43:9,24 44:11 45:4 46:2 51:13 53:18 54:24 57:5 59:13,19 60:6 62:17 64:5 66:12,25 68:6 72:13 74:25 76:7 79:12 86:23 87:11 88:12 89:18 90:16 92:11 94:17 96:5 96:13 99:13,21 100:7
**objective** 36:14
**objectives** 32:9
**obtain** 65:1,19 75:9 86:10 89:5
**occasion** 14:23 33:19 34:14 45:9 72:22 73:18
**occasions** 60:22
**occur** 81:7
**office** 4:13 5:8 6:20 14:24 51:1
**offices** 4:15
**official** 37:22 38:4,6 56:10,15,25 57:9 57:21 58:6,17 59:8 60:1,3 63:12 63:13 65:15 68:18 68:21 70:19 71:7 71:23 74:11 75:11 76:3,12,12 84:3,7 85:5,11 88:5 92:24 93:5,20
**officially** 62:9
**oh** 33:14
**okay** 5:19,20 6:4,5 6:9,16,20 7:14 8:17,21 10:3 11:6 12:11,13 13:3 14:23 15:8,14,24 16:5,10,13 17:2 17:16 18:7,25 19:8,15 20:1,2,18 21:16,20 23:5,9 23:18,25 24:8,17 24:22 25:14,23 27:11,18 29:23 30:4,11,18 31:1,8 31:24 32:6,22 33:11,11 34:3 36:23 37:2 38:10 39:20 40:7 41:3 41:15 43:13 44:3 45:9,16,22 46:9 47:20 48:14,17 49:3,7 50:18 51:4 52:12,16 53:5 54:5,9,12,25 56:2 66:3,9 67:9 68:23 69:19,23 70:9 71:9 75:13,22 78:21 80:16 81:8 83:24 84:10 87:22 87:25 88:8 89:20 90:2,20 91:22,23 92:17 93:13 94:9 96:25 97:10
100:20 101:9
**older** 95:14
**once** 23:10 42:8,22 42:22 46:22
**ones** 42:21
**OneSite** 50:2,15 54:4
**online** 77:22
**open** 58:8,15 70:3 70:24 71:22 93:5
**operations** 7:5,11 9:23 19:15 20:22 23:24 25:6,16,19 25:20,21,24 26:3 34:2,7 42:24 43:1 43:5,14,16 47:8 48:4,12,20,24 49:9,16 52:6
**opinion** 63:8
**opportunity** 5:17 22:15
**opposite** 63:11
**options** 52:17
**oral** 1:12 22:22 28:15 102:6
**orally** 22:10 23:12 23:17
**order** 7:10 66:23 67:18 86:21 88:3 100:17,18,22 101:5,6
**orders** 101:3
**original** 60:1 103:20
**originally** 12:1 13:12
**originated** 51:7
**originating** 69:24
**outcome** 49:17 77:3 102:14
**outline** 31:22 32:1
**outlined** 100:18
**outside** 76:14 80:2 80:7
**overall** 6:23 7:24 11:20 23:22 27:18 27:22
**oversee** 7:20
**overview** 77:2

**P**

**P** 2:1,1
**P.C** 2:4
**p.m** 1:16 82:12,12 101:18
**package** 34:7,10
**page** 3:2,9 16:10 24:13 68:22 82:15 85:21 104:4 105:1
**paragraph** 32:8
**parallel** 25:25
**Park** 2:11
**part** 13:8,8 15:9 23:22 25:14 26:21 32:3 33:12 59:20 60:23 72:5 73:5 74:20 75:6 78:7 86:10 90:7 91:13 92:9 93:24 95:9 95:18 97:5 98:17
**particular** 26:17,18 58:25 67:19,20 71:13
**particularly** 62:25
**parties** 102:11
**party** 66:22
**pausing** 28:6
**penalty** 5:5 15:9
**pending** 4:10
**Pennsylvania** 1:23 2:6 5:9 102:23
**people** 7:23 8:21,25 9:6,11 10:14 11:8 22:19,23 29:23 33:10 55:5 92:24 94:5,6
**percent** 80:9,11 98:20
**percentage** 27:21 52:24 53:1 61:12 67:10
**performed** 29:13
**period** 22:21 28:21 43:17
**perjury** 5:5 15:10
**person** 23:3 38:23 39:5,22 40:21,22 41:7,17,20 42:10 45:10 48:9 55:8 57:11,11 59:1 60:17,18 65:3 67:25 79:3 91:5,5 92:15,19 93:3 94:5 96:11
**person's** 39:14 44:14 71:14 96:12
**personal** 6:14 65:2 69:11,13 71:6 81:15 82:3
**personally** 18:13 30:12 39:11 45:8 65:17 67:22 79:16
81:19 82:6
**perspective** 36:12
**pertain** 80:12
**pertains** 80:10
**Philadelphia** 1:23 2:6 4:13 102:23
**phone** 18:18 77:21 102:23
**photographs** 93:8 94:21
**photos** 93:16
**phrase** 83:14
**piece** 10:1,9 49:12 65:17,19 78:8
**Pike** 1:24
**place** 21:17 23:1 29:13 82:5,8 88:10
**placed** 17:17 31:8
**placing** 48:24
**plainly** 32:2
**plaintiff** 1:5,13 17:14 18:18 19:2 19:6
**PLAINTIFFS** 2:3
**play** 38:10
**Plaza** 2:11
**please** 4:5 5:25 7:17 13:16 16:2 27:3 28:5 31:15 34:21 39:1 44:22 54:2 56:19 59:21 73:9,13 78:2 90:9 100:21,25 101:4
**point** 27:15 32:11 36:13 37:18 58:10 59:25 83:1,7
**points** 99:24
**police** 12:2,14,16 13:3,8 14:11 68:25 69:1
**policy** 3:10 16:6,14 20:10,15,16 21:12 21:16,23 22:15,21 24:18 28:9,13 31:13,20 35:8,20 35:24 37:3 50:19 53:6 54:20,23 56:3 57:4 66:4,20 68:13,21 69:20 74:24 75:14,15,22 82:14 85:22 89:15
**portal** 72:25 73:22 74:13
**portion** 9:17 36:16
**position** 7:11,19

36:15 75:17
**positions** 26:1
**positive** 41:19
**possibility** 67:8
**possibly** 58:18
**potential** 5:15 19:20 26:13 75:10
**practice** 75:25
**preparation** 18:21 26:12,18
**prepare** 15:14 17:4 20:18
**prepared** 16:11 18:4 20:14,16 22:21 23:14 26:24 27:7 37:3
**preparing** 16:15
**presented** 76:11
**presently** 4:10 6:17 7:3,12 11:14 26:10 31:4,16
**presumably** 46:7
**presume** 94:22
**pretty** 44:23
**prevent** 45:18
**previous** 6:13,15
**previously** 42:13 92:4
**primarily** 72:11
**primary** 39:9 71:23
**printed** 86:6
**prior** 7:14 14:2,10 60:7
**prisoners** 14:20,21
**private** 89:12
**privilege** 16:23
**probably** 37:11,13 82:4 84:13
**procedure** 1:19 15:21 24:1,23 28:9 35:24 90:21
**procedures** 15:20 23:23 33:4 49:19
**proceed** 5:18
**proceeding** 5:9 14:15 102:12
**proceedings** 14:24 101:17
**process** 9:2 10:5 11:12 13:1 28:1 29:10 30:24 31:1 31:25 45:19 54:5 69:6 70:12 72:9 90:22 91:1 96:19 96:20 97:11,24 98:7,16 100:17
**processes** 19:22 20:1
**processing** 9:25 19:5 34:25
**produced** 1:12
**product** 8:9,12,14 8:15,16,17 30:5 31:6
**products** 8:22
**professional** 6:17 64:13,14
**project** 23:22
**promotional** 29:4
**promptly** 100:20 103:21
**proper** 99:1
**properly** 23:12
**propounded** 105:9
**prosecutor's** 14:24
**protective** 100:17
**prove** 32:4,15,21 35:9 36:3,15,21 37:5,11,24 55:8,9 93:19
**proven** 38:8
**provide** 15:20 16:9 60:12,19 72:1
**provided** 21:22 23:17 24:20 34:1 34:18 45:17 58:15 61:24 65:16 69:7 103:12,17
**provides** 62:20 73:15 89:25
**providing** 79:20
**proving** 35:18 36:19
**public** 33:5 74:12 76:4 103:18
**publicly** 44:16 56:9 60:14 63:17 70:24
**purely** 93:15
**purpose** 9:14 29:7 32:8,19 36:13 73:3 97:1
**purposes** 8:19 20:11 37:8
**pursuant** 1:19
**put** 21:1 23:19 28:21 29:15 53:4 53:5 56:10,21 73:7 99:9
**putting** 29:8

**Q**

**query** 69:23
**question** 5:17,22 5:23 6:3 28:5 44:21,23 52:2 56:19 65:7 66:9 69:12 71:5 74:15 74:16 75:14,21 78:2,3 87:2 89:13 89:14 90:20 97:14 99:14,22
**questions** 5:14 19:25 26:6 64:14 92:17 100:10,14 100:15 105:9
**quickly** 36:8
**quite** 37:18
**quote** 57:14

**R**

**R** 2:1
**Raether** 2:10 15:18 16:8,21,25 21:14 22:25 27:2,14 36:7 41:9,22 42:11 43:9,24 44:11 45:4 46:2 46:12 51:13 53:18 54:24 57:5 59:13 59:19 60:6 62:17 64:5,10 66:12,25 68:6 72:13 74:25 76:7 79:12 82:7 82:11 86:23 87:11 88:12 89:18 90:16 92:11 94:17 96:5 96:13 99:13,21 100:7,15 101:1,5 101:13
**randomly** 94:25
**rational** 56:13
**re-ask** 90:20
**reach** 63:11
**read** 16:18 36:2 52:5 100:16 101:14 103:2,3 105:6
**readily** 70:10
**reads** 49:25
**reality** 63:21 65:11
**really** 36:8 64:3 65:11 77:25 79:2 87:8 89:8 94:4 99:22
**RealPage** 1:7,18 4:10 6:11,18,23 7:4,7 8:8,23 9:2 9:13,20 10:8,14 10:24 11:7,21 12:8 14:2 15:3,8 17:10,11,13 18:4 18:15 19:16 20:1 20:5,21 21:17,20 23:11,13 24:15 26:9,11,17 27:1,4 27:19,23 28:2 29:23 32:12,14 33:14 35:9 36:5 38:12,21,21 41:8 42:1 46:18,25 61:1 62:13 73:16 75:25 81:14,22 85:24 86:9,10 87:4 88:3 90:13 104:3
**RealPage's** 4:12,15 16:8 19:21,24 32:11,15 57:18 74:24 75:14,17 87:6
**reason** 6:6,8 15:19 58:7 95:1 103:5,9 104:4
**reasonable** 46:13
**reasoning** 49:9
**recall** 4:24 14:19 15:12,12,13 16:18 17:24 18:11,11,12 24:25 28:11 83:23 90:14
**receive** 10:6 103:22
**received** 60:21
**receives** 27:19 89:17
**recollection** 28:25
**record** 4:5 5:10 10:18 13:16 15:24 17:23,24 22:2 26:17 27:12 28:1 28:2,20 30:2 31:6 31:12,18,25 32:13 32:16 33:15,20 34:15 35:2,10,19 36:4,20 38:3,5,12 38:22 39:4,12,16 39:21 40:2,17,19 40:22,23,25 41:5 41:17,20,24 42:9 43:6,21,23 44:2,6 44:10,24 45:6,10 45:17,19,21,24,24 46:1,3,10,16,19 46:20 47:1,1,4,9 47:12,16,18,21 48:5,8,25 50:14 50:21 51:21 52:10 52:25 54:6,17,21 55:3,7,10,12,15 55:19,23 56:4,5,8 56:16 57:2,12,16 57:19 58:4,12,25 59:9,11,17 60:18 62:7,25 63:9,12 63:14,22 64:21,25 65:6,9,24 66:14 67:19 71:7,14 73:11,12 74:11,19 76:18,24 77:6,7 77:22 78:22,24 80:5,10 81:2,2,3,9 81:23,23 82:11 83:5,15,16,19 85:4,8,11 86:2,8 86:16,20,22 87:4 87:5,7 88:5 90:14 90:24 91:4,16,24 92:8 95:6,12,24 96:4,17 97:9 98:9 98:19,24 99:2,6 100:4,5,8,23 101:4 102:7
**records** 8:10 11:4,9 11:16 12:19,22 13:4 17:9,17,20 22:10,14,20 23:6 23:16 27:10 28:10 29:25 30:19,23 33:2,2,5 39:6 44:16 45:12,15 51:23 56:9,25 58:15 67:10 68:4 68:4,19,24,25 69:7,10,13,24 70:19,23 72:21,22 73:16 74:12 76:4 76:4 77:24 82:23 84:2,3,8,9 85:21 85:23,25 90:8 91:15,19 93:4,5 93:17 97:25 99:10
**reference** 32:7 33:1 73:21
**referenced** 16:7
**references** 72:16
**referring** 78:1 85:21,23
**reflect** 85:19
**reflection** 79:23
**reflects** 28:25
**refresher** 5:3

**regard** 37:1
**regarding** 19:21,25
**regardless** 76:23 78:6
**regular** 13:5
**reinserted** 83:7
**reinsertion** 83:14 83:16
**relate** 7:21 41:17 45:2
**related** 8:18,22 9:7 12:19 13:4 18:2 27:5 87:2,24 102:11
**relates** 26:22 53:11
**relating** 44:25
**relation** 6:10,13 27:22
**relative** 25:17
**releasable** 60:16
**release** 65:2 67:23 75:4 76:14 79:16 98:12
**relevant** 5:16
**relied** 90:14
**remain** 39:12,13,13 47:16,18 97:9
**remained** 63:9
**remains** 98:24
**remove** 40:2,6,8,11 40:16,24 41:23 44:10 45:2,16 46:5 47:5,23 50:21 53:13,22 54:8,9,13 57:13 74:5,23 75:7,12 76:19 86:21 97:3 97:8 99:4 100:8
**removed** 41:2,14 43:23 44:2 45:6,7 45:15 47:2,9,12 47:22 55:1 57:15 65:4,5,20 99:11
**removing** 38:3 54:6 83:20
**repeat** 22:17 28:5 31:15 35:22 59:21 68:8
**rephrase** 6:2
**report** 7:24 8:21,25 9:7 17:10,12,13 17:13,18,20,21,23 18:4,5,22 19:5,12 20:23 26:19,23 27:6,7,12 32:13 33:15,20 34:15 37:8 38:13 39:9 39:14 43:21 45:11 45:12,21 46:1,4 47:12,17 54:7,18 59:8 77:11 81:24 83:8 86:17,22 87:21
**reported** 1:17 8:11 35:10 37:5 40:1,4 40:8 57:16 68:25
**Reporter** 100:25 101:3,9 102:2
**Reporters** 1:22
**reporting** 1:22 39:9 57:11 80:20 87:16 102:21
**reports** 8:18 26:12 27:23 38:5 68:25
**represent** 29:11
**require** 72:1 103:21
**requirement** 84:10 88:8,11,13,15,19
**requires** 10:11,19 54:16,17
**research** 8:10,22
**researcher** 8:7
**researchers** 8:5,6
**reserved** 102:9
**residence** 96:9,10
**resort** 72:24
**respect** 19:22 23:9 77:13
**responses** 15:11
**responsibilities** 7:18 12:18
**responsibility** 10:10 32:4,5,15 32:20,20 35:9,12 35:14,17 37:4
**responsible** 66:21
**restate** 6:3 56:19
**result** 13:17 29:4 34:1 56:24 63:11 76:23 78:6
**results** 43:2 76:17
**retrieval** 85:25
**Return** 103:20
**reverse** 7:9
**review** 16:14,17 57:20 69:20 70:25 100:18 102:9
**reviewed** 18:2 51:3
**reviewing** 16:7
**Richardson** 1:18 4:15 6:21,25
**right** 4:23 5:1 7:17 8:1 10:6 16:1 17:3 19:4 24:6 25:1 26:5 28:18 30:7 33:13 34:25 36:18 44:21 46:9 49:19 51:24 52:24 53:4 55:14 56:12,21 62:15 63:5,8,10 65:7 67:5,20 68:12,21 69:5 70:8,11,17 71:12 74:7 77:4,15 83:13,25 87:8 88:11 93:18 95:4 98:21 99:5 100:8 100:10 101:8 103:3
**right-hand** 21:6
**role** 10:4 11:15 31:24 42:21
**Ron** 64:7
**ron.raether@trou...** 2:13
**Ronald** 2:10
**Rowlett** 12:1 14:11
**rule** 5:4
**ruled** 84:17,19 85:16 88:14,18
**rules** 1:19 5:4 103:21
**running** 13:9,15,18 13:21

**S**

**S** 2:1
**Sales-** 52:4
**Salesforce** 48:5 49:1,10,15 50:24 50:25 51:6,10,19 51:25 52:3,13 53:2,4 66:2,18
**SANDERS** 2:10
**saying** 23:7 40:7,9 49:3 55:14 59:23 59:24 60:10 63:2 65:9,12 80:8,25 83:17 85:8 97:20 97:22
**says** 16:10 21:8 32:12 33:14,19 38:12 40:19 44:5 70:7,13 72:24 74:2,6,8,22 87:19 88:1
**scale** 78:14,17,25
**scenario** 38:14,20 38:25 41:8,21 46:6 55:22 86:15 87:2,3
**scope** 35:23 70:13
**screening** 1:8 7:5 7:11 8:10,15,16 8:18 9:18 11:5 17:12,13,18,19,21 17:23 18:4,5,22 19:3 20:22 23:23 25:5,16,18,19,21 25:24 26:3,12,19 26:23 27:6 30:5 32:13 33:15,20 34:15 37:8 39:14 81:17 85:19 87:21
**seal** 84:5,12 85:12 86:21 88:6,10
**search** 93:8,8,9,10
**searching** 14:20
**second** 24:13 37:4 58:10 82:15 100:25
**secondary** 70:3 71:8,13,15,22,22 71:25 72:5 74:12 76:5 77:22 90:4,6
**section** 54:20 57:4 66:3,20 82:15 85:22
**Security** 69:15 70:20 91:21 94:21
**see** 17:4 20:11 21:5 21:7,9 22:16 28:6 33:2 34:19 35:25 48:15 49:22 50:2 52:9,9,16 57:7 58:23 59:2,4,6 69:8,9,21,22,24 70:1,5 72:12,16 72:17,25 73:2 75:13 76:21 82:17 84:5,6 91:6,15,18 93:2,5 95:5 99:12
**seek** 98:1,3
**seen** 18:7 21:19 52:15 61:1,10,16 68:10 83:4,11,15 84:21 85:16
**sees** 27:12
**send** 85:24
**sense** 18:1 89:6
**sent** 34:23 43:10
**sentence** 37:4
**separate** 9:16 10:4 48:15 49:14
**series** 5:14
**serves** 32:1
**set** 31:13,19 76:21
**She'll** 101:14
**sheet** 50:1 71:21 103:6,9,10,14,20 104:1 105:10
**sheriff** 69:2
**sheriff's** 93:6
**shorthand** 1:17 102:2
**show** 80:1,6 87:21 88:9,16
**showing** 87:17
**shows** 41:19
**sic** 28:14 66:3 72:10
**side** 21:6 47:9 52:6
**sign** 15:9 100:16 101:14 103:10,11 103:15,16
**signature** 84:5,11 85:6,11 86:21 88:5,9 102:9 103:19 105:1,17
**signed** 84:22
**signifies** 28:23
**signing** 103:13
**similar** 23:13 44:9 87:7
**similarly** 1:4
**simple** 44:23
**simply** 18:3 28:21 29:8 49:1 55:17 84:25 85:3,7 86:13,25 89:7 96:8 98:14
**single** 40:25 57:7
**site** 73:23
**sites** 74:12 76:4
**situated** 1:4
**situation** 52:14 62:12 63:3,3 78:21 81:8 83:5 85:10 87:10 88:25
**situations** 26:22 27:5
**six** 7:24 8:1 9:1,6 10:23 33:11
**social** 65:18 69:14 69:17 70:4,20,21 71:8 91:20 94:21
**sold** 8:22 18:22 27:23
**somebody** 42:19 44:9 48:1 86:18

**somebody's** 81:23
**sorry** 8:12 9:5 14:18 16:18,24 22:8,17 33:25 34:6,21 40:3 42:12 44:17 46:23 47:14 55:6 61:21 62:18 68:7 73:8 73:24 76:20 80:25 87:22 95:21 97:5 99:14
**sort** 11:21 58:22 72:2 77:2 97:7
**Soumilas** 2:4,4 3:5 4:4,8 46:13,16,17 64:7 82:9 100:20 101:2,6,11
**sound** 90:19,23 91:3,6,7
**sounds** 19:11 20:3 26:7 62:6,23,24 63:5 91:11
**source** 37:22,22 38:5,6,9 39:9,9,10 40:4,10 41:1 44:1 46:23 55:9 56:10 57:9,21 58:2,6,8 58:15,17 60:1,1,4 60:15 63:12 65:15 66:16 67:21,23 68:18,21 70:3,24 71:15,22,22,23,23 71:25 72:5 74:11 75:12 76:3,12,12 77:23 79:25 89:2 93:5,10 96:25 97:1
**sourced** 96:24
**sources** 40:1,8 56:15 70:4,4,22 71:8,8,13 74:10 74:12,17 76:5 80:9 90:4,6 92:24
**space** 103:12,17
**speak** 34:22 45:20 78:7,11 81:15 88:23
**speaking** 22:23
**specific** 12:18 87:2
**specifically** 13:22 20:18 33:7 82:5 85:23
**spelling** 91:24
**stamp** 16:1 84:5,11 85:12 86:20 88:6 88:10
**Stamped** 3:10
**Stan** 22:6,8,8
**stand** 94:13
**standard** 36:17 57:12,24 59:5 65:13,14 101:11
**standards** 67:18 68:16
**standing** 101:6
**standpoint** 32:2
**start** 34:3 93:10
**started** 13:12 17:7 25:8,9 28:17 29:6
**starting** 76:2
**state** 1:17 4:5 5:18 13:19 27:3 96:1,1 96:9,10 99:8,18 99:19,20 102:1,3
**stated** 99:24
**statement** 36:17 46:24 58:14 89:13 94:8 95:10
**statements** 102:8
**states** 1:1 32:2 33:24 44:12 52:9 60:9
**statistical** 10:4 65:21 68:2,9 81:21
**status** 74:4 87:17
**stay** 46:21 47:10 55:25 82:13 87:25
**step** 49:24,24 53:8 53:20 69:19,23 70:2,14 71:17 72:9
**step-by-step** 70:10 70:12,15 71:11
**step-by-step-by-...** 31:23
**steps** 23:15,20 24:12,13 28:19 31:11,12,18,19 35:19,24 36:4 49:22 50:5 76:22 82:15 87:1
**sticking** 84:1
**straightforward** 74:4
**street** 1:23 2:5 96:2 99:19 102:22
**subject** 5:5 10:19 45:11 100:17 103:13
**submit** 45:6 85:18 86:9 87:4 88:16
**submits** 87:19
**submitted** 61:11
**submitting** 61:17 88:21
**subsequent** 81:3 82:24 83:1
**substance** 103:4,8
**sued** 81:22
**sufficient** 96:15
**Suite** 1:23 2:5,11 102:22
**sum** 9:1
**summary** 7:17
**Summit** 1:22 101:7 101:11 102:21
**supervise** 20:7
**supervisor** 29:20
**supervisory** 11:15
**support** 72:25
**supporting** 71:21 74:3
**supposed** 22:1 31:19 32:22 50:21 75:25
**suppress** 50:1,4,11 50:16,21 53:9,17 53:19 54:3,12 58:2 66:4,17,22 66:24 76:18,25 77:7 100:6
**suppressed** 54:23 55:11,19,20,24 56:11 66:8,14 67:4,6,10,12,25 78:21 82:17,24 83:5
**suppressing** 68:4 83:19
**suppression** 50:17 53:25 54:1,2,10 54:14,16 55:2,4 57:14 65:4,5,20 67:8 75:8 80:1 82:25 83:20,21
**suppressions** 78:4 82:19
**sure** 13:17 26:8 30:22 36:10,25 46:13 78:23 82:9 86:4
**sworn** 1:14 4:2 102:6
**system** 40:6

**T**

**T-A-S-T** 91:12
**take** 4:13 16:2 28:19 39:23 44:19 46:10,12 53:23 79:3 87:1
**taken** 1:14 37:12 46:15 82:12 102:13 104:2
**talked** 14:1 28:8
**talking** 17:6,9 56:12 56:14 61:12 69:10 77:17
**Tast** 91:11
**Taylor** 95:24 96:12 96:17
**team** 7:13,20,23 8:4 9:7,11,13,13,20 9:21,22 10:1,2,4 10:11,12,15,21,23 11:8 13:13,13 20:7 22:19,24 24:4,5 25:14,17 25:20,21 29:20 30:20 31:5 32:19 33:7,8,10,11 34:2 34:7 41:11 44:8 44:24 45:7,17,18 45:20,25 46:4 47:7,13,14,17,19 47:22,23,25 48:13 48:19,24 49:9 50:5,16 54:21 64:20 65:14,22 66:1,17 74:17
**team's** 10:9
**teams** 11:2
**tell** 5:5 7:17 21:23 52:4,15 60:4 61:4 61:14 64:2 77:21 82:3
**telling** 23:11 68:12 77:18
**template** 24:19
**ten** 46:12,14
**tenant** 8:18 26:18 30:5 32:13 33:15 33:20
**term** 42:3 66:2
**terminology** 43:11
**terms** 24:23
**test-** 14:19
**testified** 4:2
**testify** 5:10
**testimony** 4:19 6:7 6:9 14:9,12,16 15:2,15 16:15 17:5 37:1,24 60:7 64:7,15,19 80:14 80:15 102:7 103:12
**Texas** 1:1,17,19 4:11,15 5:8 7:1 12:1,3,4 14:6 44:6 44:25 86:17,19 102:1,3,20
**Thank** 10:13 14:9 16:4 100:24
**they'd** 93:6
**thing** 19:8 52:9 57:7 65:19 97:17
**things** 48:15 61:23 76:6 87:12 93:10 93:16 98:11,22
**think** 10:3 27:13 32:12 33:4 34:16 37:12,14,24 56:22 57:6,7 60:25 62:1 62:12 64:10,12,14 72:14 82:10 85:2 86:12 95:1 100:21
**thinking** 37:15
**thinks** 32:15
**third-party** 79:25
**thirty** 103:22
**thorough** 32:23 35:5,14 68:14 86:11
**thought** 46:11 48:7
**Tim** 22:7
**time** 4:23 6:25 9:5 12:12,17 22:3,17 22:20 23:3,19,25 24:3 26:11 27:3 28:3,21 31:8 34:6 38:25 42:12 43:17 44:22 51:4 53:5 54:20 58:16 61:13 76:20 80:25 81:5 83:3,7 90:12 99:14
**times** 4:21 6:10 35:4 84:18
**Tina** 96:18 97:12,17 97:18
**title** 7:3,10,14
**titles** 7:6
**today** 4:12,15 5:6,9 5:22 6:7,21 11:19 15:15,25 16:15 25:11 48:7 54:6 87:19 95:11 100:11 101:7
**token** 63:10

**told** 19:24 22:11 28:13 29:1 38:14 47:7 58:11 67:17 77:4 91:19 98:19
**tone** 64:11
**Toni** 95:24 96:11,16
**top** 21:6 85:2
**total** 9:1 29:23
**totally** 41:7
**tracking** 49:17
**training** 22:9,13 23:11,17 29:18
**transcript** 100:12 100:16,22 102:6 105:6
**transcription** 105:8
**transition** 12:10
**transitioned** 85:17 87:19
**traveled** 40:5,10
**traveling** 40:15
**treat** 79:25 100:22
**Trevino** 1:16 102:2 102:20
**trial** 14:22
**trials** 14:17 15:5
**trigger** 50:16
**TROUTMAN** 2:10
**true** 79:21 102:7 105:7
**truly** 80:20
**truth** 5:6
**truthful** 62:15
**try** 78:2 91:15 94:22 98:1,7
**trying** 9:10,19 17:4 18:1 19:8 22:18 23:10 28:7,18 29:14 31:16 37:23 45:22 46:9 48:14 51:24 62:13 63:7 75:24 79:5,10 86:7 95:5,8
**turn** 100:13
**turned** 81:24 83:8 99:15
**turns** 41:4 81:3,10
**two** 6:24 7:6,8 8:3 21:21 28:3 29:23 30:1,9,25 48:15 52:7,17 60:22,25 60:25 61:4,15 62:1,2,8 94:5,5,13 99:10
**type** 11:15 13:3 14:1,15 21:12,22 23:16 33:16,21,22 35:6 37:14 58:19
**types** 10:8,20 33:5
**typical** 36:4
**typically** 27:11 35:19 52:8

**U**

**umbrella** 25:19
**un-** 60:24
**unable** 38:6,8 41:12 44:1 50:14 53:12 53:21 54:14 55:1 66:15 67:23 74:5 74:22 75:1,6,9,10 75:23 97:7
**underlying** 17:17
**underneath** 21:8 35:23
**understand** 4:14 5:6,12,24 9:10,19 10:3 23:9 26:5,8 32:14 33:13 34:4 34:25 36:25 37:23 58:21 61:7 64:8 75:20,24 86:7 87:22 89:8 97:14
**understanding** 11:20 29:7 42:25 43:3,4,15 99:22
**understood** 9:6
**undertaking** 73:4
**unique** 63:4 69:18
**UNITED** 1:1
**University** 14:6
**unquote** 57:14
**unsigned** 86:14
**untrue** 61:17,18
**untruthful** 60:24 61:3
**unverifiable** 53:25
**update** 23:23 50:1 54:17 87:20
**updated** 16:19 81:11 89:25
**use** 37:9 42:2,4 47:25 56:20 68:16 70:16 71:12,15 72:5 75:3 76:16 76:20 84:14,20 85:12 88:17 90:8 90:22,25 91:2,2 92:24 97:24 99:24
**uses** 48:1 67:17 92:15
**utilize** 44:15 58:6 70:3,14 76:10 84:14

**V**

**v** 1:6 104:3
**vacated** 81:4
**validate** 95:8
**value** 48:22
**variables** 96:4
**various** 74:10 94:19 95:4
**vendor** 89:12,17
**verification** 37:19 76:1 77:12 78:4 80:22
**verifications** 69:21
**verified** 37:16 40:22 41:1 46:20,23 47:2,4,21 67:19 80:24 81:2,9 86:3
**verify** 37:10,25 38:6 38:8,22 39:3,4,16 39:21 41:11,12 44:1 53:12,21 54:15 55:1,15,17 55:23 56:5,7,16 57:1,9 58:11,12 60:13 63:6 66:7 66:15 71:13,15 73:10 74:5,22 75:1,6,23 76:11 76:18,24 77:5,9 77:14,24 78:9,13 79:24 97:7
**verifying** 81:22
**version** 21:9,12
**versus** 53:1 88:15 89:7
**video** 4:12
**videoconference** 2:4
**Videographers** 1:22
**view** 32:11
**visual** 5:21
**voice** 77:13

**W**

**Wait** 100:25
**Walnut** 1:23 102:22
**want** 11:19 19:24 26:8 36:17 42:13 45:20 50:23 56:20 56:23 61:6 63:20 63:23 64:1,2,6,8 75:4 77:25 80:17 82:10,13 85:4 88:9 101:13
**wanted** 36:22
**wants** 64:23 101:5
**warrant** 12:25 13:1 57:13
**warrants** 12:24 13:10,20
**wasn't** 28:14 58:7
**way** 18:18 22:13,18 42:6 47:22 51:15 55:2,11 57:15,25 58:1 63:8 64:11 64:15 79:1,22 97:4
**ways** 64:2
**we'll** 5:18 100:22
**we're** 6:3 11:18 25:22 63:25 67:23 69:10 97:7 100:23
**we've** 14:1 41:11,12 41:23 45:14 46:3 46:22,22 66:7 77:9 82:8
**week** 30:20
**Weekly** 50:1
**weigh** 74:3 98:8,11 98:17
**weighed** 98:6
**weighing** 98:25
**went** 85:15 87:18
**weren't** 73:8
**Wherupon** 101:17
**willing** 59:7 79:8
**willingness** 76:14
**wish** 50:14
**witness** 1:13 3:2 5:15 14:25 16:4 16:24 17:2 19:20 62:18 64:11,14 100:16 102:5,8 103:1,16,16,17,18
**WITNESSED** 105:21
**women** 95:25
**wondering** 42:14 83:4
**word** 56:20
**wording** 37:13,14 37:17
**words** 39:3 67:18 95:3 97:18
**work** 6:17 7:23 8:9 8:14,22 10:14 11:22,25 14:1 24:17 25:10,11,16 26:22 51:1 85:14
**worked** 6:23 12:1
**working** 12:17 19:16 21:21 81:17
**wouldn't** 71:15
**write** 18:18
**writing** 23:20 28:13 28:14,22 29:8,15 86:13
**written** 15:21 21:15 22:21 28:9 29:19 32:18 50:24 91:18
**wrong** 26:8 62:24 67:25 81:24
**wrote** 29:4 37:4 75:22
**www.summitrep...** 1:25

**X**

**Y**

**yeah** 37:11 44:23 50:7 51:8,16 56:20 59:3 71:5 73:11 78:20 81:1 87:3 89:23 95:11 97:16 101:2
**year** 12:6,7 27:19 38:18 43:17 82:21 95:25 96:10,11 97:25 98:2,5,13 98:14 99:6,7,17 99:20
**years** 6:24 7:7 12:2 12:14 14:10 21:21 28:4 61:1
**yesterday** 15:18 16:7 18:5,7 87:18

**Z**

**Zach** 30:10,15

**0**

**08037** 1:24

**1**

**1** 3:10 15:23,25 20:11 21:18,23 22:16 24:1,9 28:8 29:8,11 31:14,20 31:24 35:21 49:20 75:15 78:14,17,25 100:12
**1.0** 21:9 35:24
**1.1** 76:22

**1.2** 69:6
**1.3** 70:6
**1.4** 71:17
**1.6** 72:14,15 75:2
**1.7** 72:24
**1.8** 53:11 74:2,22
**1.9** 49:24 50:6,7 53:8 54:20 57:4 76:22 82:15
**1:19-cv-501-JG** 1:6
**1:27** 1:16 101:18
**10** 4:25
**10:03** 1:15
**100** 78:15,17,19,25 79:7 80:9,11 98:20
**11:20** 46:15
**11:39** 46:15
**12/31/20** 102:21
**12:38** 82:12
**12:51** 82:12
**13** 104:2 105:6
**13th** 1:15 95:11,13 95:14
**1400** 2:11
**15** 3:10
**1500** 1:23 102:22
**1600** 2:5
**1610** 1:23 102:22
**19102** 1:23 102:23
**19103** 2:6
**1963** 95:25 99:8
**1980** 95:14,16

**2**

**2** 68:22 85:22
**2009** 4:25
**2012** 14:8 28:14
**2014** 14:5
**2017** 28:17
**2018** 21:5 23:14 28:22,22
**2019** 1:15 95:11 104:2 105:7
**2020** 102:15
**215** 1:24 2:6
**215.985.2400** 102:23
**2201** 1:18 6:21
**2510** 2:5
**25th** 95:16
**2nd** 102:15

**3**

**300** 30:25
**31** 21:5

**4**

**4** 3:5
**424** 1:24
**447-8648** 1:24

**5**

**5** 2:11
**567-3315** 1:24

**6**

**6.1** 72:10
**609** 1:24
**622-2700** 2:12

**7**

**735-8600** 2:6
**790** 16:1
**790-794** 3:10
**794** 16:1

**8**

**800** 1:24

**9**

**9.1** 66:3,20
**911** 12:16
**92614** 2:12
**9295** 102:20
**949** 2:12
**985-2400** 1:24

# Exhibit 20

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

~~~~~~~~~~~~~~~~~~~~

DIANE D. JONES,

Plaintiff,

vs. No. 3:19-cv-02087-B

REALPAGE, INC., d/b/a LEASINGDESK SCREENING,

Defendant.

~~~~~~~~~~~~~~~~~~~~

Videotape deposition of
DIANE D. JONES
Tuesday, January 14, 2020
10:02 a.m.

Taken at:
Veritext- Cleveland
1100 Superior Avenue
Cleveland, Ohio
Wendy L. Klauss, RPR

JOB NO. 3822766
PAGES 1 - 207

APPEARANCES:

On behalf of the Plaintiffs:

Francis Mailman Soumilas P.C.
LAUREN KW BRENNAN, ESQ.
1600 Market Street, Suite 2510
Philadelphia, PA 19103
(215) 735-8600
Lbrennan@consumerlawfirm.com

On behalf of the Defendant:

Troutman Sanders
TIMOTHY J. ST. GEORGE, ESQ.
1001 Haxall Point
Richmond, VA 23219
(804) 697-1200
Tim.st.george@troutman.com

~ ~ ~ ~ ~

ALSO PRESENT:

Kurt Henschel, Videographer
Martin Thornthwaite, Esq.,
In-house counsel, RealPage, Inc.

~ ~ ~ ~ ~

TRANSCRIPT INDEX

APPEARANCES:.............................. 2

INDEX OF EXHIBITS ....................... 4

EXAMINATION OF DIANE D. JONES

By Mr. St. George........................ 7

REPORTER'S CERTIFICATE................... 205

EXHIBIT CUSTODY

EXHIBITS RETAINED BY COURT REPORTER

INDEX OF EXHIBITS

| NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| Exhibit 1 | Copy of Envelope with June 24, 2016 Letter Attached, Beginning with Bates Label Diane D. Jones RealPage 00001 ... | 83 |
| Exhibit 2 | Denial Notice, Bates Label Diane D. Jones RealPage 00003 ... | 88 |
| Exhibit 3 | Screen Shot, Bates Label Diane D. Jones RealPage 00004 ..... | 99 |
| Exhibit 4 | Credit Report, Beginning with Bates Label Diane D. Jones RealPage 00005 ..... | 100 |
| Exhibit 5 | 8/21/2017 Letter, Bates Label Diane D. Jones RealPage 000164 ...... | 108 |
| Exhibit 6 | Fax Transmission Page with Attachment, Beginning with Bates Label Diane D. Jones RealPage 00015 ... | 110 |
| Exhibit 7 | Form: Consumer Dispute, Beginning with Bates Label RealPage/Jones 000041 ...... | 118 |
| Exhibit 8 | Dispute Results for Diane D. Jones, Beginning with Bates Label Diane D. Jones RealPage 00009 . | 125 |
| Exhibit 9 | Document Reflecting Internal Notes of RealPage, Beginning with Bates Label RealPage/Jones 000166 . | 133 |
| Exhibit 10 | Document Reflecting Internal Notes of RealPage, Beginning with Bates Label RealPage/Jones 000053 . | 140 |

| | | |
|---|---|---|
| Exhibit 11 | Letter Dated September 11, 2017, Beginning with Bates Label RealPage/Jones 000046 | 146 |
| Exhibit 12 | September 5, 2017 Email, RealPage/Jones 000050 | 153 |
| Exhibit 13 | Plaintiff's Objections and Responses to Defendant's First Set of Interrogatories to Plaintiff Diane D. Jones | 164 |
| Exhibit 14 | Plaintiff Diane D. Jones's Responses to Defendant's First Set of Requests for Admissions | 173 |
| Exhibit 15 | October 11, 2019 Email with Second Amended Class Action Complaint Attached to Defendant's First Set of Requests for Admissions | 184 |

INDEX OF VIDEO OBJECTION

OBJECT PAGE

objection.............................. 44

objection.............................. 56

objection.............................. 79

objection.............................. 177

objection.............................. 177

objection.............................. 178

objection.............................. 179

objection.............................. 180

objection.............................. 181

objection.............................. 182

objection.............................. 183

objection.............................. 183

objection.............................. 186

objection.............................. 187

objection.............................. 187

objection.............................. 191

objection.............................. 193

objection.............................. 195

objection.............................. 196

objection.............................. 201

objection.............................. 202

THE VIDEOGRAPHER: We are on the record at 10:02. Today's date January 14, 2020. This is the matter of Diane Jones versus RealPage. This deposition is taking place in Cleveland, Ohio.

Would counsel please identify themselves for the record.

MR. ST. GEORGE: Timothy St. George, counsel for RealPage, Inc., and I have on the line as well, attending by telephone, Martin Thornthwaite, in-house counsel for RealPage, Inc.

MS. BRENNAN: Lauren Brennan, on behalf of the plaintiff.

THE VIDEOGRAPHER: Would the court reporter please swear in the witness.

DIANE D. JONES, of lawful age, called for examination, as provided by the Statute, being by me first duly sworn, as hereinafter certified, deposed and said as follows:

EXAMINATION OF DIANE D. JONES

BY MR. ST. GEORGE:

Q. All right. Good morning, Ms. Jones.

A. Good morning.

Q. Thanks for being us with today. I appreciate it.

Ms. Jones, you understand that you have just been placed under oath, just as you would be if you were in a court?

A. Yes, I do.

Q. Do you understand that that obligates you to tell the truth with respect to your testimony today?

A. Yes.

Q. We have a court reporter sitting here today who is taking down your testimony. She is taking it down in writing, and so for that reason it is important that when I ask you a question, you give me a verbal response, and by that I mean, shaking your head one way or the other or using hand gestures don't translate to a transcript.

So if I ask you a question, it would be natural for you to shake your head one way or the other perhaps, but we do need a verbal response; does that make sense?

A. Yes.

Q. Sometimes during this deposition,

Ms. Brennan, your counsel, may put an objection on the record. She is just doing her job. If she says an objection, the protocol is for you to still go ahead and answer the question, unless she instructs you not to answer.

So it's a little bit of an unusual process, but I want to make sure that you are aware of. So even if she objects to form, you will probably look over at her, but the protocol, as I mentioned, is for you to still go ahead and answer, unless she tells you otherwise, okay?

A. Okay.

Q. Let me know if you don't understand a question that I ask you today. I'm sure at some point I'll make some statement that you don't find to be particularly clear. My only goal for today is to ask clear questions and to get clear answers.

So again, if you don't understand something, please ask me to rephrase, but if I ask you a question and you don't ask me to rephrase, is it fair for me to assume that you have understood the question that I have asked?

A. Yes.

Q. Let me know if at any point today you need a break. This deposition will span multiple hours, and it's not an endurance contest. I want you to be comfortable. The only thing I'll ask is if we are in the middle of a question-and-answer series, that we simply go ahead and close out that question-and-answer sequence before we take a break, okay?

A. Okay.

Q. Is there any reason why your ability to testify today would be impaired, either through any medical conditions or any substances that you might have taken?

A. No.

Q. All right. Have you ever been deposed before, Ms. Jones?

A. Yes.

Q. Tell me briefly, how many times?

A. Once.

Q. And what was that case, do you recall?

A. Yes. I was involved in an accident.

Q. Was this an automobile accident?

A. Yes.

Q. And when was that?
A. I believe 1988.
Q. Okay. All right. So it's been a while.
A. Yes.
Q. Were you the plaintiff or the defendant in that case?
A. The defendant.
Q. Okay. And that's your only deposition?
A. Yes.
Q. Have you ever testified in court?
A. No.
Q. All right. Can you please give me your full name, Ms. Jones, for the record?
A. Diane Denise Jones.
Q. And how old are you, Ms. Jones?
A. 58.
Q. And are you still living in Ohio?
A. I am, yes.
Q. Okay. What's your current address?
A. My address is 24350 Lake Shore Boulevard, suite 102, Euclid, Ohio, 44123.
Q. You gave a suite name. I assume, is that an apartment complex?

A. Yes.
Q. Okay. And how long have you been -- can I just call that the Euclid address?
A. Yes.
Q. How long have you been living in Euclid at that address?
A. At this address, I've been there for two years.
Q. So we are sitting here today in January of 2020. It's fair to say you moved in in January of 2018?
A. Well, actually, it will be two years in April.
Q. Okay. Understood. So you moved in in April of 2018?
A. Yes.
Q. Are you on a one-term lease -- or one-year lease, excuse me?
A. I'm not on a lease.
Q. Okay. Do you own?
A. No. It's month to month.
Q. Month to month, got it.
And what is your monthly rent?
A. $575.

Q. And what type of apartment is it, is it a one bedroom?
A. Yes.
Q. That $575 a month, do you know if that is at all subsidized in any way?
A. No, it isn't.
Q. So this would be a market-rate apartment, to use that term?
A. Yes.
Q. And where were you living immediately prior to April of 2018?
A. I lived down the street on Lake Shore at a different apartment, and I was there for one year.
Q. So you lived down the street on Lake Shore for one year, so you were there from April 2017 through April 2018?
A. Correct.
Q. Is that also an apartment?
A. Yes.
Q. Was that month-a-month apartment as well?
A. No.
Q. Did you have a lease?
A. Yes.

Q. What was the term of that lease?

A. One year.

Q. And what was the rate -- what was the monthly rate?

A. $610.

Q. And was that a subsidized apartment or was that market rate?

A. Market rate.

Q. One bedroom?

A. Yes.

Q. Why did you move in April of 2018?

A. The rent was lower.

Q. Any other reason?

A. No.

Q. And you mentioned it's right down the street?

A. Yes.

Q. All right. How about before April of 2017, where were you living?

A. Before I lived in University Heights. I shared a home with my daughter and my granddaughter.

Q. Was University Heights also in Euclid?

A. No. It's University Heights, Ohio.

Q. Oh, that's the name of the city?
A. Yes. It's a suburb of Cleveland.
Q. And who did you live there with again; you said your daughter?
A. My daughter, Tiffany Jones, and my granddaughter, Ashley Richardson.
Q. And how long did you live at the University Heights?
A. Two years.
Q. And was that an apartment as well?
A. It was a house.
Q. Was that house being rented, or did someone own it?
A. It was rented.
Q. Whose name was on the lease, do you know?
A. My daughter and mine.
Q. And how many bedrooms did that house have?
A. Four bedrooms.
Q. And so just doing the math, you would have lived there from approximately April of 2015 through April of 2017?
A. Actually, I was there from September of 2016 to April of 2018. Yes,

18 -- no, 17, I'm sorry.

Q. So you were there September 2015 through April of 2017?

A. Yes.

Q. What was the monthly rent there, do you recall?

A. $1,025.

Q. And did you split that with your daughter?

A. Yes.

Q. How old is your daughter?

A. She is 38.

Q. Why did you move from the University Heights address to the Lake Street address?

A. She got engaged, and so I moved on my own.

Q. How far away is the Lake Street address and the University Heights address?

A. The Lake Shore, where I'm at?

Q. Lake Shore. I'm sorry.

A. I want to say around ten miles.

Q. You mean to tell me your daughter didn't want you living there with your her as well?

A. Well, I kind of didn't want to.
Q. Fair either way.
And the last one I'll just ask you about, is what about prior to the University Heights location, where were you living then?
A. I lived in Bedford Heights.
Q. Is that also a suburb of Cleveland?
A. Yes.
Q. And how long did you live at the Bedford Heights address?
A. I lived there two years.
Q. Was that an apartment?
A. Yes.
Q. Did you rent it?
A. Yes.
Q. Do you recall the monthly rent there?
A. That was -- I believe that was around $600.
Q. One bedroom?
A. Yes.
Q. Now, you mentioned you had previously testified in a deposition in one proceeding before, and then you have not previously testified in court before, correct?

A. Yes.
Q. So apart from that car accident case that you identified, do you know if you have ever served as a plaintiff or a defendant in any other lawsuit, apart from this one?
A. No, no lawsuit.
Q. Do you recall whether you were sued by the City of Cleveland in 1997?
A. City of Cleveland, I don't recall. 1997.
Q. Okay. How about being sued by FNCL Credit Corporation in 2012, are you familiar with that?
A. I'm not. Do you mean Cleveland Heights maybe in 97?
Q. City of Cleveland Heights.
A. Cleveland Heights?
Q. Yes.
A. Was that -- I know that I had bought a house, and I had to pay a fine for some violations. When you move in a house, you have point-of-sale violations, if I can recall.
Q. So that would have been the Cleveland Heights lawsuit, if you recall?
A. I think -- I'm thinking that's what

it is. I can't really recall.

Q. And you don't have a recollection of the lawsuit filed by FNCL Credit Corporation?

A. No.

Q. How about Rivers Edge Investment, a lawsuit in 2003?

A. I remember that.

Q. Okay. What was that?

A. That was for a truck I had financed.

Q. And did you fall behind on payments?

A. Yes.

Q. Was the truck repossessed, do you know?

A. Yes, it was.

Q. Do you recall whether you paid any other money to Rivers Edge Investment, apart from the truck being repossessed?

A. I'm sure I paid some moneys to them.

Q. You just don't recall the amount?

A. No.

Q. Do you recall a lawsuit filed by

Household Realty Corporation?

A. No.

Q. How about a lawsuit filed by Skyline Management in 2005?

A. That was an apartment.

Q. Okay. What do you recall about that lawsuit?

A. I became ill, and I wasn't working, and I fell behind on that. It was dismissed. That's all I recall.

Q. So you say it was dismissed. Are you aware that the public docket shows a judgment was entered against you?

A. Well, you know, I know that I moved away, so I'm aware of that though.

Q. Was that -- it was by the management company for an apartment that you were living in?

A. Yes.

Q. So is it fair to say it was an eviction action?

A. Yes, for one payment, and then some interest accrued.

Q. And you moved out of the apartment complex?

A. Yes.
Q. Do you recall a lawsuit of the KD Group versus Jones in 2010?
A. I recall that.
Q. And what was that lawsuit?
A. I had fallen behind on that as well. I had some health issues.
Q. So it was another eviction action?
A. Yes.
Q. Do you know what the outcome of that case was, do you recall?
A. I think that one was dismissed.
Q. So the public docket again shows judgment being entered against you in that case. When you say "dismissed," what do you mean by that?
A. Well, because I couldn't afford to pay it. I had been off ill. I have some health issues.
Q. Okay. How about another lawsuit filed by Security First Capital in 2011?
A. I don't know about that one.
Q. How about another lawsuit filed by Capital One Bank in 2009?
A. I don't know about that one either.

Q. How about another lawsuit filed by a company called Midland Funding in 2008?

A. No.

Q. How about a lawsuit filed by the State of Ohio Department of Taxation in 2011?

A. I don't recall that, but it's possible.

Q. Do you know of any other lawsuit that's currently pending against you?

A. No.

Q. So we have identified, I believe, at least two prior eviction proceedings that you recall.

Any other eviction proceedings that you can recall in your past?

A. No.

Q. Are you current on your rent at your address presently?

A. Yes.

Q. Have you ever previously been arrested?

A. No.

Q. And because you haven't been arrested, I take it you have never had any criminal charges filed against you?

A. No.

Q. How about bankruptcy filings, have you ever filed for bankruptcy?

A. No.

Q. When you described your housing history to me from at least 2015, I think -- or 2014, that's about as far back as we went, it didn't appear to me that there were any gaps in housing.

So is it fair to say that you always had housing up until the point where you moved into the next complex?

A. Yes.

Q. Switching gears, what did you do to prepare for this deposition? And I don't want to know about any conversations that you had with Ms. Brennan or any other of your attorneys.

I'm just trying to get a sense of the process, in terms of when you might have met to prepare or what you yourself might have looked at in order to prepare for this deposition?

A. Well, I have some notes, also the information that I received from

RealPage -- well, from RealPage and from Marietta.

Q. Okay. So you looked at some documents that you received from RealPage and from Marietta?

A. Yes.

Q. Any other documents that you recall looking at?

A. No.

Q. And how about meeting with your attorneys, did you meet with them in advance of this deposition?

A. Yes.

Q. And who did you meet with?

A. With attorney Lauren Brennan.

Q. Okay. And when did you meet with her?

A. Yesterday.

Q. And how long, approximately, did you meet for?

A. I want to say maybe two hours and 15 minutes to three hours.

Q. Who are your attorneys, apart from Ms. Brennan? Can you tell me any of their names?

A. Pertaining to this case?
Q. Yes, ma'am.
A. Francis & Mailman, John Soumilas. I think that's how you pronounce his name.
Q. Okay. Anyone else besides John?
A. No.
Q. Have you ever heard of -- ever heard of an attorney named Jim Francis?
A. I imagine he's affiliated with Francis & Mailman, but I haven't met him.
Q. You haven't spoken with Mr. Francis, to your knowledge?
A. No.
Q. How about an attorney named Michael Caddell, have you ever heard of him?
A. No.
Q. How about an attorney named Amy Tabar, have you ever heard of her?
A. No.
Q. How about Daniel Cohen?
A. No.
Q. Edward Kroub?
A. No.
Q. Matthew Dooley?
A. No.

Q. Anthony Pecora?

A. No.

Q. So your only interactions with your attorneys in this case have been with either Mr. Brennan -- Ms. Brennan or Mr. Soumilas?

A. Yes.

Q. I have trouble with his last name as well, so don't worry about it.

MR. ST. GEORGE: I think it's Soumilas; is that right?

MS. BRENNAN: It is Soumilas.

Q. Okay.

A. Sorry.

Q. No, that's not your fault.

MS. BRENNAN: He wouldn't be offended.

Q. Okay. Apart from the time when you met with Ms. Brennan yesterday, so before your deposition, when was the last time before that that you can recall speaking with either Ms. Brennan or Mr. Soumilas?

A. Maybe in December.

Q. Okay. And how long was that conversation, do you recall? I say conversation. Do you know if it was on the

phone or if it was by email?

A. Email and, let's see, I think -- last March I may have spoken with Mr. Soumilas, and I know I spoke with Ms. Brennan sometime before December. I can't recall exactly what month that was.

Q. Okay. So conversation, approximately last March, with Mr. Soumilas, a conversation with Ms. Brennan sometime before December, an email exchange --

A. And in December.

Q. And in December?

A. Yeah. Via email.

Q. And then deposition preparation yesterday?

A. Yes.

Q. The conversation in December, you mentioned that was an email; is that right?

A. Yes.

Q. How about the conversation before December with Ms. Brennan, was that an email or was that on the phone?

A. That was on the phone.

Q. How long did that conversation last, approximately, do you know?

A. Maybe around 15, 20 minutes.

Q. And then the conversation with Mr. Soumilas, approximately last March, was that an email or was that a telephone call?

A. Telephone call.

Q. And do you recall approximately how long that call lasted?

A. I'd say about 20 minutes.

Q. Any other conversations you can think of, sitting here today?

A. I may have spoken with Mr. Soumilas, let's see, I may have spoken with him maybe October of 2019.

Q. Do you recall if that was a telephone call or --

A. That was a telephone call.

Q. Do you have any sense of approximately how long that call may have lasted?

A. About 20 minutes, 20 to 30 minutes.

Q. Anything else you can think of, besides those communications?

A. No.

Excuse me. There is one thing. The apartment -- the house that I moved in in

University Heights.

Q. Yes.

A. We moved in there in 2015. I think I may have said 2016.

Q. You did say 2016. Okay. So that you moved in in 2015?

A. Yes.

Q. And you were there until April of 2017?

A. Yes.

Q. So then when you were talking about the Bedford Heights location, you had mentioned that you were there for approximately two years?

A. Yes. I moved in there --

Q. That would have been 2013?

A. Yes.

Q. Thank you for that clarification.

Did you graduate from high school?

A. Yes.

Q. And what year did you graduate?

A. 1980.

Q. And what high school did you attend?

A. South High School.

Q. Where is that located?
A. In Cleveland, Ohio.
Q. After high school, did you attend college or any other type of postsecondary education?
A. Not directly after.
Q. Okay.
A. But I did in 1987.
Q. Let's take 1980 to 1987, what were you generally doing during that timeframe?
A. Well, I had my daughter in 1981, and then, of course, I worked.
Q. 1987, where did you attend?
A. Cuyahoga Community College.
Q. And did you get any type of associate degree or certificate from the community college?
A. No.
Q. How long were you there?
A. About a year.
Q. What were you studying?
A. I studied English, math, music. I think that's general studies.
Q. So a variety of courses?
A. Yes.

Q. Apart from that one year in community college, any other type of educational certificates, attendance?

A. Well, I became an insurance agent in 19- -- well, I worked for an agent, but you had to get licensed, of course. So I worked within the insurance industry for probably around 20 years after that.

Q. You got licensed as an insurance broker?

A. Yes, insurance agent.

Q. Insurance agent?

A. Uh-huh.

Q. And when did you get licensed, do you recall?

A. I obtained my property and casualty license, I want to say, in the early 90s, and then my life and health in 2000.

Q. And who were you working for, any particular agency?

A. I worked for State Farm Insurance.

Q. And you mentioned 20 years. Were you employed with State Farm that whole time?

A. No. I have also worked for Allstate Insurance.

Q. Give me a breakdown, just generally, as to time periods for the two companies?

A. Well, I worked for -- after Allstate, I ended up having my own agency at Farmers Insurance as well, but starting out in 1987 as a sales secretary for State Farm Insurance.

Q. And when did you move to Allstate?

A. I moved to Allstate in, let's see, I want to say 1995.

Q. Okay. And how long were you with Allstate?

A. Maybe four years, and I left Allstate for a while, and then I went back to Allstate.

Q. What did you do during that gap period when you left Allstate?

A. I know I stayed within the insurance industry. I'm trying to think which company I was with. In 92, I worked back with State Farm, but my employer passed away.

Q. So you were still in the insurance industry after you left Allstate in approximately 1999?

A. Yes. 99 is when I obtained my own agency with Farmers Insurance.

Q. And how long did you have your own agency?

A. For three years.

Q. And did you return to Allstate after that?

A. I did.

Q. So returning to Allstate approximately 2002?

A. Yes. And I'm trying to think. It was so long ago. I believe so though, because I was there in 2004 as well.

Q. Okay. And how about from 2002 onward, just give me a general sense of your employment?

A. Well, like I said, I was in the insurance industry for a long time.

Q. So what were you doing after 2002?

A. Working for Allstate Insurance.

Q. Okay. And how long did that last?

A. I want to say until around 2005 or 6.

Q. What did you do then?

A. After that I had some health

issues. I don't know if with the HIPAA law, if I should disclose that.

Q. I don't need to know about your health issues. But you had some health issues in 2005 and 2006. Did you stop working at that time?

A. Yes.

Q. And has that been the case to the present date, you have not worked since 2006?

A. Well, no. I went back to work for a while, and then I -- something else happened, and I ended up in the hospital again, and that's been kind of ongoing.

Q. Okay. So you have worked on and off since 2006?

A. Yes.

Q. Has that been in the insurance city?

A. Yes.

Q. And how many years -- let's take 2006 to the present. So that's 14 years.

Of that 14-year period, how much time have you spent working versus time off?

A. Up until what date?

Q. Until the present.

A. I know I did some mortgage work before. I'm just trying to --

Q. Take your time.

A. -- think back.

I spent some time in Nevada with my daughter, she had baby, and she ended up having a cardiac arrest, so I spent some time trying to help her, you know, just staying there with her and the children.

Then I came home, because something happened with my health again. Let's see. So I can't -- it's been off and on, but I spent a lot of time in the hospital.

Q. Okay. How about presently, are you employed?

A. No.

Q. When was the last time that you worked?

A. Let's see. I had -- did some catering in 2018, and then my daughter was killed in an accident, so I -- so I kind of -- I just -- so after she had her accident, I just -- I just was kind of out of it, sort of.

Q. Sure. I'm sorry to hear that.

So 2018 you had that personal tragedy and stopped working generally after that?

MS. BRENNAN: Do you need a break for a minute?

Q. Let me just focus on 2017 for a minute, because I know that that is the year that you applied to the complex at Marietta Road in Georgia. So let me just take 2017, that year.

Were you working during that year; do you know?

A. No.

Q. In 2016, so the year immediately before, do you know if you were working in 2016?

A. No.

Q. When you say no, you mean you were not working?

A. No, I wasn't working.

Q. Are you on any form of disability?

A. Yes.

Q. Is it Social Security?

A. Yes.

Q. Is that your sole source of income?

A. Yes.

Q. So that would have been your sole source of income in 2016 and 2017?

A. Yes.

Q. What are your monthly benefits; how much do you receive?

A. It's 970.

Q. Do you have any plans to return to work, or do you know if that won't be possible?

A. Well, I want to. Some of my tests were okay, so I want to return to work.

Q. You mentioned you get $970 a month in benefits?

A. Uh-huh.

Q. And you testified your present rent is $575 a month, correct?

A. Correct.

Q. Is that your largest monthly expense?

A. Yes.

Q. Have you been married?

A. No.

Q. And you mentioned one daughter who passed away?

A. A granddaughter.

 Q. Your granddaughter passed away. I'm sorry.

And then you mentioned a daughter?

A. Yes.

Q. Do you have any other children?

A. No.

Q. Okay. Let's switch gears a little bit, move into this case itself.

In your own words, can you tell me what your understanding of this lawsuit is?

A. Yes. I understand that I had applied for an apartment in Atlanta at Marietta, and they do a background check, and they -- I was told it was LeasingDesk, they did the background check, and they came back and said that I had a criminal record and that I had been involved with some drug activity, but I hadn't, and because of that, I was denied the apartment in Atlanta, because they have a criteria.

I think they have about eight criteria, and that's the one that they checked off, that I had been involved -- I had been incarcerated and involved with drugs.

Q. And so your understanding, it

relates to a background check for an apartment in Marietta, Georgia?

A. Yes.

Q. And that was in 2017; is that right?

A. Yes.

Q. So that would have been while you were living at the Lake Street address?

A. Lake Shore.

Q. Lake Shore, I'm sorry. I keep saying that wrong. The Lake Shore address?

A. Yes.

Q. And you're represented in this case, you mentioned, by two attorneys that you are aware of, you have John Soumilas and Lauren Brennan?

A. Yes.

Q. And you mentioned they are with the firm of Francis & Mailman.

How did you come to find them and retain them as an attorney?

A. Well, after I lost my granddaughter, I just wasn't focussing on anything. I just wasn't -- you know, and then once I started to feel better, I hadn't heard

back from Marietta one way or the other, and so I went online to follow up with the FTC, because I had filed a claim with them, and I saw Francis & Mailman online, so I contacted them to see if they could help me.

Q. So just you were doing internet research about a claim that you had filed with the FTC, and you came across the website for Francis & Mailman?

A. Yes.

Q. What was that claim that you had filed with the FTC; when did you file it?

A. In August of 2017.

Q. What did you say and how did you submit it?

A. Well, I had submitted it, the fact that I was denied an apartment because I was accused of having a criminal activity and being incarcerated, and that I was denied an apartment because of that.

Q. Okay. And did you submit that online?

A. I did.

Q. Did you ever hear back from the FTC?

A. Well, I had received an email just acknowledging confirmation that I had filed a claim, but I hadn't received any other correspondence thereafter.

Q. Is that true to this day, you never received anything back?

A. That's true.

Q. Did you ever follow back up with the FTC?

A. No.

Q. Have you heard of the phrase "class action lawsuit" before?

A. Yes.

Q. And what is your understanding of that phrase, when I say "class action"?

A. Well, it's, I would say, it's some type of suit where people have been harmed and they need representation.

Q. And when you say "people," who do you mean?

A. Well, more than one person.

Q. When did you first hear the phrase class action or become aware of that concept?

A. Probably over, I don't know, a span of ten or 15 years.

Q. Okay. So prior to this case?
A. Yes.
Q. Do you know if this lawsuit is a class action or if it's not a class action?
A. Well, I think that it is.
Q. And do you have an understanding of who was included in the class?
A. I don't know anyone personally. I just know that it's other people that have been denied an apartment because of a false background check.
Q. You don't know, personally know any of the proposed class members?
A. I don't.
Q. If I say the name James Arnold, do you know who that is?
A. Yes, that gentleman was there at the last meeting where you were there downtown.
Q. At the courthouse, the status conference we attended?
A. Yes.
Q. Was that the first time you met Mr. Arnold?
A. It was.
Q. Was that the only time you had

spoken with Mr. Arnold?

A. Yes.

Q. Do you know where this case is pending, what court?

A. I understand it is in Texas.

Q. Do you know the name of the judge that's overseeing the case?

A. It may be Judge Boyle, if I can remember.

Q. And we previously attended a status conference in Ohio, correct?

A. Yes.

Q. And do you know approximately when this court case got moved to Texas?

A. I believe it was September of 2018 -- no, I'm sorry -- yeah, 2018 -- 2019, I think.

Q. Do you have any idea why it got moved?

A. I believe because of the jurisdiction.

Q. What do you mean by that, if you know?

A. From my understanding, it's because the company, RealPage, is in Texas.

Q. Prior to your interactions with RealPage in 2017 in connection with the Marietta Road apartment, or the Marietta apartment, I should say, had you ever heard of RealPage before that?

A. No.

Q. So you understand that this case is a class action; is that right?

A. Yes.

Q. And who decided to make this case a class action?

MS. BRENNAN: Objection. Go ahead, you can answer, if you can without revealing attorney-client communication.

A. Well, once I -- when I went online to find -- look for the FTC, to talk to them about it, I saw that there were other people that had been harmed, that they were complaining that they were not -- they were turned down for an apartment because of some of the same reasons that I was, and I just thought, you know, that it just wasn't right, and if I could work towards some type of resolution for not just myself, but for the other people that were harmed, and that's why I

decided to just try and do that.

Q. You mentioned that you heard the phrase "LeasingDesk" before?

A. That's what I was told. That's when I contacted Marietta, once I received a letter that they were denying me, they said LeasingDesk.

So once I went online to try and find information where I could contact LeasingDesk, then the name RealPage came up.

Q. And that would have been the first time you heard of RealPage?

A. Yes.

Q. Do you have an understanding of what LeasingDesk does or what RealPage does as a business?

A. Yes.

Q. What's your understanding?

A. My understanding is that they verify information, they do background checks for various management companies to -- it's a screening, to say if you are worthy of obtaining an apartment.

Q. And that background check that you described, you mentioned a criminal record that

was reported for you. So it's your understanding then that the background checks have a criminal history report, essentially?

A. Yes.

Q. And are you also familiar with the background checks having what I'll call sort of a credit component?

A. Yes.

Q. There is a credit score and there is a list of delinquencies or credit accounts; is that fair?

A. I'm sorry?

Q. Is that fair, is that consistent with your understanding?

A. Yes.

Q. The apartments that you have described, the Lake Shore --

A. Yes.

Q. -- finally got that right. The Lake Shore apartment, and then there is the Euclid apartment that you are currently living in. Do you recall whether you had to undergo a background process to get those apartments?

A. I did.

Q. You did?

A. Yes.

Q. Okay. And you agreed to that as part of the application process?

A. Yes.

Q. And did you have any issues with any of those background checks?

A. No. I was accepted at all of those.

Q. Did you ever see any copies of any background checks, or were you just informed that you were accepted?

A. I was just informed.

Q. And remind me again, you moved into the Euclid apartment in April of 2018; is that right?

A. The one I'm in now?

Q. Yes.

A. Yes.

Q. And that -- so that was after you had applied to Marietta?

A. Yes.

Q. So we talked about the places where you lived -- or where you lived over the last five or so years. Did you apply for any other apartment during that period where you were

turned down?

A. I can't remember. You mean like before, way before I moved?

Q. No. Let's just stay within the, sort of, five-year period.

I guess what I'm asking is do you recall any situations where you applied for tenancy at an apartment but you were told that you weren't able to rent the apartment?

A. I can't --

Q. Putting aside Marietta?

A. I can't remember, because all of these I was accepted.

Q. So you are not aware of anywhere else where you have been rejected?

A. No.

Q. Apart from Marietta?

A. Right.

Q. Have you ever heard of the Fair Credit Reporting Act?

A. Yes.

Q. When did you first hear of that?

A. I heard of that several years ago.

Q. Do you recall how you first came to hear of it?

A. It's just one of those things that you -- I mean, when you apply for anything or buy anything, there is always some type of disclosures with regard to your rights.

Q. Do you have an understanding of what the Fair Credit Reporting Act does or what it requires?

A. Yes.

Q. And what is your understanding?

A. My understanding is that, you know, if someone abuses your credit or puts out information about you or things like that, that you have some protection through them.

Q. In this lawsuit, do you know what laws you are claiming that RealPage violated or the claims that you are asserting against RealPage?

A. Yes.

Q. And what are those, in your opinion?

A. Well, again, with my applying for an apartment and then being turned down because of a false report about me, it prevented me from being able to obtain an apartment. It wasn't true.

Q. Right. So I guess what I'm asking is, the actual claims that you are asserting against RealPage or the laws that you say that RealPage has violated, what are those; do you know?

A. Well, I'm thinking that when they did their background check, they didn't verify information about me. All the information was about someone else, but it was still used against me, and it prevented me from renting an apartment.

Q. Right. I understand that.

I guess what I'm asking is something just more technical, which is do you know what laws you are claiming that RealPage violated?

A. Well, my assumption is, is that they didn't thoroughly do a background check. They didn't ensure that the information about me was true. They used information that, to my understanding, when I spoke with RealPage, that they said that my birthday was a match to this other young lady.

They said that their computer or the software picked up this information. The

information that they obtained wasn't in the State of Ohio at all. It was everything was for Atlanta.

Q. Right. So let me just stop you there, I guess.

So do you know whether or not you are claiming RealPage had violated a specific law?

A. Yes, they had.

Q. Okay. And what is the name of that law, do you know?

A. Well, it's just -- I don't know exactly what the name of the law would be, but I know that it is pertaining to putting out information that wasn't mine.

Q. So coming back to this case being a class action, have you ever heard the phrase "class representative" before; have you heard that phrase?

A. Yes.

Q. And what is your understanding of that phrase?

A. A class representative would be someone who would gather information and assist in helping other people that has, in turn, been

violated the same way that I have been.

Q. And do you know, are you a class representative in this case?

A. I am.

Q. You say violated in the same way that you have, correct?

A. Yes.

Q. Okay. So what is your understanding, just tell me your understanding of who was included in the class or classes in this case; who are you representing?

A. Well, again, I don't know anyone personally.

Q. Right.

A. But I'm representing people that have been denied apartments because of false information.

Q. So it would have to have been someone who had false information and someone who was denied an apartment?

A. Yes. Their background check was inaccurate.

Q. Inaccurate in what way?

A. Well, just like myself, I have never sold any drugs, I'm allergic to opioids,

I have never been incarcerated, and my name is Diane Jones, the summary that I received from RealPage that said that the young lady's name was Toni Taylor. It said her name was seven different people.

And I just feel that they didn't -- they didn't investigate enough to see who I was. Everything was built around Toni Taylor. They said she had some aliases, and I just -- that just -- it was just kind of offensive, and it just didn't feel right that I would be accused of criminal activity when I had not been.

Q. Okay. You used the term "alias." What do you understand that to mean?

A. It means that her name -- well, not her in specific, but when someone, their name is one thing, but they are actually assuming another name. They are saying that they are different people other than the person that they are.

Q. Right. So in this case, it would have been a criminal offender who was using other names, apart from their her legal name?

A. Yes.

Q. Do you know if you are representing one class or if you are representing two classes or three classes; do you have any understanding of how many classes you are representing in this case?

A. I don't know exactly how many people, but I know that there is several people.

Q. All right. Do you know how someone comes to be a class member in this case? That's not really a clear question. Let me rephrase.

I guess what I'm asking is, if we are looking out of the universe of people that have been screened by LeasingDesk, do you know how one of those people comes to be someone who you are representing in this case? Do you know what criteria they would have to satisfy?

A. I know that there would have to be over 40 people.

Q. Okay. So putting aside just numbers, what I'm asking is, of all the people who have been screened by LeasingDesk, what would make them a class member in this case, what would, sort of, bring a person into this

lawsuit, your understanding of that?

A. Well, that I understand that they would have had to have been harmed by a company or someone, and I understand that since it's not just one individual, the same thing has happened to a lot of people over and over.

Q. When you say, "They would have to be harmed," what do you mean by that?

A. Well, again, just like myself, I have never been a criminal, but false reports put out that they had done something that -- because the screening is about criminal activity. That's one of the criteria with particular management companies.

So when a background check comes back and says that they have committed a crime, that automatically makes you ineligible.

Q. So when you say has to be harmed and made them ineligible for the apartment complex?

A. Yes. Fortunately, I was able to just go rent another apartment. Some people may not have had that -- been able to do that. Some people actually may have been homeless or had a lapse in between being able to have a

roof over their heads.

Q. So you have mentioned that your understanding of your claim is that RealPage reported information about you relating to a criminal offender in Georgia, and that was not you, correct?

A. Correct.

Q. And you said you didn't feel that -- I believe I'm using your words, correct me if I'm wrong -- they didn't adequately investigate that it was you; is that right?

A. Yes.

Q. What do you think RealPage should have done in this case?

MS. BRENNAN: Objection to the form. Go ahead and answer, if you can.

A. Well, I think that they should have -- I had given my Social Security Number, date of birth and driver's license number, and I think they should have gone on my information, because with my driver's license number and everything, it's just so easy to do a background check, and nowadays you can go right online to a court docket and it will give you information about someone.

I think that instead of just going -- I don't know. I know one representative told me that they went by my birth date, but my birth date is not the same as this young lady's, and I just think they should -- and then even once they obtained some negative information, then maybe they should, you know, try and contact the applicant and say, "Well, you know, is this you, did you do this, we pulled up this information," before they just go and sell the information to their client.

And that would, you know, kind of give an applicant the chance to, you know, clear up things prior to just getting the information, before it's totally verified where you would just be turned down.

Q. Okay. So just breaking down your response a little bit, you say that one of your contentions is that RealPage should have used your SSN, your date of birth, and your driver's license number to check that against the criminal record?

A. Yes.

Q. And then you also say that RealPage

should have contacted you in advance of sending along this record to the Marietta complex; is that right?

A. Yes.

Q. Anything else that you can think of?

A. I think that they shouldn't just go solely on a date of birth.

Q. What should they go by then? If not just date of birth, what else?

A. Well, again, your driver's license number and your Social Security Number.

MS. BRENNAN: We have been going about an hour. Is this is a good time to take a break?

MR. ST. GEORGE: Maybe five more minutes; is that okay?

MS. BRENNAN: That's okay.

MR. ST. GEORGE: Five more minutes, and we will take a break.

Q. Have you seen any of the criminal records for -- let me back up. You mentioned it was a Toni Taylor was the offender of this drug offense; is that what you have seen?

A. Yes.

Q. And where did you see that, was that on the information you received from RealPage?

A. Yes. They sent a summary. I asked them, you know, why did they send a report that said I was a criminal, and they told me that there were some things on a background check, and I asked them if they could send me a copy so I could see exactly what I was being accused of, and I received an email summary, and it just showed all the things that this young lady had done and the aliases that she had used.

Q. Okay. So you saw the Toni Taylor based on some documents you were sent from RealPage, correct?

A. Yes.

Q. Have you ever seen any of the underlying court documents for the charge that was filed against Toni Taylor?

A. I haven't seen any court documents, just the summary. Now, the summary did show that she had been incarcerated, and it also listed a case number.

Q. You didn't take that case number and try and go pull any of the documents or

anything like that?

A. I didn't pull anything, but I did contact the Atlanta Police Department and the Cleveland Police Department, because that's what I was told to do.

When I contacted Marietta and complained that it wasn't me, they said, "Well, you are going to have to, you know, straighten it out, because we can't rent you an apartment with this type of file." So immediately I started just trying to clear my name.

Q. So let's take the Atlanta Police Department. You say you contacted them?

A. I did.

Q. Did you call them or did you write to them?

A. I called them.

Q. Okay. And what did you talk about; what was that conversation?

A. I called them, and I told them that I had rented -- tried to rent an apartment, and that was I denied because of a background check, and that I hadn't committed any crimes, and I gave them the case number, and they pulled it up, and they didn't share

information, but they said, "We can tell you that we don't have anything for Diane Denise Jones."

Q. Did you get anything from them in writing?

A. No.

Q. What did you do with that information; did you call Marietta back?

A. I did, and I also called Cleveland Police Department and asked them if they saw anything like this. They didn't see anything.

Q. Okay. So did you call Marietta back after you had talked to both the Atlanta Police Department and the Cleveland Police Department?

A. I called them, yes.

Q. Okay. And what did you say?

A. Well, I told them that I had made those calls, but they still needed something in writing, and then I went right back to RealPage to try to get something cleared up with them.

Q. So you never got anything in writing from the Cleveland Police Department or the Atlanta Police Department?

A. No.

Q. And Marietta said they would need something in writing from those departments, from the police departments?

A. They said -- they didn't say specifically. They just said we need something in writing showing that you didn't do this. So at that point I went back to the initial source, where they had gotten the bad reports.

Q. And that's RealPage?

A. Yes.

Q. Okay. We will talk about that in a little more detail later on, but let's go ahead and just take a five-minute break.

THE VIDEOGRAPHER: Off the record at 11:07.

(Recess taken.)

THE VIDEOGRAPHER: On the record. 11:21.

MR. ST. GEORGE: Back on the record.

Q. Ms. Jones, I'll just remind you that you remain under oath.

A. Yes.

Q. So I want to ask you about your understanding of what you are seeking to have

happen in connection with this case, and by that I mean, what damages you are claiming, what outcomes you want as a result of this litigation.

So what is your understanding of what you are seeking from RealPage in this case?

A. One of the main things is that they maybe make some adjustments to their software so that every year people just aren't turned down for those reasons, and because when you know that you haven't done anything, and you read a report, and it says that you are a criminal and you have done all these heinous things, not only is it offensive, but it's, I don't know, it's -- it's just startling. It's like, oh, my God. It's upsetting.

Q. Okay. The changes to their software, do you have anything specific?

A. Well, I don't know exactly how they do it, but maybe if they could use more of a criteria than just the birth date. There is a lot of people that have the same birthday, but in my case, we didn't have the same birthday.

So I just think they should do a

better job of screening somehow. I don't know what they could do with their computers or exactly how they go about screening. Just maybe they -- I thought, because here in Ohio, they do use your Social Security Number, and I don't know if they do that now, but I think even the driver's license number, that picks up a lot of information about you.

Q. How would they use an Ohio driver's license number on the screening for criminal records in Georgia, for instance? How would that work?

A. Well, because when you apply -- I mean, I've never lived Georgia, so people who haven't been there, how do you verify a person in Georgia and they have never lived there.

So when you look at, you know, my history, it just shows you down the line each year where I lived, and year that you have been there, where you have worked, the years that you have worked at a certain city or state. So maybe if they could just be a little more -- just a little more accurate. A Social Security Number and a driver's license number have a lot of information.

Q. Would you agree with me that people can commit crimes in states where they don't live?

A. I agree with you.

Q. So we can't just use residence history as a basis for excluding a record, right?

A. That's correct.

Q. So you mentioned changes to the software. Anything else that you are seeking to get out of this case from RealPage?

A. Well, I just want the judge to be fair.

Q. What do you mean by that?

A. Well, in my case, and I'm assuming other people, this apartment that I had applied for was subsidized. So when things turned down, I ended up paying more for rent than I probably would have had I been accepted at that particular apartment.

Q. So one of the things that you are seeking from RealPage in this case then is perhaps the difference in the rent that you have had to pay versus the subsidized apartment?

A. Well, not just me. I'm not a selfish person. I mean, I'm here to represent other people. So just across the board.

Q. Is that something you feel like the people who you are representing, is that something that they should be getting from RealPage in this case, is that different?

A. I think so.

Q. Being called an offender, you mentioned it was startling to you. Are you claiming that it caused you stress or that you suffered emotional distress?

A. It did. When I opened that letter and they said I was turned down because of a criminal offense, it's like I lost my breath, because, you know, nobody is perfect, but I have lived out my life to stay out of trouble, and then once I got that summary, that kind of hit home, because here in Ohio, the opioid epidemic is terrible, people are dying, women are just passing out with their babies in the car.

I have a sister that was in a terrible accident, and she -- her doctor just kept prescribing opioids, kept prescribing

them. And now she is in a nursing home.
So it was just -- it was hurtful, it was offensive, and it was breathtaking.
Q. Is that something you feel like RealPage should pay you compensation for, those damages?
A. Well, it's not their fault about my sister.
Q. Oh, I understand. I'm putting aside your sister and everything.
I'm just talking about your experience and the distress that you described, is that something that you feel RealPage should compensate you for?
A. Yes.
Q. How about the other people that you are representing?
A. Of course. I wouldn't want to accept anything without these people. It's like, how fair am I being?
Q. Any other -- any other money that you think that you are owed from RealPage or the reasons why, any other types of relief that you think you are entitled to?
A. Well --

Q. You mentioned the distress and you mentioned the rent. I'm just trying to figure out, is there anything else that you feel you are owed compensation for in this case?

A. At this point, I guess I'll just have to leave that up to the judge.

Q. What if you -- despite this criminal record, the Toni Taylor, what if you had been accepted at the apartment, the Marietta Road apartment, in that situation, would you claim that you had been harmed at all by RealPage's reporting?

A. Yes.

Q. Okay. How?

A. Because I have no criminal record.

Q. Okay.

A. I have never been in jail, and to be accused of, you know, criminal activity, drugs, being locked up, it's just -- I just can't describe how it feels to be accused of some things that you know that you didn't do, that you have lived out your -- I'm 58 years old now, but I guess I was around 55 or whatever when that came out, and I've kind -- I'm kind of proud of myself.

You know, a lot of people do bad things, for whatever reason, but I haven't done anything.

Q. So it is particularly distressing to you, am I describing this correctly, it is particularly distressing to you because you didn't have any criminal background at all?

A. That was just as distressing as being turned down.

Q. So there are two components of your distress: One is being called an offender?

A. Yes.

Q. The other was being turned down?

A. Yes.

Q. In your mind, they are both equally distressing?

A. Yes. I lost several family members prior to my granddaughter, and I just chose Atlanta. I just wanted to get away from here. There was just so many bad memories here in town. I mean, good memories with my family, but losing them, and I just wanted to try and get a fresh start and just right away, you know, I wasn't able to move in the apartment and be accepted because of that.

Q. All right. Let's start talking a little bit about the application that you submitted to Marietta. We will call it the Marietta complex, but it was the apartment complex that you were seeking to rent on Marietta Road in Georgia, correct?

A. Yes.

Q. So you were starting to describe, kind of, the reasons for wanting to move. So give me an explanation, because at that point in time, you were in the Lake Shore complex; is that right?

A. Yes.

Q. So why did you want to move and how did you pick Georgia?

A. Well, I had applied prior to my moving to the Lake Shore apartment.

Q. Okay.

A. But --

Q. You applied to the Marietta complex?

A. Yes.

Q. When did you first apply?

A. While I was over in University Heights.

Q. I mean, do you know the particular month?

A. I can't remember. I know it was warm, kind of, but I had lost my mom, my auntie, my brother, my sister, some just real close people, and I just felt like I needed to get away from Cleveland. I love Cleveland, but there was just so many memories.

So while doing that, I was online looking for apartments, and then I found Marietta, and then it said that they had a subsidized apartment, so I thought that would be a little easier for me, starting out with the lower rent. But it didn't work out that way.

Q. Okay. So you were interested in moving out for personal reasons, going to Georgia. How did you pick Georgia?

A. It's warmer, not really snowing.

Q. Yeah. I guess, let me step back. I don't mean to interrupt.

Were you focussed on Georgia, or you were just doing an internet search and came across the Marietta complex in Georgia, which came first?

A. I was focused on Georgia.

Q. Okay. You were focused on Georgia. The climate, any other reasons? I didn't mean to cut you off.

A. The climate, just getting away. I was born in Alabama, so I am southern girl, sort of.

Q. And how about the Marietta -- was the Marietta complex, was that actually in Atlanta, or was that in Marietta, Georgia?

A. It's in Atlanta, Georgia.

Q. So were you focused on Atlanta, were you looking at various cities in Georgia?

A. Focused on Atlanta.

Q. So that led you to do an internet search of some properties in Atlanta?

A. Yes.

Q. And that's how you came across Marietta?

A. Yes.

Q. Did you ever visit the complex?

A. I've never been to Atlanta.

Q. And you saw that it was -- they had a subsidized community?

A. Yes.

Q. Do you know what rent you would have paid at Marietta?
A. I believe they told me it would have been about $235 per month.
Q. And at that point, you were in a lease -- oh, I'm sorry. Let me back up, because you testified you had applied earlier.
So you had applied while you were at the University Heights --
A. Yes.
Q. -- location, right?
And you moved into the Lake Shore in April of 2017?
A. Yes.
Q. You said it was warm when you had applied to Marietta. I mean, was it sometime in 2017 or was it even as far back as 2016?
A. It was 2016.
Q. 2016, the summer of 2016?
A. It may have been fall, but it was warm out. I didn't have -- you know, I remember not wearing a coat at that particular period.
Q. And both the University Heights and the Lake Shore complex, you were in a one-year

lease, correct?

A. Yes.

Q. So you are obligated to pay for that full year?

A. Uh-huh.

Q. You have to respond yes or no.

A. Oh, I'm sorry. Yes.

Q. So you find the Marietta complex online, and you apply when it is warm out, summer or fall of 2016, and did you just hear nothing back at that time?

A. I didn't hear anything -- well, I did receive a letter stating that they -- I can't verbatim.

They said they received my application and that they would be sending me some information about the apartment, and, you know, various documents had to be sent to them to go through a process.

Q. Okay. Did you apply online?

A. Yes.

Q. Do you remember consenting to a background check as part of that process?

A. Yes. Actually they sent paperwork. They sent it via the mail, and I signed the

document for that.

Q. Okay. So you apply, you got confirmation of an application, and then did nothing happen for a period of months, at least?

A. Correct.

Q. In fact, you even had to move in the interim, you went from University Heights to the Lake Shore complex?

A. Correct.

Q. That's just because you hadn't heard anything from Marietta?

A. That's correct.

Q. So then you sign a -- you move into the Lake Shore in April of 2017, sign a one-year lease for Lake Shore, right?

A. Yes.

Q. When was the next time that you heard back from Marietta?

A. Around, I want to say, August 29, 2017, I received a letter from them, and they said that I was denied.

Q. So the next time you heard back was the denial letter that you received?

A. Correct.

Q. So no communications in the interim?

A. No.

Q. Because of the subsidized community, you were seeking a subsidized apartment, correct?

A. Yes.

Q. Were you also applying for any market-rate apartments or was it only the subsidized apartment?

A. I hadn't applied for any other apartments for the marketplace, no.

Q. Within the Atlanta community, did you explore any other subsidized apartments that might have been available?

A. No.

Q. So you only looked at Marietta?

A. Yes.

Q. And that was true even after --

A. I saw some other ones on there, but I just chose this one.

Q. Okay. So you didn't ever make any applications at any of those other communities?

A. No.

Q. And even after you were denied at

Marietta, you didn't make any other application?

A. No.

Q. Do you know what income requirements existed at the Marietta complex in order to qualify for the subsidized apartment?

A. I know that there was a criteria. I can't exactly -- I think you had to make maybe less than, for one person, maybe it was less than 25,000, if I can remember.

Q. Okay. You don't recall specifically?

A. No.

Q. What did the application consist of when you applied online? Do you remember what you filled out? Did you have to provide any documentation?

A. I did. I had to submit my driver's license, my birth certificate, and proof of income.

Q. And your income at the time, was that only the Social Security disability?

A. Yes.

Q. Any other documents that you provided that you can recall?

A. I had to complete the application along with the background requests and sign that and send it back.

Q. And so you actually mailed that in?

A. I did.

Q. Did you ever have any -- during this application process, did you have any conversations with anyone at Marietta, or was this all done by printing forms off online and mailing them back?

A. It was all printing off forms and sending them back.

Q. So is it fair to say you hadn't had any communications with anyone personally at Marietta, even until the point where you got the denial letter in August of 2017?

A. Correct.

Q. Were you informed when you applied that there was a wait list or anything like that?

A. Yes.

Q. Okay. How were you informed of that?

A. Via the letter.

Q. So the letter confirming your

application mentioned that there was a wait list?

A. Yes.

Q. And you were being placed on the wait list?

A. Yes.

Q. I believe the documents I've seen put your application somewhere around the June of 2016 timeframe; does that sound about right?

A. That sounds about right.

Q. I know we mentioned it was warm, but if I said June of 2016, that sounds correct?

A. That would be correct.

Q. So basically you were on the wait list and you would just have to wait to hear further?

A. Yes.

Q. What would have happened had you gotten admitted to the Marietta complex, would you have just moved immediately, or would you have stayed for the duration of your lease at the Lake Shore complex?

MS. BRENNAN: Objection to the form. Go ahead and answer.

MR. ST. GEORGE: Did I mess something up in the question?

MS. BRENNAN: Incomplete hypothetical. Go ahead and answer.

MR. ST. GEORGE: Sorry. Just making sure I hadn't gotten some names wrong.

Q. So what was your intention if you had gotten admitted to the Marietta complex, would you have stayed for the duration of your lease at Lake Shore, or would you have moved to Marietta?

A. Well, I probably would have moved. I didn't know exactly what month, you know, that they would have provided me with an apartment, so I wouldn't have just jumped up and said, hey, I'm out of here.

I would have tried to make some type of arrangement with my current landlord at the time. If they said, you know, well, you have to move or -- I wouldn't have just jumped shipped and moved out. I would have accepted the apartment, I'll just put it that way.

Q. Because, let's say, you were accepted into Marietta, and you were intending to move into Marietta. You testified that that

was approximately -- was it 225 a month, what was the specific figure, do you recall?

A. 235.

Q. Okay. So 235, and the Lake Shore complex, you were paying 610 a month in rent, right?

A. Uh-huh.

Q. So if you had somehow had to carry the Lake Shore lease payment when you moved down to Marietta, the combined rent would have been $845 a month?

A. Well, what they could have done here in Ohio, you know, you can break your lease, but they would make an arrangement. So arrangements could have been made.

Q. How do you know that?

A. Well, I had a good relationship with my landlord at the time.

Q. Had you had any discussions or gotten any confirmation in writing --

A. No.

Q. -- that you could have broken your lease?

A. No.

Q. Would you agree with me that you

would not have been able to pay, based on the Social Security payments you were receiving, you wouldn't have been able to pay a combined rent payment of $845 a month?

A. Well, not necessarily, because arrangements would have been made. I would have -- you know, I would have made arrangements, paying what was affordable.

I'm sure that they wouldn't have said, well, you are breaking the lease, so we're going to make you pay $610 every month, in addition to what you are paying down there.

I would have attempted to make an arrangement, where it would be comfortable to continue to pay the old -- pay something on the old lease and then pay 235 in Atlanta.

Q. Could you afford an apartment, based on your current Social Security Disability income of, I believe you said, it was around $900, a little more than that a month; is that right?

What you received in Social Security Disability income, is that $900, is it slightly more?

A. 970, yeah.

Q. 970, and what was it in 2017?
A. 943.
Q. 943. So in 2017, with the Social Security disability income of 943, if an apartment was available for $845 a month, is that something that you could have afforded?
A. No.
Q. Okay. So you get the denial letter, and that was the first time that you had learned that your application was being turned down, correct?
A. Yes.
Q. Let's take a look at that letter.
A. Okay.
MR. ST. GEORGE: Can I have this marked please as Exhibit 1.

\- - - - -

(Thereupon, Deposition Exhibit 1, Copy of Envelope with June 24, 2016 Letter Attached, Beginning with Bates Label Diane D. Jones RealPage 00001, was marked for purposes of identification.)

\- - - - -

Q. Ms. Jones, do you have in front of

you what has been marked as Exhibit 1?

A. Yes.

Q. And do you recognize this document?

A. Yes, I do.

Q. I'll represent to you this is a document that was produced to my client in this case by your attorneys.

A. Yes.

Q. And what do you understand this document to be?

A. Which, the second page or --

Q. Just the whole thing.

A. Well, it's, on the top, it's information where I received a letter from Marietta, and then the second page here is the actual letter that --

Q. That was in this envelope?

A. Yes. This is the waiting list letter.

Q. Okay. I think I may have shown a little confusion here, so I apologize. This is not the denial letter?

A. No.

Q. This is the letter that you received in connection with the application?

A. Yes.
Q. Okay. I apologize. I got ahead of myself with the exhibit.
So this letter is dated June 24, 2016 at the top?
A. Yes.
Q. So again, does that confirm that the application was made in June of 2016?
A. Yes.
Q. The letter says on the first paragraph, looking at the second page of the document, Ms. Jones, that you were being placed on our waiting list; do you see that?
A. I do.
Q. So you understood as of June 24, 2016, you were on the wait list?
A. Yes.
Q. And then it says, two paragraphs down, "Once your name nears the top of either waiting list, we will contact you to begin the interview process. During the interview, final eligibility and suitability screening will be conducted"; do you see that?
A. Yes.
Q. And your testimony is that you

never had any actual interview with anyone at Marietta before you received the denial letter, correct?

A. Well, not a face-to-face.

Q. Right.

A. I guess when they send you the document, maybe that's their interview.

Q. That's fair. You didn't have any further communications with anyone at Marietta?

A. No. Once you are on the waiting list, you just wait.

Q. Right. Okay. If you look at the first page of this document, it's an actual envelope. It is addressed to the University Heights, Ohio address, right?

A. Yes.

Q. And that's where you were living as of June of 2016?

A. Yes.

Q. And then it looks like it is forwarded to your new address, the Lake Shore apartment complex, right; do you see that that?

A. Yes.

Q. It says, "Notify sender of new address."

Why -- oh, why would this have been forwarded to your new address? I thought you didn't move into the Lake Shore complex until April of 2017.

A. Well, if the date says August 2017.

Q. Right. So I'm just trying to understand something really basic.

Why is this letter dated June 24 of 2016, but it appears that it's being forwarded to your Lake Shore address when you didn't live there until April of 2017?

A. I don't know.

Q. Okay. Do you know how long the waiting list was; did you get any information about it?

A. They initially tell you it's anywhere between a year and two years.

Q. How did you hear that? When you say they initially told you, where did you hear that from?

A. Online.

Q. Do you have any understanding of what the process is once you are accepted off the wait list?

Do you know how quickly you would

have to move down to Marietta or how quickly you would have to commit?

A. Well, they go through a screening process once you are accepted, so I didn't know exactly the time span of when you could move.

Q. Okay. So you were never told, if your application was accepted, how quickly you would have to move down there or how quickly you would have to accept?

A. No.

Q. All right.

A. Because you go through a screening process, and I didn't know how long. They never mentioned how long that would take.

Q. Let's look at the next exhibit. I'll mark this as Exhibit 2, please.

\- - - - -

(Thereupon, Deposition Exhibit 2, Denial Notice, Bates Label Diane D. Jones RealPage 00003, was marked for purposes of identification.)

\- - - - -

Q. Ms. Jones, you have in front you what has been marked as Exhibit 2.

A. Yes.

Q. Take a second to just leaf through the document. I just want to ask you what you understand this to be?

A. A denial notice.

Q. Okay. Is this the denial notice you received from the Marietta complex?

A. Yes.

Q. And so this would have been, I believe you said it was late August of 2017?

A. Yes.

Q. Did you say a specific date as to when you received it, do you recall?

A. I recall around the 28th or the 29th of August.

Q. All right. Was it just this letter, or was there anything behind enclosed with the letter?

A. It was just this letter.

Q. Okay. All right. And what did you do after you received this letter?

A. I contacted Marietta Road Apartments.

Q. And who did you speak to?

A. I spoke with Ayesha.

Q. Okay. And what did you talk about?

A. Well, I asked her why was I being denied, why would they deny me, why are they saying that I had a criminal record, because I didn't know about RealPage, and at that point, she said, we didn't do it, and I said, well, who did, and she said LeasingDesk.

Q. And if you look at the front letter, it says, "We have attached the criminal history record which includes the offense on which this decision is based. Specifically, the denial is based on the following offenses. See attached."

So if you look through the next pages, was there actually an attachment to this letter, was there an enclosure?

A. The criteria, yes. There was no -- I thought you were talking about the summary or something requested from RealPage, but, yeah, they did attach this.

Q. So they attached --

A. A screening decision.

Q. Okay. All right. So if you look at the bottom, there is just some numbers that have been affixed. It says Diane D. Jones RealPage 4. Do you see that at the very bottom

of this page, the second page, Ms. Jones?
A. Okay.
Q. The screen shot. Do you see at the bottom, it says, Diane D. Jones RealPage, and then 4?
A. This wasn't on here.
Q. Right, right. So I just want you to look at this. Do you see that --
A. I see it.
Q. -- that label.
So it is your testimony that what is reflected on Diane D. Jones RealPage 4, this document was attached with this letter; is that right?
A. This stuff that's attached here, I'm not sure that this was attached.
Q. Okay. Do you know what was attached?
A. I'm looking at this. This is the information that I requested from RealPage.
Q. Okay.
A. This didn't come from Marietta.
Q. Okay. So it was something else that was enclosed in the Marietta letter? Because it says there was an attachment. So

I'm just trying to figure out what was attached.

A. Yeah.

Q. Because this is how we got the document, so I'm just trying to figure out.

A. No. I had to just think here, and I'm looking at this. Everything here is what I requested from RealPage.

Q. Okay. So when you move --

A. The only thing I received was a denial letter. There was no attachment.

Q. Okay. So then the rest of Exhibit 2, this is information that you requested from RealPage?

A. Yes.

Q. Okay. And then you received from RealPage?

A. And there is something missing that was also attached. Oh, no, here it is. Okay. The screening detail about Toni Taylor.

So, yeah, these are all the documents that I requested from RealPage. It didn't come from Marietta.

Q. Okay. So why don't we do this then. Why don't you just take off the first

 page of that document. Let's make that as Exhibit 2, that first page.

A. Yeah. That was kind of confusing.

Q. Yeah. We can talk about the rest of it as we move forward.

So the first page will be the entirety of Exhibit 2.

Let's go back to the conversation that you had with Ayesha at Marietta.

You mentioned that you spoke about a criminal record. You told her you didn't have a criminal history; is that right?

A. Yes.

Q. What did she say?

A. She said, well, you're going to have to contact Atlanta, either come out there and go to the police department and go to my own police department here in Cleveland, Ohio. I couldn't afford to fly out to Atlanta, so I called them.

Q. All right. So that was what prompted you to reach out to the Cleveland Police Department --

A. Yes.

Q. -- and the Atlanta Police

Department?

THE NOTARY: Let him finish the question, please.

THE WITNESS: I'm sorry.

Q. So then you testified that after you contacted those two police departments, you then called Marietta back; is that right?

A. Yes.

Q. And did you speak to Ayesha again?

A. I spoke with Ayesha, and then, when she said the same thing, I wasn't satisfied, so I asked to speak with someone with some authority.

Q. Okay. And did someone else get on the line?

A. Someone else got on the line, and they, you know, agreed with what she told me. They said the same thing she said, "You have to straighten this out."

So Ayesha got back on the phone, and I asked her for contact information for LeasingDesk, and she didn't provide me with that, so at that point I got online and found them on my own.

Q. Okay. And that's when you

contacted LeasingDesk for the first time?

A. Yes.

Q. So looking back at Exhibit 2, this letter, this denial letter, you see in the second paragraph there is some bolded text that says, "You have ten days from the date of receipt of this letter," in a parenthetical, "to request review in writing"; do you see that?

A. Yes.

Q. Did you request a review in writing from Marietta?

A. Yes. I actually had to contact them to get information or documentation on how I would go through and inform a review request. And so she said she would mail out a form that I could complete.

Q. Okay.

A. And then that would start an appeal process. But I couldn't start the appeal process until it was verified from LeasingDesk that this stuff wasn't mine.

Q. Okay. So your testimony is that there was an appeal process, but that you were informed that you couldn't start the appeal

process until you contacted LeasingDesk?

A. Right. So I kept calling them. Finally I got ahold of someone, and they said, well, you can -- there is a process, I think a complaint process that you could go through, and I did that via email.

Q. Okay. All right. So you mentioned a conversation you had with Ayesha before you contacted the police departments, a conversation you had with Ayesha after you contacted the police departments, a conversation with a supervisor when it was elevated above Ayesha, and then you contacted RealPage after that, correct?

A. Yes.

Q. Did you have any other conversations with anyone at Marietta?

A. No.

Q. If you look at the -- if you look at this letter, Exhibit 2, it says, towards the bottom, there is a one-sentence paragraph that says, "If you did not commit the criminal offense and you have been cleared of criminal charges, you must bring to the hearing documents showing the final disposition of the

charges"; do you see that?

A. Yes.

Q. But again, you did not make an attempt to get the criminal file of Toni Taylor?

A. Well, I wasn't allowed to have that.

Q. Why not?

A. Well, when I called the police department in Atlanta, they can't -- they can't share that.

Q. Did you ask for it?

A. Yes.

Q. And they --

A. And they wouldn't -- I'm sorry.

Q. No. So you said you asked for it. So what did they say?

A. They said, well, we can't submit anything, but we can tell you that your name is not attached to this. There was a case number for her.

Q. I take it, based on the fact that you live in complexes where you have been screened for criminal history, that you don't have any objection to a criminal background

screening process, right?

A. No.

Q. In fact, is it fair to say that you would prefer to live in a community where people are screened?

A. Yes.

Q. That would help to ensure that the residents of that community are safe, correct?

A. Yes.

Q. All right. So you described all of the conversations that you had with Marietta, correct?

A. Yes.

Q. So let's -- let me have the next page of this document -- let's tear this off as well. If you can take -- so put Exhibit 2 aside, Ms. Jones, so the cover page, so put that first page aside.

And let's take the next page and just tear that one off specifically, the screen shot that's marked as Diane Jones RealPage 4. Let's mark this marked as Exhibit 3. So if you could just hand that back to the court reporter. Yes, that piece of paper right there.

\- - - - -

(Thereupon, Deposition Exhibit 3, Screen Shot, Bates Label Diane D. Jones RealPage 00004, was marked for purposes of identification.)

\- - - - -

Q. Ms. Jones, do you have Exhibit 3 in front of you?
A. Yes.
Q. And do you recognize this document?
A. Yes.
Q. And what is it?
A. It is a screening decision.
Q. Okay. Is this a document that was provided to you?
A. Yes.
Q. And how did you get it?
A. I requested it from RealPage.
Q. And was this in the conversation that you had with -- was that request made in the conversation that you had with RealPage after you had talked to Ayesha and the supervisor at Marietta?
A. Yes.
Q. And what do you understand this

document to show?

A. It shows that they have a certain criteria, from your income to your credit, employment history, criminal record, if I had an incomplete application, and I understand it too that the criminal public records were unsatisfactory, because that was the box that they had checked.

Q. Okay. I understand. Let's put that aside, that page. Then if you can take the remainder of the documents, it should be right there, yes, the one you have your hands on, let's have that marked as Exhibit 4. If you could hand that back to the court reporter, please.

- - - - -

(Thereupon, Deposition Exhibit 4, Credit Report, Beginning with Bates Label Diane D. Jones RealPage 00005, was marked for purposes of identification.)

- - - - -

Q. Ms. Jones, you have in front of you what has been marked as Exhibit 4?

A. Yes.

Q. What is this document?

A. A credit report.

Q. Okay. And this is a document that you produced in this case. So how did you get it?

A. I got it from RealPage.

Q. Okay. So this was a document that you requested from RealPage?

A. Yes.

Q. And if I look at the very top of the document, there is a date on it. Do you see the top left-hand corner, it says August 8 of 2017; do you see that?

It's kind of in small print. It is probably by your paperclip.

A. Oh, yes, yes.

Q. Does that refresh your recollection, is that the date that you contacted RealPage?

A. Yes.

Q. Okay. So this document and the pages that follow, what do you understand this to be? And these are documents that you produced to us in this case.

A. The credit report and the summary

of the criminal report for Toni Taylor.

Q. Okay. So is it your understanding that this was a copy of the information that went to Marietta?

A. Yes.

Q. Okay. All right. Looking at just this front page, there is some various accounts. These are all for credit-related accounts, I take it?

A. Yes.

Q. You are not disputing anything about the accuracy of any of these accounts, right? I'm just asking about the first page for right now.

A. No.

Q. Okay. So let's go to the second page of Exhibit 4.

A. Yes.

Q. It looks like this is a screening detail report, and you were sent a copy of this by RealPage, correct?

A. Yes.

Q. All right. So up at the top, it's got some information about you. It's got the last four of your social as 9799; do you see

that?

A. Yes.

Q. What is your full Social Security Number?

A. 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.

Q. And then it has go a birth date of August 13, and the year is X'd out for privacy. What's your full birth date?

A. August 13, 1961.

Q. And it looks like there is a credit score that was provided here by Equifax, and that credit score is 556; do you see that?

A. Yes.

Q. Does that sound approximately correct?

A. Yes.

Q. There is address history that is below that personal identifying information, it's got a number of prior addresses, and it states that your current address at the time that you had submitted was the University Heights address.

Are all these prior addresses correct, any issues with those?

A. Where's the address on here?

Q. It's in the box that says Previous Addresses.

MS. BRENNAN: Next page.

Q. I'm sorry. We moved on to page 2, yes.

So the previous addresses box, you see that there is a number of addresses, starting with the current address in University Heights?

A. They are all correct.

Q. Okay. And then if you go with me to the very last page of the document, you see that there is a criminal record identified; do you see that?

A. Yes.

Q. And this has a criminal record for Toni Taylor?

A. Yes.

Q. And it's got some information about her, a female, black woman, black hair and brown eyes; do you see that?

A. I do.

Q. And then there is a number of aliases that were used by Toni Taylor; do you see that?

A. Yes.

Q. And you would agree with me that this reflects that she had previously used two aliases with the last name of Jones?

A. Yes.

Q. Would you agree with me that it is important to screen for aliases of offenders to make sure that you're capturing an offense for someone who might be using an alias, as opposed to their real name?

A. No.

Q. You think aliases should not be used in the screening process at all?

A. Well, I think they should be used, but Diane Jones is not one of them.

Q. Okay. So it is your opinion then that an alias would have to match your name exactly to be useful; is that right?

A. Well, I would assume so.

Q. All right. So if one of aliases had been Diane Jones, you would agree with me that that would perhaps be useful to know, but a Tina Jones or a Pamela Jones, because the first names wouldn't match, you wouldn't find that to be useful; is that right?

A. I don't -- no. I mean, Pamela Jones, Tina Jones, Diane Jones, I imagine in the screening process, but I would think that they would be more accurate, because they have all of my information.

Q. So I guess what I'm asking is, if someone has an alias name, and let's say that alias is Diane Jones, is that something that you think that the screening process should account for?

A. If the alias is exactly my name, then, yes.

Q. Okay. But if the alias is not exactly your name, then you think that that's something that should be disregarded?

A. I don't know if I would say disregarded, but I would think -- I would say they should screen further.

Q. Okay. All right. And when you saw this, this was the first time that you had seen a reference to Toni Taylor, right?

A. Yes.

Q. You say that Toni Taylor doesn't have your same birth date. You've mentioned that before in your testimony. What is her

birth date?

A. Well, according to this document, it has January 1, and it also has December 31. It doesn't have the year, so I don't know what year here birthday is.

Q. So you don't know if her year actually is -- her birth year is actually the same as yours?

A. I don't know.

Q. All right. Do you know whether there is a version of this report that you have seen in this case that actually has those years populated, so not with Xs; have you seen that version of the report?

A. No, I have not.

Q. Have you seen any documents that RealPage has produced in this case?

So apart from the ones that you got specifically, have you seen any other documents that my client has produced as part of this litigation?

A. No. I've only seen what they sent.

Q. All right. Let me show you another document.

MR. ST. GEORGE: Can I have that

marked as Exhibit 5.

- - - - -

(Thereupon, Deposition Exhibit 5, 8/21/2017 Letter, Bates Label Diane D. Jones RealPage 000164, was marked for purposes of identification.)

- - - - -

Q. I know we are going into the lunch hour, so if you need a break or -- we will at some point take a lunch break, but I just want to be respectful of anything that you have, if your stomach is growling.

A. Okay.

Q. Ms. Jones, you can put aside that other exhibit.

You have in front of you what has been marked as Exhibit 5.

A. Yes.

Q. Okay. And do you recognize this document at all?

A. It looks like the denial letter from Marietta.

Q. Okay. So just one basic question: Do you recall ever receiving this document?

A. Yes.

Q. Okay. It's dated -- so let me ask you a question. So you received the document, if you look back at Exhibit 2, that was another denial letter that we looked at from Marietta. If you can have Exhibit 2 in front of you.

A. Wait a minute. I didn't read the bottom in its entirety, but this letter, I don't remember seeing this letter.

Q. Okay. All right. Fair enough.

I'll represent to you this is a document that my client produced from its system. So I wanted to see if you had ever recalled seeing a copy of this.

A. No. This is the first time I've seen this letter. I though this was the same as that was.

Q. So you did receive Exhibit 2, which is the denial letter we looked at from Marietta?

A. Yes.

Q. And your testimony is you have not previously seen Exhibit 5?

A. No.

Q. You can put that aside.

MR. ST. GEORGE: Let's have this

marked as Exhibit 6, please.

\- - - - -

(Thereupon, Deposition Exhibit 6, Fax Transmission Page with Attachment, Beginning with Bates Label Diane D. Jones RealPage 00015, was marked for purposes of identification.)

\- - - - -

Q. Do you have Exhibit 6 in front of you, Ms. Jones?

A. Yes.

Q. And do you recognize this document?

A. Yes.

Q. What is it?

A. This is a fax that I sent to Marietta, requesting an informal hearing.

Q. Okay. So was this in response to Exhibit 2, which says you could request a review in writing?

A. Yes.

Q. Is that what this is?

A. It is.

Q. And how did you get this documentation; was it sent to you by the

Marietta complex?

A. Yes.

Q. Did it arrive in the mail?

A. Yes.

Q. And you filled it out and sent it back?

A. Yes.

Q. And it looks like the only thing you enclosed with this was a copy of your driver's license; is that right?

A. Well, along with --

Q. Yeah, so I'm not trying to be tricky here. This document that we are looking at, Exhibit 6, is this the complete fax that you sent back?

A. Yes.

Q. Okay. And after you faxed this back, did you hear anything further from Marietta?

A. Oh, it was a while --

Q. Okay.

A. -- that I heard something.

Q. What did you -- when did you hear back?

A. I want to say sometime in October.

Q. All right. What did you hear?

A. They contacted me and said that they would be having something come up, and that they would get back with me when something came up, but they didn't.

So I contacted them to see if I would still be able to have an apartment and had RealPage straightened things out.

Q. So let me back up and make sure I've got everything straight.

So you faxed this in. The fax transmission date on this is October 3, 2017; do you see that?

A. Yes.

Q. Okay. So that was, you know, approximately a month after you had gotten the denial letter, right?

A. Well, I received the denial letter in August.

Q. Right. So the very end of August though, right, like August 28?

A. Yes.

Q. So this was October 3 you faxed this in?

A. Yes.

Q. A little more than a month elapsed, September, right?

A. Yes.

Q. So you sent this fax back in on October 3, 2017. You said that you heard back from Marietta, and it took them a while. Was it in October that they contacted you?

A. Yes. Well, actually I contacted them, because I hadn't gotten my appeal process.

Q. I see. Okay. So you contacted Marietta again before you sent this fax?

A. Yes.

Q. And then they sent you the paperwork, and then you faxed it back?

A. Right.

Q. So after you faxed this back from Marietta, what happened after that?

A. Well, after that, I didn't hear anything with regard to the appeal process. So I thought, okay, well, they are not going to rent an apartment.

So I reached out to them again to see why I hadn't been allowed my appeal process and to see if I was still in line for an

apartment, and they didn't have an apartment for me.

Q. Okay.

A. They said that the apartment that was set up for me prior to my being denied had been rented.

Q. Okay. When did you -- so you mentioned you reached back out because you hadn't heard anything about your appeal. When did you reach back out, how long after you sent the fax?

A. That had to be in October as well.

Q. Was it a week, two weeks after you sent the fax, do you have any recollection?

A. Maybe two weeks.

Q. Okay. So you reached back out, and you said that you were informed at that time that there was not an apartment available?

A. They had rented it.

Q. Did you talk to Ayesha again?

A. Yes.

Q. Did she say anything about the appeal process, anything further?

A. No. In fact, I won't say -- I can't say what her demeanor was, because I

wasn't in front of her physically, but there was some hurriedness and reluctance. It was like -- it was like she was a different person.

I had this report out here, and I don't know if she believed it or she felt that I wasn't -- that it was me, but there was nothing to really truly say that it wasn't me.

So I just -- it seems as though this whole process kind of changed their mind about it, because they had rented the apartment to someone else. So I didn't get my appeal process, so I just didn't understand what was going on.

Q. Okay. And after you had that follow-up with Ayesha in, say, mid-October, mid to late October, any further conversations with Marietta after that?

A. No further conversation.

Q. Did you ever ask them if they could hold an apartment while you looked into -- while you are talking to RealPage or make any requests of them in that regard?

A. Well, they don't hold apartments.

Q. Did you ever ask?

A. I don't remember asking if they

could hold an apartment.

Q. Did you ever bring up the fact that the record related to a Toni Taylor, and that wasn't your name?

A. I didn't mention her name at all. I just said that the person on this report is not me.

Q. Okay.

A. And at that point, they hadn't received anything from -- I don't know that they had or not, but she didn't mention that RealPage had satisfied them to say it wasn't me.

Q. They needed RealPage to say it wasn't you, potentially?

A. Well, they needed something from RealPage as well as the police department.

Q. All right. So it's your testimony they told you they needed something from both the police department and RealPage?

A. Yes.

Q. And you weren't able to get anything from the police department?

A. No. And I did speak of the conversations that I had with both police

departments.

Q. Okay. So it's your testimony they told you you couldn't be approved for an apartment until you had something from both RealPage and the police department?

A. Yes. They needed to know that I hadn't been an offender.

Q. And who told you that, was that Ayesha?

A. Yes.

Q. Okay. Let's talk -- let's switch gears and talk about communications you had with RealPage.

A. Okay.

Q. So we are going to move away for a minute from the conversations you had with Marietta.

So you mentioned that after you had contacted the police departments of Cleveland and Atlanta, you had followed back up with Ayesha, and she told you that you would need something from RealPage. So then that was the first time that you contacted RealPage, right?

A. Yes.

Q. Okay. And that was around, I

think, was it August 28, 2017; is that the date?

A. 28, 29, in that area, yes.

Q. We previously looked at an exhibit that was printed off that you said you got from RealPage that showed August 28 of 2017. So is that the date then most likely?

A. Yes.

Q. So let's have another exhibit introduced. I think we are on 7. Yeah.

- - - - -

(Thereupon, Deposition Exhibit 7, Form: Consumer Dispute, Beginning with Bates Label RealPage/Jones 000041, was marked for purposes of identification.)

- - - - -

Q. So you mentioned that you had contacted RealPage. Did you call them on the phone?

A. I called them on the phone, and we emailed as well.

Q. Okay. How did you get the number, just off the internet?

A. Yes.

Q. So you called, like, their customer service department?

A. I did.

Q. Who did you speak to, do you remember?

A. There were quite a few people. I know I spoke with someone, they said their name was Terry, because I jotted that down in my notes. I spoke with a gentleman who had a foreign accent. I can't remember his name.

Q. Okay.

A. And that was my initial call, and he wasn't really helpful, and I was really upset, because he told me that the criteria was, "We go by your date of birth," and I'm trying to explain to him that, you know, that's just not good enough of an explanation, because I had been accused of being a criminal.

And he said, well -- I asked to speak with a supervisor, and he said that they didn't have supervisors there.

So I was really upset. I can't even remember exactly. I was really, really upset about it. And he apologized that I was upset, and then he said he would have someone

contact me.

No one called me, so I called again, and was really upset, and I said, well, maybe I should have my attorney contact you guys, and that's when he said, well, we will give you our email address, and we will send you some information, and then you can dispute, but I did request, I said, well, I need to know where did you get this information and I need to know what's on the report, and they sent this information here.

Q. The report copy that you are mentioning, I believe you are pointing at Exhibit 4, did they send that to you by email?

A. Yes.

Q. Okay. So you had it -- all these conversations that you described, did these all occur on the same day?

A. Well, there were various conversations because, after I received the summary, I had a conversation that I want this removed from my background.

Q. Let me just back up and take it one step at a time.

So you testified you called in, you

spoke to someone named Terry, you spoke to someone with a foreign accent, you asked for a call back, you didn't receive a call back from a supervisor, so you called back to RealPage, right?

A. Yes.

Q. Did all of that happen on the same day?

A. No.

Q. How long did it take -- you said you were going -- you requested a call back, you didn't get one. How long did it take for you to call RealPage back?

A. Well, I have had calls with them requesting information to show that they had removed this from my report up until like -- in September, September 6, September 7.

Q. Okay.

A. But I didn't receive anything to show that this was removed.

Q. Okay. So on the 28th, the first day that you contacted, that's the date that you received a copy of the report by email; is that right?

A. Yes.

Q. And did you submit documentation to RealPage that same day to initiate the dispute process?

A. Well, I believe so.

Q. Okay. So let's take a look at what you have in front of you as Exhibit 7. This is a document, I'll represent to you, that my client produced in this case. So this is not a document that you sent. It is a document that we had in our systems, and it is dated August 28 of 2017 on the first page; do you see that?

A. Yes.

Q. And it has an email address, facialcleanse13@gmail.com --

A. Yes.

Q. -- is that your email?

A. I'm sorry.

Q. Is that your email?

A. Yes.

Q. And it looks -- this document appears to represent that the dispute is being opened up in response to communications from you on August 28 of 2017; is that accurate?

A. Yes.

Q. So there was a dispute that was

initiated that day; is that right?

A. Yes.

Q. And was that the same day that you had found out about the denial from Marietta, or was it the day after?

Because you mentioned that you had gotten a denial letter from Marietta, you know, around the 28th of August. So this all happened on the same day?

A. Yes.

Q. Okay. So you initiate the dispute. So all these conversations you had with Marietta and the police departments and RealPage, all of these happened on the same day, correct?

A. Yes.

Q. All right. And then if you look at the second page, there is a sentence towards the top, it says, "Consumer is disputing non-match records, stating that she has never lived in Georgia"; do you see that?

A. Yes.

Q. Is that what you told RealPage?

A. Yes.

Q. Did you hear back from RealPage

about the dispute that you had opened up?

A. They sent an email stating that they were going to correct it, and that -- I can't remember exactly. They said that they were going to make the corrections and they would contact Marietta, and they said but I need to call them as well, because -- I can't remember the letter verbatim, but it mentioned that it will be up to them, and the letter also said -- in a way it said that it wasn't -- it could or it could not be me.

It didn't say that in verbatim, but it was worded a different way, that something to the effect that it may or may not be me, and that I would need follow-up with Marietta, and it was their decision if they would want to rent to me or not.

Q. Okay. And can you understand that RealPage -- you understand that RealPage doesn't decide whether or not someone can move into an apartment complex?

A. I understand.

Q. Okay. So let's take a look at another exhibit.

MR. ST. GEORGE: Let's have this

marked as Exhibit 8.

\- - - - -

(Thereupon, Deposition Exhibit 8, Dispute Results for Diane D. Jones, Beginning with Bates Label Diane D. Jones RealPage 00009, was marked for purposes of identification.)

\- - - - -

Q. This might relate to what you were just describing.

Ms. Jones, you have Exhibit 8 in front of you?

A. Yes.

Q. So I'll represent this is a document that you produced to us in this litigation. And do you recognize this document?

A. Yes.

Q. Okay. What is it?

A. It's a dispute results for Diane Jones.

Q. Okay. And it is from consumer.relations@leasingdesk.com, and it is to facialcleanse13@gmail.com. That's your email address, right?

A. Yes.

Q. So this is an email that you received from LeasingDesk?

A. Yes.

Q. And it is dated August 29, 2017 at 10:24 in the morning?

A. Yes.

Q. And that's when you received it?

A. Yes.

Q. So summarizing, it says, you know, "Dear Ms. Jones, Thank you for contacting us regarding your issue," and, "Regarding the accuracy and/or completeness of certain information in your consumer file."

And then if you go down to the second full paragraph, it say, "LeasingDesk Screening has investigated your dispute and has notified the sources of the disputed information. Our investigation is now complete. The investigation performed by LeasingDesk Screening revealed that the disputed information is inaccurate, incomplete, or cannot be verified. LeasingDesk Screening has reported the findings of our investigation to the Marietta Road 7302 community. The

apartment community makes a decision based upon many factors. You may want to review the findings of the reinvestigation with Marietta Road 7032, and we encourage you to do so"; do you see that?

A. Yes.

Q. And did you read this when this email came in?

A. Yes.

Q. Okay. And based on this, did you understand that LeasingDesk had determined that the disputed criminal record for Toni Taylor was not accurate and that it had reported that to the Marietta Road community?

A. Yes.

Q. Okay. And then the next paragraph down, it says, "Based upon our investigation, we have determined that the records do not belong to you and the records will be removed from your file"; did you see that?

A. Yes.

Q. So again, you understood that the records were being removed from your screening file based on the determination that they did not belong to you?

A. Yes.

Q. And this was a day after -- well, the morning after you had contacted LeasingDesk to dispute the information, correct?

A. Correct.

Q. So the disputed information was corrected and reported, and the correction was reported back to Marietta less than 24 hours after you contacted LeasingDesk, correct?

A. Yes, according to their document.

Q. Right. If you look at the next page of the document, there is another email that was produced by you in this case, and this is from the facial cleanse address to consumer relations dated August 31, 2017; do you see that?

A. Yes.

Q. So you sent an email to the consumer relations department a couple days after you received the notification that the record had been removed from your file, right?

A. Yes.

Q. Why were you sending this? What was the point of this additional email?

A. Because I wanted to see in writing

that they had indeed removed the information.

Q. Okay. Did you get any response to this email?

A. I didn't get anything to show that they had actually removed it.

Q. Okay. And what were you looking for to show that they had removed it?

A. Well, because I felt that if some day I applied for an apartment again and they would submit that information again.

Q. Okay. But they had told you it had been removed from your file at that point, right, so you were just looking for some sort of confirmation of that?

A. Yes.

Q. So is it fair to say that you wanted to see a screening report or something like it that omitted -- that did not have that criminal record on it?

A. Yes.

Q. All right. It says towards the bottom of this email, "Your errors have created an economic problem for me;" do you see that?

A. Yes.

Q. What did you mean by that?

A. I meant that because of that report, I was denied an apartment, and I have out here this criminal information that didn't belong to me.

Q. The last line says, "A copy of this and all correspondence has been forwarded to my family attorney." Who that is?

A. Well, I have a family attorney that we have had for a long, long time, and nothing became of it, but just in case the report was still out there about me, then I wanted them to know that I had representation if my name couldn't be cleared.

Q. Okay. That family attorney was not Francis & Mailman?

A. It wasn't.

Q. Have you ever encountered this Toni Taylor record being reported in connection with any application that you have submitted after August of 2017? That's a terrible question. Let me rephrase it.

Have you ever encountered the Toni Taylor record being reported on any -- in connection with any screening that has been conducted for you after August of 2017?

A. No, because I don't believe they used RealPage.

Q. Okay. Why do you say that? How do you know that these other complexes haven't used RealPage?

A. Well, some of them have -- you know, they will document various ways that they obtained your information.

Q. Okay. And you have never seen RealPage?

A. No.

Q. So to your knowledge, this record has not been reported by RealPage again after August of 2017 to anyone else?

A. Not to my knowledge.

Q. The Toni Taylor record?

A. Not to my knowledge.

Q. So RealPage, in Exhibit 8, is representing to you that they had provided the results of their dispute to the Marietta Road complex, right?

A. According to the document, yes.

Q. And did you ever hear from anyone at Marietta Road, after August 29 of 2017, that they had received those revised results?

A. No.

Q. Did you ever ask whether they had received them?

A. No.

Q. Okay. This documentation, this letter that you received from RealPage that says, "We have determined that the records do not belong to you and the records will be removed from your file," did you ever provide this to anyone at Marietta Road, this letter?

A. No, I didn't, because they said that they were going to submit the information to Marietta themselves.

Q. Well, why wouldn't you have just send this to Marietta too, if you were having follow-up conversations with Marietta?

A. I don't know.

Q. I mean, we looked at the fax that you sent in, Exhibit 6. It did not enclose the letter that you received in Exhibit 8 in connection with that fax that you sent to Marietta, right?

A. Well, to be honest, I was exhausted doing all of this, and I felt that it was RealPage's responsibility to say that they made

an error.

Q. Do you dispute that RealPage did send the results of their investigation to Marietta?

A. I don't dispute, no.

MR. ST. GEORGE: Do you want to take -- let's go off the record for a second.

THE VIDEOGRAPHER: Off the record.

(Recess taken.)

THE VIDEOGRAPHER: On the record. 1:07.

Q. Back on the record. Ms. Jones, I'll just remind you that you remain under oath.

A. Yes.

Q. I want to hand you what I'll have marked as Exhibit 9.

\- - - - -

(Thereupon, Deposition Exhibit 9, Document Reflecting Internal Notes of RealPage, Beginning with Bates Label RealPage/Jones 000166, was marked for purposes of identification.)

\- - - - -

Q. Ms. Jones, you have Exhibit 9 in front of you?

A. Yes.

Q. Okay. I'll represent to you this is not a document that you would have seen before. This is a document that is produced -- that was produced by my client in connection with this lawsuit. It reflects some internal notes.

So I'm not asking you to, sort of, confirm what this document is. I just want to talk about some of the notes in here and ask you if this is consistent with your recollection.

So this document memorializes the contacts that RealPage had with you and with Marietta Road in connection with your dispute, and so can you please turn to the third page of the document.

The third page of the document has some names and, towards the top, you will see that there are various notes being created by RealPage employees. There is a Terry Heronime -- that's probably terrible -- but you mentioned that you had spoken with someone

named Terry, right?

A. Yes.

Q. Okay. And this seems to reflect that there is another conversation that you had with someone named Marco Angelo Losantas, "Customers wants to speak with supervisor."

Do you know if Marco Angelo, is that the person that you initially spoke to, does that ring any bells?

A. The name doesn't ring a bell, but it looks like his name is -- that he may have had an accent, so it's possibly, but then I see up here that Raymond has -- may have had an accent as well.

Q. Okay. Let's look at the next page, RealPage/Jones 169 at the bottom. There is an activity history, certain notes that are reflected here, and it starts off on, actually, the next page, that sort of case history, activity history.

There is two notations here in the activity history section where Raymond John -- again, I won't attempt to pronounce the last name -- says, "Spoke to Ayesha, leasing agent, and provided the results on consumer's

dispute"; do you see that?

A. Yes.

Q. Did Ayesha ever mention to you that she had actually been contacted directly by RealPage?

A. No.

Q. Do you have any basis to dispute that she was?

A. No.

Q. The next entry up is also Raymond John. It says, "Left detailed voicemail to consumer informing the result on his" -- it should say, "Her dispute. Mentioned that email will be sent shortly." And this is at 9:18.

One of the things to realize, of course, is that RealPage is in Texas, so they are an hour behind you. So we looked at your email earlier where it showed, I think, a 10:24 or something. So that should be 9:24 for RealPage?

A. Yes.

Q. Do you recall getting a voicemail from anyone at RealPage?

A. No, I don't recall.

Q. All right. Let's look towards the

back of this document, second to the last page.

You see towards the bottom there is an email from consumer.relations@Leasingdesk.com, and it's to mariettaroad@tmo.com. Do you see that towards the bottom?

A. Yes.

Q. Did you ever email anything to Marietta Road, did you communicate to them at all by email?

A. I don't remember communicating by email.

Q. Do you if this is Marietta Road's email address? I mean, is that an email that you have used before at all?

A. I don't know. I couldn't say that it's not.

Q. Okay. That's fine. You just don't know one way or the other.

Does this appear to you to be an email from LeasingDesk to Marietta Road?

A. Yes.

Q. And it is saying that, "Based on our investigation, we have determined that the records reported do not belong to your

applicant and the records will be removed from the applicant's file"?

A. Yes.

Q. And if you look, flip back to the page immediately before this, you see that there is an email from consumer.relations@leasingdesk.com to facialcleanse13@gmail.com, dated August 29, 2017, at 9:24 a.m., and then there is an email exchange below. That's the same email exchange that you printed off from your own email, correct?

A. Where? What?

Q. Look at the bottom of the page. Do you see that there is an email from consumer.relations@leasingdesk.com to facialcleanse13@gmail.com, dated August 29, 2017 --

A. Yes.

Q. -- at 9:24 a.m.

And this is the same as the email that we looked at that you pulled from your own email inbox at the exact same time that you received from LeasingDesk, correct?

A. Well, I have to see the one that

I --

Q. Sure. You can pull it. It was previously the exhibit. I think it would have been --

A. Oh, okay.

Q. Yeah, right there.

A. Yes.

Q. Exhibit 9, I believe. Or is that Exhibit 8?

A. It's Exhibit 8.

Q. Okay. So compare Exhibit 8 and the page we are looking at right now on Exhibit 9, and just confirm that those emails are identical in terms of the content and the time that they were sent?

A. They are the same.

Q. So it looks like RealPage is keeping correspondence of communications with you and Marietta Road in connection with your dispute, correct?

A. Yes.

Q. Do you agree with me that after this reinvestigation was completed by RealPage, that you were actually approved for housing at Marietta Road?

A. No, because I was told that I needed to go through the appeal process.

Q. All right. Let's look at another document. Have this marked as Exhibit 10, please.

- - - - -

(Thereupon, Deposition Exhibit 10, Document Reflecting Internal Notes of RealPage, Beginning with Bates Label RealPage/Jones 000053, was marked for purposes of identification.)

- - - - -

Q. Ms. Jones, you have in front of you Exhibit 10, just what has been marked as Exhibit 10, Ms. Jones?

A. Yes.

Q. You have it in front of you.

Now, I'll represent to you again that this is not a document that I would expect you to be familiar with. It's a document that was produced by my client in connection with this case. So I want to just ask you about some of the contents, to see whether you would agree or not.

One thing I want you to look at is at the very first page, do you see where it has the primary applicant and your address?

A. Yes.

Q. So it has the University Heights address, correct?

A. Correct.

Q. But at the time that you were lodging your dispute and received the denial letter, that was actually at the Lake Shore address, correct?

A. Correct.

Q. Okay. So did you ever update your address with Marietta Road?

A. Yes.

Q. When did you do that?

A. Let's see. I don't know the exact date, but it had to have been after I moved to the new address.

Q. Okay. Because it looks to me like from this document, there is internal record logging a decision by Marietta Road with a decision date of 10-11-2017, but it still has your address listed as the University Heights address at that point in time.

Do you have any understanding as to whether they were still mailing you correspondence at the University Heights address?

A. No. And if I could say, if they were, then it should have been forwarded.

Q. Okay. You see at the -- staying on this front page, it says that there is a creation date, looking at the far right-hand column, of 8-15-2017, a modification of August 29, 2017, and a decision of October 11, 2017; do you see that column?

A. Yes.

Q. Do you understand that Marietta Road actually approved your application for admission on October 11, 2017?

A. No. I have never seen the letter.

Q. Okay. Let's look at the next page. You see at the top, it says the final decision is approved; do you see that?

A. I see that.

Q. And then towards the bottom, it says decision by Ayesha Beasley; do you see that?

A. Yes.

 Q. So Ayesha here is actually spelled A-Y-E-S-H-A.

A. Okay.

Q. Do you see that? I know we have been saying, I think, A-I-S-H-A.

A. Yes.

Q. Do you know if her name is actually spelled this way, or were you just doing it phonetically?

A. I didn't know exactly how her name was spelled.

Q. No worries. But do you know if Ayesha that you were speaking to, was that Ayesha Beasley; did you know her last name?

A. I didn't know her last name, but I'm sure that it's the same person.

Q. And you see this document appears to reflect a decision by Ayesha Beasley on October 10, 2017 approving the application; do you see that?

A. I see that.

Q. But your testimony is that you weren't informed of this approval or didn't know -- if it happened, you weren't aware of it?

A. I have never seen anything in writing.

Q. Okay. If you look at the next page, it's got an archive of some letters that were being sent out. And one at the top, it says approval letter dated October 10, 2017, with a user of Ayesha Beasley; do you see that?

A. I see that.

Q. But you don't recall ever receiving an approval letter?

A. I never received an approval letter.

Q. Is it possible the approval letter went to the University Heights, Ohio address?

A. Well, again, if it did, it would have been forwarded.

Q. Okay.

A. And she had my new address.

Q. All right. If you look at the next page, the last page of this document, you see it's got a series of notes here reflecting an application being submitted, an application being denied on August 21, 2017, a consumer dispute being filed with -- it looks like it's cut off, but the dispute results.

There is a reversal of a final decision on August 29, an application being approved as of October 10 -- or excuse me, October 11, 2017; do you see that?

A. Yes.

Q. Okay. And it's your testimony that you weren't aware of the results of the dispute being submitted to Marietta or the approval of your application by Marietta?

A. My testimony is that I didn't receive any of this, and I did say that they should have been the ones to submit the information that showed that I did not commit those crimes.

Q. When you say "they," are you talking about RealPage?

A. Yes.

Q. But you don't have a basis to dispute that RealPage did not do that in this case?

A. No.

Q. Okay. Let's put that aside.

Apart from the communication we have seen where RealPage responded to you on August 29 of 2017, we looked at another email

from you a couple days later seeking to confirm that the records had been removed.

Did you have any other correspondence with RealPage specifically about the dispute that you recall?

A. No. Once I requested that information to show that it had been removed -- now, what they did do, I think they sent me a copy of my credit record from Cleveland, Ohio. They didn't send anything from Atlanta.

Q. Okay. Let's take a look at another document.

MR. ST. GEORGE: Let's mark it as Exhibit 11, please.

- - - - -

(Thereupon, Deposition Exhibit 11, Letter Dated September 11, 2017, Beginning with Bates Label RealPage/Jones 000046, was marked for purposes of identification.)

- - - - -

Q. Ms. Jones, do you have Exhibit 11 in front of you?

A. Yes.

Q. And this is a document that my client produced in this case, but do you recognize it?

A. Yes.

Q. And what is it?

A. The entire?

Q. Yes, the entire document.

A. There is a letter from RealPage telling me that -- regarding to my consumer file, and there is information with regard to inquiries and disclosures, summaries of the Fair Credit Reporting Act, and the third page shows the different consumer files that they use, which is Experian, Equifax, and TransUnion, and then the last page is a copy with regard to the incident for me in Ohio.

Q. Okay. Looking at the very first page of the document, is this a letter then that you would have received from RealPage in response to your request to see a copy of your file?

A. Well, this isn't what I requested. This is just something that is on the Cuyahoga County docket, where I could pull this up myself.

What I was requesting was something to show that the derogatory information pertaining to a criminal report was no longer.

Q. Okay. So square one, is this a letter that you received from RealPage?

A. Yes.

Q. And looking at the front, it looks like they were sending it to your University Heights, Ohio address. You weren't living at that address at that point in time?

A. No.

Q. All right. Let's look at the third page of this document -- excuse me, the last page of the document, RealPage/Jones 49.

A. Yes.

Q. It says it's a file copy. Essentially, a copy of your file; is that what you understood?

A. Yes.

Q. And if you look, there is some criminal information reflected here in your file, and it's got some criminal information for offenses from Ohio, Cuyahoga. It looks like one is a stop sign, one is tinted windows, one is a housing offense, and the other one is

for a fender and backup light; do you see those?

A. Yes.

Q. Do you recall those offenses?

A. Yes.

Q. And all of those offenses are attributable to you; is that right?

A. Yes.

Q. And they look like things like traffic violations, and there is that one housing offense that we mentioned earlier, right?

A. Yeah. The tinted window, I bought a vehicle, a little get-around car, and the windows were tinted when I purchased the vehicle. So, of course, I got the tint off of there.

And then the housing, I bought a house, and there were some point-of-sale violations. I had some of the violations done, but some I hadn't completed those. So in Cleveland Heights, you know, you have to go to court if you hadn't completed them in the allotted amount of time.

So I had to pay $100 fine, and then

 I had to get a contractor out there immediately, and he fixed everything, and then they sent the inspector out, and everything was completed.

Q. Okay.

A. On the third one, where it says cowl fender and backup lights, there was an electrical problem with my vehicle, and I was coming from work, and the back lights were out, and I didn't know.

And then the police pulled me over on the highway and said, did you know your rear -- your backup lights, or whatever, was not working. So I had to go right away the next day and get the car repaired and take the receipt to them, to city hall.

Q. Okay. You would agree with me that the drug offense from Georgia does not show up in your file as of September 4, 2017; do you see that?

A. I agree.

Q. And did you understand that that offense had been removed from your file as of this date when you received this letter from RealPage?

A. No.

Q. Why not?

A. Because, again, this is something that I could access even prior to the incident with RealPage. So this is already -- this was already here, this information. This is not something that -- something new that they generated.

Q. Right. So this is the information that RealPage is saying that it has about you in their file, right?

A. In the State of Ohio, yes.

Q. Oh, so you understood that this was limited to the State of Ohio; is that what you are saying?

A. This is, yeah. It didn't show anything that was cleared up in the State of Georgia.

Q. I see. Okay. So I understand that.

So you believe at the time you got this letter, this was simply RealPage telling you what they had -- the information they had on you in Ohio, but you didn't read it as the fact that the Georgia record had been cleared

off your record?

A. Correct.

Q. All right. Even though, if you look at the first page of the document, the cover letter, it say, "Enclosed is a copy of the consumer file in response to your request for all information in the LeasingDesk Screening file associated with you."

So even with that, you didn't understand that this reflected that as of this point in time, the Georgia record was no longer in your file?

A. No, because I actually have this myself.

Q. What do you mean, you have this yourself?

A. Well, I did a bureau on myself, and this is what I received years ago.

Q. What do you mean, you did a bureau? Are you talking about like you did a free credit report or something like that?

A. Yeah. And this has been here, this exact same information, for some time.

So what I'm saying is that this is just something that they accessed that's

already there pertaining to Ohio. It doesn't -- in my mind, it doesn't satisfy that if I were to try and attempt to move to Georgia, that that same information is not still out there.

Q. Okay. All right. Let me show you another document.

MR. ST. GEORGE: Mark this as Exhibit 12, please.

- - - - -

(Thereupon, Deposition Exhibit 12, September 5, 2017 Email, RealPage/Jones 000050, was marked for purposes of identification.)

- - - - -

Q. Ms. Jones, you have in front of you what has been marked as Exhibit 12. You have the document in front of you, Ms. Jones?

A. Yes.

Q. Do you recognize this document? Do you recognize this document?

A. Yes.

Q. What do you understand it to be?

A. I understand it to be correspondence between me and RealPage via

email.

Q. Okay. So the first email is dated September 4, 2017, and it is saying, "A copy of the consumer file that LeasingDesk maintains on you is attached to this email," and there is an attachment. And we previously looked at a letter dated September 4, 2017 from LeasingDesk in Exhibit 11, right?

A. Yes.

Q. So is that what was attached to this email to you on September 4, 2017?

A. Well, no. What had happened, I have what you call -- well, Experian, where someone does a credit report of anything, I'll get an email alert.

Q. You have credit monitoring?

A. Yeah. So I have credit monitoring. So that's how I knew that they had did this again. I was upset, because that would be the third time that they pulled a credit.

Q. So I think there is a little bit of a misunderstanding here. I want to ask a basic question.

So the first email -- so put aside your email of September 5. The first email

reflected on this document is on September 4, 2017 from Consumer Relations to you, correct?

A. Yes.

Q. And then you ultimately replied to that email on September 5; do you see that?

A. Yes.

Q. So just looking at the September 4 email, they are saying that they are attaching a copy of the consumer file that LeasingDesk Screening maintains on you; do you see that?

A. Yes.

Q. So the only question I'm asking right now is, is what we looked at in Exhibit 11, is that what was attached to this email that's reflected on Exhibit 12?

A. Yes.

Q. All right. So then you respond and you say, "So let me get this straight, you guys pulled another credit report? If so, I will get an alert any day now. If you did, why did you, as you just pulled it in August"; do you see that?

A. Yes.

Q. So did you ever get any alert that there had actually been any credit pulled?

A. Yes.

Q. When did you get that alert?

A. I think it was sometime in -- well, there were three, actually. There was one by a company called Onsite, which is affiliated with RealPage; and then LeasingDesk; and then this one here.

Q. Okay. And when were those, do you recall?

A. I know two of them were in August, and this may be in August or September, but there were a total of three.

Q. And you say you got that from Experian?

A. Yes.

Q. This email that I'm looking at dated September 5 of 2017, I'll represent to you that RealPage doesn't have in its archives any further communications with you after this date, the September 5 date.

Did you contact RealPage at any time after September 5, 2017?

A. I did, around between September 5 and September 6, asking them for documentation that they removed the information from my file

in Atlanta.

Q. Was that the email we looked at earlier that you are referencing?

A. Well, I contacted them by phone a couple of times too.

Q. Okay. So I guess what I'm asking, is there anything further in writing that you ever sent to RealPage after September 5, 2017?

A. No. I don't recall sending them anything else.

Q. And you didn't have any further communications with anyone at Marietta Road after October of 2017, correct?

A. No.

Q. And you mentioned that you found Francis & Mailman online when you were checking on the FTC complaint that you had filed?

A. Yes.

Q. Okay. And do you recall when that was, what month and year you were checking on the FTC complaint and you found Francis & Mailman?

A. I want to say October of 2018, because the accident was in June, and I was just out of it for a few months with

everything. I had missed doctors appointments.

And so at that point, I was still in bed, and I just started taking care of my business at that point, and I hadn't heard from Marietta, so I said, okay, they're not going to rent the apartment. So I was going to reach out to the FTC to see what they were doing on my behalf, and that's how I found Francis & Mailman.

Q. And why didn't you reach back out to Marietta during that period?

A. Well, time had gone by, so I just assumed at that point they weren't interested in me being a tenant. I had a lot on my mind at the time. I had moved into the other apartment. There was just a lot going on.

And I just didn't want to fight with them anymore. I didn't want to argue. I didn't want to debate with RealPage or Marietta, because I had just gone through something traumatic, and I just didn't want to debate with them anymore.

Q. Are you still looking to rent an apartment in Georgia?

A. Well, to be honest, they are kind

of mean acting. I don't know that if I moved there, that there would be a cordial relationship.

Q. When you say "they," you are talking about Marietta Road?

A. Yes. I'm not sure that, at this point, that -- because I know that I was upset and Ayesha, she didn't appreciate me following through with this whole thing. So it's just, I won't say bad blood, but I don't think that there would be a good relationship.

Q. So you are not interested in living in the Marietta Road complex?

A. No.

Q. And was that bad blood, did that leave a bad taste in your mouth, or however you want to characterize it, was that because you had that, sort of, contentious phone call that you described with Ayesha in October of 2017; is that where you got that impression?

A. Once the letter came out, it just felt like I was hurried off the phone. I was -- I felt that they just didn't believe me, and they just didn't want me as a tenant.

Q. And so --

A. It just didn't -- when I first did this, started the process, they were nice and kind. But, you know, it just felt like, you know, maybe she felt I was taking it too far or something, and she didn't appreciate that, and that's the impression that I get.

Q. So the impression that you got that they didn't want you there, that was, in your opinion, formed when you were having the conversations in the end of August of 2017; is that right?

A. Yes.

Q. And at that point, you essentially decided that if they -- you felt like they didn't want you to live there, so you wouldn't want to live there either?

A. No. I still wanted to live there back in August. That's why I went through all of this too.

Q. Okay. So when did you decide then -- when did it reach a point in your mind where you felt like you didn't want to live there, based on how you felt like you were being treated by Marietta?

A. In 2018, after the accident.

Q. What month is that, 2018 after the accident?

A. The accident was in June.

Q. Why did you reach that point in 2018 after the accident if you hadn't had communications with them since October of 2017?

A. Well, I had it in my mind that she was offensive, but I went through something traumatic, and I just didn't want to argue about it anymore.

Q. Okay.

A. They didn't follow up with me, another year had gone by, I didn't hear anything, and then the accident happened, and I just was out of it. It just -- I just didn't want to deal with anything, more drama or anything traumatic.

Q. Okay.

A. Because I felt if they -- I mean, if I'm still -- if they are still going to do that, then they would send me a letter.

Q. Has your desire to move to Georgia changed; do you now want to be in Ohio?

A. I still want to move to Georgia, but I don't think that that particular

situation would be best for me right now.

Q. So you still want to move to Georgia, but you don't feel like moving to the Marietta complex would be your preference at this point?

A. Correct.

Q. So what efforts have you taken then to find anywhere else in Georgia, have you done anything?

A. Well, I've been online looking around. It's not anything like that, but I've just been clicking around looking, because I still want to get away -- get away from some of the memories.

Q. Okay. So you have done some internet research, but you haven't actually applied anywhere else, correct?

A. Correct.

Q. And you are currently on a month-to-month lease, correct?

A. Correct.

Q. So if you found somewhere in Georgia, you would be able to move there without incurring additional rent --

A. Yes.

 Q. -- beyond a particular month, right?

A. Yes.

Q. Are you only interested in looking at subsidized apartments, or would you be interested in a market-rate apartment in Georgia?

A. I would be interested in a market-rate apartment.

Q. Apart from the documents that you looked at today, are there any other communications in writing that you have had with either RealPage or Marietta?

A. No.

Q. Any other communications? Put aside anything you sent to your lawyers, I'm not interested in that. Any communications you have had with anyone else, friends or family or anything like that, about the denial of Marietta?

A. Well, immediately when I got the original letter, I called my daughter. She was at work, and she couldn't talk right away, but she knows that something -- she felt something was wrong, because I wouldn't bother her when I

knew she was at work.

So when she had the opportunity to call me back, I did tell her that they said that I had a criminal record, and I was upset about it.

Q. Okay. Anyone else you have spoken to about this case, besides your daughter?

A. No.

MR. ST. GEORGE: Let's look at another document.

- - - - -

(Thereupon, Deposition Exhibit 13, Plaintiff's Objections and Responses to Defendant's First Set of Interrogatories to Plaintiff Diane D. Jones, was marked for purposes of identification.)

- - - - -

Q. All right. Ms. Jones, do you have in front of you what has been marked as Exhibit 13?

A. Yes.

Q. And do you recognize this document?

A. Yes.

Q. What do you understand it to be?

A. Objections and interrogatories.

Q. Okay. And what are those; do you know?

A. Well, it's just a list of questions that you may or may not ask.

Q. Okay. So I'll represent to you that these are some questions that we served on your attorneys, and these are the responses that we got back.

A. Okay.

Q. Can I just have you look at the very last page of the document -- well, actually, it's probably the second to the last page. Do you see where it says Verification. Sorry. Maybe go to the last page. I think this is maybe a double-sided document.

A. Yeah.

Q. Do you see where it says Verification?

A. Yes.

Q. And you say, "I declare under the penalty of perjury that the foregoing is true and correct"?

A. Yes.

Q. Sorry. "The foregoing is true and

 correct." Is that your signature?

A. Yes.

Q. So I want to ask you about some questions, some of the responses to a few of these questions.

A. Okay.

Q. And you see it says, if you look, for instance, at the -- go to the third page. It says Specific Objections and Responses. Do you see where it says interrogatory number 1 at the top, in bold, interrogatory number 1?

A. Yes.

Q. So these are in numerical order, so I want to ask you just about a couple of these.

If I could have you turn to interrogatory number 3, which is on the very next page. And it say, "Describe specifically any communications between plaintiff or plaintiff's representative or agent and Marietta relating to plaintiff's application for housing." Do you see that at the top?

Sorry. It's on the back or -- it's got page 4 at the bottom. Excuse me, page number 4. Sorry for this being double sided. It makes it a little more complicated.

So let me just ask that again. You are now at the right page. It says, interrogatory number 3, "Describe specifically any communications between plaintiff or plaintiff's representative or agent and Marietta related to plaintiff's application for housing"; do you see that?

A. Yes.

Q. And then there is a series of communications that you list here describing your communications with Marietta; do you see that?

A. Yes.

Q. The very last one, if you look at the very last communication on page 6, so go forward to page 6, please.

So it says, "In April 2018, plaintiff called Marietta because she had not heard anything further. Plaintiff was informed that there were still no units available"; do you see that?

A. Yes.

Q. So you testified earlier that you didn't have any communications with Marietta after October of 2017. So is this correct, or

was your testimony today correct?

A. This is correct.

Q. Okay. So you are now saying that you did have a further conversation with Marietta in April of 2018?

A. It was just a brief -- I had forgotten about this.

Q. It's okay. I'm not trying to call you a liar.

A. No, no. I'm sorry.

Q. No, it's fine. I'm just asking to clarify the testimony, make sure I understand it.

So tell me about that conversation?

A. It was real brief. I called and asked if there was an apartment available, and she said that there wasn't.

I had just forgotten about that, because again, after June, things were a little fuzzy, but I did inquire. They didn't contact me, so I did, yes. I did contact them before June, before the accident.

Q. And when you say "she," are you speaking of Ayesha?

A. I'm speaking of Ayesha. I'm sorry.

I just forgot about that.

Q. That's okay. All right.

Let's look at -- well, let me ask you about one more thing. If you can go back to page 5.

A. Yes.

Q. You reference an appeal request in the last bullet point. Do you see where it says, "In late October 2017, plaintiff called Marietta back because she had not received any further response to her appeal request"; do you see that?

It's toward the very bottom. It's the last bullet point. It says, "In late October 2017, plaintiff called Marietta back because she had not received any further response to her appeal request."

When you say "appeal request," are you referring to the fax that you sent in?

A. Yes. She said that there would be a procedure. She sent me that -- she sent that via mail, I completed it and faxed it back, and I was waiting on the appeal process to be completed, but I never got the process.

Q. Okay. I just want to make sure we

are talking about the same document.

Let's go to interrogatory number 11. So if you can go to page 10 of this document. Are you there, Ms. Jones?

A. Yes.

Q. The interrogatory 11 says, "State specifically all actions that plaintiff or plaintiff's representative or agent took to investigate or correct any allegedly inaccurate information in the consumer report generated by RealPage, as well as the outcome of those actions"; do you see that?

A. Can you tell me where that is again?

Q. Sure. On page 10.

A. Oh, I'm on 11.

Q. Go back to interrogatory 11.

A. Yes.

Q. It says, "State specifically all actions that plaintiff or plaintiff's representative or agent took to investigate or correct any allegedly inaccurate information in the consumer report generated by RealPage, as well as the outcome of those actions"; do you see that?

A. Yes.

Q. I want to ask you about just a couple of entries on this. Can you look on page 11. It say, "On August 28, 2017," this is towards the middle of the page, "plaintiff submitted a complaint regarding defendant's inaccurate reporting to the Consumer Financial Protection Bureau"; do you see that?

A. Yes.

Q. Now, you've mentioned the FTC. Is that the same thing, are you talking about the same complaint, or did you file a separate complaint with the Consumer Financial Protection Bureau?

A. I just filed one complaint.

Q. Okay. All right. Were there ever any occasions where you contacted RealPage and RealPage did not respond back to you?

A. Well, they didn't respond with information showing that they had removed that information.

Q. Okay. And is that because when we were looking at that document that was your consumer file that they sent to you, that is because you understood that was only relating

to Ohio; is that right?

A. That's correct.

Q. Okay.

A. Because I had that same document.

Q. Okay. So any other times when they didn't -- RealPage did not respond to you, apart from that request?

A. Well, they didn't allow me to speak with a supervisor.

Q. Okay. Anything else?

A. Not that I recall right now.

Q. If I could have you look at interrogatory 14. It is actually on the top of page 14.

Interrogatory 14 says, "Describe specifically all of plaintiff's housing applications made in the last three years"; do you see that?

A. Yes.

Q. So we have gone through your housing history from the last three years. It included where you were renting with your daughter and granddaughter --

A. Yes.

Q. -- in the house.

There was the University Heights apartment by yourself, correct?

A. No.

Q. Or that was with your daughter?

A. Yes.

Q. I apologize.

A. It was a house.

Q. So you had the house with your daughter at University Heights, you had the Lake Shore apartment, and then you have your current address in Euclid, Ohio?

A. Yes.

Q. And did you apply to any other complexes within that period?

A. I don't recall applying to anything else.

Q. And given that you were living in all these places, you were accepted?

A. Yes.

Q. All right. You can put that exhibit aside.

\- - - - -

(Thereupon, Deposition Exhibit 14, Plaintiff Diane D. Jones's Responses to Defendant's First Set of Requests

for Admissions, was marked for purposes of identification.)

- - - - -

Q. All right, Ms. Jones. You have Exhibit 14 in front of you.

A. Yes.

Q. Okay. Can you hand that back to me for just one second. I want to make sure you don't have my copy. If so, we will just switch the exhibit numbers. Yeah. Sorry about that. I handed you a copy with some highlighting on it. I'll remove the exhibit sticker. I'll hand you that back.

I apologize. I don't remember if you answered. Do you recognize this document?

A. Yes.

Q. What do you understand it to be?

A. A request for admissions.

Q. Okay. Well, I'll just represent to you that this is some questions, requests for admissions, that we served on your attorneys, and these are the responses that we got back.

So I want to ask you about some of the responses that we received and get your understanding of them, okay?

A. Yes.

Q. All right. Let's look at request for admission number 6, which is on page 4. And you see where it says, it starts, "Admit that plaintiff did not incur any out-of-pocket expenses as a result of any alleged inaccurate information that RealPage included in a tenant screening report for housing in Marietta"; do you see that?

A. Yes.

Q. And then it says, "Plaintiff was forced to pay substantially more in rent as a result of defendant's inaccurate reporting. Plaintiff was paying $610 per month in rent in August of 2017, and expected her rent at Marietta to be approximately $280 per month"; do you see that?

A. Yes.

Q. What was the basis for your expectation that the rent would have been $280 per month?

A. Well, they have -- they send a document, and they go by your income.

Q. Okay.

A. So it's a 30 percent percentage of

your income.

Q. Okay. So it was based on the amount of income that you had at the moment, you understood that there would be a formula, and that would make your rent $280, approximately, per month?

A. Yes.

Q. Let's look at -- well, let me ask you another question.

Did you ever have anyone at Marietta confirm that it would be $280, or was that just your own calculation?

A. No. That was -- they would do that in writing.

Q. Did they do that in writing?

A. Yes. And actually when you go online and apply for the application, it's all on there.

Q. Okay. You would agree with me that, based on the documents that we have seen today, it appears that RealPage processed your dispute and sent corrected information to Marietta within approximately one day, correct?

A. According to this document, yes.

Q. Right. So this -- in this case,

you claim essentially that RealPage's procedures for reporting information are not reasonable and not adequate; is that fair?

MS. BRENNAN: Objection to the form. Go ahead and answer.

A. That's fair.

Q. Okay. So but you would also agree with me that you and others have an interest in living in communities where complexes do criminal record background screening to keep people safe, correct?

A. Correct.

Q. So what balance should a company like RealPage strike when doing screening, and by that I mean, what level of certainty should they have before they report a record for someone? Would you require, for instance, a matching Social Security Number or driver's license number?

MS. BRENNAN: Objection to the form. Go ahead and answer.

A. Yes.

Q. Other than that, you would regard there simply being too much possibility for error?

A. Yes.

Q. If you required something like a Social Security Number or a driver's license number, wouldn't you be concerned that perhaps some people would be missed, and by that we wouldn't locate criminal records for people that have them?

MS. BRENNAN: Objection to the form. You can answer.

A. No.

Q. Why not?

A. Well, in my experience, your Social Security Number just gives so much information. Once they run your bureau, they could -- I mean, once they run a background check on you, specifically you, then they should have all the information that they need.

Q. So do you know, for instance, whether the Social Security Number of criminal record offenders is made available by court systems in Georgia; do you know?

A. I don't know.

Q. You don't know if you could go and pull someone's file and see a Social Security Number in that file or not?

A. Well, in the State of Ohio, you can, but I don't know in Georgia.

Q. And what's your basis for saying that in the State of Ohio you can do that?

A. Well, one apartment that I moved in, they had my date of birth, Social Security Number, and driver's license number and did a background check, and they saw I wasn't a criminal, so I was accepted.

Q. Right. So I guess what I'm asking is, if you are going to find -- if you are going to find out whether someone has a criminal record in their past, you need to conduct a search of court jurisdictions, right, to see if there are any criminal records for that person?

MS. BRENNAN: Objection to the form. Go ahead and answer, if you know.

Q. Is that right?

A. Yes.

Q. So it's your testimony that in order to determine whether or not -- I mean, a Diane Jones, there are probably other Diane Jones criminal offenders out there somewhere in this nation of 330 million people, right?

So is it your testimony that if I came across a criminal case in Georgia with a Diane Jones and your date of birth, that I would need a Social Security Number on that criminal report that I could then compare to your Social Security Number?

MS. BRENNAN: Objection to the form. Go ahead and answer, if you understand.

A. Yes. If I could add to that?

Q. Sure.

A. Diane Jones is a common name, but Social Security Number is just you, related to you.

Q. Right.

A. So if their software did pick up another Diane Jones and she was a criminal, maybe, just maybe they could maybe contact -- even if they don't want to contact me directly, contact a management company they are selling the information to and say, hey, look, we have this information on this young lady, we need to -- we need more information to verify if this is her. Diane Jones is a common name, but we need to make sure if this is her or not. And they did have my Social Security

Number.

Q. So they should have used the Social Security Number to compare it to the Social Security Number in the Court record?

A. Yes, and I wouldn't mind that, because they used it three times anyway.

Q. So as a practical matter, wouldn't you agree that either doing that on the front end or resolving a dispute within a day essentially gets you to the same place?

MS. BRENNAN: Objection to the form. Go ahead and answer.

A. No, because even if they did that and cleared it up, it just doesn't take away the fact that there is a bad report out here. I shouldn't have to get all upset and losing my breath because they made a mistake.

And it's not just me. They are making the same mistake over and over and over again and for years. Like maybe from 2012 to right now, to this day, it is just not corrected, and it's just not a fair process. Not just to me, but for a lot of people.

Q. What percentage of RealPage's reports do you claim are inaccurate?

MS. BRENNAN: Objection. Lack of foundation. Go ahead and answer, if you know.

A. Well, I don't know exactly how many, but I know that when I had a problem and when I tried to get information about RealPage, there were people on there complaining that they had been made homeless because of this and maybe even lost a job because of it.

So it's just -- it's just kind of disheartening that they -- it just feels like they are telling us, like, well, oh, well, this is our procedure, you have to live with this. We may correct it later, you may not have that apartment, we're sorry, but we thought it was you, we made a mistake.

And they say that, but then next year or next month or even the next day, it is happening to someone else.

Q. Okay. So we provided information in discovery in this case that RealPage did about 12 million criminal screenings, more than that even, between 2016 and 2019.

How many instances on the internet did you see where people were complaining that RealPage had gotten it wrong?

MS. BRENNAN: Objection. Lack of foundation. Go ahead and answer.

A. I didn't see 1200.

Q. Well, I said 12 million.

A. 12 million, I didn't see 12 million.

Q. Did you see a handful?

A. Several. I didn't just make it a point to just keep looking for -- to see how many there were. They just, when you go online, it just pops up. So I just can't say -- give you an exact number.

Q. How many times, if you know, has RealPage successfully identified someone with a criminal history that would have represented a danger to an apartment complex?

MS. BRENNAN: Objection. Lack of foundation.

A. I don't know.

Q. If you look at -- going back to this exhibit, if you look for request for admission number 11, page 6.

A. Yes.

Q. It says, "Plaintiff admits that" -- if you look at the response, "Plaintiff admits

 that she has no personal knowledge of defendant's procedures"; do you see that?

A. Yes.

Q. And that's true?

A. That's true, except for one thing. The last time when you were here, you mentioned something about an algorithm. That's what I know about that.

Q. Okay. And that's the extent of your knowledge?

A. Yes.

Q. And that's not really personal knowledge, I guess; that's something you heard from me, right?

A. Yes.

Q. I'm going to hand you the last exhibit.

MR. ST. GEORGE: We are up to 15.

\- - - - -

(Thereupon, Deposition Exhibit 15, October 11, 2019 Email with Second Amended Class Action Complaint Attached to Defendant's First Set of Requests for Admissions, was marked for purposes of identification.)

\- - - - -

Q. Ms. Jones, do you have Exhibit 15 in front of you?

A. Yes.

Q. And it's got a number of pages. I'd ask you to just sort of briefly look through the document and tell me if you are familiar with it?

I would note that the document really starts on page 3. The first is a notification we get from a Court, the first two pages.

So just take a second, and then I just want to ask you if you are familiar with this document?

A. No.

Q. Okay. Have you not seen it before?

A. No, I don't recall seeing this.

Q. Okay. Well, I'll represent to you that this is a copy of what is called the complaint. So this is the lawsuit that was filed against RealPage and the current allegations that are made against RealPage by you. And I want to just ask you about a couple allegations in the complaint.

Do you see that there are numbered paragraphs in this document?

A. Yes.

Q. Okay. So that's how I will refer to this document.

So can I have you look at page 4. You see the very top there is paragraph 18?

A. Yes.

Q. It say, "Defendant employs policies and procedures that do not include the use of a number of reasonable identifiers, or even a precise first and last name, and it frequently allowed the information belonging to one consumer to appear in the consumer file of another"; do you see that?

A. Yes.

Q. Do you have an understanding of what is being said in this paragraph?

MS. BRENNAN: I'm just going to make an objection. The witness testified that she hasn't seen this document before.

Q. So I'm just asking you, it's in English, I mean, I'm asking you if you have an understanding of what is being alleged in paragraph 18?

MS. BRENNAN: Objection. Lack of foundation. Go ahead and answer, if you understand.

A. It appears that RealPage may be saying that they shouldn't be held accountable, because of the way their procedures are, that they don't have to have an exact match.

Q. Okay. So this is -- just to clarify, these are the allegations that you are making against RealPage. So it's not what RealPage is saying here.

Let me just ask about one point here. It says that RealPage's procedures frequently allow information belonging to one consumer to appear in the consumer file of another; do you see that in paragraph 18? It is still at the very top.

A. Yes.

Q. Okay. Do you have any understanding or knowledge about the frequency with which your situation has occurred?

MS. BRENNAN: Objection. Lack of foundation. Go ahead and answer, if you can.

A. Well, yes, because, like I said, there are a lot of complaints online where

people have said they were homeless because they couldn't get an apartment or various reasons, and it wasn't -- the criminal report wasn't theirs.

Q. Okay. So your understanding was based on some of the things you saw on the internet; is that right?

A. Well, and then my own situation.

Q. So that's the basis for your understanding of the concept of frequency?

A. Yes.

Q. The next -- look at paragraph 20. It says that, I'm looking at the very last phrase, that "Defendant purposefully," I'll say "prioritizes," even though it says prioritizing. "The defendant purposefully prioritizes quantity over accuracy of matches"; do you see that?

A. Yes.

Q. Do you have an understanding of what is being alleged in paragraph 20?

A. Yes.

Q. What is your understanding?

A. I understand that when they do their background checks, they do, like you

said, there is 12 million that you guys -- that they do, but they are not accurate.

You are doing a lot of them but -- and I understand the reason why they are being done, but a lot of people are being disqualified because of inaccurate matches.

Q. Would you agree that it is a legitimate concern -- it would be concerning if RealPage had an applicant with a criminal history but it didn't report any criminal records for that applicant, it just missed the records; would you agree that that would be a concern?

A. I won't agree, because if they used the correct procedure, then they could match it up with the correct people.

Q. Right. So what I'm saying is, let's take an applicant who has a criminal history.

A. Yes.

Q. So there is no dispute that this person is a drug offender or whatever, you know, they have a criminal history, and RealPage, in responding to the apartment complex's request for a background screening,

misses the existence of a criminal record in that person's background and doesn't report it, so that person moves in.

Would you agree that that would be a cause for concern?

A. It would be a concern on the part of RealPage, because it was their inaccuracy. They should have a procedure where they could be more -- what's the word I'm looking for -- it would be more accurate.

Again, the Social Security Numbers should tell. They shouldn't just use a year of birth. It seems as though that procedure is a problem, because a lot of people are born in 1952 or 1961.

So if you are matching a date of birth alone, they could still -- it could go either way. They could miss something or they could make accusations against someone else.

Q. Right. So are you saying then, or would you agree that the concept of accuracy includes making sure that people have a criminal -- who do have a criminal past are identified as having a criminal past?

A. People who actually have a criminal

past should be identified, because everyone deserves to be safe where they live.

Q. Okay. Can I have you turn to the next page of the complaint.

A. Yes.

Q. Paragraph 32, it says, "But by then it a was" -- typographical area.

Then it says, "But by then it was too late. Ms. Jones had already lost the rental opportunity with Interstate Realty"; do you see that?

A. I see that.

Q. Would you agree with me if the documents that we looked at showing that you had actually been approved to rent at Marietta Road are accurate, that this statement in the complaint would be false?

MS. BRENNAN: Objection. Lack of foundation. Go ahead and answer, if you can.

A. I would agree with that, if they would -- if I would have had those documents to say that. I never received that.

Q. Understood. We would have to find that out from the apartment complex, correct?

A. Yes, and they will tell you they

never sent me anything to say that. I never saw that.

Q. I'm not so sure about that, but we can ask them.

A. Yes.

Q. You can put that aside for now.

You testified earlier that it caused you distress when you learned that you had been identified as having a criminal history, correct?

A. Yes.

Q. Was that distress significant to you, were you -- it's tough to quantify, but would you regard that distress as something that affected your life?

A. Yes. No one wants to be accused of being a criminal and drugs and all of that, being turned down for something that you didn't do. I was very upset.

Q. Okay. So let's take that distress, and what I just want to find out is did you ever see any medical professionals to address that distress?

A. No. I didn't go to an emergency room or anything.

Q. Did you take any medications, over the counter or prescriptions?
A. I had a migraine headache, and I did take something for that.
Q. When did you have that migraine?
A. Immediately.
Q. Okay. So what did you take, just some Ibuprofen or something like that?
A. Yes.
Q. And apart from that, the migraine in the immediate aftermath of finding out, did you ever take any other medications or anything that you are aware of?
A. No. I wasn't taking any -- going to keep taking pills, because I was upset and in disarray. You know, I don't think they prescribe anything for an anxiety attack.
Q. Why would you have been so upset if RealPage told you within less than 24 hours that the situation had been corrected and the record had been removed?
MS. BRENNAN: Objection to form. Go ahead.
A. When I initially got letter and saw that I was being turned down because of a

criminal report, and then I received a document with a young lady who has committed crimes, and my name is nowhere on that, anyone would be upset.

Q. Right. But I guess what I'm asking you, I mean, were you -- did your distress cease, you know, within 24 hours, when RealPage addressed your dispute and told the apartment complex that the record wasn't yours?

A. No, I was still upset.

Q. Why?

A. Because, just the whole ordeal. Even though it's an algorithm or they have to check people out, had I done those things, I wouldn't have been upset, but I have lived my life without doing any of that. And someone would have to -- you know, I would have the right to be upset and furious.

And then when the initial call to RealPage, for them to say, oh, well, you know, we go by your date of birth, as if they are telling me, "Yes, this is you."

Q. Did anyone from RealPage say, "No, we know this is you"?

A. They didn't say, "We know this is

you," or they didn't say that "It's not you."

Q. But then they did say it wasn't you within less than 24 hours, right?

A. But the damage was already done.

Q. Well, what damage?

A. I was furious, I had an anxiety attack, I was turned down for the apartment.

Q. And that's assuming that you weren't actually accepted for the apartment, like the documents show?

MS. BRENNAN: Objection to the form. Go ahead.

A. Well, right at that point, all I was looking at was that I was turned down and that you were out here in Atlanta, you have been incarcerated for drug activity.

Q. You would agree that it is important for apartment complexes to screen for drug offenders, to make sure they don't have drug activity going on at the complexes, correct?

A. I agree, but they should do that to the people that actually committed those offenses.

Q. Understood. Are you able to

travel? I know you have got some medical conditions, but are you able to travel?

A. If I have to, yes.

Q. Okay. Would you be able to travel to Dallas if needed for this trial?

A. Yes.

Q. The trial in this case could last for a couple weeks. Would you be able to sit through a trial lasting a couple of weeks?

MS. BRENNAN: Objection to the form. Go ahead and answer.

A. Yes.

Q. Okay. I'm probably almost done. Let me just take five or ten minutes, look through my notes, and then maybe I'll have a couple more questions for you, Ms. Jones.

MR. ST. GEORGE: Why don't we go off the record, take a ten-minute break, and we will be done shortly after that.

THE VIDEOGRAPHER: Off the record.

(Recess taken.)

THE VIDEOGRAPHER: We are on the record. 2:35.

Q. Ms. Jones, I just remind you you remain under oath. Just a couple of questions

for you as we close out here, Ms. Jones.

You don't have any allegation that RealPage communicated the criminal record, the Toni Taylor criminal record to anyone other than Marietta Road, correct?

A. I don't know.

Q. You don't have any allegation or knowledge of them reporting it to anyone else, right?

A. No.

Q. The stress that you were describing, you mentioned the migraine and that it was distressing to you, did you change your lifestyle in any way, like did you become less social or anything that you are claiming in that regard in terms of the effects of the stress that you have identified?

A. I wouldn't say I became less social.

Q. Anything else, any lifestyle changes?

A. Less trusting, but I haven't changed my life.

Q. In fact, you still applied to some other apartment complexes and you have gone

through background screening?

A. I did.

Q. Marietta Road, the complex, do you have knowledge of the specific criteria that they used to evaluate applications for housing?

A. Well, they attached -- there is a checklist, and credit, criminal background, a lot of various things, and the only criteria that they checked for me was the criminal background.

Q. Okay. So within that criminal background category, do you know, for instance, whether Marietta has certain types of crimes that they will still allow the person to move in, versus those that they would deem disqualifying?

A. No.

Q. So you don't know whether it's possible that someone with an identified criminal history of a certain type might still be able to get an apartment at Marietta Road?

A. I don't know.

Q. Do you have any idea if the apartment would currently be available, what is the status of the wait list at Marietta at this

point in time?

A. They contacted me and said that they may have something coming up.

Q. When did they contact you?

A. January, it was before the holidays, before Thanksgiving.

Q. So did they reach out to you again in November, approximately, to say they might have something coming up?

A. But they said in order for -- first they had something in November, and then they said -- called back and said they had something in October, and I'd have to move within seven days.

Q. And you weren't willing to do that?

A. I wasn't prepared to just pick up. Even though I'm not on a lease, I just wasn't prepared to pack up within a week.

Q. And you testified you are not really interested in living there at this point in time anyway?

A. No.

Q. Okay. So just to make sure that closes the loop on all these communications, you just identified a new communication with

Marietta Road in October or November of this past year, correct?

A. Yes.

Q. Any other communications that we have talked about that -- other than the ones that we have talked about that you had with Marietta Road?

A. No. You had asked me about 2018.

Q. Okay. Well, let's take 2019 or 2020. Anything other than what you just describe?

A. No. It's over.

Q. Do you know if you have to move within -- if their policy is that you have to move in within seven days of being accepted; is that their policy?

A. I don't think that's their policy. That's Ayesha's policy.

Q. It was Ayesha that contacted you?

A. Yes.

Q. Did you talk by phone or by letter?

A. By phone.

Q. And how long did that conversation last?

A. I want to say about 15 minutes,

because she was getting upset. She brought up the fact that I -- how upset I was initially when I was turned down. She just started asking me questions about that incident, and the conversation didn't go very well.

Q. All right. If Marietta Road is contacting you still at the end of 2019 and asking you if you are able to come and move in, doesn't that indicate to you that they ultimately accepted your application?

MS. BRENNAN: Objection to the form. Go ahead and answer.

A. Two years later -- or a year and a half later.

Q. But it indicates to you that you would be accepted now in Marietta Road?

A. Yeah.

Q. You testified earlier that you understand this is a class action that's been filed?

A. Yes.

Q. There is other people that are being represented in this lawsuit. And this case, of course, implicates the background screening reports that are generated by

RealPage, right?

A. Yes.

Q. So do you have a sense of what period of time is implicated by this case, and by that I mean, if someone had a background screening report, you know, two years ago, are they in this class, versus if someone had a background screening report five years, are they in this class; do you know what period of time, in terms of screening reports, this class action covers?

A. No. And I wanted to add --

Q. Yes.

A. -- I would have had to go through the same procedure with Marietta now, and again with you guys again. So she made an offer, but I wasn't accepted.

Q. All right. Why do you say that; did they tell you you would have to be rescreened?

A. Yes.

Q. But you understand now, based on the documents you have seen, that RealPage has removed that record from your file, correct?

MS. BRENNAN: Objection.

Foundation. Go ahead.

A. No.

Q. You don't know?

A. No, it doesn't appear that they have, because again, the document that they sent me is exactly what I have that I pulled on my own a while ago.

Q. At the very least, you understand, based on some documents that you have seen, that RealPage has informed Marietta that you are not associated with the Georgia criminal record?

A. Yes.

MR. ST. GEORGE: Okay. I don't have anything further for you.

Lauren, any questions?

MS. BRENNAN: Nothing for me.

MR. ST. GEORGE: Well, thank you very much for your time, Ms. Jones. I appreciate it.

THE WITNESS: Thank you.

THE VIDEOGRAPHER: Off the record at 2:43.

MS. BRENNAN: She will read.

(Deposition concluded at 2:44 p.m.)

Whereupon, counsel was requested to give instruction regarding the witness's review of the transcript pursuant to the Civil Rules.

SIGNATURE:

Transcript review was requested pursuant to the applicable Rules of Civil Procedure.

TRANSCRIPT DELIVERY:

Counsel was requested to give instruction regarding delivery date of transcript.

MR. ST. GEORGE: Original Transcript.

MS. BRENNAN: Certified Transcript.

I, DIANE D. JONES, do hereby declare under penalty of perjury that I have read the foregoing transcript of my deposition; that I have made such corrections as noted herein, in ink, initialed by me, or attached hereto; that my testimony as contained herein, as corrected, is true and correct.

EXECUTED this _____ day of ___________________, ______, at ________________________, __________________.

(City) (State)

____________________________________

DIANE D. JONES

REPORTER'S CERTIFICATE

The State of Ohio, )

SS:

County of Cuyahoga. )

I, Wendy L. Klauss, a Notary Public within and for the State of Ohio, duly commissioned and qualified, do hereby certify that the within named witness, DIANE D. JONES, was by me first duly sworn to testify the truth, the whole truth and nothing but the truth in the cause aforesaid; that the testimony then given by the above-referenced witness was by me reduced to stenotypy in the presence of said witness; afterwards transcribed, and that the foregoing is a true and correct transcription of the testimony so given by the above-referenced witness.

I do further certify that this deposition was taken at the time and place in the foregoing caption specified and was completed without adjournment.

I do further certify that I am not a relative, counsel or attorney for either party, or otherwise interested in the event of this action.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office at Cleveland, Ohio, on this 21st day of January, 2020.

Wendy L. Klauss

Wendy L. Klauss, Notary Public
within and for the State of Ohio

My commission expires July 13, 2024.

**&**

**&** 25:3,10 39:19 40:4,9 130:15 157:16,21 158:8

**0**

**00001** 4:5 83:22
**00003** 4:7 88:20
**00004** 4:9 99:4
**000041** 4:17 118:15
**000046** 5:2 146:20
**00005** 4:11 100:19
**000050** 5:3 153:13
**000053** 4:25 140:10
**00009** 4:20 125:6
**00015** 4:15 110:6
**000164** 4:13 108:5
**000166** 4:22 133:22
**02087** 1:9

**1**

**1** 1:25 4:3 83:16 83:18 84:1 107:3 166:10,11
**1,025** 16:7
**10** 4:23 140:4,7,15 140:16 143:19 144:6 145:3 170:3 170:15
**10-11-2017** 141:23
**100** 4:10 149:25
**1001** 2:14
**102** 11:23
**108** 4:12
**10:02** 1:18 7:2
**11** 5:1,1,9 142:11 142:16 145:4 146:15,17,18,23 154:8 155:14 170:3,6,16,17 171:4 183:22 184:21
**110** 4:14
**1100** 1:20
**118** 4:16
**11:07** 62:15
**11:21** 62:18
**12** 5:3 153:9,11,17 155:15 182:21 183:4,5,5 189:1
**1200** 183:3
**125** 4:18
**13** 5:4 103:7,9 164:12,21 207:15
**133** 4:21
**14** 1:18 5:7 7:2 34:21,22 172:13 172:14,15 173:23 174:5
**140** 4:23
**146** 5:1
**15** 5:9 24:22 28:1 41:25 184:18,20 185:2 200:25
**153** 5:3
**1600** 2:6
**164** 5:4
**169** 135:16
**17** 16:1
**173** 5:7
**177** 6:6,7
**178** 6:8
**179** 6:9
**18** 16:1 186:7,25 187:16
**180** 6:10
**181** 6:11
**182** 6:12
**183** 6:13,14
**184** 5:9
**186** 6:15
**187** 6:16,17
**19** 31:5
**191** 6:18
**19103** 2:7
**193** 6:19
**195** 6:20
**1952** 190:15
**196** 6:21
**1961** 103:9 190:15
**1980** 29:22 30:9
**1981** 30:11
**1987** 30:8,9,13 32:7
**1988** 11:2
**1995** 32:11
**1997** 18:8,10
**1999** 32:25
**1:07** 133:11

**2**

**2** 3:3 4:6 88:16,18 88:24 92:13 93:2 93:7 95:3 96:20 98:16 104:4 109:3 109:5,17 110:19
**20** 28:1,8,20,20 31:8,22 188:12,21
**2000** 31:18
**2002** 33:10,14,19
**2003** 19:7
**2004** 33:13
**2005** 20:4 33:22 34:5
**2006** 34:5,9,15,21
**2008** 22:2
**2009** 21:24
**201** 6:22
**2010** 21:3
**2011** 21:21 22:5
**2012** 18:12 181:20
**2013** 29:16
**2014** 23:7
**2015** 15:23 16:2 23:6 29:3,6
**2016** 4:3 15:25 29:4,5 36:14,16 37:3 73:17,18,19 73:19 74:10 79:9 79:12 83:19 85:5 85:8,16 86:18 87:9 182:22
**2017** 5:1,3 13:17 14:19 15:23 16:3 29:9 36:6,9 37:3 39:4 40:13 44:2 73:13,17 75:15,21 78:16 83:1,3 87:4 87:5,11 89:9 101:13 112:12 113:5 118:1,6 122:11,23 126:5 128:15 130:20,25 131:14,24 138:9 138:18 142:11,11 142:16 143:19 144:6,23 145:4,25 146:18 150:19 153:12 154:3,7,11 155:2 156:17,22 157:8,13 159:19 160:10 161:6 167:25 169:9,15 171:4 175:15
**2018** 12:12,16 13:11,17 14:11 15:25 35:20 36:1 43:16,16 47:14 157:23 160:25 161:1,5 167:17 168:5 200:8

**2019** 5:9 28:13 43:16 182:22 184:21 200:9 201:7
**202** 6:23
**2020** 1:18 7:3 12:11 200:10 207:8
**2024** 207:15
**205** 3:10
**207** 1:25
**21** 144:23
**215** 2:8
**21st** 207:7
**2222** 207:11
**225** 81:1
**23219** 2:15
**235** 73:4 81:3,4 82:16
**24** 4:3 83:19 85:4 85:15 87:8 128:8 193:19 194:7 195:3
**24350** 11:22
**25,000** 77:10
**2510** 2:6
**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** 103:5
**28** 112:21 118:1,3 118:6 122:11,23 171:4
**280** 175:16,20 176:5,11
**28th** 89:13 121:21 123:8
**29** 75:20 118:3 126:5 131:24 138:8,17 142:11 145:2,25
**29th** 89:14
**2:35** 196:23
**2:43** 203:23
**2:44** 203:25

**3**

**3** 4:8 98:22 99:2,7 112:12,23 113:5 166:16 167:3 185:10
**30** 28:20 175:25
**31** 107:3 128:15
**32** 191:6
**330** 179:25
**38** 16:12
**3822766** 1:24
**3:19** 1:9

**4**

**4** 3:5 4:10 90:25 91:5,12 98:21 100:13,17,24 102:17 120:14 150:19 154:3,7,11 155:1,7 166:23,24 175:3 186:6
**40** 54:20
**44** 6:3
**44123** 11:23
**49** 148:14

**5**

**5** 4:12 5:3 108:1,3 108:17 109:22 153:12 154:25 155:5 156:17,20 156:22,23 157:8 169:5
**55** 68:23
**556** 103:12
**56** 6:4
**575** 12:25 13:4 37:16
**58** 11:18 68:22

**6**

**6** 4:14 33:23 110:1 110:3,10 111:14 121:17 132:19 156:24 167:15,16 175:3 183:22
**600** 17:19
**610** 14:5 81:5 82:11 175:14
**697-1200** 2:16

**7**

**7** 3:8 4:16 118:10 118:12 121:17 122:6
**7032** 127:4
**7302** 126:25
**735-8600** 2:8
**79** 6:5

**8**

**8** 4:18 101:12 125:1,3,11 131:18 132:20 139:9,10 139:11
**8-15-2017** 142:10
**8/21/2017** 4:12 108:4
**804** 2:16
**83** 4:3
**845** 81:11 82:4 83:5
**88** 4:6

**9**

**9** 4:21 133:17,19 134:1 139:8,12
**900** 82:20,23
**90s** 31:17
**92** 32:21
**943** 83:2,3,4
**97** 18:15
**970** 37:7,12 82:25 83:1
**9799** 102:25
**99** 4:8 33:1
**9:18** 136:14
**9:24** 136:19 138:9 138:20

**a**

**a.m.** 1:18 138:9,20
**ability** 10:11
**able** 48:9 49:24 55:21,23,25 69:24 82:1,3 112:7 116:22 162:23 195:25 196:2,4,8 198:21 201:8
**abuses** 49:11
**accent** 119:10 121:2 135:12,14
**accept** 67:19 88:9
**accepted** 47:7,11 48:13 65:19 68:9 69:25 80:21,24 87:23 88:4,7 173:18 179:9 195:9 200:15 201:10,16 202:17
**access** 151:4
**accessed** 152:25
**accident** 10:23,24 18:2 35:21,22 66:24 157:24 160:25 161:2,3,5 161:14 168:22
**account** 106:10
**accountable** 187:5
**accounts** 46:10 102:8,9,12
**accrued** 20:23
**accuracy** 102:12 126:13 188:17

190:21
**accurate** 64:23 106:4 122:23 127:13 189:2 190:10 191:16
**accusations** 190:19
**accused** 40:18 53:12 59:9 68:18 68:20 119:18 192:16
**acknowledging** 41:2
**act** 48:20 49:6 147:12
**acting** 159:1
**action** 5:10 20:21 21:8 41:12,15,23 42:4,4 44:8,11 51:17 184:22 201:19 202:11 207:4
**actions** 170:7,12 170:20,24
**activity** 38:17 40:18 53:12 55:13 68:18 135:17,20 135:22 195:16,20
**actual** 50:2 84:16 86:1,13
**add** 180:9 202:12
**addition** 82:12
**additional** 128:24 162:24
**address** 11:21,22 12:4,7,8 16:14,15 16:19,19 17:10 22:18 39:8,11 86:15,21,25 87:2 87:10 103:17,20 103:22,25 104:8 120:6 122:13 125:25 128:14 137:14 141:3,6,11 141:14,19,24,25 142:4 144:14,18 148:9,10 173:11 192:22
**addressed** 86:14 194:8
**addresses** 103:19 103:23 104:2,6,7
**adequate** 177:3
**adequately** 56:10
**adjournment** 206:22
**adjustments** 63:9
**admission** 142:16 175:3 183:22
**admissions** 5:8,11 174:1,18,21 184:24
**admit** 175:4
**admits** 183:24,25
**admitted** 79:20 80:8
**advance** 24:11 58:1
**affiliated** 25:9 156:5
**affixed** 90:24 207:6
**afford** 21:17 82:17 93:19
**affordable** 82:8
**afforded** 83:6
**aforesaid** 206:12
**aftermath** 193:11
**age** 7:17
**agency** 31:20 32:5 33:2,4
**agent** 31:4,5,11,12 135:24 166:19 167:5 170:8,21
**ago** 33:12 48:23 152:18 202:6 203:7
**agree** 65:1,4 81:25 105:2,6,21 139:22 140:25 150:17,21 176:19 177:7 181:8 189:7,12,14 190:4,21 191:13 191:20 195:17,22
**agreed** 47:2 94:17
**ahead** 9:4,11 10:7 44:12 56:16 62:12 79:25 80:4 85:2 177:5,21 179:18 180:8 181:12 182:2 183:2 187:2 187:23 191:19 193:23 195:12 196:11 201:12 203:1
**ahold** 96:3
**alabama** 72:6
**alert** 154:15 155:20,24 156:2
**algorithm** 184:7 194:13
**alias** 53:14 105:9 105:17 106:7,8,11 106:13
**aliases** 53:9 59:12 104:24 105:4,7,12 105:20
**allegation** 197:2,7
**allegations** 185:23 185:25 187:9
**alleged** 175:6 186:24 188:21
**allegedly** 170:9,22
**allergic** 52:25
**allotted** 149:24
**allow** 172:8 187:14 198:14
**allowed** 97:6 113:24 186:13
**allstate** 31:25 32:5 32:9,10,13,15,16 32:18,24 33:6,9,20
**amended** 5:10 184:22
**amount** 19:23 149:24 176:3
**amy** 25:17
**angelo** 135:5,7
**answer** 9:4,5,11 10:6,7 44:13 56:16 79:25 80:4 177:5,21 178:9 179:18 180:8 181:12 182:2 183:2 187:2,23 191:19 196:11 201:12
**answered** 174:15
**answers** 9:19
**anthony** 26:1
**anxiety** 193:17 195:6
**anymore** 158:18 158:22 161:10
**anyway** 181:6 199:21
**apart** 18:2,5 19:19 24:23 26:17 31:1 48:17 53:24 107:18 145:23 163:10 172:7 193:10

**apartment** 11:25 13:1,8,13,19,21 14:6 15:10 17:12 20:5,17,24 28:25 38:12,19 39:1 40:17,20 42:10 44:3,4,20 45:23 46:20,21 47:14,25 48:8,9 49:22,24 50:11 52:20 55:19 55:22 60:9,21 65:16,20,25 68:9 68:10 69:24 70:4 70:17 71:12 74:17 76:6,10 77:6 80:15,22 82:17 83:5 86:22 112:7 113:22 114:1,1,4 114:18 115:10,20 116:1 117:4 124:21 127:1 129:9 130:2 158:6 158:16,24 163:6,9 168:16 173:2,10 179:5 182:14 183:16 188:2 189:24 191:24 194:8 195:7,9,18 197:25 198:21,24
**apartments** 46:16 46:23 52:16 71:10 76:9,12,14 89:22 115:23 163:5
**apologize** 84:21 85:2 173:6 174:14
**apologized** 119:24
**appeal** 95:19,20 95:24,25 113:9,20 113:24 114:9,23 115:11 140:2 169:7,11,17,18,23
**appear** 23:8 137:20 186:14 187:15 203:4
**appearances** 2:1 3:3
**appears** 87:9 122:21 143:17 176:21 187:4
**applicable** 204:7
**applicant** 57:8,14 138:1 141:3 189:9 189:11,18
**applicant's** 138:2
**application** 47:3 70:2 74:16 75:3 77:2,14 78:1,7 79:1,8 83:10 84:25 85:8 88:7 100:5 130:19 142:15 143:19 144:22,22 145:2,9 166:20 167:6 176:17 201:10
**applications** 76:23 172:17 198:5
**applied** 36:8 38:12 47:20 48:7 65:16 70:16,20 73:7,8,16 76:11 77:15 78:18 129:9 162:17 197:24
**apply** 47:24 49:2 64:13 70:23 74:9 74:20 75:2 173:13 176:17
**applying** 49:21 76:8 173:15
**appointments** 158:1
**appreciate** 8:3 159:8 160:5 203:20
**approval** 143:23 144:6,10,11,13 145:8
**approved** 117:3 139:24 142:15,20 145:3 191:15
**approving** 143:19
**approximately** 15:22 24:19 27:8 27:25 28:3,6,18 29:13 32:25 33:10 43:13 81:1 103:14 112:16 175:16 176:6,23 199:8
**april** 12:14,16 13:11,17,17 14:11 14:18 15:22,23,25 16:3 29:8 47:14 73:13 75:15 87:4 87:11 167:17 168:5
**archive** 144:4
**archives** 156:18
**area** 118:3 191:7
**argue** 158:18 161:9
**arnold** 42:15,23 43:1
**arrangement** 80:18 81:14 82:14
**arrangements** 81:15 82:6,8
**arrest** 35:7
**arrested** 22:21,24
**arrive** 111:3
**ashley** 15:6
**aside** 48:11 54:21 67:10 98:17,18 100:10 108:14 109:24 145:22 154:24 163:16 173:21 192:6
**asked** 9:24 59:4,8 61:10 90:1 94:12 94:21 97:16 119:19 121:2 168:16 200:8
**asking** 48:6 50:1 50:13 54:13,22 102:13 106:6 115:25 134:10 155:12 156:24 157:6 168:11 179:10 186:22,23 194:5 201:4,8
**asserting** 49:16 50:2
**assist** 51:24
**associate** 30:16
**associated** 152:8 203:11
**assume** 9:23 11:24 105:19
**assumed** 158:13
**assuming** 53:18 65:15 195:8
**assumption** 50:17
**atlanta** 38:12,19 51:3 60:3,12 61:13,24 69:19 72:10,11,12,14,16 72:22 76:13 82:16 93:16,19,25 97:10 117:20 146:11 157:1 195:15
**attach** 90:19
**attached** 4:3 5:10 83:20 90:8,12,20 91:13,15,16,18 92:2,19 97:20 154:5,10 155:14

184:23 198:6 205:12
**attaching** 155:8
**attachment** 4:14 90:14 91:25 92:11 110:5 154:6
**attack** 193:17 195:7
**attempt** 97:4 135:23 153:3
**attempted** 82:13
**attend** 29:24 30:3 30:13
**attendance** 31:3
**attended** 42:20 43:10
**attending** 7:10
**attorney** 24:15 25:8,14,17 39:21 44:14 120:4 130:7 130:8,14 207:2
**attorneys** 23:18 24:11,23 26:4 39:14 84:7 165:8 174:21
**attributable** 149:7
**august** 40:13 75:20 78:16 87:5 89:9,14 101:12 103:7,9 112:19,20 112:21 118:1,6 122:10,23 123:8 126:5 128:15 130:20,25 131:14 131:24 138:8,17 142:10 144:23 145:2,25 155:21 156:10,11 160:10 160:18 171:4 175:15
**auntie** 71:5
**authority** 94:13
**automatically** 55:17
**automobile** 10:24
**available** 76:15 83:5 114:18 167:20 168:16 178:20 198:24
**avenue** 1:20
**aware** 9:8 20:12 20:15 39:15 41:23 48:14 143:24 145:7 193:13
**ayesha** 89:24 93:9 94:9,10,20 96:8,10 96:13 99:22 114:20 115:15 117:9,21 135:24 136:3 142:23 143:1,13,14,18 144:7 159:8,19 168:24,25 200:19
**ayesha's** 200:18

**b**

**b** 1:9,12
**babies** 66:21
**baby** 35:6
**back** 23:7 32:15 32:21 34:10 35:4 38:15 40:1,24 41:6,8 51:16 55:16 58:22 61:8 61:13,20 62:7,19 71:20 73:6,17 74:11 75:19,23 78:3,10,12 93:8 94:7,20 95:3 98:23 100:14 109:3 111:6,15,18 111:24 112:4,9 113:4,5,15,17 114:8,10,16 117:20 120:23 121:3,3,4,11,13 123:25 128:8 133:12 137:1 138:4 150:9 158:10 160:18 164:3 165:9 166:22 169:4,10 169:15,22 170:17 171:18 174:7,13 174:22 183:20 199:12
**background** 38:13 38:15 39:1 42:11 45:20,24 46:2,6,23 47:6,10 50:7,18 52:21 55:15 56:23 59:7 60:22 69:7 74:23 78:2 97:25 120:22 177:10 178:15 179:8 188:25 189:25 190:2 198:1,7,10 198:12 201:24 202:5,8
**backup** 149:1 150:7,13
**bad** 62:8 69:1,20 159:10,15,16 181:15
**balance** 177:13
**bank** 21:24
**bankruptcy** 23:2,3
**based** 59:14 82:1 82:18 90:10,11 97:22 127:1,10,17 127:24 137:23 160:23 176:2,20 188:6 202:22
203:9
**basic** 87:7 108:23 154:22
**basically** 79:15
**basis** 65:6 136:7 145:18 175:19 179:3 188:9
**bates** 4:4,6,8,10,12 4:15,17,19,22,24 5:1 83:21 88:19 99:3 100:18 108:4 110:5 118:14 125:5 133:21 140:9 146:19
**beasley** 142:23 143:14,18 144:7
**bed** 158:3
**bedford** 17:6,10 29:12
**bedroom** 13:2 14:9 17:20
**bedrooms** 15:18 15:20
**beginning** 4:4,10 4:14,17,19,21,24 5:1 83:20 100:18 110:5 118:13 125:5 133:21 140:9 146:19
**behalf** 2:3,11 7:14 158:8
**believe** 11:2 17:18 22:11 33:12 43:15 43:20 56:9 73:3 79:7 82:19 89:9 120:13 122:4 131:1 139:8 151:21 159:23
**believed** 115:5
**bell** 135:10

**bells** 135:9
**belong** 127:19,25 130:4 132:8 137:25
**belonging** 186:13 187:14
**benefits** 37:5,13
**best** 162:1
**better** 39:25 64:1
**beyond** 163:1
**birth** 56:19 57:4,4 57:21 58:8,10 63:22 77:19 103:6 103:8 106:24 107:1,7 119:15 179:6 180:3 190:13,17 194:21
**birthday** 50:22 63:23,24 107:5
**bit** 9:6 38:8 57:19 70:2 154:21
**black** 104:20,20
**blood** 159:10,15
**board** 66:3
**bold** 166:11
**bolded** 95:5
**born** 72:6 190:14
**bother** 163:25
**bottom** 90:23,25 91:4 96:21 109:7 129:22 135:16 137:2,6 138:14 142:22 166:23 169:13
**bought** 18:20 149:13,18
**boulevard** 11:23
**box** 100:7 104:1,6
**boyle** 43:8
**break** 10:2,8 36:4 58:15,20 62:13 81:13 108:9,10 196:18
**breakdown** 32:1
**breaking** 57:18 82:10
**breath** 66:15 181:17
**breathtaking** 67:3
**brennan** 2:5 7:13 7:13 9:1 23:17 24:15,24 26:5,5,11 26:15,18,21 27:5,9 27:21 36:4 39:16 44:12 56:15 58:13 58:18 79:24 80:3 104:3 177:4,20 178:8 179:17 180:7 181:11 182:1 183:1,17 186:19 187:1,22 191:18 193:22 195:11 196:10 201:11 202:25 203:17,24 204:14
**brief** 168:6,15
**briefly** 10:18 185:6
**bring** 54:25 96:24 116:2
**broken** 81:22
**broker** 31:10
**brother** 71:5
**brought** 201:1
**brown** 104:21
**built** 53:8
**bullet** 169:8,14
**bureau** 152:17,19 171:8,14 178:14
**business** 45:16 158:4
**buy** 49:3

**c**

**caddell** 25:15
**calculation** 176:12
**call** 12:3 28:4,5,7 28:15,16,18 46:6 60:15 61:8,12 70:3 118:19 119:12 121:3,3,11 121:13 124:7 154:13 159:18 164:3 168:8 194:19
**called** 7:18 22:2 60:17,20 61:9,16 66:9 69:11 93:20 94:7 97:9 118:21 119:1 120:2,2,25 121:4 156:5 163:22 167:18 168:15 169:9,15 185:20 199:12
**calling** 96:2
**calls** 61:19 121:14
**capital** 21:21,24
**caption** 206:21
**capturing** 105:8
**car** 18:2 66:22 149:14 150:15
**cardiac** 35:7
**care** 158:3
**carry** 81:8
**case** 10:20 11:7 18:3 21:11,15 25:1 26:4 34:8 38:8 39:14 42:1 43:3,7,14 44:7,10 51:16 52:3,11 53:22 54:5,10,17 54:24 56:14 59:23 59:24 60:24 63:1 63:7,24 65:11,15 65:22 66:7 68:4 84:7 97:20 101:4 101:24 107:12,17 122:8 128:13 130:10 135:19 140:23 145:20 147:2 164:7 176:25 180:2 182:20 196:7 201:24 202:4
**casualty** 31:16
**category** 198:12
**catering** 35:20
**cause** 190:5 206:12
**caused** 66:11 192:8
**cease** 194:7
**certain** 64:21 100:2 126:13 135:17 198:13,20
**certainty** 177:15
**certificate** 3:10 30:16 77:19 206:1
**certificates** 31:3
**certified** 7:20 204:14
**certify** 206:8,19 207:1
**chance** 57:14
**change** 197:13
**changed** 115:9 161:23 197:23
**changes** 63:18 65:9 197:21
**characterize** 159:17
**charge** 59:18
**charges** 22:25 96:24 97:1

**check** 38:13,15 39:1 42:11 45:24 50:7,18 52:21 55:15 56:23 57:22 59:7 60:23 74:23 178:15 179:8 194:14
**checked** 38:22 100:8 198:9
**checking** 157:16 157:20
**checklist** 198:7
**checks** 45:20 46:2 46:6 47:6,10 188:25
**children** 35:9 38:5
**chose** 69:18 76:21
**cities** 72:13
**city** 15:1 18:8,9,16 34:18 64:21 150:16 205:16
**civil** 204:3,7
**claim** 40:3,7,11 41:3 56:3 68:11 177:1 181:25
**claiming** 49:15 50:15 51:7 63:2 66:11 197:15
**claims** 49:16 50:2
**clarification** 29:18
**clarify** 168:12 187:9
**class** 5:10 41:11,15 41:23 42:4,4,7,13 44:8,11 51:17,18 51:23 52:2,10 54:2,10,24 184:22 201:19 202:7,9,10
**classes** 52:10 54:3 54:3,4
**cleanse** 128:14
**clear** 9:17,18,19 54:11 57:15 60:11
**cleared** 61:21 96:23 130:13 151:17,25 181:14
**cleveland** 1:20,21 7:5 15:2 17:7 18:8 18:9,14,16,17,24 30:2 60:4 61:9,14 61:23 71:7,7 93:18,22 117:19 146:10 149:22 207:7
**clicking** 162:12
**client** 44:14 57:12 84:6 107:20 109:11 122:8 134:7 140:22 147:2
**climate** 72:3,5
**close** 10:7 71:6 197:1
**closes** 199:24
**coat** 73:22
**cohen** 25:20
**college** 30:4,14,17 31:2
**column** 142:10,12
**combined** 81:10 82:3
**come** 39:20 91:22 92:23 93:16 112:3 201:8
**comes** 54:10,16 55:15
**comfortable** 10:4 82:14
**coming** 51:16 150:9 199:3,9
**commission** 207:15
**commissioned** 206:8
**commit** 65:2 88:2 96:22 145:13
**committed** 55:16 60:23 194:2 195:23
**common** 180:11 180:23
**communicate** 137:9
**communicated** 197:3
**communicating** 137:11
**communication** 44:14 145:23 167:15 199:25
**communications** 28:22 76:1 78:14 86:9 117:12 122:22 139:18 156:19 157:12 161:6 163:12,15 163:17 166:18 167:4,10,11,24 199:24 200:4
**communities** 76:23 177:9
**community** 30:14 30:17 31:2 72:24 76:5,13 98:4,8 126:25 127:1,14
**companies** 32:3 45:21 55:14
**company** 20:17 22:2 32:21 43:25 55:3 156:5 177:13 180:19
**compare** 139:11 180:5 181:3
**compensate** 67:14
**compensation** 67:5 68:4
**complained** 60:7
**complaining** 44:19 182:6,24
**complaint** 5:10 96:5 157:17,21 171:6,12,13,15 184:22 185:21,25 191:4,17
**complaints** 187:25
**complete** 78:1 95:17 111:14 126:20
**completed** 139:23 149:21,23 150:4 169:22,24 206:22
**completeness** 126:13
**complex** 11:25 20:25 23:12 36:8 55:20 58:2 70:4,5 70:11,21 71:24 72:9,21 73:25 74:8 75:9 77:5 79:20,23 80:8 81:5 86:22 87:3 89:6 111:1 124:21 131:21 159:13 162:4 183:16 191:24 194:9 198:3
**complex's** 189:25
**complexes** 97:23 131:4 173:14 177:9 195:18,20 197:25

**complicated** 166:25
**component** 46:7
**components** 69:10
**computer** 50:24
**computers** 64:2
**concept** 41:23 188:10 190:21
**concern** 189:8,13 190:5,6
**concerned** 178:4
**concerning** 189:8
**concluded** 203:25
**conditions** 10:12 196:2
**conduct** 179:14
**conducted** 85:23 130:25
**conference** 42:20 43:11
**confirm** 85:7 134:11 139:13 146:1 176:11
**confirmation** 41:2 75:3 81:20 129:14
**confirming** 78:25
**confusing** 93:3
**confusion** 84:21
**connection** 44:2 63:1 84:25 130:18 130:24 132:21 134:8,17 139:19 140:22
**consenting** 74:22
**consist** 77:14
**consistent** 46:13 134:13
**consumer** 4:16 118:13 123:19 126:14 128:14,19 136:12 144:23 147:9,13 152:6 154:4 155:2,9 170:10,23 171:7 171:13,24 186:14 186:14 187:15,15
**consumer's** 135:25
**consumer.relatio...** 125:23 137:4 138:7,16
**consumerlawfir...** 2:9
**contact** 45:9 57:8 60:3 85:20 93:16 94:21 95:13 120:1 120:4 124:6 156:21 168:20,21 180:18,18,19 199:4
**contacted** 40:4 45:5 58:1 60:6,13 89:21 94:6 95:1 96:1,9,11,13 101:19 112:2,6 113:7,8,11 117:19 117:23 118:19 121:22 128:3,9 136:4 157:4 171:17 199:2 200:19
**contacting** 126:11 201:7
**contacts** 134:16
**contained** 205:12
**content** 139:14
**contentions** 57:20
**contentious** 159:18
**contents** 140:24
**contest** 10:4
**continue** 82:15
**contractor** 150:1
**conversation** 26:24,25 27:7,9,17 27:20,24 28:2 60:19 93:8 96:8 96:10,12 99:19,21 115:18 120:21 135:4 168:4,14 200:23 201:5
**conversations** 23:16 28:9 78:8 96:17 98:11 115:16 116:25 117:16 120:17,20 123:12 132:16 160:10
**copies** 47:9
**copy** 4:3 59:8 83:19 102:3,20 109:13 111:9 120:12 121:23 130:5 146:9 147:15,20 148:16 148:17 152:5 154:3 155:9 174:9 174:11 185:20
**cordial** 159:2
**corner** 101:12
**corporation** 18:12 19:4 20:1
**correct** 13:18 17:25 37:16,17 43:11 52:6 56:6,7 56:9 59:15 65:8 70:6 74:1 75:6,10 75:13,25 76:6 78:17 79:13,14 83:11 86:3 96:14 98:8,12 102:21 103:15,24 104:10 123:15 124:3 128:4,5,9 138:12 138:24 139:20 141:6,7,11,12 152:2 155:2 157:13 162:6,17 162:18,20,21 165:23 166:1 167:25 168:1,2 170:9,22 172:2 173:2 176:23 177:11,12 182:13 189:15,16 191:24 192:10 195:21 197:5 200:2 202:24 205:13 206:17
**corrected** 128:7 176:22 181:22 193:20 205:13
**correction** 128:7
**corrections** 124:5 205:11
**correctly** 69:5
**correspondence** 41:4 130:6 139:18 142:3 146:4 153:25
**counsel** 2:23 7:6,9 7:11 9:1 204:1,10 207:2
**counter** 193:2
**county** 147:24 206:4
**couple** 128:19 146:1 157:5 166:14 171:3 185:24 196:8,9,16 196:25
**course** 30:12 31:6 67:18 136:16

149:16 201:24
**courses** 30:24
**court** 1:1 3:13 7:15 8:6,12 11:12 17:25 43:4,14 56:24 59:18,20 98:23 100:14 149:23 178:20 179:14 181:4 185:11
**courthouse** 42:19
**cover** 98:17 152:5
**covers** 202:11
**cowl** 150:7
**created** 129:22 134:22
**creation** 142:9
**credit** 4:10 18:12 19:3 46:7,9,10 48:20 49:6,11 100:3,18 101:2,25 102:8 103:10,12 146:9 147:12 152:21 154:14,16 154:17,20 155:19 155:25 198:7
**crime** 55:16
**crimes** 60:23 65:2 145:14 194:2 198:13
**criminal** 22:25 38:16 40:18 45:25 46:3 53:12,23 55:10,12 56:5 57:23 58:21 59:6 63:14 64:10 66:15 68:8,15,18 69:7 90:3,8 93:11,12 96:22,23 97:4,24 97:25 100:4,6 102:1 104:13,16 119:18 127:12 129:19 130:3 148:3,21,22 164:4 177:10 178:6,19 179:9,13,15,24 180:2,5,16 182:21 183:15 188:3 189:9,10,18,23 190:1,23,23,24,25 192:9,17 194:1 197:3,4 198:7,9,11 198:20 203:11
**criteria** 38:20,22 54:18 55:13 63:22 77:7 90:16 100:3 119:14 198:4,8
**current** 11:21 22:17 80:18 82:18 103:20 104:8 173:11 185:22
**currently** 22:9 46:21 162:19 198:24
**custody** 3:12
**customer** 119:1
**customers** 135:6
**cut** 72:4 144:25
**cuyahoga** 30:14 147:23 148:23 206:4
**cv** 1:9

**d**

**d** 1:5,12,17 3:7 4:4 4:6,8,10,12,15,18 4:19 5:6,7 7:17,22 83:21 88:19 90:24 91:4,12 99:3 100:19 108:5 110:6 125:4,5 164:16 173:24 205:8,22 206:9
**dallas** 196:5
**damage** 195:4,5
**damages** 63:2 67:6
**danger** 183:16
**daniel** 25:20
**date** 7:2 34:9,24 56:19 57:4,4,21 58:8,10 63:22 87:5 89:11 95:6 101:11,18 103:6,8 106:24 107:1 112:12 118:2,7 119:15 121:22 141:18,23 142:9 150:24 156:20,20 179:6 180:3 190:16 194:21 204:11
**dated** 5:1 85:4 87:8 109:1 122:10 126:5 128:15 138:8,17 144:6 146:18 154:2,7 156:17
**daughter** 14:21 15:4,5,17 16:9,11 16:23 30:11 35:6 35:20 37:23 38:3 163:22 164:7 172:23 173:4,9
**day** 41:5 120:18 121:8,22 122:2 123:1,3,5,9,15 128:2 129:9 150:15 155:20 176:23 181:9,21 182:17 205:14 207:7
**days** 95:6 128:19 146:1 199:14 200:15
**deal** 161:16
**dear** 126:11
**debate** 158:19,22
**december** 26:22 27:5,10,11,12,17 27:21 107:3
**decide** 124:20 160:20
**decided** 44:10 45:1 160:14
**decision** 90:10,21 99:13 124:16 127:1 141:22,23 142:11,19,23 143:18 145:2
**declare** 165:21 205:8
**deem** 198:15
**defendant** 1:14 2:11 11:7,8 18:4 186:9 188:14,16
**defendant's** 5:5,7 5:11 164:14 171:6 173:25 175:13 184:2,23
**degree** 30:16
**delinquencies** 46:10
**delivery** 204:9,11
**demeanor** 114:25
**denial** 4:6 75:24 78:16 83:8 84:22 86:2 88:19 89:4,5 90:11 92:11 95:4 108:21 109:4,18 112:17,18 123:4,7 141:9 163:19
**denied** 38:18 40:17,19 42:10 52:16,20 60:22 75:22 76:25 90:2

114:5 130:2 144:23
**denise** 11:16 61:2
**deny** 90:2
**denying** 45:6
**department** 22:5 60:3,4,13 61:10,14 61:15,23,24 93:17 93:18,23 94:1 97:10 116:17,20 116:23 117:5 119:2 128:19
**departments** 62:2 62:3 94:6 96:9,11 117:1,19 123:13
**deposed** 7:20 10:16
**deposition** 1:16 7:4 8:25 10:2 11:10 17:23 23:15 23:23 24:12 26:19 27:14 83:18 88:18 99:2 100:17 108:3 110:3 118:12 125:3 133:19 140:7 146:17 153:11 164:12 173:23 184:20 203:25 205:10 206:20
**derogatory** 148:2
**describe** 68:20 70:8 166:17 167:3 172:15 200:11
**described** 23:5 45:25 46:17 67:12 98:10 120:17 159:19
**describing** 69:5 125:10 167:10 197:12
**description** 4:2
**deserves** 191:2
**desire** 161:22
**despite** 68:7
**detail** 62:12 92:20 102:20
**detailed** 136:11
**determination** 127:24
**determine** 179:22
**determined** 127:11,18 132:7 137:24
**diane** 1:5,17 3:7 4:4,6,8,10,12,15 4:18,19 5:6,7 7:3 7:17,22 11:16 53:2 61:2 83:21 88:19 90:24 91:4 91:12 98:21 99:3 100:19 105:15,21 106:2,8 108:4 110:6 125:4,5,20 164:15 173:24 179:23,23 180:3 180:11,16,23 205:8,22 206:9
**difference** 65:23
**different** 13:13 53:5,20 66:7 115:3 124:13 147:13
**directly** 30:6 136:4 180:19
**disability** 36:21 77:22 82:19,23 83:4
**disarray** 193:16
**disclose** 34:2
**disclosures** 49:4 147:11
**discovery** 182:20
**discussions** 81:19
**disheartening** 182:10
**dismissed** 20:9,11 21:12,15
**disposition** 96:25
**dispute** 4:16,18 118:13 120:7 122:2,21,25 123:11 124:1 125:4,20 126:17 128:4 131:20 133:2,5 134:17 136:1,7,13 139:20 141:9 144:24,25 145:7,19 146:5 176:22 181:9 189:21 194:8
**disputed** 126:18 126:22 127:12 128:6
**disputing** 102:11 123:19
**disqualified** 189:6
**disqualifying** 198:16
**disregarded** 106:15,17
**distress** 66:12 67:12 68:1 69:11 192:8,12,14,20,23 194:6
**distressing** 69:4,6 69:8,16 197:13
**district** 1:1,2
**docket** 20:12 21:13 56:24 147:24
**doctor** 66:24
**doctors** 158:1
**document** 4:21,23 75:1 84:3,6,10 85:12 86:7,13 89:2 91:13 92:5 93:1 98:15 99:10 99:14 100:1 101:1 101:3,7,11,21 104:12 107:2,24 108:20,24 109:2 109:11 110:13 111:13 122:7,9,9 122:20 125:15,17 128:10,12 131:7 131:22 133:20 134:5,6,11,15,19 134:20 137:1 140:4,8,20,21 141:21 143:17 144:20 146:13 147:1,7,18 148:13 148:14 152:4 153:7,18,20,21 155:1 164:10,23 165:12,16 170:1,4 171:23 172:4 174:15 175:23 176:24 185:7,9,15 186:2,5,21 194:1 203:5
**documentation** 77:17 95:14 110:25 122:1 132:5 156:24
**documents** 24:4,7 59:14,18,20,25 74:18 77:24 79:7 92:22 96:25 100:11 101:23 107:16,19 163:10 176:20 191:14,21

195:10 202:23 203:9
**doing** 9:2 15:21 30:10 33:19 40:6 71:9,23 132:24 143:8 158:7 177:14 181:8 189:3 194:16
**dooley** 25:24
**double** 165:16 166:24
**downtown** 42:18
**drama** 161:16
**driver's** 56:19,21 57:21 58:11 64:7 64:9,24 77:18 111:10 177:18 178:3 179:7
**drug** 38:17 58:24 150:18 189:22 195:16,19,20
**drugs** 38:24 52:25 68:19 192:17
**duly** 7:19 206:7,10
**duration** 79:22 80:9
**dying** 66:20

**e**

**e** 143:2
**earlier** 73:7 136:18 149:11 157:3 167:23 192:7 201:18
**early** 31:17
**easier** 71:13
**easy** 56:22
**economic** 129:23
**edge** 19:6,19
**education** 30:5
**educational** 31:3
**edward** 25:22
**effect** 124:14
**effects** 197:16
**efforts** 162:7
**eight** 38:21
**either** 10:12 17:2 21:25 26:4,20 85:19 93:16 160:16 163:13 181:8 190:18 207:2
**elapsed** 113:1
**electrical** 150:8
**elevated** 96:13
**eligibility** 85:22
**email** 5:3,9 27:1,2 27:10,13,18,21 28:4 41:1 59:10 96:6 120:6,14 121:23 122:13,16 122:18 124:2 125:25 126:2 127:8 128:12,18 128:24 129:3,22 136:13,18 137:3,8 137:10,12,14,14 137:21 138:6,9,10 138:11,15,21,23 145:25 153:12 154:1,2,5,11,15,24 154:25,25 155:5,8 155:14 156:16 157:2 184:21
**emailed** 118:22
**emails** 139:13
**emergency** 192:24
**emotional** 66:12
**employed** 31:23 35:15
**employees** 134:23
**employer** 32:22
**employment** 33:16 100:4
**employs** 186:9
**enclose** 132:19
**enclosed** 89:16 91:24 111:9 152:5
**enclosure** 90:15
**encountered** 130:17,22
**encourage** 127:4
**ended** 32:5 34:12 35:6 65:18
**endurance** 10:3
**engaged** 16:16
**english** 30:22 186:23
**ensure** 50:19 98:7
**entered** 20:13 21:14
**entire** 147:6,7
**entirety** 93:7 109:7
**entitled** 67:24
**entries** 171:3
**entry** 136:10
**envelope** 4:3 83:19 84:17 86:14
**epidemic** 66:20
**equally** 69:15
**equifax** 103:11 147:14
**error** 133:1 177:25
**errors** 129:22
**esq** 2:5,13,22
**essentially** 46:3 148:17 160:13 177:1 181:10
**euclid** 11:23 12:3 12:7 14:24 46:21
47:14 173:11
**evaluate** 198:5
**event** 207:3
**eviction** 20:21 21:8 22:12,14
**exact** 138:23 141:17 152:23 183:12 187:7
**exactly** 27:6 51:13 54:6 59:9 63:20 64:3 77:8 80:13 88:5 105:18 106:11,14 119:23 124:4 143:10 182:3 203:6
**examination** 3:7 7:18,22
**exchange** 27:10 138:10,10
**excluding** 65:6
**excuse** 12:19 28:24 145:3 148:13 166:23
**executed** 205:14
**exhausted** 132:23
**exhibit** 3:12 4:3,6 4:8,10,12,14,16,18 4:21,23 5:1,3,4,7,9 83:16,18 84:1 85:3 88:15,16,18 88:24 92:12 93:2 93:7 95:3 96:20 98:16,22 99:2,7 100:13,17,24 102:17 108:1,3,15 108:17 109:3,5,17 109:22 110:1,3,10 110:19 111:14 118:4,9,12 120:14 122:6 124:24 125:1,3,11 131:18

132:19,20 133:17 133:19 134:1 139:3,8,9,10,11,12 140:4,7,15,16 146:15,17,23 153:9,11,17 154:8 155:13,15 164:12 164:20 173:21,23 174:5,10,12 183:21 184:17,20 185:2
**exhibits** 3:5,13 4:1
**existed** 77:5
**existence** 190:1
**expect** 140:20
**expectation** 175:20
**expected** 175:15
**expense** 37:19
**expenses** 175:6
**experian** 147:14 154:13 156:14
**experience** 67:12 178:12
**expires** 207:15
**explain** 119:16
**explanation** 70:10 119:17
**explore** 76:14
**extent** 184:9
**eyes** 104:21

**f**

**face** 86:4,4
**facial** 128:14
**facialcleanse13** 122:14 125:24 138:8,17
**fact** 40:16 75:7 97:22 98:3 114:24 116:2 151:25 181:15 197:24
201:2
**factors** 127:2
**fair** 9:23 12:11 17:2 20:20 23:10 46:11,13 48:19 49:6 65:13 67:20 78:13 86:8 98:3 109:9 129:16 147:12 177:3,6 181:22
**fall** 19:12 73:20 74:10
**fallen** 21:6
**false** 42:10 49:23 52:16,19 55:10 191:17
**familiar** 18:12 46:5 140:21 185:8 185:14
**family** 69:17,21 130:7,8,14 163:18
**far** 16:18 23:7 73:17 142:9 160:4
**farm** 31:21,23 32:7,22
**farmers** 32:6 33:2
**fault** 26:14 67:7
**fax** 4:14 110:4,16 111:14 112:11 113:4,12 114:11 114:14 132:18,21 169:19
**faxed** 111:17 112:11,23 113:15 113:17 169:22
**feel** 39:25 53:6,11 56:8 66:4 67:4,13 68:3 162:3
**feels** 68:20 182:10
**fell** 20:9
**felt** 71:6 115:5 129:8 132:24 159:22,23 160:3,4 160:14,22,23 161:19 163:24
**female** 104:20
**fender** 149:1 150:7
**fight** 158:17
**figure** 68:2 81:2 92:1,5
**file** 40:12 60:10 97:4 126:14 127:20,24 128:21 129:12 132:9 138:2 147:10,21 148:16,17,22 150:19,23 151:11 152:6,8,12 154:4 155:9 156:25 171:12,24 178:24 178:25 186:14 187:15 202:24
**filed** 19:3,25 20:3 21:21,23 22:1,4,25 23:3 40:3,7,12 41:2 59:19 144:24 157:17 171:15 185:22 201:20
**files** 147:13
**filings** 23:2
**filled** 77:16 111:5
**final** 85:21 96:25 142:19 145:1
**finally** 46:19 96:3
**financed** 19:11
**financial** 171:7,13
**find** 9:17 39:20 44:16 45:9 74:8 105:24 162:8 179:11,12 191:23
192:21
**finding** 193:11
**findings** 126:24 127:3
**fine** 18:20 137:18 149:25 168:11
**finish** 94:2
**firm** 39:19
**first** 5:5,8,11 7:19 21:21 41:22 42:22 45:11 48:22,24 70:23 71:25 83:9 85:10 86:13 92:25 93:2,6 95:1 98:18 102:13 105:24 106:20 109:14 117:23 121:21 122:11 141:2 147:17 152:4 154:2,24,25 160:1 164:14 173:25 184:23 185:10,11 186:12 199:10 206:10
**five** 47:24 48:5 58:16,19 62:13 196:14 202:8
**fixed** 150:2
**flip** 138:4
**fly** 93:19
**fncl** 18:11 19:3
**focus** 36:6
**focused** 72:1,2,12 72:14
**focussed** 71:22
**focussing** 39:23
**follow** 40:2 41:8 101:22 115:15 124:15 132:16 161:12

**followed** 117:20
**following** 90:11 159:8
**follows** 7:21
**forced** 175:12
**foregoing** 165:22 165:25 205:9 206:16,21
**foreign** 119:10 121:2
**forgot** 169:1
**forgotten** 168:7,18
**form** 4:16 9:8 36:21 56:16 79:25 95:16 118:13 177:5,21 178:9 179:18 180:8 181:12 193:22 195:12 196:11 201:12
**formed** 160:9
**forms** 78:9,11
**formula** 176:4
**fortunately** 55:21
**forward** 93:5 167:16
**forwarded** 86:21 87:2,9 130:6 142:6 144:16
**found** 71:10 94:23 123:4 157:15,21 158:8 162:22
**foundation** 182:2 183:2,18 187:2,23 191:19 203:1
**four** 15:20 32:14 102:25
**francis** 2:4 25:3,8 25:10,12 39:19 40:4,9 130:15 157:16,21 158:8
**free** 152:20
**frequency** 187:20 188:10
**frequently** 186:12 187:14
**fresh** 69:23
**friends** 163:18
**front** 83:25 88:23 90:7 99:8 100:23 102:7 108:16 109:5 110:10 115:1 122:6 125:12 134:2 140:14,18 142:8 146:24 148:7 153:16,18 164:20 174:5 181:8 185:3
**ftc** 40:2,8,12,25 41:9 44:16 157:17 157:21 158:7 171:10
**full** 11:15 74:4 103:3,8 126:16
**funding** 22:2
**furious** 194:18 195:6
**further** 79:17 86:9 106:18 111:18 114:23 115:16,18 156:19 157:7,11 167:19 168:4 169:11,16 203:15 206:19 207:1
**fuzzy** 168:20

**g**

**gap** 32:17
**gaps** 23:8
**gather** 51:24
**gears** 23:14 38:7 117:12
**general** 30:23 33:15
**generally** 30:10 32:2 36:2
**generated** 151:8 170:10,23 201:25
**gentleman** 42:17 119:9
**george** 2:13 3:8 7:8,9,23 26:9 58:16,19 62:19 80:1,5 83:15 107:25 109:25 124:25 133:6 146:14 153:8 164:9 184:18 196:17 203:14,18 204:12
**georgia** 36:9 39:2 56:5 64:11,14,16 70:6,15 71:18,18 71:22,24 72:1,2,10 72:11,13 123:21 150:18 151:18,25 152:11 153:4 158:24 161:22,24 162:3,8,23 163:7 178:21 179:2 180:2 203:11
**gestures** 8:18
**getting** 57:15 66:6 72:5 136:22 201:1
**girl** 72:6
**give** 8:16 11:14 32:1 33:15 56:24 57:14 70:10 120:6 183:12 204:1,10
**given** 56:18 173:17 206:13,18
**gives** 178:13
**gmail.com** 122:14 138:8,17
**gmail.com.** 125:24
**go** 9:4,11 10:7 44:12 55:22 56:16 56:23 57:11 58:7 58:9 59:25 62:12 64:3 74:19 79:25 80:4 88:3,12 93:8 93:17,17 95:15 96:5 102:16 103:6 104:11 119:15 126:15 133:7 140:2 149:22 150:14 165:15 166:8 167:15 169:4 170:2,3,17 175:23 176:16 177:5,21 178:23 179:18 180:8 181:12 182:2 183:2,10 187:2,23 190:17 191:19 192:24 193:23 194:21 195:12 196:11,17 201:5 201:12 202:14 203:1
**goal** 9:18
**god** 63:17
**going** 57:2 58:13 60:8 71:17 82:11 93:15 108:8 113:21 115:13 117:15 121:11 124:3,5 132:12 158:5,6,16 161:20 179:11,12 183:20 184:16 186:19 193:14 195:20

**good** 7:24 8:1 58:14 69:21 81:17 119:17 159:11
**gotten** 62:8 79:20 80:6,8 81:20 112:16 113:9 123:7 182:25
**graduate** 29:19,21
**granddaughter** 14:22 15:6 37:25 38:1 39:23 69:18 172:23
**group** 21:3
**growling** 108:12
**guess** 48:6 50:1,13 51:5 54:13 68:5 68:23 71:20 86:6 106:6 157:6 179:10 184:13 194:5
**guys** 120:5 155:18 189:1 202:16

**h**

**h** 143:2,5
**hair** 104:20
**half** 201:14
**hall** 150:16
**hand** 8:18 98:23 100:14 101:12 133:16 142:9 174:7,13 184:16 207:6
**handed** 174:11
**handful** 183:7
**hands** 100:12
**happen** 63:1 75:4 121:7
**happened** 34:11 35:11 55:6 79:19 113:18 123:9,14 143:24 154:12 161:14
**happening** 182:18
**harmed** 41:17 44:18,25 55:3,8,18 68:11
**haxall** 2:14
**head** 8:17,21
**headache** 193:3
**heads** 56:1
**health** 21:7,19 31:18 33:25 34:4 34:4 35:11
**hear** 35:25 40:24 41:22 48:22,25 74:10,12 79:16 87:18,19 111:18 111:23 112:1 113:19 123:25 131:23 161:13
**heard** 25:7,8,15,18 39:25 41:11 44:4 45:2,12 48:19,23 51:17,18 75:12,19 75:23 111:22 113:5 114:9 158:4 167:19 184:13
**hearing** 96:24 110:17
**heights** 14:21,23 14:25 15:8 16:14 16:19 17:5,6,10 18:15,16,17,24 29:1,12 70:25 73:9,24 75:8 86:15 103:22 104:9 141:5,24 142:3 144:14 148:9 149:22 173:1,9
**heinous** 63:14
**held** 187:5
**help** 35:8 40:5 98:7
**helpful** 119:13
**helping** 51:25
**henschel** 2:21
**hereinafter** 7:20
**hereto** 205:12
**hereunto** 207:5
**heronime** 134:24
**hey** 80:16 180:20
**high** 29:19,23,25 30:3
**highlighting** 174:11
**highway** 150:12
**hipaa** 34:1
**history** 23:6 46:3 64:18 65:6 90:9 93:12 97:24 100:4 103:17 135:17,19 135:20,22 172:21 183:15 189:10,19 189:23 192:10 198:20
**hit** 66:19
**hold** 115:20,23 116:1
**holidays** 199:6
**home** 14:21 35:10 66:19 67:1
**homeless** 55:24 182:7 188:1
**honest** 132:23 158:25
**hospital** 34:12 35:13
**hour** 58:14 108:9 136:17
**hours** 10:3 24:21 24:22 128:8 193:19 194:7 195:3
**house** 2:23 7:11 15:11,12,19 18:20 18:21 28:25 149:19 172:25 173:7,8
**household** 20:1
**housing** 23:5,9,11 139:24 148:25 149:11,18 166:21 167:7 172:16,21 175:8 198:5
**huh** 31:13 37:14 74:5 81:7
**hurried** 159:22
**hurriedness** 115:2
**hurtful** 67:2
**hypothetical** 80:4

**i**

**ibuprofen** 193:8
**idea** 43:18 198:23
**identical** 139:14
**identification** 83:23 88:21 99:5 100:21 108:6 110:8 118:16 125:7 133:24 140:12 146:21 153:14 164:17 174:2 184:25
**identified** 18:3 22:11 104:13 183:14 190:24 191:1 192:9 197:17 198:19 199:25
**identifiers** 186:11
**identify** 7:6
**identifying** 103:18

**imagine** 25:9 106:2
**immediate** 193:11
**immediately** 13:11 36:14 60:10 79:21 138:5 150:2 163:21 193:6
**impaired** 10:11
**implicated** 202:4
**implicates** 201:24
**important** 8:15 105:7 195:18
**impression** 159:20 160:6,7
**inaccuracy** 190:7
**inaccurate** 52:22 52:23 126:22 170:9,22 171:7 175:6,13 181:25 189:6
**inbox** 138:23
**incarcerated** 38:24 40:19 53:1 59:22 195:16
**incident** 147:16 151:4 201:4
**include** 186:10
**included** 42:7 52:10 172:22 175:7
**includes** 90:9 190:22
**income** 36:25 37:3 77:4,20,21 82:19 82:23 83:4 100:3 175:23 176:1,3
**incomplete** 80:3 100:5 126:22
**incur** 175:5
**incurring** 162:24
**index** 3:1,5 4:1 6:1
**indicate** 201:9
**indicates** 201:15
**individual** 55:5
**industry** 31:7 32:20,24 33:18
**ineligible** 55:17,19
**inform** 95:15
**informal** 110:17
**information** 23:25 45:9,20 49:12 50:8,8,19,20,25 51:1,15,24 52:17 52:19 56:4,21,25 57:7,10,11,16 59:2 61:1,8 64:8,25 74:17 84:14 87:14 91:20 92:13 94:21 95:14 102:3,24 103:18 104:19 106:5 120:7,9,11 121:15 126:14,19 126:22 128:4,6 129:1,10 130:3 131:8 132:12 145:13 146:7 147:10 148:2,21 148:22 151:6,9,23 152:7,23 153:4 156:25 170:10,22 171:20,21 175:7 176:22 177:2 178:13,17 180:20 180:21,22 182:5 182:19 186:13 187:14
**informed** 47:10,12 78:18,22 95:25 114:17 143:23 167:19 203:10
**informing** 136:12
**initial** 62:7 119:12 194:19
**initialed** 205:11
**initially** 87:16,19 135:8 193:24 201:2
**initiate** 122:2 123:11
**initiated** 123:1
**ink** 205:11
**inquire** 168:20
**inquiries** 147:11
**inspector** 150:3
**instance** 64:11 166:8 177:17 178:18 198:12
**instances** 182:23
**instruction** 204:2 204:10
**instructs** 9:5
**insurance** 31:4,7,9 31:11,12,21,25 32:6,8,20,23 33:2 33:18,20 34:17
**intending** 80:24
**intention** 80:7
**interactions** 26:3 44:1
**interest** 20:23 177:8
**interested** 71:16 158:13 159:12 163:4,6,8,17 199:20 207:3
**interim** 75:8 76:2
**internal** 4:21,23 133:20 134:9 140:8 141:21
**internet** 40:6 71:23 72:15 118:24 162:16 182:23 188:7
**interrogatories** 5:5 164:15 165:1
**interrogatory** 166:10,11,16 167:3 170:2,6,17 172:13,15
**interrupt** 71:21
**interstate** 191:10
**interview** 85:21,21 86:1,7
**introduced** 118:10
**investigate** 53:7 56:11 170:9,21
**investigated** 126:17
**investigation** 126:19,20,24 127:17 133:3 137:24
**investment** 19:6 19:19
**involved** 10:22 38:17,23,24
**issue** 126:12
**issues** 21:7,19 34:1 34:4,4 47:5 103:24

**j**

**j** 2:13
**jail** 68:17
**james** 42:15
**january** 1:18 7:2 12:11,12 107:3 199:5 207:7
**jim** 25:8
**job** 1:24 9:2 64:1 182:8
**john** 25:3,5 39:15 135:22 136:11

**jones** 1:5,17 3:7 4:4,6,8,11,12,15 4:17,19,19,22,25 5:2,3,6 7:3,17,22 7:25 8:4 10:16 11:15,16,17 15:5 21:3 53:2 61:3 62:21 83:21,25 85:12 88:20,23 90:24 91:1,4,12 98:17,21 99:4,7 100:19,23 105:4 105:15,21,23,23 106:2,2,2,8 108:5 108:14 110:6,11 118:14 125:4,6,11 125:21 126:11 133:12,22 134:1 135:16 140:10,14 140:16 146:20,23 148:14 153:13,16 153:18 164:16,19 170:4 174:4 179:23,24 180:3 180:11,16,23 185:2 191:9 196:16,24 197:1 203:19 205:8,22 206:9
**jones's** 5:7 173:24
**jotted** 119:8
**judge** 43:6,8 65:12 68:6
**judgment** 20:13 21:14
**july** 207:15
**jumped** 80:15,20
**june** 4:3 79:8,12 83:19 85:4,8,15 86:18 87:8 157:24 161:3 168:19,22
**jurisdiction** 43:21
**jurisdictions** 179:14

**k**

**kd** 21:2
**keep** 39:10 177:10 183:9 193:15
**keeping** 139:18
**kept** 66:25,25 96:2
**killed** 35:21
**kind** 17:1 34:13 35:21,23 53:10 57:13 66:18 68:25 68:25 70:9 71:4 93:3 101:14 115:9 158:25 160:3 182:9
**klauss** 1:22 206:6 207:12
**knew** 154:18 164:1
**know** 9:14 10:1 13:4 15:16 18:3 18:19 19:16 20:14 20:14 21:10,22,25 22:8 23:16 26:25 27:4,25 32:19 34:1,3 35:1,8 36:7 36:12,15 37:9 39:24 41:24 42:3 42:8,9,12,12,16 43:3,6,13,23 44:22 49:10,14 50:5,15 51:6,11,12,14 52:2 52:12 54:1,6,7,9 54:15,17,19 57:2,2 57:8,9,13,14 59:5 60:8 63:12,16,20 64:1,6,17 66:16 68:18,21 69:1,24 71:1,3 73:1,21 74:18 77:4,7 79:11 80:13,13,19 81:13,16 82:7 87:12,13,25 88:4 88:13 90:4 91:17 94:17 105:22 106:16 107:4,6,9 107:10 108:8 112:15 115:5 116:10 117:6 119:7,16 120:8,10 123:7 126:10 130:12 131:4,7 132:17 135:7 137:16,19 141:17 143:4,7,10,12,14 143:15,24 149:22 150:10,12 156:10 159:1,7 160:3,4 165:3 178:18,21 178:22,23 179:2 179:18 182:2,3,4 183:13,19 184:8 189:23 193:16 194:7,17,20,24,25 196:1 197:6 198:12,18,22 200:13 202:6,9 203:3
**knowledge** 25:12 131:12,15,17 184:1,10,13 187:20 197:8 198:4
**knows** 163:24
**kroub** 25:22
**kurt** 2:21
**kw** 2:5

**l**

**l** 1:22 206:6 207:12
**label** 4:4,6,8,10,12 4:15,17,19,22,24 5:2 83:21 88:19 91:10 99:3 100:19 108:4 110:6 118:14 125:5 133:22 140:10 146:19
**lack** 182:1 183:1 183:17 187:1,22 191:18
**lady** 50:23 59:11 180:22 194:2
**lady's** 53:3 57:5
**lake** 11:22 13:12 13:16 16:14,18,20 16:21 39:8,9,10,11 46:17,20 70:11,17 73:12,25 75:9,15 75:16 79:23 80:10 81:4,9 86:21 87:3 87:10 141:10 173:10
**landlord** 80:18 81:18
**lapse** 55:25
**largest** 37:18
**lasted** 28:7,19
**lasting** 196:9
**late** 89:9 115:16 169:9,14 191:9
**lauren** 2:5 7:13 24:15 39:15 203:16
**law** 34:1 51:8,11 51:13
**lawful** 7:17

**laws** 49:15 50:3,15
**lawsuit** 18:5,6,24 19:3,7,25 20:3,7 21:2,5,20,23 22:1 22:4,8 38:10 41:12 42:3 49:14 55:1 134:8 185:21 201:23
**lawyers** 163:16
**lbrennan** 2:9
**leaf** 89:1
**learned** 83:10 192:8
**lease** 12:18,19,20 13:24 14:1 15:15 73:6 74:1 75:16 79:22 80:10 81:9 81:14,23 82:10,16 162:20 199:17
**leasing** 135:24
**leasingdesk** 1:12 38:14 45:3,7,10,15 54:15,23 90:6 94:22 95:1,21 96:1 126:3,16,21 126:23 127:11 128:3,9 137:21 138:24 152:7 154:4,7 155:9 156:6
**leasingdesk.com** 125:23 137:4 138:7,16
**leave** 68:6 159:16
**led** 72:15
**left** 32:14,18,24 101:12 136:11
**legal** 53:24
**legitimate** 189:8
**letter** 4:3,12 5:1 45:6 66:13 74:13 75:21,24 78:16,24 78:25 83:9,13,20 84:14,16,19,22,24 85:4,10 86:2 87:8 89:16,17,18,20 90:8,15 91:13,24 92:11 95:4,4,7 96:20 108:4,21 109:4,7,8,15,18 112:17,18 123:7 124:8,9 132:6,10 132:20 141:10 142:17 144:6,10 144:12,13 146:18 147:8,18 148:5 150:24 151:22 152:5 154:7 159:21 161:21 163:22 193:24 200:21
**letters** 144:4
**level** 177:15
**liar** 168:9
**license** 31:17 56:19,21 57:22 58:11 64:7,10,24 77:19 111:10 177:19 178:3 179:7
**licensed** 31:6,9,14
**life** 31:18 66:17 192:15 194:16 197:23
**lifestyle** 197:14,20
**light** 149:1
**lights** 150:7,9,13
**limited** 151:14
**line** 7:10 64:18 94:15,16 113:25 130:5
**list** 46:10 78:19 79:2,5,16 84:18 85:13,16,20 86:11 87:14,24 165:4 167:10 198:25
**listed** 59:23 141:24
**litigation** 63:4 107:21 125:16
**little** 9:6 38:7 57:19 62:12 64:22 64:23 70:2 71:13 82:20 84:21 113:1 149:14 154:21 166:25 168:19
**live** 15:3,7 17:9 65:3 87:10 97:23 98:4 160:15,16,17 160:22 182:12 191:2
**lived** 13:12,15 14:20 15:22 17:6 17:11 47:23,23 64:14,16,19 66:17 68:22 123:21 194:15
**living** 11:19 12:6 13:10 14:19 16:24 17:5 20:18 39:8 46:21 86:17 148:9 159:12 173:17 177:9 199:20
**locate** 178:6
**located** 30:1
**location** 17:5 29:12 73:11
**locked** 68:19
**lodging** 141:9
**logging** 141:22
**long** 12:2,6 15:7 17:9 24:19 26:23 27:24 28:7,18 30:19 32:12 33:3 33:12,18,21 87:13 88:13,14 114:10 121:10,12 130:9,9 200:23
**longer** 148:3 152:11
**look** 9:9 44:16 64:17 83:13 86:12 88:15 90:7,13,22 91:8 96:19,19 101:10 109:3 122:5 123:17 124:23 128:11 135:15 136:25 138:4,14 140:3 141:1 142:18 144:3,19 146:12 148:12,20 149:9 152:4 164:9 165:11 166:7 167:14 169:3 171:3 172:12 175:2 176:8 180:21 183:20,21 183:25 185:6 186:6 188:12 196:14
**looked** 23:22 24:3 76:17 109:4,18 115:20 118:4 132:18 136:17 138:22 145:25 154:6 155:13 157:2 163:11 191:14
**looking** 24:8 54:14 71:10 72:13 85:11 91:19 92:7 95:3 102:6 111:13

129:6,13 139:12 142:9 147:17 148:7 155:7 156:16 158:23 162:10,12 163:4 171:23 183:9 188:13 190:9 195:14
**looks** 86:20 102:19 103:10 108:21 111:8 122:20 135:11 139:17 141:20 144:24 148:7,23
**loop** 199:24
**losantas** 135:5
**losing** 69:22 181:16
**lost** 39:22 66:15 69:17 71:4 182:8 191:9
**lot** 35:13 55:6 63:23 64:8,25 69:1 158:14,16 181:23 187:25 189:3,5 190:14 198:8
**love** 71:7
**lower** 14:12 71:14
**lunch** 108:8,10

**m**

**ma'am** 25:2
**mail** 74:25 95:16 111:3 169:22
**mailed** 78:4
**mailing** 78:10 142:2
**mailman** 2:4 25:3 25:10 39:19 40:4 40:9 130:15 157:16,22 158:9
**main** 63:8
**maintains** 154:4 155:10
**making** 80:6 181:19 187:10 190:22
**management** 20:4 20:17 45:21 55:14 180:19
**march** 27:3,8 28:3
**marco** 135:5,7
**marietta** 24:2,5 36:8 38:13 39:2 40:1 44:3,3 45:5 47:20 48:11,17 58:2 60:6 61:8,12 62:1 68:10 70:3,4 70:6,20 71:11,24 72:8,9,10,19 73:2 73:16 74:8 75:12 75:19 76:17 77:1 77:5 78:8,15 79:20 80:8,11,24 80:25 81:10 84:15 86:2,9 88:1 89:6 89:21 91:22,24 92:23 93:9 94:7 95:12 96:17 98:11 99:23 102:4 108:22 109:4,19 110:17 111:1,19 113:6,12,18 115:17 117:17 123:4,7,13 124:6 124:15 126:25 127:3,14 128:8 131:20,24 132:10 132:13,15,16,22 133:4 134:17 137:9,13,21 139:19,25 141:14 141:22 142:14 145:8,9 157:12 158:5,11,20 159:5 159:13 160:24 162:4 163:13,20 166:20 167:6,11 167:18,24 168:5 169:10,15 175:8 175:16 176:11,23 191:15 197:5 198:3,13,21,25 200:1,7 201:6,16 202:15 203:10
**mariettaroad** 137:5
**mark** 88:16 98:22 146:14 153:8
**marked** 4:2 83:16 83:22 84:1 88:20 88:24 98:21,22 99:4 100:13,20,24 108:1,5,17 110:1,7 118:15 125:1,6 133:17,23 140:4 140:11,15 146:20 153:13,17 164:16 164:20 174:1 184:24
**market** 2:6 13:7 14:7,8 76:9 163:6 163:9
**marketplace** 76:12
**married** 37:21
**martin** 2:22 7:11
**match** 50:22 105:17,24 123:20 187:7 189:15
**matches** 188:17 189:6
**matching** 177:18 190:16
**math** 15:21 30:22
**matter** 7:3 181:7
**matthew** 25:24
**mean** 8:17 16:23 18:14 21:16 36:18 41:20 43:22 48:2 49:2 53:15 55:8 63:2 64:14 65:14 66:2 69:21 71:1 71:21 72:3 73:16 106:1 129:25 132:18 137:14 152:15,19 159:1 161:19 177:15 178:15 179:22 186:23 194:6 202:5
**means** 53:16
**meant** 130:1
**medical** 10:12 192:22 196:1
**medications** 193:1 193:12
**meet** 24:11,14,16 24:20
**meeting** 24:10 42:18
**member** 54:10,24
**members** 42:13 69:17
**memorializes** 134:15
**memories** 69:20 69:21 71:8 162:14
**mention** 116:5,11 136:3
**mentioned** 9:10 14:15 17:22 27:18 29:12 31:22 37:12

37:23 38:3 39:14 39:18 45:2,25 56:2 58:22 65:9 66:10 68:1,2 79:1 79:11 88:14 93:10 96:7 106:24 114:8 117:18 118:18 123:6 124:8 134:25 136:13 149:11 157:15 171:10 184:6 197:12
**mentioning** 120:13
**mess** 80:1
**met** 23:21 25:10 26:18 42:22
**michael** 25:14
**mid** 115:15,15
**middle** 10:5 171:5
**midland** 22:2
**migraine** 193:3,5 193:10 197:12
**miles** 16:22
**million** 179:25 182:21 183:4,5,6 189:1
**mind** 69:15 115:9 153:2 158:14 160:21 161:7 181:5
**mine** 15:17 51:15 95:22
**minute** 36:5,7 62:13 109:6 117:16 196:18
**minutes** 24:22 28:1,8,20,20 58:17 58:19 196:14 200:25
**missed** 158:1 178:5 189:11
**misses** 190:1
**missing** 92:18
**mistake** 181:17,19 182:15
**misunderstanding** 154:22
**modification** 142:10
**mom** 71:4
**moment** 176:3
**money** 19:19 67:21
**moneys** 19:21
**monitoring** 154:16 154:17
**month** 12:22,22,23 12:23 13:4,21,21 27:6 37:12,16 71:2 73:4 80:13 81:1,5,11 82:4,11 82:21 83:5 112:16 113:1 157:20 161:1 162:20,20 163:1 175:14,16 175:21 176:6 182:17
**monthly** 12:24 14:4 16:5 17:16 37:5,18
**months** 75:4 157:25
**morning** 7:24 8:1 126:6 128:3
**mortgage** 35:1
**mouth** 159:16
**move** 14:11 16:13 18:21 32:9 38:8 69:24 70:9,14 75:7,14 80:20,25 87:3 88:1,5,8 92:9 93:5 117:15 124:20 153:3 161:22,24 162:2 162:23 198:14 199:13 200:13,15 201:8
**moved** 12:11,15 16:16 20:14,24 23:12 28:25 29:3 29:6,15 32:10 43:14,19 47:13 48:3 73:12 79:21 80:10,12,21 81:9 104:4 141:18 158:15 159:1 179:5
**moves** 190:3
**moving** 70:17 71:17 162:3
**multiple** 10:3
**music** 30:22

**n**

**name** 11:15,24 15:1,15 25:4 26:7 42:15 43:6 45:10 51:10,13 53:1,3,4 53:16,17,19,24 60:11 85:19 97:19 105:4,10,17 106:7 106:11,14 116:4,5 119:7,10 130:12 135:10,11,24 143:7,10,14,15 180:11,24 186:12 194:3
**named** 25:8,14,17 121:1 135:1,5 206:9
**names** 24:25 53:24 80:6 105:24 134:21
**nation** 179:25
**natural** 8:21
**nears** 85:19
**necessarily** 82:5
**need** 8:22 10:2 34:3 36:4 41:18 62:1,5 108:9 117:21 120:8,9 124:7,15 178:17 179:13 180:4,22 180:22,24
**needed** 61:19 71:6 116:14,16,19 117:6 140:2 196:5
**negative** 57:7
**nevada** 35:5
**never** 22:24 41:5 52:25 53:1 55:10 61:22 64:14,16 68:17 72:22 86:1 88:6,14 123:20 131:9 142:17 144:1,11 169:24 191:22 192:1,1
**new** 86:21,24 87:2 141:19 144:18 151:7 199:25
**nice** 160:2
**non** 123:20
**northern** 1:2
**notary** 94:2 206:6 207:12
**notations** 135:21
**note** 185:9
**noted** 205:11
**notes** 4:21,24 23:24 119:9 133:20 134:9,12 134:22 135:17 140:8 144:21

196:15
**notice** 4:6 88:19 89:4,5
**notification** 128:20 185:11
**notified** 126:18
**notify** 86:24
**november** 199:8 199:11 200:1
**nowadays** 56:23
**number** 4:2 56:18 56:19,22 57:22 58:12,12 59:23,24 60:24 64:5,7,10,24 64:24 97:20 103:4 103:19 104:7,23 118:23 166:10,11 166:16,24 167:3 170:2 175:3 177:18,19 178:3,4 178:13,19,25 179:7,7 180:4,6,12 181:1,3,4 183:12 183:22 185:5 186:11
**numbered** 186:1
**numbers** 54:22 90:23 174:10 190:11
**numerical** 166:13
**nursing** 67:1

**o**

**oath** 8:5 62:22 133:14 196:25
**object** 6:2
**objection** 6:1,3,4,5 6:6,7,8,9,10,11,12 6:13,14,15,16,17 6:18,19,20,21,22 6:23 9:1,3 44:12 56:15 79:24 97:25 177:4,20 178:8 179:17 180:7 181:11 182:1 183:1,17 186:20 187:1,22 191:18 193:22 195:11 196:10 201:11 202:25
**objections** 5:4 164:13 165:1 166:9
**objects** 9:8
**obligated** 74:3
**obligates** 8:9
**obtain** 49:24
**obtained** 31:16 33:1 51:1 57:6 131:8
**obtaining** 45:23
**occasions** 171:17
**occur** 120:18
**occurred** 187:21
**october** 5:9 28:13 111:25 112:12,23 113:5,7 114:12 115:15,16 142:11 142:16 143:19 144:6 145:3,4 157:13,23 159:19 161:6 167:25 169:9,15 184:21 199:13 200:1
**offended** 26:16
**offender** 53:23 56:5 58:23 66:9 69:11 117:7 189:22
**offenders** 105:7 178:20 179:24 195:19
**offense** 58:24 66:15 90:9 96:23 105:8 148:25 149:11 150:18,23
**offenses** 90:11 148:23 149:4,6 195:24
**offensive** 53:11 63:15 67:3 161:8
**offer** 202:16
**office** 207:6
**oh** 15:1 63:17 67:9 73:6 74:7 87:1 92:19 101:16 111:20 139:5 151:13 170:16 182:11 194:20
**ohio** 1:21 7:5 11:19,23 14:25 22:5 30:2 43:11 51:2 64:4,9 66:19 81:13 86:15 93:18 144:14 146:10 147:16 148:9,23 151:12,14,24 153:1 161:23 172:1 173:11 179:1,4 206:2,7 207:7,13
**okay** 9:12,13 10:8 10:9 11:3,9,21 12:2,15,21 18:11 19:9 20:6 21:20 24:3,16 25:5 26:12,17,23 27:7 29:5 30:7 32:12 33:14,21 34:14 35:14 37:11 38:7 40:21 42:1 47:2 51:10 52:8 53:14 54:21 57:18 58:17 58:18 59:13 60:18 61:12,17 62:11 63:18 68:14,16 70:18 71:16 72:2 74:20 75:2 76:22 77:11 78:22 81:4 83:8,14 84:20 85:2 86:12 87:13 88:6 89:5,19,25 90:22 91:2,17,21 91:23 92:9,12,16 92:19,24 94:14,25 95:18,23 96:7 99:14 100:9 101:3 101:7,21 102:2,6 102:16 104:11 105:16 106:13,19 108:13,19,23 109:1,9 110:18 111:17,21 112:15 113:11,21 114:3,7 114:16 115:14 116:8 117:2,11,14 117:25 118:23 119:11 120:16 121:18,21 122:5 123:11 124:18,23 125:19,22 127:10 127:16 129:2,6,11 130:14 131:3,9 132:5 134:4 135:3 135:15 137:18 139:5,11 141:13 141:20 142:7,18 143:3 144:3,17 145:6,22 146:12 147:17 148:4 150:5,17 151:19 153:6 154:2 156:8 157:6,19 158:5 160:20 161:11,18

162:15 164:6 165:2,6,10 166:6 168:3,8 169:2,25 171:16,22 172:3,5 172:10 174:7,19 174:25 175:24 176:2,19 177:7 182:19 184:9 185:17,19 186:4 187:8,19 188:5 191:3 192:20 193:7 196:4,13 198:11 199:23 200:9 203:14
**old** 11:17 16:11 68:23 82:15,16
**omitted** 129:18
**once** 10:19 39:25 44:15 45:5,8 57:6 66:18 85:19 86:10 87:23 88:4 146:6 159:21 178:14,15
**ones** 76:20 107:18 145:12 200:5
**ongoing** 34:13
**online** 40:2,4,22 44:15 45:8 56:24 71:9 74:9,20 77:15 78:9 87:21 94:23 157:16 162:10 176:17 183:11 187:25
**onsite** 156:5
**onward** 33:15
**opened** 66:13 122:22 124:1
**opinion** 49:20 105:16 160:9
**opioid** 66:19
**opioids** 52:25 66:25
**opportunity** 164:2 191:10
**opposed** 105:9
**ordeal** 194:12
**order** 23:22 77:6 166:13 179:22 199:10
**original** 163:22 204:12
**outcome** 21:10 170:11,24
**outcomes** 63:3
**overseeing** 43:7
**owed** 67:22 68:4

**p**

**p.c.** 2:4
**p.m.** 203:25
**pa** 2:7
**pack** 199:18
**page** 4:14 6:2 84:11,15 85:11 86:13 91:1,1 93:1 93:2,6 98:15,17,18 98:19 100:10 102:7,13,17 104:3 104:4,12 110:4 122:11 123:18 128:12 134:18,20 135:15,19 137:1 138:5,14 139:12 141:2 142:8,18 144:4,20,20 147:12,15,18 148:13,14 152:4 165:12,14,15 166:8,17,23,23 167:2,15,16 169:5 170:3,15 171:4,5 172:14 175:3 183:22 185:10 186:6 191:4
**pages** 1:25 90:14 101:22 185:5,12
**paid** 19:18,21 73:2
**pamela** 105:23 106:1
**paper** 98:24
**paperclip** 101:15
**paperwork** 74:24 113:15
**paragraph** 85:11 95:5 96:21 126:16 127:16 186:7,18 186:25 187:16 188:12,21 191:6
**paragraphs** 85:18 186:2
**parenthetical** 95:7
**part** 47:3 74:23 107:20 190:6
**particular** 31:20 55:14 65:20 71:1 73:22 161:25 163:1
**particularly** 9:17 69:4,6
**party** 207:3
**passed** 32:22 37:24 38:1
**passing** 66:21
**pay** 18:20 21:18 65:24 67:5 74:3 82:1,3,11,15,15,16 149:25 175:12
**paying** 65:18 81:5 82:8,12 175:14
**payment** 20:22 81:9 82:4
**payments** 19:13 82:2
**pecora** 26:1
**penalty** 165:22 205:9
**pending** 22:9 43:4
**people** 41:17,19 42:9 44:17,25 51:25 52:15 53:5 53:20 54:7,8,14,16 54:20,22 55:6,22 55:24 63:10,23 64:14 65:1,16 66:3,5,20 67:16,19 69:1 71:6 98:5 119:6 177:11 178:5,6 179:25 181:23 182:6,24 188:1 189:5,16 190:14,22,25 194:14 195:23 201:22
**percent** 175:25
**percentage** 175:25 181:24
**perfect** 66:16
**performed** 126:20
**period** 32:18 34:22 47:25 48:5 73:23 75:4 158:11 173:14 202:4,9
**periods** 32:2
**perjury** 165:22 205:9
**person** 41:21 53:20 54:25 64:15 66:2 77:9 115:3 116:6 135:8 143:16 179:16 189:22 190:3 198:14
**person's** 190:2
**personal** 36:1 71:17 103:18

184:1,12
**personally** 42:8,12 52:13 78:14
**pertaining** 25:1 51:14 148:3 153:1
**philadelphia** 2:7
**phone** 27:1,22,23 94:20 118:20,21 157:4 159:18,22 200:21,22
**phonetically** 143:9
**phrase** 41:11,15 41:22 45:3 51:17 51:19,22 188:14
**physically** 115:1
**pick** 70:15 71:18 180:15 199:16
**picked** 50:25
**picks** 64:7
**piece** 98:24
**pills** 193:15
**place** 7:4 181:10 206:20
**placed** 8:5 79:4 85:12
**places** 47:22 173:18
**plaintiff** 1:7 5:6,7 7:14 11:6 18:4 164:15 166:18 167:4,18,19 169:9 169:15 170:7,20 171:5 173:24 175:5,11,14 183:24,25
**plaintiff's** 5:4 164:13 166:19,20 167:5,6 170:8,20 172:16
**plaintiffs** 2:3
**plans** 37:8
**please** 7:6,16 9:21 11:14 83:16 88:16 94:3 100:15 110:1 134:18 140:5 146:15 153:9 167:16
**pocket** 175:5
**point** 2:14 9:16 10:1 18:22 23:11 62:7 68:5 70:10 73:5 78:15 90:4 94:23 108:10 116:9 128:24 129:12 141:25 148:10 149:19 152:11 158:2,4,13 159:7 160:13,21 161:4 162:5 169:8 169:14 183:9 187:12 195:13 199:1,20
**pointing** 120:13
**police** 60:3,4,12 61:10,14,14,23,24 62:3 93:17,18,23 93:25 94:6 96:9 96:11 97:9 116:17 116:20,23,25 117:5,19 123:13 150:11
**policies** 186:9
**policy** 200:14,16 200:17,18
**pops** 183:11
**populated** 107:13
**possibility** 177:24
**possible** 22:7 37:9 144:13 198:19
**possibly** 135:12
**postsecondary** 30:4
**potentially** 116:15
**practical** 181:7
**precise** 186:12
**prefer** 98:4
**preference** 162:4
**preparation** 27:14
**prepare** 23:15,21 23:22
**prepared** 199:16 199:18
**prescribe** 193:17
**prescribing** 66:25 66:25
**prescriptions** 193:2
**presence** 206:15
**present** 2:20 34:9 34:21,25 37:15
**presently** 22:18 35:14
**prevented** 49:23 50:10
**previous** 104:1,6
**previously** 17:23 17:25 22:20 43:10 105:3 109:22 118:4 139:3 154:6
**primary** 141:3
**print** 101:14
**printed** 118:5 138:11
**printing** 78:9,11
**prior** 13:11 17:4 22:12 42:1 44:1 57:15 69:18 70:16 103:19,23 114:5 151:4
**prioritizes** 188:15 188:17
**prioritizing** 188:16
**privacy** 103:7
**probably** 9:9 31:7 41:24 65:19 80:12 101:15 134:24 165:13 179:23 196:13
**problem** 129:23 150:8 182:4 190:14
**procedure** 169:21 182:12 189:15 190:8,13 202:15 204:7
**procedures** 177:2 184:2 186:10 187:6,13
**proceeding** 17:24
**proceedings** 22:12 22:14
**process** 9:7 23:20 46:23 47:3 74:19 74:23 78:7 85:21 87:23 88:4,13 95:20,21,24 96:1,4 96:5 98:1 105:13 106:3,9 113:10,20 113:24 114:23 115:9,12 122:3 140:2 160:2 169:23,24 181:22
**processed** 176:21
**produced** 84:6 101:4,24 107:17 107:20 109:11 122:8 125:15 128:13 134:7,7 140:22 147:2
**professionals** 192:22

**prompted** 93:22
**pronounce** 25:4 135:23
**proof** 77:19
**properties** 72:16
**property** 31:16
**proposed** 42:13
**protection** 49:13 171:8,14
**protocol** 9:3,10
**proud** 68:25
**provide** 77:16 94:22 132:9
**provided** 7:18 77:25 80:14 99:15 103:11 131:19 135:25 182:19
**public** 20:12 21:13 100:6 206:6 207:12
**pull** 59:25 60:2 139:2 147:24 178:24
**pulled** 57:10 60:25 138:22 150:11 154:20 155:19,21 155:25 203:6
**purchased** 149:15
**purposefully** 188:14,16
**purposes** 83:22 88:21 99:5 100:20 108:6 110:7 118:15 125:7 133:23 140:11 146:21 153:14 164:16 174:2 184:25
**pursuant** 204:3,6
**put** 9:1 55:11 79:8 80:22 98:16,17 100:9 108:14 109:24 145:22 154:24 163:15 173:20 192:6
**puts** 49:11
**putting** 48:11 51:14 54:21 67:9

**q**

**qualified** 206:8
**qualify** 77:6
**quantify** 192:13
**quantity** 188:17
**question** 8:16,20 9:4,15,22,24 10:6 10:7 54:11 80:2 94:3 108:23 109:2 130:20 154:23 155:12 176:9
**questions** 9:18 165:4,7 166:4,5 174:20 196:16,25 201:4 203:16
**quickly** 87:25 88:1 88:7,8
**quite** 119:6

**r**

**rate** 13:7 14:3,4,7 14:8 76:9 163:6,9
**raymond** 135:13 135:22 136:10
**reach** 93:22 114:10 158:6,10 160:21 161:4 199:7
**reached** 113:23 114:8,16
**read** 63:13 109:6 127:7 151:24 203:24 205:9
**real** 71:5 105:10 168:15
**realize** 136:15
**really** 19:1 54:11 71:19 87:7 115:7 119:13,13,22,23 119:23 120:3 184:12 185:10 199:20
**realpage** 1:12 2:23 4:4,6,8,11,13,15 4:17,20,21,22,24 4:25 5:2,3 7:4,9 7:12 24:1,1,4 43:25 44:2,5 45:10,12,15 49:15 49:17 50:3,4,15,21 51:7 53:3 56:3,13 57:20,25 59:3,15 61:20 62:9 63:6 65:11,22 66:7 67:5,13,22 83:21 88:20 90:4,18,25 91:4,12,20 92:8,14 92:17,22 96:14 98:21 99:4,18,21 100:19 101:6,8,19 102:21 107:17 108:5 110:6 112:8 115:21 116:12,14 116:17,20 117:5 117:13,22,23 118:6,14,19 121:4 121:13 122:2 123:14,23,25 124:19,19 125:6 131:2,5,10,13,18 132:6 133:2,21,22 134:16,23 135:16 136:5,16,20,23 139:17,23 140:9 140:10 145:16,19 145:24 146:4,20 147:8,19 148:5,14 150:25 151:5,10 151:22 153:13,25 156:6,18,21 157:8 158:19 163:13 170:11,23 171:17 171:18 172:6 175:7 176:21 177:14 182:5,20 182:25 183:14 185:22,23 187:4 187:10,11 189:9 189:24 190:7 193:19 194:7,20 194:23 197:3 202:1,23 203:10
**realpage's** 68:12 132:25 177:1 181:24 187:13
**realty** 20:1 191:10
**rear** 150:13
**reason** 8:15 10:10 14:13 69:2 189:4
**reasonable** 177:3 186:11
**reasons** 44:21 63:11 67:23 70:9 71:17 72:3 188:3
**recall** 10:21 16:6 17:16 18:7,9,22,24 19:1,18,23,25 20:6 20:10 21:2,4,11 22:6,13,15 24:7 26:20,24 27:6 28:6,14 31:15 46:22 48:7,24 77:11,25 81:2 89:12,13 108:24 136:22,24 144:9

146:5 149:4 156:9 157:9,19 172:11 173:15 185:18
**recalled** 109:13
**receipt** 95:7 150:16
**receive** 37:6 74:13 109:17 121:3,19 145:11
**received** 23:25 24:4 41:1,3,6 45:5 53:2 59:2,10 74:15 75:21,24 82:22 84:14,25 86:2 89:6,12,20 92:10,16 109:2 112:18 116:10 120:20 121:23 126:3,8 128:20 131:25 132:3,6,20 138:24 141:9 144:11 147:19 148:5 150:24 152:18 169:10,16 174:24 191:22 194:1
**receiving** 82:2 108:24 144:9
**recess** 62:16 133:9 196:21
**recognize** 84:3 99:10 108:19 110:13 125:16 147:3 153:20,21 164:23 174:15
**recollection** 19:2 101:18 114:14 134:14
**record** 7:2,7 9:2 11:15 38:16 45:25 57:23 58:2 62:14 62:17,20 65:6 68:8,15 90:3,9 93:11 100:4 104:13,16 116:3 127:12 128:21 129:19 130:18,23 131:12,16 133:7,8 133:10,12 141:21 146:9 151:25 152:1,11 164:4 177:10,16 178:20 179:13 181:4 190:1 193:21 194:9 196:18,20 196:23 197:3,4 202:24 203:12,22
**records** 58:22 64:11 100:6 123:20 127:18,19 127:23 132:7,8 137:25 138:1 146:2 178:6 179:15 189:11,12
**reduced** 206:14
**refer** 186:4
**reference** 106:21 169:7
**referenced** 206:13 206:18
**referencing** 157:3
**referring** 169:19
**reflect** 135:3 143:18
**reflected** 91:12 135:18 148:21 152:10 155:1,15
**reflecting** 4:21,23 133:20 140:8 144:21
**reflects** 105:3 134:8
**refresh** 101:17
**regard** 49:4 113:20 115:22 147:10,16 177:23 192:14 197:16
**regarding** 126:12 126:12 147:9 171:6 204:2,11
**reinvestigation** 127:3 139:23
**rejected** 48:15
**relate** 125:9
**related** 102:8 116:3 167:6 180:12
**relates** 39:1
**relating** 56:4 166:20 171:25
**relations** 128:15 128:19 155:2
**relationship** 81:17 159:3,11
**relative** 207:2
**relief** 67:23
**reluctance** 115:2
**remain** 62:22 133:13 196:25
**remainder** 100:11
**remember** 19:8 43:9 48:2,12 71:3 73:22 74:22 77:10 77:15 109:8 115:25 119:5,10 119:23 124:4,8 137:11 174:14
**remind** 47:13 62:21 133:13 196:24
**remove** 174:12
**removed** 120:22 121:16,20 127:19 127:23 128:21 129:1,5,7,12 132:9 138:1 146:2,8 150:23 156:25 171:20 193:21 202:24
**rent** 12:24 14:12 16:5 17:14,16 22:17 37:15 48:9 55:22 60:9,21 65:18,23 68:2 70:5 71:14 73:1 81:5,10 82:4 113:22 124:17 158:6,23 162:24 175:12,14,15,20 176:5 191:15
**rental** 191:10
**rented** 15:12,14 60:21 114:6,19 115:10
**renting** 50:10 172:22
**repaired** 150:15
**rephrase** 9:21,23 54:12 130:21
**replied** 155:4
**report** 4:10 46:3 49:23 59:5 63:13 100:18 101:2,25 102:1,20 107:11 107:14 115:4 116:6 120:10,12 121:16,23 129:17 130:2,10 148:3 152:21 154:14 155:19 170:10,23 175:8 177:16 180:5 181:15 188:3 189:10 190:2 194:1 202:6

202:8
**reported** 46:1 56:4 126:24 127:13 128:7,8 130:18,23 131:13 137:25
**reporter** 3:13 7:16 8:12 98:24 100:14
**reporter's** 3:10 206:1
**reporting** 48:20 49:6 68:12 147:12 171:7 175:13 177:2 197:8
**reports** 55:10 62:8 181:25 201:25 202:10
**repossessed** 19:15 19:20
**represent** 66:2 84:5 109:10 122:7 122:21 125:14 134:4 140:19 156:17 165:6 174:19 185:19
**representation** 41:18 130:12
**representative** 51:18,23 52:3 57:3 166:19 167:5 170:8,21
**represented** 39:13 183:15 201:23
**representing** 52:11,15 54:1,2,5 54:17 66:5 67:17 131:19
**request** 95:8,11,15 99:20 110:19 120:8 147:20 152:6 169:7,11,17 169:18 172:7
174:18 175:2 183:21 189:25
**requested** 90:18 91:20 92:8,13,22 99:18 101:8 121:11 146:6 147:22 204:1,6,10
**requesting** 110:17 121:15 148:1
**requests** 5:8,11 78:2 115:22 173:25 174:20 184:24
**require** 177:17
**required** 178:2
**requirements** 77:5
**requires** 49:7
**rescreened** 202:20
**research** 40:7 162:16
**residence** 65:5
**residents** 98:8
**resolution** 44:24
**resolving** 181:9
**respect** 8:9
**respectful** 108:11
**respond** 74:6 155:17 171:18,19 172:6
**responded** 145:24
**responding** 189:24
**response** 8:16,23 57:19 110:18 122:22 129:2 147:20 152:6 169:11,17 183:25
**responses** 5:5,7 164:13 165:8 166:4,9 173:24 174:22,24
**responsibility** 132:25
**rest** 92:12 93:4
**result** 63:3 136:12 175:6,13
**results** 4:18 125:4 125:20 131:20,25 133:3 135:25 144:25 145:7
**retain** 39:21
**retained** 3:13
**return** 33:6 37:8 37:11
**returning** 33:9
**revealed** 126:21
**revealing** 44:13
**reversal** 145:1
**review** 95:8,11,15 110:20 127:2 204:2,6
**revised** 131:25
**richardson** 15:6
**richmond** 2:15
**right** 7:24 10:15 11:3,14 14:15,18 26:10 27:18 39:5 44:8,22 46:19 47:15 48:18 50:1 50:12 51:4 52:14 53:11,22 54:9 56:11,24 58:3 61:20 65:7 69:23 70:1,12 73:11 75:16 79:9,10 81:6 82:21 86:5 86:12,15,22 87:6 88:11 89:15,19 90:22 91:7,7,14 93:12,21 94:7 96:2,7 98:1,10,24 100:12 102:6,13
102:14,23 105:18 105:20,25 106:19 106:21 107:10,23 109:9 111:10 112:1,17,20,21 113:2,16 116:18 117:23 121:5,24 123:1,17 125:25 128:11,21 129:13 129:21 131:21 132:22 135:1 136:25 139:6,12 140:3 142:9 144:19 148:12 149:7,12 150:14 151:9,11 152:3 153:6 154:8 155:13,17 160:11 162:1 163:2,23 164:19 167:2 169:2 171:16 172:1,11 173:20 174:4 175:2 176:25 179:10,14 179:19,25 180:14 181:21 184:14 188:7 189:17 190:20 194:5,18 195:3,13 197:9 201:6 202:1,18
**rights** 49:4
**ring** 135:9,10
**rivers** 19:6,19
**road** 36:9 44:3 68:10 70:6 89:21 126:25 127:4,14 131:20,24 132:10 134:17 137:9,21 139:19,25 141:14 141:22 142:15 157:12 159:5,13

191:16 197:5 198:3,21 200:1,7 201:6,16
**road's** 137:13
**roof** 56:1
**room** 192:25
**rpr** 1:22
**rules** 204:3,7
**run** 178:14,15

**s**

**s** 143:2,5
**safe** 98:8 177:11 191:2
**sale** 18:22 149:19
**sales** 32:7
**sanders** 2:12
**satisfied** 94:11 116:12
**satisfy** 54:18 153:2
**saw** 40:4 44:17 59:13 61:10 72:23 76:20 106:19 179:8 188:6 192:2 193:24
**saying** 39:11 53:19 90:3 137:23 143:5 151:10,15 152:24 154:3 155:8 168:3 179:3 187:5,11 189:17 190:20
**says** 9:3 55:16 63:13 85:10,18 86:24 87:5 90:8 90:24 91:4,25 95:6 96:20,22 101:12 104:1 110:19 123:19 126:10 127:17 129:21 130:5 132:7 135:24 136:11 142:8,19 142:23 144:6 148:16 150:6 165:14,18 166:7,9 166:10 167:2,17 169:9,14 170:6,19 172:15 175:4,11 183:24 187:13 188:13,15 191:6,8
**school** 29:19,23,25 30:3
**score** 46:9 103:11 103:12
**screen** 4:8 91:3 98:20 99:3 105:7 106:18 195:18
**screened** 54:15,23 97:24 98:5
**screening** 1:12 45:22 55:12 64:1 64:3,10 85:22 88:3,12 90:21 92:20 98:1 99:13 102:19 105:13 106:3,9 126:17,21 126:23 127:23 129:17 130:24 152:8 155:10 175:8 177:10,14 189:25 198:1 201:25 202:6,8,10
**screenings** 182:21
**seal** 207:6
**search** 71:23 72:16 179:14
**second** 5:10 84:11 84:15 85:11 89:1 91:1 95:5 102:16 123:18 126:16 133:7 137:1 165:13 174:8 184:21 185:13
**secretary** 32:7
**section** 135:22
**security** 21:21 36:23 56:18 58:12 64:5,24 77:22 82:2,18,23 83:4 103:3 177:18 178:3,13,19,24 179:6 180:4,6,12 180:25 181:3,4 190:11
**see** 27:2 28:12 32:10 35:11,19 40:5 47:9 53:7 59:1,9 61:11 85:13,23 86:22 90:12,25 91:3,8,9 95:4,8 97:1 101:12,13 102:25 103:12 104:7,12 104:14,21,25 109:12 112:6,13 113:11,24,25 122:11 123:21 127:5,20 128:15 128:25 129:17,23 134:21 135:12 136:1 137:2,5 138:5,15,25 140:24 141:2,17 142:7,12,19,20,21 142:23 143:4,17 143:20,21 144:7,8 144:20 145:4 147:20 149:1 150:20 151:19 155:5,10,22 158:7 165:14,18 166:7 166:10,21 167:7 167:11,21 169:8 169:12 170:12,25 171:8 172:18 175:4,9,17 178:24 179:15 182:24 183:3,5,7,9 184:2 186:1,7,15 187:16 188:18 191:11,12 192:22
**seeing** 109:8,13 185:18
**seeking** 62:25 63:6 65:10,22 70:5 76:5 146:1
**seen** 58:21,24 59:17,20 79:7 106:20 107:12,13 107:16,19,22 109:15,22 131:9 134:5 142:17 144:1 145:24 176:20 185:17 186:21 202:23 203:9
**selfish** 66:2
**sell** 57:11
**selling** 180:20
**send** 59:5,8 78:3 86:6 120:6,14 132:15 133:3 146:10 161:21 175:22
**sender** 86:24
**sending** 58:1 74:16 78:12 128:23 148:8 157:9
**sense** 8:23 23:19 28:17 33:15 202:3
**sent** 59:4,14 74:18 74:24,25 102:20 107:22 110:16,25 111:5,15 113:4,12

113:14 114:10,14 120:10 122:9 124:2 128:18 132:19,21 136:14 139:15 144:5 146:9 150:3 157:8 163:16 169:19,21 169:21 171:24 176:22 192:1 203:6
**sentence** 96:21 123:18
**separate** 171:12
**september** 5:1,3 15:25 16:2 43:15 113:2 121:17,17 121:17 146:18 150:19 153:12 154:3,7,11,25 155:1,5,7 156:11 156:17,20,22,23 156:24 157:8
**sequence** 10:8
**series** 10:6 144:21 167:9
**served** 18:4 165:7 174:21
**service** 119:2
**set** 5:5,8,11 114:5 164:14 173:25 184:23 207:6
**seven** 53:4 199:13 200:15
**shake** 8:21
**shaking** 8:17
**share** 60:25 97:11
**shared** 14:21
**shipped** 80:21
**shore** 11:22 13:13 13:16 16:20,21 39:9,10,11 46:17 46:20 70:11,17 73:12,25 75:9,15 75:16 79:23 80:10 81:4,9 86:21 87:3 87:10 141:10 173:10
**shortly** 136:14 196:19
**shot** 4:8 91:3 98:21 99:3
**show** 59:21 100:1 107:23 121:15,20 129:4,7 146:7 148:2 150:18 151:16 153:6 195:10
**showed** 59:11 118:6 136:18 145:13
**showing** 62:6 96:25 171:20 191:14
**shown** 84:20
**shows** 20:12 21:13 64:18 100:2 147:13
**sided** 165:16 166:24
**sign** 75:14,15 78:2 148:24
**signature** 166:1 204:5 207:11
**signed** 74:25
**significant** 192:12
**simply** 10:6 151:22 177:24
**sister** 66:23 67:8 67:10 71:5
**sit** 196:8
**sitting** 8:12 12:10 28:10
**situation** 68:10 162:1 187:21 188:8 193:20
**situations** 48:7
**skyline** 20:4
**slightly** 82:24
**small** 101:14
**snowing** 71:19
**social** 36:23 56:18 58:12 64:5,23 77:22 82:2,18,22 83:3 102:25 103:3 177:18 178:3,12 178:19,24 179:6 180:4,6,12,25 181:2,3 190:11 197:15,19
**software** 50:25 63:9,19 65:10 180:15
**sold** 52:25
**sole** 36:25 37:2
**solely** 58:8
**someone's** 178:24
**sorry** 16:1,21 26:13 35:25 38:2 39:10 43:16 46:12 73:6 74:7 80:5 94:4 97:15 104:4 122:17 165:15,25 166:22,24 168:10 168:25 174:10 182:14
**sort** 35:23 46:6 48:5 54:25 72:7 129:13 134:10 135:19 159:18 185:6
**soumilas** 2:4 25:3 26:5,10,11,21 27:4 27:8 28:3,12 39:15
**sound** 79:9 103:14
**sounds** 79:10,12
**source** 36:25 37:3 62:8
**sources** 126:18
**south** 29:25
**southern** 72:6
**span** 10:2 41:24 88:5
**speak** 89:23 94:9 94:12 116:24 119:4,20 135:6 172:8
**speaking** 26:20 143:13 168:24,25
**specific** 51:7 53:17 63:19 81:2 89:11 166:9 198:4
**specifically** 62:5 77:12 90:10 98:20 107:19 146:4 166:17 167:3 170:7,19 172:16 178:16
**specified** 206:21
**spelled** 143:1,8,11
**spent** 34:23 35:5,7 35:12
**split** 16:8
**spoke** 27:4 50:21 89:24 93:10 94:10 119:7,9 121:1,1 135:8,24
**spoken** 25:11 27:3 28:11,12 43:1 134:25 164:6
**square** 148:4
**ss** 206:3
**ssn** 57:21

**st** 2:13 3:8 7:8,8,23 26:9 58:16,19 62:19 80:1,5 83:15 107:25 109:25 124:25 133:6 146:14 153:8 164:9 184:18 196:17 203:14,18 204:12
**start** 69:23 70:1 95:19,20,25
**started** 39:25 60:11 158:3 160:2 201:3
**starting** 32:6 70:8 71:13 104:8
**startling** 63:16 66:10
**starts** 135:18 175:4 185:10
**state** 22:5 31:21,23 32:7,22 51:2 64:21 151:12,14 151:17 170:6,19 179:1,4 205:16 206:2,7 207:13
**statement** 9:16 191:16
**states** 1:1 65:2 103:20
**stating** 74:13 123:20 124:2
**status** 42:19 43:10 198:25
**statute** 7:19
**stay** 48:4 66:17
**stayed** 32:19 79:22 80:9
**staying** 35:8 142:7
**stenotypy** 206:14
**step** 71:20 120:24
**sticker** 174:12
**stomach** 108:12
**stop** 34:5 51:4 148:24
**stopped** 36:2
**straight** 112:10 155:18
**straighten** 60:8 94:19
**straightened** 112:8
**street** 2:6 13:12,15 14:16 16:14,18 39:8
**stress** 66:11 197:11,17
**strike** 177:14
**studied** 30:22
**studies** 30:23
**studying** 30:21
**stuff** 91:15 95:22
**submit** 40:15,21 77:18 97:18 122:1 129:10 132:12 145:12
**submitted** 40:16 70:3 103:21 130:19 144:22 145:8 171:6
**subsidized** 13:5 14:6 65:17,24 71:12 72:24 76:4 76:5,10,14 77:6 163:5
**substances** 10:13
**substantially** 175:12
**suburb** 15:2 17:7
**successfully** 183:14
**sued** 18:7,11
**suffered** 66:12
**suit** 41:17
**suitability** 85:22
**suite** 2:6 11:23,24
**summaries** 147:11
**summarizing** 126:10
**summary** 53:2 59:4,10,21,21 66:18 90:18 101:25 120:21
**summer** 73:19 74:10
**superior** 1:20
**supervisor** 96:12 99:23 119:20 121:4 135:6 172:9
**supervisors** 119:21
**sure** 9:7,15 19:21 35:25 80:6 82:9 91:16 105:8 112:9 139:2 143:16 159:6 168:12 169:25 170:15 174:8 180:10,24 190:22 192:3 195:19 199:23
**swear** 7:16
**switch** 38:7 117:11 174:9
**switching** 23:14
**sworn** 7:19 206:10
**system** 109:12
**systems** 122:10 178:21

**t**

**tabar** 25:18
**take** 10:8 22:24 30:9 34:20 35:3 36:9 58:14,20 59:24 60:12 62:13 83:13 88:14 89:1 92:25 97:22 98:16 98:19 100:10 102:9 108:10 120:23 121:10,12 122:5 124:23 133:7 146:12 150:15 181:14 185:13 189:18 192:20 193:1,4,7 193:12 196:14,18 200:9
**taken** 1:19 10:13 62:16 133:9 162:7 196:21 206:20
**talk** 44:16 60:18 62:11 89:25 93:4 114:20 117:11,12 134:12 163:23 200:21
**talked** 47:22 61:13 99:22 200:5,6
**talking** 29:11 67:11 70:1 90:17 115:21 145:16 152:20 159:5 170:1 171:11
**taste** 159:16
**taxation** 22:5
**taylor** 53:4,8 58:23 59:13,19 68:8 92:20 97:5 102:1 104:17,24 106:21,23 116:3 127:12 130:18,23 131:16 197:4
**tear** 98:15,20
**technical** 50:14

**telephone** 7:10 28:4,5,15,16
**tell** 8:9 10:18 16:23 24:24 38:9 52:9 61:1 87:16 97:19 164:3 168:14 170:13 185:7 190:12 191:25 202:19
**telling** 147:9 151:22 182:11 194:22
**tells** 9:11
**ten** 16:22 41:25 95:6 196:14,18
**tenancy** 48:8
**tenant** 158:14 159:24 175:7
**term** 12:18 13:8 14:1 53:14
**terms** 23:20 139:14 197:16 202:10
**terrible** 66:20,24 130:20 134:24
**terry** 119:8 121:1 134:23 135:1
**testified** 11:12 17:23,25 37:15 73:7 80:25 94:5 120:25 167:23 186:20 192:7 199:19 201:18
**testify** 10:11 206:10
**testimony** 8:10,13 85:25 91:11 95:23 106:25 109:21 116:18 117:2 143:22 145:6,10 168:1,12 179:21 180:1 205:12 206:13,17
**tests** 37:10
**texas** 1:2 43:5,14 43:25 136:16
**text** 95:5
**thank** 29:18 126:11 203:18,21
**thanks** 8:2
**thanksgiving** 199:6
**theirs** 188:4
**thing** 10:5 28:24 53:18 55:5 84:12 92:10 94:11,18 111:8 141:1 159:9 169:4 171:11 184:5
**things** 49:1,12 57:15 59:7,11 63:8,15 65:17,21 68:21 69:2 112:8 136:15 149:9 168:19 188:6 194:14 198:8
**think** 18:25 21:12 23:6 25:4 26:9 27:3 28:10,21 29:3 30:23 32:20 33:11 35:4 38:21 42:5 43:17 56:13 56:17,20 57:1,5 58:5,7 63:25 64:6 66:8 67:22,24 77:8 84:20 92:6 96:4 105:12,14 106:3,9,14,17 118:1,10 136:18 139:3 143:5 146:8 154:21 156:3 159:10 161:25 165:15 193:16 200:17
**thinking** 18:25 50:6
**third** 134:18,20 147:12 148:12 150:6 154:20 166:8
**thornthwaite** 2:22 7:11
**thoroughly** 50:18
**thought** 44:22 64:4 71:12 87:2 90:17 113:21 182:14
**three** 24:22 33:5 54:3 156:4,12 172:17,21 181:6
**tiffany** 15:5
**tim.st.george** 2:17
**time** 26:17,19 31:23 32:2 33:18 34:6,23,23 35:3,5 35:7,13,17 42:22 42:25 45:12 58:14 70:11 74:11 75:18 75:23 77:21 80:19 81:18 83:9 88:5 95:1 103:20 106:20 109:14 114:17 117:23 120:24 130:9 138:23 139:14 141:8,25 148:10 149:24 151:21 152:11,23 154:20 156:22 158:12,15 184:6 199:1,21 202:4,10 203:19 206:20
**timeframe** 30:10 79:9
**times** 10:18 157:5 172:5 181:6 183:13
**timothy** 2:13 7:8
**tina** 105:23 106:2
**tint** 149:16
**tinted** 148:24 149:13,15
**tmo.com.** 137:5
**today** 8:2,10,13 9:15,18 10:1,11 12:10 28:10 163:11 168:1 176:21
**today's** 7:2
**told** 38:14 45:4 48:8 57:3 59:6 60:5,20 61:18 73:3 87:19 88:6 93:11 94:17 116:19 117:3,8,21 119:14 123:23 129:11 140:1 193:19 194:8
**toni** 53:4,8 58:23 59:13,19 68:8 92:20 97:4 102:1 104:17,24 106:21 106:23 116:3 127:12 130:17,22 131:16 197:4
**top** 84:13 85:5,19 101:10,12 102:23 123:19 134:21 142:19 144:5 166:11,21 172:13 186:7 187:17
**total** 156:12

**totally** 57:16
**tough** 192:13
**town** 69:21
**traffic** 149:10
**tragedy** 36:2
**transcribed** 206:16
**transcript** 3:1 8:19 204:3,6,9,11 204:13,14 205:10
**transcription** 206:17
**translate** 8:19
**transmission** 4:14 110:4 112:12
**transunion** 147:15
**traumatic** 158:21 161:9,17
**travel** 196:1,2,4
**treated** 160:24
**trial** 196:5,7,9
**tricky** 111:13
**tried** 60:21 80:17 182:5
**trouble** 26:7 66:17
**troutman** 2:12
**troutman.com** 2:17
**truck** 19:10,15,20
**true** 41:5,7 49:25 50:20 76:19 165:22,25 184:4,5 205:13 206:16
**truly** 115:7
**trusting** 197:22
**truth** 8:9 206:11 206:11,12
**try** 45:1,8 57:8 59:25 61:21 69:22 153:3
**trying** 23:19 32:20 33:11 35:2,7 60:11 68:2 87:6 92:1,5 111:12 119:16 168:8
**tuesday** 1:18
**turn** 51:25 134:18 166:15 191:3
**turned** 44:20 48:1 49:22 57:17 63:10 65:17 66:14 69:9 69:13 83:11 192:18 193:25 195:7,14 201:3
**two** 12:9,13 15:9 17:11 22:12 24:21 29:13 32:2 39:14 54:2 69:10 85:18 87:17 94:6 105:3 114:13,15 135:21 156:10 185:11 201:13 202:6
**type** 13:1 30:4,15 31:2 41:17 44:23 49:3 60:10 80:18 198:20
**types** 67:23 198:13
**typographical** 191:7

**u**

**uh** 31:13 37:14 74:5 81:7
**ultimately** 155:4 201:10
**undergo** 46:22
**underlying** 59:18
**understand** 8:4,8 9:14,20 38:11 43:5 44:7 50:12 53:15 55:2,4 67:9 84:9 87:7 89:3 99:25 100:5,9 101:22 115:12 124:18,19,22 127:11 142:14 150:22 151:19 152:10 153:23,24 164:25 168:12 174:17 180:8 187:3 188:24 189:4 201:19 202:22 203:8
**understanding** 38:10,25 41:14 42:6 43:24 45:14 45:18,19 46:2,14 49:5,9,10 50:21 51:21 52:9,9 54:4 55:1 56:3 62:25 63:5 87:22 102:2 142:1 174:25 186:17,24 187:20 188:5,10,20,23
**understood** 9:24 12:15 85:15 127:22 148:18 151:13 171:25 176:4 191:23 195:25
**united** 1:1
**units** 167:20
**universe** 54:14
**university** 14:20 14:23,25 15:8 16:14,19 17:4 29:1 70:24 73:9 73:24 75:8 86:14 103:21 104:8 141:5,24 142:3 144:14 148:8 173:1,9
**unsatisfactory** 100:7
**unusual** 9:6
**update** 141:13
**upset** 119:14,22,24 119:25 120:3 154:19 159:7 164:4 181:16 192:19 193:15,18 194:4,10,15,18 201:1,2
**upsetting** 63:17
**use** 13:8 63:21 64:5,9 65:5 147:14 186:10 190:12
**useful** 105:18,22 105:25
**user** 144:7

**v**

**va** 2:15
**variety** 30:24
**various** 45:21 72:13 74:18 102:7 120:19 131:7 134:22 188:2 198:8
**vehicle** 149:14,16 150:8
**verbal** 8:16,23
**verbatim** 74:14 124:8,12
**verification** 165:14,19
**verified** 57:16 95:21 126:23
**verify** 45:20 50:7 64:15 180:23
**veritext** 1:20
**version** 107:11,14

**versus** 7:3 21:3 34:23 65:24 198:15 202:7
**video** 6:1
**videographer** 2:21 7:1,15 62:14,17 133:8,10 196:20 196:22 203:22
**videotape** 1:16
**violated** 49:15 50:4,16 51:7 52:1 52:5
**violations** 18:21 18:22 149:10,20 149:20
**visit** 72:21
**voicemail** 136:11 136:22
**vs** 1:9

**w**

**wait** 78:19 79:1,5 79:15,16 85:16 86:11 87:24 109:6 198:25
**waiting** 84:18 85:13,20 86:10 87:14 169:23
**want** 9:7 10:4 16:22,24 17:1 23:15 24:21 31:17 32:11 33:22 37:10 37:11 62:24 63:3 65:12 67:18 70:14 75:20 89:2 91:7 108:10 111:25 120:21 124:16 127:2 133:6,16 134:11 140:23 141:1 154:22 157:23 158:17,18 158:19,21 159:17 159:24 160:8,15 160:16,22 161:9 161:16,23,24 162:2,13 166:3,14 169:25 171:2 174:8,23 180:18 185:14,24 192:21 200:25
**wanted** 69:19,22 109:12 128:25 129:17 130:11 160:17 202:12
**wanting** 70:9
**wants** 135:6 192:16
**warm** 71:4 73:15 73:21 74:9 79:11
**warmer** 71:19
**way** 8:17,22 13:5 17:2 40:1 48:3 52:1,5,23 71:15 80:22 124:10,13 137:19 143:8 187:6 190:18 197:14
**ways** 131:7
**wearing** 73:22
**website** 40:8
**week** 114:13 199:18
**weeks** 114:13,15 196:8,9
**wendy** 1:22 206:6 207:12
**went** 23:7 32:15 34:10 40:2 44:15 45:8 57:3 61:20 62:7 75:8 102:4 144:14 160:18 161:8
**whereof** 207:5
**willing** 199:15
**window** 149:13
**windows** 148:24 149:15
**witness** 7:16 94:4 186:20 203:21 206:9,14,15,18 207:5
**witness's** 204:2
**woman** 104:20
**women** 66:20
**word** 190:9
**worded** 124:13
**words** 38:9 56:9
**work** 34:10 35:1 37:9,11 44:23 64:12 71:14 150:9 163:23 164:1
**worked** 30:12 31:5 31:6,21,24 32:4,21 34:9,14 35:18 64:20,21
**working** 20:8 31:19 33:20 34:5 34:23 36:2,11,15 36:19,20 150:14
**worries** 143:12
**worry** 26:8
**worthy** 45:22
**write** 60:15
**writing** 8:14 61:5 61:20,23 62:2,6 81:20 95:8,11 110:20 128:25 144:2 157:7 163:12 176:14,15
**wrong** 39:11 56:10 80:6 163:25 182:25

**x**

**x'd** 103:7
**xs** 107:13

**y**

**y** 143:2
**yeah** 27:13 43:16 71:20 82:25 90:19 92:3,21 93:3,4 111:12 118:10 139:6 149:13 151:16 152:22 154:17 165:17 174:10 201:17
**year** 12:19 13:14 13:16 14:2 29:21 30:20 31:1 34:22 36:7,10,11,14 48:5 63:10 64:19,19 73:25 74:4 75:16 87:17 103:7 107:4 107:5,6,7 157:20 161:13 182:17 190:12 200:2 201:13
**years** 12:9,14 15:9 17:11 29:14 31:8 31:22 32:14 33:5 34:20,21 41:25 47:24 48:23 64:20 68:22 87:17 107:12 152:18 172:17,21 181:20 201:13 202:6,8
**yesterday** 24:18 26:18 27:15
**young** 50:23 53:3 57:5 59:11 180:21 194:2

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.



DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

# Exhibit 21



**FRANCIS MAILMAN SOUMILAS, P.C.** is a law firm located in center city Philadelphia, Pennsylvania that concentrates in consumer protection litigation. Founded in 1998, the firm's goal is to provide exceptional advocacy to consumers subjected to unfair business, industry and trade practices. The firm represents consumers in individual actions, as well as through class action lawsuits, in the areas of unlawful consumer credit reporting, employment background screening, fair debt collection, unlawful robo calls, unfair and deceptive trade practices litigation, and other consumer matters.

FMS is one of the preeminent consumer litigation firms in the country. In June of 2017, the firm obtained a record $60 million dollar jury verdict in a class action brought under the Fair Credit Reporting Act. The firm has been certified to serve as class counsel in over 50 class actions nationally, and has helped obtain groundbreaking legal rulings and decisions at both the trial court and appellate court levels. The firm has also served as counsel in some of the largest class action settlements in history. Due to the quality of its trial and appellate advocacy, FMS has been recognized by courts throughout the country for the high caliber of its work and its expertise. *White v. Experian Info. Solutions*, No. 05-01070, 2014 WL 1716154, at *13, 19, 22 (C.D. Cal. May 1, 2014) (finding Francis Mailman Soumilas "FCRA specialists" and appointing firm and its team as interim class counsel over objections from competing national law firm because their team's "credentials and experience [we]re significantly stronger in class action and FCRA litigation."); *Barel v. Bank of America*, 255 F.R.D. 393, 398-99 (E.D. Pa. 2009) (finding firm "competent, experienced and well-qualified to prosecute class actions" and noting that class counsel "have done an excellent job in representing the class in the instant litigation.")

## JAMES A. FRANCIS

JIM FRANCIS has been admitted to practice before the United States Court of Appeals for the Third, Fourth and Ninth Circuits, the United States District Court for the Eastern District of Pennsylvania, the United States District Court for the District of New Jersey, as well as the Pennsylvania and New Jersey state courts. He is a 1992 graduate of Muhlenberg College (B.A., *cum laude*) and a 1995 graduate of the Temple University Beasley School of Law. In law school, he won the 1995 Wapner, Newman & Wigrizer, P.C. award for excellence in civil trial advocacy, was awarded outstanding oral advocacy and served as President of the Student Bar Association. Following law school, Mr. Francis was associated with Kolsby, Gordon, Robin, Shore & Rothweiler in Philadelphia. Since 1998, he has focused his practice in consumer protection litigation, with a particular concentration in fair credit reporting, fair debt collection practices and consumer class actions.

In 2004, Mr. Francis was the youngest lawyer to be ranked in the Top 100 Superlawyers in the Commonwealth of Pennsylvania in *Philadelphia Magazine* and *Pennsylvania Super Lawyers* magazine. He was subsequently ranked a Top 100 Pennsylvania Superlawyer in 2008, 2012, and 2014, and has been regularly ranked one of the Top 100 Superlawyers in Philadelphia since 2004.

In 2017, Mr. Francis served as trial counsel in a $60 million dollar class action jury verdict, which is the largest verdict in history for a case brought under the Fair Credit Reporting Act. In

2009, Mr. Francis argued the seminal FCRA case of *Cortez v. Trans Union* before the Third Circuit Court of Appeals. He lectures and speaks extensively on the FCRA for continuing legal education seminars, law schools and community groups, and has published articles on the FCRA. He has appeared on various news programs including the *Today Show* and *PBS NewsHour* to discuss consumer-related issues, and was featured in *The Philadelphia Inquirer*'s biographical "Question & Answer" segment in February of 2009. He has been certified to serve as class counsel in over 50 consumer class actions, has been trial counsel in three class actions to successful plaintiff's verdicts, and has served as counsel in some of the largest FCRA settlements in history.

In May of 2014, Mr. Francis was awarded the Community Legal Services of Philadelphia's *Equal Justice Award* at its annual Breakfast of Champions. He was also selected as one of a small national group of plaintiffs' lawyers to be featured in Law 360's *Titans of the Plaintiff's Bar* series in October of 2014. He currently serves on the Board of Directors of the National Association of Consumer Advocates (NACA).

## CLASS COUNSEL CERTIFICATIONS

*Leo v. APPFOLIO, Inc.,* No.3:17-cv-05771-RJB (W.D. Wash. 2019)

*Thomas v. Equifax Info. Services, LLC*, No. 18-cv-684 (E.D. Va. 2020)).

*Clark v. Experian Info. Sols., Inc.*, No. 16-cv-32 (E.D. Va. 2019).

*Clark/Anderson v. Trans Union, LLC*, No. 15-cv-391 & No. 16-cv-558 (E.D. Va. 2018).

*Kelly v. Business Information Group*, C.A. 15-6668, 2019 WL 414915 (E.D. Pa. 2019)

*Carter v. McDonald's Restaurants,* 15-01531-MWF (March 15, 2015)

*Ridenour v. Multi-Color Corporation,* C.A. No. 2:15-cv-00041, (E.D. Va., Jan. 13, 2017)

*Flores v. Express Personnel*, C.A. No. 14-cv-03298, (E.D. Pa. Oct. 21, 2016)

*Larson v. Trans Union, LLC*, C.A. No. 12-cv-05726, (N.D. CA, Aug. 11, 2016)

*Miller v. Trans Union, LLC*, C.A. No. 12-cv-1715, (M.D. PA, Dec. 26, 2016)

*Henderson v. Trans Union, LLC*, C.A. No. 14-cv-00679, E.D. Va., May 3, 2016)

*Pawlowski v. United Tranzactions, LLC*, C.A. no. 15-cv-2330, (E.D. PA, April 18, 2016)

*Rodriguez v. Calvin Klein, Inc.,* C.A. 1:15-cv-02590 (S.D. N.Y. 2015)

*Giddiens v. Infinity Staffing,* C.A. No. 13-cv-07115, (E.D. Pa., Jan. 12, 2016)

*Giddiens v. First Advantage*, C.A. No. 14-cv-5105, (E.D. Pa., July 11, 2015)

*Jones v. Halstead Management Corporation,* C.A. No. 14-cv-03125 (S.D. N.Y., May 5, 2016)

*Berry v. LexisNexis Risk & Info. Analytics Group, Inc*., No. 3:11-cv-754, 2014 WL 4403524 (E.D. Va. Sept. 5, 2014)

*Thomas v. BackgroundChecks.com,* C.A. No. 13-029 2015 WL 11004870 (E.D. Va. Aug. 5, 2015)

*Henderson v. Acxiom Risk Mitigation, Inc.*, C.A. No. 12-589 (E.D. Va., Aug. 7, 2015)

*Magallon v. Robert Half International, Inc.* WL 8778398 (D. Or. Nov. 10, 2015)

*Patel v. Trans Union, LLC,* 308 F.R.D. 292 (N.D. Cal, 2014)

*Goode v. First Advantage LNS Screening Solutions, Inc*., C.A. No. 11-cv-02950 (E.D. Pa. Dec. 29, 2014)

*Blandina v. Midland Funding, LLC,* 2014 WL 7338744 (E.D. Pa. Dec. 23, 2014)

*King v. General Information Services, Inc*., C.A. No. 11-06850 (E.D. Pa. Nov. 4, 2014)

*Robinson v. General Information Services, Inc*., C.A. No. 11-07782 (E.D. Pa. Nov. 4, 2014)

*Ramirez v. Trans Union, LLC*, 2014 WL 3734525 (N.D. Cal. July 24, 2014)

*White v. Experian Information Solutions,* 993 F. Supp. 2d 1154, 1172 (C.D. Ca. 2014)

*Sapp v. Experian Information Solutions, Inc.,* 2:10-04312 (E.D. Pa. Jan. 29, 2013)

*LaRocque v. TRS Recovery Services, Inc*., 2012 WL 291191 (D. Me. July 17, 2012)

*Ryals et al. v. Hireright Solutions, Inc.,* C.A. No. 3:09-625 (E.D. Va. July 7, 2011)

*Serrano v. Sterling Testing Systems, Inc.,* 711 F. Supp. 2d 402 (E.D. Pa. 2010)

*Summerfield v. Equifax Information Services, LCC*, 264 F.R.D. 133 (D. N.J. 2009)

*Chakejian v. Equifax Information Services, LLC*, 256 F.R.D. 492 (E.D. Pa. 2009)

*Jones v. Midland Funding, LLC,* C.A. No. 3:08-802 (RNC) (D. Conn. October 13, 2009)

*Barel v. Bank of America,* 255 F.R.D. 393 (E.D. Pa. 2009)

*Mann v. Verizon*, C.A. No. 06-5370 (E.D. Pa. Sept. 26, 2008)

*Smith v. Grayling Corp.,* 2008 WL 3861286, C.A. No. 07-1905 (E.D. Pa. 2008)

*Strausser v. ACB Receivables Management, Inc.,* 2008 WL 859224 (E.D. Pa. March 28, 2008)

*Nienaber v. Citibank (South Dakota), N.A.,* 2007 WL 2003761 (D.S.D. July 5, 2007)

*Jordan v. Commonwealth Financial Systems, Inc*., 237 F.R.D. 132, (E.D. Pa. 2006)

*Marino v. UDR*, 2006 WL 1687026, C.A. No. 05-2268 (E.D. Pa. June 14, 2006)

*Seawell v. Universal Fidelity Corp,* 235 F.R.D. 64 (E.D. Pa. 2006)

*Perry v. FleetBoston Financial Corp.*, 229 F.R.D.105 (E.D. Pa. 2005)

*Beck v. Maximus, Inc*., 2005 WL 589749 (E.D. Pa. 2005)

*Beck v. Maximus*, 457 F. 3d 291, 2006 WL 2193603 (3d Cir. Aug. 4, 2006)

*Stoner v. CBA Information Services*, 352 F. Supp. 2d 549 (E.D. Pa. 2005)

*Bittner v. Trans Union, LLC,* C.A. No. 04-2562 (E.D. Pa. January 4, 2005)

*Wisneski v. Nationwide Collections, Inc*., 227 F.R.D. 259 (E.D. Pa. 2004)

*Petrolito v. Arrow Financial Services, LLC*, 221 F.R.D. 303 (D. Conn. 2004)

*Orloff v. Syndicated Office Systems, Inc*., 2004 WL 870691 (E.D. Pa 2004)

*Bonett v. Education Debt Services, Inc*., 2003 WL 21658267 (E.D. Pa. 2003)

*Gaumer v. The Bon-Ton Stores*, C.A. No. 02-8611 (E.D. Pa. Dec. 30, 2003)

*Street v. Portfolio Recovery Associates*, C.A. No. 01-3684 (E.D. Pa. July 30, 2003)

*Samuel-Bassett v. Kia Motors America, Inc.,* 212 F.R.D. 271 (E.D. Pa. 2000)

*Oslan v. Law Offices of Mitchell N. Kay,* 232 F. Supp. 2d 436 (E.D. Pa. 2002)

*Oslan v. Collection Bureau of Hudson Valley*, 206 F.R.D. 109 (E.D. Pa. 2002)

*Saunders v. Berks Credit & Collections*, 2002 WL 1497374 (E.D. Pa. 2002)

*Schilling v. Let's Talk Cellular and Wireless*, 2002 U.S. Dist. LEXIS 3352 (E.D. Pa. 2002)

*Fry v. Hayt, Hayt and Landau*, 198 F.R.D. 461 (E.D. Pa. 2000)

*Smith v. First Union Mortgage Corporation*, 1999 WL 509967 (E.D. Pa. 1999)

*Miller v. Inovision*, December Term, 1999, No. 3504 (C.P. Phila. County).

## NOTABLE CASES

- *Ramirez v. Trans Union, LLC*—served as trial counsel in record $60 million jury verdict, highest verdict in FCRA history.

- *Thomas v. Equifax Info. Services, LLC*, No. 18-cv-684 (E.D. Va.). FCRA class action, alleging violations by credit bureau, providing nationwide resolution of class action claims asserted across multiple jurisdictions, including injunctive relief, and an uncapped mediation program for millions of consumers.

- *Clark v. Experian Info. Sols., Inc.*, No. 16-cv-32 (E.D. Va.). FCRA class action, alleging violations by credit bureau, providing a nationwide resolution of class action claims asserted by 32 plaintiffs in 16 jurisdictions, including injunctive relief and an uncapped mediation program, for millions of consumers.

- *Clark/Anderson v. Trans Union, LLC*, No. 15-cv-391 & No. 16-cv-558 (E.D. Va.). FCRA consolidated class action, alleging violations by credit bureau, providing groundbreaking injunctive relief, and an opportunity to recover monetary relief, for millions of consumers.

- *In Re: TRS Recovery Services, Inc. And Telecheck Services, Inc.*, Fair Debt Collection Practices Act (FDCPA Litigation)- Served as Class Counsel in a national FDCPA class action and obtained a 3.4-million-dollar settlement against one of the nation's largest check history consumer reporting agencies.

- *Berry v. LexisNexis Risk & Info. Analytics Group, Inc.*, No. 3:11-cv-754, 2014 WL 4403524, at *11 (E.D. Va. Sept. 5, 2014) -- Appointed class counsel in national FCRA class action that obtained a $13.5-million-dollar settlement against Lexis/Nexis, one of the largest information providers in the world, along with a groundbreaking injunctive relief settlement on behalf of 200 million Americans in which LexisNexis agreed to bring its Accurint product into FCRA compliance.

- *Thomas v. BackgroundChecks.com*, C.A. No. 13-029 (E.D. Va. Aug. 11, 2015) –Appointed class counsel in an FCRA national class action which obtained $18 million against another of the largest background screening companies in the world, and also obtained significant injunctive and remedial relief.

- *Henderson v. Acxiom Risk Mitigation, Inc*., C.A. No. 12-589 (E.D. Va., Aug. 7, 2015)- Appointed class counsel in a national FCRA class action which obtained a $20.8 million

settlement against one of the largest data sellers and background screening companies in the world.

- *Ryals et al. v. Hireright Solutions, Inc.,* C.A. No. 3:09cv625 (E.D. Va. Dec. 22, 2011) – $28.3 million national settlement achieved for class of consumers subjected to employment background checks in case brought under Fair Credit Reporting Act (FCRA); believed to be the third largest FCRA settlement in history.

- *Cortez v. Trans Union, LLC*, 617 F.3d 688 (3d. Cir. 2010) – argued precedential case of first impression before the U.S. Court of Appeals for the Third Circuit which outlines the liability, causation and damages standards for FCRA cases against credit reporting agencies; $800,000 jury verdict against Trans Union in fair credit reporting case (remitted to $150,000).

- *Little v. Kia Motors America, Inc.,* 2003 WL 25568765 (N.J. Super. L. 2003) – $6 million (approximate) verdict for class of New Jersey car purchasers.

- *Samuel-Bassett v. Kia Motors America, Inc.,* __ A.3d __, 2011 WL 60559098 (Pa. 2011), C.P. Phila. County, January Term, 2001, No. 2199 – $5.6 million verdict for class of Pennsylvania car purchasers, plus award of attorney's fees.

- *Serrano v. Sterling Testing Systems, Inc.*, __ F. Supp. 2d __, 2008 WL 2223007 (E.D. Pa. May 30, 2008) – federal court finding as a matter of first impression what defines a record of arrest under the FCRA.

- *Ziegenfuse v. Apex Asset Management, LLC*, 239 F.R.D. 400 (E.D. Pa. 2006) – obtained court decision holding that offers of judgment under Rule 68 of the Federal Rules of Civil Procedure cannot be used in class actions.

- *Stoner v. CBA Information Services*, 352 F. Supp. 2d 549 (E.D. Pa. 2005) – obtained $772,500 settlement for class of consumers who disputed errors in their credit reports.

- *Richburg v. Palisades Collection, LLC*, 247 F.R.D. 457 (E.D. Pa. 2008); federal court ruled that actions to collect delinquent credit card debt in Pennsylvania subject to 4 year statute of limitations (not 6 as the defendant collection agency had argued).

- *Perry v. FleetBoston Financial Corp.*, 2004 WL 1508518 (E.D. Pa. 2004) – defeated motion to compel arbitration in class action brought under Fair Credit Reporting Act.

- *Crane v. Trans Union, LLC,* 282 F. Supp. 2d 311 (E.D. Pa. 2003) – federal court held that credit reporting agencies that merely parrot information from credit furnishers and fail to forward dispute documentation face claims for punitive damages under the Fair Credit Reporting Act; violation of the Fair Credit Reporting Act presents a violation of Pennsylvania's Consumer Protection Law).

- *Lawrence v. Trans Union, LLC*, 296 F. Supp. 2d 582 (E.D. Pa. 2003) (same).

- *Wisneski v. Nationwide Collections, Inc.*, 227 F.R.D. 259 (E.D. Pa. 2004) – obtained class certification in Fair Debt Collection Practices action in which a Pennsylvania federal court

held for the first time that statutory net worth limitation is not limited to balance sheet net worth, and includes equity, capital stock and goodwill.

- *Evantash v. G.E. Capital Mortgage Services, Inc.*, 2003 WL 22844198 (E.D. Pa. 2003) – federal court held that technical accuracy defense was not available to defendants under the Fair Credit Reporting Act.

- *Sheffer v. Experian Information Solutions, Inc.*, 2003 WL 21710573 (E.D. Pa. 2003) – federal court held that Fair Credit Reporting Act permits as recoverable damage emotional distress in trying to correct errors in a consumer's credit file, even where no pecuniary or out-of-pocket losses.

- *Sheffer v. Experian Information Solutions Inc.,* 249 F. Supp. 2d 560 (E.D. Pa. 2003) – federal court held that FCRA provides a private right of action against furnishers of information.

- *Sullivan v. Equifax, Inc. et al.*, 2002 U.S. Dist. LEXIS 7884 (E.D. Pa. 2002) – federal court held that reporting a debt to a credit reporting agency is a communication covered by the Fair Debt Collection Practices Act.

- *Wenrich v. Cole*, 2000 U.S. Dist. LEXIS 18687 (E.D. Pa. 2000) – federal court held that FDCPA provides protection for all persons, not just consumers.

- *Jaramillo v. Experian Information Solutions, Inc.*, 155 F. Supp. 2d 356 (E.D. Pa. 2001) – federal court held that single publication rule does not apply to actions brought for violation of the Fair Credit Reporting Act.

## LECTURES/PRESENTATIONS BY INVITATION

Faculty, 21st Annual Consumer Financial Services Litigation Institute (CLE-accredited), "Fair Credit Reporting and Debt Collection Litigation", March and April 2016, NYC and Chicago;

Speaker, The Conference on Consumer Finance Law, Annual Consumer Financial Services Conference, Loyola University School of Law, Chicago, Illinois, September 16, 2016

Speaker, "New Frontiers: FCRA Litigation Against Lesser Known CRAs", Consumer Rights Litigation Conference, National Consumer Law Center, Anaheim, California, October 2016

Faculty, "Pursuing and Defending FDCPA, FCRA and TCPA Claims", Consumer Finance Class Actions, Strafford Publications, June 2, 2016

Speaker, "Stump the Champs", Consumer Rights Litigation Conference, National Consumer Law Center, San Antonio, Texas, October 2015

Speaker, *Fair Credit Reporting Act Conference*, National Association of Consumer Advocates, Las Vegas, NV May 1–3, 2015.

Co-Chair and Speaker, NACA 2013 FCRA Conference, National Association of Consumer Advocates, May 29 – June 1, 2013;

Presenter, *Beyond E-Oscar: Litigating "Non-Credit" FCRA Cases*, Webinar, National Association of Consumer Advocates, February 27, 2013;

Faculty, *FDCPA Class Actions: Latest Litigation Developments*, Strafford Webinars and Publications, November 8, 2012;

Speaker, Consumer Finance Class Actions: *FCRA and FACTA: Leveraging New Developments in Certification, Damages and Preemption*, Strafford Webinars and Publications, March 21, 2012;

Speaker, *FCRA Developments*, Consumer Rights Litigation Conference, National Consumer Law Center, Seattle, Washington, October 2012;

Speaker, *11th Consumer Class Action Symposium*, National Consumer Law Center, Chicago, Illinois, November 6, 2011;

Speaker, *Tenant, Employment and Chexsystems Reports*, Consumer Rights Litigation Conference, National Consumer Law Center, Chicago, Illinois, November 3 – 6, 2011;

Speaker, *Specialty Consumer Reports and the FCRA*, FCRA Conference on Consumer Credit, National Association of Consumer Advocates, Memphis, Tennessee, May 20 – 22, 2011;

Panelist, *Taking on the Challenges Facing Workers with Criminal Records: Advancing the Legal and Policy Advocacy Agenda*, National Employment Law Project, Washington, D.C., April 5, 2011;

Faculty, 16th Annual Consumer Financial Services Litigation Institute (CLE-accredited), *Collection Issues Including The TCPA & Hot Topics*, Practicing Law Institute, New York, NY and Chicago, IL, March 2011,

Speaker, *ABCs of Fair Credit Reporting*, *Tips on FCRA Depositions*, *Evolution of Credit Reporting Industries*, Consumer Rights Litigation Conference, National Consumer Law Center, Boston, Massachusetts, November 11 – 14, 2010;

Faculty, Banking and Consumer Financial Services Law Update, *Litigation and Arbitration Update*, Pennsylvania Bar Institute, April 14, 2010;

Faculty, *Deposit-Side Litigation Developments & Credit Card Developments*, 14th Annual Consumer Financial Services Litigation Institute, New York, NY and Chicago, IL, March and April 2009;

Faculty, 13th Annual Consumer Financial Services Litigation Institute (CLE-accredited), Practicing Law Institute, New York, NY and Chicago, IL, January 2008, March 2008;

Speaker, *Fair Credit Reporting Act Conference*, National Association of Consumer Advocates, Chicago, IL May 8 – 10, 2009;

Faculty, 12th Annual Consumer Financial Services Litigation Institute (CLE-accredited), Practicing Law Institute, New York, NY, March 2007;

Faculty, *Fair Credit Reporting Litigation*, Consumer Protection Law (CLE-accredited), Pennsylvania Bar Institute, Philadelphia, PA and Mechanicsburg, PA, December 2004, March 2007;

Speaker, *Litigating Accuracy Issues with Furnishers of Credit Data*, National Association of Consumer Advocates, New Orleans, LA, June 2 – 5, 2005;

Speaker, Philadelphia Housing Expo, Homeownership Counseling Association of the Delaware Valley, 2005 and 2006;

Speaker, *Understanding Credit Scoring*, Consumer Rights Litigation Conference, National Consumer Law Center, Boston, MA, November 7, 2004;

Speaker, *Litigating Accuracy Issues With Credit Reporting Agencies*, National Association of Consumer Advocates, Chicago, Ill., May 14 – 16, 2004;

Speaker, *Protecting Privacy, Ensuring Accuracy*, National Association of Consumer Advocates, Albuquerque, NM, June 1, 2002;

Faculty/Speaker, *Credit Reporting and Debt Collection Litigation*, Municipal Court Judicial Conference (CLE), Pennsylvania, PA, May 6, 1999;

Speaker, The People's Law School, Philadelphia Bar Association, Philadelphia, PA, October 2004;

Guest Lecturer, Consumer Protection Law, Temple Law School, 2003 – 2012;

Guest Lecturer, Consumer Protection Law, Widener Law School, 2004 – 2009.

## PUBLICATIONS

*The FCRA: A Double-Edged Sword for Consumer Data Sellers*,
GP SOLO Magazine, American Bar Association, Volume 29, Number 6, November/December 2012

*Credit Rating Damage: Compensable, Yet Overlooked Damage in Tort Cases*,
The Verdict, Philadelphia Trial Lawyers Association, Volume 2008-2009, Issue 6 (2009).

## COMMITTEE APPOINTMENTS AND POSITIONS

Mr. Francis currently serves as co-chair on the National Association of Consumer Advocates Fair Debt Collection and Credit Reporting Legislative Issue Committee. He has served on the Editorial Board of the Consumer Financial Services Law Report, the Philadelphia Bar Association's Lawyer Referral and Information Service Committee (where he served as chair or co-chair for 3 years), and has served on the Philadelphia Bar Association's Federal Court's Committee. He has served as an arbitrator for the Court of Common Pleas of Philadelphia County and is on the Judge Pro Tem panel. He is a member of the Philadelphia Bar Association, Pennsylvania Trial Lawyers Association, Philadelphia Trial Lawyers Association, and National Association of Consumer Advocates.

# MARK D. MAILMAN

MARK MAILMAN is admitted to practice before the United States for the Eastern District of Pennsylvania and District of New Jersey as well as the state courts of Pennsylvania and New Jersey. He is a graduate of Muhlenberg College (B.A. *magna cum laude*, 1991) when he was also inducted into Phi Beta Kappa. Mr. Mailman received his law degree from the Temple University School of Law (J.D. 1995). While at Temple Law School, he achieved the highest grade in his Trial Advocacy clinic.

Throughout law school, Mr. Mailman interned at the Philadelphia District Attorney's Office where he tried cases and argued motions in the areas of domestic violence and sexual assault. Following graduation from law school, Mr. Mailman was an attorney with the law firm of Hwang & Associates where his practice focused on Lemon Law litigation. In 1996, Mr. Mailman was associated with the law firm of Fellheimer, Eichen, Bravermen & Kaskey where his practice focused on complex commercial litigation including creditor's rights. He has been certified to serve as class counsel by state and federal courts in both contested and settlement class actions.

In October 2018, Mr. Mailman was awarded the 2018 Consumer Attorney of the Year award from the National Association of Consumer Advocates (NACA). NACA is a nationwide organization of more than 1,500 consumer attorneys and advocates who represent the victims of abusive and fraudulent business practices.

## CLASS COUNSEL CERTIFICATIONS

*Serrano v. Sterling Testing Systems, Inc.,* 711 F. Supp. 2d 402 (E.D. Pa. 2010)

*Summerfield v. Equifax Information Services, LCC*, 2009 WL 3234191 (D.N.J. Sept. 30, 2009)

*Chakejian v. Equifax Information Services, LLC*, 256 F.R.D. 492, 2009 WL 764656 (E.D. Pa. 2009)

*Barel v. Bank of America,* __F.R.D.__, 2009 WL 122805 (E.D. Pa. 2009)

*Mann v. Verizon*, C.A. No. 06-5370 (E.D. Pa. Sept. 26, 2008)

*Smith v. Grayling Corp.,* 2008 WL 3861286, C.A. No. 07-1905 (E.D. Pa. 2008)

*Strausser v. ACB Receivables Management, Inc.,* 2008 WL 859224 (E.D. Pa., March 28, 2008)

*Nienaber v. Citibank (South Dakota), N.A.,* 2007 WL 2003761 (D.S.D., July 5, 2007)

*Jordan v. Commonwealth Financial Systems, Inc.*, 237 F.R.D. 132, 2006 WL 2294855 (E.D. Pa. 2006);

*Seawell v. Universal Fidelity Corp,* 235 F.R.D. 64 (E.D. Pa. 2006);

*Perry v. FleetBoston Financial Corp.*, 299 F.R.D. 105, 2005 WL 1527694 (E.D. Pa. 2005);

*Beck v. Maximus, Inc.*, 2005 WL 589749 (E.D. Pa. 2005);

*Beck v. Maximus*, 457 F. 3d 291, 2006 WL 2193603 (3d Cir. Aug. 4, 2006)

*Stoner v. CBA Information Services*, 352 F. Supp. 2d 549 (E.D. Pa. 2005)

*Bittner v. Trans Union, LLC,* C.A. No. 04-2562 (E.D. Pa. January 4, 2005)

*Wisneski v. Nationwide Collections, Inc.*, 227 F.R.D. 259 (E.D. Pa. 2004)

*Petrolito v. Arrow Financial Services, LLC*, 221 F.R.D. 303 (D. Conn. 2004)

*Orloff v. Syndicated Office Systems, Inc*., 2004 WL 870691 (E.D. Pa 2004)
*Bonett v. Education Debt Services, Inc*., 2003 WL 21658267 (E.D. Pa. 2003)
*Gaumer v. The Bon-Ton Stores*, C.A. No. 02-8611 (E.D. Pa. Dec. 30, 2003)
*Street v. Portfolio Recovery Associates*, C.A. No. 01-3684 (E.D. Pa. July 30, 2003)
*Samuel-Bassett v. Kia Motors America, Inc.,* 212 F.R.D. 271 (E.D. Pa. 2000),
*Oslan v. Law Offices of Mitchell N. Kay,* 232 F. Supp. 2d 436 (E.D. Pa. 2002)
*Oslan v. Collection Bureau of Hudson Valley*, 206 F.R.D. 109 (E.D. Pa. 2002)
*Saunders v. Berks Credit & Collections*, 2002 WL 1497374 (E.D. Pa. 2002)
*Schilling v. Let's Talk Cellular and Wireless*, 2002 U.S. Dist. LEXIS 3352 (E.D. Pa. 2002)
*Fry v. Hayt, Hayt and Landau*, 198 F.R.D. 461 (E.D. Pa. 2000);
*Smith v. First Union Mortgage Corporation*, 1999 WL 509967 (E.D. Pa. 1999)
*Miller v. Inovision*, C.P. Phila. County, December Term, 1999, No. 3504.

## NOTABLE CASES

- *Schwartz v. Aracor Search & Abstract, Inc*., 2014 WL 4493662 (E.D. Pa. Sept. 11, 2014) (upholding compensatory and punitive damages judgment against title company that misappropriated certain funds at real estate closing)
- *Ferguson v. Wells Fargo Bank, NA*, 538 Fed. Appx. 782 (9th Cir. 2013) (reversing summary judgment for bank that failed to properly remove bankruptcy notation
- *King v. General Info. Servs., Inc*., 903 F. Supp. 2d 303 (E.D. Pa. 2012) (first court to uphold constitutionality of FCRA's obsolescence provision
- *Seamans v. Temple University,* Civil No. 11-6774 (E.D. Pa., Oct. 28, 2011) – precedential case of first impression before U.S. Court of Appeals for the Third Circuit addressing duties of furnishers and interplay between the FCRA and HCA.
- *Dixon-Rollins v. Trans Union, LLC,* Civil No. 09-646 (E.D. Pa., April 10, 2010) – $530,000 jury verdict against a credit reporting agency that falsely reported an old landlord collection claim for rent (*remitted* to $300,000).
- *Adams v. LexisNexis Risk & Info. Analytics Group, Inc*., 2010 WL 1931135 (D.N.J. May 12, 2010) (first court to find that consumers may sue under FRCA over information in specialty Accurint report used by debt collectors)
- *Shames-Yeakel v. Citizens Financial Bank*, 677 F. Supp. 2d 994 (N.D. Ill. 2009) (first court to rule that consumer may proceed to jury trial on claim that bank breached its duty to sufficiently secure its online banking system).
- *Cortez v. Trans Union, LLC,* Civil No. 05-5684 (E.D. Pa., April 26, 2007) – $800,000 jury verdict against Trans Union in fair credit reporting case (*remitted* to $150,000).
- *Samuel-Bassett v. Kia Motors America, Inc.,* C.P. Phila. County, January Term, 2001, No. 2199 – $5.6 million verdict for class of Pennsylvania car purchasers;
- *Little v. Kia Motors America, Inc.,* 2003 WL 25568765 (N.J. Super. L. 2003) – $6 million (approximate) verdict for class of New Jersey car purchasers, damages later decertified.

- *Serrano v. Sterling Testing Systems, Inc.*, __F.Supp.2d__, 2008 WL 2223007 (E.D. Pa. May 30, 2008) – federal court finding as a matter of first impression what defines a record of arrest under the FCRA.
- *Stoner v. CBA Information Services*, 352 F. Supp. 2d 549 (E.D. Pa. 2005) – obtained $772,500 settlement for class of consumers who disputed errors in their credit reports.
- *Perry v. FleetBoston Financial Corp.*, 2004 WL 1508518 (E.D. Pa. 2004) – defeated motion to compel arbitration in class action brought under Fair Credit Reporting Act.
- *Crane v. Trans Union, LLC,* 282 F. Supp. 2d 311 (E.D. Pa. 2003) – federal court held that credit reporting agencies that merely parrot information from credit furnishers and fail to forward dispute documentation face claims for punitive damages under the Fair Credit Reporting Act; violation of the Fair Credit Reporting Act presents a violation of Pennsylvania's Consumer Protection Law);
- *Lawrence v. Trans Union, LLC*, 296 F. Supp. 2d 582 (E.D. Pa. 2003) – same.
- *Wisneski v. Nationwide Collections, Inc.*, 227 F.R.D. 259 (E.D. Pa. 2004) – in fair debt class action, Pennsylvania federal court held for the first time that statutory net worth limitation is not limited to balance sheet net worth, and includes equity, capital stock and goodwill.
- *Evantash v. G.E. Capital Mortgage Services, Inc.*, 2003 WL 22844198 (E.D. Pa. 2003) – in fair credit reporting case, court held that technical accuracy is not a defense.
- *Sheffer v. Experian Information Solutions, Inc.*, 2003 WL 21710573 (E.D. Pa. 2003) – federal court held that Fair Credit Reporting Act permits as recoverable damage emotional distress in trying to correct errors in a consumer's credit file, even where no pecuniary or out-of-pocket losses.
- *Sheffer v. Experian Information Solutions Inc.,* 249 F. Supp. 2d 560 (E.D. Pa. 2003) – federal court held that FCRA provides a private right of action against furnishers of information.
- *Sullivan v. Equifax, Inc. et al.*, 2002 U.S. Dist. LEXIS 7884 (E.D. Pa. 2002) – federal court held that reporting a debt to a credit reporting agency is a communication covered by the Fair Debt Collection Practices Act;
- *Wenrich v. Cole*, 2000 U.S. Dist. LEXIS 18687 (E.D. Pa. 2000) – federal court held that FDCPA provides protection for all persons, not just consumers; and
- *Jaramillo v. Experian Information Solutions, Inc.*, 155 F. Supp. 2d 356 (E.D. Pa. 2001); 2001 U.S. Dist. LEXIS 10221 (E.D. Pa. 2001) – federal court held that single publication rule does not apply to actions brought for violation of the Fair Credit Reporting Act.

## PRESENTATIONS/LECTURES BY INVITATION

Speaker, *Fair Credit Reporting Act Conference*, National Association of Consumer Advocates, Las Vegas, NV May 1–3, 2015.

Speaker, *Fair Debt Collection Experienced Training Conference,* National Association of Consumer Advocates, Baltimore, MD, March 7–8, 2013

Speaker, *Fair Debt Collection Experienced Training Conference*, National Association of Consumer Advocates, New Orleans, LA, February 23–24, 2012.

Speaker, *Negotiating 101,* National Association of Consumer Advocates, Memphis, TN, May 20–22, 2011

Speaker, *Fair Credit Reporting Act Conference*, National Association of Consumer Advocates, Chicago, IL May 8–10, 2009.

Speaker, *Fair Debt Collection Experienced Training Conference*, National Association of Consumer Advocates, Nashville, TN, March 27–29, 2008.

Speaker, *Litigation Trends: "Getting to Know the Other Team",* 11th Annual DBA International World Championship of Debt Buying, Las Vegas, NV, February 5–7, 2008.

Speaker, *Protecting Vulnerable Consumers and Promoting Marketplace Justice,* Consumer Rights Litigation Conference, National Consumer Law Center, Miami, FL, November 10–13, 2006.

Speaker, *FCRA: Playing to Win,* National Association of Consumer Advocates, Las Vegas, NV, May 5–7, 2006.

Speaker, *Litigating Accuracy Issues With Furnishers of Credit Data*, National Association of Consumer Advocates, New Orleans, LA, June 2–5, 2005.

Speaker, *Understanding Credit Scoring*, Consumer Rights Litigation Conference, National Consumer Law Center, Boston, MA, November 7, 2004.

Speaker, *Litigating Accuracy Issues With Credit Reporting Agencies*, National Association of Consumer Advocates, Chicago, Ill., May 14–16, 2004.

Speaker, *FCRA/Building On Our Success*, National Association of Consumer Advocates, Orlando, FL, March 7–9, 2003.

Speaker, *Protecting Privacy, Ensuring Accuracy*, National Association of Consumer Advocates, Albuquerque, NM, June 1, 2002.

Faculty/Speaker, *Credit Reporting and Debt Collection Litigation*, Municipal Court Judicial Conference (CLE), Pennsylvania, PA, May 6, 1999.

Mr. Mailman has been consistently voted and named one of Pennsylvania's Super Lawyers by *Law and Politics* published by *Philadelphia Magazine* and *Pennsylvania Super* for the years 2004-2016. Mr. Mailman has lectured before judges, lawyers and various professional organizations on the topics of Fair Debt Collection and Fair Credit Reporting litigation. He has also appeared on various news programs to discuss consumer relevant issues.

Mr. Mailman has litigated cases on behalf of victimized consumers throughout Pennsylvania. He concentrates his practice in the areas of Fair Debt Collection, Fair Credit Reporting, unwanted auto calls and texts, Credit Repair Litigation and consumer class actions. He serves as a certified arbitration panelist with the Federal Arbitration Panel and serves on the Editorial Board of the Consumer Financial Services Law Report. Additionally, he is a member of the Pennsylvania Trial Lawyers Association, Philadelphia Trial Lawyers Association, Philadelphia Bar Association, and National Association of Consumer Advocates, and regularly serves on the Philadelphia Bar Association's Federal Courts Committee.

# JOHN SOUMILAS

JOHN SOUMILAS concentrates his practice in consumer protection law, including fair credit reporting, fair debt collection, and consumer class actions. John litigates individual and class action cases primarily in federal court on behalf of victims of identity theft, persons defamed and otherwise harmed by credit errors, individuals harassed and deceived by debt collectors, and many others who are subjected to unwelcome invasions of their privacy, fraud, overcharging and other unfair business or employment practices.

John has been repeatedly recognized by Philadelphia Magazine as a "*SuperLawyer*," a recognition received by only 5% of attorneys in Pennsylvania. Through settlements and verdicts, John has recovered tens of millions of dollars on behalf of victimized consumers and has forced banks, credit bureaus and other businesses to make pro-consumer changes to their records and practices. He was lead class counsel and lead trial counsel in the June 2017 record-breaking $60 million dollar class action jury verdict, the largest verdict in history for a case brought under the Fair Credit Reporting Act.

John is a 1994 cum laude graduate of Rutgers University, where he was inducted into Phi Beta Kappa. He also holds a master's degree in American history from the State University of New York at Stony Brook. John received his law degree cum laude from the Temple University Beasley School of Law in 1999, where he was a member of the Jessup Moot Court and Temple Law Review. He began his legal career by clerking for Justice Russell M. Nigro of the Supreme Court of Pennsylvania.

John is admitted to practice before the United States Courts of Appeals for the Third, Fourth, Sixth, Seventh, Ninth and Eleventh Circuits, the United States District Courts for the District of Colorado, Eastern District of Michigan, Eastern District of Pennsylvania, and the District of New Jersey, as well as the state courts of Pennsylvania and New Jersey. He has also successfully litigated cases on a *pro hac vice* basis throughout the country.

## JURY TRIALS

Tried several cases and obtained among the highest jury verdicts in cases brought under the Fair Credit Reporting Act (FRCA), including the highest known FCRA jury verdicts in California, Pennsylvania and Michigan.

- *Cortez v. Trans Union, LLC,* Civ. No. 05-5684 (E.D. Pa. Apr. 26, 2007)
- *Dixon-Rollins v. Trans Union, LLC*, Civ. No. 09-0646 (E.D. Pa. March 9, 2010)
- *Smith v. LexisNexis Screening Solutions, Inc*., Civ. No. 13-10774 (E.D. Mich. Oct. 24, 2014).
- *Ramirez v. Trans Union, LLC*, No. 12-cv-00632-JSC, 2017 WL 5153280 (N.D. Cal. Nov. 7, 2017).

## APPEALS

Successfully handled several appeals and obtained some of the most favorable appellate decisions for consumers under the FCRA.

- *Seamans v. Temple University,* 744 F.3d 853 (3d Cir. 2014)
- *Cortez v. Trans Union, LLC,* 617 F.3d 688 (3d Cir. 2010).

## CLASS ACTIONS

Has served as class counsel in over two dozen cases, including some of the largest FCRA settlements and verdicts.

- *Flores v. Express Personnel*, C.A. No. 14-cv-03298, (E.D. Pa. Oct. 21, 2016) (several improper background screening practices);
- *Magallon v. Robert Half International, Inc.* WL 8778398 (D. Or. Nov. 10, 2015) (employment candidate notices to late);
- *Ramirez v. Trans Union, LLC*, 301 F.R.D. 408 (N.D. Cal. 2014) (false terrorist alerts on credit reports);
- *LaRocque v. TRS Recovery Services Inc.,* 285 F.R.D. 139 (D. Maine 2012) (deceptive collection letter for returned check and other fees);
- *Summerfield v. Equifax Info. Servs., LLC,* 264 F.R.D. 133 (D.N.J. 2010) (misrepresenting reinvestigation results of disputed bankruptcies, tax liens and civil judgments listed on credit reports).

## NOTABLE CASES

- *Dennis v. Trans Union, LLC*, 2014 WL 5325231 (E.D. Pa. Oct. 20, 2014) (first court to rule that consumer may sue credit reporting agency for failing to identify private vendors of public records information placed on consumer's credit file);
- *Schwartz v. Aracor Search & Abstract, Inc*., 2014 WL 4493662 (E.D. Pa. Sept. 11, 2014) (upholding compensatory and punitive damages judgment against title company that misappropriated certain funds at real estate closing);
- *Ferguson v. Wells Fargo Bank, NA*, 538 Fed. Appx. 782 (9th Cir. 2013) (reversing summary judgment for bank that failed to properly remove bankruptcy notation);
- *King v. General Info. Servs., Inc*., 903 F. Supp. 2d 303 (E.D. Pa. 2012) (first court to uphold constitutionality of FCRA's obsolescence provision);
- *Howley v. Experian Info. Solutions, Inc*., 813 F. Supp. 2d 629 (D.N.J. 2011) (first court to find that consumer may sue credit reporting agency that improperly disclosed his information to an identity thief);
- *Adams v. LexisNexis Risk & Info. Analytics Group, Inc*., 2010 WL 1931135 (D.N.J. May 12, 2010) (first court to find that consumers may sue under FRCA over information in specialty Accurint report used by debt collectors); and
- *Shames-Yeakel v. Citizens Financial Bank*, 677 F. Supp. 2d 994 (N.D. Ill. 2009) (first court to rule that consumer may proceed to jury trial on claim that bank breached its duty to sufficiently secure its online banking system).

## LECTURES / PUBLICATIONS

John is a regular lecturer on consumer matters, including for the National Business Institute, National Consumer Law Center, Practicing Law Institute, National Association of Consumer Advocates, and other organizations. John has been interviewed and quoted concerning many legal issues affecting consumers by a wide range of media outlets, from the Wall Street Journal and

Forbes Magazine to Consumer Reports and Free Speech Radio. He has authored several popular and scholarly articles, including *Predatory Lending, the FCRA and the FDCPA* (NBI 2009) and *How Can I Combat Identity Theft* (Philadelphia Magazine, Dec. 2008).

## DAVID A. SEARLES

DAVID A. SEARLES, of counsel to the firm, is admitted to practice before the Supreme Court of the United States, the United States Courts of Appeals for the Third, Fourth and Sixth Circuits, and the United States District Courts for the District of Maryland, the District of Colorado, the Northern District of Oklahoma, and Eastern and Middle Districts of Pennsylvania, as well as the state courts of Pennsylvania. He is a graduate of the American University School of Law, Washington, D.C., where he served on law review.

Following graduation from law school, Mr. Searles was an attorney for Community Legal Services of Philadelphia, where he specialized in consumer and bankruptcy law. In 1990, he successfully argued the first consumer reorganization bankruptcy case considered by the U.S. Supreme Court, *Pennsylvania v. Davenport*, 495 U.S. 552 (1990), and has served as lead counsel and presented argument in numerous consumer law cases before the United States Court of Appeals for the Third Circuit. From 1992 through 1997, Mr. Searles was associated with the Philadelphia law firm of Drinker Biddle & Reath LLP, where his practice focused on Chapter 11 bankruptcy and creditors' rights. Thereafter, he was a member of Donovan Searles, LLC until 2011, specializing in consumer class action litigation.

In 2005, Mr. Searles was awarded the Equal Justice Award at the Community Legal Services Breakfast of Champions for his role in directing funding for legal assistance for low-income residents of Philadelphia. Mr. Searles has served as the Pennsylvania contributor to SURVEY OF STATE CLASS ACTION LAW (ABA Section of Litigation – 2010), and as a contributing author of PENNSYLVANIA CONSUMER LAW (2010). He has taught advanced bankruptcy law at the Rutgers University School of Law – Camden, business law at Widener University and bankruptcy law at Pierce Junior College, Philadelphia. He is a past co-chairperson of the Education Committee of the Eastern District of Pennsylvania Bankruptcy Conference. Mr. Searles has been named a Pennsylvania Super Lawyer for many years.

### CLASS ACTIONS

*Patel v. Trans Union, LLC,* 2018 WL 1258194 (N.D. Ca. March 11, 2018);

*Carter v. Shalhoub Management Company, Inc.,* 2017 WL 5634300 (C.D. Ca. March 15, 2017);

*Flores v. Express Services, Inc.,* 2017 WL 1177098 (E.D. Pa. March 30, 2017);

*Miller v. Trans Union, LLC*, 2017 WL 412641 (M.D. Pa. Jan. 18, 2017);

*Larson v. Trans Union, LLC*, No. 12-5726 (N.D. Ca. June 26, 2015);

*Blandina v. Midland Funding, LLC,* 2014 WL 7338744 (E.D. Pa. Dec. 23, 2014);

*King v. General Information Services, Inc.*, C.A. No. 2:11-cv-06850 (E.D. Pa. Nov. 4, 2014);

*Robinson v. General Information Services, Inc.*, C.A. No. 2:11-cv-07782 (E.D. Pa. Nov. 4, 2014);

*Jones v. Midland Funding, LLC*, 2013 WL 12286081 (D. Conn. Dec. 3, 2013);

*Sapp v. Experian Information Solutions, Inc.,* 2:10-cv-04312 (E.D. Pa. Jan. 29, 2013);
*Reibstein v. Rite Aid Corporation,* 2011 WL 192512 (E.D. Pa. Jan. 18, 2011);
*McCall v. Drive Financial,* January Term 2006, No. 0005 (C.P. Phila. July 20, 2010);
*Serrano v. Sterling Testing Systems, Inc.,* 711 F.Supp.2d 402 (E.D. Pa. 2010);
*Summerfield v. Equifax Information Services, LLC,* 264 F.R.D. 133 (D.N.J. 2009);
*Chakejian v. Equifax Information Services, LLC,* 256 F.R.D. 492 (E.D. Pa. 2009);
*Barel v. Bank of America,* 255 F.R.D. 393 (E.D. Pa. 2009);
*Markocki v. Old Republic National Title Ins. Co.,* 254 F.R.D. 242 (E.D. Pa. 2008);
*Strausser v. ACB Receivables Management, Inc.,* 2008 WL 859224 (E.D. Pa. Mar. 28, 2008);
*Allen v. Holiday Universal, Inc.,* 249 F.R.D. 166 (E.D. Pa. 2008);
*Cohen v. Chicago Title Insurance Company,* 242 F.R.D. 295 (E.D. Pa. 2007);
*Jordan v. Commonwealth Financial Systems, Inc.,* 237 F.R.D. 132 (E.D. Pa. 2006);
*Braun v. Wal-Mart Stores, Inc.,* 2005 WL 3623389 (C.P. Phila. Dec. 27, 2005);
*Perry v. FleetBoston Financial Corp.,* 229 F.R.D. 105 (E.D. Pa. 2005);
*Beck v. Maximus, Inc.,* 2005 WL 589749 (E.D. Pa. March 11, 2005);
*Stoner v. CBA Information Services,* 352 F.Supp.2d 549 (E.D. Pa. 2005);
*Orloff v. Syndicated Office Systems, Inc.,* 2004 WL 870691 (E.D. Pa. April 22, 2004);
*Petrolito v. Arrow Financial Services, LLC,* 221 F.R.D. 303 (D. Conn. 2004);
*Piper v. Portnoff Law Associates, Ltd.,* 216 F.R.D. 325 (E.D. Pa. 2003);
*Bonett v. Education Debt Services, Inc.,* 2003 WL 21658267 (E.D. Pa. 2003).

## GEOFFREY H. BASKERVILLE

GEOFF BASKERVILLE is admitted to practice before the United States District Court for the Eastern District of Pennsylvania, the United States District Court for the District of New Jersey, as well as the Pennsylvania and New Jersey state courts. He is a 1982 graduate of Gettysburg College and a 1992 graduate of the Dickinson School of Law. During law school, Mr. Baskerville published an article entitled *Human Gene Therapy: Application, Ethics and Regulation* in the Dickinson Law Review, Vol. 96, No. 4.

Since graduating from law school, Mr. Baskerville has worked for both plaintiff and defense litigation firms practicing in the areas of medical malpractice, architect's and engineer's malpractice, the Federal Employer's Liability Act, and trucking litigation. In 2007, Mr. Baskerville began to practice in the area of consumer protection litigation, including fair credit reporting and fair debt collection.

Mr. Baskerville is an active member of his community and volunteers his time by serving on his local Land Use Board and Historic Preservation Commission.

## LAUREN KW BRENNAN

LAUREN BRENNAN joined Francis Mailman Soumilas, P.C. in 2013, and concentrates her practice on class action litigation on behalf of consumers harmed by credit reporting errors, inaccurate employment background screening, abusive debt collection practices, and other unfair and fraudulent trade practices.

Ms. Brennan is a 2008 graduate of Swarthmore College where she majored in political science and English literature. Ms. Brennan received her J.D. *cum laude* from Temple University's Beasley School of Law, where she was a Beasley Scholar and a member of the Temple Political & Civil Rights Law Review. While in law school, Ms. Brennan worked as a law clerk at the Federal Trade Commission Bureau of Consumer Protection, and served as a judicial intern for Chief Judge Eric L. Frank of the U.S. Bankruptcy Court for the Eastern District of Pennsylvania.

Ms. Brennan is admitted to practice in the U.S. Courts of Appeal for the Third, Seventh, Ninth, and Eleventh Circuits, in the state courts of Pennsylvania and New Jersey, as well as before the United States District Court for the Eastern District of Pennsylvania and the United States District Court for the District of New Jersey.

## JORDAN M. SARTELL

Jordan M. Sartell joined Francis Mailman Soumilas, P.C. in 2017 and litigates on behalf of consumers damaged by erroneous credit reports, inaccurate employment background checks, abusive debt collection practices, and other deceptive and unfair business practices.

A *summa cum laud*e graduate of the DePaul University College of Law and member of the DePaul Law Review, Jordan began his legal career protecting vulnerable senior citizens from financial exploitation with Prairie State Legal Services in Wheaton, Illinois. His consumer protection practice with the Zamparo Law Group focused on debt collection abuses and credit reporting litigation. Jordan is admitted to practice in Illinois and before the United States District Court for the Northern District of Illinois.

Jordan lives in suburban Chicagoland with his wife and children where he volunteers regularly with the Willow Creek Community Church Legal Aid Ministry. He is a member of the National Association of Consumer Advocates, the DuPage County Bar Journal Editorial Board, and the DuPage County Volunteer Money Management Program Advisory Board.

## ALEXIS I. LEHMANN

Alexis I. Lehmann, joined Francis Mailman Soumilas, P.C. in 2016 and represents individual consumers' rights under the Fair Debt Collections Practices Act and the Fair Credit Reporting Act, in addition to various other consumer protection laws. Prior to joining FMS, Alexis worked as a civil litigator for local and state law enforcement officers handling cases under

Title VII, The Americans With Disabilities Act, The Age Discrimination in Employment Act and the First Amendment Free Speech and Petition Clause. She has won several jury trials, most notably a $1.97 million-dollar verdict against the Pennsylvania State Police in 2014 for discrimination in employment, and violations of the First Amendment and Equal Protection clause.

Alexis received her J.D. in 2009 from the University of Detroit Mercy School of Law. While attending law school, she received a Book Award for achieving excellence in Employment Discrimination and was an active member in the Women's Law Caucus. In 2007 she clerked for The Honorable Nicholas Tsoucalas in the New York Federal Court of International Trade, assisting in drafting opinions regarding trade adjustment benefits, countervailing duties and classifications of imported goods. Alexis obtained her Bachelor of Arts degree from Temple University where she was an NCAA scholarship athlete and four time All-American.

Alexis is admitted to practice in the Supreme Court of Pennsylvania, the Pennsylvania Eastern District Court, and the Court of Appeals for the Third Circuit.

## JOSEPH GENTILCORE

Joseph Gentilcore focuses his practice on Fair Credit Reporting Act cases and other consumer protection matters under both state and federal law. He currently represents consumers in cases against credit card companies, banks, debt collectors, mortgage servicers and background check companies. Prior to joining FMS, Joseph worked with a New Jersey law firm helping to expand their consumer protection practice, and successfully litigated cases against numerous large financial institutions.

Joseph graduated Ursinus College in 2008, and Temple University School of Law in 2011. While still a student at Temple, he was certified to formally participate in legal proceedings and represented Pennsylvania in criminal misdemeanor trials in Philadelphia. Joseph was also on the executive board of Temple's Moot Court Honors Society. Every year since 2013, Joseph has been named a Rising Star by Pennsylvania Super Lawyers.

Joseph is licensed to practice in Pennsylvania and New Jersey, and is admitted in numerous federal districts throughout the country.

### The Firm's Staff

The firm employs a highly qualified staff of paralegals, legal assistants and secretaries to advance its objectives.